# Exhibit Index

**Tab**

Memorandum Opinion and Order, ECF 305 ..................................................... Ex. 1

Complaint, ECF 1 ............................................................................................ Ex. 2

Amended Complaint, ECF 20 ........................................................................... Ex. 3

Memorandum Opinion and Order, ECF 315...................................................... Ex. 4

Intervenor Defendants' Post-Trial Memorandum of Law, ECF 282................. Ex. 5

Order, ECF 161 ............................................................................................... Ex. 6

Plaintiff States' Opposed Rule 59(e) Motion to Reconsider Judgment,

ECF 310 ..................................................................................................... Ex. 7

**Ex. 1: Memorandum Opinion and Order, ECF 305**

United States District Court
Southern District of Texas
**ENTERED**
March 08, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § § § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of U.S. Citizenship and Immigration Services, in her official capacity; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity, | § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

This is an immigration case focusing on a new parole process created by the Department of Homeland Security ("DHS") called the CHNV Parole Program (interchangeably, the "CHNV Parole Program" or the "Program"). The Program grants a pathway for parole in the United States to nationals from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV nationals"). The Program provides up to a two-year parole for up to 30,000 qualifying CHNV nationals per month—360,000 per year. DHS argues that 8 U.S.C. § 1182(d)(5) gives it the authority to implement the Program. Plaintiffs, a collection of 21 States,[1] disagree arguing that the scope of the CHNV Parole Program exceeds the authority given to DHS by Congress under that statute. The Parties do agree, however, that the record establishes that the number of CHNV nationals entering the United States since the Program's implementation has dramatically decreased by as much as 44 percent. Plaintiffs, therefore, are unable to demonstrate that they have been injured by the Program, and as a result, they lack standing to bring these claims. In reaching this conclusion, the Court does not address the lawfulness of the Program. The Court may only reach that question after a plaintiff has established that it has standing.

In recent years there has been an immigration crisis at the Southwest border of the United States with devastating effects. *See, e.g.*, *Florida v. United States*, 660 F.Supp.3d 1239, 1247 (N.D. Fla. 2023), *appeal docketed*, No. 23-11642 (11th Cir. May 17, 2023); *State of*

---

[1]    Plaintiffs are 21 states including Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming.

*Tex. v. U.S. Dep't of Homeland Sec.*, No. 2:23-CV-00055, <u>2023 WL 8285223</u>, at *3 (W.D. Tex. Nov. 29, 2023); *see also State v. United States Dep't of Homeland Sec.*, <u>88 F.4th 1127, 1130</u> (5th Cir. 2023), *vacated sub nom. Dep't of Homeland Sec. v. Tex.*, No. 23A607, <u>2024 WL 222180</u> (U.S. Jan. 22, 2024).  From 2011 to 2017, encounters[2] along the Southwest border averaged fewer than 400,000 per year.  In 2022, however, DHS reported *more than 2.2 million encounters*—a nearly 600 percent increase.

Of particular concern for DHS has been a surge in migration of CHNV nationals, who are attempting to enter the United States in unprecedented numbers.  When a CHNV national is encountered attempting to enter the United States, DHS is placed in a difficult position.  For a variety of reasons, DHS's ability to remove or return CHNV nationals to their home countries is limited.[3]  Thus, when a CHNV national is encountered, they are given a "conditional release."  A conditional release consists of issuing the alien[4] a Notice to Appear ("NTA"), and then releasing them into the United States.  The NTA requires— or at least requests—that the alien self-report to an immigration judge.  These conditional releases have now become routine.  For example, between May 1 and October 17 of 2022,

---

[2]    By "encounter," the Court refers to any situation in which either U.S. Customs and Border Protection or U.S. Border Patrol discovers an alien attempting to enter the United States unlawfully.  *See, e.g., Reporting Terminology and Definitions,* <u>https://www.dhs.gov/ohss/about-data/glossary</u> (last visited March 8, 2024).

[3]    *See infra* I<u>I.C.4</u>.

[4]    The Court understands that some may find the term "alien" offensive, and the Court's intent is certainly not to offend.  The term is used in this opinion because it is contained in the statutes as well as official government documents quoted by the Supreme Court in a seminal immigration case.  *See Arizona v. United States,* <u>567 U.S. 387, 397</u>, <u>132 S.Ct. 2492, 2500</u>, <u>183 L.Ed.2d 351</u> (2012).  Moreover, "alien" and "immigrant" are different and defined statutory terms.  *Compare* <u>8 U.S.C. § 1101(a)(3)</u> *with id.* § 1101(a)(15).

an estimated 113,229 Venezuelan nationals were encountered at the Southwest border, and 99,055—87 percent—of them were conditionally released.[5]

In January 2023, DHS announced the CHNV Parole Program.  According to DHS, the Program would alleviate some of the difficulties caused by CHNV nationals illegally entering the United States at such a high rate.  Under the Program, CHNV nationals can apply to DHS for a two-year grant of parole in the United States.  But before applying, they must first find a "supporter"—a U.S. citizen or resident that agrees to provide them with financial support for the duration of their parole.  Once a supporter is designated and fills out an online request and declaration, a CHNV national may apply to DHS for advance authorization to travel to the United States.  If given advance authorization, the CHNV national may fly to an interior port of entry where a U.S. Citizenship and Immigration Services ("USCIS") agent will determine whether to grant parole.

As far as DHS is concerned, the Program has been a tremendous success.  From October 2022 to June 2023, DHS has adjudicated 194,683 applications from CHNV nationals hoping to become beneficiaries of the program and approved 189,942 of them—an approval rate of 97.5 percent.

After the Program was implemented, twenty-one states filed suit against Defendants.[6]  Plaintiffs argue the Program should be set aside for three reasons: (1) the

---

[5]     (Dkt. No. 264 at 321).

[6]     Defendants are DHS, DHS Secretary Alejandro Mayorkas, in his official capacity, USCIS, Ur Jaddou, in her official capacity as USCIS Director, U.S. Customs and Border Protection, Troy Miller, in his official capacity as Acting Commissioner of CBP, U.S. Immigration and Customs Enforcement, and Patrick "P.J." Lechleitner, in his official capacity as Acting Director of ICE.

(continue)

Program exceeds any authority given to Defendants under Title 8 Section 1182(d)(5), (2) the Program failed to include a notice-and-comment period, and (3) the Program is arbitrary and capricious.  The Court held a bench trial on August 23–25, 2023.

But before this Court may address the merits of Plaintiffs' claims, the Constitution requires Plaintiffs to demonstrate that they have standing to bring suit.  For the reasons explained below, they have not done so.  The Court will first address certain evidentiary issues that have arisen along the way.

## I.   EVIDENTIARY ISSUES

Intervenors filed a Motion to Strike Extra-Record Evidence in Texas's Post-Trial Brief.  (Dkt. No. 292).  The Motion asks the Court to strike all references and citations to four categories of U.S. Customs and Border Protection ("CBP") data cited in Texas's Post-Trial Brief.  (*Id.* at 1–2).  Those categories are:

(1)   CBP data describing nationwide encounters of CHNV aliens through August 2023;

(2)   CBP data describing nationwide encounters of aliens of all nationalities through August 2023;

(3)   CBP data describing encounters along the Southwest border of aliens of all nationalities through August 2023; and

(4)   CBP data describing nationwide encounters of aliens of all nationalities except CHNV countries through August 2023.

(*Id.* at 2).  Intervenors argue this data should be stricken for three reasons.  First, Texas's introduction of the evidence is incompatible with this Court's instruction that the record

---

Valerie Laveus, Paul Zito, Francis Arauz, Eric Sype, Dr. Kate Sugarman, Dr. Nan Langowitz, and Dr. Germán Cadenas (the "Intervenors") joined this lawsuit several months later.

closed at trial. (*Id.*). Second, permitting Texas to supplement the record would implicate fairness and due process concerns and prejudice Intervenors who had no opportunity to examine, interrogate, or rebut it within the procedural safeguards of trial. (*Id.*). And third, Texas's characterization of the Post-Trial Data is misleading. (*Id.*). The Court disagrees.

The Federal Rules of Evidence allow courts to take judicial notice of adjudicative facts. *See* Fed. R. Evid. 201. Facts subject to judicial notice are those which are "not subject to reasonable dispute" because they are (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Courts *may* take judicial notice *sua sponte*. Fed. R. Evid. 201(c)(1). And they *must* "take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). A request to take judicial notice may be done by brief. *See MAZ Encryption Techs., LLC v. Blackberry Ltd.*, 347 F.Supp.3d 283, 293 (N.D. Tex. 2018) (citing *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 423 (5th Cir. 2013)). "On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed. R. Evid. 201(e). "If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard." *Id.* An "opponent's opportunity to address the issue in briefing is sufficient to provide the opportunity to be heard regarding the propriety of taking judicial notice of facts." *MAZ*, 347 F.Supp.3d at 293 (citing *Ctr. for Biological Diversity*, 704 F.3d at 423).

Courts "may take judicial notice at *any stage* of the proceeding."  Fed. R. Evid. 201(d)

(emphasis added).

Texas requested the Court to take judicial notice of certain sets of CBP data

released after trial.  (*See* Dkt. No. 285 at 21–26).  That data has been supplied to the Court.

(*See id.* at 22–26).  Intervenors have not demonstrated that the data is inaccurate or that

taking judicial notice is inappropriate.  The Rules require judicial notice here.  *See* Fed. R.

Evid. 201(c)(2).  Accordingly, the Court **DENIES** the Motion and considers the contested

facts as part of the record in determining the merits of the case.[7]

## II.   FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance

of the evidence.

### A.   THE PARTIES

1.      Plaintiffs in this suit are a group of twenty-one states—Texas, Alabama,
Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi,
Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West
Virginia, and Wyoming.

2.      DHS implements the Parole Program. DHS oversees Defendants USCIS,
CBP, and Immigration and Customs Enforcement ("ICE").

3.      Defendant Alejandro Mayorkas is the Secretary of DHS.  He administers
the Program challenged here.

4.      Defendant Troy Miller is the Senior Official Performing the Duties of the
Commissioner of CBP.  He administers important aspects of the challenged Program,
including the CBP One application.

---

[7]     Also contained in the Motion is Intervenors' request that the Court take judicial notice
of certain data and other publicly available sources offered by Intervenors.  (Dkt. No. 292 at 9 n.3).
The request is unopposed.  (*See* Dkt. No. 298 at 8).  The request is **GRANTED.**

5.     Defendant Patrick "P.J." Lechleitner is the Acting Director of ICE.  He administers important aspects of the challenged program.

6.     Defendant Ur Mendoza Jaddou is the Director of USCIS.  She administers important aspects of the challenged program.

### B.   Relevant Statutes

7.     This case involves 8 U.S.C. § 1182(d)(5).  Paragraph A of that subsection provides:

> The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

8.     Paragraph B of that subsection continues:

> The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

*Id.* § 1182(d)(5)(B).

### C.   The CHNV Parole Program

#### 1.   Crisis on the Southwest Border

9.     Increases in immigration at the Southwest border during the current administration in particular have strained DHS's operational capacity.  These surges are driven in large part by an  increase in migration from Cuba, Haiti, Nicaragua, and

Venezuela ("CHNV")—countries from which DHS has never encountered migration at these levels in its history.  (Dkt. No. 264 at 316).

10.     This increase has been especially challenging because it is difficult for DHS to remove CHNV nationals to their home countries.  (*Id.* at 320); *see also infra* II.C.4.

## 2.     **The Program**

11.     In an attempt to alleviate the migration crisis at the Southwest border, on December 22, 2022, DHS and Secretary Mayorkas issued a decision memorandum that created a new parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela—the CHNV Parole Program.  (Dkt. No. 263 at 76, 80, 84, and 88).

12.     On January 5, 2023, President Biden and Defendants announced the creation of the CHNV Parole Program.  (*Id.* at 2–4).

13.     According to a DHS press release, the Program was designed to "provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border."  (*Id.* at 3).

14.     Under the Program, CHNV nationals can "seek advance authorization to travel to the United States, and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization[.]"  (*Id.*).  This authorization is subject to certain background check and public health requirements as well as the CHNV national obtaining a "supporter in the United States who commits to providing financial and other support[.]"  (*Id.*).

15.     Defendants further decreed that the Program "will allow up to 30,000 qualifying nationals per month from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period."  (*Id.*).

16.     On January 6, 2023, USCIS published a webpage[8] for this new program entitled "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans."  (*Id.* at 6).

17.     The webpage listed the basic requirements for the Program as they were contained in DHS's announcement the day prior, but added additional details, including:

a.     The "supporter" agrees to provide the CHNV national with financial support for the duration of their parole in the United States and begins the process by filing a Form I-134A "Online Request to be a Supporter and Declaration of Financial Support." (*Id.* at 7).

---

[8]     https://www.uscis.gov/CHNV (last visited March 8, 2024).

b.     There is no cost to apply for the Program for the CHNV national or the "supporter."  (*Id.* at 6).

c.     "Supporters" can include: U.S. citizens and nationals; lawful permanent residents, lawful temporary residents, and conditional permanent residents; nonimmigrants in lawful status (who maintain their nonimmigrant status and have not violated any of the terms or conditions of their nonimmigrant status); asylees, refugees, and parolees; individuals granted Temporary Protected Status; and, beneficiaries of deferred action (including deferred action for childhood arrivals) or deferred enforced departure.  (*Id.* at 7).

d.     The beneficiaries of the Program can be any national of Cuba, Haiti, Nicaragua, or Venezuela, plus their immediate family members.  However, beneficiaries cannot be minor children traveling without adults.  (*Id.* at 8–10).

e.     Upon approval of a Form I-134A, the CHNV national is authorized to travel to the United States at their own expense, and upon arrival, will be considered for parole into the United States.  (*Id.* at 12).

f.     In July 2023, DHS updated the supporter form, Form I-134A, for the CHNV processes to include a new question: "[a] grant of parole is a discretionary determination granted on a case-by-case basis for urgent humanitarian reasons or significant public benefit.  Please explain why a favorable exercise of discretion is merited for this individual."  Both USCIS and CBP Office of Field Operations officers have access to the response to this question to inform their decision making.  (Dkt. No. 264 at 66, 70).

18.     On January 9, 2023, the Department published four separate notices in the Federal Register regarding the implementation of the CHNV Parole Program—one for each eligible nationality.[9]  (*Id.* at 315–16).

19.     The Federal Register notices do not substantively differ from the webpage's content, explaining the general parameters of the Program and qualifications.  The notices do, however, offer more analysis on why the Program allegedly comports with 8 U.S.C. § 1182(d)(5).  *See, e.g.*, 88 Fed. Reg. at 1260–63.

---

[9]     *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); and Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

20.     Defendants did not publish advance notice of the Program in the Federal Register before posting the Program's details on the webpage.

21.     Defendants provide three reasons for why a notice-and-comment period was not required.  First, "the Department is merely adopting a general statement of policy[.]"  Second, the Program is exempt "because it involves a foreign affairs function of the United States[.]"  And third, "there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable."  88 Fed. Reg. at 1264–65.

22.     Defendants did not explain or analyze how they would remove CHNV nationals paroled through the Program after the authorized parole period despite admitting general difficulty in removing such individuals to their home countries.

23.     Defendants did not consult Plaintiffs about the potential effects of the Program or the ability of Plaintiffs to provide services to CHNV nationals paroled through the Program.

24.     Defendants did not explain any mechanism for recovering funds from "supporters" who do not actually provide for the needs of CHNV nationals paroled under the Program, whether by the Department itself, any federal entity, or by any State.

### 3.     The Program in Application

25.     Once an alien's supporter form is approved, the Program relies on the CBP One smartphone application ("CBP One").  88 Fed. Reg. at 1263–64.  One "function[] of the CBP One app" is its "Advance Travel Authorization ('ATA') functionality used as part of the CHNV parole processes."  88 Fed. Reg. 31314, 31401.

26.     CBP One requires that CHNV nationals "enter limited biographic information into CBP One and submit a live photo" before arriving at a port of entry.  88 Fed. Reg. at 1252, 1264, 1276.

27.     After the CHNV national submits their information through CBP One, "CBP conducts systems checks and vetting to determine the individual's eligibility for the CHNV processes and whether it is appropriate to issue a travel authorization."  (Dkt. No. 263–2 at 46).

28.     After a travel authorization is granted, a CBP officer considers the request for parole at the port of entry on an individualized, case-by-case basis.  CBP has, when making this determination, denied parole for aliens who traveled with advance travel authorization pursuant to the CHNV processes.  (Dkt. No. 264 at 340).

29.     Individuals are generally ineligible for consideration for parole under these processes if they have entered the United States unlawfully or irregularly crossed the Mexican or Panamanian border after January 9, 2023.  88 Fed. Reg. at 1,252, 1,263, 1,276, 1,279.

### 4.     Agreement with Mexico

30.     Prior to the Program, when a CHNV national was detained for illegally entering the United States, DHS faced significant challenges in returning the alien back to their home country.  (Dkt. No. 264 at 320).

31.     For example, Venezuela currently does not allow repatriations via charter flights, which significantly restricts DHS's ability to remove Venezuelan nationals. Nicaragua currently allows only one charter removal flight every 15 days, equivalent to two percent of Nicaraguan encounters in 2022.  And while DHS has recently restarted removal flights to Cuba, conducting a flight on April 24, 2023, and another on May 10, 2023, following a pause in operations since February 2020 as a result of the COVID-19 pandemic, the cadence and volume at which DHS can facilitate such removals does not keep pace with the number of Cuban nationals DHS has encountered at times.  While DHS can operate removal flights to Haiti, the precarious security situation on the ground there, including the security situation at the airport, has at times raised operational challenges in doing so.  (*Id.*).

32.     As a result, DHS claims that 96 percent of CHNV nationals detained while attempting entry in 2022 could not be removed by DHS under the Title 42 public health order.  Instead, they were generally excepted from the order and processed pursuant to Title 8.  And under Title 8 processing, the alien generally wound up being conditionally released into the country.  (*Id.* at 320–21).

33.     To ameliorate these issues, the Program was conditioned on an agreement with Mexico.  88 Fed. Reg. at 1,243–44, 1,256, 1,267–68, 1,279.  Specifically, because the Program would require CHNV nationals to enter the United States via an interior port of entry—as opposed to traveling through Mexico to reach the Southwest border—the Government of Mexico agreed to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect.[10]

---

[10]     *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration (last visited March 8, 2024); U.S. Dep't of Homeland Sec., *DHS and DOJ Finalize Rule to Incentivize Use of Lawful Immigration Pathways* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/dhs-and-doj-finalize-rule-incentivize-use-lawful-immigration-pathways (last visited March 8, 2024).

34. The Government of Mexico has indicated that its willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States. (Dkt. No. 264 at 318, 331).

D. **RESULTS OF THE PROGRAM SO FAR**

<u>35</u>. From October 2022 to June 2023, 71,633 Venezuelans applied to the Program. DHS adjudicated 60,422 of the applications. Of these, 58,397 applications were approved—an approval rate of 96.6 percent. (Dkt. No. 263-2 at 85).

*36.* From January 2023 to June 2023, 39,699 Nicaraguans applied to the Program. DHS adjudicated 30,930 of the applications. Of these, 29,935 applications were approved—an approval rate of 96.8 percent. (*Id.*).

37. From January 2023 to June 2023, 78,838 Haitians applied to the Program. DHS adjudicated 64,285 of the applications. Of these, 63,214 applications were approved—an approval rate of 98.3 percent. (*Id.*).

38. From January 2023 to June 2023, 44,360 Cubans applied to the Program. DHS adjudicated 39,046 of the applications. Of these, 38,396 applications were approved—an approval rate of 98.3 percent. (*Id.*).

39. The total number of Program applicants from October 2022 to June 2023 was 234,530. Of these, DHS adjudicated 194,683 of the applications. 189,942 applications were approved—a total Program approval rate of 97.6 percent. (*Id.*).

E. **EFFECTS ON TEXAS**

40. Between October 2022 and June 2023, the number of CHNV parolees who listed Texas as their intended destination is 13,990. (Dkt. No. 263-2 at 89).

41. Of the total CHNV parolees for the same period, 17,806 were minors under eighteen, and 2,664 of them reported Texas as their intended address. (*Id.* at 89–90).

1. <u>**An Increase in CHNV Nationals Entering Texas Would Impose Healthcare Costs on the State.**</u>

42. The Texas Health and Human Services Commission ("HHSC") provides two different categories of services and benefits to aliens that Texas has shown would impose costs on the State: Texas Emergency Medicaid and Texas Children's Health Insurance Program (CHIP) Perinatal Coverage ("CHIP Perinatal"). (Dkt. No. 263 at 50).

43. The Emergency Medicaid program is a federally required program jointly funded by the federal government and the states. It provides Medicaid coverage, limited

to emergency medical conditions, including childbirth and labor, to aliens living in the United States. (*Id.* at 51–52).

44.     In May 2023, HHSC estimated expenditures for Emergency Medicaid services provided to CHNV nationals. The expenditure calculations reflect the sum of paid amounts on Emergency Medicaid claims for services to individuals with a country of origin listed as one of those four countries, regardless of immigration status. The expenditure calculations are as follows: $207,000 in 2019; $141,000 in 2020; $123,000 in 2021; $178,000 in 2022; and $30,000 in 2023 (as of May 5, 2023). (*Id.* at 52).

45.     CHIP Perinatal provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. (*Id.* at 53).

46.     In May 2023, HHSC estimated the cost of Texas CHIP Perinatal services provided to aliens from Cuba, Haiti, Nicaragua, and Venezuela. The total estimated cost to Texas for these services was approximately $28,000 in 2019; $37,000 in 2020; $64,000 in 2021; $80,000 in 2022; and $51,000 in 2023 (as of May 5, 2023). (*Id.* at 54). Further, since October 1, 2022, Texas paid an estimate of $47,500 in services for aliens from Cuba, Haiti, Nicaragua, and Venezuela. (*Id.*).

47.     While these figures are estimates, the Court finds that through these two programs, Texas will inevitably expend some health care resources on CHNV nationals who enter the United States under the Parole Program.

### 2.     <u>An Increase in CHNV Nationals Entering Texas Would Impose Incarceration Costs on the State.</u>

48.     According to a 2022 figure, the average cost of incarcerating an inmate who qualifies for reimbursement under the federal government's State Criminal Alien Assistance Program ("SCAAP") in Texas Department of Criminal Justice ("TDCJ") facilities is $77.49 per day. (Dkt. No. 263 at 35).

49.     From July 1, 2020, to June 30, 2021, TDCJ incarcerated 7,058 eligible inmates for a total of 1,984,597 days. Using the 2022 per-day figure, the estimated cost of incarcerating these inmates for that period was $153,786,422. (*Id.*).

50.     Of that amount, SCAAP reimbursed only $17,364,520. Thus, Texas paid approximately $68.74 per day per criminal alien incarcerated in TDCJ facilities. (*Id.*).

51.     Texas, via TDCJ, also incurs costs to keep aliens in custody or add them to mandatory parole or supervision programs when those aliens are not detained or removed by federal immigration authorities. (*Id.* at 36). For example, in Fiscal Year 2022, the average per-day cost of these programs for each inmate not detained or removed is $4.69, which would mean total costs of $9,307,760, based on the most recently completed SCAAP application. (*Id.* at 36).

52.     In all, if the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will also increase. In turn, the net cost to Texas from detaining those aliens will also increase. Similar to Texas's healthcare expenditures, the Court finds that Texas will inevitably expend some incarceration related costs on CHNV nationals who enter the United States under the Program.

### 3.     An Increase in CHNV Nationals Under the Age of 18 Entering Texas Would Impose Education Costs on the State.

53.     Texas is required by both federal and state law to provide alien children with a public-school education.[11]

54.     For each student enrolled in a Texas public school during Fiscal Year 2023, the Texas Education Agency ("TEA") estimates a cost of $9,564 to Texas. (*Id.* at 39).

55.     For students that qualify for the Bilingual and Compensatory Education services, TEA estimates an $11,781 cost per student. (*Id.*).

56.     James Terry, Associate Commissioner for School Finance and Chief School Finance Officer at TEA, authored an affidavit summarizing Texas's education costs. Terry explains the costs by referring to unaccompanied children ("UAC"). He avers that "the total costs to [Texas] of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in [Texas's] public school system increases." (*Id.* at 40).

57.     But UAC cannot be paroled under the Program. Instead, any individual "determine[d] to be an unaccompanied child" is expressly "ineligible for advance authorization to travel to the United States as well as parole under this process." 88 Fed. Reg. at 1,252, 1,263, 1,276.

58.     Accompanied children, however, are eligible for parole under the Program. In fact, between October 18, 2022 and June 30, 2023, 2,664 CHNV parolees under the age of 18 reported Texas as their intended address. (Dkt. No. 263–2 at 89–90).

59.     Although Associate Commissioner Terry speaks in terms of UAC, nothing about the costs Texas incurs for education are exclusive to UAC. Rather, the Court understands Terry's affidavit to mean that Texas is forced to spend, at minimum, $9,564 per student enrolled in the Texas public school systems. (Dkt. No. 263 at 39).

---

[11]     *See generally Plyler v. Doe*, 457 U.S. 202, 230, 102 S.Ct. 2382, 2401–02, 72 L.Ed.2d 786 (1982); *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) ("[T]he State's public education expenditures for the children of undocumented aliens are required by the equal protection clause[.]").

60.     Thus, an increase in CHNV nationals under the age of 18 entering Texas under the Parole Program will inevitably result in at least some costs for Texas.

### 4.     An Increase in CHNV Nationals Seeking Drivers' Licenses Would Not Impose Additional Costs on the State.

61.     Texas makes two arguments with respect to driver's licenses: (1) issuing licenses to CHNV nationals costs Texas money, and (2) for every additional 10,000 requests for a limited term license, Texas is forced to incur costs of hiring more staff and building more facilities.  (Dkt. No. 286 at 14–15).

62.     As to Texas's first argument—that providing limited-term licenses to CHNV nationals will cost Texas—the Court finds that Texas makes a profit administering limited-term licenses.

63.     CHNV nationals paroled into Texas would qualify for a limited-term license.  Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [the Texas Department of Public Safety ("DPS")] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section 521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)."  (Dkt. No. 263 at 21–22).

64.     If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document, parole, or grant of deferred action) and otherwise meets eligibility requirements, DPS will issue a limited-term driver license or personal identification certificate to an alien resident of Texas.  (*Id.* at 22).

65.     A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence.  (*Id.*).

66.     For each paroled CHNV national that applies for a limited-term license, Texas would pay $0.30 for verification services.  Further, Texas estimates that 18% of those customers would require additional verification services, each costing Texas an additional $0.50.  (*Id.*).

67.     DPS also verifies each alien's social security number and eligibility though both the Social Security Online Verification and the American Association of Motor Vehicle Administrators.  This process costs Texas an additional $0.05 per customer.  And

when the customer is seeking a commercial driver's license, Texas pays $0.028 for additional verification.  (*Id.* at 22–23).

68.     The production of each limited-term license card costs Texas $1.35.  (Dkt. No. 264 at 172).

69.     Thus, for each customer seeking a limited-term license, Texas spends a maximum of $2.23.

70.     Texas charges $33 for every limited-term license.  (*Id.* at 169).  Therefore, limited-term license applicants do not cost Texas money.  Instead, the State profits roughly $30 for each license.

71.     As to Texas's second argument—that for every 10,000 CHNV nationals that enter Texas and request a limited-term license, Texas will bear a biennial cost of approximately $2,014,870.80—the Court finds that the evidence in the record is speculative and insufficient.

72.     This amount includes hiring additional staff, opening additional offices, and expanding current facilities.  As support, Texas offers an affidavit from Sheri Gipson, the Chief of DPS.  (Dkt. No. 263 at 23).  In Gipson's affidavit, she states that "[f]or every 10,000 additional customers above the 10,000-customer threshold, DPS *may* have to open additional driver license offices or expand current facilities to meet that increase in customer demand."  (*Id.*) (emphasis added).

73.     Evidence submitted by Intervenors suggests that 10,000 new applicants would not require more offices or expanded facilities.  (*See* Dkt. No. 265-18 at 8).  Cyierra Roldan, Deputy Director of the Immigration Research Initiative, authored a declaration in which she notes that "[i]f 10,000 noncitizens were to reside in Texas due to the parole process and obtain driver's licenses, that would only be a small .16 percent increase to all driver's license transactions and an even smaller .14 percent increase to all transactions, much smaller than the increase due to migrants from other states and individuals turning l6 getting a permit."  (*Id.*).

74.     It is improbable that DPS would be forced to build new offices or expand current facilities because of a .14 percent increase in transactions, and Texas has provided no further evidence or explanation as to how that might be.

75.     In sum, Texas profits on limited-term licenses and has not established that an additional 10,000 license seeking parolees would require Texas to build new offices or spend on expansions.

**5.** **Migration of CHNV Nationals has Decreased Since the Start of the Parole Program**

76.     Despite the high approval rate of Program applications, the record reflects that the Program has resulted in a decrease of CHNV nationals entering the United States.

77.     Specifically, in the five-plus months before implementation of the Program, DHS conditionally released an average of 2,356 CHNV nationals per day into the United States.  (Dkt. No. 264 at 328 n.16, 340–41).

78.     In the nearly five months after the Program started, DHS conditionally released an average of 239 CHNV nationals per day, an additional 297 CHNV nationals were arriving through the new CBP One process per day on average, and an additional 791 CHNV nationals were being paroled through the new CHNV processes per day on average, for a total of 1,326 arrivals of CHNV nationals per day.  (*Id.* at 328 n.16).

79.     Thus, as of May 2023, the total number of CHNV nationals entering the United States had declined from an average of 2,356 per day prior to the Program starting to 1,326 per day in the months after—a 44 percent reduction.  (*Id.*).

80.     The decline in CHNV nationals entering the United States after the rollout of the Program was occurring at the time that Plaintiffs filed their Amended Complaint on February 14, 2023.

81.     For example, the number of Venezuelan nationals attempting to enter the United States substantially decreased following the start of the Venezuelan parole process.  Prior to October 12, 2022, when Venezuela's parole process was announced, DHS was encountering an average of 1,100 Venezuelan nationals per day at the Southwest border.  Within a week of the Venezuelan process announcement, DHS observed the number of encounters per day begin to drop.  By the week ending in January 22, 2023, DHS reported a daily average of just 28 Venezuelan encounters per day.  (*Id.* at 324).

82.     This significant drop in encounters was not just limited to Venezuelan nationals.  Rather, encounters of Cuban, Haitian, and Nicaraguan nationals dropped from a daily average of 1,231, recorded the week before the Program was implemented, to an average of 205 encounters just two weeks later.  (*Id.* at 326).

83.     Taken together, these facts mean that less than a month after the Program was in effect for all four countries, an average of 233 CHNV nationals were being encountered at the Southwest border each day.  About 7,000 per month.  And in all of January, DHS approved 24,744 applications from CHNV nationals to be paroled under the Program.  (Dkt. No. 263-2 at 85).  Assuming each of the estimated 7,000 encountered CHNV nationals were conditionally released, and all 24,744 approved applications

resulted in a CHNV national entering the country on parole, the Court estimates that 31,744 CHNV nationals entered the United States in January 2023.

84.    In the five months preceding the Program, an average of 2,356 CHNV nationals were entering the country per day.  If the Program never went into effect, and that daily average played out into January, the data suggests that 73,036 CHNV nationals would have entered the country in January 2023.  Thus, on February 14, 2023, when Plaintiffs filed suit, fewer CHNV nationals were entering the country compared to before the Program began.

85.    Plaintiffs agree that since the implementation of the Program, CHNV nationals have been entering the United States at a lower rate than before.  At trial, Texas conceded as much:

> THE COURT:  Well, let me ask you this.  I think this is where we get to it.  Is it Texas's position that -- does Texas agree with the statement that at this point as opposed to before the Program, there are fewer aliens coming into the country now as opposed to before the Program from those four countries?
>
> MR. WALTERS (Texas):  That's what the data looks like up through June.
>
> THE COURT:  Okay.

(Trial Transcript (Aug. 25) at 131:24-132:7).

86.    And again:

> THE COURT: So the only evidence in the record, I should say, then, is that the numbers are decreasing –
>
> MR. WALTERS (Texas): Right. So –

(*Id.* at 249:17-249:19).

87.    In conclusion, the Parties agree, and the record reflects, that the number of CHNV nationals entering the United States has dramatically declined from the date the Program commenced through the last date for which data was received by the Court.

## III.    STANDING

A plaintiff must have standing to sue in federal court.  The Supreme Court has distilled the standing doctrine into an "irreducible constitutional minimum" whereby a

plaintiff must demonstrate (1) that he has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent," (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39, 136 S.Ct. 1540, 1547–48, 194 L.Ed.2d 635 (2016). While Plaintiffs would submit that each State has standing, (*see* Dkt. No. 20 at 12–29), only one needs standing to proceed to the merits. *Biden v. Nebraska*, 600 U.S. 477, 489, 143 S. Ct. 2355, 2365, 216 L.Ed.2d 1063 (2023) ("If at least one plaintiff has standing, the suit may proceed."). At the request of Plaintiffs, the Court focuses its standing analysis on Texas. Since there was a final trial on the merits, Texas must prove standing by a preponderance of the evidence. *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021), *as revised* (Dec. 21, 2021) ("*MPP II*"), *rev'd and remanded on other grounds*, 597 U.S. 785, 142 S. Ct. 2528, 213 L. Ed. 2d 956 (2022).[12] Standing is determined at the time the case commenced. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5, 112 S.Ct. 2130, 2142 n.5, 119 L.Ed.2d 351 (1992).

### A.   Injury-In-Fact

To prove an injury in fact, Texas must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (cleaned up). In the context of state challenges to federal immigration policies, states have historically proven

---

[12] For clarity, the Fifth Circuit initially considered various states' challenge to DHS's Migrant Protection Protocols program on a motion for stay pending appeal, and later did so again on the merits. The Court discusses both at various points, and in so doing, the former will be referred to as "*MPP I*," and the latter as "*MPP II*."

injury-in-fact by demonstrating the *additional costs* paid across state-funded industries because of *additional aliens*.  The most common showings include costs absorbed by the state in issuing driver's licenses, administering healthcare, and providing education.  *See*, *e.g.*, *MPP II*, <u>20 F.4th at 968</u>–969 (driver's licenses and healthcare); *Texas v. United States*, <u>50 F.4th 498, 517</u>–518 (5th Cir. 2022) (healthcare and education) ("*DACA*"); *Gen. Land Office v. Biden*, <u>71 F.4th 264, 272</u> (5th Cir. 2023) ("*GLO*") (all three).  The Fifth Circuit made clear recently that these types of fiscal harms remain viable Fifth Circuit caselaw.  *GLO*, <u>71 F.4th at 272</u>.  In this case, Texas alleges precisely these types of harms, submitting that "[t]he increase in the presence of illegal aliens will inflict significant financial costs on Texas, including but not limited to *driver licenses, healthcare, education, as well as enforcement and correctional services*."[13]  (Dkt. No. 286 at 53) (emphasis added); (*see also* Dkt. No. 20 at 12–13); (Dkt. No. 22 at 25).

