No. 24-40160

# In the United States Court of Appeals for the Fifth Circuit

---

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF IDAHO; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WYOMING; STATE OF OKLAHOMA,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR M. JADDOU, DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TAE D. JOHNSON, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

*Defendants-Appellees,*

VALERIE LAVEUS; FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; GERMAN CADENAS,

*Appellees.*

---

On Appeal from the United States District Court
for the Southern District of Texas, Victoria Division

---

## BRIEF FOR APPELLANTS
*(Counsel Listed on Inside Cover)*

———————

GENE P. HAMILTON
America First Legal Foundation
Virginia Bar No. 80434
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

CORY A. SCANLON
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas

[Additional counsel listed in signature block]

# Certificate of Interested Persons

No. 24-40160

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants*

*v.*

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees,*

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson
Aaron L. Nielson
*Counsel for the State of Texas*

i

## STATEMENT REGARDING ORAL ARGUMENT

The district court dismissed for lack of standing a challenge brought by nearly two dozen States against defendants within the U.S. Department of Homeland Security (collectively, "DHS") to an immigration regulatory program by which up to 30,000 foreign nationals every month are purportedly authorized to live and work in the United States—thus imposing millions of dollars in support costs on the States. Although such an important case would ordinarily meet the Court's standards for holding oral argument, the ongoing and daily accumulating injury to the States counsels in favor of swift action. The States therefore respectfully urge the Court to summarily reverse the district court and remand so that it can promptly resolve this important challenge on the merits. To the extent, however, that the Court believes that oral argument would be helpful, the States welcome an opportunity to explain why reversal is warranted.

# Table of Contents

Page

Certificate of Interested Persons ............................................................i

Statement Regarding Oral Argument ................................................... ii

Table of Authorities .............................................................................v

Introduction ......................................................................................... 1

Statement of Jurisdiction .................................................................... 2

Issues Presented ................................................................................. 3

Statement of the Case ......................................................................... 3

    I.   DHS's Limited Parole Authority ................................................. 3

    II.  DHS's Past Failures to Accept the Limits on Its Authority ......................4

    III. The CHNV Program ................................................................. 6

    IV. Procedural History .................................................................... 7

Summary of the Argument................................................................... 11

Standard of Review ............................................................................. 13

Argument............................................................................................ 13

    I.   Texas has Article III standing. .................................................. 13

         A.  The district court improperly turned the injury element of standing into an "accounting exercise."............................................. 14

            1.   Justiciability requires only the existence of an injury................... 14

            2.   The district court matched costs and benefits of a different type and from different transactions. ........................... 17

            3.   Recent Supreme Court precedent does not alter this rule. .......... 23

            4.   The district court's analysis fails. ............................. 25

         B.  Even if justiciability were an accounting exercise, the district court got the math wrong as a matter of law. ...................................28

            1.   The district court clearly erred by disregarding evidence suggesting multiple causes of decreased migration rate...............28

            2.   Facts at the time of trial confirm that Texas is likely to be injured in the future....................................................30

         C.  The States are entitled to special solicitude.......................................33

D.  Texas has met the remaining standing requirements. ........................ 37

II.  Appellees' other jurisdictional arguments are equally meritless. .............. 39

A.  Congress has not precluded judicial review. ...................................... 39

1.  There is a strong presumption of judicial review......................... 39

2.  Nothing in the text of the INA overcomes that presumption. .............................................................................. 40

3.  Nor does the APA bar review. ...................................................... 44

B.  The CHNV Program is final agency action. ..................................... 46

C.  Texas is within the relevant zone of interests. .................................. 47

Conclusion ............................................................................................................ 49

Certificate of Service .......................................................................................... 55

Certificate of Compliance .................................................................................. 55

# T ABLE OF A UTHORITIES

Page(s)

**Cases:**

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) ................................................................ 39, 40

*ACORN v. Fowler*,
178 F.3d 350 (5th Cir. 1999) ...................................................14, 15

*Alexander v. S.C. State Conf. of the NAACP*,
144 S.Ct. 1221 (2024) ................................................................. 13

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) ...................................................................... 35

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) ......................................................................30

*Apter v. Dep't of Health & Hum. Servs.*,
80 F.4th 579 (5th Cir. 2023) ................................................ 39, 43

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................................................................46

*Biden v. Nebraska*,
143 S.Ct. 2355 (2023) ................................................................... 14

*Biden v. Texas*,
597 U.S. 785 (2022) ...............................................................*passim*

*Career Colls. & Sch. of Tex. v. Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ................................................ 13, 30

*Cent. Pines Land Co. v. United States*,
274 F.3d 881 (5th Cir. 2001) ................................................23, 40

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................................................ 31

*Contreras v. City of Los Angeles*,
656 F.2d 1267 (9th Cir. 1981) ...............................................28, 29

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
1 F.4th 371 (5th Cir. 2021) ........................................................ 31

*Data Mktg. P'ship, LP v. Dep't of Lab.*,
45 F.4th 846 (5th Cir. 2022) .................................................23, 40

*Davis v. FEC*,
554 U.S. 724 (2008) ...................................................................... 17

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ................................................................31, 38

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ......................................................... 24, 39, 40

*GLO v. Biden*,
    71 F.4th 264 (5th Cir. 2023) .......................................... 18, 26, 27, 37

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021) ...............................................29

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................ 24, 44, 45

*Huss v. Gayden*,
    571 F.3d 442 (5th Cir. 2009) ...............................................29

*Johnson v. Arkema, Inc.*,
    685 F.3d 452 (5th Cir. 2012) ...............................................30

*In re Joint E. & S. Dist. Asbestos Litig.*,
    52 F.3d 1124 (2d Cir. 1995) ...............................................29

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) .......................................... 35, 36

*Kucana v. Holder*,
    558 U.S. 233 (2010) ...................................................... 41, 43

*L.A. Haven Hospice, Inc. v. Sebelius*,
    638 F.3d 644 (9th Cir. 2011) ...............................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ........................................................47

*Louisiana v. NOAA (LDWF)*,
    70 F.4th 872 (5th Cir. 2023) .......................................... 26, 27

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................13

*Maryland Shall Issue, Inc. v. Hogan*,
    971 F.3d 199 (4th Cir. 2020) ...............................................14

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ..............................................14, 33, 34, 35

*Montano v. Texas*,
    867 F.3d 540 (5th Cir. 2017) ...............................................12

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................45

*MPP, Martinelli v. Hearst Newspapers, L.L.C.*,
  65 F.4th 231 (5th Cir. 2023) ........................................................ 40, 41

*Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*,
  730 F.3d 208 (3d Cir. 2013) ................................................................ 14

*New Mexico v. Dep't of Interior*,
  854 F.3d 1207 (10th Cir. 2017) .......................................................... 34

*New York v. DHS*,
  969 F.3d 42 (2d Cir. 2020) .................................................................. 14

*OCA-Greater Hous. v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ........................................................ 14, 15

*Patel v. Garland*,
  596 U.S. 328 (2022) ...................................................................... 40, 41

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923) ............................................................................ 35

*Plyler v. Doe*,
  457 U.S. 202 (1982) .............................................................................. 9

*Preston Expl. Co., L.P. v. GSF, L.L.C.*,
  669 F.3d 518 (5th Cir. 2012) .............................................................. 13

*Roe v. Mayorkas*,
  No. 22-CV-10808-ADB, 2023 WL 3466327 (D. Mass.
  May 12, 2023) ...................................................................................... 43

*Ross v. Marshall*,
  426 F.3d 745 (5th Cir. 2005) .............................................................. 33

*RSBCO v. United States*,
  No. 23-30062, ---F.4th----, 2024 WL 2966083 (5th Cir. June 13,
  2024) .................................................................................................... 42

*Sanchez v. R.G.L.*,
  761 F.3d 495 (5th Cir. 2014) .............................................................. 38

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
  Coll.*, 600 U.S. 181 (2023) .................................................................. 47

*Sutton v. St. Jude Med. S.C., Inc.*,
  419 F.3d 568 (6th Cir. 2005) .............................................................. 14

*In re Technicool Sys., Inc.*,
  896 F.3d 382 (5th Cir. 2018) .............................................................. 33

*Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) .............................................................. 46

*Texas v. Biden (MPP)*,
   20 F.4th 928 (5th Cir. 2021) ..................................................*passim*
*Texas v. Biden*,
   646 F. Supp. 3d 753 (N.D. Tex. 2022) ............................................ 25
*Texas v. DHS*,
   No. DR-23-CV-00055-AM, 2023 WL 8285223 (W.D. Tex. Nov.
   29, 2023) ...................................................................... 5, 22
*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) ................................................ 46, 47
*Texas v. United States*,
   497 F.3d 491 (5th Cir. 2007) .................................................... 13
*Texas v. United States*,
   549 F. Supp. 3d 572 (S.D. Tex. 2021).............................................24
*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015)......................................... 1, 24
*Texas v. United States (DACA)*,
   50 F.4th 498 (5th Cir. 2022) ................................................*passim*
*Texas v. United States (DAPA)*,
   809 F.3d 134 (5th Cir. 2015)................................................*passim*
*United States Army Corps of Engineers v. Hawkes Co.*,
   578 U.S. 590 (2016) ............................................................ 46
*United States v. Clark*,
   990 F.3d 404 (5th Cir. 2021) ................................................... 42
*United States v. Texas (Enforcement Priorities)*,
   599 U.S. 670 (2023) ..................................................... 23, 24, 25
*Uzuegbunam v. Preczewski*,
   141 S.Ct. 792 (2021) ....................................................... 15, 21
*Wendt v. 24 Hour Fitness USA, Inc.*,
   821 F.3d 547 (5th Cir. 2016)..................................................... 14
*West Virginia v. EPA*,
   597 U.S. 697 (2022) ............................................................ 11
*Yates v. United States*,
   574 U.S. 528 (2015)............................................................. 43
*Zadvydas v. Davis*,
   533 U.S. 678 (2001)............................................................. 43

