No. 24-40160

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,**

**Plaintiffs-Appellants,**

**v.**

**United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,**

**Defendants-Appellees,**

**Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,**

**Appellees.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

---

## BRIEF FOR *AMICUS CURIAE*
## IMMIGRATION REFORM LAW INSTITUTE
## IN SUPPORT OF APPELLANTS

---

**(Counsel Listed on Next Page)**

**MATT A. CRAPO**
**CHRISTOPHER J. HAJEC**
**Immigration Reform Law Institute**
**25 Massachusetts Ave., NW, Suite 335**
**Washington, DC 20001**
**Telephone: (202) 232-5590**

**Attorneys for *Amicus Curiae***

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1 and Fed. R. App. P. 26.1, *amicus curiae* Immigration Reform Law Institute makes the following disclosures:

1)      For non-governmental corporate parties please list all parent corporations: None.

2)      For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3)      The following entity has an interest in the outcome of this case: Immigration Reform Law Institute.

DATED: July 3, 2024                    Respectfully submitted,

/s/ Matt Crapo
Matt A. Crapo
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorney for *Amicus Curiae*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF *AMICUS CURIAE*............................................................1

INTRODUCTION ......................................................................................2

ARGUMENT ..............................................................................................5

I.      The District Court erred by equating the costs caused by CHNV parolees and the costs caused by non-paroled CHNV nationals ...................................5

II.     The District Court erred by failing to adjust for seasonal migration fluctuations ..................................................................................11

CONCLUSION ...........................................................................................13

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ariz. Dream Act Coalition v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ............................................................... 1

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................................ 8

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ............................................................... 9

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................ 8

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ............................................................................ 8

*Matter of Silva-Trevino*,
   26 I. & N. Dec. 826 (B.I.A. 2016) ...................................................... 1

*Texas v. SEC*,
   2024 U.S. App. LEXIS 11543, 2024 WL 2106183 (5th Cir. 2024) .... 9

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ............................................................................ 1

*United States v. Texas*,
   599 U.S. 670 (2023) ............................................................................ 1

*Wash. All. Tech Workers v. U.S. Dep't Homeland Security*,
   50 F.4th 164 (D.C. Cir. 2022) ............................................................ 1

## STATUTES

8 U.S.C. § 1182(d)(5)(A) ......................................................................... 3

8 U.S.C. § 1255(a) ................................................................................. 10

8 U.S.C. § 1611(a) ...............................................................................5

8 U.S.C. § 1611(b)(1)(A) ......................................................................5

8 U.S.C. § 1612(a)(1) ...........................................................................6

8 U.S.C. § 1612(a)(3) ...........................................................................6

8 U.S.C. § 1621(a) ...............................................................................5

8 U.S.C. § 1621(b)(1) ...........................................................................5

8 U.S.C. § 1622(a) ...............................................................................6

8 U.S.C. § 1641(b)(4) ...........................................................................5

42 U.S.C. § 18032(f)(3) ........................................................................7

## REGULATIONS

7 C.F.R. § 273.4(a)(6)(i)(D).................................................................6

7 C.F.R. § 273.4(a)(6)(ii)(J).................................................................6

8 C.F.R. § 274a.12(c)(11) ....................................................................7

## MISCELLANEOUS

Final Rule, *Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic Health Program,* 89 Fed. Reg. 39392 (May 8, 2024) (effective Nov. 1, 2024) ...............................6

## INTEREST OF *AMICI CURIAE*[1]

The Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. For more than twenty years the Board of Immigration Appeals has solicited supplementary briefing, drafted by IRLI staff, from the Federation for American Immigration Reform, of which IRLI is a supporting organization. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 585 U.S. 667 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't Homeland Security*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

---

[1] All parties have consented in writing to the filing of IRLI's *amicus curiae* brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

## **INTRODUCTION**

This case arises in the context of the federal government's ongoing abdication of its duty to protect the various States from invasion and to take care that the nation's immigration laws are faithfully executed. Since inauguration day on January 20, 2021, the federal government has terminated effective immigration enforcement policies such as the Migrant Protection Protocols (colloquially known as the "Remain in Mexico policy"), restricted interior immigration enforcement actions, and ceased all border wall construction projects.[2]

Not content with dismantling several of the most effective programs aimed at minimizing illegal immigration, Defendants have sought to create new avenues

