**No. 24-40160**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants*,

v.

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees*,

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees*.

On Appeal from the United States District Court
for the Southern District of Texas, Case No. 6:23-cv-00007

## BRIEF FOR DEFENDANTS-APPELLEES

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Counsel*

BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation,
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
ELISSA FUDIM
*Trial Attorney*

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.1.1, Appellees, as governmental parties, are not required to provide a certificate of interested persons.

*/s/ Brian C. Ward*
BRIAN C. WARD
United States Department of Justice

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully requests oral argument in this case.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................v

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION.....................................................3

ISSUE PRESENTED ........................................................................3

STATEMENT OF THE CASE......................................................... 3

I.      Legal Background. ...............................................................3

II.     CHNV Parole Processes .......................................................4

III.    Procedural History...............................................................7

SUMMARY OF THE ARGUMENT ................................................. 10

STANDARD OF REVIEW ............................................................. 12

ARGUMENT ................................................................................. 12

I.      Plaintiffs Lack Standing. ....................................................12

        A.    There is no evidence in the trial record of injury to Texas
              from the CHNV processes. ..........................................12

        B.    The district court did not consider an improper baseline. ...............16

        C.    The district court did not consider offsetting benefits of the
              CHNV processes..........................................................22

        D.    Appellants' claimed injury is not judicially cognizable. ..................28

        E.    The district court correctly evaluated the evidence at the time
              of the opeartive complaint. ..........................................37

F.    Texas did not establish a prospective risk of harm...........................40

G.    The States are not entitled to special solicitude...............................45

H.    Texas has not met the remaining standing requirements. ................50

II.    The Court Need Not Reach Other Jurisdictional Arguments...................51

CONCLUSION ...................................................................................................54

CERTIFICATE OF COMPLIANCE........................................................................ 56

CERTIFICATE OF SERVICE ............................................................................... 57

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) .......................................................... 47, 49

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014) ........................................................32

*Bennett v. Spear*,
    520 U.S. 154 (1997) .........................................................................53

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) .............................................................. 32, 36, 52

*Boelens v. Redman Homes, Inc.*,
    759 F.2d 504 (5th Cir. 1985) ...............................................................37

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321 (2021) ......................................................................40

*Browning v. Kramer*,
    931 F.2d 340 (5th Cir. 1991) ...............................................................24

*California v. Texas,*
    141 S. Ct. 2104 (2021) ................................................................. 46, 48

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ........................................................ 19, 30, 40, 42

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
    1 F.4th 371 (5th Cir. 2021) .................................................................42

*Ctr. for Biological Diversity v. EPA*,
    937 F.3d 533 (5th Cir. 2019) ......................................................... 40, 41

*Data Mktg. P'ship, LP v. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) ...............................................................33

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008) ...................................................................42

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ......................................................... 46, 48

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,*
  968 F.3d 357 (5th Cir. 2020) ....................................................40

*Florida v. Mellon,*
  273 U.S. 12 (1927) ................................................... 31, 46, 52

*Food & Drug Admin. v. All. for Hippocratic,*
  *Med.*, 602 U.S. 367 (2024) ....................................... 28, 29, 30

*Gen. Land Off. v. Bi*den,
  ("GLO"), 71 F.4th 264 (5th Cir. 2023) ...................... 20, 21

*Haaland v. Brackeen,*
  143 S. Ct. 1609 (2023) .............................................................32

*Heckler v. Chaney,*
  470 U.S. 821 (1985) .................................................................51

*Henderson v. Stalder,*
  287 F.3d 374 (5th Cir. 2002) ...................................................25

*Hobbs v. EVO Inc.,*
  7 F.4th 241 (5th Cir. 2021) ......................................................12

*In re Gee,*
  941 F.3d 153 (5th Cir. 2019) ....................................................18

*Kaplan v. Tod,*
  267 U.S. 228 (1925) ...................................................................4

*Knauff v. Shaughnessy,*
  338 U.S. 537 (1950) ...................................................................3

*Kucana v. Holder*,
   558 U.S. 233 (2010) ...................................................................52

*Leng May Ma v. Barber*,
   357 U.S. 185 (1958) .....................................................................4

*Loa-Herrera v. Trominski*,
   231 F.3d 984 (5th Cir. 2000) ................................................ 32, 52

*Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
   ("LDWF"), 70 F.4th 872 (5th Cir. 2023) ...................................... 19, 20

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .............................................................. passim

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .......................................................... 45, 46, 47

*Music, Inc. v. Xanthas, Inc.*,
   855 F.2d 233 (5th Cir. 1988) .....................................................28

*O'Brien's Response Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*,
   24 F.4th 422 (5th Cir. 2022) ......................................................24

*Patel v. Garland*,
   142 S. Ct. 1614 (2022) ...............................................................52

*Perry v. Arlington Heights*,
   186 F.3d 826 (7th Cir. 1999) ................................................ 42, 44

*Raines v. Byrd*,
   521 U.S. 811 (1997) ...................................................................32

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007) ...................................................................37

*Smith v. GC Servs. Ltd. P'ship*,
   986 F.3d 708 (7th Cir. 2021) .....................................................18

*Spokeo v. Robins*,
578 U.S. 330 (2016) ...........................................................................48

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............................................... 19, 21, 48

*Texas v. Biden*,
("MPP"), 20 F.4th 928 (5th Cir. 2021)............................. 16, 17, 18, 25

*Texas v. United States*,
("DACA"), 50 F.4th 498 (5th Cir. 2022) .................................... passim

*Texas v. United States*,
("DAPA"), 809 F.3d 134 (5th Cir. 2015).................................... passim

*Texas v. United States*,
106 F.3d 661 (5th Cir. 1997) ................................................................32

*Trump v. New York*,
141 S. Ct. 530 (2020) .............................................. 46, 48

*United States v. Texas*,
("Priorities"), 599 U.S. 670 (2023) ............................................. passim

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ...........................................................................25

## Statutes

5 U.S.C. § 701(a)(2).........................................................................51

6 U.S.C. § 202(4) ................................................................................3

8 U.S.C. § 1103(a)(1)..........................................................................3

8 U.S.C. § 1182(d)(5)(A) .............................................. 4, 35, 36

8 U.S.C. § 1226...................................................................................36

28 U.S.C. § 1291..................................................................................3

28 U.S.C. § 1331 ........................................................................................3

42 U.S.C. § 7607 ......................................................................................47

## Rules

Fed. R. App. P. 32(a)(7)(B) ....................................................................56

Fed. R. App. P. 32(f) ..............................................................................56

Fed. R. App. P. 35(a)(5)-(6) ...................................................................56

Fed. R. Civ. P. 65(a)(2) ...........................................................................8

Fifth Cir. R. 32.1 ....................................................................................56

## Regulations

8 C.F.R. § 274a.12(c)(14) ................................................................. 34, 50

## Other Authorities

*State Standing*,
   81 Va. L. Rev. 387 (1995) ....................................................................47

## INTRODUCTION

In 2022, the Department of Homeland Security (DHS) faced a historically high level of migration that threatened to undermine DHS's ability to effectively manage the southwest border. This influx was driven largely by migration from four countries, Cuba, Haiti, Nicaragua, and Venezuela (the CHNV countries), which pose distinct challenges to DHS's efforts to secure the border. Conditions in these countries have precipitated various humanitarian crises that have driven CHNV nationals to flee in large numbers. Moreover, these countries do not allow (or country conditions do not permit) the United States to return their nationals in sufficient numbers to effectively deter irregular migration.

In response, DHS instituted four parole processes designed to deter unlawful entry and channel migration through lawful pathways. The processes allow certain CHNV nationals with a financial supporter in the United States to request authorization to travel to the United States to seek parole. They require substantial individualized vetting and allow DHS to deny travel authorization to unqualified individuals before they travel here and cannot be removed. Based on these processes, which are directly responsive to requests from the Mexican government to reduce irregular migration across Mexico to the southwest border, Mexico decided, for the first time, to accept the removal of CHNV nationals who do not follow lawful paths to the United States, creating a significant new consequence for irregular migration

and allowing DHS to remove CHNV nationals who enter without authorization to Mexico.

These processes were an immediate success, quickly and dramatically reducing the number of CHNV nationals entering the United States—lawfully or unlawfully—and the significant strain on DHS's border enforcement resources.

Following a two-day bench trial, the district court found that the Plaintiff States, who expressly limited their assertions of harm for standing purposes to Texas, submitted no evidence showing any injury from the CHNV processes. In fact, the evidence in the trial record clearly established that the number of CHNV nationals arriving at the border and released into the United States sharply declined in the months after the CHNV processes were implemented, a point the States repeatedly conceded at trial.

On appeal, the States cannot point to any evidence in the trial record of harm to Texas between the start of the parole processes and the date the operative complaint was filed—the point at which the States argued the district court should assess standing. Instead, they argue the district court improperly considered offsetting benefits to the States in finding that Texas had not been harmed, and that engaging in such an "accounting exercise" was error. The district court was clear, however, that because Texas failed to produce any evidence of harm from the CHNV processes at trial, and conceded that the number of CHNV nationals released into

Texas had declined following the start of the parole processes, there was no injury against which offsetting benefits could be considered. The district court thus specifically declined to consider arguments or evidence related to offsetting benefits.