Both Defendants and Intervenors take issue with the premise that Texas is suffering any injury at all.  As put by Defendants, Texas's theory for standing "was based on allegations that the CHNV processes were likely to increase the number of CHNV nationals in the State and thus increase the State's costs."  (Dkt. No. 284 at 34).  And as observed by Intervenors, the trial record disproves this theory.  (*See* Dkt. No. 282 at 17–18).  Intervenors argue that the undisputed data presented at trial confirms that the CHNV Parole Program has *reduced* the total number of individuals from the four

---

[13]   At trial, Texas asserted quasi-sovereign interests for purposes of availing itself to special solicitude.  But as to injury-in-fact, Texas's basis for standing is dollar damages.  (*See* Dkt. No. 278 at 246).

countries, and consequently, Texas has actually spent less money as a result of the Program.  (*Id.* at 16–18).

Plaintiffs do not dispute either contention: (1) that there are fewer aliens coming into the country from those four countries, or (2) that as a result, Texas is spending less money.  Instead, Plaintiffs argue that the Program can injure Texas for standing purposes *even if* it reduces the rate of overall CHNV migrant flows.  (Dkt. No. 294 at 6–7).  According to Plaintiffs, "the test is whether the challenged program *itself* increases migrant flows, not overall numbers resulting from a multitude of policies and outside forces."  (*Id.*at 6) (emphasis in original).  In other words, Texas suggests that the Court look only to the costs incurred by the nationals that have come through the CHNV Parole Program in a vacuum and ignore the net decrease in costs due to the corresponding decrease in the overall migration of those nationals.

## 1.    Forfeiture of Texas's Revised Theory of Injury-In-Fact

Before considering the merits of the Parties' arguments as to injury-in-fact, the Court must address Intervenors' assertion that the Court should not consider Texas's new theory of harm.  In short, Intervenors argue that "[f]or nearly seven months leading up to trial," Texas complained of harm resulting from an increase in the number of immigrants residing in Texas.  (Dkt. No. 282 at 18).  And once Texas realized "on the eve of trial that the facts were fatal to its theory of harm," Texas swapped its theory by claiming that whether an increase in CHNV nationals occurred is irrelevant, as the Court "can only narrowly consider costs associated with the specific 'paroled aliens' who have entered through the CHNV Pathways."  (*Id.* at 19).  According to Intervenors, Texas is

married to its first theory and has forfeited the alternative theory. (*Id.* at 19–20). The Court disagrees.

It is true that "[a]rguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived." *Ctr. for Biological Diversity v. United States Env't. Prot. Agency*, 937 F.3d 533, 542 (5th Cir. 2019). But there are two key limitations to this principle. First, courts that have applied the forfeiture rule did so when the plaintiffs re-characterized their injury *on appeal*. *See*, *e.g.*, *E.T. v. Paxton*, 41 F.4th 709, 716–17 (5th Cir. 2022); *Durbois v. Deutsche Bank Nat'l Tr. Co.*, 37 F.4th 1053, 1059 (5th Cir. 2022); *United States ex rel. Drummond v. BestCare Lab'y Servs., LLC*, 950 F.3d 277, 285 (5th Cir. 2020); *United States v. Vasquez*, 899 F.3d 363, 380 n.11 (5th Cir. 2018). And while Intervenors offer one New Jersey district court opinion for the proposition that a plaintiff cannot change their theory on standing at the district court stage without amending the pleading, (*see* Dkt. No. 282 at 20 (citing *Oh v. Collecto, Inc.*, No. 2:20-CV-01937, 2021 WL 3732881 (D.N.J. Aug. 23, 2021))), that reasoning does not fit this case.

In *Oh*, a Fair Debt Collection Practice Act case, the plaintiff originally asserted standing based on a letter the plaintiff received requesting certain documentation in connection with a debt. *Id.* at *1. The plaintiff alleged that the contents of the letter violated federal law. *Id.* at *1. At the summary judgment stage, however, the plaintiff added a new theory for standing. That is, the plaintiff argued that she never owed the debt, and the debt collector reported it in a way that negatively impacted her credit. *Id.* at *2. The court found that the new standing theory was precluded. *See id.* at *4–*5. This case is different.

23

Unlike the plaintiff in *Oh*, Texas is not alleging a new injury. Throughout this case, Texas has maintained that its injury is comprised of the same costs to the public fisc. Texas, therefore, has not forfeited the ability to argue that those same costs may be viewed in isolation instead of in comparison with amounts spent in previous years.

Moreover, one of the main drivers for the forfeiture rule is to exclude theories that neither side "had the opportunity to brief[.]" *Ctr. For Biological Diversity*, 937 F.3d at 542. In this case, this consideration also weighs against finding forfeiture because the Parties had ample opportunity to argue—and in fact did argue at length—Texas's theory both (1) at trial, and (2) in post-trial briefing. And while Intervenors argue that they were prejudiced because they "have had no opportunity to seek discovery on Texas's new standing theory," (Dkt. No. 282 at 20), this argument is unpersuasive. As stated above, Texas is not asserting a new injury. In fact, Texas has consistently asserted the same injury throughout this litigation. Instead, faced with the fact that its out-of-pocket costs have declined during the relevant period, Texas simply pivoted to arguing that this reality does not matter for standing purposes. This argument is based on the same facts that supported its original standing argument. For these reasons, Intervenors' forfeiture argument fails.

### 2.   Evaluation of Texas's Alleged Injury-In-Fact

With respect to injury-in-fact, the Parties' disagreement boils down to whether the CHNV Parole Program should be construed as increasing the number of CHNV nationals entering Texas. Specifically, the Parties disagree about what the baseline migration

numbers should be for "before versus after" purposes in evaluating whether Texas has been injured by the Program.

As mentioned, in the five months preceding the Program, DHS conditionally released an average of 2,356 CHNV nationals per day.  (Dkt. No. 264 at 340–42).  And in the nearly five months since the Program's implementation, that figure had dwindled to 1,326.[14]  (*Id.*).  Plaintiffs ask the Court to consider only whether *any* aliens have been released into the United States under the Program.  (Dkt. No. 285 at 18); (Dkt. No. 294 at 6).  If so, the money Texas is required to spend on those aliens is sufficient to establish standing.  (*Id.*).  In other words, there were zero aliens coming in through the Program before it existed, so if any come in under the Program, that is an increase.  (*Id.*); (*see also* Trial Transcript (Aug. 25) at 249:22–249:24).  This theory ultimately fails.

As the Fifth Circuit has warned, "federal courts must consider plaintiffs' *actual injury*—not the labels plaintiffs put on that injury."  *E.T.*, 41 F.4th at 717 (emphasis added).  In assessing injury-in-fact, substance matters.  This is because "the law of standing is

---

[14]    The daily averages submitted by Defendants were calculated with data ranging from before the Program began to May 2023.  This is problematic because, as the Supreme Court has made clear, "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*."  *Davis v. FEC*, 554 U.S. 724, 734, 128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008) (emphasis added).  Plaintiffs filed their Amended Complaint on February 14, 2023.  (Dkt. No. 20).  This date serves as the operative complaint because when a plaintiff "voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."  *Rockwell Intern. Corp. v. United States*, 549 U.S. 457, 474, 127 S.Ct. 1397, 1409, 167 L. Ed. 2d 190 (2007).  Here, no Party submits calculations of CHNV nationals entering the United States using *only* data taken before February 14.  However, as explained in the Court's Findings of Fact, the consistent drop of CHNV encounters since the Program began, partnered with the fact that the Program approves a monthly maximum of 30,000 applications, leaves little room for doubt that the numbers have decreased since the Program's inception.  In fact, Texas concedes as much.  (*See* Trial Transcript (Aug. 25) at 131:24-132:7, 249:17-249:19).

fraught with the danger that plaintiffs will engage in 'artful pleading' to make an end-run around the strictures of Article III." *Id.* Upon review, Plaintiffs' theory on injury-in-fact is unavailing because their proffered re-characterization attempts to skirt the fact that Texas is not financially harmed by the Program. This conclusion is grounded in the way that the term "harm" has long been understood in the immigration context: relative to the status quo, and relative to Plaintiff's position absent the challenged policy.

For most, if not all, recent Fifth Circuit immigration cases, a comparative rise in the number of migrants in the State was the norm. And because of that rise, either of the two dueling theories of injury at issue in this case—(1) looking to the costs incurred under the challenged agency action versus (2) looking to the costs that would have been incurred absent the challenged agency action—would have produced additional costs and, therefore, an injury under either formulation. The Court begins by discussing two of these immigration cases before delving into multiple cases, immigration and beyond, which are much more instructive on how fiscal injuries should be conceptualized. Together, these cases indicate that the latter formulation, looking to the costs that would have been incurred absent the challenged agency action, is the appropriate lens through which the Court must consider the CHNV Parole Program.

In *Texas v. United States,* 809 F.3d 134, 155 (5th Cir. 2015), *as revised*, (Nov. 25, 2015) ("*DAPA*"), *aff'd by equally divided Court*, 597 U.S. 547, 136 S.Ct. 2271, 195 L.Ed.2d 638 (2016), various states challenged a program, Deferred Action for Parents of Americans ("DAPA"), that would give legal status to illegal immigrants who were parents of citizens or lawful permanent residents. *Id.* at 147. The Fifth Circuit held that Texas demonstrated

an injury-in-fact because "DAPA would enable at least 500,000 illegal aliens in Texas" who qualify for the relevant cost-incurring expenses to remain in Texas.  *Id.* at 155.  The Circuit's reasoning in *DAPA* was premised on the fact that the number of people eligible for cost-incurring expenses in Texas would rise under the program.[15]  Similarly, in *DACA*, various states challenged the DACA program, which permitted deferral of the removal of certain aliens and conferred certain benefits upon them.  *DACA*, 50 F.4th at 508.  Texas demonstrated injury-in-fact from "pocketbook injuries on the State in the form of healthcare, education, and social service costs."  *Id.* at 517.  Again, Texas established standing because DACA would indisputably increase the number of aliens in Texas.

These two cases provide guidance because they demonstrate that an injury in the challenge-to-an-immigration-program context is typically premised on an increase in the number of aliens entering under the program, which necessarily leads to increased costs. But these cases do not provide the baseline for comparison purposes.  That is because in *DAPA* and *DACA*, it was not disputed that the number of aliens would increase under the programs and the resulting costs to Texas would increase as well.  *DAPA*, 809 F.3d at 155; *DACA*, 50 F.4th at 509.

While the discussions in *DAPA* and *DACA* did not specify for injury-in-fact purposes whether the proper question is whether Texas's costs increased as compared to pre-program expenditures or whether Texas had to expend any resources at all on aliens covered by the programs, the same cannot be said for *MPP II*, *GLO*, and *Louisiana v. Nat'l*

---

[15]    There was no dispute in *DAPA* that the number of aliens in Texas would increase under the program.

*Oceanic & Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023) ("*LDFW*").  In each of these cases, the Fifth Circuit signaled that injury is relative.

In April 2021, Texas and Missouri challenged DHS's termination of the Migrant Parole Protocols ("MPP"), a program which returned certain undocumented aliens to Mexico for the duration of their removal proceedings.  *MPP II,* 20 F.4th at 941.  In evaluating Texas's alleged injury at the preliminary injunction stage, the Fifth Circuit noted that "MPP's termination has caused an *increase* in unlawful immigration into Texas." *State v. Biden,* 10 F.4th 538, 548 (5th Cir. 2021) (emphasis added) ("*MPP I*").  And on this same issue at the merits stage, the Fifth Circuit asserted that "[t]he district court's *most important finding* was that MPP's termination has *increased* the number of aliens released on parole into the United States, including Texas[.]"  *MPP II,* 20 F.4th at 966 (emphasis added).   Finding that illegal encounters "skyrocketed" since MPP's termination, the Circuit explained that the States' fiscal harms were attributable "precisely [to] that increase[.]"  *Id.* at 968.

In reading the Fifth Circuit's repeated use of "increase" in context, it is clear what the increase is relative to—not zero immigration, but immigration levels prior to the termination of MPP.  The Fifth Circuit's consistent use of comparative and relative verbiage, rather than absolute verbiage, is telling.

The Fifth Circuit's recent holding in *GLO* also illustrates this approach.  There, a group of plaintiffs, including Texas, sued DHS to challenge the manner in which it spent funds that had been appropriated by Congress for the "construction of [a] barrier system along the southwest border." 71 F.4th at 268.  Texas alleged the same type of injuries that

it alleges here, arguing that the State would incur costs "from the increase in unlawful migrants entering and remaining in the State[.]"  *Id.* at 271.  In finding that there was an injury-in-fact for Rule 12(b)(6) purposes, the Fifth Circuit attributed Texas's damages to "*increased* illegal immigration."  *Id.* at 273 (emphasis added).  The Circuit discussed Texas's costs in connection with "the *relative* number of illegal aliens entering Texas," and "*relative* to a non-border wall policy."  *Id.* at 272–73 (emphasis added).  Just as with *MPP I* and *MPP II*, *GLO* considered the situation Texas would be placed in absent the challenged agency action as the baseline for injury-in-fact.  Had the baseline instead been zero, the appropriate inquiry would have merely been whether illegal immigration was occurring at all under the challenged agency action, and this would wholly obviate the before-versus-after comparison.

Finally, the Fifth Circuit has relied on this comparative lens for assessing injuries beyond the immigration context.  In one particularly analogous case, *LDWF*, Louisiana challenged a federal rule requiring certain shrimping vessels in Louisiana waters to use turtle excluder devices.  *LDWF*, 70 F.4th at 875.  In that case, one of Louisiana's purported injuries was the additional strain on Louisiana Department of Wildlife and Fisheries' enforcement resources.  *Id.* at 881.  The Fifth Circuit rejected this argument observing that this position was "necessarily contingent on a finding that the Final Rule will *increase* LDWF enforcement costs" compared to what the LDWF had been paying before the rule.  *Id.* (emphasis added).  Had Texas's proposed theory of injury carried the day, Louisiana would have only needed to show that the LDWF would incur some enforcement costs

attributable to the Final Rule.  Again, the Fifth Circuit considered injury in context, and not in a vacuum.

In sum, when deciding whether a state has been injured for Article III standing purposes, the Fifth Circuit reviews whether the numbers of aliens, and the associated amount expended because of them, increased relative to those same numbers prior to the implementation of the challenged program.  In *MPP II*, the Fifth Circuit declared that the "*most important finding*" was whether the agency action "increased the number of aliens released . . . into the United States."[16]  20 F.4th at 966 (emphasis added).  Here, that "most important finding" results in a different outcome, a decrease.  And in contrast to *GLO*, where Texas's fiscal injuries were tied to an *increase* in the number of illegal entries, the rate of entries here has decreased subsequent to the implementation of the CHNV Parole Program.

The Fifth Circuit has consistently looked to the impact that the challenged agency action had on the State's fiscal interests in *DAPA*, *DACA*, *MPP I*, *MPP II*, *GLO*, and *LDWF*.  And in doing so, the Fifth Circuit has invariably considered whether expenditures increased as compared to pre-agency action expenditures.  In this case, those expenditures declined subsequent to the implementation of the CHNV Parole Program, and the Court has before it a case in which Plaintiffs claim that they have been injured by

---

16   Like in *GLO*, under a baseline-of-zero theory, the Fifth Circuit's reliance on the increase in aliens would have been wholly unnecessary in *MPP I* and *MPP II*.  Applying Texas's proposed theory to *MPP I* and *MPP II*, Texas's bar would have been much lower.  Rather than demonstrating that "MPP's termination has caused an increase in immigration into Texas,"  *MPP I*, 10 F.4th at 548, Texas would have only needed to show that MPP's termination resulted in *any* immigration into Texas.

a program that has actually lowered their out-of-pocket costs.  As a result, the Court finds that Texas has failed to prove that it suffered an injury-in-fact for purposes of Article III standing.[17]

## IV.    CONCLUSION

The Court finds that Plaintiffs have not proven that Texas has suffered an injury and therefore do not have standing to maintain this suit.[18]  This case is **DISMISSED** without prejudice.[19]  The Court **DENIES** all requested relief and will enter a final judgment by separate order.

It is SO ORDERED.

Signed on March 8, 2024.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

---

[17]    Because the Court finds that Texas has not suffered an injury, it need not consider Defendants' other arguments with respect to (1) offsetting benefits, and (2) the viability of indirect costs constituting injury in the wake of *United States v. Texas*, 599 U.S. 670, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023).

[18]    The Court would make one final point.  Proving injury-in-fact in similar challenges—and even for the CHNV Parole Program—is not an insurmountable hurdle.  In this case, Texas was required to prove by a preponderance of the evidence that terminating the Program would reduce migration flow from the four countries or that migrant flow increased as a result of the Program.  Should Texas meet this burden in the future, a different result on this point may follow.

[19]    A case that is dismissed for lack of standing should ordinarily be dismissed without prejudice.  *E.g.*, *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209 (5th Cir. 2010); *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 468 (5th Cir. 2020).

**Ex. 2: Complaint, ECF 1**

**United States District Court**
**Southern District of Texas**
**Victoria Division**

| | |
|---|---|
| STATE OF TEXAS,<br>STATE OF ALABAMA<br>STATE OF ALASKA<br>STATE OF ARKANSAS<br>STATE OF FLORIDA<br>STATE OF IDAHO<br>STATE OF IOWA<br>STATE OF KANSAS<br>COMMONWEALTH OF KENTUCKY<br>STATE OF LOUISIANA<br>STATE OF MISSISSIPPI<br>STATE OF MISSOURI<br>STATE OF MONTANA<br>STATE OF NEBRASKA<br>STATE OF OHIO<br>STATE OF SOUTH CAROLINA<br>STATE OF TENNESSEE<br>STATE OF UTAH<br>STATE OF WEST VIRGINIA<br>STATE OF WYOMING<br> *Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>ALEJANDRO MAYORKAS, in his official<br> capacity as Secretary of Homeland<br> Security;<br>U.S. CITIZENSHIP AND IMMIGRATION<br> SERVICES;<br>UR JADDOU, in her official capacity as<br> Director of U.S. Citizenship and<br> Immigration Services;<br>U.S. CUSTOMS & BORDER PROTECTION;<br>TROY MILLER, in his official capacity as<br> Acting Commissioner of U.S. Customs &<br> Border Protection;<br>U.S. IMMIGRATION & CUSTOMS<br> ENFORCEMENT; and | Case No. _____ |

TAE JOHNSON, in his official capacity as
  Acting Director of U.S. Immigration &
  Customs Enforcement;
    *Defendants.*

## COMPLAINT

1.     The Department of Homeland Security (DHS or Department),
under the false pretense of preventing aliens from unlawfully crossing the
border between the ports of entry, has effectively created a new visa program—
without the formalities of legislation from Congress—by announcing that it
will permit up to 360,000 aliens annually from Cuba, Haiti, Nicaragua, and
Venezuela to be "paroled" into the United States for two years or longer and
with eligibility for employment authorization.

2.     The Department's parole power is exceptionally limited, having
been curtailed by Congress multiple times, and can be used "only on a case-by-
case basis for urgent humanitarian reasons or significant public benefit." 8
U.S.C. § 1182(d)(5)(A). But the Department's new "parole" program allows
aliens *in their home countries* to obtain the benefit of being able to obtain
advance authorization to enter the United States—despite no other basis in
law for them doing so.

3.     The parole program established by the Department fails each of
the law's three limiting factors. It is not case-by-case, is not for urgent
humanitarian reasons, and advances no significant public benefit. Instead, it
amounts to the creation of a new visa program that allows hundreds of
thousands of aliens to enter the United States who otherwise have no basis for
doing so. This flouts, rather than follows, the clear limits imposed by Congress.

4.     In establishing this unlawful program, the Department did not
engage in notice-and-comment rulemaking under the Administrative
Procedure Act, substituting instead its unilateral judgment to bring into the

United States hundreds of thousands of aliens who otherwise have no other authority to enter.

5.     The Plaintiff States—Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, South Carolina, Tennessee, Utah, West Virginia, and Wyoming—face substantial, irreparable harms from the Department's abuses of its parole authority, which allow potentially hundreds of thousands of additional aliens to enter each of their already overwhelmed territories.

6.     The Department does not have the authority to invite more than a third of a million more illegal aliens into the United States annually as it has announced with this program.

7.     This Court should enjoin, declare unlawful, and set aside the Department's lawless parole program.

<u>**Parties**</u>

**I.     Plaintiffs.**

8.     Plaintiff State of Texas is a sovereign State of the United States of America.

9.     Plaintiff State of Alabama is a sovereign State of the United States of America.

10.     Plaintiff State of Alaska is a sovereign State of the United States of America.

11.     Plaintiff State of Arkansas is a sovereign State of the United States of America.

12.     Plaintiff State of Florida is a sovereign State of the United States of America.

13.     Plaintiff State of Idaho is a sovereign State of the United States of America.

14.     Plaintiff State of Iowa is a sovereign State of the United States of America.

15.     Plaintiff State of Kansas is a sovereign State of the United States of America.

16.     Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America.

17.     Plaintiff State of Louisiana is a sovereign State of the United States of America.

18.     Plaintiff State of Mississippi is a sovereign State of the United States of America.

19.     Plaintiff State of Missouri is a sovereign State of the United States of America.

20.     Plaintiff State of Montana is a sovereign State of the United States of America.

21.     Plaintiff State of Nebraska is a sovereign State of the United States of America.

22.     Plaintiff State of Ohio is a sovereign State of the United States of America.

23.     Plaintiff State of South Carolina is a sovereign State of the United States of America.

24.     Plaintiff State of Tennessee is a sovereign State of the United States of America.

25.     Plaintiff State of Utah is a sovereign State of the United States of America.

26.     Plaintiff State of West Virginia is a sovereign State of the United States of America.

27.     Plaintiff State of Wyoming is a sovereign State of the United States of America.

## II.     Defendants.

28.     Defendant U.S. Department of Homeland Security is a cabinet-level federal executive agency that oversees the Defendants, U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE), which are constituent agencies of DHS. DHS and its constituent agencies are obligated to enforce the Immigration and Nationality Act (INA).

29.     Defendant Alejandro Mayorkas is the Secretary of DHS. The Plaintiff States sue him in his official capacity.

30.     Defendant Ur Jaddou is the Director of USCIS. The Plaintiff States sue her in her official capacity.

31.     Defendant Troy Miller is the Acting Commissioner of CBP. The Plaintiff States sue him in his official capacity.

32.     Defendant Tae Johnson is the Acting Director of ICE. The Plaintiff States sue him in his official capacity.

### Jurisdiction and Venue

33.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that the Plaintiff States request.

34.    This district is a proper venue because the State of Texas resides in this district. 28 U.S.C. § 1391(e).

## Facts

### I.    The Parole Authority.

35.    The Immigration and Nationality Act details the specific instances where the government may use its authority to parole individuals into the United States who otherwise would not be lawfully permitted to enter, or who are otherwise subject to mandatory detention. *See* 8 U.S.C. § 1182(d)(5).

36.    Specifically, Congress has directed that parole may only be granted on a case-by-case basis, and even then, only for "urgent humanitarian reasons or significant public benefit." *Id.* at § 1182(d)(5)(A); *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021).

37.    Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, in part because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and *not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States.* This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

38.    Congress has also emphasized that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather

than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B); *see also Texas v. Biden*, 20 F.4th at 994.

39.     As the U.S. Court of Appeals for the Fifth Circuit stated less than two years ago, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Id.* at 947. But the power is not unlimited: "DHS cannot use that power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *Id.* at 997.

40.     The Supreme Court recently affirmed the limited nature of the parole power, noting that it "is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' … And under the [Administrative Procedure Act], DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022).

## II.     The Parole Program.

41.     On December 22, 2022, Secretary Mayorkas issued a decision memorandum that created a new parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Although the Defendants have referred to this memorandum as authority for the new parole program, *see, e.g.*, Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023), they have not publicly released it.

42.     On January 5, 2023, President Biden and the Defendants announced the creation of the new parole program, which was modeled off

recent programs the Defendants had created for nationals of Ukraine and Venezuela. Press Release, Department of Homeland Security, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes, (Jan. 5, 2023) https://bit.ly/3VR83z2.

43.     According to the Department's announcement, the program "will provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border." *Id.*

44.     Secretary Mayorkas said in the press release announcing the program "[w]e can provide humanitarian relief consistent with our values, cut out vicious smuggling organizations, and enforce our laws." *Id.* He added "[i]ndividuals who are provided a safe, orderly, and lawful path to the United States are less likely to risk their lives traversing thousands of miles in the hands of ruthless smugglers, only to arrive at our southern border and face the legal consequences of unlawful entry." *Id.*

45.     Without authority, the Defendants have decreed that, subject to an alien obtaining a "supporter in the United States who commits to providing financial and other support" and certain background checks,"[aliens] can seek *advance authorization* to travel to the United States, and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization[.]" *Id.* (emphasis added).

46.     The Defendants have further decreed that the program "will allow up to 30,000 qualifying nationals *per month* from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." *Id.* (emphasis added).

47.     On January 6, Defendant USCIS published a new website for this new program, entitled "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans." U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://bit.ly/3ZOb9Hg (last accessed Jan. 23, 2023).

48.     The website lists the basic requirements for the program as they were contained in its announcement the day prior, but added additional details, including:

- The "supporter" agrees to provide the alien with financial support for the duration of their parole in the United States and begins the process by filing a Form I-134A "Online Request to be a Supporter and Declaration of Financial Support." *Id.*

- There is no cost to apply for the program for the alien or the "supporter."

- "Supporters" can include: U.S. citizens or nationals; lawful permanent residents, lawful temporary residents, and conditional permanent residents; *nonimmigrants in lawful status* (who maintain their nonimmigrant status and have not violated any of the terms or conditions of their nonimmigrant status); asylees, refugees, and *parolees*; *individuals granted Temporary Protected Status*; and, *beneficiaries of deferred action* (including deferred action for childhood arrivals) or deferred enforced departure. *Id.* (emphasis added).

- The beneficiaries can be any national of Cuba, Haiti, Nicaragua, or Venezuela, plus their immediate family members. But beneficiaries cannot be minor children traveling without adults. *Id.*

- Upon approval of the Form, the alien is authorized for travel to the United States at the alien's own expense, and upon arrival the alien will be considered for parole into the United States. *Id.*

49.     The Defendants did not publish advance notice of the program in the Federal Register prior to posting details about the program on the Department's website.

50.     The Defendants have not published the decision memorandum from Secretary Mayorkas despite referring to such a memorandum in the four separate Federal Register notices announcing the parole program that are described below.

51.     The Defendants have not published any analysis or supporting materials for the Secretary's decision memorandum.

52.     But on January 9, 2023, the Department published four separate notices in the Federal Register regarding the implementation of the parole program, with one notice for each eligible nationality. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

53.     In substance, the Federal Register notices do not differ from the website content—explaining the general parameters of the program and the qualifications for it. But they do offer more analysis from the Department as to why, in the Department's view, the program comports with the limitations on the Secretary's parole power under 8 U.S.C. § 1182(d)(5). *See, e.g.*, 88 Fed. Reg. at 1260–63.

54.     The Defendants did not provide an opportunity for public comment, nor did they undertake a formal notice-and-comment rulemaking process. Instead, they asserted that their new program was exempt from notice-and-comment rulemaking because (1) "the Department is merely

adopting a general statement of policy," (2) the program is exempt "because it involves a foreign affairs function of the United States," and (3) "there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable." *See, e.g.*, 88 Fed. Reg. at 1264-65.

55.     The Defendants did not explain or analyze how they would remove from the United States aliens paroled through the program after the end of any period of authorized parole, despite admitting general difficulty removing such aliens to their home countries presently.

56.     The Defendants did not consult the Plaintiff States about the potential effects of this program or the ability of the Plaintiff States to provide services to aliens paroled in through the program.

57.     The Defendants, if in fact they have devised a mechanism, did not explain any such mechanism for the recovery of funds from "supporters" who do not actually provide for the needs of aliens paroled under the program, whether by the Department itself, any federal entity, or most pertinent to the Plaintiff States, by any state.

### III.     Irreparable Harm to the Plaintiff States.

58.     The parole program harms Texas. Texas spends significant amounts of money providing services to illegal aliens because of the federal government's violations of and refusal to enforce federal law. These include education and healthcare, as well as many other social services. Federal law requires Texas to include illegal aliens in some of these programs. As the number of illegal aliens in Texas increases, the number of illegal aliens receiving such services likewise increases.

59.     For example, the Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

60.     The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

61.     The Texas Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

62.     Texas spends hundreds of millions of dollars each year for uncompensated care provided by state public hospital districts to illegal aliens.

63.     Also, Texas spends tens of millions of dollars each year for increased law enforcement as its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration.

64.     Texas spends millions of dollars each year on public education costs to educate illegal aliens, which puts a strain on its system for citizens and which costs are uncompensated from the federal government.

65.     If the Defendants allow these new aliens into the United States in violation of federal law, then the harm will only grow over time.

66.     This increase strains Texas's resources and ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services.

67.     Texas cannot recover from the federal government its increased costs, which it would otherwise not incur if the federal government enforced

the law. This affects Texas's sovereign interests in its territory and its ability to properly carry out such interests on behalf of the citizens of the State.

68.     Alabama also "bears many of the consequences of unlawful immigration." *Arizona v. U.S.*, <u>567 U.S. 387, 397</u> (2012). The State incurs significant costs providing services to illegal aliens that it would otherwise not incur if the federal government enforced the federal immigration law. Alabama currently has tens of thousands of illegal aliens living in the State. Recent reports estimate that approximately 55,000 to 73,000 illegal aliens are living in the State; about 68% of them are uninsured; about 34% of them have incomes below the poverty line; and these illegal aliens cost Alabama taxpayers more than $324.9 million a year. *See, e.g.*, MIGRATION POLICY INSTITUTE, *Unauthorized Immigrant Population Profiles*, https://bit.ly/3kws01c (62,000 illegal aliens, 68% uninsured, 34% below poverty level) (last visited Jan. 23, 2023); PEW RESEARCH CENTER, *U.S. Unauthorized Immigrant Population Estimates by State* (2016), https://pewrsr.ch/2NoU5VA (55,000 illegal aliens); FEDERATION FOR AMERICAN IMMIGRATION REFORM, *The Fiscal Burden of Illegal Immigration*, (2017), https://bit.ly/3ZYDMBU (73,190 illegal aliens, $324.9 million annual cost).

69.     While Alabama is not a contemplated "port[] of entry" according to DHS's press release, *see* Press Release, Department of Homeland Security, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes (Jan. 5, 2023) (https://bit.ly/3QYnMvo), the federal government itself has acknowledged that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both," <u>86 Fed. Reg. at 42,835</u>.

70.     Unlawfully adding more aliens through an abuse of the parole power will inevitably increase the costs of Alabama's healthcare system. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 223–30 (1982) (holding States constitutionally obligated to provide free education to children of unlawfully present aliens); 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255 (Medicare and Medicaid provision requiring States to provide emergency services to unlawful aliens as condition of program participation).

71.     Alaska will also be harmed by the parole program. Alaska has approximately 5,000 to 11,000 illegal aliens living in the State. They cost the State more than $72 million a year. If more illegal aliens enter Alaska, that will force Alaska to expend limited resources on education, healthcare, public assistance, and general government services. The program is also likely to cause increased crime and/or drug trafficking in Alaska's communities, requiring additional expenditures by law enforcement.

72.     Arkansas spends significant amounts of money providing services to illegal aliens because of the federal government's abuses of federal law. Those services include education services and healthcare, as well as many other social services. Federal law requires Arkansas to include illegal aliens in some of these programs. As the number of illegal aliens in Arkansas increases, the number of illegal aliens receiving such services likewise increases.

73.     The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Arkansas to include illegal aliens in its Emergency Medicaid program. The program costs Arkansas tens of millions of dollars annually.

74.     Arkansas spends millions of dollars each year to provide public education to illegal aliens. There are approximately 5,000 children unlawfully present in Arkansas. MIGRATION POLICY INSTITUTE, *Profile of the Unauthorized*

*Population: Arkansas,* https://bit.ly/3D8AK49 (last accessed Jan. 19, 2023). Arkansas spends $7,349 on each child who attends its public schools, for a total of $36,745,000 spent to educate children who are illegally present in Arkansas. Ark. House of Reps., *2022 Education Adequacy Study* (Jan 12, 2022), https://bit.ly/3D6O7lh (last accessed Jan. 23, 2023). Increasing the number of children unlawfully present will only increase that financial burden.

75. Florida will also be irreparably harmed by the parole program. Florida expends significant state resources on providing state services to illegal aliens within the State. The presence of these illegal aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State of Florida millions of dollars.

76. Florida's state prison system spends more than $100 million per year incarcerating criminal aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government under 8 U.S.C. § 1231(i).

77. Florida spends more than $8,000 per student each year on public-school education, which it provides regardless of immigration status.

78. Florida's Department of Children and Families provides a variety of public services to illegal aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

79. Florida frequently pays the cost of emergency medical services for the uninsured, which includes expenses related to the provision of medical services to illegal aliens.

80. Florida's Department of Economic Opportunity provides unemployment benefits to aliens who are eligible for work authorization, including parolees.

81. Idaho experiences similar harms. Idaho spends significant amounts of money providing services to illegal aliens because of the federal government's abuses of federal law. Those services include education services and healthcare, as well as many other social services. Federal law requires Idaho to include illegal aliens in those programs. Like many Western states, the number of illegal aliens in Idaho continues to increase—likewise increasing the number of illegal aliens receiving such services.

82. The number of illegal aliens present in Idaho is estimated to be approximately 35,000. School age children comprise nearly 6% of that number.

83. Idaho spends tens of millions of dollars each year to increase law-enforcement capacity, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration. *See, e.g.*, MIGRATION POLICY INSTITUTE, *Unauthorized Immigrant Population Profiles*, https://bit.ly/3kAAzIi (25,000 illegal aliens, 60% uninsured, 27% below poverty level); PEW RESEARCH CENTER, *U.S. Unauthorized Immigrant Population Estimates by State* (2016), https://pewrsr.ch/3WqL5z6 (35,000 illegal aliens); The Fiscal Burden of Illegal Immigration, FEDERATION FOR AMERICAN IMMIGRATION REFORM, *The Fiscal Burden of Illegal Immigration* (2017), https://bit.ly/3ZYDMBU (50,670 illegal aliens, $225.4 million annual cost).

84. Iowa spends tens of millions of dollars providing services to illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Iowa to include illegal aliens in those programs. As the number of illegal aliens in Iowa increases, the number of

illegal aliens receiving such services likewise increases, and so too the burden on the public increases.