**Constitutional Provision, Statutes, and Rules:**

U.S. Const. art. III, §2 .................................................................. 14

5 U.S.C.:

  §551(4) ..................................................................................... 44

  §701(a)(2) ......................................................................... 39, 44

  §705 ............................................................................................ 2

  §706 ............................................................................................ 2

8 U.S.C.:

  §1182 .......................................................................................... 3

  §1182(i) .................................................................................... 42

  §1182(d)(5) ......................................................................... *passim*

  §1182(d)(5)(A) ........................................................ 1, 3, 40, 41, 43

  §1182(h) ................................................................................... 42

  §1229b ...................................................................................... 42

  §1229c ...................................................................................... 42

  §1252 .................................................................................. 40, 43

  §1252(a)(2)(B) ......................................................................... 42

  §1252(a)(2)(B)(i) ............................................................... 41, 42

  §1252(a)(2)(B)(ii) .............................................................. *passim*

  §1252(a)(2)(D) ........................................................................ 41

  §1255 ........................................................................................ 42

  §1325 ........................................................................................ 22

  §1326 ........................................................................................ 22

  §1621(a) .................................................................................... 48

28 U.S.C.:

  §1291 .......................................................................................... 3

  §1331 ............................................................................................ 2

  §1346 ............................................................................................ 2

  §1361 ............................................................................................ 2

  §2201 ............................................................................................ 2

  §2202 ............................................................................................ 2

**Other Authorities:**

13A C. Wright & A. Miller, Fed. Practice & Procedure §3531.4
  (3d ed. 2014) ........................................................................... 14

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of*
  *Legal Texts* 199 (2012) ........................................................... 42

Appellant's Br., *Texas v. Biden*,
No. 21-10806, 2021 WL 4444444 (5th Cir. Sept. 20, 2021) ............................. 19

Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266
(Jan. 9, 2023) ...................................................................................................... 6

Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243
(Jan. 9, 2023) .....................................................................................................20

Interim Final Rule, 89 Fed. Reg. 48710 (Jun. 7, 2024) ............................................5

John Gramlich & Alissa Scheller, *What's Happening at the U.S.-Mexico
border in 7 charts*, Pew Research Center (Nov. 9, 2021),
https://tinyurl.com/PewImmigPattern ............................................................30

Motion, *Florida v. Mayorkas*,
No. 23-11644, ECF 3-2 (11th Cir. May 19, 2023) ...............................................30

Parole, *Black's Law Dictionary* 1345 (11th ed. 2019) ..................................................7

The White House, *President Joe Biden Statement on the Bipartisan
Senate Border Security Negotiations* (Jan. 26, 2024),
https://tinyurl.com/2y733m35 .......................................................................... 2

The White House, *FACT SHEET: President Biden Announces New
Actions to Keep Families Together* (June 18, 2024),
https://tinyurl.com/FamilyFactSheet ......................................................... 5, 6

## Introduction

DHS may only "parole" foreign nationals into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. §1182(d)(5)(A). Nonetheless, the agency has created a new program that grants parole to nearly 98% of nationals from Cuba, Haiti, Nicaragua, and Venezuela who apply. Nearly 200,000 foreign nationals have already been allowed to live and work in the United States under this program, with tens of thousands more being admitted monthly. Such "en masse" parole cannot be squared with federal law, *see, e.g.*, *Texas v. Biden (MPP)*, 20 F.4th 928, 997 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022), or precedent, *see, e.g., Texas v. United States*, 86 F.Supp. 3d 591, 670 n.101 (S.D. Tex. 2015) (rejecting program as "merely pretext" where acceptance exceeds 95%), *aff'd*, *Texas v. United States (DAPA)*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016). After all, the "whole point of" Congress's decision to enact a "'case-by-case' requirement" is that DHS "cannot … parole aliens en masse." *MPP*, 20 F.4th at 997.

Unfortunately, this appeal does not present the Court the opportunity to address DHS's unlawful actions because the district court dismissed the claims of nearly two dozen States for lack of standing. The district court started in the right place: It found that a federal program creating new immigration rights for tens of thousands of individuals will "inevitably" impose significant costs on States. ROA.11524-11526. But it quickly went astray by dismissing a challenge to that program on the grounds that the program's putative immigration-reducing benefits for the States outweigh such inevitable costs. ROA.11534-11541.

The district court's decision was error twice over: The district court's appraisal of the costs and benefits of this massive new regulatory program is wrong on its own terms. By no means does DHS's unlawful action benefit the States. More fundamentally, however, the district court should not have been comparing costs and benefits at all: Nearly a decade ago—in addressing a claim not unlike this one—this Court unequivocally held that standing to challenge immigration programs "is not an accounting exercise." *DAPA*, 809 F.3d at 156. Instead, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id.* at 155-56. The district court here, however, engaged in the very "accounting exercise" this Court rejects.

The district court's standing analysis is plainly wrong. The consequences, moreover, are significant. Every month thousands more foreign nationals enter the United States pursuant to an unlawful program, thus exacerbating what even President Biden admits has become a national immigration "crisis." The White House, *President Joe Biden Statement on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024), https://tinyurl.com/2y733m35. The Court should promptly reverse the district court's clear misapplication of this Court's standing precedent and remand so the district court can address the merits in the first instance.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. §§1331, 1346, 1361, 2201, and 2202, and 5 U.S.C. §§705 and 706. ROA.331. It entered final judgment on March 8, 2024, ROA.11542-11543, and denied the States' Rule 59(e) motion on May 28, 2024, ROA.11627. The States timely appealed the judgment on March 11,

2024, and amended their notice of appeal on June 3. ROA.11544-11549; ROA.11643-11648. The Court thus has jurisdiction under 28 U.S.C. §1291.

## Issues Presented

1. Whether the States have standing to challenge the CHNV Program.

2. Whether other alleged justiciability bars preclude judicial review.

## Statement of the Case

### I.   DHS's Limited Parole Authority

Foreign nationals cannot enter the United States without statutory authorization. 8 U.S.C. §1182. Congress in turn has limited the number of foreign nationals DHS may allow into the United States and under what conditions.

Relevant here, Congress has given DHS limited authority to "parole" foreign nationals into the United States. *Id.* §1182(d)(5). This power may be exercised "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit …." *Id.* §1182(d)(5)(A). Nor can parole be indefinite: Once the "purposes of such parole" have ended, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* Congress enacted these limits as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) because, although parole has never been "a supplement to Congressionally-established immigration policy," some Administrations attempt "to admit entire categories of aliens who do not qualify for admission … with the intent that they will remain permanently in the United

States." H.R. Rep. No. 104-469, at 140 (1996). Such en masse parole "contravenes the intent of Congress and "illustrates why further, specific limitations on the Attorney General's discretion are necessary." *Id.*

"Quintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947. By contrast, "DHS cannot use that power to parole aliens en masse; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *Id.* at 997. In short, the limited parole authority Congress granted "is not unbounded" but must be exercised "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and in a way that is both "reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 806-07 (2022).

## II.  DHS's Past Failures to Accept the Limits on Its Authority

After Congress repeatedly declined to enact the DREAM Act, the Obama Administration unilaterally created the Deferred Action for Childhood Arrivals program ("DACA") in 2012 and the Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA") in 2014. *See, e.g.*, *DAPA*, 809 F.3d at 146. For both programs, the Obama Administration claimed that its refusal to enforce federal law was simply a matter of nonreviewable enforcement discretion and that approximately two dozen States lacked standing to challenge the programs. *Id.* at 150, 167. This Court disagreed, holding both unlawful. *See id.* at 150-62; *see also Texas v. United States (DACA)*, 50 F.4th 498, 518 (5th Cir. 2022).

Although President Trump attempted to again enforce immigration law, one of the first actions of the Biden Administration was to terminate the "Remain in Mexico" program that required "certain non-Mexican nationals arriving by land from Mexico [to be] returned to Mexico to await the results of their removal proceedings." *Biden*, 597 U.S. at 791. The Biden Administration also uses "rhetoric" that has encouraged millions of foreign nationals to illegally enter the United States. *Texas v. DHS*, No. DR-23-CV-00055-AM, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023). Indeed, not only has DHS encouraged foreign nationals to cross the border, but a federal judge also recently found that DHS went further and deliberately destroyed Texas property to facilitate such entry, while "utter[ly] fail[ing] … to deter, prevent, and halt unlawful entry into the United States." *Id.* at *14.

The result is "an immigration crisis at the Southwest border of the United States with devastating effects." ROA.11512. After holding steady for years at "fewer than 400,000 per year," the number of Border Patrol encounters with migrants swelled in 2022 to "*more than 2.2 million … a nearly 600 percent increase.*" ROA.11513. Because of this crisis, President Biden earlier this month ordered DHS to reinstate a policy like President Trump's "Remain in Mexico" policy, *see* Interim Final Rule, 89 Fed. Reg. 48710 (Jun. 7, 2024), though, unfortunately, one riddled with loopholes.[1]

---

[1] Earlier this month, President Biden also announced an effective amnesty for noncitizen spouses and children. *See, e.g.*, The White House, *FACT SHEET: President Biden Announces New Actions to Keep Families Together* (June 18, 2024),

### III. The CHNV Program

On December 22, 2022, DHS announced a new regulatory program ("the CHNV Program" or "the Program") for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV nationals"). ROA.11519.

As explained by DHS, the Program is designed to "provide a lawful and stream-lined way for qualifying nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to enter the United States, without having to make the dangerous journey to the border." ROA.11519. In total, the Program "allow[s] up to 30,000 qualifying nationals per month from all four of these countries to reside legally in the United States for up to two years and to receive permission to work here, during that period." ROA.11519. It is hardly certain, however, that they will ever leave. In fact, DHS "did not explain or analyze" if—let alone "how"—"they would remove CHNV nationals … after the authorized parole period …." ROA.11521.