---

[2] The federal government's abdication of its responsibility to secure the border and protect the country from invasion has resulted an estimated 5.5 million illegal aliens' crossing the border from inauguration day in 2021 through fiscal year 2022. *See FAIR Analysis: 5.5 Million Illegal Aliens Have Crossed our Borders Since Biden Took Office—How is Secretary Mayorkas Still Employed?*, dated Oct. 25, 2022, available at: https://www.fairus.org/press-releases/border-security/fair-analysis-55-million-illegal-aliens-have-crossed-our-borders (last visited June 25, 2024). The number of encounters has only increased since. In fiscal year 2023 alone, Customs and Border Protection ("CBP") encountered over 3.2 million aliens, including nearly 2.5 million at the southwest border, with more than half of those encounters, or nearly 1.4 million, being in Texas alone. CBP, *Nationwide Encounters*, available at: https://www.cbp.gov/newsroom/stats/nationwide-encounters (last visited June 25, 2024). And there have been more than 2.2 million encounters nationwide in fiscal year 2024 to date. *Id.* Moreover, 85 percent of aliens encountered on the southern border are released into the United States. Fox News, *Mayorkas tells Border Patrol agents that 'above 85%' of illegal immigrants released into US: sources*, available at: https://www.foxnews.com/politics/mayorkas-tells-border-patrol-agents-illegal-immigrants-released-into-us-sources (last visited June 25, 2024).

to allow inadmissible aliens to enter the United States. This case involves one such avenue, a new programmatic parole process called the CHNV Parole Program, which allows immigration officers to parole into the United States up to 30,000 nationals from Cuba, Haiti, Nicaragua, and Venezuela (CHNV) each month (or 360,000 CHNV nationals per year).

While the text of the governing parole statute requires that parole be given "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit ....," 8 U.S.C. § 1182(d)(5)(A), Defendants attempt to justify the CHNV Parole Program by claiming that paroling tens of thousands of aliens from these four countries provides the alleged public benefit of reducing "irregular migration" by making it "regular." In short, Defendants seek to battle "irregular migration" of a certain class of aliens (CHNV nationals) by creating an unauthorized parole program that will permit that class of aliens to enter the United States lawfully.

Appellants filed suit in the district court challenging the lawfulness of the CHNV Parole Program, arguing that it exceeds Defendants' authority under the statute, that it was implemented without undergoing the requisite notice-and-comment procedure, and that it is arbitrary and capricious. The district court did not address the lawfulness of the CHNV Parole Program because the court determined that the Plaintiff States lacked standing to bring those claims. Memorandum Opinion and Order, dated Mar. 8, 2024, ECF Dkt. No. 305 ("D. Ct.

Op.") at 2. The court concluded that the CHNV Parole Program did not cause the requisite injury to Texas because the total number of CHNV nationals (both parolees and illegal entrants) entering the United States decreased substantially after the program was implemented. *Id.* at 30-31 (observing that the "rate of entries here has decreased" and that Texas's "expenditures declined subsequent to the implementation of the CHNV Parole Program").

But the district court erred in equating the costs imposed by CHNV parolees to those imposed by CHNV nationals who enter the United States illegally in concluding that Texas's expenditures declined and that CHNV Parole Program "actually lowered [Texas's] out-of-pocket costs," *id.* at 31, because CHNV parolees impose different and greater costs on Texas than CHNV nationals who are conditionally released after crossing the border illegally. In addition, the district court failed to recognize that although the number of CHNV nationals entering the United States immediately following the implementation of the CHNV Parole Program may have declined, the number of CHNV nationals in the United States continued to increase. Therefore, it is illogical to conclude that Texas's expenditures *declined* or that the program *actually lowered* Texas's costs. Instead, Texas's expenditures simply grew at a slower pace due to the reduction in the number of CHNV nationals entering the United States. The Court should therefore reverse the district court's judgment and remand for further proceedings.

# **ARGUMENT**

## I.    **The District Court erred by equating the costs caused by CHNV parolees and the costs caused by non-paroled CHNV nationals.**

In concluding that Texas failed to demonstrate the requisite injury for Article III standing, the district court treated the costs incurred by each beneficiary of the CHNV Parole Program as equivalent to the costs incurred by a CHNV national who entered the United States illegally. But an alien who is paroled into the United States (like CHNV Parole Program beneficiaries) is eligible for certain public benefits for which other unlawfully present CHNV nationals are ineligible. Therefore, the costs to the Plaintiff States differ between these two classes of aliens, and the district court erred by equating these costs.

To remove the incentive for illegal immigration provided by the availability of public benefits, Congress, with certain exceptions, generally precludes aliens who enter the United States unlawfully from being eligible for public benefits. 8 U.S.C. §§ 1611(a) (limiting federal public benefits to qualified aliens), 1621(a) (limiting State and local public benefits to qualified aliens, nonimmigrants, and aliens paroled for less than one year); *see also id.* § 1641(b)(4) (defining qualified alien to include aliens paroled for at least one year). One exception is for emergency medical care, *id.* §§ 1611(b)(1)(A), 1621(b)(1), and the district court properly concluded that Texas would incur additional expenses under its

5

emergency Medicaid and Children's Health Insurance Program for both CHNV parolees and CHNV nationals who entered illegally.[3]