Appellants cannot show that the district court committed clear error in finding that the States failed to submit any evidence at trial that they had been harmed, or faced imminent harm, from the CHNV processes. This Court should affirm the district court's dismissal for lack of standing.

## STATEMENT OF JURISDICTION

The States alleged jurisdiction under 28 U.S.C. §§ 1331, 1346, 1361. ROA.331. The district court entered judgment on March 8, 2024, and denied the States' motion to reconsider on May 28, 2024. ROA.11543, 11634. The States noticed appeals on March 11 and June 3, 2024. ROA.11545, 11636. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## ISSUE PRESENTED

1.  Whether Appellants have standing to challenge the CHNV processes.

## STATEMENT OF THE CASE

### I.    Legal Background

The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(4); 8 U.S.C.

§ 1103(a)(1), (3). The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, "in his discretion," to "parole" applicants for admission "under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). This statutory authority accords with the Executive Branch's authority over management of the border and foreign affairs, including its historical discretion to grant parole. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229 (1925) (describing parole of noncitizen who could not be removed due to international conflicts). In 1952, Congress generally "codif[ied]" the Executive's longstanding "administrative [parole] practice" in the INA's original version of Section 1182(d)(5). *Leng May Ma v. Barber*, 357 U.S. 185, 188-190 (1958). For decades, the Executive Branch has exercised its authority under Section 1182(d)(5)(A) to use case-by-case parole to advance foreign affairs goals where it would advance humanitarian goals or provide other significant public benefits, such as controlling irregular migration to the United States. ROA.13420- 21.

## II.    CHNV Parole Processes

For years, DHS has sought Mexico's agreement to accept the removal of individuals from countries such as Cuba, Haiti, Nicaragua, and Venezuela to which the United States cannot send removable noncitizens in sufficient numbers to deter unlawful entry, either because of conditions in those countries or because those

countries refuse to accept individuals removed from the United States. ROA.5433, 13403-08; 87 Fed. Reg. 63507-08. In October 2022, through negotiations with Mexico on how to address irregular migration through Mexico to the southwest border, DHS developed and implemented a parole process for Venezuelans to provide an avenue for orderly processing of noncitizens away from the United States-Mexico border, allowing eligible individuals to avoid traveling through Mexico and overwhelming the southwest land border. *Id*. Under this process, individuals may be eligible to travel to the United States to be considered for parole on a case-by-case basis if they have a supporter in the United States who agrees to provide financial support, pass rigorous national security and public safety vetting, and agree to fly at their own expense to an interior U.S. port of entry where they will be further screened and evaluated for possible parole eligibility. *Id*. at 63,508; 63,515.

At the same time, for the first time in our country's bilateral relations, Mexico agreed to accept, at scale, the return or removal of non-Mexicans, including Venezuelans who do not follow this parole process, allowing DHS to impose consequences on, and enforce the immigration laws against, otherwise unremovable noncitizens. 87 Fed. Reg. 63508; ROA.13403-04. Venezuelans who do not take advantage of this process and instead attempt to enter at the southwest border without authorization are thus subject to removal to Mexico. 87 Fed. Reg. 63,508. As DHS

explained, the Venezuelan process was an immediate success. 88 Fed. Reg. at 1,279.

"Within a week of the October 12, 2022 announcement of that process, the number

of Venezuelans encountered at the [southwest border] fell from over 1,100 per day

to under 200 per day, and as of the week ending December 4, to an average of 86

per day." *Id*. The Venezuelan process demonstrated that combining a clear

consequence for unauthorized entry with an incentive for migrants to wait where

they are and use a lawful process to come to the United States had significant impact

on reducing irregular migration. *Id*.

Given the immediate success of the Venezuelan parole process, on January 9,

2023, DHS announced similar processes for Cubans, Haitians, and Nicaraguans as

well as a continued Venezuelan parole process with minor modifications. 88 Fed.

Reg. 1,243 (Haitians); 88 Fed. Reg. 1,255 (Nicaraguans); 88 Fed. Reg. 1,266

(Cubans); 88 Fed. Reg. 1,279 (Venezuelans). As with the Venezuelan process, the

number of Cubans, Haitians, and Nicaraguans encountered between ports of entry

dropped significantly after DHS introduced the new processes, from a seven-day

average of 1,231 on January 5, 2023 (the date the new processes were implemented),

to a seven-day average of 205 just two weeks later. Ex. HH, ¶ 26. This represented

a 94 percent decline from a peak of 3,644 CHNV encounters on December 10, 2022,

and the reduction occurred even as encounters of other noncitizens began to rebound

from their typical seasonal drop. *Id*.

The CHNV processes require extensive individualized vetting before a noncitizen is authorized to travel to the United States to be considered for parole at an interior port of entry away from the border. 88 Fed. Reg. at 1,252, 1,263, 1,276, 1,279. And these processes give DHS both the ability to deny travel authorization to ineligible CHNV nationals before they come to the United States and cannot be removed to their home countries, and the ability, with Mexico's cooperation, to remove to Mexico CHNV nationals who do come to the border or enter unlawfully. *Id*. The ability to remove individuals who do not avail themselves of lawful and orderly pathways is critical to enforcing the immigration laws against CHNV nationals because DHS otherwise has very limited ability to remove noncitizens to these four countries. *Id*. at 1,247, 1,259, 1,270-01; 87 Fed. Reg. at 63,509. Removal to Mexico thus "impose[s] a consequence on irregular entry that [did] not exist" prior to the CHNV processes, creating an enforcement mechanism for individuals who otherwise cannot be removed and a new deterrent to irregular migration. 87 Fed. Reg. at 63,511.

### III.    Procedural History

In February 2023, Plaintiffs, 21 states, filed an amended complaint challenging the CHNV processes under the Administrative Procedure Act (APA). ROA.355. Plaintiffs stipulated that they were "only seek[ing] to establish Article III injury based on alleged injuries to Texas" and would "not submit any evidence as to

7

injury for any other State Plaintiff." ROA.7986. Plaintiffs moved for a preliminary

injunction, which the district court consolidated with the merits under Fed. R. Civ.

P. 65(a)(2). ROA.365, 719.

Following a two-day bench trial in August 2023, Judge Tipton found that

Plaintiffs failed to "demonstrate that they have standing to bring suit," and dismissed

the case for lack of Article III standing. ROA.11514, 11543. The Court found that

the evidence in the trial record established that migration from CHNV countries was

increasing prior to the parole processes, reaching historically high levels, which was

"especially challenging because it is difficult for DHS to remove CHNV nationals

to their home countries." ROA.11518-19. The court found, however, that, between

the start of the CHNV processes and the filing of the operative complaint, releases

of CHNV nationals significantly declined, foreclosing Texas's assertions of harm.

*Id.* at 11528, ¶ 80.

The district court specifically found that "[t]he decline in CHNV nationals

entering the United States after the rollout of the Program was occurring at the time

that Plaintiffs filed their Amended Complaint on February 14, 2023." ROA.11528,

¶ 80; *see also id.* ¶ 81 (finding "the number of Venezuelan nationals attempting to

enter the United States substantially decreased following the start of the Venezuelan

parole process," declining from "October 12, 2022, when Venezuela's parole

process was announced," and "DHS was encountering an average of 1,100

Venezuelan nationals per day at the Southwest border," to "a daily average of just 28 Venezuelan encounters per day" by "the week ending in January 22, 2023"); *id.* ¶ 82 (noting this "significant drop in encounters was not just limited to Venezuelan nationals," but "[r]ather, encounters of Cuban, Haitian, and Nicaraguan nationals dropped from a daily average of 1,231, recorded the week before the Program was implemented, to an average of 205 encounters just two weeks later"). Overall, the Court found that "on February 14, 2023, when Plaintiffs filed suit, fewer CHNV nationals were entering the country compared to before the Program began." ROA.11529 at ¶ 84. The Court also noted that Texas "conceded" this point at trial, "agree[ing] that since the implementation of the Program, CHNV nationals have been entering the United States at a lower rate than before." *Id.* at ¶ 85.

On April 4, 2024, Plaintiffs moved to reconsider, arguing the court "engaged in an impermissible accounting exercise" by considering offsetting benefits when assessing Texas's injury. ROA. 11628, 11631. The court explained, however, that because "Texas 'has not suffered an injury' at all," the court did "not consider Defendants' other arguments," including "with respect to [] offsetting benefits." ROA.11631 (quoting ROA.11541). "[A]s Plaintiffs conceded, the evidence presented at trial demonstrated that the numbers actually decreased." ROA.11631. Because "all evidence presented at trial indicated that when the suit was filed, the rate of entry was plummeting," and "Plaintiffs offered nothing to suggest that … a

rebound in the rate of entry was on the horizon," ROA.11633, there was no injury and no need to consider potential offsetting benefits of the CHNV processes.