85.     In 2007, the Fiscal Services Division of the Iowa Legislative Services Agency found that Iowa was home to an estimated 55,000 to 85,000 illegal immigrants. At that time, 16 years ago, the total cost of illegal immigrants to the State General Fund was more than $100 million and accounted for about 2.4% of Iowa's general fund expenditures. IOWA LEGISLATIVE SERVICES AGENCY FISCAL SERVICES, *Undocumented Immigrants' Cost to the State* (Feb. 22, 2007), https://bit.ly/3HkKMS5. Even simply adjusting for inflation (without accounting for any increase in services or the number of illegal immigrants) would bring that total to nearly $150 million annually.

86.     Iowa also spends tens of millions of dollars each year for increased law enforcement, while its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration.

87.     The total costs to Iowa of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases.

88.     Iowa has been identified as a hot spot for trafficking activity due to the junction of Interstate 35 and Interstate 80. Traffickers bring illegal immigrants to and through the State. Proactively, in 2020, Iowa became one of the first states in the country to pass legislation to require motel and hotel staff to receive training in human-trafficking prevention. Iowa bears the additional costs of combating trafficking associated with illegal immigration.

89.     If the Defendants are permitted to allow these new aliens into the United States in violation of federal law, then the harm will only grow over time.

90.    This strains Iowa's resources and ability to provide essential services, such as emergency medical care, public education, and other public safety services.

91.    Iowa cannot recover from the federal government its increased costs, which it would otherwise not incur if the federal government enforced the law. That affects Iowa's sovereign interests in its territory and its ability to carry out properly such interests on behalf of the citizens of the State.

92.    Kansas is also harmed by the Defendants' new parole program.

93.    Kansas will be required to stretch its scarce resources even further under the parole program because, under the program, the Defendants will monthly admit into the interior many thousands of new aliens who will at least temporarily reside there. This will be in addition to the many aliens who illegally cross the border every day (whom the Defendants fail to apprehend). *See* Bradford Betz, *Mayorkas Testifies More Than 389,000 Migrant 'Gotaways' at Border*, FOX NEWS (Apr. 28, 2022), https://fxn.ws/3H0U04z; U.S. CUSTOMS AND BORDER PROTECTION, *On a Typical Day in Fiscal Year 2021*, CBP…, https://bit.ly/3kDcD7d (last accessed Jan. 18, 2023) ("[CBP] [c]onducted … 1,703 apprehensions between U.S. ports of entry[,] 25 arrests of wanted criminals at U.S. ports of entry[,] [and] 723 refusals of inadmissible persons at U.S. ports of entry").

94.    The program will result in increased crime and drug trafficking in Kansas communities, requiring additional expenditures by Kansas law enforcement. This is because at least some proportion of those aliens will come to Kansas. That means more people in Kansas, at least some proportion of whom will engage in illegal activity and whom law-enforcement officials will inevitably encounter. *See, e.g.*, *United States v. Salinas-Calderon*, 728 F.2d 1298, 1299–1300 (10th Cir. 1984) (recounting details of a traffic stop conducted

by a Kansas Highway Patrol Trooper who encountered six individuals in the bed of a pickup truck who admitted they were unlawfully present in the U.S.); *see also* Tim Hrenchir, *City settles police SUV crash lawsuit for $335K*, TOPEKA CAPITAL-JOURNAL, Mar. 12, 2021, at A4 ("Topeka's city government has agreed to pay $335,000 to settle a lawsuit over an April 2016 crash in which a vehicle driven by an [illegal alien] was hit by a Topeka police SUV, which allegedly went through a red light while responding to a call with its lights and siren on."); Glenn E. Rice, *Man Who Heard Voices Charged With Murdering Tattoo Artist*, KAN. CITY STAR (May 22, 2018), https://bit.ly/3wpXqca, (discussing an illegal alien who allegedly shot and killed another motorist while driving in Kansas City, shot and wounded two men minutes apart in Clay County, and burglarized a residence, stole firearms, and tampered with a motor vehicle in Jackson County); THE ASSOCIATED PRESS, *Murder & Abduction Suspect Living in U.S. Illegally*, CBS NEWS DFW (Nov. 24, 2016), https://cbsn.ws/3Wy24Qf ("A Texas woman accused of [travelling to Wichita, Kansas and] killing a [Wichita] mother and taking her baby was in the U.S. illegally when she was released from [Sedgwick County (KS) Jail] this summer before immigration officials had a chance to request she be held, law enforcement authorities said.").

95.     Additionally, by incentivizing aliens from Cuba, Haiti, Nicaragua, and Venezuela to obtain advance authorization to enter the United States, the parole program will force Kansas to expend its limited resources on education, healthcare, public assistance, and general government services on even more individuals who are not U.S. citizens. *See Plyler v. Doe*, 457 U.S. 202, 223–30 (1982) (establishing that undocumented school-age children are entitled to a free public education); KAN. STATE DEP'T OF EDUC., EXPENDITURES PER PUPIL: 2020–2021 at 8 (Jan. 2021) (noting 2020–2021 school year expenditures per pupil were approximately $15,869), *available at* https://bit.ly/3ZPAelj;

KANCARE OMBUDSMAN, KANCARE GENERAL INFORMATION FACT SHEET (Updated Nov. 19, 2020), *available at* https://bit.ly/3Da3MAd ("KanCare Eligible Non-Citizens[:] To be considered eligible for any of the KanCare medical assistance programs, non-U.S. citizens must hold (1) legal residency in the U.S. for 5 years or more or (2) hold a certain immigration status."); KAN. DEP'T OF HEALTH & ENV'T, DIV. OF HEALTH CARE FIN., MKEESM MANUAL §§ 2142, 2146 (Jan. 2023), *available at* https://bit.ly/3wjMLzX (pertaining to "Qualified Non-Citizen Status" and "Documentation of Legal Status"); KAN. DEP'T OF HEALTH & ENV'T, DIV. OF HEALTH CARE FIN., A-1 NON-CITIZEN QUALIFICATION CHART 1 (Jan. 2023), *available at* https://bit.ly/3WuYXZk ("The purpose of this chart is to provide policy guidance for eligibility staff when addressing requests for coverage when the individual attests to being a non-citizen and provides supporting documentation."); *see also* KAN. DEP'T OF HEALTH AND ENV'T, MEDICAID TRANSFORMATION 214 (Jan. 2009), *available at* https://bit.ly/3ZTllhH (explaining Kansas's administration of "SOBRA," noting "[illegal aliens] have been found to use hospital and emergency services at over twice the rate of the overall U.S. population," and observing that there is a "large number of" "uninsured" illegal aliens).

96.    Kansas has approximately 69,000 to 85,000 illegal aliens already living in the State, about 64% of whom are uninsured and about 25% of whom have incomes below the poverty line. *See* MIGRATION POLICY INSTITUTE, *Profile of the Unauthorized Population: Kansas*, https://bit.ly/3GVy4I6 (69,000 illegal aliens, 81% from "Mexico and Central America," 64% uninsured, 11% below 50% of the poverty level); PEW RESEARCH CTR., *U.S. Unauthorized Immigrant Population Estimates by State, 2016* (Feb. 5, 2019), https://pewrsr.ch/2NoU5VA (75,000 illegal aliens). These illegal aliens cost Kansas taxpayers more than $377 million per year. *See* FED'N FOR AM. IMMIGRATION REFORM, *The Fiscal*

*Burden of Illegal Immigration On United States Taxpayers* (2017), https://bit.ly/2zj1XSX. If more illegal aliens enter Kansas, that will increase the costs of the State's healthcare system (among other things).

97.    Kentucky is also injured by the Defendants' illegal program. Kentucky will be required to stretch its scarce resources even further under the parole program because it will cause an influx of illegal aliens to be released into the United States, including Kentucky, which increases the burden on the Commonwealth's ability to provide critical governmental services to its citizens.

98.    Specifically, the parole program incentivizes further illegal immigration by allowing illegal aliens who have already illegally entered the United States to act as "supporters" and encourage aliens who have not yet left their countries to do so. As a result, the Defendants' unlawful actions will lead to an increased number of illegal aliens in Kentucky, thereby forcing Kentucky to expend limited resources on education, healthcare, public assistance, and general government services.

99.    Kentucky has approximately 35,000 to 56,000 illegal aliens living in the Commonwealth; about 60% of them are uninsured; about 37% of them have incomes below the poverty level; and they cost Kentucky taxpayers more than $261 million per year. If more illegal aliens enter the Commonwealth, that will increase the costs of the Commonwealth's healthcare system.

100.    According to one estimate, there are approximately 4,000 illegal aliens residing in Kentucky that are under the age of 16. Under Kentucky law, all children residing in the Commonwealth, regardless of lawful status, shall attend public school until age 16, with exceptions for students who attend private, parochial, or home school options. Ky. Rev. Stat. § 159.010. The Defendants' unlawful parole program will result in an increased number of

illegal-alien children attending public schools in the Commonwealth, which will increase educational costs, including, but not limited to, requiring additional faculty for ESL instruction, increased administrative costs, and reductions in space at public school facilities.

101.   Louisiana will also be injured gravely by the parole program. Louisiana will be required to stretch its resources even further under the parole program, because the parole program involves the unlawful release of hundreds of thousands of illegal aliens into the United States. The parole program will force Louisiana to expend limited resources on education, healthcare, public assistance, and general government services.

102.   Indeed, Louisiana already has approximately 70,000 to 78,000 aliens living in the State who are not lawfully in the United States. More than 70% of them do not have health insurance, about 34% of them have incomes below the poverty level, and they cost Louisiana taxpayers more than $362 million a year. *See, e.g.*, MIGRATION POLICY INSTITUTE, *Unauthorized Immigrant Population Profiles*, https://bit.ly/3XRLr2H (70,000 illegal aliens, 73% uninsured, 34% poverty level); PEW RESEARCH CENTER *U.S. Unauthorized Immigrant Population Estimates by State* (2016), https://pewrsr.ch/2NoU5VA (70,000 illegal aliens); FEDERATION FOR AMERICAN IMMIGRATION REFORM, *The Fiscal Burden of Illegal Immigration* (2017), https://bit.ly/3GZQuYm (78,820 illegal aliens, $362 million annual cost). More aliens entering the State will increase the costs of the State's healthcare system.

103.   Louisiana spends more than $10,000 per student on public schooling. Melanie Hanson, *U.S. Public Education Spending Statistics*, EDUCATION DATA INITIATIVE (Jun. 15, 2022), https://bit.ly/3H0j5gb. Additional aliens enrolled in public schools increase Louisiana's education expenditures. *See Plyler*, <u>457 U.S. at 223</u>–30.

104.   Defendant DHS has previously recognized that Louisiana "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Louisiana." Memorandum of Understanding Between DHS and the Louisiana Department of Justice at 1-2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Louisiana's current residents for, among other things, employment, housing, goods and services." *Id*. at 3.

105.   Louisiana cannot recover its increased costs, which it would otherwise not incur if the federal government enforced the law, from the federal government. This affects Louisiana's sovereign interests in its territory and its ability to carry out properly such interests on behalf of the citizens of the State.

106.   Mississippi is also injured by the parole program. Mississippi will be required to stretch its scarce resources even further under the program because it will cause an influx of illegal aliens who otherwise have no basis for entering the country. The program will further incentivize and exacerbate illegal immigration, and thus will force Mississippi to expend limited resources on education, healthcare, public assistance, law enforcement, and general government services.

107.   Mississippi has approximately 20,000 to 28,000 illegal aliens living in the State; about 75% of them are uninsured; about 49% of them have incomes below the poverty level; and they cost Mississippi taxpayers more than $117 million per year. If more illegal aliens enter the State, that will increase the costs to the State's healthcare system.

108.   Missouri is directly and adversely affected by increases in illegal immigration at the southern border. Recent studies have established that significant numbers of illegal aliens who enter the United States end up residing in Missouri. *See Texas v. Biden*, 554 F. Supp. 3d 818, 838 (N.D. Tex. 2021), *aff'd*, 20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). Like Texas, Missouri experiences pocketbook injuries as a result of the unlawful presence of illegal aliens in the State in the form of education, healthcare, and law-enforcement costs. These financial injuries are irreparable because Missouri has no plausible recourse to recoup them.

109.   Illegal aliens and their children receive education benefits from Missouri at Missouri's expense. *See Plyler v. Doe*, 457 U.S. 202, 205, 230 (1982) (holding that the Constitution prohibits States from "deny[ing] to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens").

110.   As the District Court for the Northern District of Texas has found, the costs to "Missouri … of providing public education for illegal alien children will rise … as the number of illegal alien children present in the State increases." *Texas*, 554 F. Supp. 3d at 838.

111.   "Some aliens who … are being released or paroled into the United States … will use state-funded healthcare services or benefits in … Missouri." *Id.* "The total costs to [Missouri] will increase as the number of aliens within [Missouri] increases." *Id.* at 839.

112.    Federal law requires Missouri to include illegal aliens in its Emergency Medicaid program, which provides health coverage for low-income children, families, seniors, and disabled persons. 42 C.F.R. § 440.255(c).

113.    Missouri is also a destination State and hub for human-trafficking crimes within the United States, due to its situation at the confluence of several major interstate highways. *See Texas*, 554 F. Supp. 3d at 839 ("Missouri is … a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally."). Illegal aliens are disproportionately the victims of these crimes. Some illegal aliens also commit crimes. Human-trafficking and other crimes committed by or against illegal aliens inflict irreparable costs on Missouri, both in law-enforcement costs and in providing resources for victims. *See id.* (finding that "[h]uman trafficking" arising from and involving increases in unlawful immigration "causes fiscal harm to … Missouri").

114.    Additionally, Missouri is suffering a "fentanyl crisis," and that crisis is "worsening." Alex Smith, *Missouri's Fentanyl Crisis is Worsening, But Patients Can't Get Treatment for Substance Abuse*, ST. LOUIS PUBLIC RADIO (Apr. 5, 2022), https://bit.ly/3QVv9nr. "St. Louis ranks among the deadliest cities in the country for overdose deaths among African Americans, and … the Black community seems caught between organized crime's fentanyl push and ineffective efforts to stop it." *Id.* Drug smugglers unlawfully entering the United States through the southern border are critical suppliers for distributors of fentanyl and other illegal substances in Missouri and elsewhere in the United States. *See* Anna Giaritelli, *Is America's Immigration Crisis Causing the Fentanyl Epidemic?*, WASHINGTON EXAMINER (July 13, 2022), https://bit.ly/3wlho7Z. In addition to devastating the lives and health of Missouri's citizens, drug-related and other crimes committed by or against

illegal aliens impose major healthcare and law-enforcement costs on the State. An increased influx of illegal aliens will exacerbate these problems. *See Texas*, 554 F. Supp. 3d at 839 (finding that "[s]ome aliens who … are being released or paroled into the United States … will commit crimes in … Missouri").

115.   An increased influx of illegal aliens will also affect Missouri's labor market and reduce job opportunities for U.S. citizens and aliens lawfully present in Missouri, as illegal aliens frequently compete for jobs at lower wages than workers who are lawfully present. Missouri has a large agricultural sector. Illegal aliens unlawfully present in Missouri distort Missouri's labor market and inflict irreparable injury on both the State and its citizens.

116.   The State of Montana is acutely affected by modifications in federal policy regarding immigration.

117.   Montana bears the costs of illegal aliens, including their U.S.-born children, and is forced to expend resources on education, healthcare, public assistance, and general government services.

118.   Because Montana has no state sales tax, many illegal aliens pay virtually no state taxes. Therefore, the costs of all the public services they consume are borne by lawfully present taxpayers.

119.   Ohio will also be irreparably harmed by the parole program. Ohio expends significant state resources on providing state services to illegal aliens within the State. The illegal parole program will increase the number of illegal aliens in Ohio. While illegal border crossings most severely affect border States, the parole program requires aliens to "provide for their own commercial travel" to the United States, and therefore will affect States beyond the border. Populous States, including Ohio, will likely shoulder a substantial number of illegal aliens, particularly given the requirement that the alien associate with a United States "supporter" to gain entry.

120. Ohio is forced to expend resources on illegal aliens, including emergency medical services and schooling. Ohio schools spend more than $12,000 per pupil, on average, and Ohio provides schooling regardless of immigration status. Ohio is unable to recover these costs from the federal government and would not incur these costs but for the federal government's unlawful "parole" program.

121. The program harms Ohio's quasi-sovereign interests by compromising its territorial integrity and skewing its labor market.

122. South Carolina will also be irreparably harmed by the parole program. South Carolina expends significant state resources on providing state services to illegal aliens within the State. For example, South Carolina spends thousands of dollars per student each year on public-school education, which the State provides to students regardless of their immigration status.

123. The parole program will necessarily lead to a new inflow of illegal aliens into South Carolina. By the Defendants' own estimation, up to 30,000 qualifying individuals per month from all four countries will be admitted to the United States under the program. The program could thus allow for the entry of up to 360,000 new illegal aliens to enter the United States per year. Because the program will significantly increase the total number of illegal aliens in the country, the program will harm South Carolina by causing it to expend even more state resources on the newly arrived illegal aliens.

124. Tennessee is also harmed. According to the Migration Policy Institute analysis of U.S. Census Bureau data from the pooled 2015–2019 American Community Survey, Tennessee has approximately 128,000 unauthorized individuals living within the State. Tennessee spends significant sums of money providing services to illegal aliens. Those include education services and healthcare, as well as many other social services. As the number

27

of illegal aliens in Tennessee increases, Tennessee will be required to expend its limited resources and additional money on education, healthcare, public assistance, and general government services.

125.    The parole program will force Tennessee to increase expenditures on K–12 education. Tennessee spends thousands of dollars per student each year on public school education, which the State provides to students regardless of their immigration status. Tennessee spends approximately $5.5 billion of state funds on K–12 education, a portion of which is already spent on students regardless of immigration status, and additional funding will be required due to the parole program.

126.    The parole program will also require Tennessee to increase expenditures on various social services like healthcare. Tennessee already spends approximately $214 million on total uncompensated care costs at public hospitals. Additionally, Tennessee expended approximately $46.7 million on healthcare coverage for undocumented immigrants in its CoverKids (CHIP) program. These expenditures will increase under the parole program.

127.    Utah is also harmed. The parole program will create increased crime and drug trafficking in Utah's communities, requiring additional expenditures by law enforcement. In addition, by increasing illegal immigration, the parole program will force Utah to expend limited resources on education, healthcare, public assistance, and general government services.

128.    Utah has approximately 89,000 to 113,000 illegal aliens living in the State; about 61% of them are uninsured; about 23% of them have incomes below the poverty line; and they cost Utah taxpayers more than $521 million a year. *See, e.g.*, MIGRATION POLICY INSTITUTE, *Unauthorized Immigrant Population Profiles,* https://bit.ly/3WBikj7 (89,000 illegal aliens, 61% uninsured, 23% below poverty level); PEW RESEARCH CENTER, *U.S.*

*Unauthorized Immigrant Population Estimates by State* (2016), https://pewrsr.ch/3XOB5Rd (95,000 illegal aliens); FEDERATION FOR AMERICAN IMMIGRATION REFORM, *The Fiscal Burden of Illegal Immigration* (2017), https://bit.ly/3GYoowp (112,600 illegal aliens, $521 million annual cost).

129.   The State of West Virginia is affected by modifications in federal policy regarding immigration. It incurs costs related to its nearly 4,000 illegal aliens, including their U.S.-born children, and expends resources on education, healthcare, public assistance, and general government services. For example, West Virginia spends more than $12,000 per year per public-school student, and it provides public education and related benefits (such as free or reduced-price meals) irrespective of immigration status. West Virginia makes illegal aliens paroled under 8 U. S. C. § 1182(d)(5) eligible for Medicaid. If more illegal aliens enter West Virginia, that will increase West Virginia's education, healthcare, and other costs.

130.   Wyoming is also injured by the Defendants' new parole program. Wyoming will be required to stretch its scarce resources even further under the new  program because it will cause an influx of illegal aliens to be released into the United States (including to Wyoming) which increases the burden on Wyoming's ability to provide critical governmental services to its citizens. The Defendants' unlawful actions will lead to an increased number of illegal aliens in Wyoming, thereby forcing Wyoming to expend additional resources on education, healthcare, public assistance, and general government services.

131.   Wyoming has approximately 5,000 to 7,000 illegal aliens living in the State, and they cost Wyoming taxpayers more than $26.1 million a year. *See, e.g.*, MIGRATION POLICY INSTITUTE, *Unauthorized Immigrant Population Profiles,* https://bit.ly/407NphJ (7,000 illegal aliens); PEW RESEARCH CENTER, *U.S. Unauthorized Immigrant Population Estimates by State* (2016),

https://pewrsr.ch/2NoU5VA (5,000 illegal aliens); FEDERATION FOR AMERICAN IMMIGRATION REFORM, *The Fiscal Burden of Illegal Immigration* (2017), https://bit.ly/3WAo0tH (<6,000 illegal aliens, $26.1 million annual cost).

132.    If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Claims for Relief

## Count One (APA)

133.    Under the Administrative Procedure Act (APA), 5 U.S.C. § 706, a court shall decide all relevant questions of law, interpret the constitution and statutes, and determine the meaning or applicability of the terms of an agency action. Then, it shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law.

134.    The Defendants' parole program should be held unlawful and set aside because:

a.  The program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5).

b.  The Defendants unlawfully failed to engage in notice-and-comment rulemaking.

c.  The Defendants arbitrarily created a program that allows hundreds of thousands of aliens to enter the United States with no consideration of their ability to remove those aliens from the United States at the end of their respective periods of parole.

d.  The Defendants arbitrarily created a program that relies upon an alien obtaining a "sponsor" who agrees to provide support for the alien, but with no meaningful mechanism to legally enforce such an agreement against the sponsor.

e.  The Defendants arbitrarily did not consider and account for the Plaintiff States' legally recognized reliance interest in the enforcement of federal immigration statutes, including by not allowing into the United States individuals who have no right to be here.

### Count Two (Ultra Vires)

135.  A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

136.  The Defendants' parole program exceeds their statutory parole authority under 8 U.S.C. § 1182(d)(5).

## **Prayer for Relief**

For these reasons, the Plaintiff States ask that the Court:

- Stay, postpone, or preliminarily enjoin the Defendants' implementation of the parole program;

- Following a trial on the merits, decree that the parole program was issued in violation of the APA and vacate it, set it aside, or in the alternative, permanently enjoin the Defendants from implementing it;

- Declare that the parole program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5);

- Award the Plaintiff States their attorneys' fees and costs of court; and

- Award the Plaintiff States all other relief to which they may be entitled.

Dated January 24, 2023.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney
General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel: (512) 936-1700

Respectfully submitted,

*/s/ Aaron F. Reitz*
AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771
aaron.reitz@oag.texas.gov

LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

GENE P. HAMILTON*
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
*Counsel for the State of Texas*

*Application for admission forthcoming

STEVE MARSHALL
Alabama Attorney General
EDMUND G. LACOUR JR.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

TREG R. TAYLOR
Attorney General of Alaska
CORI M. MILLS
Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

TIM GRIFFIN
Arkansas Attorney General
NICHOLAS J. BRONNI
Arkansas Solicitor General
HANNAH L. TEMPLIN
Assistant Solicitor General
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201

*Counsel for the State of Arkansas*

34

ASHLEY MOODY
Attorney General of Florida
JAMES H. PERCIVAL (FBN 1016188)
Deputy Attorney General of Legal
Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
Fax: (850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

RAÚL R. LABRADOR
Attorney General of Idaho
DAVID M.S. DEWHIRST, ISB No. 12141
  *Chief Deputy Attorney General*
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
Fax: (208) 854-8071
david.dewhirst@ag.idaho.gov

*Counsel for the State of Idaho*

BRENNA BIRD
Attorney General of Iowa
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-5164
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

KRIS KOBACH
Attorney General of Kansas
JESSE A. BURRIS, Kan. Sup. Ct.  #26856
Assistant Attorney General
Office of Kansas Attorney General Kris
Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Fax: (785) 296-3131
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

DANIEL CAMERON
Attorney General of Kentucky
MARC MANLEY
Associate Attorney General
Kentucky Office of the
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

JEFF LANDRY
Attorney General of Louisiana
ELIZABETH B. MURRILL (La #20685)
Solicitor General
JOSEPH SCOTT ST. JOHN (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

LYNN FITCH
Attorney General of Mississippi
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Mississippi
Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

ANDREW BAILEY
Attorney General of Missouri
JOSHUA M. DIVINE, Mo. Bar #69875
Solicitor General
CHARLES F. CAPPS, Mo. Bar #72734
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

AUSTIN KNUDSEN
Attorney General of Montana
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

MICHAEL T. HILGERS
Attorney General of Nebraska
ERIC J. HAMILTON
Deputy Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

DAVE YOST
Ohio Attorney General
SYLVIA MAY MAILMAN
Ohio Deputy Solicitor General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
May.Mailman@OhioAGO.gov

*Counsel for the State of Ohio*

ALAN WILSON
Attorney General of South Carolina
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter
CLARK L. HILDABRAND
Assistant Solicitor General
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*

38

SEAN D. REYES
Utah Attorney General
MELISSA HOLYOAK
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

PATRICK MORRISEY
Attorney General of West Virginia
LINDSAY SEE
Solicitor General
MICHAEL R. WILLIAMS
Senior Deputy Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

BRIDGET HILL
Wyoming Attorney General
RYAN SCHELHAAS
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

**I.(a) Plaintiffs**

**THE STATE OF TEXAS,**
By and through its Attorney General, Ken Paxton,

**STATE OF ALABAMA**
By and through its Attorney General, Steve Marshall

**STATE OF ALASKA**
By and through its Attorney General, Treg R. Taylor

**STATE OF ARKANSAS**
By and through its Attorney General, Tim Griffin

**STATE OF FLORIDA**
By and through its Attorney General, Ashley Moody

**STATE OF IDAHO**
By and through its Attorney General, Raúl R. Labrador

**STATE OF IOWA**
By and through its Attorney General, Brenna Bird

**STATE OF KANSAS**
By and through its Attorney General, Kris Kobach

**COMMONWEALTH OF KENTUCKY**
By and through its Attorney General, Daniel Cameron

**STATE OF LOUISIANA**
By and through its Attorney General, Jeff Landry

**STATE OF MISSISSIPPI**
By and through its Attorney General, Lynn Fitch

**STATE OF MISSOURI**
By and through its Attorney General, Andrew Bailey

**STATE OF MONTANA**
By and through its Attorney General, Austin Knudsen

**STATE OF NEBRASKA**
By and through its Attorney General, Michael T. Hilgers

**STATE OF OHIO**
By and through its Attorney General, David Yost

**STATE OF SOUTH CAROLINA**
By and through its Attorney General, Alan Wilson

**STATE OF TENNESSEE**
By and through its Attorney General, Jonathan Skrmetti

**STATE OF UTAH**
By and through its Attorney General, Sean D. Reyes

**STATE OF WEST VIRGINIA**
By and through its Attorney General, Patrick Morrisey

**STATE OF WYOMING**
By and through its Attorney General, Bridget Hill

**THE STATE OF ARKANSAS,**
By and through its Attorney General, Leslie Rutledge

**THE STATE OF FLORIDA,**
By and through its Attorney General, Ashley Moody

**THE STATE OF INDIANA,**
By and through its Attorney General, Todd Rokita

**THE STATE OF MISSOURI,**
By and through its Attorney General,

**THE STATE OF MONTANA,**
By and through its Attorney General, Austin Knudsen

**THE STATE OF OKLAHOMA,**
By and through its Attorney General, John M. O'Connor


**I.(b) Attorneys**

**THE STATE OF TEXAS,**
By and through its Attorney General, Ken Paxton,
AARON F. REITZ
Deputy Attorney General for Legal Strategy
*Lead Counsel*
Texas Bar No. 24105704
Southern District of Texas No. 3653771
Aaron.Reitz@oag.texas.gov

LEIF A. OLSON
Chief, Special Litigation Division
*Special Counsel*
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov
RYAN D. WALTERS
*Special Counsel*
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov
Office of the Attorney General
PO Box 12548 (MC 009)
Austin, TX 78711-2548
Tel: (512) 463-4139
Fax: (512) 474-2697
*Counsel for the State of Texas*

**Gene P. Hamilton**
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
*Counsel for the State of Texas*

**THE STATE OF ALABAMA,**
STEVE MARSHALL
Alabama Attorney General
EDMUND G. LACOUR JR.
Solicitor General
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
*Counsel for the State of Alabama*

**THE STATE OF ALASKA**
TREG R. TAYLOR
Attorney General of Alaska
CORI M. MILLS
Deputy Attorney General of Alaska

CHRISTOPHER A. ROBISON
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov
*Counsel for the State of Alaska*

**THE STATE OF ARKANSAS**
TIM GRIFFIN
Arkansas Attorney General
NICHOLAS J. BRONNI
Arkansas Solicitor General
HANNAH L. TEMPLIN
Assistant Solicitor General
Office of the Arkansas
Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
*Counsel for the State of Arkansas*

**THE STATE OF FLORIDA**
ASHLEY MOODY
Attorney General of Florida
JAMES H. PERCIVAL* (FBN 1016188)
Deputy Attorney General of Legal
Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
Fax: (850) 410-2672 (fax)
james.percival@myfloridalegal.com
*Counsel for the State of Florida*

**THE STATE OF IDAHO**
RAÚL R. LABRADOR
ATTORNEY GENERAL OF IDAHO
DAVID M.S. DEWHIRST, ISB No. 12141
  *Chief Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010

Tel: (208) 334-2400
Fax: (208) 854-8071
david.dewhirst@ag.idaho.gov
*Counsel for the State of Idaho*

**THE STATE OF IOWA**
BRENNA BIRD
Attorney General of Iowa
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-5164
Fax: (515) 281-4209
wessan.eric@ag.iowa.gov
*Counsel for the State of Iowa*

**THE STATE OF KANSAS**
KRIS KOBACH
Attorney General of Kansas
JESSE A. BURRIS, Kan. Sup. Ct.  #26856*
Assistant Attorney General
Office of Kansas Attorney General Kris Kobach
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Fax: (785) 296-3131
Jesse.Burris@ag.ks.gov
*Counsel for the State of Kansas*

**THE STATE OF KENTUCKY**
DANIEL CAMERON
Attorney General of Kentucky
MARC MANLEY*
Associate Attorney General
Kentucky Office of the
Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478
*Counsel for the Commonwealth of Kentucky*

**THE STATE OF LOUISIANA**
JEFF LANDRY
Attorney General of Louisiana
ELIZABETH B. MURRILL (La #20685)

Solicitor General
JOSEPH SCOTT ST. JOHN (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
*Counsel for the State of Louisiana*

**THE STATE OF MISSISSIPPI**
LYNN FITCH
Attorney General of Mississippi
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Mississippi
Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov
*Counsel for the State of Mississippi*

**THE STATE OF MISSOURI**
ANDREW BAILEY
Attorney General of Missouri
JOSHUA M. DIVINE, Mo. Bar #69875*
Solicitor General
CHARLES F. CAPPS, Mo. Bar #72734*
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Fax: (573) 751-0774
Josh.Divine@ago.mo.gov
*Counsel for the State of Missouri*

**THE STATE OF MONTANA**
AUSTIN KNUDSEN
Attorney General of Montana
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Assistant Solicitor General

Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov
*Counsel for the State of Montana*

**THE STATE OF NEBRASKA**
MICHAEL T. HILGERS
Attorney General of Nebraska
ERIC J. HAMILTON
Deputy Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov
*Counsel for the State of Nebraska*

**THE STATE OF OHIO**
DAVE YOST
Ohio Attorney General
SYLVIA MAY MAILMAN*
Ohio Deputy Solicitor General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
May.Mailman@OhioAGO.gov
*Counsel for the State of Ohio*

**THE STATE OF SOUTH CAROLINA**
ALAN WILSON
Attorney General of South Carolina
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov
*Counsel for the State of South Carolina*

**THE STATE OF TENNESSEE**
JONATHAN SKRMETTI
Tennessee Attorney General and Reporter
CLARK L. HILDABRAND
Assistant Solicitor General

P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov
*Counsel for the State of Tennessee*

THE STATE OF UTAH
SEAN D. REYES
Utah Attorney General
MELISSA HOLYOAK
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

THE STATE OF WEST VIRGINIA
PATRICK MORRISEY
Attorney General of West Virginia
LINDSAY SEE*
Solicitor General
MICHAEL R. WILLIAMS*
Senior Deputy Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov
*Counsel for the State of West Virginia*

THE STATE OF WYOMING
BRIDGET HILL
Wyoming Attorney General
RYAN SCHELHAAS*
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov
*Counsel for the State of Wyoming*

**I.(a) Defendants**

U.S. DEPARTMENT OF HOMELAND SECURITY;

ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security;

U.S. CITIZENSHIP AND IMMIGRATION SERVICES;

UR JADDOU, in her official capacity as Director of U.S. Citizenship and Immigration Services;

U.S. CUSTOMS & BORDER PROTECTION;

TROY MILLER, in his official capacity as Acting Commissioner of U.S. Customs & Border Protection;

U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and

TAE JOHNSON, in his official capacity as Acting Director of U.S. Immigration & Customs Enforcement

**Ex. 3: Amended Complaint, ECF 20**

# United States District Court
## Southern District of Texas
### Victoria Division

<table>
<tr><td>

STATE OF TEXAS,
STATE OF ALABAMA
STATE OF ALASKA
STATE OF ARKANSAS
STATE OF FLORIDA
STATE OF IDAHO
STATE OF IOWA
STATE OF KANSAS
COMMONWEALTH OF KENTUCKY
STATE OF LOUISIANA
STATE OF MISSISSIPPI
STATE OF MISSOURI
STATE OF MONTANA
STATE OF NEBRASKA
STATE OF OHIO
STATE OF OKLAHOMA
STATE OF SOUTH CAROLINA
STATE OF TENNESSEE
STATE OF UTAH
STATE OF WEST VIRGINIA
STATE OF WYOMING
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, in his official
   capacity as Secretary of Homeland
   Security;
U.S. CITIZENSHIP AND IMMIGRATION
   SERVICES;
UR JADDOU, in her official capacity as
   Director of U.S. Citizenship and
   Immigration Services;
U.S. CUSTOMS & BORDER PROTECTION;

</td><td>

Case No. 6:23-cv-7

</td></tr>
</table>

1

Troy Miller, in his official capacity as
   Acting Commissioner of U.S. Customs &
   Border Protection;
U.S. Immigration & Customs
   Enforcement; and
Tae Johnson, in his official capacity as
   Acting Director of U.S. Immigration &
   Customs Enforcement;
   *Defendants.*

## Amended Complaint

1.   The Department of Homeland Security (DHS or Department), under the false pretense of preventing aliens from unlawfully crossing the border between the ports of entry, has effectively created a new visa program—without the formalities of legislation from Congress—by announcing that it will permit up to 360,000 aliens annually from Cuba, Haiti, Nicaragua, and Venezuela to be "paroled" into the United States for two years or longer and with eligibility for employment authorization.