On January 9, 2023, DHS published four notices outlining the Program in the Federal Register, declaring it "amenable to immediate issuance and implementation." *E.g.*, Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266, 1,277 (Jan. 9, 2023). DHS claimed the Program was exempt from the APA's ordinary rulemaking requirements for multiple reasons, including alleged foreign-affairs and public-interest concerns, and that it would be "impracticable" to wait for public comments. *See* ROA.11521. DHS also has not opened the Program to comments in the nearly 18 months since it has been in effect.

---

https://tinyurl.com/FamilyFactSheet. The purported authority for that amnesty appears to be 8 U.S.C. §1182(d)(5)—the same authority DHS relies on here.

Potential beneficiaries of the Program may include CHNV nationals other than unaccompanied minors. ROA.12794-12795. Notably, "supporters" for CHNV parolees need not be U.S. citizens or lawful permanent residents, but can include "asylees," "refugees," DACA recipients, and even other "parolees." ROA.12793.

Perhaps because of this Court's decisions regarding the DACA and DAPA programs, DHS does not claim that the CHNV Program is an exercise of prosecutorial discretion. Instead, DHS purports to ground the Program in its parole authority. ROA.11283. Like DACA, however, a CHNV national undergoes a background check and receives "employment authorization." ROA.11519; ROA.12800. They also receive the right to "seek advance authorization to travel to the United States." ROA.11519; ROA.12800. In other words, rather than providing actual parole, i.e., a conditional release from confinement, *see* Parole, *Black's Law Dictionary* 1345 (11th ed. 2019), the Program provides affirmative immigration rights.

And, like DACA, the CHNV Program has no end date. Thus, even though Congress refused to allow DHS to use the agency's parole authority to "supplement … immigration policy," H.R. Rep. No. 104-469, at 140, for every month in perpetuity up to 30,000 CHNV nationals may now enter and work in the country.

## IV. Procedural History

Twenty-one States challenged the CHNV Program. In their operative complaint, the States raised three primary arguments under the APA: (1) the CHNV Program exceeds DHS's limited parole authority under 8 U.S.C. §1182(d)(5); (2) DHS unlawfully refused to engage in notice-and-comment rulemaking; and (3) the Program is arbitrary and capricious. ROA.327; ROA.355; ROA.11514-11515.

The case was tried in August 2023. ROA.11515. Because only one plaintiff must establish standing, the parties stipulated to confine their standing arguments to Texas. ROA.11530. The district court found that between October 2022 to June 2023, 13,990 CHNV nationals paroled under the Program listed Texas as their intended destination, 2,664 of whom were minors. ROA.11523; ROA.13076.

The evidence reflects that these new entrants into Texas impose real-world costs in at least three ways. *First*, beneficiaries of the CHNV Program in Texas become eligible for Texas Emergency Medicaid and Texas Children's Health Insurance Program ("CHIP") Perinatal Coverage, which are administered by the Texas Health and Human Services Commission ("HHSC"). ROA.11523; ROA.13076. HHSC estimated the increased costs of such services as follows:

|  | **Emergency Medicaid** | **CHIP** |
|---|---|---|
| 2019 | $207,000 | $28,000 |
| 2020 | $141,000 | $37,000 |
| 2021 | $123,000 | $64,000 |
| 2022 | $178,000 | $80,000 |
| Jan.-May 5, 2023 | $30,000 | $51,000 |

ROA.11524; ROA.12835-12840.

*Second*, Texas incurs costs when those putatively paroled under the CHNV Program are incarcerated. Although the federal government reimburses Texas for some incarceration costs, the Texas Department of Criminal Justice offered evidence that the federal reimbursement program does not cover the full costs. ROA.11524; ROA.12820-12822. For example, in 2022, the federal government's reimbursement

left Texas on the hook for $68.74 per day per incarcerated foreign national. ROA.11524-11525, ROA.12821-12822.

*Third*, education for the 2,664 minors who have already entered Texas under the CHNV Program costs Texas at least $9,564 per student, which Texas must pay under *Plyler v. Doe*, 457 U.S. 202 (1982). ROA.12824-12827. Texas must pay $11,781 per student for parolees who qualify for Bilingual and Compensatory Education Services. ROA.12824-12827. Thus, education alone will cost Texas more than $25 million—and that is just for students who have arrived thus far.

On March 8, 2024, the district court issued findings of fact agreeing with Texas that the CHNV program imposes costs on the States. For example, it found:

- "Texas will inevitably expend some health care resources on CHNV nationals who enter the United State under the Parole Program."
- "Texas will inevitably expend some incarceration related costs on CHNV nationals who enter the United States under the Program."
- "[A]n increase in CHNV nationals under the age of 18 … will inevitably result in at least some costs for Texas" and its public schools.

ROA.11524-11526.

The district court also found that notwithstanding 8 U.S.C. §1182(d)(5)'s requirement that parole determination must be individualized on a "case-by-case basis," DHS approves 97.6% of adjudicated applications. ROA.11523.

Yet the district court concluded the States lack standing, based on what it admitted was the court's own "estimates" that "the record reflects that the Program has resulted in a decrease of CHNV nationals entering the United States" resulting

in a "net decrease in costs." ROA.11528-11529; ROA.11532. Although the district court's analysis is not entirely clear, it appears it concluded the Program must be evaluated in connection with a putative agreement with Mexico[2] under which "Mexico has indicated that its willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States." ROA.11523. The district court looked to average decreases in Venezuelan nationals entering the United States during an approximately 90-day period from October 2022 to January 2023, and a two-week period for Cuban, Haitian, and Nicaraguan nationals in the week before and the week after the Program was implemented. ROA.11528.[3] According to the district court, despite *DAPA*'s instruction that standing is "not an accounting exercise," 809 F.3d at 156, this Court's precedents "indicate that … looking to the costs that would have been incurred absent the challenged agency action[] is the appropriate lens" through which to examine Texas's standing. ROA.11536.

The district court, however, said nothing about the testimony of the DHS Assistant Secretary for Border and Immigration Policy that such a decrease "can likely

---

[2] This "agreement" is not a treaty and the States have not seen it. The district court used the word "agreement," but the cited declaration evidence does not. ROA.11523; ROA.13404; ROA.13417.

[3] The district court mentioned data from DHS about a five-month period before and after the Program's creation, ROA.11528, but explained they do not address the key question, *see* ROA.11535. It thus appears that the district court focused on these brief 90-day and two-week periods, though the point is somewhat unclear. Either way, the district court did not focus on a long period of time.

be attributed to a number of factors," including "misinformation campaigns by smugglers" and "the aftermath of the fire." ROA.13411. Nor did it account for the fact that any cost-benefit balance inevitably changes over time and border crossings by CHNV nationals were indisputably greater in the summer of 2023 than any pre-Program "baseline" period. ROA.11534-11539. The States argued there were errors in the district court's analysis, but the court denied their Rule 59(e) motion.

## Summary of the Argument

**I.**   The Court will rarely see a more clear-cut example of using "pen-and-phone regulations as substitutes for laws passed by the people's representatives," *West Virginia v. EPA*, 597 U.S. 697, 753 (2022) (Gorsuch, J., concurring). In fact, the Court has already held that DHS cannot "parole aliens en masse." *MPP*, 20 F.4th at 997. Yet that is what DHS is doing. The district court also found that the CHNV Program forces Texas to incur significant costs. It had to: Texas alone will spend millions of dollars more per year providing services to foreign nationals who are unlawfully here—not to mention other pocketbook injuries.

Nevertheless, the district court held that the States lack standing to challenge this unlawful program because the rate of CHNV nationals entering the United States via Mexico decreased during a short period around the time that the States filed their operative complaint. According to the district court, this means the CHNV Program *on net* benefits rather than harms the States, thus precluding the States from suffering an Article III injury.

That analysis is wrong in multiple respects. To start, it improperly turns standing into the very "accounting exercise" this Court has repeatedly rejected. Nor did

the district court try to bring its analysis within the limited exception to Article III's 'no accounting' rule for closely related transactions the Court has suggested in *dicta*. Nor could that exception apply here because CHNV nationals who enter the United States with lawful authorization and work permits are, by definition, not similarly situated with those who enter from Mexico, many of whom have crossed illegally and essentially none of whom may legally work.

Moreover, even if standing were an accounting exercise, the district court went about it in an impermissible way. The district court ignored evidence that the CHNV Program has no connection to short-term decrease in entry, which had entirely disappeared by the time of trial—demonstrating that the States' allegations of likely *future* injury were well founded at the time of the complaint. And the district court gave short shrift to the special solicitude that States receive regarding standing—contrary to this Court's *DAPA* and *DACA* decisions. Indeed, especially given such special solicitude, the Court has already indicated that questions about overall immigration numbers do not relate to injury, but to traceability. Any of these errors by itself warrants reversal. Combined, there can be no doubt.

**II.** Nor can the district court's judgment be supported by any other jurisdictional objection that DHS raised below. Because the district court did not address these objections, the Court should remand so the district court can resolve them in the first instance. This Court, after all, is one of "review, not first view." *Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017). If the Court reaches DHS's additional objections in the first instance, however, it should reject them as meritless. Both this Court and the Supreme Court, for example, have already recognized that an

12

immigration regulatory program that purports to confer legal benefits is different from mere nonenforcement. The Court has also held that 8 U.S.C. §1252(a)(2)(B)(ii)'s bar on judicial review does not apply to program-wide decisions. And any suggestion that the APA does not authorize judicial review is squarely foreclosed by both precedent and the presumption of reviewability.

## Standard of Review

The Court reviews legal questions de novo and a district court's factual findings for clear error. *Preston Expl. Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012). Clear-error review "is not a rubber stamp," *Alexander v. S.C. State Conf. of the NAACP*, 144 S.Ct. 1221, 1240 (2024), and a district court clearly errs as a matter of law when it ignores material record evidence, *see, e.g.*, *Career Colls. & Sch. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 237 (5th Cir. 2024).