But beneficiaries of the CHNV Parole Program, having been paroled into the United States "for up to two years," fall within the definition of qualified alien and are not subject to the public benefits bar.[4] For instance, CHNV parolees under the age of 18 are eligible for supplemental nutrition assistance benefits under SNAP. 7 C.F.R. § 273.4(a)(6)(i)(D), (ii)(J). In addition, individuals who are paroled into the United States for a period of at least one year (which would include all CHNV parolees) are deemed "lawfully present" under the Patient Protection and Affordable Care Act (ACA) and are therefore eligible for certain health care benefits. *See* Final Rule, *Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium*

---

[3] The district court found that CHNV nationals who entered the United States illegally (and not through the CHNV Parole Program) "generally wound up being conditionally released into the country." Dt. Ct. Op. at 12 ¶ 32; *see also id.* at ¶ 29 (noting that CHNV nationals who enter the United States unlawfully after January 9, 2023 "are generally ineligible for consideration for parole"). Therefore, the CHNV nationals who entered the United States illegally and did not participate in the CHNV Parole Program are only eligible for emergency care and similar benefits.

[4] Qualified aliens are subject to further limitations with respect to certain specified federal public benefit programs. 8 U.S.C. § 1612(a)(1), (3). States are afforded some flexibility in determining eligibility for any State public benefits of an alien who is a qualified alien. 8 U.S.C. § 1622(a).

*Tax Credit, Cost-Sharing Reductions, and a Basic Health Program*, 89 Fed. Reg. 39392, 39435 (May 8, 2024) (effective Nov. 1, 2024) (amending the definition of "qualified noncitizen" in 42 C.F.R. § 435.4 to include "noncitizen[s] who [are] paroled into the United States … for a period of at least 1 year"); *id.* at 39436 (amending the definition of "[l]awfully present" in 45 C.F.R. § 155.20 to include "a qualified noncitizen as defined at 42 C.F.R. § 435.4"); *see also* 42 U.S.C. § 18032(f)(3) (limiting eligibility for qualified health plans under the ACA to "a citizen or national of the United States or an alien *lawfully present* in the United States"). Because CHNV parolees are eligible for a broader subset of public benefits, the costs imposed by their presence in the United States are greater than those imposed by other unlawfully present CHNV nationals.

In addition to broader eligibility to public benefits, Plaintiff States are harmed by the fact that CHNV parolees are eligible for work authorization in the United States. D. Ct. Op. at 9 ¶ 15 (noting that CHNV parolees will "receive permission to work" in the United States); *see also* 8 C.F.R. § 274a.12(c)(11) (permitting aliens who have been granted parole to apply for work authorization). On the other hand, other CHNV nationals who enter illegally are not eligible to receive work authorization due to their unlawful status (absent some other qualification). Several of the Plaintiff States, including Texas, specifically alleged in their amended complaint that their citizens suffer increased unemployment due

to illegal immigration. ECF Dkt. No. 20 at 12 ¶ 69 (Texas), 16 ¶ 86 (Florida

unemployment benefits), *id.* ¶ 89 (Idaho), 17 ¶ 92 (Iowa), and 22-23 ¶ 109

(Louisiana).

Plaintiff States have a quasi-sovereign interest in the proper execution of

federal immigration law. The various States largely ceded their sovereign

prerogative to control their borders and set conditions for alien admission and

employment to the federal government upon their admission to the Union. Because

Plaintiff States are generally precluded from setting their own policies with respect

to alien employment, *see Arizona v. United States*, 567 U.S. 387, 406 (2012)

(holding that a State law regulating alien employment is preempted where its

method of enforcement differs from federal law), they have an interest in seeing

that federal law, as enacted by Congress, is properly executed by the Executive

Branch. Insofar as the CHNV Parole Program violates federal law or is in excess of

Appellees statutory parole authority, Plaintiff States have standing to vindicate

their quasi-sovereign interests in the proper execution of federal immigration law.

*Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (noting that "there is a

critical difference between allowing a State to protect her citizens from the

operation of federal statutes (which is what [*Massachusetts v. Mellon*, 262 U.S.

447 (1923)] prohibits) and allowing a State to assert its rights under federal law

(which it has standing to do") (internal quotation omitted). Just as Massachusetts

asserted the rights of her citizens under the Clean Air Act, Appellants have a quasi-sovereign interest in asserting the rights of their citizens under the INA to be protected from competition for employment with unauthorized aliens.[5] To the extent that the CHNV Parole Program unlawfully permits beneficiaries of that program to compete for employment with citizens of the Plaintiff States, the States are harmed in a distinct and different manner than the mere presence of other unlawfully present CHNV nationals.