Plaintiffs also argued the court should have found standing based on evidence in their post-trial briefing. ROA.11632. The court found this later evidence was insufficient to establish that Texas faced an "imminent" injury or a "threat of future injury" that was "certainly impending" at the time of the operative complaint, and that "Plaintiffs offered nothing" at trial to show the CHNV processes were likely to cause Texas prospective harm. ROA.11633.

## SUMMARY OF THE ARGUMENT

The district court correctly found Texas, the only state that attempted to prove standing, did not present evidence of harm from the CHNV processes at trial. All parties agreed in the district court that standing must be determined by the facts at the time of the operative complaint, and that, between the start of the CHNV processes and the operative complaint, the number of CHNV nationals arriving and being released in Texas decreased significantly. Because this case went to trial, Plaintiffs bore the burden of proof to establish standing by a preponderance of the evidence. The district court correctly found Texas failed to present evidence of actual or imminent harm to meet that burden.

Appellants cannot point to any evidence in the trial record that shows the district court committed clear error in making that finding. They argue the court

should not have considered offsetting benefits in evaluating standing, but the district court was clear that it did not do so. They argue recent Supreme Court decisions do not undermine their arguments for standing, but recent precedent calls into question States' ability to assert standing based on allegations of indirect harm. They argue the district court should have considered the number of CHNV parolees in isolation, but the evidence at trial was clear that these numbers were lower than prior to the parole processes, foreclosing Appellants' arguments for harm. They also argue there are multiple causes of fluctuations in migration, but they fail to point to any trial evidence that the decrease in arrivals of CHNV nationals prior to the operative complaint can be explained by some other cause. Appellants' argument that the district court should have found standing based on post-trial evidence is inconsistent with precedent and what they argued to the district court, and unsupported by the evidence in any event. Appellants also argue they are entitled to special solicitude. But recent Supreme Court authority says they are not, and even if they were, it would not relieve them of the burden to prove harm.

The Court should affirm the district court's well-supported finding that there was no evidence of actual or imminent harm to Texas to support Article III standing.

## STANDARD OF REVIEW

On appeal from a bench trial, this Court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*. *Hobbs v. EVO Inc.*, 7 F.4th 241, 247 (5th Cir. 2021).

## ARGUMENT

## I.    Plaintiffs Lack Standing

### A.    There is no evidence in the trial record of injury to Texas from the CHNV processes.

In their amended complaint, the States alleged injury based on speculation that the CHNV processes would increase the number of CHNV nationals released in Texas. ROA.337, 7986. All the evidence in the trial record shows, however, that the number of CHNV nationals released in Texas sharply declined following implementation of the CHNV processes before the operative complaint, a point Plaintiffs conceded at trial. Appellants thus cannot show the district court clearly erred when it found Texas failed to prove harm and Article III standing at trial.

When a suit "challeng[es] the legality of government action or inaction, the nature and extent of facts that must be … proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed,"

12

and plaintiffs face a "substantially more difficult" burden to establish standing. *Id*. Moreover, at trial, a "plaintiff can no longer rest on [ ] mere allegations, but must" prove standing through "specific facts," "supported adequately by evidence adduced at trial." *Id*. (quotation marks omitted).

The States put forth no evidence of harm to meet this burden. They alleged that Texas would be harmed if it had to expend additional funds to provide services to CHNV nationals, arguing that, "[a]s the number of illegal aliens in Texas increases, the number of illegal aliens receiving such services increases." ROA.337. Appellants' theory of harm thus depended on the assumption that the number of CHNV nationals in Texas would increase following the implementation of the parole processes. *Id*. But the evidence pre-dating the operative complaint—the point at which standing must be assessed, *infra* at 37, 40—already showed the numbers had decreased. Each of the four processes detailed the sharp decline in arrivals that resulted from the earlier implementation of the parole process for Venezuelans:

> Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the [southwest border (SWB)] fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day. The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darien Gap … was down from 40,593 in October 2022 to just 668 in November.

88 Fed. Reg. at 1267; *see also* 88 Fed. Reg. at 1243, 1256, 1279. The evidence in the record established that prior to the operative complaint, the number of Venezuelans encountered at the southwest border had declined sharply from 1,100 per day prior to the parole process to "28 per day" by "the week ending January 22, 2023." ROA.13409, ¶ 20.

The evidence of a decline in arrivals in the trial record prior to the operative complaint was not limited to Venezuelans:

> As was the case following the implementation of the parole process for Venezuelans, the number of Cuban, Haitian, and Nicaraguan nationals encountered between ports of entry dropped significantly after DHS introduced the new processes, from a seven-day average of 1,231 on January 5, 2023 (the date the new processes were implemented), to a seven -day average of 205 just two weeks later. The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop and represented a significant decline of 94 percent from the peak CHNV encounters of 3,644 on December 10, 2022.

ROA.13412, ¶ 26. The evidence establishes a decline in encounters of Cubans, Haitians, and Nicaraguans from an average of 1,231 to an average of 205 encounters by January 19, 2023, prior to the operative complaint and at a time when encounters of other nationalities were rising. *Id*.

At trial, the States did not dispute that the data in the trial record showed a decrease in arrivals of CHNV nationals after the parole processes were in place. They conceded the data showed, "at this point as opposed to before the program, there are fewer aliens coming into the country now as opposed to before the program

from those four countries." ROA.12485-86; *see also* ROA.12598 (court noting Texas "stipulated that it did reduce the number of people who came from those countries," and that "it is not disputed that the number of immigrants who have come into the State of Texas, the rate of that has decreased since the program started").

Based on this evidence, the district court correctly found that "[t]he decline in CHNV nationals entering the United States after the rollout of the Program was occurring at the time that Plaintiffs filed their Amended Complaint on February 14, 2023." ROA.11528, ¶ 80. The court found "the number of Venezuelan nationals attempting to enter the United States substantially decreased following the start of the Venezuelan parole process," declining from "October 12, 2022, when Venezuela's parole process was announced," and "DHS was encountering an average of 1,100 Venezuelan nationals per day at the Southwest border," to "a daily average of just 28 Venezuelan encounters per day" by "the week ending in January 22, 2023," *id.* ¶ 81, and that the "significant drop in encounters was not just limited to Venezuelan nationals" during this time period, but "[r]ather, encounters of Cuban, Haitian, and Nicaraguan nationals dropped from a daily average of 1,231, recorded the week before the Program was implemented, to an average of 205 encounters just two weeks later," *id.* ¶ 82.

Accordingly, the court correctly found that "on February 14, 2023, when Plaintiffs filed suit, fewer CHNV nationals were entering the country compared to

before the Program," as Texas "conceded." ROA.11529 at ¶ 84-85. Given the evidence in the trial record, there is no basis to argue these findings are clearly erroneous.

**B.    The district court did not consider an improper baseline.**

At trial, Texas did not dispute "that there are fewer aliens coming into the country from th[e] four [CHNV] countries, or [] that as a result, Texas is spending less money." ROA.11532. Accordingly, the district court concluded that "Texas is not financially harmed by the [CHNV] Program." ROA.11536. The court's linear conclusion was based on "the way that the term 'harm' has long been understood in the immigration context: relative to the status quo, and relative to Plaintiff's position absent the challenged policy." *Id.* Appellants argue that in considering whether Texas was injured by the CHNV processes, the court should have considered the processes in isolation, without considering that their implementation led to a decrease in the arrival and conditional release of CHNV nationals, Br. 25-27, but the district court's understanding of harm was correct.

As the district court correctly observed, ROA.11536-37, this Court relied upon the same conception of harm when it decided *Texas v. United States* ("*DAPA*"), 809 F.3d 134 (5th Cir. 2015), *Texas v. United States* ("*DACA*"), 50 F.4th 498 (5th Cir. 2022), and the Migrant Protection Protocols ("MPP") case, *Texas v. Biden* ("*MPP*"), 20 F.4th 928, 966 (5th Cir. 2021), *rev'd and remanded*, 597 U.S. 785

(2022). In *DAPA*, this Court held the States had standing to challenge Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) because it would have enabled "at least 500,000" undocumented immigrants in Texas to become eligible for State-funded benefits, 809 F.3d at 155, and "DAPA would have a major effect on the states' fiscs." *Id*. at 152-53. In *DACA*, this Court held the States had standing to challenge Deferred Action for Childhood Arrivals (DACA), because there was evidence in the record that "if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social services and education costs." 50 F.4th at 520. In *MPP*, this Court held that the States had standing based on the district court's finding that "MPP's termination has increased the number of immigrants paroled into Texas," *MPP*, 20 F.4th at 970, thereby resulting in increased costs to the State, *id*. at 970-72 (finding standing where the challenged action "increased the number of parolees in the state" overall). Indeed, this Court referred to the increase in the number of noncitizens in the State as "[t]he district court's *most important finding*." *Id*. at 966 (emphasis added). In each of these cases, this Court concluded that the plaintiff States had standing based on the same rationale—evidence of more noncitizens in the State who qualify for specific State sponsored programs meant more costs.

Texas's theory of standing—where the court must ignore the status quo ante— falls squarely outside this Court's rationale in the *DAPA*, *DACA*, and *MPP* cases.