2.   The Department's parole power is exceptionally limited, having been curtailed by Congress multiple times, and can be used "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). But the Department's new "parole" program allows aliens *in their home countries* to obtain the benefit of being able to obtain advance authorization to enter the United States—despite no other basis in law for them doing so.

3.   The parole program established by the Department fails each of the law's three limiting factors. It is not case-by-case, is not for urgent humanitarian reasons, and advances no significant public benefit. Instead, it amounts to the creation of a new visa program that allows hundreds of thousands of aliens

to enter the United States who otherwise have no basis for doing so. This flouts, rather than follows, the clear limits imposed by Congress.

4.   In establishing this unlawful program, the Department did not engage in notice-and-comment rulemaking under the Administrative Procedure Act, substituting instead its unilateral judgment to bring into the United States hundreds of thousands of aliens who otherwise have no other authority to enter.

5.   The Plaintiff States—Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming—face substantial, irreparable harms from the Department's abuses of its parole authority, which allow potentially hundreds of thousands of additional aliens to enter each of their already overwhelmed territories.

6.   The Department does not have the authority to invite more than a third of a million more illegal aliens into the United States annually as it has announced with this program.

7.   The Court should enjoin, declare unlawful, and set aside the Department's lawless parole program.

## PARTIES

## I.  Plaintiffs.

8.   Plaintiff State of Texas is a sovereign State of the United States of America.

9.   Plaintiff State of Alabama is a sovereign State of the United States of America.

10.  Plaintiff State of Alaska is a sovereign State of the United States of America.

11.   Plaintiff State of Arkansas is a sovereign State of the United States of America.

12.   Plaintiff State of Florida is a sovereign State of the United States of America.

13.   Plaintiff State of Idaho is a sovereign State of the United States of America.

14.   Plaintiff State of Iowa is a sovereign State of the United States of America.

15.   Plaintiff State of Kansas is a sovereign State of the United States of America.

16.   Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America.

17.   Plaintiff State of Louisiana is a sovereign State of the United States of America.

18.   Plaintiff State of Mississippi is a sovereign State of the United States of America.

19.   Plaintiff State of Missouri is a sovereign State of the United States of America.

20.   Plaintiff State of Montana is a sovereign State of the United States of America.

21.   Plaintiff State of Nebraska is a sovereign State of the United States of America.

22.   Plaintiff State of Ohio is a sovereign State of the United States of America.

23.   Plaintiff State of Oklahoma is a sovereign State of the United States of America.

24.  Plaintiff State of South Carolina is a sovereign State of the United States of America.

25.  Plaintiff State of Tennessee is a sovereign State of the United States of America.

26.  Plaintiff State of Utah is a sovereign State of the United States of America.

27.  Plaintiff State of West Virginia is a sovereign State of the United States of America.

28.  Plaintiff State of Wyoming is a sovereign State of the United States of America.

## II.  Defendants.

29.  Defendant U.S. Department of Homeland Security is a cabinet-level federal executive agency that oversees the Defendants, U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE), which are constituent agencies of DHS. DHS and its constituent agencies are obligated to enforce the Immigration and Nationality Act (INA).

30.  Defendant Alejandro Mayorkas is the Secretary of DHS. The Plaintiff States sue him in his official capacity.

31.  Defendant Ur Jaddou is the Director of USCIS. The Plaintiff States sue her in her official capacity.

32.  Defendant Troy Miller is the Acting Commissioner of CBP. The Plaintiff States sue him in his official capacity.

33.  Defendant Tae Johnson is the Acting Director of ICE. The Plaintiff States sue him in his official capacity.

JURISDICTION AND VENUE

34.  The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that the Plaintiff States request.

35.  This district is a proper venue because the State of Texas resides in this district and a substantial part of the events and omissions giving rise to the claim occurred here. 28 U.S.C. § 1391(b), (e).

FACTS

## I.   The Parole Authority.

36.  The Immigration and Nationality Act details the specific instances where the government may use its authority to parole individuals into the United States who otherwise would not be lawfully permitted to enter, or who are otherwise subject to mandatory detention. *See* 8 U.S.C. § 1182(d)(5).

37.  Specifically, Congress has directed that parole may only be granted on a case-by-case basis, and even then, only for "urgent humanitarian reasons or significant public benefit." *Id.* at § 1182(d)(5)(A); *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021).

38.  Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—to the parole power in 1996, in part because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and *not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other*

6

> *category in immigration law, with the intent that they will re-*
> *main permanently in the United States.* This contravenes the
> intent of section 212(d)(5), but also illustrates why further,
> specific limitations on the Attorney General's discretion are
> necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

39.  Congress has also emphasized that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General deter-mines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B); *see also Texas v. Biden*, 20 F.4th at 994.

40.  As the Fifth Circuit stated less than two years ago, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Id.* at 947. But the power is not unlimited: "DHS cannot use that power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *Id.* at 997.

41.  The Supreme Court recently affirmed the limited nature of the parole power, noting that it "is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian rea-sons or significant public benefit.' ... And under the [Administrative Procedure Act], DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022).

## II.  The Parole Program.

42.  On December 22, 2022, Secretary Mayorkas issued a decision memorandum that created a new parole program for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Although the Defendants have referred to this memorandum as authority for the new parole program, *see, e.g.*, Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023), they have not publicly released it.

43.  On January 5, 2023, President Biden and the Defendants announced the creation of the new parole program, which was modeled off recent programs the Defendants had created for nationals of Ukraine and Venezuela. Press Release, Dept. of Homeland Security, DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes (Jan. 5, 2023).[1]

44.  According to the Department's announcement, the program "will provide a lawful and streamlined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States, without having to make the dangerous journey to the border." *Id.*

45.  Secretary Mayorkas said in the press release announcing the program "[w]e can provide humanitarian relief consistent with our values, cut out vicious smuggling organizations, and enforce our laws." *Id.* He added "[i]ndividuals who are provided a safe, orderly, and lawful path to the United States are less likely to risk their lives traversing thousands of miles in the hands of ruthless smugglers, only to arrive at our southern border and face the legal consequences of unlawful entry." *Id.*

---

[1]  https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.

46.   Without authority, the Defendants have decreed that, subject to an alien obtaining a "supporter in the United States who commits to providing financial and other support" and certain background checks,"[aliens] can seek *advance authorization* to travel to the United States, and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years, including employment authorization[.]" *Id.* (emphasis added).

47.   The Defendants have further decreed that the program "will allow up to 30,000 qualifying nationals *per month* from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." *Id.* (emphasis added).

48.   On January 6, Defendant USCIS published a new website for this new program, entitled "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans." U.S. CITIZENSHIP AND IMMIG. SERVICES, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV (visited Jan. 23, 2023).

49.   The website lists the basic requirements for the program as they were contained in its announcement the day prior, but added additional details, including:

50.   The "supporter" agrees to provide the alien with financial support for the duration of their parole in the United States and begins the process by filing a Form I-134A "Online Request to be a Supporter and Declaration of Financial Support." *Id.*

51.   There is no cost to apply for the program for the alien or the "supporter."

52.   "Supporters" can include: U.S. citizens or nationals; lawful permanent residents, lawful temporary residents, and conditional permanent residents; *nonimmigrants in lawful status* (who maintain their nonimmigrant status and

have not violated any of the terms or conditions of their nonimmigrant status); asylees, refugees, and *parolees*; *individuals granted Temporary Protected Status*; and, *beneficiaries of deferred action* (including deferred action for childhood arrivals) or deferred enforced departure. *Id.* (emphasis added).

53.  The beneficiaries can be any national of Cuba, Haiti, Nicaragua, or Venezuela, plus their immediate family members. But beneficiaries cannot be minor children traveling without adults. *Id.*

54.  Upon approval of the Form, the alien is authorized for travel to the United States at the alien's own expense, and upon arrival the alien will be considered for parole into the United States. *Id.*

55.  The Defendants did not publish advance notice of the program in the Federal Register prior to posting details about the program on the Department's website.

56.  The Defendants have not published the decision memorandum from Secretary Mayorkas despite referring to such a memorandum in the four separate Federal Register notices announcing the parole program that are described below.

57.  The Defendants have not published any analysis or supporting materials for the Secretary's decision memorandum.

58.  But on January 9, 2023, the Department published four separate notices in the Federal Register regarding the implementation of the parole program, with one notice for each eligible nationality. *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

59. In substance, the Federal Register notices do not differ from the website content—explaining the general parameters of the program and the qualifications for it. But they do offer more analysis from the Department as to why, in the Department's view, the program comports with the limitations on the Secretary's parole power under 8 U.S.C. § 1182(d)(5). *See, e.g.*, 88 Fed. Reg. at 1260–63.

60. The Defendants did not provide an opportunity for public comment, nor did they undertake a formal notice-and-comment rulemaking process. Instead, they asserted that their new program was exempt from notice-and-comment rulemaking because (1) "the Department is merely adopting a general statement of policy," (2) the program is exempt "because it involves a foreign affairs function of the United States," and (3) "there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable." *See, e.g.*, 88 Fed. Reg. at 1264–65.

61. The Defendants did not explain or analyze how they would remove from the United States aliens paroled through the program after the end of any period of authorized parole, despite admitting general difficulty removing such aliens to their home countries presently.

62. The Defendants did not consult the Plaintiff States about the potential effects of this program or the ability of the Plaintiff States to provide services to aliens paroled in through the program.

63. The Defendants, if in fact they have devised a mechanism, did not explain any such mechanism for the recovery of funds from "supporters" who do not actually provide for the needs of aliens paroled under the program, whether by the Department itself, any federal entity, or most pertinent to the Plaintiff States, by any state.

**III. Irreparable Harm to the Plaintiff States.**

64. The parole program harms Texas. Texas spends significant amounts of money providing services to illegal aliens because of the federal government's violations of and refusal to enforce federal law. These include education and healthcare, as well as many other social services. Federal law requires Texas to include illegal aliens in some of these programs. As the number of illegal aliens in Texas increases, the number of illegal aliens receiving such services likewise increases.

65. For example, the Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

66. The Texas Family Violence Program provides emergency shelter and supportive services to victims and their children in Texas. Texas spends more than a million dollars per year on the Texas Family Violence Program for services to illegal aliens.

67. The Texas Children's Health Insurance Program offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

68. Texas spends hundreds of millions of dollars each year for uncompensated care provided by state public hospital districts to illegal aliens.

69. Also, Texas spends tens of millions of dollars each year for increased law enforcement as its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration.

70. Texas spends millions of dollars each year on public education costs to educate illegal aliens, which puts a strain on its system for citizens and which costs are uncompensated from the federal government.

71. If the Defendants allow these new aliens into the United States in violation of federal law, then the harm will only grow over time.

72. This increase strains Texas's resources and ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services.

73. Texas cannot recover from the federal government its increased costs, which it would otherwise not incur if the federal government enforced the law. This affects Texas's sovereign interests in its territory and its ability to properly carry out such interests on behalf of the citizens of the State.

74. Alabama also "bears many of the consequences of unlawful immigration." *Arizona v. U.S.*, <u>567 U.S. 387, 397</u> (2012). The State incurs significant costs providing services to illegal aliens that it would otherwise not incur if the federal government enforced the federal immigration law. Alabama currently has tens of thousands of illegal aliens living in the State. Recent reports estimate that approximately 55,000 to 73,000 illegal aliens are living in the State; about 68% of them are uninsured; about 34% of them have incomes below the poverty line; and these illegal aliens cost Alabama taxpayers more than $324.9 million a year. *See, e.g.*, MIGRATION POLICY INST., *Unauthorized Immigrant Population Profiles*, https://bit.ly/3kws01c (62,000 illegal aliens, 68% uninsured, 34% below poverty level) (last visited Jan. 23, 2023) ("*Population Profiles*"); PEW RESEARCH CENTER, *U.S. Unauthorized Immigrant Population Estimates by State* (2016) ("*Population Estimates*"), https://pewrsr.ch/2NoU5VA (55,000 illegal aliens); FEDN. FOR AM. IMMIG. REFORM, *The Fiscal Burden of Illegal Immigration*, (2017) ("*Fiscal Burden*"), https://bit.ly/3ZYDMBU (73,190 illegal aliens, $324.9 million annual cost).

75. While Alabama is not a contemplated "port[] of entry" according to DHS's press release, *supra* fn.1 above, the federal government itself has

acknowledged that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both," 86 Fed. Reg. at 42,835.

76.  Unlawfully adding more aliens through an abuse of the parole power will inevitably increase the costs of Alabama's healthcare system. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 223–30 (1982) (States constitutionally obligated to provide free education to children of unlawfully present aliens); 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255 (Medicare and Medicaid requirement that States provide emergency services to unlawful aliens as condition of program participation).

77.  Alaska will also be harmed by the parole program. Alaska has approximately 5,000 to 11,000 illegal aliens living in the State. They cost the State more than $72 million a year. If more illegal aliens enter Alaska, that will force Alaska to expend limited resources on education, healthcare, public assistance, and general government services. The program is also likely to cause increased crime and/or drug trafficking in Alaska's communities, requiring additional expenditures by law enforcement.

78.  Arkansas spends significant amounts of money providing services to illegal aliens because of the federal government's abuses of federal law. Those services include education services and healthcare, as well as many other social services. Federal law requires Arkansas to include illegal aliens in some of these programs. As the number of illegal aliens in Arkansas increases, the number of illegal aliens receiving such services likewise increases.

79.  The Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Arkansas to include illegal aliens in its Emergency Medicaid program. The program costs Arkansas tens of millions of dollars annually.

80.  Arkansas spends millions of dollars each year to provide public education to illegal aliens. There are approximately 5,000 children unlawfully present in Arkansas. *See Unauthorized Population.* Arkansas spends $7,349 on each child who attends its public schools, for a total of $36,745,000 spent to educate children who are illegally present in Arkansas. Ark. House of Reps., *2022 Education Adequacy Study* (Jan 12, 2022), (last accessed Jan. 23, 2023). Increasing the number of children unlawfully present will only increase that financial burden.

81.  Florida will also be irreparably harmed by the parole program. Florida expends significant state resources on providing state services to illegal aliens within the State. The presence of these illegal aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State of Florida millions of dollars.

82.  Florida's state prison system spends more than $100 million per year incarcerating criminal aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government under 8 U.S.C. § 1231(i).

83.  Florida spends more than $8,000 per student each year on public-school education, which it provides regardless of immigration status.

84.  Florida's Department of Children and Families provides a variety of public services to illegal aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

85.  Florida frequently pays the cost of emergency medical services for the uninsured, which includes expenses related to the provision of medical services to illegal aliens.

15

86. Florida's Department of Economic Opportunity provides unemployment benefits to aliens who are eligible for work authorization, including parolees.

87. Idaho experiences similar harms. Idaho spends significant amounts of money providing services to illegal aliens because of the federal government's abuses of federal law. Those services include education services and healthcare, as well as many other social services. Federal law requires Idaho to include illegal aliens in those programs. Like many Western states, the number of illegal aliens in Idaho continues to increase—likewise increasing the number of illegal aliens receiving such services.

88. The number of illegal aliens present in Idaho is estimated to be approximately 35,000. School age children comprise nearly 6% of that number.

89. Idaho spends tens of millions of dollars each year to increase law-enforcement capacity, and its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration. *See, Population Profiles* (25,000 illegal aliens, 60% uninsured, 27% below poverty level); *Population Estimates* (35,000 illegal aliens); *Fiscal Burden* (50,670 illegal aliens, $225.4 million annual cost).

90. Iowa spends tens of millions of dollars providing services to illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Iowa to include illegal aliens in those programs. As the number of illegal aliens in Iowa increases, the number of illegal aliens receiving such services likewise increases, and so too the burden on the public increases.

91. In 2007, the Fiscal Services Division of the Iowa Legislative Services Agency found that Iowa was home to an estimated 55,000 to 85,000 illegal

immigrants. At that time, 16 years ago, the total cost of illegal immigrants to the State General Fund was more than $100 million and accounted for about 2.4% of Iowa's general fund expenditures. IOWA LEGIS. SERVICES AGENCY FISCAL SERVICES, *Undocumented Immigrants' Cost to the State* (Feb. 22, 2007), https://bit.ly/3HkKMS5. Even simply adjusting for inflation (without accounting for any increase in services or the number of illegal immigrants) would bring that total to nearly $150 million annually.

92.  Iowa also spends tens of millions of dollars each year for increased law enforcement, while its citizens suffer increased crime, unemployment, environmental harm, and social disorder, due to illegal immigration.

93.  The total costs to Iowa of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases.

94.  Iowa has been identified as a hot spot for trafficking activity due to the junction of Interstate 35 and Interstate 80. Traffickers bring illegal immigrants to and through the State. Proactively, in 2020, Iowa became one of the first states in the country to pass legislation to require motel and hotel staff to receive training in human-trafficking prevention. Iowa bears the additional costs of combating trafficking associated with illegal immigration.

95.  If the Defendants are permitted to allow these new aliens into the United States in violation of federal law, then the harm will only grow over time. This strains Iowa's resources and ability to provide essential services, such as emergency medical care, public education, and other public safety services.

96.  Iowa cannot recover from the federal government its increased costs, which it would otherwise not incur if the federal government enforced the law.

That affects Iowa's sovereign interests in its territory and its ability to carry out properly such interests on behalf of the citizens of the State.

97.  Kansas is also harmed by the Defendants' new parole program.

98.  Kansas will be required to stretch its scarce resources even further under the parole program because, under the program, the Defendants will monthly admit into the interior many thousands of new aliens who will at least temporarily reside there. This will be in addition to the many aliens who illegally cross the border every day (whom the Defendants fail to apprehend). *See* Bradford Betz, *Mayorkas Testifies More Than 389,000 Migrant 'Gotaways' at Border*, FOX NEWS (Apr. 28, 2022), https://fxn.ws/3H0U04z; U.S. CUSTOMS AND BORDER PROTECTION, *On a Typical Day in Fiscal Year 2021, CBP…*, https://www.cbp.gov/newsroom/stats/typical-day-fy2021 (last accessed Jan. 18, 2023) ("[CBP] [c]onducted … 1,703 apprehensions between U.S. ports of entry[,] 25 arrests of wanted criminals at U.S. ports of entry[,] [and] 723 refusals of inadmissible persons at U.S. ports of entry").

99.  The program will result in increased crime and drug trafficking in Kansas communities, requiring additional expenditures by Kansas law enforcement. This is because at least some proportion of those aliens will come to Kansas. That means more people in Kansas, at least some proportion of whom will engage in illegal activity and whom law-enforcement officials will inevitably encounter. *See, e.g.*, *United States v. Salinas-Calderon*, 728 F.2d 1298, 1299–1300 (10th Cir. 1984) (recounting details of a traffic stop conducted by a Kansas Highway Patrol Trooper who encountered six individuals in the bed of a pickup truck who admitted they were unlawfully present in the U.S.); *see also* Tim Hrenchir, *City settles police SUV crash lawsuit for $335K*, TOPEKA CAPITAL-JOURNAL, Mar. 12, 2021, at A4 ("Topeka's city government has agreed to pay $335,000 to settle a lawsuit over an April 2016 crash in which a vehicle

driven by an [illegal alien] was hit by a Topeka police SUV, which allegedly went through a red light while responding to a call with its lights and siren on."); Glenn E. Rice, *Man Who Heard Voices Charged With Murdering Tattoo Artist*, KAN. CITY STAR (May 22, 2018), https://bit.ly/3wpXqca, (discussing an illegal alien who allegedly shot and killed another motorist while driving in Kansas City, shot and wounded two men minutes apart in Clay County, and burglarized a residence, stole firearms, and tampered with a motor vehicle in Jackson County); ASSOCIATED PRESS, *Murder & Abduction Suspect Living in U.S. Illegally*, CBS NEWS DFW (Nov. 24, 2016), https://cbsn.ws/3Wy24Qf ("A Texas woman accused of [travelling to Wichita, Kansas and] killing a [Wichita] mother and taking her baby was in the U.S. illegally when she was released from [Sedgwick County (KS) Jail] this summer before immigration officials had a chance to request she be held, law enforcement authorities said.").

100. Additionally, by incentivizing aliens from Cuba, Haiti, Nicaragua, and Venezuela to obtain advance authorization to enter the United States, the parole program will force Kansas to expend its limited resources on education, healthcare, public assistance, and general government services on even more individuals who are not U.S. citizens. *See Plyler v. Doe*, <u>457 U.S. 202, 223</u>–30 (1982) (establishing that undocumented school-age children are entitled to a free public education); KAN. STATE DEPT. OF EDUC., EXPENDITURES PER PUPIL: 2020–2021 at 8 (Jan. 2021) (2020–2021 school year expenditures per pupil were approximately $15,869), *available at* https://bit.ly/3ZPAelj; KANCARE OMBUDSMAN, KANCARE GEN. INFO. FACT SHEET (updated Nov. 19, 2020), *available at* https://bit.ly/3Da3MAd ("KanCare Eligible Non-Citizens[:] To be considered eligible for any of the KanCare medical assistance programs, non-U.S. citizens must hold (1) legal residency in the U.S. for 5 years or more or (2) hold a certain immigration status."); KAN. DEPT. OF HEALTH & ENVT., DIV.

OF HEALTH CARE FIN., MKEESM MANUAL §§ 2142, 2146 (Jan. 2023), *available at* https://bit.ly/3wjMLzX (pertaining to "Qualified Non-Citizen Status" and "Documentation of Legal Status"); KAN. DEPT. OF HEALTH & ENVT., DIV. OF HEALTH CARE FIN., A-1 NON-CITIZEN QUALIFICATION CHART 1 (Jan. 2023), *available at* https://bit.ly/3WuYXZk ("The purpose of this chart is to provide policy guidance for eligibility staff when addressing requests for coverage when the individual attests to being a non-citizen and provides supporting documentation."); *see also* KAN. DEPT. OF HEALTH & ENVT., MEDICAID TRANSFORMATION 214 (Jan. 2009), *available at* https://bit.ly/3ZTllhH (explaining Kansas's administration of "SOBRA," noting "[illegal aliens] have been found to use hospital and emergency services at over twice the rate of the overall U.S. population," and observing that there is a "large number of" "uninsured" illegal aliens).

101. Kansas has approximately 69,000 to 85,000 illegal aliens already living in the State, about 64% of whom are uninsured and about 25% of whom have incomes below the poverty line. *See Population Profiles* (69,000 illegal aliens, 81% from "Mexico and Central America," 64% uninsured, 11% below 50% of the poverty level); *Population Estimates* (Feb. 5, 2019),. These illegal aliens cost Kansas taxpayers more than $377 million per year. *See Fiscal Burden*. If more illegal aliens enter Kansas, that will increase the costs of the State's healthcare system (among other things).

102. Kentucky is also injured by the Defendants' illegal program. Kentucky will be required to stretch its scarce resources even further under the parole program because it will cause an influx of illegal aliens to be released into the United States, including Kentucky, which increases the burden on the Commonwealth's ability to provide critical governmental services to its citizens.

103. Specifically, the parole program incentivizes further illegal immigration by allowing illegal aliens who have already illegally entered the United States to act as "supporters" and encourage aliens who have not yet left their countries to do so. As a result, the Defendants' unlawful actions will lead to an increased number of illegal aliens in Kentucky, thereby forcing Kentucky to expend limited resources on education, healthcare, public assistance, and general government services.

104. Kentucky has approximately 35,000 to 56,000 illegal aliens living in the Commonwealth; about 60% of them are uninsured; about 37% of them have incomes below the poverty level; and they cost Kentucky taxpayers more than $261 million per year. If more illegal aliens enter the Commonwealth, that will increase the costs of the Commonwealth's healthcare system.

105. According to one estimate, there are approximately 4,000 illegal aliens residing in Kentucky that are under the age of 16. Under Kentucky law, all children residing in the Commonwealth, regardless of lawful status, shall attend public school until age 16, with exceptions for students who attend private, parochial, or home school options. Ky. Rev. Stat. § 159.010. The Defendants' unlawful parole program will result in an increased number of illegal-alien children attending public schools in the Commonwealth, which will increase educational costs, including, but not limited to, requiring additional faculty for ESL instruction, increased administrative costs, and reductions in space at public school facilities.

106. Louisiana will also be injured gravely by the parole program. Louisiana will be required to stretch its resources even further under the parole program, because the parole program involves the unlawful release of hundreds of thousands of illegal aliens into the United States. The parole program

will force Louisiana to expend limited resources on education, healthcare, public assistance, and general government services.

107. Indeed, Louisiana already has approximately 70,000 to 78,000 aliens living in the State who are not lawfully in the United States. More than 70% of them do not have health insurance, about 34% of them have incomes below the poverty level, and they cost Louisiana taxpayers more than $362 million a year. *See, e.g.*, *Population Profiles* (70,000 illegal aliens, 73% uninsured, 34% poverty level); *Population Estimates* (70,000 illegal aliens); *Fiscal Burden* (78,820 illegal aliens, $362 million annual cost). More aliens entering the State will increase the costs of the State's healthcare system.

108. Louisiana spends more than $10,000 per student on public schooling. Melanie Hanson, *U.S. Pub. Educ. Spending Statistics*, EDUC. DATA INITIATIVE (Jun. 15, 2022), https://bit.ly/3H0j5gb. Additional aliens enrolled in public schools increase Louisiana's education expenditures. *See Plyler*, 457 U.S. at 223–30.

109. Defendant DHS has previously recognized that Louisiana "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Louisiana." Mem. of Understanding Between DHS & La. Dept. of Justice at 1–2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased

economic competition with the State of Louisiana's current residents for, among other things, employment, housing, goods and services." *Id.* at 3.

110. Louisiana cannot recover its increased costs, which it would otherwise not incur if the federal government enforced the law, from the federal government. This affects Louisiana's sovereign interests in its territory and its ability to carry out properly such interests on behalf of the citizens of the State.

111. Mississippi is also injured by the parole program. Mississippi will be required to stretch its scarce resources even further under the program because it will cause an influx of illegal aliens who otherwise have no basis for entering the country. The program will further incentivize and exacerbate illegal immigration, and thus will force Mississippi to expend limited resources on education, healthcare, public assistance, law enforcement, and general government services.

112. Mississippi has approximately 20,000 to 28,000 illegal aliens living in the State; about 75% of them are uninsured; about 49% of them have incomes below the poverty level; and they cost Mississippi taxpayers more than $117 million per year. If more illegal aliens enter the State, that will increase the costs to the State's healthcare system.

113. Missouri is directly and adversely affected by increases in illegal immigration at the southern border. Recent studies have established that significant numbers of illegal aliens who enter the United States end up residing in Missouri. *See Texas v. Biden*, 554 F. Supp. 3d 818, 838 (N.D. Tex. 2021), *aff'd*, 20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). Like Texas, Missouri experiences pocketbook injuries as a result of the unlawful presence of illegal aliens in the State in the form of education, healthcare, and law-enforcement costs. These financial injuries are irreparable because Missouri has no plausible recourse to recoup them.

114. Illegal aliens and their children receive education benefits from Missouri at Missouri's expense. *See Plyler v. Doe*, <u>457 U.S. 202, 205</u>, <u>230</u> (1982) (holding that the Constitution prohibits States from "deny[ing] to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens").

115. As the District Court for the Northern District of Texas has found, the costs to "Missouri … of providing public education for illegal alien children will rise … as the number of illegal alien children present in the State increases." *Texas*, <u>554 F. Supp. 3d at 838</u>.

116. "Some aliens who … are being released or paroled into the United States … will use state-funded healthcare services or benefits in … Missouri." *Id.* "The total costs to [Missouri] will increase as the number of aliens within [Missouri] increases." *Id.* at 839.

117. Federal law requires Missouri to include illegal aliens in its Emergency Medicaid program, which provides health coverage for low-income children, families, seniors, and disabled persons. <u>42 C.F.R. § 440.255(c)</u>.

118. Missouri is also a destination State and hub for human-trafficking crimes within the United States, due to its situation at the confluence of several major interstate highways. *See Texas*, <u>554 F. Supp. 3d at 839</u> ("Missouri is … a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally."). Illegal aliens are disproportionately the victims of these crimes. Some illegal aliens also commit crimes. Human-trafficking and other crimes committed by or against illegal aliens inflict irreparable costs on Missouri, both in law-enforcement costs and in providing resources for victims. *See id.* (finding that "[h]uman trafficking" arising from and involving increases in unlawful immigration "causes fiscal harm to … Missouri").

119. Additionally, Missouri is suffering a "fentanyl crisis" that is "worsening." Alex Smith, *Missouri's Fentanyl Crisis is Worsening, But Patients Can't Get Treatment for Substance Abuse*, ST. LOUIS PUBLIC RADIO (Apr. 5, 2022).[2] "St. Louis ranks among the deadliest cities in the country for overdose deaths among African Americans, and … the Black community seems caught between organized crime's fentanyl push and ineffective efforts to stop it." *Id.* Drug smugglers unlawfully entering the United States through the southern border are critical suppliers for distributors of fentanyl and other illegal substances in Missouri and elsewhere in the United States. *See* Anna Giaritelli, *Is America's Immigration Crisis Causing the Fentanyl Epidemic?*, WASHINGTON EXAMINER (July 13, 2022).[3] In addition to devastating the lives and health of Missouri's citizens, drug-related and other crimes committed by or against illegal aliens impose major healthcare and law-enforcement costs on the State. An increased influx of illegal aliens will exacerbate these problems. *See Texas*, 554 F. Supp. 3d at 839 (finding that "[s]ome aliens who … are being released or paroled into the United States … will commit crimes in … Missouri").

120. An increased influx of illegal aliens will also affect Missouri's labor market and reduce job opportunities for U.S. citizens and aliens lawfully present in Missouri, as illegal aliens frequently compete for jobs at lower wages than workers who are lawfully present. Missouri has a large agricultural sector. Illegal aliens unlawfully present in Missouri distort Missouri's labor market and inflict irreparable injury on both the State and its citizens.

---

[2]   Available at https://news.stlpublicradio.org/health-science-environment/2022-04-05/missouris-fentanyl-crisis-is-worsening-but-patients-cant-get-treatment-for-substance-abuse.

[3]   Available at https://www.washingtonexaminer.com/policy/defense-national-security/is-immigration-causing-fentanyl-epidemic.

121. The State of Montana is acutely affected by modifications in federal policy regarding immigration.

122. Montana bears the costs of illegal aliens, including their U.S.-born children, and is forced to expend resources on education, healthcare, public assistance, and general government services.

123. Because Montana has no state sales tax, many illegal aliens pay virtually no state taxes. Therefore, the costs of all the public services they consume are borne by lawfully present taxpayers.

124. Ohio will also be irreparably harmed by the parole program. Ohio expends significant state resources on providing state services to illegal aliens within the State. The illegal parole program will increase the number of illegal aliens in Ohio. While illegal border crossings most severely affect border States, the parole program requires aliens to "provide for their own commercial travel" to the United States, and therefore will affect States beyond the border. Populous States, including Ohio, will likely shoulder a substantial number of illegal aliens, particularly given the requirement that the alien associate with a United States "supporter" to gain entry.

125. Ohio is forced to expend resources on illegal aliens, including emergency medical services and schooling. Ohio schools spend more than $12,000 per pupil, on average, and Ohio provides schooling regardless of immigration status. Ohio is unable to recover these costs from the federal government and would not incur these costs but for the federal government's unlawful "parole" program.

126. The program harms Ohio's quasi-sovereign interests by compromising its territorial integrity and skewing its labor market.

127. Oklahoma will also be irreparably harmed by the parole program. The Defendants' operation of the parole program injures Oklahoma's interests in

its territory and the welfare of its citizens and causes Oklahoma to incur millions of dollars of costs every year.

128. Among other things, Oklahoma must incur the expense of providing a free public education to any school age child admitted through the parole program—a cost of more than $10,000 per year per child. Oklahoma also incurs significant costs for health care and other state services that are broadly available in the state, including to illegal aliens. As a result, increasing the presence of aliens through the parole program will impose significant financial harm on Oklahoma.

129. South Carolina will also be irreparably harmed by the parole program. South Carolina expends significant state resources on providing state services to illegal aliens within the State. For example, South Carolina spends thousands of dollars per student each year on public-school education, which the State provides to students regardless of their immigration status.

130. The parole program will necessarily lead to a new inflow of illegal aliens into South Carolina. By the Defendants' own estimation, up to 30,000 qualifying individuals per month from all four countries will be admitted to the United States under the program. The program could thus allow for the entry of up to 360,000 new illegal aliens to enter the United States per year. Because the program will significantly increase the total number of illegal aliens in the country, the program will harm South Carolina by causing it to expend even more state resources on the newly arrived illegal aliens.

131. Tennessee is also harmed. Tennessee has approximately 128,000 unauthorized individuals living within the State. Tennessee spends significant sums of money providing services to illegal aliens. Those include education services and healthcare, as well as many other social services. As the number of illegal aliens in Tennessee increases, Tennessee will be required to expend its

limited resources and additional money on education, healthcare, public assistance, and general government services.

132. The parole program will force Tennessee to increase expenditures on K–12 education. Tennessee spends thousands of dollars per student each year on public school education, which the State provides to students regardless of their immigration status. Tennessee spends approximately $5.5 billion of state funds on K–12 education, a portion of which is already spent on students regardless of immigration status, and additional funding will be required due to the parole program.

133. The parole program will also require Tennessee to increase expenditures on various social services like healthcare. Tennessee already spends approximately $214 million on total uncompensated care costs at public hospitals. Additionally, Tennessee expended approximately $46.7 million on healthcare coverage for undocumented immigrants in its CoverKids (CHIP) program. These expenditures will increase under the parole program.

134. Utah is also harmed. The parole program will create increased crime and drug trafficking in Utah's communities, requiring additional expenditures by law enforcement. In addition, by increasing illegal immigration, the parole program will force Utah to expend limited resources on education, healthcare, public assistance, and general government services.

135. Utah has approximately 89,000 to 113,000 illegal aliens living in the State; about 61% of them are uninsured; about 23% of them have incomes below the poverty line; and they cost Utah taxpayers more than $521 million a year. *See, e.g.*, *Population Profiles* (89,000 illegal aliens, 61% uninsured, 23% below poverty level); *Population Estimates* (95,000 illegal aliens); *Fiscal Burden* (112,600 illegal aliens, $521 million annual cost).

136. The State of West Virginia is affected by modifications in federal policy regarding immigration. It incurs costs related to its nearly 4,000 illegal aliens, including their U.S.-born children, and expends resources on education, healthcare, public assistance, and general government services. For example, West Virginia spends more than $12,000 per year per public-school student, and it provides public education and related benefits (such as free or reduced-price meals) irrespective of immigration status. West Virginia makes illegal aliens paroled under 8 U. S. C. § 1182(d)(5) eligible for Medicaid. If more illegal aliens enter West Virginia, that will increase West Virginia's education, healthcare, and other costs.