## Argument

### I.   Texas has Article III standing.

To establish Article III standing, a plaintiff must show a concrete injury that is fairly traceable to the defendant's action and likely redressable by the requested relief. *See, e.g.*, *Texas v. United States*, 497 F.3d 491, 496-98 (5th Cir. 2007) (following *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The States meet all three requirements because the costs found by the district court are concrete and traceable to CHNV nationals paroled into Texas under the Program, and an injunction will foreclose future costs. The district court's contrary conclusion is erroneous in numerous respects.

### A. The district court improperly turned the injury element of standing into an "accounting exercise."

#### 1. Justiciability requires only the existence of an injury.

**a.**     Article III standing "is not an accounting exercise." *DAPA,* 809 F.3d at 156; *see also DACA*, 50 F.4th at 518. Instead, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 n.10 (5th Cir. 2016) (quoting *DAPA*, 809 F.3d at 155-56). After all, "[s]tanding is recognized to complain that some *particular aspect* of the relationship is unlawful and has caused injury." 13A C. Wright & A. Miller, Fed. Practice & Procedure §3531.4 (3d ed. 2014) (emphasis added).[4] Only one plaintiff's standing need be established. *See, e.g.*, *Biden v. Nebraska*, 143 S.Ct. 2355, 2365 (2023).

The reason for this "no accounting" rule is straightforward. Because federal courts can hear only "Cases" and "Controversies," U.S. Const. art. III, §2, standing prevents the judiciary from deciding abstract questions or issuing advisory opinions. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 514-15 (2007). But standing is not the bar to jurisdiction the district court made it out to be. "The injury alleged need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quoting *ACORN v. Fowler*, 178 F.3d

---

[4] Other courts agree. *See, e.g., Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020); *New York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020); *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 223 (3d Cir. 2013); *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 656-59 (9th Cir. 2011); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 570-75 (6th Cir. 2005).

350, 358 (5th Cir. 1999) (cleaned up). Thus, while courts should refrain from exercising jurisdiction when no trifles can be identified, even a non-substantial injury is enough for standing. *See id.*

Here, the district court found that "Texas will inevitably expend some health care resources on CHNV nationals who enter the United States under the Parole Program," ROA.11524, and that "an increase in CHNV nationals under the age of 18 entering Texas under the Parole Program will inevitably result in at least some costs for Texas." ROA.11526. Those findings—which are plainly correct—established standing. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *DACA*, 50 F.4th at 518. Even nominal damages are enough. *See Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 797-99 (2021).

Rather than apply this blackletter rule, the district court turned standing into the very "accounting exercise" precedent rejects: Even after acknowledging the real-world costs imposed on Texas, the district court found standing lacking because it concluded—based on a short period around the time of the operative complaint—that since the Program's introduction, the rate at which CHNV nationals enter the United States decreased. ROA.11512. The court explained that in determining whether a State has been injured, it must examine "whether the numbers of aliens, and the associated amount expended because of them, increased relative to those same numbers prior to the implementation of the challenged program." ROA.11540. In fact, the district court said that to assess injury, it must consider whether there has been a "net decrease in costs." ROA.11532. That is wrong.

**b.**    The district court's approach cannot be reconciled with *DAPA* and *DACA*. In *DAPA*, the Court held that courts must not consider "offsetting benefits" because doing so amounts to an inappropriate "accounting exercise." 809 F.3d at 155-56. Further, the Court held that Texas is entitled to special solicitude in the standing analysis, recognizing the harm to the State's sovereignty created by DHS's failures to fully enforce federal law. *Id.* at 153. It mattered not, the Court said, that DHS could identify possible offsets in the form of ancillary benefits that may result from the program. *Id.* at 156-57. An evenly divided Supreme Court affirmed, *Texas*, 579 U.S. 547, leading the Obama Administration to withdraw the program.

In *DACA*, the Court reached the same conclusion as to the DACA program. 50 F.4th at 518. Again, before holding the DACA program unlawful, the Court held that the States had standing to challenge the program because Texas established "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Id.* at 518-19. The Court reached this conclusion even in the face of DHS's assertions that without the DACA program, Texas's "healthcare costs would increase for aliens who remain in Texas." *Id.* at 518. Again, the Court recognized Texas's special solicitude in the standing analysis "because of its procedural right under the APA to challenge DACA and Texas' quasi-sovereign interest in alien classification, an area in which the State would like to, but cannot, regulate." *Id.* at 517.

By themselves, the Court's opinions in *DAPA* and *DACA* confirm the district court erred. After finding that agency action will impose a fiscal injury on a State,

nothing requires a court to go further and decide whether that agency action on net will benefit the State. As the Court has held, standing is not a matter of bookkeeping.

**c.** The Court's 'no accounting' rule makes good sense. A contrary rule would be unworkable because jurisdiction would depend on the vagaries of migrant flow, which naturally vacillate for a variety of reasons. *Supra* pp. 10-11. "[T]he injury required for standing," however, "need not be actualized" so long as the prospect of discrete injury "is real, immediate and direct." *Davis v. FEC*, 554 U.S. 724, 734 (2008).

Even one person paroled into Texas under an illegal application of DHS's parole authority causes Texas to sustain an injury for standing purposes. *See DACA*, 40 F.4th at 218 n.6; *MPP*, 20 F.4th at 966; *DAPA*, 809 F.3d at 155-56. And the facts proved that by trial, that future potential injury had happened and promised to continue indefinitely. *Infra* pp. 30-32. Yet the district court said Texas was not injured because discovery revealed that the filing of the operative complaint coincided with a temporary dip in arrivals. ROA.11633-11634. That is not the law anywhere.

### 2. The district court matched costs and benefits of a different type and from different transactions.

The Court has said—albeit in *dicta*—that Article III's 'no accounting' rule may not apply in cases with "offsetting benefits that are of the same type and arise from the same transaction." *DAPA*, 809 F.3d at 155. Assuming the exception exists, it is narrow and inapplicable here. Indeed, the district court declined to consider it.

**a.**    Although this Court has maintained the possibility of considering offsetting benefits of "the same type" and arising out of the "same transaction" as the plaintiff's costs, it has refused to do so in immigration cases. For example, in *GLO v. Biden*, 71 F.4th 264 (5th Cir. 2023), the Court held that States had standing to challenge an agency's refusal to fund a border wall even if such refusal to do so would allow investment on "system-enhancing technology" that DHS claimed would more effectively reduce immigration. *Id.* at 273. "[E]ven if the installation of system-enhancing technology assists in border control," the Court explained "that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *Id.* (quoting *DAPA*, 809 F.3d at 155). The States thus were not required to "demonstrat[e that] their 'preferred' border-barrier system would be more effective than the system DHS has elected to construct" because "once an 'injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant.'" *Id.* at 274 (quoting *DAPA*, 809 F.3d at 155-56). Furthermore, *GLO* explicitly assessed whether there would be "a net increase in the number of undocumented immigrants who enter the United States" as a question of *traceability*—not *injury*. *Id.* at 273 (quotation omitted).

*MPP* reiterated this point. There, the Court held that DHS's creation of a regulatory pathway to parole for aliens who otherwise would be barred caused fiscal harms to States. 20 F.4th at 966. DHS argued that the States could not demonstrate injury because "encounters jumped from 58,000 in January 2019, when MPP first took effect, to 144,000 in May 2019, while MPP was still in effect." Appellants' Br.

at 14, *Texas v. Biden*, No. 21-10806, 2021 WL 4444444 (5th Cir. Sept. 20, 2021). Instead of relying on overall flows of migrants, however, the Court said "[t]he district court's most important finding was that *MPP's termination*"—that is, the challenged action—"has increased the number of aliens released on *parole* into the United States, including Texas." *MPP*, 20 F.4th at 966 (emphases added). In other words, rather than focusing on whether the rate of migration increased, let alone compounding the economic impact of all types and variations of immigration into a single category, the Court held that "even if the Government were correct that MPP was an ineffective deterrent, … *MPP's termination* drastically increases the proportion of incoming aliens who are paroled rather than returned to Mexico. And it is precisely that increase in *paroles* that causes the States' harms." *Id.* at 968 (emphases added). Similar analysis applies here.

**b.** DHS's only argument that this narrow exception to the Court's ordinary 'no accounting' rule allowed the district court to weigh Texas's established injury against offsetting benefits is premised on the notion that Texas benefits from Mexico's putative agreement "to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect." ROA.11522. According to DHS, courts must consider not only the obvious and direct costs to Texas from the Program, but also such supposedly offsetting benefits. ROA.11028. Article III does not require that vague and convoluted accounting exercise.

Tellingly, not even the district court accepted DHS's claim that these costs and benefits were of the same type or came from the same transaction. ROA.11028 (citing *DAPA*, 809 F.3d at 155). It declined to evaluate DHS's position under that

test but instead concluded it need not consider "arguments with respect to … offsetting benefits." ROA.11541. The States agree that the district court was right to not consider "offsetting benefits," but observe that the district court never attempted to reconcile that statement with its decision to consider the benefits of (allegedly) reduced overall entry into Texas against the costs Texas undoubtedly incurs for individual CHNV parolees. The district court's standing analysis thus contradicted itself—a telltale sign of reversible error.

Regardless, the Court's narrow "offsetting benefits" exception—to the extent it exists at all—cannot apply here for at least three reasons.

*First*, any DHS deal with Mexico is not part of the "same transaction," *DAPA*, 809 F.3d at 155, as the CHNV Program's costs imposed on Texas. The record calls into question whether a formal agreement even exists by referencing the "*independent* decision" of Mexico "to accept the returns of" CHNV nationals "who crossed the [Southwest Border] without authorization." Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243-44 ( Jan. 9, 2023) (emphasis added). Assuming DHS's acceptance of the benefits of such "independent decisions as to [Mexico's] ability to accept returns of third country nationals," *id*. at 1251, could be considered an informal agreement, no State was consulted—let alone regarding what *quid* DHS should offer in return for Mexico's implicit *quo*. Yet there is no inherent reason why the Program must be linked to a deal with Mexico. To the contrary, as often occurs during political haggling, DHS could have purchased Mexico's cooperation with any type of tradeable federal resource.