The district court did not account for this distinct and different type of harm incurred due to the CHNV Parole Program. Citizens of the Plaintiff States must now compete for employment with CHNV parolees, whereas they do not have to compete with other, non-paroled CHNV nationals who enter the United States unlawfully. This harm is substantial and affects a substantial portion of the citizens of each Plaintiff State. Indeed, the federal government recently announced that more than 462,100 CHNV nationals have been paroled into the United States under

---

[5] It is unclear as to "what extent states can still bring a *parens patriae* suit against the federal government when a state asserts its own sovereign or quasi-sovereign interest." *Texas v. SEC*, 2024 U.S. App. LEXIS 11543, 2024 WL 2106183, at *3 (5th Cir. 2024) (describing a circuit split on this question but declining to decide the issue). The Sixth Circuit allows *parens patriae* lawsuits to be brought when a state "seeks to vindicate its own sovereign and quasi-sovereign interests against the United States" and does not merely "represent[] its citizens in a purely third-party … capacity." *Kentucky v. Biden*, 23 F.4th 585, 596 (6th Cir. 2022). This Court should follow the Sixth Circuit in recognizing the availability of *parens patriae* standing under the circumstance presented here.

the program. *FACT SHEET: President Biden's Presidential Proclamation and Joint DHS-DOJ Interim Final Rule Cut Encounters at Southwest Border by Over 40 Percent in First Three Weeks*, available at:

https://www.dhs.gov/news/2024/06/25/fact-sheet-president-bidens-presidential-proclamation-and-joint-dhs-doj-interim (last visited June 26, 2024).

Because numerous citizens in Plaintiff States will be deprived of their federal right not to compete for employment with aliens who otherwise would be unauthorized to work in the United States, Plaintiff States have a quasi-sovereign or *parens patriae* interest in ensuring that their citizens' federal protections against unlawful employment competition by illegal aliens are fully enforced. Plaintiff States are prohibited from legislating in this area and therefore have a strong interest in the robust enforcement of federal protections enacted by Congress.

Finally, CHNV parolees, unlike CHNV nationals who enter the United States unlawfully, will be eligible to adjust their status to that of a lawful permanent resident. 8 U.S.C. § 1255(a) (limiting adjustment of status to aliens who were "inspected and admitted *or paroled* into the United States"). Because CHNV parolees are eligible for this form of relief and other CHNV nationals are not, parolees are likely to impose their additional costs on Plaintiff States for longer periods of time.

The district court erred by not taking these disparities in costs between the two classes of CHNV nationals into account. CHNV parolees are eligible for a broader subset of public benefits than other unlawfully present CHNV nationals. In addition, CHNV parolees compete for employment with citizens of the Plaintiff States, while other unlawfully present CHNV nationals do not. The district court erred by failing to take these differences into account in concluding that the Plaintiff States were not injured by the CHNV Parole Program.

## II.     The District Court erred by failing to adjust for seasonal migration fluctuations.

The district court also erred by attributing the decrease in the number of CHNV nationals entering the United States each month at the time of the filing of the amended complaint solely to the effectiveness of the CHNV Parole Program and failed reasonably to consider that the decrease was at least partly due to seasonal fluctuations in illegal immigrant flows.

The district court estimated that "the total number of CHNV nationals entering the United States had declined from an average of 2,356 per day [in the 5 months] prior to the Program starting to 1,326 per day in the [nearly five] months after—a 44 percent reduction." D. Ct. Op. at 18 ¶ 79. But the government's own numbers show a similar drop in total alien encounters at the southwest border between December 2022 and January 2023 (dropping from 252,315 encounters in December to 157,358 in January)—a 37 percent reduction in one month that

coincided with the full implementation of the CHNV Parole Program. *See CBP, Southwest Land Border Encounters*, available at:

https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited June 26, 2024). In fact, the drop in average total encounters for the five months leading up to January 2023 to the five months after January 2023 amounts to approximately 20 percent. Accordingly, nearly have of the reduction in CHNV nationals is likely attributable solely to the seasonal fluctuation in illegal migrant flows.

Taken together, the district court erred by failing to account for the different types of harm imposed by CHNV parolees as opposed to other unlawfully present CHNV nationals, as well as by failing to attribute at least some of the decrease in the number of CHNV nationals released into United States to seasonal fluctuations in migrant flows.

//

//

//

## <u>CONCLUSION</u>

For the forgoing reasons, the Court should reverse the district court's

judgment and remand the case for further proceedings.

DATED: July 3, 2024                    Respectfully submitted,

<u>/s/ Matt Crapo</u>
Matt A. Crapo
Christopher J. Hajec
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC  20001
Telephone: (202) 232-5590

Attorneys for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 3, 2024, I electronically filed the foregoing *amicus* brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Matt Crapo
Matt A. Crapo

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 27(d)(2)(A) because it contains 2,877 words, as measured by Microsoft Word software. The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

DATED: July 3, 2024    Respectfully submitted,

        /s/ Matt Crapo
        Matt A. Crapo