Indeed, if Appellants' theory of standing were correct, this Court's reliance in *MPP* on the increase in noncitizens would have been entirely unnecessary. As the district court correctly observed, if Appellants' baseline-of-zero theory of standing were correct, "[r]ather than demonstrating that MPP's termination has caused an increase in immigration into Texas, Texas would have only needed to show that MPP's termination resulted in *any* immigration into Texas." ROA.11540 (quotation marks and citation omitted).

The States argue the district court misunderstood *MPP* because in that decision "the Court never focused on each and every economic aspect of immigration." Appellants Br. 26-26. But the district court here did not focus on every economic aspect of immigration either; it merely held that fewer people were paroled following the policy change, in contrast to *MPP*, where the district court found more people would be paroled following that policy change.

An "injury-in-fact" means just that: the injury must "in fact" exist. *Id*. In other words, injury, or harm, necessarily implies that some situation has gotten worse for the plaintiff relative to the status quo ante. *In re Gee*, 941 F.3d 153, 163 (5th Cir. 2019) ("To the extent the challenged regulations require Plaintiffs to do what they've already been doing [], they do not have standing to challenge them."); *see also Smith v. GC Servs. Ltd. P'ship*, 986 F.3d 708, 711 (7th Cir. 2021) (plaintiff lacked standing where she was no worse off than if the challenged action had not occurred).

A plaintiff thus cannot show standing where the "present costs and burdens" existed "even before" the challenged policy "was enacted." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416-17 (2013). In *Clapper*, the Supreme Court considered and compared costs and burdens both prior to and following enactment of a policy, indicating that courts are not limited to considering whatever prospective costs a plaintiff alleges in isolation. *Id.* Because an injury for standing purposes requires some negative change compared to the status quo ante relative to the plaintiff, there is no such thing as injury from a program in the abstract. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("We know of no precedent for the proposition that . . . a plaintiff . . . retains standing to challenge . . . [a] regulation in the abstract[], apart from any concrete application that threatens imminent harm to his interests. Such a holding would fly in the face of Article III's injury-in-fact requirement.").[1]

For example, in *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.* ("*LDWF*"), 70 F.4th 872 (5th Cir. 2023), Louisiana brought an action challenging the National Marine Fisheries Service rule requiring certain shrimping vessels in Louisiana waters to use turtle excluder devices. The State claimed it had standing because it would incur enforcement costs because of the rule. *Id.* at 876. This Court concluded, however,

---

[1] Indeed, Appellants argue elsewhere in their brief that Texas only has to incur one dollar of injury, but they concede that the dollar must be one "it would not otherwise have to spend," Br. at 21, undermining their own theory of standing.

that it lacked standing because a standing argument premised upon increased enforcement costs "is necessarily contingent on a finding that the Final Rule will increase [the State's] enforcement costs," which the State did not establish because, among other reasons, it did not show that the rule would lead to increased enforcement. *Id.* at 881. The district court properly cited *LDWF* for the proposition that this Court has "relied on [a] comparative lens for assessing injuries beyond the immigration context." ROA.11539. Appellants try to distinguish *LDWF* claiming that here they "offered evidence that costs are incurred and will be incurred in the future," Br. 27, but the district court correctly found they failed to provide any evidence of present or future costs caused by the CHNV processes.

Appellants also challenge the district court's analysis by attempting to draw a distinction between an increase in "rate" of migration with an increase in raw number of migrants. Br. 19, 27. Appellants' argument is not entirely clear, but it is unavailing in any event. Texas did not establish either that the rate or number of CHNV nationals conditionally released into the country increased following the CHNV processes, nor did they show any increased costs. ROA.11528-29.

Appellants next challenge the district court's reliance upon *Gen. Land Off. v. Biden* ("*GLO*"), 71 F.4th 264 (5th Cir. 2023), among other cases, for the proposition that this Court analyzes injury based upon a comparison of circumstances before and after a challenged policy. *See* Br. 26-27 (addressing ROA.11538). Appellants point

out that in *GLO*, this Court discussed the "relative number of illegal aliens entering Texas" before and after the challenged program, as well as the attendant "relative costs," in the context of addressing the *redressability* prong of standing. 71 F.4th at 273. While that is partially true,[2] Appellants offer no explanation for why relative numbers would be relevant for redressability but not for assessing injury.[3]

Consider this hypothetical: The government implements a new immigration policy that provides that the only individual who will be permitted to enter the United States at the southwest border is John Doe, a sixteen-year-old from Nicaragua. Everyone else will be removed if they cross the border unlawfully. There will be no exceptions. The policy is implemented and strictly enforced, and over a year, the only person allowed to enter at the southwest border is John. He crosses the border, is granted parole, and moves to Texas. Would Texas have standing to challenge the policy because it may have to provide benefits, including a public education, to John, even if all the evidence showed that Texas's education costs had decreased? Of course not. A contrary holding would create a cosmic shift in this country's standing jurisprudence that would ripple beyond the immigration context, and "would fly in the face of Article III's injury-in-fact requirement." *Summers*, 555 U.S. at 494.

---

[2] In *GLO*, this Court discussed the "relative" number of noncitizens coming to Texas both in its discussion of causation and redressability. 71 F.4th at 273.

[3] *See infra* at 50-51, discussing redressability.

Appellants have not pointed to any cases that support their view of standing—that the district court should have considered Texas's alleged injury from the CHNV processes in a vacuum by comparing the number of CHNV nationals released into the country under the challenged processes (and thus the costs associated with those individuals) against an imaginary baseline of zero immigration, particularly for four countries from which arrivals were previously hitting historically high levels and to which the United States has extremely limited ability to remove people. On the contrary, the law in this Circuit is clear, injury and harm are relative terms where the status quo provides the comparator.

## C.    The district court did not consider offsetting benefits of the CHNV processes.

The States argue the district court (1) found Texas was injured by the CHNV processes, but then (2) improperly discounted that harm by considering offsetting benefits. Br. 15. The district court did neither.

First, the court correctly found Texas had not shown injury from increased costs from CHNV nationals because they submitted no evidence at trial of any such increase and conceded the numbers had decreased. *Supra* at 12-16. The States argue the court found Texas "will inevitably expend some health care resources on CHNV nationals," that "an increase in CHNV nationals under the age of 18 entering Texas will inevitably result in at least some costs for Texas," and that this is enough to establish standing. Br. 15 (quoting ROA.11524, 11526). The States take the district

22

court's statements out of context and misrepresent its findings. The district court stated that "an increase in CHNV nationals entering Texas would impose healthcare costs on the State," and "an increase in CHNV nationals under the age of 18 entering Texas would impose education costs." ROA.11523, 11525. But the court did not find that Texas had actually incurred healthcare or education expenses; rather, it merely observed that *if* the number of CHNV nationals released in Texas increased then that might increase Texas's costs. But the court unequivocally found that the evidence showed instead that "migration of CHNV nationals has decreased since the start of the parole program." ROA.11528.

Second, the district court was clear that it was not considering offsetting benefits as part of the standing inquiry. The court stressed that without any evidence of injury to begin with, there was nothing to be offset by potential benefits. *See* ROA.11541 n.17 (noting that because Texas "has not suffered an injury" the court "need not consider Defendants' other arguments," including with respect to "offsetting benefits"). The district court found Texas failed to provide any evidence of an increase in CHNV nationals or costs and thus failed to prove standing even without considering potential offsetting benefits. Appellants' arguments on offsetting benefits, Br. 16-17, are thus irrelevant.

The States next urge this Court to engage in a different accounting exercise and disregard the decrease in CHNV arrivals as a result of "the vagaries of migrant

flow, which naturally vacillate for a variety of reasons." Br. 17. Appellants, however, put forth no evidence at trial showing the decrease in CHNV arrivals could be explained by seasonal patterns. Rather, as the district court explained, "all the evidence presented at trial indicated that when suit was filed, the rate of entry was plummeting" following the start of the CHNV processes and "Plaintiffs offered nothing to suggest that as of February 24, 2023, a rebound in that rate of enter was on the horizon." ROA.11633. Moreover, the government submitted evidence showing the sharp decline in arrivals of CHNV nationals "occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop." ROA.13412, ¶ 26. It was Appellants' burden to prove harm, and they failed to do so.

Appellants spend much of their brief arguing about what types of offsets the district court could consider. Br. 17-23. Since the district court did not consider offsets at all, these arguments are ultimately irrelevant to this appeal, and any consideration of offsets would first require remand to the district court to address the trial evidence on offsets in the first instance. *Browning v. Kramer*, 931 F.2d 340, 345 (5th Cir. 1991) ("As a court for review of errors, we are not to decide facts or make legal conclusions in the first instance"); *see O'Brien's Response Mgmt., L.L.C. v. BP Expl. & Prod., Inc.*, 24 F.4th 422, 437 (5th Cir. 2022).