137. Wyoming is also injured by the Defendants' new parole program. Wyoming will be required to stretch its scarce resources even further under the new program because it will cause an influx of illegal aliens to be released into the United States (including to Wyoming) which increases the burden on Wyoming's ability to provide critical governmental services to its citizens. The Defendants' unlawful actions will lead to an increased number of illegal aliens in Wyoming, thereby forcing Wyoming to expend additional resources on education, healthcare, public assistance, and general government services.

138. Wyoming has approximately 5,000 to 7,000 illegal aliens living in the State, and they cost Wyoming taxpayers more than $26.1 million a year. *See, e.g.*, *Population Profile* (7,000 illegal aliens); *Population Estimates* (5,000 illegal aliens); *Fiscal Burden* (<6,000 illegal aliens, $26.1 million annual cost).

139. If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

CLAIMS FOR RELIEF

## I.   Count One (APA)

140. Under the Administrative Procedure Act (APA), 5 U.S.C. § 706, a court must decide all relevant questions of law, interpret the constitution and statutes, and determine the meaning or applicability of the terms of an agency action. It must then hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law.

141. The Defendants' parole program should be held unlawful and set aside because:

   a.   The program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5).

   b.   The Defendants unlawfully failed to engage in notice-and-comment rulemaking.

   c.   The Defendants arbitrarily created a program that allows hundreds of thousands of aliens to enter the United States with no consideration of their ability to remove those aliens from the United States at the end of their respective periods of parole.

   d.   The Defendants arbitrarily created a program that relies upon an alien obtaining a "sponsor" who agrees to provide support for the alien, but with no meaningful mechanism to legally enforce such an agreement against the sponsor.

   e.   The Defendants arbitrarily did not consider and account for the Plaintiff States' legally recognized reliance interest in the enforcement of federal immigration statutes, including by not allowing into the United States individuals who have no right to be here.

## II. Count Two (Ultra Vires)

142. A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

143. The Defendants' parole program exceeds their statutory parole authority under 8 U.S.C. § 1182(d)(5).

### PRAYER FOR RELIEF

For these reasons, the Plaintiff States ask that the Court:

- Stay, postpone, or preliminarily enjoin the Defendants' implementation of the parole program;

- Following a trial on the merits, decree that the parole program was issued in violation of the APA and vacate it, set it aside, or in the alternative, permanently enjoin the Defendants from implementing it;

- Declare that the parole program exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5);

- Award the Plaintiff States their attorneys' fees and costs of court; and

- Award the Plaintiff States all other relief to which they may be entitled.

Dated February 14, 2023.                         Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

AARON F. REITZ
*Lead Counsel*
Deputy Attorney General for Legal
Strategy
Texas Bar No. 24105704
Southern District of Texas No. 3653771
aaron.reitz@oag.texas.gov

/s/ Leif A. Olson
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas No. 33695
leif.olson@oag.texas.gov

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON*
America First Legal Foundation
Virginia Bar No. 80434
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for the State of Texas*

*Application for admission forthcoming

STEVE MARSHALL
Alabama Attorney General
EDMUND G. LACOUR JR.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

TIM GRIFFIN
Arkansas Attorney General
NICHOLAS J. BRONNI
Arkansas Solicitor General
HANNAH L. TEMPLIN
Assistant Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201

*Counsel for the State of Arkansas*

RAÚL R. LABRADOR
Attorney General of Idaho
David M.S. Dewhirst, ISB No. 12141
Chief Deputy Attorney General
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
david.dewhirst@ag.idaho.gov

*Counsel for the State of Idaho*

TREG R. TAYLOR
Attorney General of Alaska
CORI M. MILLS
Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

ASHLEY MOODY
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

BRENNA BIRD
Attorney General of Iowa
ERIC H. WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 281-5164
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

KRIS KOBACH
Attorney General of Kansas
JESSE A. BURRIS, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

JEFF LANDRY
Attorney General of Louisiana
ELIZABETH B. MURRILL (La #20685)
Solicitor General
JOSEPH SCOTT ST. JOHN (La #36682)
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for the State of Louisiana*

ANDREW BAILEY
Attorney General of Missouri
JOSHUA M. DIVINE, Mo. Bar #69875
Solicitor General
CHARLES F. CAPPS, Mo. Bar #72734
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

DANIEL CAMERON
Attorney General of Kentucky
MARC MANLEY
Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for the Commonwealth of Kentucky*

LYNN FITCH
Attorney General of Mississippi
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

AUSTIN KNUDSEN
Attorney General of Montana
CHRISTIAN B. CORRIGAN
Solicitor General
PETER M. TORSTENSEN, JR.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

34

MICHAEL T. HILGERS
Attorney General of Nebraska
ERIC J. HAMILTON
Deputy Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

DAVE YOST
Ohio Attorney General
SYLVIA MAY MAILMAN
Ohio Deputy Solicitor General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
May.Mailman@OhioAGO.gov

*Counsel for the State of Ohio*

GENTNER F. DRUMMOND
Attorney General of Oklahoma
GARRY M. GASKINS, II
Solicitor General
ZACH WEST
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter
CLARK L. HILDABRAND
Assistant Solicitor General
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 253-5642
Clark.Hildabrand@ag.tn.gov

*Counsel for the State of Tennessee*

SEAN D. REYES
Utah Attorney General
MELISSA HOLYOAK
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

PATRICK MORRISEY
Attorney General of West Virginia
LINDSAY SEE
Solicitor General
MICHAEL R. WILLIAMS
Senior Deputy Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

BRIDGET HILL
Wyoming Attorney General
RYAN SCHELHAAS
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

## CERTIFICATE OF SERVICE

I certify that this Amended Complaint was filed through the Court's CM/ECF system, which served it upon all counsel of record.

/s/ Leif A. Olson

**Ex. 4: Memorandum Opinion and Order, ECF 315**

United States District Court
Southern District of Texas
**ENTERED**
May 29, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § § § § § § § § § § § |
| Plaintiffs, | § § |
| v. | § § |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of U.S. Citizenship and Immigration Services, in her official capacity; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity, | § § § § § § § § § § § § § § § § § § § § § § § |
| Defendants. | § |

Civil Action No. 6:23-CV-00007

## MEMORANDUM OPINION AND ORDER

On March 8, 2024, this Court entered final judgment, finding that Plaintiffs failed to establish that they have standing and dismissing their claims without prejudice. (Dkt. No. 306). Three days later, Plaintiffs appealed to the United States Court of Appeals for the Fifth Circuit. (Dkt. No. 307). On April 4, 2024, Plaintiffs filed Plaintiff States' Opposed Rule 59(e) Motion to Reconsider Judgment. (Dkt. No. 310). Plaintiffs argue that the Court "applied the wrong standard to determine whether the Plaintiffs had demonstrated that Texas had standing to challenge the CHNV Program," and that "[e]ven under the Opinion's articulated standard, the facts demonstrated that the Program led to increased CHNV nationals entering the United States." (*Id.* at 5).

The Federal Defendants and Intervenor Defendants both oppose the Motion. (*See* Dkt. Nos. 312, 313). In addition to disagreeing that the Court should reconsider its order, Intervenor Defendants also raise two additional contentions: (1) that Plaintiffs have not met the requirements for reconsideration under Rule 59(e), and (2) that because the notice of appeal pre-dated Plaintiffs' motion to reconsider, the Court has been divested of jurisdiction to entertain the Motion at all. (Dkt. No. 312 at 2–5). The Court first considers whether it has jurisdiction to take up the Motion.

## I.      JURISDICTION

Intervenor Defendants argue that once Plaintiffs appealed this Court's final judgment to the Fifth Circuit, this Court lost jurisdiction to grant a subsequently filed Rule 59(e) motion. (*Id.* at 3–5). As a general rule, a timely appeal divests the district court of jurisdiction over those aspects of the case on appeal. *See, e.g., Alice L. v. Dusek*, 492 F.3d

2

563, 564 (5th Cir. 2007) (per curiam).  However, "the efficacy of a notice of appeal can be

delayed under <u>Federal Rule of Appellate Procedure 4</u>[.]"  *Redding-Guidry v. Harmony Pub.*

*Sch.*, No. 4:22-CV-02299, <u>2024 WL 460244</u>, at *2 (S.D. Tex. Feb. 6, 2024).  Rule 4 provides,

in relevant part:

> If a party files a notice of appeal after the court announces or
> enters a judgment—but before it disposes of any motion listed
> in Rule 4(a)(4)(A)—the notice becomes effective to appeal a
> judgment or order, in whole or in part, when the order
> disposing of the last such remaining motion is entered.

<u>Fed. R. App. P. 4(a)(4)(B)(i)</u>.  As the Fifth Circuit has explained, the effect of this rule is

that "the timely filing of a motion listed in Rule 4(a)(4)(A) suspends or renders dormant

a notice of appeal until all such motions are disposed of by the trial court."  *Ross v.*

*Marshall*, <u>426 F.3d 745, 751</u> (5th Cir. 2005).  And most importantly, "[t]his holds true

*regardless of whether the motion was filed before or after the notice of appeal*."  *Id.* at 751–52

(emphasis added).  Thus, when a party files a Rule 4(a)(4)(A) motion after previously

filing a notice of appeal—as is the case here—the district court is "not entirely finished

with [the] case."  *Simmons v. Reliance Standard Life Ins. Co. of Tex.*, <u>310 F.3d 865, 868</u> (5th

Cir. 2002).  That is why a pre-existing appeal is therefore "suspend[ed] or render[ed]

dormant" until the motion's resolution.  *Ross*, <u>426 F.3d at 751</u>.

Rule 59(e) falls within the motions contemplated by Rule 4.  *See* <u>Fed. R. App. P.</u>

<u>4(a)(4)(A)(iv)</u>.  Accordingly, the Court has jurisdiction to decide the present Motion.

## II.     MOTION TO RECONSIDER UNDER RULE 59(E)

A Rule 59(e) motion "calls into question the correctness of a judgment."  *In re*

*Transtexas Gas Corp.*, <u>303 F.3d 571, 581</u> (5th Cir. 2002).  Such a motion serves "the narrow

purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989) (internal quotation marks omitted). It can also be appropriate "when there has been an intervening change in the controlling law." *Schiller v. Physicians Res. Grp.*, 342 F.3d 563, 567 (5th Cir. 2003). A Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). Put differently, "Rule 59(e) is not designed to permit a party to continue to re-litigate the same claims with the same arguments, or even new arguments, once there has been a ruling on the merits of a claim." *Finney v. Thaler*, No. 7:10-CV-00131, 2020 WL 13663878, *2 (W.D. Tex. Jan. 17, 2020) (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5, 128 S.Ct. 2605, 2617 n.5, 171 L.Ed.2d 570 (2008)). Accordingly, "[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Templet*, 367 F.3d at 479.

Here, Plaintiffs have neither asserted that there has been an intervening change in controlling law, nor that there is newly discovered evidence. Instead, they move under Rule 59(e) solely on the basis that the Court's standing analysis "contains manifest errors of law and fact." (Dkt. No. 314 at 4); (*see* Dkt. No. 310). But the substance of Plaintiffs' motion seeks to do precisely what Rule 59(e) forbids: re-litigate the same legal theories and present the same arguments upon which the Court has already ruled. Those arguments are no more availing now on reconsideration. The Court does not find "manifest error" in its prior judgment.

4

While the Court will not rehash its standing analysis, it appears that Plaintiffs have misunderstood certain aspects of the Court's prior ruling. Thus, the Court will briefly comment on those points.

## A.   OFFSETTING BENEFITS

Plaintiffs first argue that the Court "engaged in an impermissible accounting exercise" by considering whether Texas's injury was outweighed by offsetting benefits. (Dkt. No. 310 at 6–11). But as the Court explained, "it need not consider Defendants' other arguments," including "with respect to [] offsetting benefits," because Texas "has not suffered an injury" at all. *Texas v. U.S. Dep't of Homeland Sec.*, ____ F.Supp.3d ____, ____ n.17, No. 6:23-CV-00007, 2024 WL 1021068, at *17 n.17 (S.D. Tex. Mar. 8, 2024) ("*CHNV*"). The Court noted that Texas could have proved its alleged injury—dollar damages[1]—in one of two ways: proving by a preponderance either (1) "that terminating the Program would reduce migration flow from the four countries," or (2) "that migration flow increased" after implementation of the Program. *Id.* at *17 n.18. But, as Plaintiffs conceded, the evidence presented at trial demonstrated that the numbers actually decreased.[2] *Id.* at *9–12, *14–16. The Court therefore did not impermissibly "weigh a given program's costs versus other benefits in assessing standing." (Dkt. No. 310 at 7).

---

[1]   *See CHNV*, 2024 WL 1021068 at *12 n.13 (citing Dkt. No. 278 at 246).

[2]   At trial, Plaintiffs primarily relied on the second theory: that the Court should conceptualize the migration flow as having increased. But on reconsideration, they also say that "even if overall immigration flows decreased for such a discrete period of time, they would have decreased *even more* if the unlawful CHNV Program were enjoined." (Dkt. No. 310 at 7) (emphasis in original). Plaintiff failed to prove that fact at trial and would have the Court assume as much. At no point, including on reconsideration, have Plaintiffs identified evidence to support this assertion.

### B.   FACTS POST-DATING COMPLAINT

Plaintiffs' second point of contention is that the Court "impermissibly evaluated facts occurring after the complaint to find a lack of standing." (*Id.* at 11). On this point, the Court directs Plaintiffs to Finding of Fact 80, as well as footnote 14 of the *CHNV* opinion. *CHNV*, 2024 WL 1021068 at *11, *14 n.14. In the former, the Court found as a factual matter that "[t]he decline in CHNV nationals entering the United States after the rollout of the Program *was occurring at the time that Plaintiffs filed their Amended Complaint on February 14, 2023.*" *Id.* at *11 (emphasis added). And as explained in footnote 14, while the Parties did not offer only data taken before February 14, 2023, any data post-dating that date was used for purposes of determining standing as of February 14, 2023. *Id.* at *14 n.14.

### C.   DATA FROM POST-TRIAL BRIEFING

Finally, Plaintiffs argue that the Court erred by "disregard[ing] data" presented in their post-trial briefing which "show[s] that border crossings from aliens from CHNV countries have continued to increase and are higher than ever."[3] (Dkt. No. 310 at 13–14). Federal and Intervenor Defendants both dispute this assertion. (*See* Dkt. No. 313 at 12) (arguing that Plaintiffs' post-trial data "does not establish" an increase of CHNV nationals entering the country); (Dkt. No. 312 at 7) (stating that "it remains true now" that there has been a dramatic decrease of CHNV nationals entering the country, and Plaintiffs have "mischaracterize[ed]" the data).

---

[3]   Essentially, Plaintiffs ask the Court to both (1) ignore post-Complaint, pre-trial data, yet (2) consider post-trial data. (*See* Dkt. No. 310).

Regardless of how the Court interprets Plaintiffs' post-trial data, it remains the rule that prospective injuries, "like all injuries supporting Article III standing, [require] an injury in fact." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). Because an injury must be "actual or imminent," under Article III, "[t]he threat of future injury must be 'certainly impending'; mere allegations of possible future injury will not suffice." *James v. Hegar*, 86 F.4th 1076 (5th Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013)), *cert. denied*, No. 23-1011, 2024 WL 1839132 (U.S. Apr. 29, 2024)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (explaining that a threat of future injury must be "certainly impending," or there must be a "substantial risk" that the harm will occur). In articulating this standard, the Fifth Circuit has stated that a plaintiff satisfies the imminence requirement by showing "that future injury is 'fairly likely.'" *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 228 (5th Cir. 2023). As Plaintiffs remark, the likelihood of its alleged future injury is determined at the time of the operative complaint. (Dkt. No. 310 at 12).

In this case, all the evidence presented at trial indicated that when suit was filed, the rate of entry was plummeting. And Plaintiffs offered nothing to suggest that as of February 24, 2023, a rebound in that rate of entry was on the horizon, i.e., "fairly likely." Plaintiffs' post-trial evidence is of no moment on this point. Even assuming the data indicated that the entry rate of CHNV nationals has since rebounded to exceed pre-Program rates, a plaintiff "cannot . . . establish standing retroactively." *In re Technicool Sys., Inc.*, 896 F.3d 382, 386 (5th Cir. 2018). In other words, knowledge of an entry-rate

uptick in late-2023 in hindsight is not evidence that Plaintiffs proved this uptick was "imminent" as of February 24, 2023, when standing is determined.[4]

## III.    CONCLUSION

While the Court does have jurisdiction to consider Plaintiffs' Opposed Rule 59(e) Motion to Reconsider Judgment, (Dkt. No. 310), the substance of the Motion reveals that it is a re-hashing of the Parties' previous legal arguments and falls short of Rule 59(e)'s application.  Accordingly, the Motion is **DENIED**.

It is SO ORDERED.

Signed on May 28, 2024.

DREW B. TIPTON
**UNITED STATES DISTRICT JUDGE**

---

[4]    While Plaintiffs heavily rely on Judge Ho's concurrence in *Crawford v. Hinds Cnty. Bd. of Supervisors*, the alleged future injury in that case was sufficient because the evidence indicated that at the time of suit, that injury was expected to occur again, and "on a regular basis." 1 F.4th 371, 377 (5th Cir. 2021).  It is precisely this point which distinguishes *Crawford* from this case, as Plaintiffs here have not shown that their alleged future injury was "fairly likely," much less "certainly impending," as of February 24, 2023.

**Ex. 5: Intervenor Defendants' Post-Trial Memorandum of Law, ECF 282**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | Civil Action No. |
| | § | 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants,* and | § | Judge Drew B. Tipton |
| | § | |
| VALERIE LAVEUS, *et al.*, | § | |
| | § | |
| *Intervenor Defendants.* | § | |

**INTERVENOR DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW**

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................... 1

RESPONSES TO THE COURT'S QUESTIONS ..................................... 3

ARGUMENT ......................................................................................... 8

I.   Texas Lacks Standing. ...................................................................... 8

    a.  Standing Is Determined at the Time the Complaint is Filed and Requires Assessment of All Record Evidence. ......................... 8

    b.  Texas Lacks Injury. ................................................................... 9

        i.   The Court Should Not Accept Texas's New Theories of Standing, Which Are Meritless in Any Event. ........................... 11

        ii.  Regardless of Net Migration, Texas Has Failed to Establish Injury Because the Court Must Consider Net Costs. ...................................................................................... 16

    c.  Texas's Alleged Injury is Not Redressable. ............................... 18

    d.  Special Solicitude Has Been Narrowed, Further Undermining Texas's Standing. ..................................................................... 20

II.  Texas's Merits Arguments Fail. ...................................................... 22

    a.  The CHNV Pathways Are Consistent with the Statute ............. 22

        i.   The CHNV Pathways Comport with Unambiguous Statutory Text ........................................................................ 22

        ii.  The CHNV Pathways Are Consistent with Congressional Intent ...................................................................................... 34

        iii. The Major Questions Doctrine Cannot Save Texas's Case. ....... 40

    b.  The CHNV Pathways Are Not "Arbitrary and Capricious." ...... 41

III. The Balance of Hardships and the Public Interest Overwhelmingly Favor Defendants, Precluding Any Equitable Relief. ............................... 46

IV.  If Any Relief Is Justified, It Must Be Remand Without Vacatur. ..... 48

CONCLUSION .................................................................................... 54

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Ala. Ass'n of Realtors v. Dep't Health & Hum. Serv.*,
141 S. Ct. 2485 (2021) ............................................ 41

*Amoco Prod. Co. v. Vill. Of Gambell, AK*,
480 U.S. 531 (1987) ............................................ 49, 50

*Beame v. Friends of the Earth*,
434 U.S. 1310 (1977) ............................................ 49

*Benisek v. Lamone*,
138 U.S. 1942 (2018) ............................................ 49, 50

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ............................................ 39

*Cent. & S. W. Servs. v. EPA*,
220 F.3d 683 (5th Cir. 2000) ............................................ 3, 54

*Chem. Mfrs. Ass'n v. EPA*,
870 F.2d 177 (5th Cir. 1989) ............................................ 54

*Croft v. Governor of Texas*,
562 F.3d 735 (5th Cir. 2009) ............................................ 18

*Ctr. for Biological Diversity v. EPA*,
937 F.3d 533 (5th Cir. 2019) ............................................ 13

*Dep't of Homeland Sec. v. New York*,
140 S.Ct. 599 (2020) (Gorsuch, J., concurring) ............................................ 52

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891,1913 (2020) ............................................ 43

*E.T. v. Paxton*,
19 F.4th 760 (5th Cir. 2021) ............................................ 4, 12, 51

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ............................................ 46, 49

*Encino Motorcars, LLC v. Navarro*
579 U.S. 211 (2016) ............................................ 42, 43

ii

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
968 F.3d 357 (5th Cir. 2020) ............................................................ 4, 8

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ......................................................................... 45

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................................................................... 37, 39

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir. 2023) ................................................................ 51

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .............................................................................. 48

*Florida v. United States*,
Case No. 3:21cv1066-TKW-EMT, 2022 WL 2431414 (N.D. Fla. May
4, 2022) ................................................................................................... 7

*FPL Energy Me. Hydro LLC v. FERC*,
287 F.3d 1151 (D.C. Cir. 2002) ..................................................... 42, 46

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) .......................................................................... 51

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006) .............................................................................. 31

*Henderson v. Stalder*,
287 F.3d 374 (5th Cir. 2002) ................................................. 14, 16, 18

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) ................................................................ 46

*U.S. ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) .............................................................................. 22

*Louisiana ex rel. Landry v. Biden*,
64 F.4th 674 (5th Cir. 2023) ................................................................ 20

*Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric
Admin.*,
70 F.4th 872 (5th Cir. 2023) ................................................................ 20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...................................................... 5, 8, 13, 14, 18

iii

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ...................................................................... 21

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.*
    *Automobile Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................... 46

*Nat'l Fed. Indep. Bus. v. Occupational Safety & Health Admin.,*
    142 S. Ct. 661 (2022) .......................................... 27, 34, 41, 42

*Oh v. Collecto, Inc.,*
    No. 20-01937 (KM) (ESK), 2021 WL 3732881 (D.N.J. Aug. 23, 2021) ................ 13

*Saxbe v. Bustos,*
    419 U.S. 65 (1974) ....................................................................... 39

*Schaffer ex rel. Schaffer v. Weast,*
    546 U.S. 49 (2005) ................................................................ 8, 26

*Soc'y of Separationists, Inc. v. Herman,*
    959 F.2d 1283 (5th Cir. 1992) .......................................................... 8

*Texas Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n,*
    989 F.3d 368 (5th Cir. 2021) ........................................................... 4

*Texas Gen. Land Off. v. Biden,*
    71 F.4th 264 (5th Cir. 2023) ........................................................... 6

*Texas v. Biden (Minimum Wage),*
    No. 6:22-cv-00004, slip op. (S.D. Tex. Sept. 26, 2023) ................... 19, 33, 40, 51

*Texas v. EPA,*
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ............................................... 3, 4

*Texas v. United States,*
    50 F.4th 498 (2022) .................................................................. 5, 8

*Texas v. United States (DAPA),*
    809 F.3d 134 (5th Cir. 2015) ....................................... 6, 14, 16, 17, 18

*Texas v. United States,*
    Case No. 1:18-cv-00068, 2023 WL 5951196 (S.D. Tex. Sept. 13,
    2023) ................................................................................ 31

*Texas v. United States (DACA),*
    549 F. Supp. 3d 572 (S.D. Tex. 2021) *aff'd in part, vacated in part,*
    *remanded,* 50 F.4th 498 (5th Cir. 2022) ............................................. 21

*Texas v. USA,*
    Case 1:14-cv-00254, ECF 347 (S.D. Tex. May 19, 2016) ....................................... 53

*Turkiye Halk Bankasi A.S. v. United States,*
    598 U.S. 264 (2023) ........................................................................................... 32

*U.S. v. Sineneng-Smith,*
    140 S.Ct. 1575 (2020) ......................................................................................... 7

*United States v. Texas (Guidelines),*
    143 S. Ct. 1964 (2023) ..................................................... 5, 18, 19, 20, 21

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ...................................................................................... 40, 41

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ........................................................................................ 40

*Whitfield v. United States,*
    543 U.S. 209 (2005) ........................................................................................... 33

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ................................................................................... 4, 46, 50

*Worldcall Interconnect, Inc. v. F.C.C.,*
    907 F.3d 810 (5th Cir. 2018) ............................................................................. 41

## Statutes

8 U.S.C. § 1152(d)(5)(A) ............................................................................................ 33

8 U.S.C. § 1182(d)(5) ......................................................................................... 7, 8, 28

8 U.S.C. § 1182(d)(5)(A) ......................... 7, 22, 23, 27, 31, 32, 33, 35, 37, 40, 41

8 U.S.C. § 1182(d)(5)(B) .................................................................................... 32, 33

## Other Authorities

87 Fed. Reg. at 63507 ............................................................................................... 36

87 Fed. Reg. 63507, 63516 (Oct. 19, 2022) .......................................................... 25

87 Fed. Reg. at 63508 .......................................................................................... 29, 37

87 Fed. Reg. at 63509 .......................................................................................... 28, 37

87 Fed. Reg. at 63516 ............................................................................................... 25

88 Fed. Reg. at 1243 ................................................................................................. 36, 37

88 Fed. Reg. 1243, 1253 (Jan. 9, 2023) ................................................................... 24

88 Fed. Reg. at 1244 ................................................................................................. 29

88 Fed. Reg. at 1245 ................................................................................................. 37

88 Fed. Reg. at 1246 ................................................................................................. 28

88 Fed. Reg. at 1253 ............................................................................................. 25, 37

88 Fed. Reg. at 1255 ............................................................................................. 36, 37

88 Fed. Reg. 1255, 1264 (Jan. 9, 2023) ................................................................... 25

88 Fed. Reg. at 1256 ................................................................................................. 29

88 Fed. Reg. at 1257-58 ............................................................................................ 37

88 Fed. Reg. at 1259 ................................................................................................. 28

88 Fed. Reg. at 1264 ............................................................................................. 25, 37

88 Fed. Reg. 1266, 1276 (Jan. 9, 2023) ................................................................... 24

88 Fed. Reg. at 1267 ............................................................................................. 36, 37

88 Fed. Reg. at 1268 ................................................................................................. 29

88 Fed. Reg. at 1269 ............................................................................................. 28, 36

88 Fed. Reg. at 1276 ................................................................................................. 25

88 Fed. Reg. at 1277 ................................................................................................. 37

88 Fed. Reg. at 1279 ................................................................................................. 36

88 Fed. Reg. at 1280 ................................................................................................. 37

## INTRODUCTION

Per ECF 271, Intervenor Defendants submit the following post-trial memorandum of law addressing the questions on which the Court requested further briefing during trial, as well as other matters relevant to the Court's adjudication. The answers to the Court's questions illustrate why Texas has failed to prove its case.

Texas asks this Court to accept a standing standard so low as to render it meaningless. Longstanding precedent and recent Supreme Court admonitions alike dispense with Texas's standing arguments: Texas cannot change its standing theory at the eve of trial; it cannot ask this Court to ignore the *evidence* of reduced net migration in the record; and it cannot rely on special solicitude as a substitute for evidence of the injury-in-fact and redressability that Article III demands.

On the merits, Texas seeks to recharacterize the Parole Pathways for people from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV Pathways") as permitting unlimited and undocumented immigration in order to argue that they contravene statutory authority—but that is simply false. The CHNV Pathways, which are justified by well-documented urgent humanitarian reasons and significant public benefit, permit a limited number of eligible individuals with sworn financial sponsors to be considered for parole on a case-by-case basis. Texas asks this Court to be the first *in over seven decades* to invalidate one of dozens of parole programs of its kind. Doing so would require this Court to substitute its own judgment for congressional intent and executive discretion over a program involving foreign policy—and to do so absent any evidence of harm.

Even if the Court permits Texas to invoke jurisdiction on its thin theory of harm, *and* finds that Texas has succeeded on the merits of its novel claims, the Court cannot grant the relief Texas seeks. Texas asks for an extraordinary nationwide injunction that would halt the CHNV Pathways and strip people who have obtained parole under it of their status, along with a vacatur of the program. Such relief would be unlawful in every respect. Because Texas concedes that total migration of individuals from CHNV countries has *decreased* since the CHNV Pathways took effect, it cannot establish *any* actual harm, let alone at a scale that outweighs the competing harms to Intervenors and the public interest. An order blocking the CHNV Pathways would extinguish the opportunities of Intervenors, like countless others, to exercise deeply held religious beliefs, reunify with their families, protect the lives of loved ones, and create economic opportunities for individuals and communities in need. Absent Texas's showing of harm, longstanding equitable principles do not permit this Court to enjoin the CHNV Pathways even in Texas, let alone nationwide.

Nor should the Court vacate the CHNV Pathways. To the extent the Court finds any errors, those errors could be cured by the agency—whether through notice and comment, re-assessing the harms, or altering program processes. Thus, the only appropriate course would be to remand without vacatur.

Finally, the Court most certainly should not strip people now living with the support of their sponsors of their immigration status. There would be absolutely no legal basis to support such an unprecedented order.

The sweeping nationwide relief Texas seeks is inappropriate, unlawful, and far outweighed by the harm it would cause to Intervenors, other sponsors, beneficiaries, families, employers, and communities—not to mention to countless Texans and Texas itself.

## RESPONSES TO THE COURT'S QUESTIONS

Intervenor Defendants provide concise answers below to each question raised by the Court. More fulsome explication for the complex questions as well as additional post-trial argument follow thereafter.

### 1. What does an "intermediate course," or limited relief, look like? [Trial Tr. vol. 2 of 2, 332:3-10]

Should the Court find the challenged action unlawful, an "intermediate course"—and indeed the only appropriate remedy—would be remand without vacatur. Any other remedy would risk significant disruption to international relations, global migration patterns, domestic immigration policy and agency resources, conditions along the southern border, and up to seven other ongoing parole programs affecting thousands of people, including Uniting for Ukraine ("U4U") and Afghan Allies Welcome. *See* Expert Declaration of Yael Schacher ("Schacher Expert Decl.") Int. Defs' Trial Ex. 141; Declaration of Blas Nuñez-Neto Declaration ("Nuñez-Neto Decl."), Fed. Defs' Trial Ex. HH ¶¶ 5-7, 27-51; *see also Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019) (finding remand without vacatur appropriate when vacatur "would be disruptive" and there is a "serious possibility" the agency's defects could be cured (citing *Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

Should the Court disagree, it still should not issue an injunction, as Texas has certainly proven no harm from the CHNV Pathways that outweighs the harm that an injunction would cause Intervenors, nonparties, and the public interest. *Winter v. Nat. Res. Def. Council*, <u>555 U.S. 7, 20</u> (2008). A nationwide injunction would be still more unwarranted. *E.T. v. Paxton*, <u>19 F.4th 760, 769</u> (5th Cir. 2021). Nor should the Court strip thousands of CHNV Pathways beneficiaries of their lawful status; Texas has provided no authority to support that draconian request. *See infra* Section IV.

### 2. What would the remedy be if the only violation is failure to engage in notice-and-comment? [Trial Tr. vol. 2 of 2, 332:3-10]

Remand without vacatur would be the most appropriate remedy. *See Texas Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n*, <u>989 F.3d 368, 389</u> (5th Cir. 2021) (ordering remand without vacatur following notice and comment violation); *Texas v. EPA*, <u>389 F. Supp. 3d 497, 505</u> (S.D. Tex. 2019) (same).

### 3. Explain the relevance of the Major Questions doctrine to this case. [Trial Tr. vol. 2 of 2, 310:13-17]

The Major Questions doctrine is not relevant to this case, and Texas has failed to sufficiently demonstrate its applicability here. *See infra* Section II(a)(iii).

### 4. Is standing determined at the time of the complaint, or later? [Trial Tr. vol. 2 of 2, 265:8-23]

As discussed extensively at trial, the Court must determine whether Plaintiff States had standing as of the date they filed the operative (amended) complaint, ECF 20, and Plaintiff States must carry the burden of proving they have standing with evidence at trial. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, <u>968 F.3d 357, 367</u> (5th Cir. 2020) ("Because this case was tried, Plaintiffs needed to prove standing

4

by a preponderance of the evidence."); *see also Texas v. United States,* 50 F.4th 498, 513 (2022) (hereinafter "*DACA*") ("At summary judgment, [the plaintiffs] can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." (cleaned up)). *See infra* Section I(a).

### 5. Can the Court consider data post-dating the complaint to determine standing? [Trial Tr. vol. 2 of 2, 267:7-10]

The Court can look to any evidence in the trial record, including evidence post-dating the complaint. Plaintiff States pled future injury as a result of the CHNV Pathways, *see* First Amended Complaint ("FAC"), ECF 20, and they bear the burden of proving those allegations "with the manner and degree of evidence required at the successive stages of litigation." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 561 (1992).

### 6. Is $1 of harm sufficient to establish standing? [Trial Tr. vol. 2 of 2, 119:10-11]

Not here, where Texas complains only of indirect costs from a federal policy that does not regulate Texas. "[F]ederal policies frequently generate indirect effects on state revenues or state spending," and every such effect does not suffice for standing. *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023) (hereinafter "*Guidelines*"). In addition, Texas has not provided any evidence that it has suffered even one dollar of harm as a result of the CHNV Pathways. *See infra* Section I(b).

### 7. Can the Court factor reimbursements into the equation to determine standing? [Trial Tr. vol. 2 of 2, 267:11-270:5]

Yes, and it is required to do so. As discussed at trial, the Court must consider offsetting reimbursements and revenues that "arise from the same transaction as the

costs." *Texas v. United States*, <u>809 F.3d 134, 155</u> (5th Cir. 2015) (hereinafter "*DAPA*").

*See infra* Section I(b).

> **8. Is the expenditure of funds on one person paroled through the CHNV Pathways sufficient to give Texas standing, even if net migration has decreased? What authority establishes whether the Court can consider the net decrease in migration? [Trial Tr. vol. 2 of 2, 264: 16-21; 266: 3-11]**

No. Texas claims increased spending *as a result of increased migration caused by the CHNV Pathways*, *see* FAC, ECF 20 ¶ 5, but the CHNV Pathways have reduced total migration from CHNV countries. *See, e.g.,* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 31, n.16. Under binding precedent, the Court must consider "offsets" to total migration of individuals from CHNV countries because the total reduction is part of the "same transaction" as the CHNV Pathways themselves. *DAPA*, <u>809 F.3d at 155-56</u>. *See infra* Section I(b).

> **9. Is the Fifth Circuit's border wall decision in June 2023, which establishes that financial injury is sufficient to establish standing, still binding? How is it distinguishable here? [Trial Tr. Vol. 2 of 2, 276:10-278:3]**

No, because it predates *Guidelines* and cannot be reconciled with it. The standing analysis in *Texas General Land Office v. Biden*, <u>71 F.4th 264</u> (5th Cir. 2023) (hereinafter "*Texas GLO*"), particularly its analysis of indirect harm, *id*. at 273, and special solicitude, *id*. at 274, is materially indistinguishable from the argument Texas made and lost before the Supreme Court in *Guidelines*. Moreover, *Texas GLO* assessed standing at the motion to dismiss stage; it did not consider a factual record, let alone a developed record like this one, involving direct offsets to the alleged financial injury that Texas has refused even to try to calculate. *Id*. at 269.