The district court's factual findings confirm this point. It explained that Mexico sought "the continued availability of lawful processes for nationals from those countries to come directly to the United States." ROA.11523. Of course, the CHNV Program is *not* a "lawful process"—as *MPP* confirms. Even putting that aside, the supposed side deal with Mexico apparently was not for the CHNV Program at all. Nothing in the district court's assessment of this alleged agreement—again, not a treaty—suggests that the deal with Mexico should apply to 30,000 people a month (as the Program does) or must provide for two years of lawful presence (which limit, it appears, DHS has no plan to implement, ROA.11521). DHS's failure to open the Program to comments prevented the States from pointing out such obvious errors in DHS's implementation of any agreement with Mexico.

*Second*, preventing illegal cross-border entry of CHNV nationals from Mexico is not remotely a "benefit" "of the same type" as the "costs" imposed on Texas. *DAPA*, 809 F.3d at 155. The federal government is duty-bound to protect the States from illegal border crossings. *Id.* at 153-54. And Congress has taken at least some steps to do so by making *all* these individuals—both those covered by the deal with Mexico and CHNV parolees—legally inadmissible. That DHS may have made a deal with Mexico to allow fewer individuals unlawfully in the country might do something to mitigate the harm to Texas, but it does not eliminate Texas's standing if the State still must spend a single dollar it would not otherwise have to spend due to the CHNV Program. *Uzuegbunam*, 141 S.Ct. at 797-99.

Again, precedent supports Texas. As the Court explained in *DAPA*, the States relinquished a portion of their power to manage migration in exchange for joining

21

the Union. Thus, when DHS does not enforce federal law, the States necessarily suffer an injury to their sovereignty. *DAPA*, 809 F.3d at 153-54. Here, DHS has a duty to prevent foreign nationals from illegally entering Texas. It turns that duty on its head to say that DHS's creation of an unlawful parole program cannot be challenged because it supposedly helps reduce injuries caused by DHS's separately unlawful failure to prevent illegal entry elsewhere. DHS cannot use its own "utter failure … to deter, prevent, and halt unlawful entry" and "obviously derelict" conduct, *Texas*, 2023 WL 8285223, at *14, as the very reason Texas lacks standing to challenge additional and distinct unlawfulness.

*Third*, regardless, foreign nationals who are removed to Mexico or who never enter Texas from Mexico because of the prospect of removal are not of the same category as foreign nationals paroled into Texas under the CHNV Program. After all, CHNV nationals who are removed to Mexico entered the United States *illegally*, whereas those paroled under the Program enter through a separate, purportedly lawful process. ROA.11522. Individuals unlawfully present in the United States should be incarcerated in federal detention centers paid for by the federal government and then removed, and cannot lawfully work. Indeed, entering the United States outside of a port of entry is a crime. 8 U.S.C. §§1325-26. By contrast, parolees can stay in Texas until parole ends and are authorized to work—thus imposing greater and different kinds of costs on Texas. Equating two groups of foreign nationals—one group (purportedly) lawfully in Texas and another group unlawfully present in Texas—is a category error. *DAPA*, 809 F.3d at 148-49.

The only relevant testimony emphasized this point. Intervenor Defendants' sole witness, Eric Sype, testified that he sponsored a Nicaraguan national under the CHNV Program who had never left Nicaragua and would not have entered Texas if he were not a Program beneficiary. ROA.12071-12072. Accordingly, even if the Program was conditioned on an agreement with Mexico, it addresses a different category of foreign nationals.

### 3.  Recent Supreme Court precedent does not alter this rule.

Although the Supreme Court has revised this Court's standing analysis in some respects, it has never altered the rule that once an injury is established, courts do not consider offsetting benefits. If anything, the Supreme Court seems to have implicitly agreed with this Court's position when it reversed the Court's decision in *MPP* on the *merits*—but not standing. *See Biden*, 597 U.S. at 801-07. In all events, because the Supreme Court reversed *MPP* on other grounds, this Court's standing analysis remains binding circuit precedent. *See Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022) (*MPP's* standing analysis is binding); *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001).

True, the Court has held that States sometimes lack standing to impose upon DHS to make more arrests. *See United States v. Texas (Enforcement Priorities)*, 599 U.S. 670, 680-81 (2023). It does not follow, however, that "federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Id.* at 681. To the contrary, relying on this Court's precedent, the Supreme Court distinguished a situation where the federal government refuses to enforce federal law from one where it does not enforce

federal law *and* purports to provide "legal benefits or legal status." *Id*. at 683 (citing *DAPA*, 809 F.3d at 154). By providing for work authorization and advanced travel authorization to internal ports of entry, the CHNV Program is much "'more than simply a non-enforcement policy.'" *Enforcement Priorities*, 599 U.S. at 683 (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 18-19 (2020)).

Moreover, *Enforcement Priorities* also notes that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id*. at 682-83 (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id*. at 683. The *Enforcement Priorities* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in th[at] case or argued that the Executive has entirely ceased enforcing the relevant statutes." *Id*. But relevant here, the Supreme Court's analysis reaffirms an approach to standing from *DAPA*, which found that States have standing to challenge immigration rules based on this abdication theory. *See Texas*, 86 F.Supp.3d at 636-41.

Here, as in *DAPA*, the CHNV Program represents an abdication of DHS's statutory responsibility. As in *DAPA*, the CHNV Program "prevents immigration officials from enforcing these [limiting] provisions of the" parole statute. *Texas v. United States*, 549 F.Supp.3d 572, 608 (S.D. Tex. 2021). And, as in *DAPA*, the district court found that nearly every applicant to the CHNV Program was granted parole. ROA.11523. "Deciding to parole aliens *en masse* is the opposite of *case-by-*

24

*case* decisionmaking." *MPP*, 20 F.4th at 942. The sheer "number of aliens paroled each month … gives rise to a strong inference that the Government is not really making these parole decisions on a case-by-case basis." *Texas v. Biden*, 646 F.Supp.3d 753, 775 (N.D. Tex. 2022) (cleaned up) (quoting *Biden*, 597 U.S. at 825-26 (Alito, J., dissenting)), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). Such *en masse* parole provides standing here, *MPP*, 20 F.4th at 942—even if *Enforcement Priorities* were applicable, which it is not.

### 4. The district court's analysis fails.

Despite the foregoing, the district court concluded that the States lack standing. To begin, it focused on "what the baseline migration numbers should be" for a "before versus after" analysis. ROA.11534-11535. Yet that is the wrong framing. Rather than looking at baselines and comparators, it should have done what this Court's cases require: Simply determine whether Texas must expend resources for beneficiaries of the unlawful CHNV Program. Because the district court answered that question in the affirmative, its standing inquiry should have ended there.

The district court, however, reasoned that forcing Texas to spend money is not an "actual injury" because if the Program on "net" results in less overall entry, Texas would not be "financially harmed." ROA.11535-11536. Yet setting off costs caused by the presence of one foreign national (a CHNV parolee) against costs supposedly saved by the absence of another foreign national (someone trying to enter from Mexico) can only be one thing: an accounting exercise.

The district court also stated that in "immigration cases, a comparative rise in the number of migrants in the State was the norm." ROA.11536. The parties,

however, disagreed sharply in *DAPA*, *MPP*, and *GLO* whether the challenged action would on net harm the States. *See supra* pp. 17-23. This Court correctly concluded in each case that the whole cost/benefit inquiry was misplaced. That is consistent with the overarching purpose of Article III standing. By requiring concrete disputes—such as whether the Program will cause Texas to expend funds for CHNV parolees—Article III's standing requirement *prevents* courts from being forced to decide amorphous and speculative questions; standing thus cannot *require* courts to decide such questions. Yet, accepting the district court's rule would bog courts down in determining not just whether a plaintiff has been forced to expend money (a straightforward question), but in considering possible benefits arising elsewhere due to hundreds of thousands of other people's decisions regarding endless confounding political, social, and economic variables. The complexity of such analysis is enough to demonstrate the wisdom of this Court's holdings that standing is not an accounting exercise. Surely Article III does not require multivariate analysis.

Against all of this, the district court offered snippets from several of this Court's cases. Yet it misunderstood them. Consider its reading of *MPP* and *Louisiana v. NOAA (LDWF)*, 70 F.4th 872 (5th Cir. 2023). True, the "most important finding" in *MPP* was that the program's "termination has increased the number of aliens released on *parole*," ROA.11540 (quoting *MPP*, 20 F.4th at 966) (emphasis added), and that the fiscal harm caused by "illegal encounters 'skyrocketed.'" ROA.11538 (quoting *MPP*, 20 F.4th at 968). But the Court never focused on each and every economic aspect of immigration (which the district court's analysis logically implicates), nor

on whether such "skyrocket[ing]" expenses may have been elsewhere. And to the extent this Court considers increases as to "relative costs," nothing in *GLO* or *MPP* requires Texas to show that it is experiencing an increasing *rate* of migration. *See GLO*, 71 F.4th at 273-74. Indeed, *GLO* treated the question of whether there was a "net increase" as one of redressability—not injury. *Id.* at 272. In any event, there is no basis to offset costs and benefits here because they are fundamentally different in kind, *see supra* pp. 17-23, and, regardless, the evidence the States offered establishes standing even on the district court's own mistaken terms, *see infra* pp. 30-33.

The district court's reliance on *LDWF* is similarly mistaken. There, Louisiana claimed that requiring vessels to install a turtle-excluder device would injure the State by straining its enforcement resources and increasing enforcement costs. *LDWF*, 70 F.4th at 880-81. But *LDWF* did not turn on anything about the rate of cost inflation. Instead, the concern was that rather than evidence of concrete injury, Louisiana relied on allegations "that additional enforcement duties triggered by the Final Rule 'could substantially burden and interfere with LDWF Enforcement's ability to effectively perform its various other enforcement duties.'" *Id.* at 881. Texas relied on no such speculation: It offered evidence that costs are incurred and will be incurred in the future. Further, the scheme in *LDWF* apparently included federal payments to "offset" increased State enforcement spending. *Id.* at 882, 884. Regardless, *LDWF* said nothing about this Court's 'no accounting' rule, which Louisiana's briefing did not mention. The district court erred by reading a decision that doesn't mention accounting as *sub silentio* overruling the rule that this Court has clearly articulated and repeatedly applies in the immigration context.