The States are also incorrect that the district court could not have considered offsets had they shown some injury. This Court has held that, if a court finds

evidence of injury, the court should consider "offsetting benefits" that "arise from the same transaction as the costs." *DAPA*, 809 F.3d at 155; *see Henderson v. Stalder*, 287 F.3d 374, 379-80 (5th Cir. 2002) (finding plaintiffs lacked standing based on the cost of producing specialized license plates, where that cost was offset by payments made by members of the public to cover those costs). Appellants argue this rule should not apply in immigration cases, *see* Br. 18, but they cite no decision holding that or that supports applying a different rule for standing in immigration cases.

Appellants emphasize that the *MPP* decision found standing because "MPP's termination drastically increases the proportion of aliens who are paroled" regardless of "overall flows of migrants." Br. 19 (quoting *MPP*, 20 F.4th at 966). Here, however, both the arrival and release numbers sharply declined for CHNV nationals in the months after the parole processes began. Because country conditions and diplomatic relations with Cuba, Haiti, Nicaragua, and Venezuela severely limit DHS's ability to remove CHNV nationals, ROA.13403-08, and the Supreme Court has limited DHS's ability to detain noncitizens it cannot remove, *see Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) (limiting detention of noncitizens with final removal orders unless there is a significant likelihood of removal in the reasonably foreseeable future), "DHS conditionally released most" CHNV nationals who entered prior to the CHNV processes, ROA.13406-07. The CHNV processes allow DHS to deny travel authorization to CHNV nationals who are ineligible for parole

before they leave their home countries and travel to the United States, where they cannot be removed, thus reducing the number of unremovable noncitizens who must be released because they cannot be detained for extended periods of time.

Separately, because the CHNV processes aim to address and deter irregular migration of CHNV nationals throughout the region, including through Mexico to our southern border, Mexico stated it would, for the first time at scale, accept the return or removal of CHNV nationals who enter the United States without authorization, creating a new consequence for unauthorized entry by CHNV nationals that did not previously exist. *See, e.g.*, 88 Fed. Reg. at 1268 (explaining how the CHNV processes combine "a clear meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States").

The States argue it is improper to consider this offsetting benefit, *i.e.*, removal of previously unremovable CHNV nationals to Mexico. Br. 19. But the district court did not consider these removals because the evidence showed that the number of CHNV nationals being conditionally released in Texas had plummeted even without considering the number of CHNV nationals who could now be removed to Mexico. *See* ROA.11541 n.17.

Had Texas identified any evidence of harm from increasing numbers of CHNV nationals, the ability to remove these individuals to Mexico plainly would

have been a relevant offset the district court would have to consider. Appellants concede that "a deal with Mexico to allow fewer individuals unlawfully in the country might do something to mitigate the harm to Texas," but argue this offsetting benefit cannot be considered because it is not part of the "same transaction," Br. 20-21. However, the CHNV processes were "contingent on the [government of Mexico] accepting the return, departure, or removal to Mexico of [CHNV] nationals seeking to enter the United States without authorization," 88 Fed. Reg. 1268, making these returns and removals relevant offsets that "arise from the same transaction as the costs," *DAPA*, 809 F.3d at 156. And the government of Mexico has stated that it would reverse its decision to accept the return or removal of CHNV nationals if the CHNV parole processes ended. ROA.13408, 13416-17.

Appellants next attempt to distinguish CHNV nationals who previously entered the United States as "not of the same category as foreign nationals paroled into Texas under the CHNV Program," because the latter are "paroled" into the United States rather than being "unlawfully present." Br. 21-22. In their view, this distinction matters because noncitizens who are "unlawfully present in the United States should be incarcerated in federal detention centers paid for by the federal government and then removed." *Id*. at 22. But most CHNV nationals who entered the United States prior to the CHNV processes were conditionally released because DHS could not remove them and thus lacked the authority to detain them for

removal, undermining Appellants' effort to distinguishing these groups. *Supra* at 25-26.[4]

### D.     Appellants' claimed injury is not judicially cognizable.

Appellants acknowledge the Supreme Court recently revisited and "revised this Court's standing analysis." Br. 23. In *United States v. Texas* ("*Priorities*"), 599 U.S. 670 (2023), the Supreme Court held that two states lacked standing to challenge DHS's discretionary immigration enforcement priorities because their alleged injury—indirect costs associated with having more noncitizens in their States—was not "legally and judicially cognizable." *Priorities*, 599 U.S. at 670, 676. The Supreme Court has also held federal courts should "chiefly" evaluate standing "by comparing the allegations of the particular complaint to those made in prior standing cases." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024) ("*AHM*") (quotation omitted). Comparing this case to *Priorities*, standing here is lacking.

Here, Texas alleges the same type of injury as in *Priorities*. *Compare* ROA.337-338 (alleging Texas would incur healthcare, law enforcement, education and other social services costs as a result of more noncitizens), *with Priorities*, 599

---

[4] The States also argue there was testimony at trial that CHNV parolees are different than CHNV nationals who entered prior to the parole processes, Br. 23, but cite only testimony that did not answer this question, *see* ROA.12085-86, 12090-91, and which was inadmissible as hearsay, even in a bench trial, *see Broad. Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238 (5th Cir. 1988).

U.S. at 670 (alleging harm from costs to "supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government"). Thus, even if Appellants could show that they incurred social service costs from the CHNV processes, *Priorities* reaffirms that when a theory of harm is based solely on such costs, standing is substantially more difficult to establish. Indeed, *Priorities* calls into serious question whether indirect costs related to driver's licenses, education, health care, or law enforcement can ever satisfy Article III. 599 U.S. at 680 n.3. As the Supreme Court noted, "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," and "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id*.

More recently, in *AHM*—where the Supreme Court unanimously held that doctors and medical associations lack Article III standing to challenge the FDA's decisions to relax certain regulatory requirements—the Supreme Court again rejected a theory of standing premised on attenuated, indirect injuries. In doing so, the Court compared the plaintiffs to firefighters challenging building codes that increase fires, police officers challenging legislation associated with increased crime, and "[t]eachers in border states" suing "to challenge allegedly lax immigration policies that lead to overcrowded classrooms." 602 U.S. at 393. The

Court rejected standing in these scenarios. *Id*. A contrary holding would lead down a path where "every citizen had standing to challenge virtually every government action that they do not like," *Id.* at 392, and improperly draw courts into all sorts of generalized grievances.

A plaintiff may not challenge federal regulation merely because he disagrees with it; that remains true even if the "plaintiff believes that the government is acting illegally." *AHM*, 602 U.S. at 381. Rather, because there is no general oversight "of the conduct of the National Government by means of lawsuits in federal courts," some issues must be "left to the political and democratic processes." *Id*. at 396; *id.* at 382 ("Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive.") (citation omitted); *Clapper*, 568 U.S. at 408 ("The law of Article III standing … serves to prevent the judicial process from being used to usurp the powers of the political branches" in this manner.).

Like the plaintiffs in *Texas* and *AHM*, Texas is an unregulated third party. The Supreme Court has consistently held that "when the plaintiff is not himself the object of the government action or inaction he challenges," plaintiffs face a "substantially more difficult" burden to establish standing. *AMH*, 602 U.S. at 382; *see Priorities*, 599 U.S. at 680 n.3. And as the Supreme Court long ago held, an indirect theory of harm based solely on the assertion that a change in federal policy will affect a State's

population and in turn affect state revenue is insufficient to satisfy Article III. *See*

*Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (rejecting standing where State argued

change in federal policy would "have the result of inducing potential taxpayers to

withdraw property from the state," negatively affecting State revenue). Such injuries

are "at most, only remote and indirect" and insufficient to show the type of "direct

injury" required for standing. *Id*. at 18; *see also Priorities*, 599 U.S. at 680, n.3

(citing *Florida v. Mellon* and *Lujan*, in noting that standing arguments premised on

"indirect effects" and "attenuated" harms may not satisfy "bedrock Article III

constraints").

In short, following *Priorities*, it is no longer sufficient for a State simply to

argue that some change in federal policy may cause a change in population that may

cause indirect changes in States expenditures with respect to social services. 599

U.S. at 680, n.3. When faced with an identical theory of harm in *Priorities*, the

Supreme Court found the plaintiffs lacked standing. *Id*.

*Priorities* also made clear that in assessing Article III standing, courts must

consider whether the case is judicially cognizable by looking to "history and

tradition" to determine if the "asserted injury" is the type that has "traditionally"

been "redressable in federal court" as opposed to the type of dispute that should be

resolved through the political process. *Id*. at 676-78. Here the asserted injury does

not satisfy these requirements. The Executive has, for many decades, used the parole

authority in similar ways to the CHNV processes.[5] And yet, Appellants "have not cited any precedent, history or tradition" of judicial review of the Executive's use of its discretionary parole authority. *Priorities*, 599 U.S. at 676; *see also Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022) (Kavanaugh, J., concurring) ("[n]othing in the relevant immigration statutes at issue here suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment" with respect to the use of parole); *cf. Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000).