**10. Can an ultra vires claim exist alongside an exceeding statutory authority claim under the APA? [Trial Tr. vol. 2 of 2, 308:11-16]**

Intervenor Defendants take no position on this issue.

**11. Is it a question of fact or law whether parole is being granted on a case-by-case basis? [Trial Tr. vol. 2 of 2, 305:25 – 306:6]**

Whether the Federal Defendants are granting parole on a "case-by-case" basis under the CHNV Pathways is a mixed question of fact and law. Whether parole is being granted on a case-by-case basis, in compliance with 8 U.S.C. § 1182(d)(5)(A), is a question of fact. *See, e.g.*, *Florida v. United States*, Case No. 3:21cv1066-TKW-EMT, 2022 WL 2431414, at *12 (N.D. Fla. May 4, 2022) ("[W]hether Defendants are truly making individualized case-by-case parole decisions in compliance with the statutory scheme is a disputed factual issue . . . ."). But because Congress expressly left "case-by-case" undefined in the statute, what it means to grant parole on a case-by-case basis is a question of law on which the Executive is entitled to substantial deference. *Id.* at *9 ("Congress's failure to define 'urgent humanitarian reasons' or 'significant public benefit' in § 1182(d)(5) gives [the federal agency] discretion to fill in the gaps.").

In any event, Texas expressly affirmed at trial that it is bringing only a facial, not an as-applied, challenge to the CHNV Pathways. *See* Trial Tr. vol. 2 of 2, 298:21–24. As a result, the Court should not consider whether Federal Defendants are, as a factual matter, granting parole on a "case-by-case" basis. *See U.S. v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ("[C]ourts normally decide only questions presented by the parties.") (internal punctuation and citation omitted).

7

**12. Whose burden is it to prove whether parole is being granted on a case-by-case basis? [Trial Tr. vol. 2 of 2, 305:25–306:6]**

It is Texas's burden to show that the Federal Defendants are not granting parole on a case-by-case basis as § 1182(d)(5) requires. *See, e.g.*, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[P]laintiffs bear the burden of persuasion regarding the essential aspects of their claims."). Plaintiff States have come nowhere close to meeting this burden. *See infra* Section II(a)(i).

## ARGUMENT

### I.  Texas Lacks Standing.

#### a.  Standing Is Determined at the Time the Complaint is Filed and Requires Assessment of All Record Evidence.

The Court must determine whether Plaintiff States had standing "at the time the [operative] complaint was filed." *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992). Once a case has progressed to a trial on the merits, however, the standing elements are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan,* 504 U.S. at 561. "Because this case was tried, Plaintiffs needed to prove standing by a preponderance of the evidence." *Env't Tex. Citizen Lobby, Inc.*, 968 F.3d at 367; *see also DACA,* 50 F.4th at 513 (plaintiffs bear the burden of proving standing "with the manner and degree of evidence required at the successive stages of the litigation.").

Thus, while Texas's standing is assessed at the time the First Amended Complaint was filed on February 14, 2023, ECF 20, Texas shoulders the growing burden to *prove* its standing claims throughout the course of this litigation. Under these longstanding requirements, Texas has failed to prove standing.

8

### b. Texas Lacks Injury.

In the First Amended Complaint, Plaintiff States pled harm resulting from the CHNV Pathways allowing "potentially hundreds of thousands of *additional* aliens to enter each of their already overwhelmed territories."[1] FAC, ECF 20 ¶ 5 (emphasis added). Texas alleged categories of increased costs including education, healthcare, and "many other social services" that would supposedly increase due to the program. *Id.* at ¶ 64 ("As the number of illegal aliens *increases*, the number of illegal aliens receiving such services likewise increases.") (emphasis added). Nineteen of the additional twenty Plaintiff States alleged similar harm resulting from increased undocumented immigrants in their states. *See id.* at ¶¶ 64-139. At this stage of the case, mere allegations do not suffice to confer standing, and Texas has admitted it cannot prove those allegations because the record disproves them. Trial Tr. vol. 2 of 2, 131:24-132:20.

The trial record proves that at the time of the operative complaint—February 14, 2023—both total migration and border encounters with individuals from the CHNV countries had decreased dramatically. In January 2023, when the CHNV Pathways were implemented, border encounters with individuals from these four countries dropped by over 75%, and that decrease continued through February 2023. *Compare* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 55 with U.S. Customs and Border Protection

---

[1] Here and below, *supra* at 11, 12 and 31, Intervenor Defendants depart from their practice of replacing terminology for noncitizens and immigrants that they find pejorative in order to precisely state Texas's allegations.

Encounters: Southwest Border Venezuelan Nationals, FY 2023, Int. Defs' Trial Ex. 59; *see also* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 31, n.16 ("total CHNV arrivals fell to approximately 1,326 per day, a 44 percent reduction from their pre-CHNV process levels."); Memorandum of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin & Leah Boustan as Amici Curiae in Opposition to Plaintiffs' Request for Injunctive and Other Equitable Relief ("Economist Amici Curiae in Opp. to Pls' P.I."), ECF 222 at 8 ("In December 2022, CHNV migrants accounted for over a third of all DHS border encounters, but by February 2023 that number had dropped by roughly 77,000, to less than 10 percent of that greatly reduced total.").

Total migration by individuals from CHNV countries had thus *decreased* between when the CHNV Pathways were implemented in January 2023 and when the First Amended Complaint was filed in February 2023, and the undisputed trial record confirms it has *continued to decrease* since the filing of the complaint. Nuñez - Neto Decl., Fed Defs' Trial Ex. HH ¶¶ 29-31. This necessarily *reduced*, rather than increased, alleged state expenditures associated with individuals from CHNV countries. Thus, "[b]y their own argument, the huge drop in CHNV migration since December 2022 must mean the States spent *less* money on newly arrived CHNV nationals than they did before the Program went into effect . . . Texas thus reaps fiscal benefits—not harms—from the Program." Economist Amici Curiae in Opp. to Pls' P.I., ECF 222 at 13.

As the record evidence proves the opposite of Texas's alleged basis for standing, Texas has failed to carry its burden to prove injury-in-fact. This alone defeats standing and requires dismissal for lack of jurisdiction.

  i. <u>The Court Should Not Accept Texas's New Theories of Standing, Which Are Meritless in Any Event.</u>

For nearly seven months leading up to trial, Texas complained of harm resulting from costs associated with allowing "more than a third of a million *more illegal aliens* into the United States annually" as a result of the CHNV Pathways. FAC, ECF 20 ¶ 6 (emphasis added). Texas complained the CHNV Pathways would increase the number of immigrants residing in Texas and thus increase costs associated with driver's licenses, education, law enforcement, and medical care. *Id.* at ¶¶ 3, 64-72; Pls' Motion for Preliminary Injunction ("Pls' P.I."), ECF 22 at 24-27. In discovery responses, Texas confirmed that its case was based entirely on this theory of harm. Texas's Updated Discovery Response, Fed. Defs' Trial Ex. O ("Texas's asserted injuries are the same for all its claims for relief and arise from costs imposed by the *increased presence of aliens* in Texas.") (emphasis added). The declarations that Texas proffered into the trial record are likewise based on this theory of harm. *See generally* Declaration of Sheri Gipson ("Gipson Decl."), Pls' Trial Ex. 4; Declaration of Rebecca Waltz ("Waltz Decl."), Pls' Trial Ex. 5; Declaration of James Terry ("Terry Decl."), Pls' Trial Ex. 6; Declaration of Susan Bricker ("Bricker Decl."), Pls' Trial Ex. 7. Yet, the record evidence clearly showed—and indeed, Texas admitted at trial—that there has been a net *decrease* in migration from the CHNV countries since the CHNV Pathways were implemented. Trial Tr. vol. 2 of 2, 131:24-132:20 (Mr.

Walters for the State of Texas responding "[t]hat is what the data looks like to me" when asked by the Court if Texas agrees that there are fewer individuals from CHNV countries coming to the United States after implementation of the CHNV Pathways).

Seeming to realize on the eve of trial that the facts were fatal to its theory of harm, Texas scrambled to salvage its case. *After* the parties completed discovery, briefed Texas's preliminary injunction motion, filed trial exhibit lists, and *after* Intervenor Defendants moved to dismiss on standing, Texas changed its theory completely. *Seven days* before trial, in its Proposed Findings of Fact/Conclusions of Law ("PFOF/COL"), Texas swapped its original theory of harm for another, which was otherwise unmentioned in any court filing up to that point. *See* ECF No. 244 at 16, ¶ 76.

Texas *now* claims that an increased presence of noncitizens (as Texas pled), or even an increased presence of noncitizens from the CHNV countries, is irrelevant, and that the Court can only narrowly consider costs associated with the specific "paroled aliens" who have entered through the CHNV Pathways. Pls' PFOF/COL, ECF 244 ¶ 76; s*ee also* Trial Tr. vol. 2 of 2, 130:1-3 ("[B]efore the program, there were zero coming through the program. One month later there is 30,000 coming through the program."); *see also id.* at 129:5-132:24. Texas's attempt to recast its theory of harm is both unpermitted and without merit.

*First*, binding precedent prohibits Texas's attempts to "move the [standing] goalposts" in this manner." *E.T.*, 41 F.4th at 717 ("At successive stages of this litigation, plaintiffs have changed their standing theory from 'increased risk' to

'reasonable access' to 'equal access.' The forfeiture rules—which apply to arguments in favor of standing as they do to other arguments in federal litigation . . . prohibit such efforts to move the goalposts."); *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived."); *Oh v. Collecto, Inc.*, No. 20-01937 (KM) (ESK), 2021 WL 3732881, at *4 (D.N.J. Aug. 23, 2021) ("The same principle applies to allegations to support standing. A plaintiff must include allegations of injury in the complaint and establish standing at the outset of a case, or the court is powerless to act. . . . Jurisdiction cannot be a moving target." (citing *Lujan*, 504 U.S. at 561)). The prohibition is critical here, where permitting Texas to shift their theory would prejudice Intervenor Defendants, who have had no opportunity to seek discovery on Texas's new standing theory, or to fully address it with evidence or in briefing. In short, it would be grossly unfair to consider Texas's new theory, and the Court should find it forfeited. *Id.*

*Second*, if the Court does consider Texas' brand-new theory, it nonetheless fails on its merits. As a threshold issue, Texas wrongly argued that it suffers harm from the CHNV Pathways because of increased spending compared to a "baseline of zero" individuals before the program. Trial Tr. vol 2 of 2, 259:6-8. But that mischaracterizes the state of migration from CHNV countries prior to the implementation of the CHNV Pathways, which was higher than it was after its implementation. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 26. Thus, this case does not concern "a choice between regular migration and no migration at all." Economist Amici Curiae in Opp. to Pls'

P.I., ECF 222 at 13 n.11. To the extent Texas claims harm from such a "misleading baseline," that alleged harm is not concrete or actual. *Lujan*, <u>504 U.S. at 560</u>.

Moreover, even if the Court does accept Texas's false baseline, Texas's only legal argument supporting its belated theory is that the Court may not consider "offsets" to total migration of people from CHNV countries. Trial Tr. vol. 2 of 2, 248:23-251:1. Texas is wrong. Those offsets, *i.e.*, the decrease in net migration, "arise from the same transaction" as the CHNV Pathways themselves, and thus must be considered in the standing analysis. *DAPA*, <u>809 F.3d at 155</u>.

In *DAPA*, the Fifth Circuit rejected the "offset" to driver's license costs because the downstream "benefits to the state" that it considered, such as vehicle registration fees, were not "sufficiently connected" to the costs of issuing driver's licenses. *Id.* at 156. In doing so, the court distinguished *Henderson v. Stalder*, <u>287 F.3d 374, 381</u> (5th Cir. 2002), where the offsetting costs in question "involved a much tighter nexus" and, therefore, had to be considered. *DAPA*, <u>809 F.3d at 156</u>. *Henderson* concerned a challenge to a Louisiana statute authorizing the issuance of pro-life automobile license plates. <u>287 F.3d at 376-77</u>. The Fifth Circuit held that the individual plaintiffs, who complained of the use of their tax money to distribute the license plates, lacked standing in part because the fees that consumers pay in exchange for the license plates "offset the administrative cost" associated with their issuance—and thus, there was no basis to conclude that the pro-life license plates cost the State more on net. *Id.* at 379.

14

Here, the record shows the CHNV Pathways *themselves* include harsh ineligibility requirements that disincentivize and thereby reduce unauthorized migration—not to mention parole and the ability to travel to an interior port of entry as incentives for using the limited CHNV Pathways. *See, e.g.,* United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (last updated July 12, 2023), Int. Defs' Trial Ex. 68; United States Citizenship and Immigr. Servs., Frequently Asked Questions About the Process for Cubans, Haitians, Nicaraguans, and Venezuelans (last updated June 14, 2023), Int. Defs' Trial Ex. 69. The CHNV Pathways also rely on and incorporate negotiations with the Government of Mexico that resulted in new removal mechanisms for unauthorized entrants from the CHNV countries. *See, e.g.,* U.S, Dep't of Homeland Sec., Parole Process for Certain Cuban Nationals (Dec. 22, 2022), Int. Def. Trial Ex. 70 ("Like the Venezuela process, the Cuba process will require a significant expansion of opportunities for return or removal, to include the [Government of Mexico's] acceptance of Cuban nationals encountered attempting to irregularly enter the United States without authorization between [ports of entry]."); Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 25.[2] Because "the costs of unauthorized entry have risen, while the CHNV Program offers the benefit of a new legal entry alternative," the

---

[2] *See also* U.S. Dep't of Homeland Sec., Parole Process for Certain Haitian Nationals (Dec. 22, 2022); Int. Defs' Trial Ex. 71; U.S. Dep't of Homeland Sec., Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022), Int. Defs' Trial Ex. 72; U.S. Dep't of Homeland Sec., Parole Process for Certain Venezuelan Nationals (Oct. 12, 2022), Int. Defs' Trial Ex. 73; U.S. Dep't of Homeland Sec., Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022), Int. Defs' Trial Ex. 74.

CHNV Pathways disincentivize unauthorized migration. Economist Amici Curiae in Opp. to Pls' P.I, ECF 222 at 6. Thus, the factors contributing to the net decrease in migration from CHNV countries are a part of the "same transaction" as the CHNV Pathways themselves. *DAPA*, 809 F.3d at 155.

To the extent Texas complains of costs associated with CHNV nationals, the corresponding net decrease in migration from CHNV countries is a *direct* "offset" to those purported costs that arise from the CHNV Pathways themselves, and so that alleged injury is "insufficient to confer standing." *Henderson*, 287 F.3d at 381.

## ii. Regardless of Net Migration, Texas Has Failed to Establish Injury Because the Court Must Consider Net Costs.

In addition to the fact that Texas's proffered evidence purporting to show costs associated with CHNV Pathways has nothing to do with the CHNV Pathways, *see* Int. Defs' Motion to Dismiss, ECF 197 at 11-12, Texas's alleged financial injury suffers from further fatal flaws.

The evidence in the record concerning Texas's costs associated with education, drivers' licenses, healthcare, public safety, and other economic impact prove that Texas receives offsetting reimbursements, revenues, fees, and other countervailing benefits within each category. Because Texas has affirmatively refused to produce complete revenue data in discovery, Int. Defs' Advisory, ECF 177 at 1-2; Pls' Response to Int. Defs' Advisory, ECF 178 at 4, even after the Court explicitly put Texas "on notice" that "net costs as opposed to gross costs . . . [is] an issue," July 7, 2023 Tr. 27:17-285, it cannot prove that its costs are not fully offset. Thus, Texas cannot carry its burden to prove injury-in-fact on this basis alone.

Texas's incomplete revenue disclosures confirm, however, that Texas's cost estimates ignore fees that directly offset driver's license costs, in addition to the fiscal benefits from increasing driver's license access. Expert Declaration of Cyierra Roldan ("Roldan Expert Decl."), Int. Defs' Ex. 140 ¶¶ 22-24. To the extent Texas argues that additional fees like vehicle registration fees cannot be considered because they do not arise from the transaction of providing a driver's license, then by Texas's logic, neither can it rely on overhead and infrastructure costs for the DMV's general operation (which comprise the vast majority of Texas's estimated costs). Gipson Decl., Pls' Ex. 4 ¶ 9. If the Court considers only the driver's license transaction itself, as Texas purports it should, the record in this case shows that Texas makes an average of $30 in net profit for each license it provides to a noncitizen, disproving any injury regardless of migration statistics. *See* Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶ 25.

In *DAPA,* federal defendants did not dispute Texas's accounting of costs associated with issuing driver's licenses, including Texas's conclusion that it would lose money on each license issued to the estimated 500,000 noncitizens it estimated would receive Texas licenses in a very short period of time if the program at issue were allowed to go into effect. 809 F.3d at 155. In other words, *DAPA* did not consider this argument or the factual record in this case, which demonstrates that Texas makes a profit on the (many fewer) licenses for which CHNV parolees are eligible.

Similarly, Texas's estimated education costs ignore both federal compensation for students receiving bilingual education and the value of education as an

investment from which the state benefits. Joint Expert Declaration of Patricia Gándara and Gary Orfield ("Gándara and Orfield Joint Expert Decl."), Int. Defs' Trial Ex. 136 ¶¶ 17-19. And Texas's claims about uncompensated healthcare ignore federal compensation that benefits Texas. Expert Declaration of Leighton Ku ("Ku Expert Decl."), Int. Defs' Trial Ex. 138 ¶¶ 12-14. Moreover, even *if* Texas had proven a net increase in migration (which it has not), increased immigration often suppresses crime which decreases law enforcement costs. Expert Declaration of Charis Kubrin ("Kubrin Expert Decl."), Int. Defs' Trial Ex. 139 ¶ 19. Finally, more broadly, economists across the political spectrum agree that immigration increases economic growth. Expert Declaration of Jennifer Hunt ("Hunt Expert Decl."), Int. Defs' Trial Ex. 137 ¶ 7.

Since these "offsetting benefits . . . arise from the same transaction as the costs," the Court must consider them in determining Texas's standing—which Texas bears the burden to prove. *DAPA*, 809 F.3d at 155. When properly considered, the offsets demonstrate that Texas has failed to prove *net costs* to the state resulting from the CHNV Pathways, and therefore failed to establish standing. *Henderson*, 287 F.3d at 381.

### c. Texas's Alleged Injury is Not Redressable.

Additionally, Texas has failed to establish Article III standing because it has failed to establish "the likelihood that a favorable decision will redress the injury." *Guidelines*, 143 S. Ct. at 1970; *see also Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61). "When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of

someone else, *much more* is needed' to establish standing." *Guidelines*, <u>143 S. Ct. at</u> <u>1971</u> (emphasis added). When states complain only of "indirect effects on state revenues or state spending . . . standing can become more attenuated." *Id.* at 1972 n.3.

Here, Texas complains exclusively of "indirect effects on state revenues or state spending" arising from a policy that implements the Executive's statutory authority to exercise discretion over whom to parole. Like the policy at issue in *Guidelines*, the CHNV Pathways do not exercise coercive authority over Texas. *Id.* Thus, the alleged indirect injuries are again too "attenuated" and therefore not cognizable. Indeed, whether or not one dollar of injury is sufficient to confer standing in cases concerning policies that *directly regulate* state coffers, *see Texas v. Biden (Minimum Wage)*, No. 6:22-cv-00004, slip op. at 6-8 (S.D. Tex. Sept. 26, 2023) (hereinafter "*Minimum Wage*"), such is not the case here, where the immigration policy at issue does not directly regulate Texas, and Texas has failed to prove even one dollar of harm from the CHNV Pathways. *See supra* Section (I)(b)(i).[3]

Moreover, Texas's alleged injury is not redressable because Texas has not claimed *any* injury traceable to the CHNV Pathways; it complains of alleged costs incurred from immigration generally, and mostly from undocumented immigration. *E.g.,* FAC, ECF 20 ¶¶ 6, 64. Thus, *even if* immigrants—undocumented or otherwise—

---

[3] Unlike in *Minimum Wage*, where "[t]he evidence of Texas's injury [was] generally uncontroverted by Defendants," slip op. at 7, here, Federal and Intervenor Defendants have vigorously disputed Texas's alleged injury, and Intervenor Defendants were denied in their efforts to obtain additional discovery regarding the nature and scope of Texas's claimed injuries. *See* July 7, 2023 Min. Entry.

impose actual injury on Texas, and *even if* this Court finds the CHNV Pathways unlawful, an order blocking the CHNV Pathways still would not redress those purported harms because an order would not curtail undocumented immigration. Indeed, the record shows Texas's alleged costs would increase if the CHNV Pathways are blocked. *See, e.g.,* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 39-40.

Finding otherwise could impermissibly "run up against the Executive's Article II authority to enforce federal law," including in the immigration context, which implicates "foreign policy objectives." *Guidelines*, <u>143 S. Ct. at 1971-72</u>. That is particularly true here, where the Executive is endowed with exclusive authority to implement the parole statute on which the CHNV Pathways are premised, and where interference with such authority obstructs federal foreign policy. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 48-51.

Texas's alleged injury is not redressable and therefore Texas lacks standing.

### d. Special Solicitude Has Been Narrowed, Further Undermining Texas's Standing.

Special solicitude cannot establish Texas's standing. First, "[r]egardless of the applicability of the special solicitude, [states] must still satisfy the basic requirements of standing." *Louisiana ex rel. Landry v. Biden*, <u>64 F.4th 674, 683</u>–84 (5th Cir. 2023); *see also Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, <u>70 F.4th 872, 882</u> (5th Cir. 2023) ("[Special solicitude] is not a standing shortcut when standing is otherwise lacking . . . [It] does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and

particularized."). Because Texas has failed to satisfy those basic requirements, *supra* Sections (I)(b)-(c), special solicitude is irrelevant.

Further, in rejecting Texas's standing theory in *Guidelines*, the Supreme Court failed even to mention special solicitude and described the case establishing that doctrine narrowly, as involving "a statutorily authorized petition for rulemaking, not a challenge to the Executive's enforcement discretion." 143 S. Ct. at 1975 n.6 (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)). The Court made clear that in cases such as this one, where the plaintiff is not directly regulated and claims injury only indirectly, its burden to prove standing is higher. *Compare id.* at 1970 ("When 'a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed' to establish standing.") *and id.* at 1972 n.3 ("When states complain only of "indirect effects on state revenues or state spending . . . standing can become more attenuated."); *with Texas v. United States (DACA)*, 549 F. Supp. 3d 572, 590 (S.D. Tex. 2021) (defining special solicitude as a "relaxed standard in the traditional causation and redressability analysis of standing") *aff'd in part, vacated in part, remanded*, 50 F.4th 498 (5th Cir. 2022). That "relaxed standard" for which Texas advocates is irreconcilable with the majority opinion in *Guidelines* requiring "much more" in cases like this.

Confirming as much, Justice Gorsuch's concurrence indicated that the majority opinion suggests the Court has now abandoned special solicitude altogether. *Guidelines*, 143 S. Ct. at 1977 (Gorsuch, J., concurring) ("[I]t's hard not to think . . . that lower courts should just leave that idea [of special solicitude] on the shelf in

future [years].") (internal citations omitted). Because the majority opinion in *Guidelines*—issued after *Texas GLO*, *supra* Short Answer 9—made clear that the burden to prove standing in cases such as this is *higher*, the low standard of special solicitude cannot apply.

Indeed, even if the doctrine is not entirely obsolete, Texas cannot articulate any concrete way in which it actually helps them here. Thus, Texas lacks standing.

## II. Texas's Merits Arguments Fail.

### a. The CHNV Pathways Are Consistent with the Statute.

The CHNV Pathways are consistent with both the statutory text and with Congressional intent. No evidence in the trial record proves otherwise.

#### i. The CHNV Pathways Comport with Unambiguous Statutory Text.

As the Court and the parties acknowledged at trial, Congress left undefined and up to the interpretation of the executive the key statutory terms: "case-by-case," "urgent humanitarian reason," and "significant public benefit." *See, e.g.*, Trial Tr. vol. 2 of 2, 10:18-11:2. What is more, Congress said expressly that the parole authority would be exercised at the executive's discretion. *See* 8 U.S.C. § 1182(d)(5)(A) ("The Attorney General may . . . *in his discretion* parole into the United States . . ."); *see also U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543-44 (1950) ("It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." (internal punctuation and citation omitted)). As Justice Kavanaugh observed in his

concurrence in *Biden v. Texas*, "every President since the late 1990s has employed the parole option," and "[b]ecause the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently. That is Administrative Law 101." 142 S. Ct. 2528, 2548.

*Case-by-case.* As noted above, *supra* Short Answer 11, Texas has disclaimed an as-applied challenge to the CHNV Pathways. The Court need not—and should not—consider whether, as an as-applied, factual matter, Federal Defendants are granting parole under the CHNV Pathways on a case-by-case basis. Nevertheless, the evidence in the record shows that under the CHNV Pathways, DHS paroles individuals "under such conditions as [it] may prescribe only on a case-by-case basis," just as the statute commands. *See* 8 U.S.C. § 1182(d)(5)(A). Individualized case-by-case assessment is built into the discretionary grant of parole at multiple stages in the process, including:

> (1) in adjudicating the completed I-134A form, both when USCIS considers whether the applicant meets the requisite criteria and when it determines whether the sponsor is able to financially support the beneficiary;
>
> (2) in deciding whether or not to grant individualized travel authorization, which requires the parole beneficiary to submit additional personal information to USCIS to establish their eligibility for travel authorization *and* a discretionary grant of parole; and

23

(3) at the port of entry, where CBP screens the individual parole beneficiary in person to again determine whether parole is warranted. *See, e.g.*, United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans (last updated July 12, 2023), Int Defs' Trial Ex. 68; Trial Tr. Vol. 1, 87:23-88:18 (noting that it took Intervenor Defendant Eric Sype's sponsored parole beneficiary "around three hours to be processed through immigration").

Both the sponsor and the parole beneficiary are informed that "parole is a discretionary determination made by CBP at the port of entry, based on a finding that parole is warranted due to urgent humanitarian reasons or significant public benefit." United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Int Defs' Trial Ex. 68. DHS guidance to the USCIS and CBP officers responsible for the determinations referenced above confirms that, at multiple points in the process, those officers retain discretion to grant or deny parole. *See, e.g.*, Fed. Defs' Trial Exs. K, L.

The Federal Register Notices (FRNs) for each CHNV Pathway likewise confirm the discretionary nature of the grant of parole, emphasizing that "[e]ach individual arriving at a [port of entry]" through the CHNV Pathways "will be inspected by CBP and considered for a grant of discretionary parole . . . on a case-by-case basis." *See, e.g.*, Implementation of a Parole Process for Cubans ("Cuban Parole Process FRN"), 88 Fed. Reg. 1266, 1276 (Jan. 9, 2023); Implementation of a Parole Process for Haitians ("Haitian Parole Process FRN"), 88 Fed. Reg. 1243, 1253 (Jan. 9, 2023);

Implementation of a Parole Process for Nicaraguans ("Nicaraguan Parole Process FRN"), 88 Fed. Reg. 1255, 1264 (Jan. 9, 2023); Implementation of Parole Process for Venezuelans ("Venezuelan Parole Process FRN"), 87 Fed. Reg. 63507, 63516 (Oct. 19, 2022). The FRNs further warn that "[i]ndividuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole . . . as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention." *See, e.g.*, Cuban Parole Process FRN, 88 Fed. Reg. at 1276; Haitian Parole Process FRN, 88 Fed. Reg. at 1253; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1264; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63516.

Intervenor Defendant Eric Sype's testimony confirms the rigor of the adjudicative process. Mr. Sype testified that the I-134A application process was very "time consuming and involved," Trial Tr. vol. 1 of 2, 49:11-22, and that Oldrys (the beneficiary he sponsored) took "around three hours to be processed through immigration" at the port of entry. *Id.* at 88:2-18. There is no contrary evidence in the record suggesting that Oldrys, or indeed any other beneficiary of the CHNV Pathways, was granted parole in a manner inconsistent with the parole statute's case-by-case requirement.

Texas musters only one argument that parole under the CHNV Pathways is not granted on a case-by-case basis. This argument does not carry Texas's burden to demonstrate that the CHNV Pathways are inconsistent with the statutory text. *See,*

*e.g.*, *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[P]laintiffs bear the burden of persuasion regarding the essential aspects of their claims.").

Texas argues that the approval rate of the CHNV Pathways is so high that parole cannot possibly be granted on a case-by-case basis, but instead must be granted "en masse." Pls' P.I., ECF 22 at 15-16. To establish the allegedly high approval rates of the CHNV Pathways, Texas points to data on the number of "parole process applications" received, adjudicated, approved, denied, and pending. Pls' Trial Ex. 41. There are, however, at least three different stages of adjudication in the CHNV Pathways (the I-134A application; travel authorization; and port of entry assessment), and Texas has not proffered any evidence clarifying which stage of the process the cited "parole process application" data reflects. Without such evidence, the data sheds no light on, and certainly provides no evidence of, allegedly "en masse" grants of parole. Because ineligible individuals are winnowed out at *each* stage, the Court cannot draw any reliable inference about overall approval rates from the single-point-in-time approval rate data cited by Texas.

There is simply no inconsistency between a high approval rate and case-by-case consideration, as can be seen everywhere in everyday life. If a high approval rate is tantamount to acting "en masse," then the Senate acted "en masse" when it confirmed 94.7 percent of President Trump's Circuit Court nominees;[4] court security officers at federal courthouses act "en masse" when they permit virtually everyone

---

[4] Congressional Research Service, *Judicial Nominations Statistics and Analysis: U.S. Circuit Court and District Courts, 1977-2022* (Apr. 3, 2023), *available at* https://crsreports.congress.gov/product/pdf/R/R45622.

entry who queues up for the security line each day; and the Transportation Security Administration likewise acts "en masse" with regards to the approximately 2.5 million passengers who pass through their security checkpoints at airports every day.

To support its claims of "en masse" grants of parole, Texas also cites Justice Alito's dissent *Biden v. Texas*, in which he observed that parole of more than 27,000 individuals per month at the border gives rise to an inference that the Government is not really making these [parole] decisions on a case-by-case basis." 142 S. Ct. at 2528. Not only is Justice Alito's observation in dissent is neither controlling nor probative, but Texas is trying to compare apples and oranges. Parole granted in the context discussed in that case is not programmatic and does not involve any specific, pre-determined criteria for parole eligibility; rather, it affects all individuals considered for parole at the southwest border pursuant to 8 U.S.C. § 1182(d)(5)(A). By contrast, the CHNV Pathways involve the consideration of a narrow group of self-selecting, *prescreened applicants* who must fit specific, pre-determined eligibility criteria that were developed in connection with the Executive's consideration of the urgent humanitarian reasons and significant public benefits at stake. Any inference that the Court could draw from Justice Alito's dissent on non-programmatic parole in *Biden v. Texas* has little, if any, relevance here.

And similar to Texas's attempt to equate a high approval rate with acting "en masse," the bare number of individuals whose applications are approved within a particular time period is not a reasoned or logical basis for concluding that those individuals did not receive case-by-case consideration. Arguments from that basis are

mere speculation, and *far* more evidence than those numbers alone would be necessary to reach any conclusion. Yet here, and despite having every opportunity to develop the record on this issue in discovery, Texas has proffered nothing beyond speculation, unsupported by actual evidence.

*Urgent humanitarian reason / significant public benefit.* The FRNs for each of the CHNV Pathways articulate why the case-by-case parole of nationals from the CHNV countries is necessary "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). As extensively documented by the Administrative Record, each FRN provides detailed information about the political, economic, and humanitarian crises occurring in each of the CHNV countries that have "led tens of thousands of Haitians to lose hope and attempt to migrate," Haitian Parole Process FRN, 88 Fed. Reg. at 1246; "have pushed thousands of Nicaraguans to seek humanitarian relief . . . in the United States," Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1259; have caused Cubans to "flee[] the island in record numbers, eclipsing the mass exodus of Cuban migrants seen during the Mariel exodus of 1980," Cuban Parole Process FRN, 88 Fed. Reg. at 1269; and "have caused nearly 7 million Venezuelans to flee their country," Venezuelan Parole Process FRN, 87 Fed. Reg. at 63509. *See also see also* Fed. Defs' Trial Exs. A, B, C, D.

In addition, citing this evidence but also specifically the significant increase in Cubans, Haitians, Nicaraguans, and Venezuelans arriving at the United States border in 2022—together, nationals of the four countries made up approximately forty percent of the total number of migrants presenting at the border—each FRN

states that the "temporary, case-by-case parole" of qualifying nationals of the CHNV countries "will provide a significant public benefit for the United States by reducing unauthorized entries along our [Southwest border] while also addressing the urgent humanitarian reasons" causing the displacement of hundreds of thousands of Cubans, Haitians, Nicaraguans, and Venezuelans. *See* Cuban Parole Process FRN, 88 Fed. Reg. at 1268; Haitian Parole Process FRN, 88 Fed. Reg. at 1244; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1256; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63508. Each FRN further identifies additional significant public benefits of the CHNV Pathways, including enhanced border security; reduced irregular migration; the ability to vet individuals before they arrive in the United States; reduced strain on DHS personnel and resources, particularly along the border with Mexico; disincentivizing dangerous irregular travel that jeopardizes migrant lives and safety and enriches smuggling networks; and the fulfillment of important foreign policy goals to manage migration collaboratively. *Id*. Texas disputes none of these facts; nor do they seriously contend that these circumstances fail to meet the statutory criteria.

At trial, the Court expressed concern that a broad interpretation of the statutory parole authority could allow the executive to grant parole even to individuals seeking to come to the United States for purely economic reasons. Trial Tr. vol. 2 of 2, 182:7-13. The CHNV Pathways do not present that situation. The FRNs for the CHNV Pathways reflect multiple interconnected considerations related to both urgent humanitarian reasons *and* significant public benefits that went into the

creation and adoption of each Pathway, including important foreign policy goals, specific humanitarian crises in the CHNV countries, and, as reflected in CBP data, the sharp increase in migration at the United States' southern border, specifically of CHNV nationals, in the months immediately preceding the adoption of the CHNV pathways. *See* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2022, Int. Defs' Trial Ex. 52; U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 52. All of these considerations speak to and provide the foundation for the urgent humanitarian reasons and significant public benefits underlying the CHNV Pathways. These conditions might overlap with or exacerbate economic need in individual cases, but nothing about that possibility makes the CHNV Pathways inconsistent with the statute. In short, this case neither requires nor justifies deciding the outer bounds of the parole authority.