**B.  Even if justiciability were an accounting exercise, the district court got the math wrong as a matter of law.**

Even if precedent allowed the district court to set off the costs and benefits of the CHNV Program, it still erred for two reasons. *First*, it did not apply a sound methodology. And *second*, it disregarded evidence that any illusory benefits were fleeting while disregarding the prospective injury that the States were experiencing at the time of trial and continue to experience today.

**1.  The district court clearly erred by disregarding evidence suggesting multiple causes of decreased migration rate.**

Even if standing did require courts to balance the costs and benefits of a challenged action to determine whether, on net, the plaintiff was injured, the district court's analysis fails on its own terms. The district court concluded that the CHNV Program has resulted in lower rates of entry, ROA.11528, but it did not base this finding on anything more than the fact that entries happened to have decreased during brief intervals near the filing of the operative complaint. ROA.11528-11529. Although the district court's precise analysis is somewhat unclear, *see supra* p. 10 & n.3, it apparently considered average decreases during a 90-day period for Venezuelans and a mere two weeks for the nationals of the other countries. ROA.11528. Such analysis contains at least three independent errors.

*First*, the district court erred by considering such a short span of time. Making factual findings based on such a limited period—without ensuring that period was even representative—was clearly erroneous, especially because the States' requested relief is prospective in nature and covers a time indefinite in duration. It is clear error to use "an extremely small sample size," *e.g.*, *Contreras v. City of Los*

*Angeles*, 656 F.2d 1267, 1275 (9th Cir. 1981), yet that is what the district court did. There is no basis to assess the injury caused by a perpetual program based on the happenstance of a few months' or weeks' worth of migrations flows.

*Second*, even though "any scientist or statistician must acknowledge that correlation is not causation," *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (cleaned up), the district court failed to account for a similar drop in migrant flows during this period across *all* population groups—not just CHNV populations—as reflected in graphics provided to the district court, ROA.11089-11093, and appended here as Tab 6 of the States' record excerpts. There is thus no reason to deduce that any decrease in border crossing by CHNV nationals was caused by the Program rather than other factors applicable to all foreign nationals.

*Third*, the district court did not consider other likely causes of that short-term reduction in border crossings. When relying on statistics, it is necessary to "narrow down the universe of possible confounding factors." *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1130 (2d Cir. 1995); *see also, e.g.*, *Hardeman v. Monsanto Co.*, 997 F.3d 941, 964 (9th Cir. 2021). The district court failed to do so.

DHS's own analysis reflects that migrant flows are affected by "a number of factors," including "misinformation campaigns by smugglers." ROA.13411. DHS's declarant further admitted how "the imposition of stiffened consequences for irregular migration in place at the land border" have all contributed to lower encounters of Venezuelan migrants between ports of entry. ROA.13411. The same is true for actions by other nations, including Colombia, Costa Rica, Ecuador, Canada, and Guatemala. ROA.13422-13423. None of that has anything to do with

the CHNV Program. In short, as DHS has admitted, "numerous factors can drive a large increase in the number of noncitizens or a dramatic decrease in encounters[.]" Mot. at 8, *Florida v. Mayorkas*, No. 23-11644, ECF 3-2 (11th Cir. May 19, 2023); *see also* ROA.11094 (similar admission). Moreover, the States also established below that illegal immigration follows seasonal patterns. ROA.11090; *see also, e.g.*, John Gramlich & Alissa Scheller, *What's Happening at the U.S.-Mexico border in 7 charts*, Pew Research Center (Nov. 9, 2021), https://tinyurl.com/PewImmigPattern. In other words, every year migration decreases in the winter and increases again in the spring and summer; the district court's analysis overlooks this pattern.

Rather than address this evidence, the district court relied on temporal proximity—in other words, correlation—to infer causation. ROA.11528. Disregarding relevant evidence, however, is clear error as a matter of law. *See Career Colls.*, 98 F.4th at 237. Regardless, though the Court affords district courts some deference in weighing contradictory evidence, where facts are largely undisputed and credibility is not at issue, such deference is minimal. *See, e.g.*, *Anderson v. City of Bessemer City,* 470 U.S. 564, 574-75 (1985). Here, the district court's focus on temporal correlation to exclusion of all other relevant facts would not even survive *Daubert*, *see, e.g.*, *Johnson v. Arkema, Inc.*, 685 F.3d 452, 467 (5th Cir. 2012)—let alone justify dismissing the complaint of nearly two dozen States.

### 2. Facts at the time of trial confirm that Texas is likely to be injured in the future.

Even if Texas were wrong about all the foregoing, the district court's standing analysis would still fail: Whatever happened in February 2023, the States' claim is

*prospective*, ROA.326-361, and the likelihood of a future injury must be assessed at each stage of the proceeding. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). The district court never held that the States failed to *plead* a sufficient injury in good faith—notwithstanding the Intervenors' motion to dismiss under Rule 12(b)(1). ROA.11808. And at the time of trial in summer of 2023, it was plain that the CHNV Program does not reduce illegal border crossings by CHNV nationals.

Because the States seek prospective relief, they are only required to show that a future injury is "fairly likely." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021). It follows, therefore, that a plaintiff establishes standing based on an injury that it anticipated when it filed suit when that injury later comes to fruition. *See, e.g.*, *id.* at 377 (Ho, J., concurring). After all, when a plaintiff presents post-complaint evidence that his predicted harms did, in fact, occur, "he is not presenting a new injury that did not threaten him until after he filed suit. Rather, he is producing further evidence to confirm the existence of a threat present when he filed suit." *Id.*; *accord Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019).

Texas presented such evidence below confirming that both the rate and absolute numbers of entrants by CHNV nationals increased between the time the Program was instituted and the time of trial. *See* ROA.11490-11492. Indeed, using DHS's own encounter data for nationals from "Cuba," "Haiti," "Nicaragua," and "Venezuela," Texas showed the following:



ROA.11414 (describing methodology).

As this chart demonstrates, total nationwide encounters with CHNV nationals were increasing at the time of trial—from 56,708 in July 2023, ROA.11088, to 76,604 in August, ROA.11413-11414, to 113,324 in September. ROA.11413-11414. Texas's predicted harms thus were not just "fairly likely"—they came to be. DHS's own figures showed that its theory does not withstand scrutiny.

It was a "manifest error of law or fact," *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005), for the district court to set aside these data and find that "the rate of entries here has decreased subsequent to the implementation of the CHNV

Program." ROA.11540. This is especially true because the Program has no expiration date. The States predicted when they filed this challenge that crossings by CHNV nationals would increase. That has now happened, just as the States reasonably predicted. That is more than enough to establish injury.

In refusing to consider this data, the district court stated that even if the numbers changed, the States could not "establish standing retroactively." ROA.11633 (quoting *In re Technicool Sys., Inc.*, 896 F.3d 382, 386 (5th Cir. 2018)). Respectfully, that misses the point. *Technicool* involved whether a party who was *not* a creditor at the time a suit was filed could sue for past damages if he *became* one after the case was filed. 896 F.3d at 386. That is a fundamentally different question from whether facts that materialize post-complaint can be considered to determine whether a prospective injury was reasonably likely at the time of the complaint. They can, especially where, as here, the relief sought is prospective only. It makes no sense to require the States in such a case to file a new lawsuit (which the district court said they can, ROA.11541) where the injury claimed in the complaint is happening right now.

## C.   The States are entitled to special solicitude.

The States' standing should be especially apparent because they are "not normal litigants for the purposes of invoking federal jurisdiction" and are entitled to "special solicitude." *DACA*, 50 F.4th at 514 (citing *Massachusetts*, 549 U.S. at 518, 520). A State thus will establish standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts*, 549 U.S. at 518). Here,

the States have shown (1) "a procedural right to challenge the action in question" that could, if vindicated, result in a change in the outcome, and (2) the action "affect[ed] one of the State's quasi-sovereign interests." *Id.* (citing *DAPA*, 809 F.3d at 151-52).

Texas satisfies the first prong because it "asserts a procedural right under the APA to challenge agency action," something it can do for all its claims. *Id.* (citing *DAPA*, 809 F.3d at 152); *see also MPP*, 20 F.4th at 970 n.10 (same for substantive claims). "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *MPP*, 20 F.4th at 970 (quoting *DAPA*, 809 F.3d at 152). In fact, had DHS let the States file comments—a right Congress expressly provided in the APA—they could have explained the flaws in the Program that are causing significant real-world harm to the States. Loss of a "procedural right" is plainly injury.

Put differently, no one would say that private hospitals lack standing to raise an APA claim challenging an agency's decision to increase reimbursement rates if the hospitals were not allowed to file comments explaining why they are entitled to an even more favorable reimbursement rate. That is because for procedural injuries, "a plaintiff 'need show only that compliance with the procedural requirements *could* have better protected its concrete interests.'" *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017) (citation omitted). Given special solicitude, that principle applies *a fortiori* to the States. *Id.* at 1219. Even if the Program benefits the States on net (and it does not), the States' inability to submit comments explaining

how the Program could be even more "beneficial" to them on net by, for example, including plans for removal post-parole is itself a cognizable injury.

The States also satisfy the second element because the CHNV Program injures their quasi-sovereign interests. "A quasi-sovereign interest is 'a judicial construct that does not lend itself to a simple or exact definition.'" *DACA*, 50 F.4th at 514 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). "'One helpful indication' of a quasi-sovereign interest," however, "is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *Id.* at 515 (quoting *Massachusetts*, 549 U.S. at 519). Additionally, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain 'sovereign prerogatives [that] are now lodged in the Federal Government.'" *Id.* (quoting *Massachusetts*, 549 U.S. at 519). A State also has a quasi-sovereign interest in the "'health, comfort, and welfare' of its citizens." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 592 (1923)).