The absence of suits like this one during most of our Nation's history is powerful evidence that such suits are incompatible with our constitutional structure, which "contemplates a more restricted role for Article III courts." *Raines v. Byrd*, 521 U.S. 811, 828 (1997); *cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (noting limits on state standing to raise claims against the federal government). "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," and a "State's allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review." *Texas v. United States*, 106 F.3d 661, 667 (5th Cir. 1997); *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) (A "state official has not suffered an injury in fact to a

---

[5] *See* ROA.10,221-22, ¶¶ 127-135.

legally cognizable interest" even if "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources" because this is a generalized grievance that would improperly "permit nearly all state officials to challenge a host of Federal laws.").

Appellants seek to dilute the significance of *Priorities* by arguing that the Supreme Court must "implicitly agree[]" with this Court's standing analysis in the *MPP* decision—where this Court relied upon indirect injuries similar to those alleged here to support standing—because the Supreme Court reversed this Court's *MPP* decision on the merits, rather than on standing. Br. 23. This argument fails for two reasons. First, the issue of standing was not the question before the Supreme Court in *MPP*, and the parties did not brief it. Second, the Supreme Court's rejection of indirect costs in *Priorities* undermines this Court's standing analysis in *MPP*. And while Appellants cite to *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022), for the proposition that "*MPP's* standing analysis is binding," Br. 23, this Court decided *Data Mktg. P'ship* before *Priorities* was decided. Simply put, there can be no doubt that *Priorities* calls into serious question this Court's analysis in *MPP* with respect to both justiciability and indirect costs.

Appellants next argue that *Priorities* is distinguishable because the Supreme Court distinguished policies dealing only with arrest and non-enforcement from those that also provide legal benefits or legal status. Appellants Br. 23. They argue

the CHNV processes fall in the latter category because, in their view, they provide affirmative benefits "[b]y providing for work authorization and advanced travel authorization to internal ports of entry" Br. 23. At the outset, Appellants are wrong to say the CHNV processes provide affirmative benefits. Work authorization for parolees is provided for by regulations that long predate the CHNV processes, 8 C.F.R. § 274a.12(c)(14)—and would exist even if the CHNV processes were vacated—and advance travel authorization is not an affirmative benefit. More to the point, Appellants read *Priorities* too narrowly. The Supreme Court made clear in *Priorities* that: (1) indirect costs of the type alleged here are insufficient to establish standing; (2) history and tradition matter, and where there is no history or tradition of justiciability, there likely is no standing; (3) special solicitude does not apply where states allege indirect injury from population growth (discussed further *infra* at 45-50); and (4) States generally lack standing to challenge the Executive's discretionary choices, particularly with respect to decisions concerning arrest and prosecution. The Supreme Court did not cabin these first three points to immigration cases challenging arrest policies or non-enforcement; it did not even cabin them to immigration cases. *See generally Priorities*.

Only with respect to its holding that states generally lack standing to challenge the Executive's discretionary choices did the Court carve out possible distinctions. And even there, the Supreme Court simply acknowledged that certain factors might

affect the standing analysis in "cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions," and reserved resolution of those questions for another day. 599 U.S. at 681. Even if the CHNV processes did provide legal benefits that would not be available without those processes, it would not dilute the Supreme Court's holding that States face a high burden in proving standing based on indirect injuries.

Appellants next argue that *Priorities* does not control because "the CHNV Program represents an abdication of DHS's statutory responsibility," Br. 24, and the Court in *Priorities* recognized that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id*. (quoting 599 U.S. at 682-83). This argument also fails. According to Plaintiffs, the government is abdicating its responsibility under 8 U.S.C. § 1182(d)(5)(A) to grant parole only on a case-by-case basis. Br. 24. But Plaintiffs presented no evidence of that. To the contrary, DHS vets the potential financial supporter, reviews information provided by the supporter and noncitizen, and evaluates whether to provide travel authorization to the particular noncitizen; and even if the noncitizen is granted travel authorization to fly to the United States to seek parole, a CBP officer at a port of entry must still inspect the individual and consider whether it is appropriate to grant parole to that specific individual. 87 Fed.

Reg. 63,516; 88 Fed. Reg. at 1,253, 1,264, 1,276. The evidence shows that some applicants were denied advance travel authorization, ROA.11523, and others were denied parole even after they arrived. ROA.13426.

Finally, even as to the Supreme Court's holding that States generally lack standing to challenge the Executive's discretionary choices, this case is more like *Priorities* than different from it. Both *Priorities* and this case involve Article II discretion. For example, the memorandum in *Priorities* concerned enforcement actions the statutes provided DHS "shall" take. *See* 8 U.S.C. §§ 1226(c), 1231(a)(2). The Court explained that the states' challenge nevertheless was not cognizable because it implicated with the Executive's inherent Article II discretion to decide how to enforce the law. *Priorities*, 599 U.S. at 684-85. This case concerns a statute in which Congress expressly placed the authority for granting parole in the "discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A).

This case is also like *Priorities* because both concern "foreign-policy objectives." 143 S. Ct. at 1971-72. This case involves parole processes that depend on negotiations with foreign governments, and their agreement to accept the removal of CHNV nationals. ROA.10,172-73, 10,179-84. When "the President chooses the parole option … for foreign-policy reasons, a court … must be deferential to the President's Article II foreign-policy judgment." *MPP*, 597 U.S. at 814 (Kavanaugh, J., concurring)

This case is also like *Priorities* because it involves a "complicated balancing" of factors, including foreign affairs, "inevitable resource constraints and regularly changing public-safety and public-welfare needs," and DHS's limited ability to remove individuals from these four countries. *Priorities*, 599 U.S. at 680. The Supreme Court held these factors weigh against finding that "federal courts" are "the proper forum for resolving" such disputes. *Id*.

### E. The district court correctly evaluated the evidence at the time of the operative complaint.

Appellants next argue the district court erred by disregarding evidence of multiple causes of decreased migration rates. Br. 28. There is no merit to this argument.

The States do not dispute that CHNV "entries … decreased" prior to the operative complaint, but argue that the district court should not have assessed standing based on that time period without ensuring that period was "representative." Br. 28. The States repeatedly argued in the district court, however, that standing is determined by facts in existence when the suit was commenced. *See, e.g.*, ROA. 11082, 11569. And the Supreme Court has held that, "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985)). The States filed their amended complaint on February

14, 2023, ROA.326, and the district court correctly found there had already been a sharp decline in releases of CHNV nationals in Texas by that point, ROA.11633.

The States argue that it is not certain that this period before the operative complaint was a representative sample or that the decrease in arrivals can be attributed solely to the CHNV processes. Br. 28-29. But the States did not provide any evidence at trial that the decline in arrivals they admit occurred during that period can be explained by some other cause. And the evidence of a sharp decline in arrivals immediately following the start of the CHNV processes is compelling. For example, within a week of the Venezuela process, encounters of Venezuelans at the southwest border fell from over 1,100 per day to under 200 per day, and further fell to an average of 28 per day by January 22, 2023. 88 Fed. Reg. at 1279; ROA.13410. The other processes followed a similar pattern, with encounters of Cubans, Haitians, and Nicaraguans dropping from an average of 1,231 when the new processes were announced to an average of 205 just two weeks later. ROA.13412; *see also supra* at 13-16.

The States argue "the district court failed to account for a similar drop in migrant flows during this period across *all* population groups," Br. 29, but they put forth no evidence of this at trial. The only evidence in the trial record reflects that the "reduction" in encounters of CHNV nationals "represented a significant decline of 94 percent from the peak CHNV encounters" that "occurred even as encounters

of other noncitizens began to rebound from their typical seasonal drop." ROA.13412. The States argue they "established below that illegal immigration follows seasonal patterns," but all they cite for this proposition is the statement of their attorney in a brief that cites nothing in support of the argument. Br. 29-30 (citing ROA.11090). They provided no evidence showing that seasonal migration patterns alone can explain the sharp and immediate change in CHNV migration patterns after the CHNV processes began.

Appellants cite other factors they say could have contributed to the drop in arrivals of CHNV nationals, but none that correspond to the period leading up to the operative complaint. They cite "misinformation campaigns by smugglers," Br. 29 (citing ROA.13411), but cite evidence from "early May" 2023, well after the operative complaint, ROA.13411. The "stiffened consequences for irregular migration … at the land border" they cite, Br. 29 (citing ROA.13411), also occurred later, in May 2023, ROA.13411. Finally, they cite "actions by other nations, including Colombia, Costa Rica, Ecuador, Canada, and Guatemala." Br. 29 (citing ROA.13422-13423), but these actions occurred in June 2022, well before the CHNV processes, *see* ROA.13422-13423.

Appellants' unsupported assertions of other explanations for the decline are insufficient to meet their burden to prove standing, particularly at the trial stage where they must "provide "evidence" of "specific facts" to prove harm through the

"evidence adduced at trial." *Lujan*, 504 U.S. at 561; *Clapper*, 568 U.S. at 411-12. Nor can they point to anything in the record to meet the high burden to show the district court's finding that Texas did not sustain injury was clear error. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) ("If the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance."); *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020).

**F.    Texas did not establish a prospective risk of harm.**

The States argue the district court should have found Texas was fairly likely to be injured by the CHNV processes by looking at evidence at the time of trial. Br. 30-31. This is incorrect and contradicts what the States argued below.