The parole granted to Intervenor Defendant Eric Sype's beneficiary, Oldrys, bears out these considerations: Mr. Sype testified that Oldrys sought parole to the United States because, among other things, Oldrys's community has been impacted by multiple tropical storms and hurricanes which caused his in-laws to lose their home and political uprisings that caused "basically all economic activity" in the country to stop, such that "there was no work for any extended period of time." Trial Tr. vol 1 of 2, 82:2-83-9.

Texas does not rebut the humanitarian reasons or significant public benefits advanced by the CHNV Pathways. Instead, Texas claims (in wholly conclusory

fashion) that the statutory language does not permit the executive to "admit entire categories of aliens." Pls' P.I., ECF 22 at 15 (quoting H.R. Rep. No. 104-496, at 180 (1996)). Not only is this assertion just a conclusion, but it is wrong. It is undisputed that this language from the legislative history concerns proposed amendments that Congress *rejected*. Intervenor Defendants' Post-Trial Proposed Findings of Fact/Conclusions of Law, ¶¶ 115-119; *see also* Trial Tr. vol. 2 of 2, 15:14-18:22, 162:18-163:2. Simply put, Congress refused to narrowly limit what qualified as an "urgent humanitarian reason" or a "reason deemed strictly in the public interest." Congress's rejection of this qualifying language defeats Texas's argument. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation.").

Similarly unpersuasive is the interpretation Judge Hanen recently adopted in *Texas v. United States*, Case No. 1:18-cv-00068, 2023 WL 5951196 (S.D. Tex. Sept. 13, 2023). Relying exclusively on an inapposite paragraph of a 2008 agency memorandum, Judge Hanen held erroneously (and arguably in *dicta*), that parole may only be granted under 8 U.S.C. § 1182(d)(5)(A) pursuant to "two Congressionally limited exceptions"—for "urgent medical, family, and related needs" and to "those individuals aiding law enforcement." *Id.* at *15. But the legislative history *actually* reflects that Congress considered and declined to limit the parole authority in this manner, choosing instead to leave the interpretation of "urgent humanitarian reasons" and "significant public benefits" to the discretion of the executive.

Wherever the "line" or outer bound limiting the executive's broad discretionary authority might be, it certainly is not where Texas claims it is; and in any event, this case does not require the Court to draw it. The evidentiary record shows that the CHNV Pathways are wholly consistent with the plain text of 8 U.S.C. § 1182(d)(5)(A), and Texas has not met its burden to show otherwise, either as a matter of fact or law.

Texas also argues the executive may not consider the aggregate effects of a broader parole program to determine that parole would satisfy an "urgent humanitarian reason" or "significant public benefit." Pls. P.I., ECF 22 at 17-18. Texas claims the statute requires the executive to determine that each grant of parole to each individual beneficiary would be for an urgent humanitarian reason or significant public benefit. *Id.* But Texas points to no command in the statute requiring this—and it cannot because such a command does not exist. Nor does Texas cite any precedent supporting their ahistorical interpretation of the statute—and it cannot, because such precedent does not exist.

To the contrary, the statute as a whole makes plain that the requirement to make individualized (non-aggregate) assessments does *not* apply here. *See Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (discussing the courts' "duty to construe statutes, not isolated provisions"). Congress imposed this exact condition on a distinct and readily identifiable group of potential parolees—those already determined to be refugees—in the immediately following statutory provision, § 1182(d)(5)(B). Therein, Congress expressly commanded that the Attorney General may parole a refugee into the United States only when he or she "determines that

compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States." 8 U.S.C. § 1182(d)(5)(B) (emphasis added). Congress did not employ this narrower condition in the provision pursuant to which the CHNV Pathways were adopted, § 1182(d)(5)(A).

Congress's inclusion of this individual-level assessment requirement in § 1182(d)(5)(B) "clearly demonstrates that it knows how to impose such a requirement when it wishes to do so," and that it clearly decided *not* to impose that requirement for the relevant statutory provision, § 1182(d)(5)(A). *Whitfield v. United States*, 543 U.S. 209, 216 (2005). More generally, the lack of a similar specific command in 8 U.S.C. § 1152(d)(5)(A), combined with the lack of any definition or guidance for the meaning of "case-by-case," confirms both that an individualized assessment of the urgent humanitarian reason or significant public benefit for a specific individual's parole is not required, and that Congress left it to the discretion of the executive how to grant parole on a "case-by-case basis." *Cf. Minimum Wage*, No. 6:22-cv-00004, slip op. at 21 (S.D. Tex. Sept. 26, 2023) (contrasting different statutory provisions and concluding that a clear expression of Congress's direction in one section and its absence from another "demonstrates that Congress knew how to" impose a certain a directive and therefore "did no such thing with respect to" the provision lacking the same statement).

But even if the Court determines that, as a matter of statutory interpretation, § 1182(d)(5)(A) requires the executive to assess the urgent humanitarian reason or significant public benefit at the individual level, the record reflects that this is

consistent with the CHNV Pathways. In fact, there is *no* evidentiary basis to conclude otherwise. The record evidence reflects that sponsors and potential parole beneficiaries are warned multiple times that parole is granted only on a case-by-case basis; that sponsors must explain why they believe parole for the individual they are sponsoring will provide a significant public benefit or satisfy an urgent humanitarian reason; and that individual beneficiaries face individualized assessment upon arrival at ports of entry. *See, e.g.*, United States Citizenship and Immigr. Servs., Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, Int. Defs' Trial Ex. 68; Trial Tr. vol. 2 of 2, 5:19-6:6.

Oldrys, who sought parole pursuant to the CHNV Pathways after facing severe economic instability in the wake of political unrest and natural disasters in Nicaragua, *see* Trial Tr. vol. 1 of 2, 46:22–47:15; 81:24–82:23, was processed for three hours at the port of entry before being granted parole. *Id.* at 87:23-88:18. Texas has no evidence that this individualized process was inconsistent with the statute. Indeed, Texas has provided no evidentiary basis to conclude that Oldrys's parole, or any other grant of parole under the CHNV Pathways, is inconsistent with its erroneously narrow interpretation of the parole statute.

> ii.  The CHNV Pathways Are Consistent with Congressional Intent.

The CHNV Pathways likewise comport with seven decades of prior uses of the parole authority, further illustrating their consistency with Congressional intent.

As the Supreme Court recently recognized in *Biden v. Texas*, "Every administration, including the Trump and Biden administrations, has utilized [the parole] authority to some extent." 142 S. Ct. at 2543. Indeed, different

administrations have exercised their discretion under the parole authority in several ways ever since creating the parole authority in 1952 and codifying it in its modern form in the 1996 enactment of IIRIRA. And Congress—through its *enactments*, as opposed to discussions of ultimately rejected amendments to which Texas tethers its arguments—has *consistently* expressed approval of the Executive's programmatic use of the parole authority. As detailed below, this includes by affirmatively ratifying certain parole programs; by declining to defund, prohibit, or otherwise roll back any parole program or grants thereunder; and by rejecting attempts to prevent or otherwise limit the executive's use of the parole authority to create programs allowing certain broadly defined populations to be considered for parole on a case-by-case basis.

The CHNV Pathways comport with numerous other executive exercises of the parole authority that Congress has either ratified or to which it has acquiesced. It is Texas's legal challenge to the CHNV Pathways, and not the Pathways themselves, that contravene Congressional intent.

*Congressional Ratification.* The record details multiple instances when Congress ratified the executive's use of the parole authority by legislating to extend benefits to individuals who had been granted parole under programs created pursuant to 8 U.S.C. § 1182(d)(5)(A). *See, e.g.*, Int. Defs' Trial Exs. 10, 14, 15, 16;[5] *see*

---

[5] Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Division C, § 602(a), 110 Stat. 3009-546, 3009-689 (1996), Int. Defs' Trial Ex. 10; National Defense Authorization for Fiscal Year 2020, Pub. L. NO. 116-92, 133 Stat. 1198 (2019), Int. Defs' Trial Ex. 14; Extending Government Funding and Delivering

*also* Schacher Expert Decl., Int. Defs' Trial Ex. 141. While the CHNV Pathways share DNA with many of these prior ratified programs, of particular relevance here is legislation providing benefits for Ukrainians paroled through U4U. Fed. Defs' Trial Ex. A at Cuba AR_000069. The CHNV Pathways are expressly "modeled on the successful Uniting for Ukraine (U4U)" program. *See* Cuban Parole Process FRN, 88 Fed. Reg. at 1279; Haitian Parole Process FRN, 88 Fed. Reg. at 1243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1255; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63507.

Like the U4U program, the CHNV Pathways were created to provide, among other things, a "safe, legal, and orderly pathway" for individuals who have been displaced from their countries due to crises. *Compare* Fed. Defs' Trial Ex. A at Cuba AR_000069 *with* Cuban Parole Process FRN, 88 Fed. Reg. at 1267; Haitian Parole Process FRN, 88 Fed. Reg. at 1243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1255; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63507. Like the U4U program, the CHNV Pathways were adopted, in part, in response to an unprecedented uptick in Southwest border encounters with nationals of the pertinent countries before adoption of the program. *Compare* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2023, Int. Defs' Trial Ex. 56 *with* U.S. Customs and Border Protection Encounters: Southwest Border, CHNV, FY 2021, Int. Defs' Trial Exs. 52, 53; *see also* Cuban Parole Process FRN, 88 Fed. Reg. at 1269; Haitian Parole

---

Emergency Assistance Act, Pub. L. No. 117-43, Div. C, 135 Stat. 344, 372-379 (2021), Int. Defs' Trial Ex. 15; Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128, 136 Stat. 1211 (2022), Int. Defs' Trial Ex. 16.

Process FRN, <u>88 Fed. Reg. at 1245</u>; Nicaraguan Parole Process FRN, <u>88 Fed. Reg. at 1257</u>-58; Venezuelan Parole Process FRN, <u>87 Fed. Reg. at 63509</u>. And like the U4U program, parole under the CHNV Pathways requires a United States-based sponsor to commit to financially supporting the paroled beneficiary for the duration of their parole. *Compare* Fed. Defs' Trial Ex. A at Cuba AR_000070 *with* Cuban Parole Process FRN, <u>88 Fed. Reg. at 1267</u>; Haitian Parole Process FRN, <u>88 Fed. Reg. at 1243</u>; Nicaraguan Parole Process FRN, <u>88 Fed. Reg. at 1255</u>; Venezuelan Parole Process FRN, <u>87 Fed. Reg. at 63508</u>.

In form and function, the CHNV Pathways are materially indistinguishable from U4U and other similar exercises of the parole authority that Congress has ratified and effectively approved. *See FDA v. Brown & Williamson Tobacco Corp.*, <u>529 U.S. 120, 145</u> (2000) (holding that congressional actions premised on an agency's interpretation of its statutory authority "effectively ratified" agency's interpretation). If anything, U4U represents an even *broader* use of parole power: the executive placed no limit on the number of individuals who could be paroled through U4U, whereas the executive did so limit the CHNV Pathways. *Compare* Fed. Defs' Trial Ex. A at Cuba AR_000069 *with* Cuban Parole Process FRN, <u>88 Fed. Reg. at 1277</u>; Haitian Parole Process FRN, <u>88 Fed. Reg. at 1253</u>; Nicaraguan Parole Process FRN, <u>88 Fed. Reg. at 1264</u>; Venezuelan Parole Process FRN, <u>88 Fed. Reg. at 1280</u>.

*No Congressional Disapproval of Any Parole Program*. Congress has never acted to overturn or cut back any parole program adopted under <u>8 U.S.C. § 1182(d)(5)(A)</u>—including parole programs that have allowed parole for materially

indistinguishable urgent humanitarian reasons and significant public benefits articulated by the CHNV Pathways. Multiple prior administrations have used the parole authority to achieve the identified statutory benefits in aggregate, for example, to deter irregular migration, to advance important foreign policy goals, and to manage migration collaboratively with international partners. *See* Declaration of Eric Schwartz ("Schwartz Decl."), Int. Defs' Trial Ex. 134 ¶¶ 9, 11, 14-6; Declaration of Morton Halperin ("Halperin Decl."), Int. Defs' Trial Ex. 131 ¶¶ 4, 35; Schacher Expert Decl., Int. Defs' Trial Ex. 141 ¶¶ 64-66; *see also* Fed. Defs' Trial Ex. A at Cuba AR_000001; Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 48-51. The urgent humanitarian reasons and significant public benefits identified in the FRNs for the CHNV Pathways are entirely consistent with multiple prior uses of the parole authority, to which Congress has consistently acquiesced and declined to overturn.

*No Congressional Action to Substantively Constrain the Parole Authority.* Congress has left the parole provision untouched since 1996. The 1996 amendment added the "case-by-case" language and swapped in the current "urgent humanitarian reasons" and "significant public benefit" criteria for what had been there since 1952 ("emergent reasons or for reasons deemed strictly in the public interest")—the latter of which, it should be noted, altered the criteria somewhat but did not make them stricter. Following those amendments, multiple administrations have used the parole authority to "designat[e] a class whose members generally would be considered appropriate candidates for parole," and then to allow "the adjudicator [to] individually determine whether a person is a member of the class and whether there

are any reasons not to exercise the parole authority in the particular case." *See* Fed. Defs' Tr. Ex. A at Cuba AR_000097; *see also* Int. Defs' PFOF/COL, ECF 245.

As the Administrative Record reflects, the executive has found that such a use of the parole authority "does not violate the case-by-case requirement" of the statute "[s]o long as individual consideration is given to parole determinations." *See* Fed. Defs' Tr. Ex. A at Cuba AR_000097. Not only are the CHNV Pathways and other numerous parole programs entirely consistent with this interpretation of the parole provision, Congress has also declined to adopt any legislation that would limit or otherwise constrain such an interpretation. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 145; *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974) ("[L]ongstanding administrative construction is entitled to great weight, particularly when, as here, congress has revisited the Act and left the practice untouched."); *cf. Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983) (holding that Congress's awareness of widely known agency statutory interpretation spanning decades "when enacting other and related legislation make out an unusually strong case of legislative acquiescence" to that interpretation).

Although Texas insists on casting the CHNV Pathways as a rogue and unchecked exercise of the parole authority, this argument withers in the face of an unrebutted trial record establishing that Congress has consistently approved of or acquiesced to every administration's use of the parole authority to create parole programs that, like the CHNV Pathways, define a population whose members the executive determines are appropriate candidates for parole; facilitate the case-by-

case adjudication of parole for that population; and articulate the same or similar urgent humanitarian reasons and significant public benefits articulated by the CHNV Pathways.

    iii. <u>The Major Questions Doctrine Cannot Save Texas's Case.</u>

While the Major Questions doctrine is, at most, one potential tool of statutory interpretation, it is inapplicable in cases of "clear congressional authorization," such as this one. *West Virginia v. EPA*, <u>142 S. Ct. 2587, 2609</u> (2022). DHS established the CHNV Pathways pursuant to expressly granted parole authority, which allows the DHS secretary to, "in his discretion," parole non-citizens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." <u>8 U.S.C. § 1182(d)(5)(A)</u>. As explained at trial and above, *see supra* Section II(a)(i), this is precisely what DHS has been doing. Major Questions simply does not apply.

Courts have also invoked the Major Questions doctrine when the Executive suddenly uses a "long-extant" statute in ways the statute had never previously been used. *E.g.*, *Minimum Wage*, 6:22-CV-00004, at 23 (S.D. Tex. Sep. 26, 2023) ("When the executive branch claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, courts typically greet its announcement with a measure of skepticism." (internal quotations omitted) (quoting *Util. Air Regul. Grp. v. EPA*, <u>573 U.S. 302, 324</u> (2014)). This case could not be more different: there is a long history of materially indistinguishable and undisturbed uses of the same authority. *See supra* Section II(a)(ii). Not only have Democrat and Republican presidents used this same authority to implement similar parole programs for seven decades, including since the 1996 enactment of IIRIRA, but

Plaintiff States themselves admit that the CHNV Pathways were directly modeled on the existing and highly popular U4U program. FAC, ECF 20 ¶ 43. Stated differently, because there is nothing "transformative" about this use of the parole authority, the Major Questions doctrine is not implicated. *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014).

Finally, DHS's exercise of the parole authority bears no resemblance to the other typical through-line of Major Questions precedent: when the challenged agency action newly attempted to regulate beyond the agency's primary congressionally delegated area of responsibility. *See, e.g., Ala. Ass'n of Realtors v. Dep't Health & Hum. Serv.,* 141 S. Ct. 2485, 2487 (2021) (holding that the Centers for Disease Control lacked the authority to implement a nationwide eviction moratorium); *Nat'l Fed. Indep. Bus. v. Occupational Safety & Health Admin.,* 142 S. Ct. 661 (2022) (holding that OSHA could not force 84 million Americans to either obtain the COVID-19 vaccine or undergo weekly medical testing). It cannot possibly be disputed that DHS is acting within its primary areas of congressionally granted responsibility—namely, managing migration and border security in manners that implicate foreign policy.

For all these reasons, the Major Questions doctrine is irrelevant to this case.

### b.  The CHNV Pathways Are Not "Arbitrary and Capricious."

An application of the parole authority of § 1182(d)(5)(A) is not arbitrary and capricious if there is a rational connection between the facts the agency found and the decision made. *Worldcall Interconnect, Inc. v. F.C.C.,* 907 F.3d 810, 817 (5th Cir. 2018). An agency is afforded additional deference in the context of policies issued pursuant to the parole statute, as courts "must be deferential to the President's

Article II foreign-policy judgment." *Biden v. Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). Federal policy must be upheld if it is supported by "substantial evidence," which is *"less than* a preponderance." *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) (emphasis added).

Here, substantial evidence in the record demonstrates: the CHNV Pathways constitute well-reasoned policy aimed at reducing complex political, humanitarian, and economic crises associated with increased migration from the relevant countries. *See* Fed. Defs' Trial Exs. 14, 43 (DHS data highlighting the increase in migration); *cf* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 11-16. And, within the first six months of being implemented, the CHNV Pathways are undisputedly achieving their stated goal. Despite granting travel authorization to a total of 30,000 individuals per month, the program has produced a much larger corresponding decrease in net migration, therefore allowing CBP, including in Texas, to focus its resources on border management. Nuñez-Neto Decl. Fed. Defs' Trial Ex. HH ¶¶ 11-16, 20-28.

Grasping at straws, Texas argues the CHNV Pathways are arbitrary and capricious because the government failed to consider their "reliance interests." Pls' P.I., ECF 22 at 22-23. Yet, Texas has not even been able to *identify* a cognizable reliance interest to show standing, including at trial, when the Court repeatedly asked it to do so. Trial Tr. vol. 1 of 2, 147:17-151:9. Reliance interests are only implicated when a party makes decisions based (*i.e.*, relies) upon a longstanding policy, and a change in that policy causes them hardship or liability *because* of their reliance. For example, in *Encino Motorcars, LLC v. Navarro*, the Supreme Court held

that the Department of Labor, in reversing a 1978 decision that certain employees of the regulated industry *were* exempt from the Fair Labor Standards, acted arbitrarily and capriciously in failing to consider the reliance interests these employees held for *over* three decades. 579 U.S. 211, 222 (2016). As the Court explained, the regulated industry had "negotiated and structured their compensation plans against this background understanding" that those employees were exempt, and thus the agency's reversal would "necessitate systemic, significant changes" to the "compensation arrangements" that it had relied upon the prior rule. *Id.* at 222-23. Those reliance interests in the agency's longstanding policy had to be explicitly considered before the agency could reverse course. *Id.* Here, by contrast, Texas cannot claim to have had a reliance interest in a newly created policy like the CHNV Pathways, because it did not previously exist. Nor can Texas articulate any reliance that it placed on the pre-Pathways *status quo* or how, even if it had so relied, that reliance is now to their detriment.

With no real "reliance interest," Texas asks this Court to equate its alleged injury (the purported fiscal costs of immigration) with "reliance interests." First, this is not the law. *See id.*; *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891,1913 (2020) (an agency implicates a party's reliance interests when that party has made decisions *in reliance upon* a longstanding policy and the agency later "changes course" from those "longstanding policies" to the detriment of the party who relied upon the status quo ante).

Second, to the extent Texas's "reliance" argument has any merit, the CHNV Pathways do not ignore "costs." To the contrary, DHS contemplated a decrease in the number of individuals migrating from these four countries, which would reduce the very injury Texas complains of. Trial Tr. vol. 2 of 2, 30:11-20; *see also* Fed. Defs' Trial Ex. 42. Like parole processes promulgated in the past, *see generally* Schacher Expert Decl,, Int. Defs.' Tr. Ex. 141, the record clearly shows the CHNV Pathways have already lowered migration and therefore any costs associated with increased migration. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶¶ 26, 29, 31, 174-179 n.16. The requirement that each parolee have a fiscal sponsor—which is neither a statutory requirement for parole nor required it many other such programs—likewise demonstrates that DHS considered the potential costs that Texas claims it ignores.

Moreover, Texas's discussion of costs is not probative of any likely costs associated with the CHNV Pathways. Texas's evidence estimates purported costs of undocumented immigrants and unaccompanied children from all nations, but the CHNV parolees are not undocumented immigrants and unaccompanied children are categorically ineligible for the CHNV Pathways. United States Citizenship and Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, Int. Defs' Trial Ex. 68. The CHNV Pathways only allow adults and families to be lawfully admitted under parole after a series of successful background checks, security vetting, and an approved sworn declaration of financial support. United States Citizenship and Immigr. Servs., Form I-134, Declaration of Financial Support, Int. Defs' Trial Ex. 67.

Texas's "evidence" as to costs of parolees is likewise unsubstantiated and inconsistent. Indeed, the record is replete with well-established empirical evidence contradicting each of Texas's claims. *See e.g.*, Kubrin Expert Decl., Int. Defs' Trial Ex. 139 ¶ 19 ("[H]igher or increased immigration does not lead to more crime" and "often suppresses it"); Gándara & Orfield Expert Decl., Int. Defs' Trial Ex. 136 ¶¶ 13–14 (determining the educational costs of bilingual students tends to be close to zero); Ku Expert Decl., Int. Defs' Trial Ex. 138 ¶¶ 12-15 (even when ignoring federal compensation policies that benefit states, the medical costs for undocumented immigrants are "so small that they do not displace services for other needy people"); Roldan Expert Decl., Int. Defs' Trial Ex. 140 ¶¶ 22–24 (driver's licenses have a net fiscal benefit to states). Texas's evidence simply does not support any "arbitrary and capricious" behavior.

Beyond its lack of evidence or reliance interests, Texas asks this Court to assess the rationality of the CHNV Pathways in a vacuum—ignoring the complexity of the problems it seeks to address in favor of terminating it for failing to resolve the challenges of global migration through one action alone. However, it is impermissible for the Court to replace the executive's extensively reasoned policy judgment regarding a complex issue only to appease a challenger's own policy preference; nothing in the Constitution, U.S. Code, or precedent gives Texas (or any other state) a heckler's veto over federal immigration policy. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("[A] court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency . . . has reasonably

considered the relevant issues and reasonably explained the decision."); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A] court is not to substitute its judgment for that of the agency.").

This Court should reject Texas's claims of arbitrary and capricious agency action for there is "substantial evidence" in the record supporting that the CHNV Pathways have a rational connection to reducing unauthorized immigration and costs to states. *FPL Energy Me. Hydro LLC*, 287 F.3d at 1160.

## III.     The Balance of Hardships and the Public Interest Overwhelmingly Favor Defendants, Precluding Any Equitable Relief.

The Court must weigh the balance of equities and hardships between Plaintiffs and Defendants and the public interest when considering whether to grant an injunction or other equitable relief. *Winter*, 555 U.S. at 20; *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Texas's hardship, if any, is eclipsed by the countervailing hardships Intervenor and Federal Defendants would suffer, even before considering the public's exceptional interest in maintaining the CHNV Pathways. Because Texas cannot make the "clear showing" to carry its "burden of persuasion" that it has met this criterion, *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985), it cannot receive equitable relief.

The CHNV Pathways allow Intervenor Defendants—alongside individuals across the United States—to tangibly support their global neighbors, exercise deeply held religious beliefs, reunify with their families, protect the lives of family members and loved ones, and create economic opportunities for individuals and communities in need. Int. Defs' Response in Opposition to Pls.' Motion for Preliminary Injunction,

ECF 175 at 27-29; Int. Defs' PFOF/COL, ECF 245 at 87-90. Texas's request for relief would extinguish these opportunities.

Yet, Texas pushes even further. Texas concedes it hopes to establish precedent that would threaten various other similar parole programs currently operating, foremost among them, U4U. Pretrial Conference Tr., 91:2-10 ("[I]f the precedent we create would show later that that program is also unlawful for the same reasons, we don't have to actually file litigation . . . . [T]hrough the Anglo-American system of precedent, it takes care of itself.") (cleaned up); *see also id.* at 90:16-91:10. Thus, not only would sponsors and beneficiaries of the CHNV Pathways suffer from an injunction, but also other parolees and their families, communities, employers, and employees currently benefiting from other ongoing parole programs, which would likewise be at risk of termination following such a decision from this Court. Int. Defs' PFOF/COL, ECF 245 at 27-44.

This is to say nothing of the hardships the United States would suffer from an injunction or vacatur of the CHNV Pathways. As Federal Defendants explained at trial, foreign policy negotiations played a key role in the development and implementation of the CHNV Pathways. *E.g.*, Trial Tr. vol. 1 of 2, 194, 219; *accord* Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 37. Given this fact, enjoining or vacating the CHNV Pathways threatens to frustrate foreign relations with Mexico and other Central and South American countries. Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH ¶ 38.

And although Texas and other Plaintiff States seek the termination of the CHNV Pathways (even though the latter have not even attempted to prove standing or entitlement to relief), at least fifteen other States and the District of Columbia support the CHNV Pathways and submitted an amicus brief detailing the hardships both the States themselves and individuals residing in those states would suffer if the CHNV Pathways were enjoined. Brief for Amici Curiae States, ECF 247. These include: the loss of significant economic benefits through state and local taxes and spending power; the proliferation of labor shortages in key industries; family separations and the endangerment of parolees; diminishment in public safety; and increased costs of public services like healthcare. *Id.*

For all of these reasons, Texas has not established that it suffers any hardship. And even if the Court were to find Texas has proven some amount of hardship, it is heavily outweighed by the harms Federal and Intervenor Defendants, at least fifteen other states, and the public would suffer if Texas received the relief it seeks.

## IV. If Any Relief Is Justified, It Must Be Remand Without Vacatur.

As detailed above, Plaintiffs are not entitled to relief for several independent reasons. However, should the Court find otherwise, the only appropriate relief would be remand without vacatur. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."). In determining whether to order the more drastic equitable relief Texas seeks—such as a permanent injunction or

vacatur—the Court is required to consider the likelihood of disruption and harm that would result from such an order. Here, the likely consequences confirm that remand without vacatur is the only prudent and lawful course.

*First*, no injunctive relief should issue. A permanent injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 U.S. 1942, 1943 (2018) (affirming denial of injunction where balance of equities and public interest "tilt" against plaintiffs). When considering whether to grant injunctive relief for legal violations, federal courts must also "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 542 (1987). Plaintiffs *must prove* that a permanent injunction would not disserve the public interest *and* that the balance of equities tips in Plaintiffs' favor. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiffs have not even attempted to carry their burden with regard to either factor, which by itself requires denying any injunctive relief.

Texas's total failure to show any net injury is fatal to its request for injunctive relief. *Supra* at Section I(b). Even *if* just one dollar in net costs could satisfy standing, *but see supra* Short Answer 6, the Court cannot ignore that reimbursements, revenues, and other benefits Texas receives from the CHNV Pathways *at least* significantly offset its costs when assessing the parties' relative equities for purposes of an injunction. *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (balancing parties' hardships, the Court found that a city's reliance on economic harm

"does not weigh entirely in [its] favor" because "there will be some economic benefits" from the challenged action). To obtain an injunction, Texas must not only demonstrate more than *de minimis* harm, but must also prove that the financial injury it suffers—the only injury it has sought to prove—*outweighs* the likely harm to Defendants and the general public if an injunction issues. *Winter*, 555 U.S. at 20. To the extent Texas has shown any fiscal cost, it plainly does not outweigh the hardship to Defendants on the other side of the equation.

The uncontested evidence demonstrates the likely destabilizing effects of an injunction on foreign policy, border management, and safe migration pathways; on Intervenors whose ability to sponsor family and friends as well as to exercise their sincerely held religious beliefs would be at risk; and on the public interest in addressing humanitarian crises, reuniting families, and filling domestic labor shortages, among others. *Supra* Section III. Moreover, such an injunction would cause widespread harm throughout the country, including in the 16 *amici* states, ECF 239-1, and threaten up to seven other *ongoing* parole programs including U4U and Afghan Allies Welcome. Schacher Expert Decl., Int. Defs.' Trial. Ex. 141; USCIS, Family Reunification Parole Processes, available at https://www.uscis.gov/FRP. The overwhelming imbalance in equities and interests is hard to overstate—to reiterate, Texas has *not even tried* to carry its burden—confirming that no injunction should issue. *See Benisek*, 138 U.S. at 1943; *Amoco Prod. Co.*, 480 U.S. at 542.

*Second*, even if the Court finds that Texas would otherwise be entitled to an injunction, it is not entitled to a nationwide injunction. The Supreme Court and Fifth

Circuit caution that "a federal court's 'constitutionally prescribed role is to vindicate the individual rights *of the people appearing before it*,' and accordingly '[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury.' *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 393 (5th Cir. 2023) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018)). No Plaintiff State other than Texas has even attempted to prove injury, and Texas has never even attempted to show that people paroled into other states would come to Texas in such numbers as to cause it material harm, let alone harm sufficient to offset the interests of nonparties.

The nationwide injunction Texas seeks would permit and incentivize a single state experiencing any downstream budgetary effect from our federal constitutional system to dictate national policy, notwithstanding the countervailing interests of several other states. *See* Brief for Amici Curiae States, ECF 247. Moreover, the Court cannot consider any hypothetical interests of the other Plaintiff States that affirmatively abandoned this case, declining not only to attempt to show injury but also to participate in the litigation at all beyond lending their names for the pleadings. Joint Notice of Stipulation, ECF 139. Thus, any injunction must be narrowly tailored to vindicate only the injury the Court finds has occurred, which *at most* could be an injury to Texas. *E.T.*, 19 F.4th at 769 (finding a blanket injunction was unlawfully overbroad where it was not narrowly tailored to the parties); *Minimum Wage*, No. 6:22-cv-00004, slip op. at 35 (finding a nationwide injunction inappropriate because, when "ordering the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the

court could still be acting in the judicial role of resolving cases and controversies." (quoting *Dep't of Homeland Sec. v. New York*, <u>140 S.Ct. 599, 600</u> (2020) (Gorsuch, J., concurring)).[6]

*Third*, for the first time at trial, Texas articulated that it is seeking an even more extraordinary remedy: the retroactive invalidation of grants of parole already issued under the CHNV Pathways. Trial Tr. vol. 1 of 2, 174:1-7 ("[I]f you vacate it, it takes away any of the legal authority of anyone who was issued parole under it. . . . [T]hey would then be here unlawfully."); Trial Tr. vol. 2 of 2, 236:11-13 (Mr. Walters for the State of Texas explaining that the relief Plaintiffs request is that "if the action is nullified, then, obviously, they [current parolees] will not have the status that that action grants"). Texas has neither provided authority for its eleventh-hour request nor attempted to demonstrate that it would be equitable and in the public interest.

Though Texas purports to seek the clawback of prior grants of parole through vacatur, it has cited no authority establishing that vacatur alone would have this effect. Even Plaintiffs concede that the CHNV Pathways merely created a process for accessing existing statutory parole authority, and that the underlying parole authority would remain even after vacaturs. Pls' Opposition to Motion to Intervene, ECF 127 at 6 ("Curtailing the program …. simply curtails [potential parolees'] ability to [seek parole] through a particular set of processes."). Vacating the CHNV Pathways at most could foreclose DHS's ability to use those processes prospectively,

---

[6] If no injunction could be narrowly tailored to remedy the specific harm Texas has proven, then no injunction should issue given the obvious imbalance in equities.

but it would have no legal effect on those who have already made their way through those processes. However, if Texas is correct that this effect would be automatic alongside vacatur, then there would be no need for the Court to order it at all. Trial Tr. vol. 2 of 2, 236:11-13.

What Texas actually requests is an extraordinary mandatory injunction commanding the executive to revoke previously issued grants of parole and work authorization. This would result in tens of thousands of paroled individuals losing their jobs and ongoing streams of income, while hundreds of businesses would lose their workers—including in Texas. *See, e.g.*, Phillip Connor, *Immigration parole has added 450,000 workers to industries with critical labor shortages*, FWD.us (Apr. 20, 2023), Int. Defs. Tr. Ex. 85. If anything, this would intensify, rather than redress, the injury Texas complains of. *See supra* Section I(c). Texas's request would also subject paroled individuals to the threat of deportation. The Court should decline to impose cruel, unnecessary harm on people who came to the United States through an established, documented process. *Supra* Section II(a)(i); *see, e.g.*, Supplemental Declaration of Anne-Valerie Daniel-Laveus, Int. Defs. Tr. Ex. 122.

Moreover, whether or not that extraordinary and cruel remedy could be contemplated as a sanction for misconduct if, in the future, the government continued to adjudicate applications *after* the Court issues a nationwide injunction blocking the program, *cf.*, *Texas v. USA* , Case 1:14-cv-00254, ECF 347 (S.D. Tex. May 19, 2016), it could not as an injunction where Texas has not even attempted to meet its burden to show an injunction clawing back the status of thousands of third parties *who are*

*not represented in this litigation* would be equitable, in the public interest, encompassed by their complaint, or even legal. To be clear, it is not.

*Finally*, if any relief is warranted, the only appropriate relief would be to remand the decision to the agency without vacatur. This remedy "is generally appropriate when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d at 692 (citation omitted). Both conditions are met here.

Here, there is a serious possibility that any infirmity identified by the Court could be cured on remand. For example, if the Court finds DHS should have engaged in notice and comment rulemaking or should have considered certain factors, remand would permit DHS to consider any such factor, curing the infirmity. *Chem. Mfrs. Ass'n v. EPA,* 870 F.2d 177, 264 (5th Cir. 1989). On the other hand, vacatur would disrupt the settled interests of intervenors, communities, employers, and states throughout the country, while undermining border management, safe migration patterns, and foreign policy.

## CONCLUSION

For the foregoing reasons, the Court should deny Texas's requested relief.