In *DACA*, this Court concluded that the "interest in classifying aliens was analogous to the interest in regulating emissions that the Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA*." 50 F.4th at 515. And because the States "surrendered some of their sovereign prerogatives over immigration" upon entering the Union, including to "establish their own classifications of aliens," they rely on the federal government to protect their interests. *Id.* Therefore, "DACA implicate[d] Texas's quasi-sovereign interest in classifying aliens." *Id.* The Court

also "recognized that a State's inability to legislate around DACA can create a quasi-sovereign interest." *Id.* (following *DAPA*, 809 F.3d at 153).

The CHNV Program implicates quasi-sovereign interests just as the DACA Memorandum did. Not only must Texas pay millions to provide services to CHNV nationals, but if the States sought to change the classifications of parole recipients to alleviate their injuries, they would be threatened with federal preemption. The Court acknowledged these issues in *DACA*, concluding that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *Id.* at 516. Just so here. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id.* Furthermore, the States have an important interest in the "'economic well-being'" of their "citizens," *Kentucky*, 23 F.4th at 598, who are obviously injured by the influx of tens of thousands of competing workers.

The district court observed that Texas asserted that it was entitled to special solicitude but dismissed such solicitude because "as to injury-in-fact, Texas's basis for standing is dollar damages." ROA.11531; ROA.12600. That observation fails because Texas is suffering significant monetary injury. *See supra* pp. 8-9. It also misses the point: The costs proved below were the same type of injury to Texas's rights that led this Court to afford Texas special solicitude in *DAPA* and *DACA* and find standing. *See DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 152). Although special solicitude is relevant to redressability, whether an injury is redressable is necessarily tied to the nature of injury. Yet the district court's analysis effectively

conflates standing and redressability; the district court considered the total numbers of migrants to determine if the States suffered an injury without considering if that (supposed) drop in migrant flow could have been even larger had DHS created a better version of the CHNV Program. For example, had DHS honored the States' APA procedural rights, the States would have been able to explain why this Program is unlawful and what DHS could do to cause fewer harms, including that DHS "did not explain or analyze how they would remove CHNV nationals paroled through the Program after the authorized parole period …." ROA.11521. That type of an injury is what this Court allowed Texas to vindicate in *DACA* and *DAPA*.

In short, the district court's analysis dresses up a traceability and redressability question in injury clothing. *See GLO*, 71 F.4th at 273 (analyzing whether illegal immigration will decrease as a question of traceability, not injury). The court did not deny that Texas is incurring costs for CHNV parolees but reasoned that the costs on net would be there regardless. That is tantamount to saying that Texas cannot show that its undisputed pocketbook injuries come from the Program rather than illegal immigration generally. Nor is this error semantic: Texas has a lighter burden on traceability and redressability due to special solicitude.

### D. Texas has met the remaining standing requirements.

Finally, to be complete, although the district court did not reach these issues, Texas has also satisfied the remaining standing requirements—even without special solicitude and especially with it.

*First* Texas's injury is fairly traceable to the CHNV Program. This connection need not be direct. For example, New York could establish standing based on its

claim that a likelihood of aliens refusing to respond to census takers might result in diminished federal funding from Congress. *See Dep't. of Com.*, 588 U.S. at 768.

The district court's findings demonstrate why Texas's injuries are traceable to the challenged action. As the district court recognized, Texas has been spending money and will spend more money to serve unlawfully paroled CHNV nationals. *See supra* pp. 8-9. For example, a Texas witness testified any increase in parolees will result in Texas incurring healthcare costs. ROA.12838. It is "obvious[] that *if* the total number of in-State aliens [via parole] increases, the States will spend more on healthcare." *MPP*, 20 F.4th at 969; *accord DAPA*, 809 F.3d at 161.

*Second*, "[w]hen establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (cleaned up). Texas easily clears that hurdle. As in prior cases where DHS has adopted improper immigration policies, an order vacating the Program will excuse Texas from providing public services to those individuals. *See DAPA*, 809 F.3d at 161; *accord MPP*, 20 F.4th at 997.

*       *       *

The district court missed the forest for the trees. The States pleaded and proved a future injury, yet the district court first engaged in an accounting exercise and then compounded that error by looking at the wrong time window. Not only does such analysis ignore that injunctive relief is inherently prospective, but it also rests on a theory that effectively bakes in DHS's failure to enforce the law elsewhere and

conflates correlation (of seasonal migration patterns) with causation (of the Program's purported efficacy). None of this is proper.

## II. Appellees' other jurisdictional arguments are equally meritless.

The district court dismissed this case for one reason: lack of standing. It did not address other justiciability arguments. Accordingly, the Court—as a court of review, not first view—should simply reverse that erroneous standing decision and remand for further proceedings. *See, e.g.*, *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 595 (5th Cir. 2023) (remanding justiciability issues). Nonetheless, because Appellees may ask this Court to resolve their other jurisdictional objections in the first instance, the States address them here out of an abundance of caution.

### A. Congress has not precluded judicial review.

Appellees argued in the district court that Congress precluded judicial review of the Program in the INA (8 U.S.C. §1252(a)(2)(B)(ii)) and APA (5 U.S.C. §701(a)(2)). Both arguments suffer from the same fatal flaw: Those statutes cover individual enforcement decisions—not rules or programs.

#### 1. There is a strong presumption of judicial review.

The APA "establishes a basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Regents*, 591 U.S. at 16-17 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)). "That presumption can be rebutted by a showing that the relevant statute precludes review, or that the agency action is committed to agency discretion by law." *Id.* at 17 (cleaned up). "Establishing unreviewability is a heavy burden, and where substantial doubt about

the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *Id.* (quotation omitted).

### 2.   Nothing in the text of the INA overcomes that presumption.

The INA does not overcome this presumption. It provides that "no court shall have jurisdiction to review … any other decision" of DHS "the authority for which is specified under this subchapter to be in the discretion of" DHS. 8 U.S.C. §1252(a)(2)(B)(ii). As relevant here, DHS "may … in [its] discretion parole into the United States temporarily under such conditions as [it] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." *Id.* §1182(d)(5)(A).

**a.**   DHS contends that the CHNV Program is nothing more than a discretionary use of the parole power—and thus is immune from review. The Court rejected this argument in *MPP*, reasoning that "the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." 20 F.4th at 977. Nothing in that text or structure, the Court explained, supports that "an *entire program*—operating across an international border and affecting thousands or millions of people and dollars—is rendered unreviewable by § 1252(a)(2)(B)(ii)." *Id.* "The Government's reading of it would bury an awfully large elephant in a really small mousehole." *Id.* Because the Supreme Court has never disturbed that holding, it applies with full force here. *See, e.g.*, *Data Mktg.*, 45 F.4th at 856 n.2; *Central Pines*, 274 F.3d at 893.

Nor is the analysis in *Patel v. Garland*, 596 U.S. 328 (2022), to the contrary. Not only does *Patel* not "unequivocally overrule" *MPP*, *Martinelli v. Hearst Newspapers,*

*L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023), but it supports this Court's analysis. The question in *Patel* was whether Congress precluded courts from reviewing *factual findings* under §1252(a)(2)(B)(i); the answer to which turned on the meaning of the word "judgment." *Patel*, 596 U.S. at 336-37. The Supreme Court looked to §1252(a)(2)(B)(i), which precludes review of discretionary judgements, and §1252(a)(2)(D), which permits review of legal and constitutional challenges. *Id.* at 338-39. To give both provisions meaning, the Court concluded that facts would fall in the discretionary component of a judgment that courts cannot reach. *Id.* Nothing in that analysis suggests that DHS can disregard 8 U.S.C. §1182(d)(5)'s "case-by-case" requirement." Rather, *Patel* was discussing decisions "made discretionary by legislation"—not challenges to programmatic immigration policy. 596 U.S. at 333-34 (quoting *Kucana v. Holder*, 558 U.S. 233, 246-47 (2010)). Furthermore, the fact that the Court was focused on a single discrete regulatory action rather than a program-wide decision demonstrates the proper scope of §1252(a)(2)(B)(ii).

Additionally, the Supreme Court has explained that DHS's parole authority "is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 597 U.S. at 806-07 (quoting 8 U.S.C. §1182(d)(5)(A)). The Supreme Court would not have said that DHS's parole must comport with the APA if there were no review under the APA whatever DHS does.

**b.**   Even if the panel were writing from a blank slate, this Court's holding in *MPP* that §1252 precludes judicial review of *individual*, not categorical, relief is plainly correct. "When confronted with a list of specific terms that ends with a catchall phrase" a court should "limit the catchall phrase to 'things of the same general kind or class specifically mentioned.'" *United States v. Clark*, 990 F.3d 404, 408 (5th Cir. 2021) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012)); *see also RSBCO v. United States*, No. 23-30062, ---F.4th----, 2024 WL 2966083, at *4 (5th Cir. June 13, 2024) (same).

Applying this principle, §1252(a)(2)(B)(ii)'s catch-all provision is limited to specific, individualized relief. Section 1252(a)(2)(B) precludes judicial review in two scenarios, namely, of: "(i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255" or "(ii) any other decision or action … the authority for which is specified … to be in the discretion of the Attorney General or the Secretary of Homeland Security …." And the relief afforded by the specific statutes identified in §1252(a)(2)(B)(i) are individual in nature. For example, 8 U.S.C. §1182(i) allows waiver of inadmissibility "in the case of *an immigrant*" if the Attorney General is satisfied "that the refusal of admission … of *such immigrant alien* would result in extreme hardship to the citizen or lawfully resident spouse or parent *of such an alien*…." (emphases added)). The other provisions cited by §1252(a)(2)(B) are similar in nature.[5]

---

[5] *See also* 8 U.S.C. §1182(h) (waive an individual's inadmissibility resulting from marijuana possession); *id.* §1229b (cancel removal for certain inadmissible or deportable aliens); *id.* §1229c (voluntary departure); §1255 (adjustment of status).