Again, the States repeatedly—and correctly—argued to the contrary below that courts may not consider post-complaint evidence in evaluating standing. *See* ROA.11082; ROA.11569 (standing "is determined—even after trial—based on facts that existed when the suit was commenced"); ROA.11082; ROA.11633; *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived."). And Texas had no basis to argue future injury was "fairly

40

likely" at the time of the amended complaint when CHNV numbers had already sharply declined, as they conceded. ROA.11529.

As the district court explained, because an injury must be "actual or imminent," under Article III, in a case seeking to prevent future injury the "threat of future injury must be 'certainly impending'; mere allegations of possible future injury will not suffice." ROA.11633. But mere allegations are all Texas put forth at trial:

> [A]ll the evidence presented at trial indicated that when suit was filed, the rate of entry was plummeting. And Plaintiffs offered nothing to suggest that as of February 24, 2023, a rebound in that rate of entry was on the horizon, i.e., "fairly likely."

*Id.* The States raised no arguments, and presented no evidence, to explain why, if the CHNV processes were going to cause Texas some injury, there was no evidence of it in the months before the operative complaint when these processes were already in effect. All the evidence showed that the number of CHNV nationals released in the United States through all avenues—including counting the noncitizens paroled through the CHNV processes—declined by 41 percent in the months after the CHNV processes began, a sharp decrease that cannot be explained by other factors. ROA.13426-27, ¶¶ 4, 6 n.2; ROA.13413, ¶ 29. There was no basis to find Texas faced an imminent, certainly impending injury, and no clear error in the court's finding.

The States argue they can present "post-complaint evidence" to establish an injury they anticipated when they filed suit because "when a plaintiff presents post-complaint evidence that his predicted harms did, in fact, occur, 'he is not presenting a new injury that did not threaten him until after he filed suit,'" but rather "producing further evidence to confirm the existence of a threat present when he filed suit." Br. 31 (citing *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021)). But the States were not attempting to present "further evidence," because they had no evidence of injury at the outset, so this case is nothing like *Crawford*. In *Crawford*, the plaintiff presented evidence that the anticipated harm had already twice occurred at the time of complaint and that supported the argument that the harm was almost certain to recur. *Id*. at 376. The concurrence noted later evidence confirmed that recurrence, *id.* at 377, but this point was not necessary to the Court's holding. Nothing in *Crawford* relieves Texas of the burden to show a "*certainly impending*" injury at the outset. *Clapper*, 568 U.S. at 408; *see Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (Plaintiff raising a "prospective injury," still bears the burden to show "the threatened injury is real, immediate, and direct."); *Lujan*, 504 U.S. at 671 n.4 (later events cannot "retroactively create[]" redressability and jurisdiction "that did not exist at the outset"); *Perry v. Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) ("It is not enough … to attempt to satisfy the

requirements of standing as the case progresses" because "[t]he requirements of standing must be satisfied from the outset.").

There are various other problems with the evidence the States argue they "presented … below" to show increasing "entrants by CHNV nationals" by "the time of trial." Br. 31-32 (citing ROA.11414, 11490-92). First, this evidence, including the chart Appellants include in their brief, is not evidence they presented at trial, but rather evidence they did not present until months after the trial ended and the evidentiary record was closed. *See* ROA.11414 (submitted October 27, 2023); ROA.11490-11492 (submitted March 8, 2024); *see also* ROA.12020; ROA.12095 ("[T]he record is officially closed.").

Second, the States cite "Nationwide" data, but they stipulated that neither the district court, nor this Court, could receive or consider evidence related to any State other than Texas to evaluate standing. Appellants stipulated they would "only seek to establish Article III injury based on alleged injuries to Texas and … will not submit any evidence as to injury for any other State Plaintiff," that "Plaintiffs may not attempt to introduce new evidence of injury or irreparable harm to any State other than Texas" and that this limitation "applies to any attempt by Plaintiffs to introduce such new evidence at any stage of this case." ROA.7986. It cannot be clear error for the district court to decline to give controlling weight to post-trial evidence that Appellants stipulated could not be entered in the record.

Third, even if the district court could consider post-complaint evidence, the evidence of CHNV encounters on the southwest border shows that those encounters were lower in the months following the CHNV processes and the start of this suit than they were over the same period the previous year. ROA.11608-09. Overall, the number of CHNV nationals encountered between January and September of 2023 was significantly lower than the number of encounters between January and September of 2022, the year before the CHNV processes. *Id.*

Ultimately, the States argue the Court should ignore any evidence of decreases after the CHNV processes began as a product of other factors, and instead give weight only to much later post-trial evidence. They argue that later evidence shows month-to-month increases in arrivals that should be attributed solely to the CHNV processes rather than the other factors they argue affect migration. Appellants provide no evidence or justification for taking these inconsistent approaches, or for why the Court should consider evidence only from periods where they view it as favorable to them, ignoring evidence at the time of the operative complaint and judging standing exclusively based on evidence that post-dates the trial. This "heads I win, tails you lose" argument for standing has no basis in precedent, and would improperly permit litigants to challenge any federal policy as increasing migration even if there is no temporal relation to the policy change. The Court should reject

this unprecedented argument and affirm the district court's well-supported finding that Texas failed to prove harm sufficient to satisfy Article III.

### G.    The States are not entitled to special solicitude.

The States argue their "standing should be especially apparent" because they are entitled to special solicitude under *Massachusetts v. EPA*, 549 U.S. 497 (2007). Br. 33; *see id.* at 34-37. The Supreme Court's decision in *Priorities* confirmed, however, that special solicitude has no application when a State asserts standing based on the type of indirect costs Texas asserted here—that immigration policy might affect the number of people in the State, which might in turn affect State expenditures with respect to law enforcement or "social services such as healthcare and education." *Priorities*, 599 U.S at 674.

The majority noted that plaintiffs based "part of their argument for standing" on *Massachusetts*, but nonetheless held that "none of the various theories of standing asserted by the States … overcomes the fundamental Article III problem with this lawsuit." *Priorities*, 599 U.S. at 680 n.3, 685 n.6. Indeed, the majority clearly stated that *Massachusetts* "does not control this case," *Id*. at 685 n.6, a point the concurrence also noted while explaining the limited historical application of the doctrine overall. *Id*. at 688-89 (Gorsuch, J., concurring).[6]

---

[6] As Justice Gorsuch, writing for himself and two other Justices, explained: "Before *Massachusetts v. EPA*, the notion that States enjoy relaxed standing rules

*Continued on next page.*

Indeed, the Supreme Court has never afforded States "special solicitude" in any other case. To the contrary, since applying special solitude in *Massachusetts*, the Court's decisions have consistently analyzed State standing without granting States more favorable treatment in the standing analysis simply because they are States. *See, e.g., California v. Texas,* 141 S. Ct. 2104, 2116-20 (2021); *Trump v. New York*, 141 S. Ct. 530, 534-37 (2020) (per curiam); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

And in any event, even when courts have relied on the special solicitude doctrine, they have not relieved States of the obligation to meet the basic requirements of Article III by showing a concrete and particularized injury traceable to the challenged agency action. *Massachusetts*, 549 U.S. at 522. At most, the Supreme Court and this Court have suggested that special solicitude may lower the threshold for establishing redressability. *Id.* at 517-18; *DACA*, 50 F.4th at 514. But a looser standard for redressability cannot overcome the failure to establish a concrete harm. It is, therefore, of no use to Texas, which is alleging indirect, unsubstantiated costs that are insufficient to satisfy "bedrock Article III constraints." *Priorities*, 599 U.S. at 680, n.3; *see Mellon*, 273 U.S. at 17-18 (States may sue the

---

'ha[d] no basis in our jurisprudence.' … Nor has 'special solicitude' played a meaningful role in this Court's decisions in the years since." *Id.* (citation omitted). The concurrence warned, "it's hard not to think … that lower courts should just leave that idea on the shelf in future" cases. *Id.*

United States only if they have suffered a "direct injury," not where the alleged harm is "only remote and indirect").

*Massachusetts*, in contrast, involved a direct harm to a State, namely the threatened loss of territory owned by and subject to the sovereignty of the State. *Massachusetts*, 549 U.S. at 521. The Supreme Court has long treated the loss of territory as a distinct and legally cognizable harm. *See* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 415–16 (1995) (discussing 19th-century cases). Appellants' challenge to the CHNV processes involve only alleged "indirect fiscal burdens"—a "humdrum feature" of many federal policies, including many policies with respect to immigration. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.).

Special solicitude does not apply in this case for additional reasons. A state invoking special solicitude must also show a procedural right to challenge the action in question. *DACA*, 50 F.4th at 514. *Massachusetts* attached "critical importance" to the state's "procedural right" provided by the Clean Air Act to submit a petition for rulemaking and challenge the denial of such a petition related to emissions standards. *Massachusetts*, 549 U.S. at 516, 518; 42 U.S.C. § 7607(b)(1); *Priorities*, 599 U.S. at 685, n.6 (noting that in *Massachusetts*, "[t]he issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking," rather than a challenge to

47

an exercise of the Executive's discretion). The INA creates no similar procedural right.

Appellants argue that the APA creates a procedural right "for all its claims"—particularly through its notice and comment provisions—sufficient to satisfy the first requirement for invoking special solicitude. Br. 34. But the Supreme Court has never held that an APA claim alone is sufficient to satisfy this requirement, and the Court has not applied special solicitude in cases where it might otherwise have been implicated if an APA claim alone were enough. *See*, *e.g.*, *California*, 593 U.S. at 673-680; *Trump*, 592 U.S. at 129-134; *Dep't of Commerce*, 139 S. Ct. at 2565. Indeed, in *Priorities*, the plaintiffs asserted an APA claim, including a claim challenging the absence of notice and comment, 599 U.S. at 717, n.4, and still the majority held that special solicitude did not apply. *Id*. at 685, n.6.[7] Thus, to the extent prior decisions of this Court have suggested that a State may be entitled to special solicitude merely by alleging an APA claim, those decisions are inconsistent with Supreme Court precedent.

---

[7] Furthermore, the lack of opportunity to comment on the parole processes through notice-and-comment rulemaking is not, in itself, a sufficient injury to satisfy Article III and obtain relief. The "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." *Summer v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009). "It makes no difference that the procedural right has been accorded by Congress," because "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Id*.; *see also Spokeo v. Robins*, 578 U.S. 330, 341 (2016).

To invoke special solicitude, an agency action must also be "imposing substantial pressure on" the state's "quasi-sovereign" interests." *DAPA*, 809 F.3d at 153. A State does not suffer an injury to its sovereignty by virtue of the presence of noncitizens whom the federal government has permitted to enter the country. That is because the States agreed to cede the authority to determine which noncitizens may enter the country to the federal government when they ratified the Constitution and gave the federal government the power to "establish a uniform Rule of Naturalization." *See* U.S. Const., Art. I, § 8, cl. 4. "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Arizona*, 40 F.4th at 386–87.

Nonetheless, Appellants rely upon this Court's decisions in the *DAPA* and *DACA* to argue they are entitled to special solicitude. In *DAPA*, this Court held that this requirement was satisfied where immigration policy placed substantial pressure on the state to change its laws related to driver's licenses. 809 F.3d at 153. But here, Appellants never claimed that the CHNV processes have placed any pressure on them to change State laws, and indeed the court found that Texas *profits* from issuing more driver's licenses to noncitizens. ROA.11527.

Texas argues that, as in *DACA*, "[a]n attempt by Texas to establish an alternative classification system or work authorizations [for CHNV noncitizens] would be preempted, despite the State's likely interest in doing so." Br. 36 (quoting

*DACA*, 50 F.4th at 516). But the comparison is strained. In *DACA*, this Court held noncitizens in Texas received lawful status because of the challenged program. Here, the temporary parole conferred on CHNV nationals is conferred by Section 1182(d)(5)(A), not the CHNV processes. Further, the CHNV processes do not provide work authorization. That is a function of 8 C.F.R. § 274a.12(c)(14), not the processes.

But even if the injuries alleged here are of "the same type … that led this Court to afford Texas special solicitude in *DAPA* and *DACA*," as Appellants argue, Br. 36, the injury alleged here is *identical* to the injury alleged in *Priorities*. And yet, in *Priorities* eight justices agreed that special solicitude had no place in the analysis. 599 U.S. at 685 n.3, n.6, 688-89. That decision calls into serious question the correctness of this Court's decisions as to the application of special solicitude in both *DAPA* and *DACA*.

**H.     Texas has not met the remaining standing requirements.**

Appellants' arguments for traceability and redressability, Br. 37-38, fail because they depend on showing increased costs linked to an increased number of CHNV nationals in Texas, something they could not prove. They thus have not met their burden to show an injury traceable to the CHNV processes that could be remedied by a favorable decision. *Lujan*, 504 U. S., at 561. Here, the evidence shows that ending the CHNV processes would likely lead to a surge in migration, such that

50

Texas would likely have *more* CHNV nationals in the State and its costs would *increase*, ROA.11528-29, 13417, 13426-27, precisely the harm Appellants seek to avoid. Moreover, they cannot show redressability where DHS officers would possess the same authority under the parole statute without the CHNV processes. *See Priorities*, 143 S. Ct. at 1978-79 (Gorsuch, J., concurring) (redressability cannot be established where a "judicial decree rendering" guidance "a nullity does nothing to change the fact that federal officials possess the same underlying" discretion without the guidance).

## II.     This Court Need Not Reach Other Jurisdictional Arguments.

Appellants address three jurisdictional arguments the district court "did not address," and that they argue this Court should not reach, but include because "Appellees may ask this Court to resolve" them. Br. 39. Appellees agree this Court should not address these arguments in the first instance, but in an abundance of caution, briefly respond to preserve their arguments.

*First*, the APA and the INA bar review of actions that are committed to agency discretion. The APA precludes review "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *DAPA*, 809 F.3d at 165; *see* 5 U.S.C. § 701(a)(2); *cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985). And 8 U.S.C. § 1252(a)(2)(B)(ii) provides, "no court shall have jurisdiction to review . . . any other decision or action … the authority for which is specified …

to be in the discretion of the ... Secretary." *See Kucana v. Holder*, 558 U.S. 233, 248 (2010). Section 1182(d)(5)(A) commits parole to agency discretion by providing the Secretary "may" in "his discretion parole" noncitizens "into the United States temporarily under such conditions as he may prescribe," "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," without setting any standard for how requests for parole should be submitted or processed.

Contrary to Appellants' arguments, Br. 44-45, the parole processes do not restrict this discretion or provide legal rights or status, *supra* at 34-36, 49-50. To the extent they rely on this Court's *MPP* decision, *id.*, that decision was incorrect and does not survive subsequent Supreme Court precedent. Among other things, the Supreme Court reversed that decision and applied a provision of Section 1252 to bar a policy challenge brought by Texas, foreclosing Texas's argument that Section 1252 applies only to individual challenges. *MPP*, 597 U.S. at 797-98; *see also Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (holding Section 1252(a)(2)(B)(i)'s bar to review of "any judgment regarding" certain types of "relief" extended to "judgments of whatever kind" "*relating to*" that relief, "not just discretionary judgments or the last-in-time judgment"); *Loa-Herrera*, 231 F.3d at 991 (bar to review of decision also covers "the *manner* in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" ); *Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring)

("[T]he immigration statutes afford substantial discretion to the Executive," and courts "must be deferential" when the Executive "chooses the parole option … for foreign-policy reasons.").

*Second*, Appellants argue the CHNV processes are final agency actions because they consummate "the agency's decisionmaking process," "set forth the requirements to apply via a website," and "bind" the agency "to a particular legal position," providing "rights and obligations." Br. 46. The parole processes do not bind the agency or guarantee parole in any case, even for those granted travel authorization. ROA.13426. Parole decisions continue to be made on a case-by-case basis by officials at ports of entry, and it is only those individual decisions that complete the decision-making process in a way that determines legal rights. *See* ROA.10899, ¶¶ 33-34, ROA.13426; *see also* 88 Fed. Reg. at 1,276, 1,277 ("This process is being implemented as a matter of the Secretary's discretion" and "does not create any rights, substantive or procedural, enforceable by any party in any matter").

*Finally*, Appellants do not fall in the zone of interests of Section 1182(d)(5)(A). They argue the inquiry is "whether Texas falls within the zone of interest of the INA *as a whole*," Br. 47-48, but zone of interests is determined not by "the overall purpose of the Act … but by reference to the particular provision of law," *Bennett v. Spear*, 520 U.S. 154, 175-77 (1997). Decisions applying a more

lenient test are inconsistent with Supreme Court precedent, including *Priorities*, 143 S. Ct. at 1973, which made clear that States have no cognizable interest in the way the Executive enforces immigration laws against others.

## CONCLUSION

This Court should affirm the district court's decision.

July 26, 2024                    Respectfully submitted,

                                 BRIAN M. BOYNTON
                                 *Principal Deputy Assistant*
                                 *Attorney General*

                                 WILLIAM C. PEACHEY
                                 *Director*

                                 EREZ REUVENI
                                 *Counsel*

                                 */s/ Brian C. Ward*
                                 BRIAN C. WARD
                                 *Senior Litigation Counsel*
                                 U.S. Department of Justice, Civil Division
                                 Office of Immigration Litigation,
                                 District Court Section
                                 P.O. Box 868, Ben Franklin Station
                                 Washington, DC 20044
                                 Tel: (202) 616-9121
                                 Email: brian.c.ward@usdoj.gov

                                 ELISSA FUDIM
                                 *Trial Attorney*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Cir. R. 32.1, it contains 12,993 words.

This brief complies with the typeface and the type style requirements of Fed. R. App. P. 35(a)(5)-(6), and Fifth Cir. R. 32.1 because it has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

*/s/ Brian C. Ward*
BRIAN C. WARD
United States Department of Justice

## CERTIFICATE OF SERVICE

I certify that on July 26, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Brian C. Ward*
BRIAN C. WARD
United States Department of Justice