Dated: September 29, 2023     Respectfully submitted,

    */s/ Monika Y. Langarica*
    **Monika Y. Langarica***
    California Bar No. 308518
    langarica@law.ucla.edu

**Ahilan T. Arulanantham\***
California Bar No. 237841
arulanantham@law.ucla.edu

**Talia Inlender\***
California Bar No. 253796
inlender@law.ucla.edu

CENTER FOR IMMIGRATION LAW AND POLICY
UCLA SCHOOL OF LAW
385 Charles E. Young Dr. E., Box 951476
Los Angeles, CA 90095
Telephone: (310) 983-3345

**Esther H. Sung (Attorney-In-Charge)\***
California Bar No. 255962
*Application for Admission pending*
esther.sung@justiceactioncenter.org

**Karen C. Tumlin\***
California Bar No. 234961
karen.tumlin@justiceactioncenter.org

**Jane Bentrott\***
California Bar No. 323562
D.C. Bar No. 1029681
Virginia Bar No. 87903
jane.bentrott@justiceactioncenter.org

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

**Brandon Galli-Graves\***
Texas Bar No. 24132050
brandon.galli-graves@raicestexas.org

THE REFUGEE AND IMMIGRANT CENTER
FOR EDUCATION AND LEGAL SERVICES (RAICES)
5121 Crestway Drive, Suite 105
San Antonio, Texas 78239
Telephone: (210) 960-3206

55

Facsimile: (210) 634-1279

**Kate Kaufmann Shih**
Texas Bar No. 24066065
Federal Bar No. 1214426
kateshih@quinnemanuel.com

QUINN EMANUEL URQUHART & SULLIVAN LLP
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713)221-7100

*admitted pro hac vice*

56

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing instrument was served via ECF pursuant to the Federal Rules of Civil Procedure on the 29th day of September 2023, upon all counsel of record in this matter.

/s/ *Monika Y. Langarica*

**Ex. 6: Order, ECF 161**

United States District Court
Southern District of Texas
**ENTERED**
June 08, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| The STATE OF TEXAS; the STATE OF ALABAMA; the STATE OF ALASKA; the STATE OF ARKANSAS; the STATE OF FLORIDA; the STATE OF IDAHO; the STATE OF IOWA; the STATE OF KANSAS; the COMMONWEALTH OF KENTUCKY; the STATE OF LOUISIANA; the STATE OF MISSISSIPPI; the STATE OF MISSOURI; the STATE OF MONTANA; the STATE OF NEBRASKA; the STATE OF OHIO; the STATE OF OKLAHOMA; the STATE OF SOUTH CAROLINA; the STATE OF TENNESSEE; the STATE OF UTAH; the STATE OF WEST VIRGINIA; and the STATE OF WYOMING, | § § § § § § § § § § § § § § § § § § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | Civil Action No. 6:23-CV-00007 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, Secretary of the United States Department of Homeland Security, in his official capacity; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR JADDOU, Director of U.S. Citizenship and Immigration Services, in her official capacity; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, Acting Commissioner of U.S. Customs & Border Protection, in his official capacity; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT; and TAE JOHNSON, Acting Director of U.S. Immigration & Customs Enforcement, in his official capacity, | § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

**ORDER**

Pending before the Court is Federal and Intervenor Defendants' Unopposed Request to Continue Deadlines for Briefing on Plaintiff States' Motion for Preliminary Injunction [ECF 22].  (Dkt. No. 160).  After reviewing the Motion, the record and the applicable law, the Court is of the opinion that it should be **DENIED**.

As stated previously, the Court will not rule on the motion for preliminary injunction until after the trial has been completed, which is now scheduled for August 24, 2023.  This is because the motion has been consolidated with the trial on the merits. The briefing currently ordered by the Court is to assist the Court in preparation for trial. The Parties will have many opportunities to provide the Court with many briefs, including after trial when the actual evidence (as opposed to discovery) will govern the Court's ruling.

It is SO ORDERED.

Signed on June 8, 2023.

**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**

# Ex. 7: Plaintiff States' Opposed Rule 59(e) Motion to Reconsider Judgment, ECF 310

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
      *Plaintiffs,*

    v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,
      *Defendants.*

Case 6:23-cv-00007

# PLAINTIFF STATES' OPPOSED RULE 59(e) MOTION TO RECONSIDER JUDGMENT

TABLE OF CONTENTS

Table of Contents ..................................................................................................... ii

Table of Authorities ................................................................................................. iii

Standard of Review .................................................................................................... 1

    I.   The Opinion applied the wrong standards in evaluating standing. ..................... 2

        A.    The Opinion engaged in an impermissible accounting exercise. ............................ 2

        B.    The Opinion impermissibly evaluated facts occurring after the complaint to find a lack of standing........................................................................................................7

    II.  The Opinion disregarded data that the number of CHNV nationals entering the United States increased after implementation of the Program. ..................................... 9

Conclusion ............................................................................................................... 13

Certificate of Conference ........................................................................................18

Certificate of Compliance ......................................................................................18

CERTIFICATE OF SERVICE ........................................................................................18

TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for Hippocratic Med. v. FDA*,
  78 F.4th 210 (5th Cir. 2023) ........................................................... 9, 11

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
  1 F.4th 371 (5th Cir. 2021) ........................................................... 10, 13

*Davis v. FEC*,
  554 U.S. 724 (2008) ..........................................................................10

*Edward H. Bohlin Co. v. Banning Co.*,
  6 F.3d 350 (5th Cir. 1993) ................................................................1

*Ellis v. Railway Clerks*,
  466 U.S. 435 (1984) ..........................................................................9

*Franciscan All., Inc. v. Becerra*,
  47 F.4th 368 (5th Cir. 2022) ............................................................9

*Gill v. City of Philadelphia*,
  No. 3:13-cv-917, 2016 WL 6427285 (S.D. Miss. Oct. 28, 2016) ...............1

*GLO v. Biden*,
  71 F.4th 264 (5th Cir. 2023) ...................................................... 5, 7, 8

*Kemp v. United States*,
  596 U.S. 528 (2022) ..........................................................................1

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
  567 U.S. 298 (2012) ..........................................................................9

*L.A. Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) ............................................................2

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ..........................................................................2

*Markva v. Haveman*,
  317 F.3d 547 (6th Cir. 2003) ............................................................2

*Marquette Transportation Co. Gulf-Inland, LLC v. Bulgare*,
  No. CV 19-10927, 2022 WL 5520694 (E.D. La. May 17, 2022) ...............1

*New York v. DHS*,
    969 F.3d 42 (2d Cir. 2020) ........................................................................... 2

*Pederson v. Louisiana State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ......................................................................... 8

*Ross v. Marshall*,
    426 F.3d 745 (5th Cir. 2005) ....................................................................... 10

*Sutton v. St. Jude Med. S.C., Inc.*,
    419 F.3d 568 (6th Cir. 2005) ......................................................................... 2

*Templet v. Hydrochem, Inc.*,
    367 F.3d 473 (5th Cir. 2004) ......................................................................... 1

*Texas v. Biden*,
    554 F. Supp. 3d 818 (N.D. Tex. 2021) (Kacsmaryk, J.) ............................... 6

*Texas v. Biden (MPP)*,
    20 F.4th 928 (5th Cir. 2021) ......................................................................... 6

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ......................................................................... 7

*Texas v. United States (DACA)*,
    50 F.4th 498 (5th Cir. 2022) ......................................................................... 3

*Texas v. United States (DAPA)*,
    809 F.3d 134 (5th Cir. 2015) ..................................................................... 2, 4

*Trevino v. City of Fort Worth*,
    944 F.3d 567 (5th Cir. 2019) ......................................................................... 1

*White v. New Hampshire Dept. of Employment Sec.*,
    455 U.S. 445 (1982) ....................................................................................... 1

**Other Authorities**

88 Fed. Reg. 31314 (May 16, 2023) ..................................................................... 12

Federal Rule of Civil Procedure 59(e) ................................................................... 1

Wright & Miller, *Federal Practice and Procedure* § 2821 (3d ed. 2012) ......................... 1, 2

Plaintiffs respectfully ask the Court to reconsider its final judgment dismissing this case and its opinion explaining that judgment. ECF 305 ("Opinion"), 306. Most fundamentally, the Opinion applied the wrong standard to determine whether the Plaintiffs had demonstrated that Texas had standing to challenge the CHNV Program. Even under the Opinion's articulated standard, the facts demonstrated that the Program led to increased CHNV nationals entering the United States. This Motion is opposed by Federal Defendants and Intervenor Defendants.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(e) provides that a motion to alter or amend a judgment must be filed no later than twenty-eight days after the entry of judgment. *Kemp v. United States*, 596 U.S. 528, 537 (2022). "A Rule 59(e) motion 'calls into question the correctness of a judgment,'" *Templet v. Hydrochem, Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)), and allows a court "to rectify its own mistakes in the period immediately following entry of judgment." *White v. New Hampshire Dept. of Employment Sec.*, 455 U.S. 445, 450 (1982). The standard for reconsideration under Rule 59(e) "allows a court to alter or amend a judgment to," among other things, "correct a manifest error of law or fact." *Trevino v. City of Fort Worth*, 944 F.3d 567, 570 (5th Cir. 2019); *see also Gill v. City of Philadelphia*, No. 3:13-cv-917, 2016 WL 6427285, at *1 (S.D. Miss. Oct. 28, 2016) (granting motion to reconsider where the "[c]ourt erred by applying the wrong standard").

In deciding such a motion, the Court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). Although Plaintiff States have filed a notice of appeal, this Court retains jurisdiction over this Motion. *See Marquette Transportation Co. Gulf-Inland, LLC v. Bulgare*, No. CV 19-10927, 2022 WL 5520694, at *2 & n.14 (E.D. La. May 17, 2022); *see also* Wright & Miller, *Federal Practice and Procedure* § 2821 (3d ed. 2012) ("The district court does, however, retain jurisdiction over motions for alteration or amendment of a judgment filed after a notice of appeal is given.").

1

## I.      The Opinion applied the wrong standards in evaluating standing.

To establish Article III standing, a plaintiff must show a concrete and particularized injury, fairly traceable to the defendant's challenged action, and likely redressable by the requested relief. *Lujan v. Defenders of Wildlife*, <u>504 U.S. 555, 560</u>–61 (1992).

### A.  The Opinion engaged in an impermissible accounting exercise.

The Fifth Circuit has held that Article III standing "is not an accounting exercise." *Texas v. United States (DAPA)*, <u>809 F.3d 134, 156</u> (5th Cir. 2015). That means "once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id*. In other words, a court is to consider "only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *Id*. at 155–56; *see also* N*ew York v. DHS*, <u>969 F.3d 42, 60</u> (2d Cir. 2020) ("'[T]he fact that an injury may be outweighed by other benefits ... does not negate standing.'" (citation omitted)); *Wright & Miller*, 13A *Federal Practice and Procedure* § 3531.4 (3d ed. 2012) ("Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant. Standing is recognized to complain that some particular aspect of the relationship is unlawful and has caused injury."); *L.A. Haven Hospice, Inc. v. Sebelius*, <u>638 F.3d 644, 656</u>–59 (9th Cir. 2011) (hospice had standing to challenge a regulation that allegedly increased its costs in some ways even though the regulation may have saved it money in other ways or in other fiscal years); *Sutton v. St. Jude Med. S.C., Inc.,* <u>419 F.3d 568, 570</u>–75 (6th Cir. 2005) (patient had standing to sue designers, manufacturers, and distributors of a medical device implanted in his body because it allegedly increased the risk of medical problems even though it had not malfunctioned and had benefited him); *Markva v. Haveman,* <u>317 F.3d 547, 557</u>–58 (6th Cir. 2003) (grandparents had standing to challenge a requirement that they pay more for Medicaid benefits than would similarly situated parents, even though the grandparents may have received more of other types of welfare benefits).

Yet, the Opinion's holding that Texas lacked standing never addressed this rule. It found that since the implementation of the CHNV Program, the number of CHNV nationals entering the

United States has decreased. Opinion at 2.[1] From that, the Court concluded that Texas could not show that the Program had injured it and thus lacked standing. *Id*. at 2. It explained that in determining whether a State has been injured, it must examine "whether the number of aliens, and the associated amount expended because of them, increased relative to those same numbers prior to the implementation of the challenged program." *Id*. at 30.

As explained above, however, courts should not weigh a given program's costs versus other benefits in assessing standing. Here, the Court repeatedly found facts showing that Texas would be required to spend money because of the CHNV Program. Specifically, it found that "Texas will inevitably expend some health care resources on CHNV nationals who enter the United States under the Parole Program," Opinion at 14, and that "an increase in CHNV nationals under the age of 18 entering Texas under the Parole Program will inevitably result in at least some costs for Texas." Opinion at 16. Those findings were sufficient to establish standing. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Texas v. United States (DACA)*, 50 F.4th 498, 518 (5th Cir. 2022).

The Court was required to evaluate injury based on the specific agency action challenged here, not the overall federal immigration policy or actions of foreign nations that are not subject to the APA. *See* ECF 285 at 27–28. The Plaintiffs were not permitted to challenge the federal government's overall immigration policy—with its many discrete agency actions—so this Court wrongly evaluated the challenge to the particular program here by evaluating overall immigration flows for a discrete period of time rather than the indisputable increased flows of 30,000 aliens a month created by the CHNV Program itself. Indeed, the key point is that even if overall immigration flows decreased for such a discrete period of time, they would have decreased *even more* if the unlawful CHNV Program were enjoined.

---

[1]    References to pagination for documents filed on this Court's electronic docket are to the stamped page numbers in the header of those filings.

The Federal Defendants contend that an agreement with Mexico offsets the costs to Texas. Specifically, due to various reasons, it is difficult for the United States to deport aliens from Cuba, Haiti, Nicaragua, and Venezuela back to those countries. Opinion at 12. But, according to the Court, the CHNV Program "was conditioned on an agreement with Mexico." Opinion at 12. Because the CHNV Program requires CHNV nationals to enter the United States via an interior port of entry as opposed to traveling through Mexico to enter the United States, Mexico agreed "to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect." Opinion at 12. According to the Federal Defendants, the standing analysis requires considering the number of individuals who can be removed from the United States under this separate agreement, not just the number who enter the country through the Program. ECF 284 at 38. Not so.

Even though Federal Defendants couched this reduction in flow as offsetting benefits of the same type and that arise from the same transaction as the costs, *see* ECF 284 at 38 (citing *DAPA*, 809 F.3d at 155), the Court did not evaluate it under that test—*see* Opinion at 31 n.31 (stating it need not consider "arguments with respect to … offsetting benefits"). Even if the Court had done so, it could not have found that test satisfied, because removing such aliens (or discouraging others to not come because of the prospect of being removed) is not a "benefit" "of the same type" nor does it "arise from the same transaction" as the "costs." *DAPA*, 809 F.3d at 155. Aliens who are removed (or removable) to Mexico are not the same group of people who are paroled into the country under the Program, so federal immigration policies applied to them are not "of the same type" or "arise from the same transaction" as the grants of parole under the Program. Trial Transcript (Aug. 25) at 132:10–24 (Texas's counsel making this point).

Aliens who are removed to Mexico entered the United States illegally, *see* Opinion at 12, whereas those paroled under the Program enter through a purportedly lawful process. Opinion at 12 ("Individuals are generally ineligible for consideration for parole under these processes if they have entered the United States unlawfully …"). The only testimony this Court heard at trial emphasized this point. Intervenor Defendants' sole witness, Eric Sype, testified that Oldrys—the

alien Sype sponsored to enter the United States through the CHNV Program—had never left his own country of Nicaragua and he had no reason to believe that Oldrys would have unlawfully crossed the border into the United States if he were not a Program beneficiary. Trial Transcript (Aug. 24) at 65:1–67:14. Accordingly, even if the Program was conditioned on this agreement with Mexico, it addresses a different category of aliens than those removable to Mexico.

The Opinion's analysis is contrary to Fifth Circuit precedent. In *GLO v. Biden*, 71 F.4th 264 (5th Cir. 2023), the Federal Defendants argued that the States lacked standing because the challenged agency action—refusing to fund the border wall—allowed them to spend the money on "system-enhancing technology" they argued would reduce fiscal injuries to the States because the latter would be more effective at reducing migrant flows. *Id.* at 273–74. The Fifth Circuit disagreed on the independent basis that this was an impermissible accounting exercise: "[E]ven if the installation of system-enhancing technology assists in border control, 'that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs.'" *Id.* at 273 (quoting *DAPA*, 809 F.3d at 155); *see also id.* at 274 ("Federal Defendants argue that the States have not cited evidence demonstrating their 'preferred' border-barrier system would be more effective than the system DHS has elected to construct … [but] as noted above, once an 'injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant.'") (quoting *DAPA*, 809 F.3d at 155–56).

The Opinion contains the same reasoning rejected by the Fifth Circuit: the challenged agency action (here: the CHNV Program; there: the refusal to build the border wall) allows the federal immigration authorities to pursue alternative actions that reduce the flow of aliens on net (here: the agreement with Mexico to accept the removal of CHNV aliens who do not go through the Program; there: the funding of "system-enhancing technology" instead of the wall).

The Opinion also adopts an argument made by Federal Defendants in the case challenging the Migrant Protection Protocols (MPP) but rejected by the Fifth Circuit. There, the States challenged the termination of MPP because the termination led to the specific aliens eligible for

MPP being paroled into the United States, causing fiscal harms to the States. The Federal Defendants argued that the States could not demonstrate injury from the termination of MPP because the data cited by the district court showed alien "encounters jumped from 58,000 in January 2019, when MPP first took effect, to 144,000 in May 2019, while MPP was still in effect." Br. for Appellants in *Texas v. Biden*, No. 21-10806 (5th Cir.), 2021 WL 4444444, at *12–14. The Fifth Circuit disagreed—instead of relying on overall flows of aliens eligible for MPP (all non-Mexicans from the Western Hemisphere), it looked specifically at the harm from the challenged agency action (the termination of MPP): "The district court's most important finding was that MPP's termination has increased the number of aliens *released on parole* [due to the challenged agency action—the termination of MPP] into the United States, including Texas." *Texas v. Biden (MPP)*, 20 F.4th 928, 966 (5th Cir. 2021) (emphasis added). "*MPP's termination [i.e., the specific agency action challenged in the case]*, combined with the lack of detention capacity, has increased and (without an injunction) will increase the total number of parolees" into the States. *Id.* at 967. The Fifth Circuit did not rely on overall migration numbers that could be influenced by many factors, ignoring the Federal Defendants' data showing that illegal migration actually increased under MPP.

And here is the coup de grâce: "Even if the termination of MPP played *no* role in the increasing number of migrants, the lack of MPP as a tool to manage the influx means that more aliens will be released and paroled into the United States as the surge continues to overwhelm DHS's detainment capacity." *Id.* (emphasis in original). So, the *MPP* court held that even if the challenged agency action (the termination of MPP) did not itself increase the number of aliens paroled into the States, the States had standing. *See id.* at 968 ("even if the Government were correct that MPP was an ineffective deterrent, the fact remains that, according to both the record and the Government's own brief, MPP's termination drastically increases the proportion of incoming aliens who are paroled rather than returned to Mexico. And it is precisely that increase in paroles that causes the States' harms."); *see also Texas v. Biden*, 554 F. Supp. 3d 818, 837 (N.D. Tex. 2021) (Kacsmaryk, J.) ("Defendants' termination of MPP necessarily increases the number

of aliens present in the United States regardless of whether it increases the absolute number of would-be immigrants. MPP authorized the return of certain aliens to Mexico. Without MPP, Defendants are forced to release and parole aliens into the United States because Defendants simply do not have the resources to detain aliens as mandated by statute."). Given that analysis, it is apparent that the States have standing to challenge an agency action that *directly* paroles 30,000 aliens a month.

The Fifth Circuit also rejected another attempt by Federal Defendants to use overall immigration numbers to defeat standing relating to a particular agency action. In *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022), the court faced a challenge where the States' injuries were based on agency action that reduced federal arrests of certain criminal aliens. Defendants argued against standing because "various statistics show[ed] an increase in arrests and expulsions year-over-year," and "the percentage of enforcement actions involving noncitizens increased as compared to the same time frame in fiscal year 2020." *Id.* at 218 n.6.

The Fifth Circuit rejected the relevance of these overall numbers: "[F]or purposes of standing, the inquiry is whether the [challenged agency action] caused Texas to have to incur additional financial, law enforcement, and welfare costs, not whether there were generally more enforcement actions year-over-year in the midst of a historic immigration crisis." *Id.* This directly contradicts the Opinion's view that courts should not "look only to the costs incurred by the nationals that have come through the CHNV Program in a vacuum and ignore the net decrease in costs due to the corresponding decrease in overall migration of those nationals." Opinion at 22.

**B. The Opinion impermissibly evaluated facts occurring after the complaint to find a lack of standing.**

Even apart from its reliance on an impermissible accounting exercise, the Opinion also evaluated facts that arose after the filing of the complaint. Standing, however, is determined—even after trial—based on facts that existed when the suit was commenced. ECF 285 at 15–16. The Court recognized this principle, observing that "[s]tanding is determined at the time the case commenced." Opinion at 20 (quoting *Lujan*, 504 U.S. at 570 n.5). Any attempt to use facts after

the commencement of suit to show lack of Article III jurisdiction must be evaluated under the test for mootness, not standing. *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000). Plaintiffs made this point in their post-trial briefing. *See* ECF 294 at 11–12. The Opinion's failure to evaluate the post-complaint migrant flows under the correct legal standard is a fundamental mistake of law.

The Court noted that "in the five months preceding the Program, DHS conditionally released an average of 2,356 CHNV nationals per day" and that "in the nearly five months since the Program's implementation, that figure had dwindled to 1,326." Opinion at 25. Because of this temporary decrease, the Court reasoned that "Plaintiffs' theory on injury-in-fact is unavailing because their proffered re-characterization attempts to skirt the fact that Texas is not financially harmed by the Program." *Id.* at 26.

However, it was error to find a lack of standing based on a comparison of the daily border crossing numbers for the five months before and after the CHNV Program started. *See GLO*, 71 F.4th at 272 n.12 ("As this action was filed in October 2021, developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing). Rather, the proper inquiry was whether Texas's alleged injuries were "fairly likely" at the time of the complaint, and post-trial briefing confirmed the likelihood: "The 113,324 CHNV encounters in September 2023 work out to an average daily encounter rate of 3,777. Daily encounters with CHNV aliens are now unambiguously *higher* than before the CHNV Program started." ECF 294 at 9. It was error for this Court to ignore that Texas had "shown injury from the CHNV Program even under Federal Defendants' and Intervenors' flawed theory that overall migrant flows from the CHNV countries could affect the Plaintiffs' standing to challenge a specific program." *Id.* The Federal Defendants' "own statistics now confirm the Plaintiffs' allegation that the CHNV Program would incentivize increased illegal immigration." *Id.* at 5. The Opinion fails to consider these publicly available facts brought to its attention in the post-trial briefing, even though the Court found it was required to take judicial notice of such facts. Opinion at 6–7.

The difference between the two Article III doctrines is important because "the burden of proving mootness is higher than simply showing a lack of standing." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 n.40 (5th Cir. 2022). A case is moot if "it is *impossible* for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (emphasis added; quotation omitted). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Railway Clerks,* 466 U.S. 435, 442 (1984).

Defendants did not meet their heavy burden of showing that Texas could *never* suffer an injury from the operation of the CHNV Program that this Court could redress. Again, there is no expiration date on the Program, and—as reinforced by the updated numbers demonstrating the increased flow of CHNV migrants after the Program's implementation, discussed below—migrant flows can dramatically change month-to-month due to the multitude of factors that influence it. *See* ECF 285 at 26–29.

## II.  The Opinion disregarded data that the number of CHNV nationals entering the United States increased after implementation of the Program.

The Plaintiffs' harms as alleged in the Amended Complaint were sufficient to confer standing, and the facts presented at trial and in post-trial briefing support those allegations. However, because the Plaintiffs here seek "prospective relief," *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 228 (5th Cir. 2023), this is not the end of the standing analysis: "[A] plaintiff seeking prospective relief need only show that future injury is 'fairly likely.'" *Id.* (quoting *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021)); *see also* Trial Transcript (Aug. 25) at 242:1–242:7 (counsel for Texas citing *Alliance for Hippocratic Medicine* for proposition that "you do not need to show certainty that some things would happen when you have a pre-enforcement review if you're seeking prospective injunctive relief"); ECF 285 at 17 (Plaintiffs' post-trial brief citing "fairly likely" standard); ECF 294 at 11 (Plaintiffs' post-trial response brief citing "fairly likely" standard).

A plaintiff can thus establish standing based on an injury that it anticipated when it filed the complaint. *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 377 (5th Cir. 2021) (Ho, J., concurring) (quoting *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005)) ("[A] plaintiff cannot establish standing based on an injury that it did not 'anticipate at the time it filed the complaint.'" (cleaned up)). Although not necessary to show standing—because "the injury required for standing need not be actualized," merely "threatened," *Davis v. FEC*, 554 U.S. 724, 734 (2008)—if an actual injury occurs after the filing of the complaint then standing is satisfied because evidence post-dating the complaint that shows that the injury actually *did* happen necessarily shows that this injury was "fairly likely" and "anticipate[d]." Thus, Judge Ho pointed out in *Crawford* that when the plaintiff presented post-complaint evidence that proved his predicted harms did, in fact, occur, "he [was] not presenting a new injury that did not threaten him until after he filed suit. Rather, he [was] producing further evidence to confirm the existence of a threat present when he filed suit." *Id.* (Ho, J., concurring).

Although not necessary to satisfy Article III, the Plaintiffs have presented just this sort of evidence here. The border crossing numbers that they cited in their post-trial briefing show that crossings of aliens from CHNV countries have skyrocketed—and are higher than before the CHNV Program was implemented. The numbers the Plaintiffs cited in their Notice of Supplemental Authority—filed earlier the same day the Court issued its judgment and the Opinion—further confirm it. ECF 304. It was a "manifest error of law or fact," *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005), for the Opinion to set aside these data and instead find that "the rate of entries here has decreased subsequent to the implementation of the CHNV Program." Opinion at 30. It was a manifest error of law and fact for the Opinion to ignore that Texas's predicted harms have come true—for three reasons.

*First*, the post-trial briefs show that border crossings from aliens from CHNV countries have continued to increase and are higher than ever. And because the rate of crossings by CHNV aliens has *increased*, Texas's predicted harms have manifested, and the States, therefore, have standing. Texas's predicted harms are not just "fairly likely"—they have been actualized. The

Plaintiffs' post-trial brief—which used the Federal Defendants' own publicly reported numbers, requested the Court take judicial notice of them, ECF 294 at 7, and which this Court found it was *required* to take such notice, Opinion at 6–7—"show[ed] that the Defendants' claim of reduced crossings does not stand up to scrutiny" because those "numbers show that total nationwide encounters with aliens from Cuba, Haiti, Nicaragua, and Venezuela have *increased* since the trial— to 76,604 in August from 56,708 in July," ECF 285 at 21, "a 35% increase in just one month." ECF 294 at 7. The "September [2023] numbers show that the problem has only worsened—nationwide encounters with CHNV aliens in September 2023 totaled 113,324, a 47.9% increase from August and a mindboggling increase of 99.8% from July." *Id.* "[N]ationwide encounters with aliens from Cuba, Haiti, Nicaragua, and Venezuela are skyrocketing, and overall numbers from those countries are higher than before the CHNV Program came online." *Id.*

*Second*, any decrease around the time the complaint was filed was because of seasonal variation and not because of the CHNV Program. ECF 285 at 22–29. The Opinion assumed that temporary decreases in border crossings by CHNV aliens around the time that the CHNV Program began were caused by the Program, but the facts belie this assumption. The post-trial brief shows that "[i]llegal immigration follows seasonal patterns" and that border crossings for *all* aliens decreased during the same months that crossings by CHNV aliens also decreased, thus demonstrating "that the decrease that the Federal Defendants attributed to the Parole Program was merely an artifact of normal seasonal variation in illegal immigrant flows." ECF 285 at 23. The CHNV Program could not have been the cause of decreases in CHNV alien crossings because "the pattern for CHNV encounters follow[ed] the same trend as the data for all aliens, including non-CHNV aliens." *Id.*

*Third*, evidence in the record shows that even Federal Defendants pointed to factors other than the CHNV Program as responsible for any reduction in migrant flows. *See* ECF 285 at 26–29. Migrant flows are affected by a multitude of variables, including the actions of foreign nations (including Mexico's agreement to accept removals of aliens from CHNV countries) and other federal immigration policies not challenged in this case (such as the Circumvention of Lawful

Pathways Rule limiting asylum claims, <u>88 Fed. Reg. 31314</u> (May 16, 2023), which DHS claimed the loss of would lead to "a return to elevated encounter levels," ECF 57-2 at ¶28 in *Indiana v. Mayorkas*, No. 1:23-cv-106 (D.N.D)).

Defendants' own declarant in this case explained that "the increase in Venezuelan migration experienced in early May can likely be attributed to a number of factors, including: misinformation campaigns by smugglers, the aftermath of the fire in a Mexican government facility that killed a number of Venezuelan migrants in March and impacted enforcement efforts in Mexico, and the limited number of available CBP One appointments to present at a port of entry." Defs. Ex. HH at ¶22. DHS also sought a stay in the Eleventh Circuit by declaring that "[n]umerous factors can drive a large increase in the number of noncitizens or a dramatic decrease in encounters, including a temporary decrease in encounters." ECF 3-2 in *Florida v. Mayorkas*, No. 23-11644 (11th Cir.). Of course, events like these will happen again—the Parole Program has no expiration date, Trial Transcript (Aug. 24) at 128:14–129:3; Trial Transcript (Aug. 25) at 253:9–253:16, 271:22-271:24; ECF 285 at 62–69; ECF 304 at 3–4, and Plaintiffs seek relief for future injury. This lack of an expiration date means that almost all aliens admitted under the Program will be able to remain indefinitely in the United States. Comparing Program parolees to aliens illegally crossing the border is inapposite because the latter are subject to removal from the United States, where they will no longer impose costs on Texas or any other State.

Federal Defendants' own declarant further states how "the imposition of stiffened consequences for irregular migration in place at the land border … including a new condition on asylum eligibility, at least a five-year bar on admission to the United States, and the potential for criminal prosecution for repeat illegal entries" have all contributed to lower encounters of Venezuelan migrants between ports of entry. Defs. Ex. HH at ¶ 23. The actions of foreign nations have also contributed to a decline, according to that evidence in the record. *Id.* at ¶ 50 (discussing actions of Colombia, Costa Rica, Ecuador, Canada, Guatemala, and Mexico). The Court cannot use such other federal policies or actions of foreign governments—not subject to challenge in this

case—to find a lack of standing to challenge this particular agency action creating the CHNV Program.

*     *     *

The case has been litigated to conclusion, and this Court should render a decision on the merits. In *Crawford*, the plaintiff filed his complaint in 2017, alleging future harm was likely. 1 F.4th at 373. The district court dismissed, finding that the plaintiff's claimed harm was too speculative. *Id.* Yet, while the case was pending, the claimed harm actually happened—twice, in 2018 and again in 2019. As Judge Ho observed, "[i]f [the plaintiff] had brought suit in 2020, there would be no doubt about his standing to seek injunctive relief. … The question on appeal is whether he has standing given that he brought this suit in 2017. That is, we must decide whether, for purposes of determining standing, we are allowed to consider his post-filing" evidence from "2018 and 2019." *Crawford*, 1 F.4th at 377. There was "no reason why we should treat this 2017 suit any differently than we would treat the hypothetical 2020 suit. In either case, Crawford has presented evidence of a sufficient threat of future injury at the time of suit to establish standing for injunctive relief." *Id.* at 377–78. So too here. This Court should not treat the Plaintiffs' February 14, 2023, Amended Complaint any differently than a new suit filed in April 2024.

As Texas pointed out in the post-trial briefing, "[t]he CHNV Program has no expiration date, and it was reasonable for Texas to foresee that the program would threaten its education, incarceration, driver's license, and healthcare costs over the life of the Program. That was all that Article III requires." ECF 294 at 11. The States predicted that crossings by CHNV aliens would increase, and they did. This is more than enough to establish standing.

<h3 style="text-align:center">CONCLUSION</h3>

The Court should grant Plaintiffs' motion for reconsideration, vacate its final judgment, and determine the merits of their claims.

13

Dated: April 4, 2024.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-1700

Respectfully submitted,

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085
Southern District of Texas No. 3369185
ryan.walters@oag.texas.gov

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500
Southern District of Texas No. 808332
david.bryant@oag.texas.gov

GENE P. HAMILTON
JAMES K. ROGERS
America First Legal Foundation
Virginia Bar No. 80434
Southern District of Texas No. 3792762
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
james.rogers@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512)686-3940 (phone)
(512)686-3941 (fax)
jonathan@mitchell.law

*Counsel for the State of Texas*

14

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*

Raúl R. Labrador
Attorney General of Idaho
Joshua N. Turner, ISB No. 12193
Alan M. Hurst, ISB No. 12425
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
josh.turner@ag.idaho.gov
alan.hurst@ag.idaho.gov

*Counsel for the State of Idaho*

Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

Ashley Moody
Attorney General of Florida
James H. Percival (FBN 1016188)
Deputy Attorney General of Legal Policy
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

Brenna Bird
Attorney General of Iowa
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

15

Kris Kobach
Attorney General of Kansas
Jesse A. Burris, Kan. Sup. Ct. #26856
Assistant Attorney General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the State of Kansas*

Elizabeth B. Murrill
Attorney General of Louisiana
Kelsey L. Smith
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

Russell Coleman
Attorney General of Kentucky
Marc Manley
Assistant Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478
Marc.Manley@ky.gov

*Counsel for the Commonwealth of Kentucky*

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Whitney Hermandorfer
Director of Strategic Litigation
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

Dave Yost
Ohio Attorney General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

Sean D. Reyes
Utah Attorney General
Stanford E. Purser
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
spurser@agutah.gov

*Counsel for the State of Utah*

17

Patrick Morrisey
Attorney General of West Virginia
Lindsay See
Solicitor General
Michael R. Williams
Principal Deputy Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

Bridget Hill
Wyoming Attorney General
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

### CERTIFICATE OF CONFERENCE

I certify that on April 3, 2024, I conferred via email with counsel for Federal Defendants, and counsel for Intervenor Defendants. Both sets of Defendants stated that they oppose this Motion.

*/s/Ryan D. Walters*
RYAN D. WALTERS

### CERTIFICATE OF COMPLIANCE

I certify that this motion complies with Rule 16.c. of Judge Tipton's Court Procedures because it contains 4,909 words, excluding the parts of the document exempt from that Rule, according to Microsoft Word.

*/s/Ryan D. Walters*
RYAN D. WALTERS

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on April 4, 2024, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,

    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND

    SECURITY, *et al.*,

    *Defendants.*

Case 6:23-cv-7

## <u>ORDER</u>

Before the Court is Plaintiff States' Opposed Rule 59(e) Motion to Reconsider Judgment. After considering the motion, record, and relevant authorities, the Court **GRANTS** the Motion and orders that the Final Judgment, ECF No. 306, is vacated.

Signed on _____, 2024.

_____
DREW B. TIPTON
UNITED STATES DISTRICT JUDGE