Section 1252 is also titled "Judicial review of orders of removal," indicating it addresses review of *individual* immigration processes—the only agency actions that end in orders of removal. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 539-40 (2015) (relying on heading). Given that limited scope, it makes no sense to read the statute as allowing DHS to create an unlawful "supplement to Congressionally-established immigration policy." H.R. Rep. No. 104-469, at 140.

Regardless, §1252(a)(2)(B)(ii) prevents aliens from challenging DHS's refusal to grant discretionary relief "as a matter of grace." *Kucana*, 558 U.S. at 247-48. It thus does not apply when a plaintiff "challenge[s] the extent of the [official's] authority" *itself* because "authority is not a matter of discretion." *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). Here, Congress specifically limited DHS's parole authority to individual cases; DHS has no discretion to disregard that clear limit. As the Court has held, agencies do not have even "colorable authority" to disregard limits set by Congress on their authority. *Apter*, 80 F.4th at 589.

Other courts, unsurprisingly, have thus also rejected DHS's argument that §1252(a)(2)(B)(ii) bars review of programmatic challenges of the sort the States assert here. *See, e.g.*, *Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *8-9 (D. Mass. May 12, 2023) (explaining that "§1252(a)(2)(B)(ii) does not bar all judicial review of agency action taken under §1182(d)(5)(A)" and collecting similar holdings). These decisions are consistent with the Supreme Court's approach reading §1252 narrowly because "[i]f Congress wanted the jurisdictional bar to encompass decisions" beyond those specified, "Congress could easily have said so." *Kucana*, 558 U.S. at 248.

Here, the States challenge the CHNV Program under the APA, not the "[d]enial[] of discretionary relief" in an individual case. 8 U.S.C. §1252(a)(2)(B)(ii). Because Congress did not see fit to say otherwise, the presumption of judicial review of administrative action controls.

### 3.    Nor does the APA bar review.

The APA disallows judicial review of "agency action ... committed to agency discretion by law." 5 U.S.C. §701(a)(2). Yet as this Court has held, that provision is narrow. *See, e.g., MPP*, 20 F.4th at 978; *DAPA*, 809 F.3d at 163. For example, courts generally cannot review an agency's decision not to institute enforcement proceedings or statutes drawn so broadly that "there is no law to apply." *DAPA*, 809 F.3d at 163. But this is not about mere non-enforcement—the CHNV Program provides a legal right to be in the United States and work. *Supra* p. 6. Neither is this a situation where "there is no law to apply": Congress set forth specific criteria for parole eligibility and a specific process for determining whether those criteria are met. *See* 8 U.S.C. §1182(d)(5). That alone should end the inquiry.

Furthermore, the CHNV Program is plainly a "rule" under the APA—that is, "an agency statement of general ... applicability and future effect" that either "prescribe[s] law or policy" or "describ[es] ... [agency] organization, procedure, or practice requirements." 5 U.S.C. §551(4). This matters because the Court has held that *Heckler v. Chaney*, 470 U.S. 821 (1985)—the landmark case addressing whether actions are "committed to agency discretion by law"—"does not apply to agency rules." *MPP*, 20 F.4th at 978. Instead, courts "apply *Heckler*, if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Id*. at 984. Such

one-off enforcement decisions would include, for example, a particular decision to grant or deny parole to a specific CHNV national. Although Intervenors offered evidence regarding an individual parolee, *supra* p. 23, the States here do not challenge any such decision in this lawsuit.

*Heckler* also does not apply to actions purporting to "trigger … eligibility for federal benefits … and state benefits … that would not otherwise be available to illegal aliens." *DAPA*, 809 F.3d at 166. Such decisions are reviewable under the APA. *See id.* at 167 (quoting *Heckler*, 470 U.S. at 832). Under Texas law, §1182(d)(5) parole satisfies the State's "lawful presence" requirement—which is a prerequisite to obtaining a driver's license. *Id.* at 155. Thus, the Program functions to "remov[e] a categorical bar on receipt of [public] benefits and thereby mak[e] a class of persons newly eligible for them." *Id.* at 167. The removal of that bar "provides a focus for judicial review." *Heckler*, 470 U.S. at 832; *accord DAPA*, 809 F.3d at 167.

Finally, even if *Heckler*'s presumption against review applied, "the presumption [is] rebutted" because "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Heckler*, 470 U.S. at 832-33. Parole authority "is not unbounded." *Biden*, 597 U.S. at 806-07. It requires a case-by-case determination and "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), an APA case). Because neither the INA nor the APA displace the presumption of reviewability, jurisdiction exists here.

### B.   The CHNV Program is final agency action.

Appellees have also argued that the CHNV Program is not final agency action. The Program, however, meets each of the two elements of finality from *Bennett v. Spear*, 520 U.S. 154 (1997), and *United States Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016)). *First*, the Program marks the "consummation the agency's decisionmaking process." *Bennett*, 520 U.S. at 177-78 (quotation omitted). DHS has reached a final determination of the parole criteria and process for applicants from the four CHNV countries. *Second*, as the district court found, the CHNV Program set forth the requirements to apply via a website and through publication of its notices, resulting in a final determination that this pathway is now available to any CHNV national. ROA.11519-11522. These are hallmarks of final, substantive agency action. *See, e.g.*, *Texas v. Becerra*, 89 F.4th 529, 538 (5th Cir. 2024).

DHS did not meaningfully disagree with that analysis. Instead, it argued that the Program is not final agency action because individual foreign nationals still must apply. ROA.11370-11373. This conflates two different final agency actions: the creation of standards through rulemaking and their application through adjudication. *See, e.g.*, *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (explaining that "'a substantive rule'—which is, by definition, a final agency action" exists when "an agency intends to bind itself to a particular legal position") (citation omitted). As to the rulemaking here, the finality inquiry is "whether the action '*result[ed] in a final determination* of "rights or obligations,"'"—not whether implementation of that determination has occurred. *Biden*, 597 U.S.at 809 n.7 (alterations in original) (citation omitted).

The nominal existence of discretion does not alter the outcome. Here, agency personnel are not free to exercise discretion in any real sense, as demonstrated by approval rates of nearly 100%. ROA.11514 (DHS adjudicated 194,683 cases between October 2022 and June 2023, approving 189,942—an approval rate of 97.6%).[6] Because the "rule has binding effect on agency discretion," DHS cannot ignore the Program's requirements or benefits, and the Program constitutes a final agency action, *DAPA*, 809 F.3d at 171—namely a substantive rule that can and will be applied in other agency actions, *see also DACA*, 50 F.4th at 521-24. Regardless, even if there were some discretion in individual cases, an agency's programmatic decision does not cease to be final agency action merely because that decision must later be applied in individual cases. *See, e.g.*, *EEOC*, 933 F.3d at 441.

### C.   Texas is within the relevant zone of interests.

Finally, DHS also argued below that Texas does not fall within the zone of interests of the INA. ROA.11368. Again, not so. This is not an "especially demanding," test and it "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized the plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)

---

[6] A more granular look at the data demonstrates this point even more clearly. For each of the countries, the rate was at least 96.6%, and for both Haiti and Cuba, it was 98.3%. ROA.11523. The likelihood that two countries would have exactly the same approval rate by pure chance—across tens of thousands of applications—is nanoscopic. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 222 (2023) ("Harvard's focus on numbers is obvious.").

(citation omitted). Importantly, this lenient test focuses on whether Texas falls within the zone of interests of the INA *as a whole*, not the particular provision used to create the program. *MPP*, 20 F.4th at 975-76; *see DAPA*, 809 F.3d at 163.

This Court has already repeatedly held that States fall within the INA's zone of interests. As the Court put it in *DAPA*, "the pervasiveness of federal regulation does not diminish the importance of immigration policy to the States, which bear many of the consequences of unlawful immigration." 809 F.3d at 163 (quotation omitted; cleaned up). "Reflecting a concern that aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates, Congress deemed some *unlawfully* present aliens ineligible for certain state and local public benefits unless the state explicitly provides otherwise." *Id.* (cleaned up). "With limited exceptions, unlawfully present aliens are 'not eligible for any State or local public benefit.'" *Id.* (quoting 8 U.S.C. §1621(a)). Just as Texas fell within the zone of interests of the INA in *DAPA*, so it does here where the district court has found that Texas will expend at least some health care and education costs on CHNV nationals who enter the United States via the program.

## Conclusion

The judgment of the district court should be reversed, and the case should be remanded for further proceedings.

Respectfully submitted.

Gene P. Hamilton
America First Legal Foundation
Virginia Bar No. 80434
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

Cory A. Scanlon
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for the State of Texas*

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alabama*

Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*

Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Alaska*

Ashley Moody
Attorney General of Florida
James H. Percival (FBN 1016188)
Chief of Staff
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

Raúl R. Labrador
Attorney General of Idaho
Joshua N. Turner, ISB No. 12193
Alan M. Hurst, ISB No. 12425
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
josh.turner@ag.idaho.gov
alan.hurst@ag.idaho.gov

*Counsel for the State of Idaho*

Kris Kobach
Attorney General of Kansas
Anthony J. Powell
Solicitor General
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Anthony.Powell@ag.ks.gov

*Counsel for the State of Kansas*

Brenna Bird
Attorney General of Iowa
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

Russell Coleman
Attorney General of Kentucky
Matthew F. Kuhn
Solicitor General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478
Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

Elizabeth B. Murrill
Attorney General of Louisiana
Benjamin Aguiñaga
Solicitor General
Kelsey L. Smith
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
aguinagab@ag.louisiana.gov
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney
General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

Dave Yost
Ohio Attorney General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Whitney Hermandorfer
Director of Strategic Litigation
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*

Patrick Morrisey
Attorney General of West Virginia
Michael R. Williams
Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

Sean D. Reyes
Utah Attorney General
Stanford E. Purser
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
spurser@agutah.gov

*Counsel for the State of Utah*

Bridget Hill
Wyoming Attorney General
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

## CERTIFICATE OF SERVICE

On June 26, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,943 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON