Case No.  24-40160

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants,*

*v.*

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees,*

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees.*

---

On Appeal from the United States District Court
for the Southern District of Texas, Victoria Division
(USDC No. 6:23-CV-7)

---

## BRIEF OF INTERVENOR DEFENDANT APPELLEES

---

*Monika Y. Langarica, Ahilan Arulanantham, Talia Inlender, Sofía López Franco*
*Center for Immigration Law and Policy, UCLA Law*
*385 Charles E. Young Dr., E., Box 951476*
*Los Angeles, CA 90095*
*(310) 983-3345*

*(Additional Counsel Listed on Signature Block)*

## CERTIFICATE OF INTERESTED PERSONS

Case No.  24-40160

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants*,

*v.*

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees*,

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that judges of this court may evaluate possible disqualification or recusal.

i

## Parties and Counsel

*Plaintiff Appellants*

*Counsel for the State of Texas*

Ken Paxton,
Attorney General of Texas
Brent Webster
First Assistant Attorney General
Aaron L. Nielson
Solicitor General
Cory A. Scanlon
Assistant Solicitor General
Lanora Christine Pettit
Ryan Daniel Walters
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
Aaron.Nielson@oag.texas.gov

*Counsel for the State of Alabama*

Steve Marshall
Alabama Attorney General
Edmund G. LaCour Jr.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Tel: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for the State of Alaska*

Treg Taylor
Attorney General of Alaska
Cori M. Mills
Deputy Attorney General
Christopher A. Robison
Alaska Bar No. 2111126
Texas Bar No. 24035720

Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
chris.robison@alaska.gov

*Counsel for the State of Arkansas*

Tim Griffin
Arkansas Attorney General
Nicholas J. Bronni
Arkansas Solicitor General
Dylan L. Jacobs
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Florida*

Ashley Moody
Attorney General of Florida
James H. Percival
Deputy Attorney General of Legal Policy
Henry Charles Whitaker
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Tel: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for the State of Idaho*

Raúl R. Labrador
Attorney General of Idaho
Joshua N. Turner
Alan M. Hurst
Office of the Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, Idaho 83720-0010
Tel: (208) 334-2400
josh.turner@ag.idaho.gov
alan.hurst@ag.idaho.gov

*Counsel for the State of Iowa*

Brenna Bird
Attorney General of Iowa

Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel: (515) 823-9117
Fax: (515) 281-4209
eric.wessan@ag.iowa.gov

*Counsel for the State of Kansas*

Kris Kobach
Attorney General of Kansas
Jesse A. Burris
Assistant Attorney General
Anthony J. Powell
Office of Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
Tel: (785) 368-8197
Jesse.Burris@ag.ks.gov

*Counsel for the Commonwealth of Kentucky*

Russell Coleman
Attorney General of Kentucky
Matthew F. Kuhn
Solicitor General
Kentucky Office of the Attorney
General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478
Matt.Kuhn@ky.gov

*Counsel for the State of Louisiana*

Elizabeth B. Murrill
Attorney General of Louisiana
Jorge Benjamin Aguiñaga
Solicitor General
Kelsey L. Smith
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
aguinagab@ag.louisiana.gov
smithkel@ag.louisiana.gov

iv

| | |
|---|---|
| *Counsel for the State of Mississippi* | Lynn Fitch<br>Attorney General of Mississippi<br>Justin L. Matheny<br>Deputy Solicitor General<br>Office of the Mississippi Attorney General<br>P.O. Box 220<br>Jackson, MS 39205-0220<br>Tel: (601) 359-3680<br>justin.matheny@ago.ms.gov |
| *Counsel for the State of Missouri* | Andrew Bailey<br>Attorney General of Missouri<br>Joshua M. Divine<br>Solicitor General<br>Maria Lanahan<br>Deputy Solicitor General<br>Missouri Attorney General's Office<br>Post Office Box 899<br>Jefferson City, Missouri 65102<br>Tel: (573) 751-8870<br>Josh.Divine@ago.mo.gov |
| *Counsel for the State of Montana* | Austin Knudsen<br>Attorney General of Montana<br>Christian B. Corrigan<br>Solicitor General<br>Peter M. Torstensen, Jr.<br>Assistant Solicitor General<br>Office of the Attorney General<br>215 N Sanders<br>Helena, Montana 59601<br>Tel: (406) 444-2026<br>Christian.Corrigan@mt.gov |
| *Counsel for the State of Nebraska* | Michael T. Hilgers<br>Attorney General of Nebraska<br>Eric J. Hamilton<br>Solicitor General<br>Office of the Nebraska Attorney |

General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Ohio*

Dave Yost
Ohio Attorney General
Thomas Elliot Gaiser
Ohio Solicitor General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Oklahoma*

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zachary West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of South Carolina*

Alan Wilson
Attorney General of South Carolina
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of Tennessee*

Whitney Hermandorfer
Director of Strategic Litigation
Tennessee Attorney General P.O. Box
20207

vi

Nashville, TN 37202
Tel: (615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Utah*

Sean D. Reyes
Utah Attorney General
Stanford E. Purser
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
spurser@agutah.gov

*Counsel for the State of West Virginia*

Patrick Morrisey
Attorney General of West Virginia
Michael R. Williams
Senior Deputy Solicitor General
Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
Tel: (681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of Wyoming*

Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Federal Defendant Appellees*

*United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement*

Brian Christopher Ward
Direct: 202-616-9121
Email: brian.c.ward@usdoj.gov
Elissa P. Fudim
Direct: 202-451-7460
Email: elissa.p.fudim@usdoj.gov
U.S. Department of Justice
Civil Division
P.O. Box 868
Ben Franklin Station
Washington, DC 20044-0868

Erez Reuveni, Assistant Director
Email: erez.r.reuveni@usdoj.gov
U.S. Department of Justice, Office of Immigration Litigation
Civil Division
450 5th Street, N.W.
Liberty Square Building
Washington, DC 20001

*Intervenor Defendant Appellees*

*Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas*

Monika Y. Langarica
Ahilan Arulanantham
Talia Inlender
Sofia Lopez Franco
Center for Immigration Law and Policy
UCLA Law
385 Charles E. Young Dr., E., Box 951476
Los Angeles, CA 90095
(310) 983-3345

Esther H. Sung
Karen C. Tumlin
Laura Flores-Perilla

Brandon Galli-Graves
Vanessa Rivas-Bernardy
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323)316-0944

Javier Hidalgo
RAICES
P.O. Box 786100
San Antonio, TX 78278
(210)610-6143

*s/ Monika Langarica*
Monika Langarica
Center for Immigration Law and Policy
UCLA Law
385 Charles E. Young Dr. E.,
Box 951476
Los Angeles, CA 90095
(310) 983-3345

*Counsel for Intervenor Defendant Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns a statutory parole program for individuals from Cuba, Haiti, Nicaragua, and Venezuela that significantly impacts the lives of thousands of United States residents, including Intervenor Defendants and others like them, who seek to sponsor individuals through the program. It also implicates the Executive's ability to manage complex foreign relations using the parole authority, as the Executive has for decades. Moreover, the issues on review include key questions of justiciability that the Supreme Court has addressed in recent decisions. For these reasons, Intervenor Defendants respectfully request oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................ i

STATEMENT REGARDING ORAL ARGUMENT .................................. x

TABLE OF AUTHORITIES ............................................................... xii

STATEMENT OF ISSUES PRESENTED .................................................. 1

INTRODUCTION .............................................................................. 2

STATEMENT OF THE CASE ............................................................. 5

I.  CHNV Parole Program. ........................................................... 5

    a.  Application Process. ............................................................. 7

    b.  Longstanding Statutory Authority. ....................................... 11

II.  Procedural History ................................................................. 12

SUMMARY OF ARGUMENT ........................................................... 17

ARGUMENT ................................................................................... 21

I.  Standard of Review. ............................................................... 21

II.  The Court Did Not Err in Concluding Texas Failed to Meet Its Burden to Show Injury Because the CHNV Program Has Caused a Net Reduction in Migration. 22

    a.  Texas Bore the Burden to Establish Standing and Failed to Do So. ............. 23

    b.  The Court Did Not Err in Considering Reduced Net Migration ................... 33

    c.  Texas's Non-Enforcement and Abdication Arguments Are Meritless .......... 44

III.  Texas Failed to Prove Traceability or Redressability. ................................. 47

    a.  Texas Failed to Prove Traceability. ...................................... 48

    b.  Any Purported Injury Would Not Be Redressable. ..................... 50

IV.  Special Solicitude Cannot Cure Texas's Standing Defects. ......................... 52

CONCLUSION ................................................................................ 55

CERTIFICATE OF SERVICE ............................................................ 57

CERTIFICATE OF COMPLIANCE .................................................... 58

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Biden v. Texas ("MPP II"),*
  597 U.S. 785 (2022) ........................................................4, 20, 28, 41, 42, 47

*Carney v. Adams,*
  592 U.S. 53 (2020) ............................................................................. 23

*Cinel v. Connick,*
  15 F.3d 1338 (5th Cir. 1994) ............................................................. 22

*Clapper v. Amnesty Int'l,*
  568 U.S. 398 (2013) .......................................................... 17, 18, 23, 50

*Crawford v. Hinds County Bd. of Supervisors,*
  1 F.4th 371 (5th Cir. 2021) ............................................................... 29

*Croft v. Governor of Texas,*
  562 F.3d 735 (5th Cir. 2009) ............................................................ 51

*Data Mktg. P'ship, LP v. Dep't of Lab.,*
  45 F.4th 846 (5th Cir. 2022) ............................................................. 46

*DeJoria v. Maghreb Petroleum Expl., S.A.,*
  935 F.3d 381 (5th Cir. 2019) ............................................................ 22

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ...................................................................... 29, 49

*E.T. v. Paxton,*
  41 F.4th 709 (5th Cir. 2022) ............................................................. 43

*Env't Tex. Citizen Lobby v. ExxonMobil Corp.,*
  824 F.3d 507 (5th Cir. 2016) ............................................................ 21

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) .......................................................... 27, 38, 48, 50

*Gilbert v. Donahoe,*
  751 F.3d 303 (5th Cir. 2014) ............................................................ 47

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ................................................................ 44, 45

*Henderson v. Stalder,*
  287 F.3d 374 (5th Cir. 2002) ................................................. 39, 40

*Kona Tech. Corp. v. S. Pac. Transp. Co.,*
  225 F.3d 595 (5th Cir. 2000) ....................................................... 21

*Louisiana ex rel. Landry v. Biden,*
  64 F.4th 674 (5th Cir. 2023) .......................................... 21, 52, 54

*Louisiana Dep't of Wildlife and Fisheries v. Nat'l Oceanic & Atmospheric Admin.,*
  70 F.4th 872 (5th Cir. 2023) .......................................... 37, 38, 52

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555, 560 (1992)................................................. 23, 31, 51

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) .................................................................... 52

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) ............................................ 4, 38, 39, 50, 55

*Ross v. Marshall,*
  426 F.3d 745 (5th Cir. 2005) ...................................................... 22

*Stringer v. Whitley,*
  942 F.3d 715 (5th Cir. 2019) ................................................. 17, 23

*Texas Gen. Land Office v. Biden* ("*GLO*"),
  71 F.4th 264 (5th Cir. 2023) ................................................. 34, 35

*Texas Gen. Land Office v. Biden*
  No. 7:21-CV-00272, 2024 WL 1023047 (S.D. Tex. Mar. 8, 2024) ......... 35

*Texas v. Biden* ("*MPP I*"),
  20 F.4th 928 (5th Cir. 2021) ............................. 28, 33, 34, 35

*Texas v. United States* ("*DACA*"),
  50 F.4th 498 (5th Cir. 2022) ..........................................*passim*

*Texas v. United States* ("*DAPA*"),
   809 F.3d 134 (5th Cir. 2015) ...................................................................*passim*

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................... 47

*United States v. Texas* ("*Priorities*"),
   599 U.S. 670 (2023) .............................................................................*passim*

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ................................................................................... 41

**Statutes**

8 U.S.C. § 1182(d)(5) ................................................................ 6, 11, 12, 13, 45

8 U.S.C. § 1225(b)(2)(A) ............................................................................ 42

8 U.S.C. § 1226(c) .................................................................................... 42

8 U.S.C. § 1231(a)(2) ................................................................................ 42

**Other Authorities**

87 Fed. Reg. 63,507 (Oct. 19, 2022) .............................................................. 6

88 Fed. Reg. 1,243 (Jan. 9, 2023) ................................................................. 6

88 Fed. Reg. 1,255 (Jan. 9, 2023) ................................................................. 6

88 Fed. Reg. 1,267 (Jan. 9, 2023) ................................................................. 6

Fed. R. Civ. P. 59(e) ........................................................................16, 17, 22

**STATEMENT OF ISSUES PRESENTED**

1. Whether Judge Tipton erred in holding that Texas failed to carry its burden to prove Article III injury from the CHNV program, which he found reduces migration to Texas, and thereby reduces costs to the state.

2. Alternatively, whether Texas can establish the traceability and redressability requirements for Article III standing where the remedy it seeks would increase, rather than decrease, total migration to the state.

3. Whether Texas can invoke special solicitude to establish Article III standing where it has otherwise failed to prove injury in fact.

## INTRODUCTION

In January 2023, Federal Defendants created a program that allows a limited number of qualifying individuals from Cuba, Haiti, Nicaragua, and Venezuela to undergo a thorough application and vetting process, and, if approved, fly directly to the interior of the United States to be considered for parole. The government created the program in order to decrease irregular migration of individuals from those countries at the Southwest border. It was modeled on the Uniting for Ukraine program, which created a similar parole pathway for Ukrainians fleeing Russia's invasion.

Both programs proved extremely successful at decreasing migration pressure at the Southwest border. The parole program for Cuba, Haiti, Nicaragua, and Venezuela ("CHNV Program") has reduced total migration from CHNV countries by incentivizing people to use it rather than migrating to the Southwest border. It also disincentivizes irregular migration through harsh ineligibility criteria and an agreement with the government of Mexico that permits the federal government to remove individuals from CHNV countries to Mexico if they enter the United States without authorization (rather than through the parole program). This feature of the CHNV Program is critical for the federal government, which otherwise faces difficulty removing individuals to the CHNV countries.

For Intervenor Defendants and many others in the United States eager to sponsor their global neighbors, the CHNV Program is a "bright spot." ROA.14738. It

2

has allowed them to reunite with their loved ones from abroad, facilitate access to safety for those fleeing violence, and fulfill their religious obligations. For Intervenor Defendant Paul Zito, the CHNV Program allowed him to answer "a calling from God" by sponsoring his close friend and member of his faith community, Abel, whom he sees as a "brother in need." ROA.14754.

Texas nonetheless filed suit shortly after the start of the CHNV program (though it did not challenge the substantively indistinguishable Ukraine program). Texas claimed the CHNV Program increases migration (and therefore costs) to the state. But Judge Tipton held a trial in this case, and found, based on overwhelming evidence, that the CHNV Program *decreases* total migration from CHNV countries—a data point Texas conceded at trial. ROA.12486; ROA.12603. He found the decrease in migration resulted in *lowered* costs to Texas. Judge Tipton therefore correctly concluded that Texas failed to prove injury in support of Article III standing.

Texas identifies no error in Judge Tipton's meticulous findings, let alone clear error. Nonetheless, Texas asks this Court to second-guess Judge Tipton's analysis of the complete trial record, ignore dispositive evidence, and recast Judge Tipton's analysis as something it is not. Texas also advances an alternative standing theory—that so long as the CHNV Program allows even one person into the state, it injures Texas, even if the program reduces net migration. But this Court has never found that a state can challenge a federal immigration program that decreases migration into the state.

3

Additionally, that supposed injury is too attenuated to be fairly traceable to the CHNV Program. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023) ("*Priorities*"). It also cannot be redressed by the relief Texas seeks, because the trial record here showed that enjoining the CHNV Program would *increase* migration.

Texas's arguments cannot be squared with the standard of review, the record below, or this Court's precedent in immigration policy cases involving state standing, which Judge Tipton faithfully applied. Nor can Texas's claims be reconciled with the Supreme Court's longstanding (and recent) refusal to permit courts to interfere with Executive authority to conduct foreign relations. *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("*MPP II*").

This Court should decline Texas's invitation to invent yet another "boundless" theory of standing. *Murthy v. Missouri*, 144 S. Ct. 1972, 1996 (2024) (internal citations omitted).

There was no clear error in Judge Tipton's findings that "Texas is not financially harmed by the program," ROA.11536, nor any legal flaw in the conclusion that Texas cannot establish Article III injury from a program that undisputedly reduces costs to its state. This Court should affirm.

## STATEMENT OF THE CASE

This case was tried over two days before Judge Drew B. Tipton in the Southern District of Texas. The facts described below are drawn largely from Judge Tipton's findings.

### I.     CHNV Parole Program.

In October 2022, Federal Defendants implemented a parole program to respond to an increase in Venezuelan migrants encountered near the Southwest border. ROA.14559-14570. Federal Defendants expressly "modeled the program on the successful Uniting for Ukraine (U4U) parole process," ROA.14560, which they created in response to a sharp increase in Ukrainians arriving at the Southwest border fleeing the Russian invasion. ROA.13267-13274. Just as U4U provided a parole pathway for Ukrainians, the Venezuela program provided one for certain Venezuelans. Eligible individuals with U.S.-based sponsors could be vetted in advance and then, if selected, granted advance authorization to travel to an interior port of entry to be considered for parole by Department of Homeland Security ("DHS") officials. ROA.14567-14569. This allowed such individuals to forgo the perilous journey to the Southwest border only after going through the requisite application process and passing all background checks and vetting. ROA.14560; ROA.14567-14568. Within one week of this parole process announcement, encounters of Venezuelan migrants at the Southwest border dropped from more than 1,100 per day to fewer than 200 per day. ROA.13410 ¶ 20.

In light of the program's success, on January 5, 2023, DHS announced a continued parole process for Venezuela with minor modifications, and new similar parole processes for Cuba, Haiti, and Nicaragua (collectively, "CHNV Program"), ROA.13411 ¶ 24, also expressly "modeled" on U4U. *See, e.g.,* Cuban Parole Process FRN, 88 Fed. Reg. at 1,267; Haitian Parole Process FRN, 88 Fed. Reg. at 1,243; Nicaraguan Parole Process FRN, 88 Fed. Reg. at 1,255; Venezuelan Parole Process FRN, 87 Fed. Reg. at 63,507.

Federal Defendants negotiated a crucial component of the CHNV Program with Mexico. Under the agreement, individuals from CHNV countries encountered at the Southwest border without authorization may be removed or returned to Mexico. ROA.11522-11523 ¶¶ 33-34. Mexico's agreement is "contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States." ROA.13403 at ¶ 6; 11522 ¶ 33. That agreement is significant because DHS is often unable to deport people to Cuba, Haiti, Nicaragua, and Venezuela. ROA.11519 ¶ 10.

DHS implemented the CHNV Program pursuant to 8 U.S.C. § 1182(d)(5), which gives the Executive Branch discretion to parole noncitizens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* Pursuant to the CHNV Program, DHS may issue advance travel authorization to "up to 30,000 qualifying nationals per month from all four of these countries" combined to

travel to an interior port of entry of the United States to be considered on a case-by-case basis for parole. ROA.11519 ¶¶ 14-15. Individuals granted parole under the CHNV Program have sworn financial sponsors, are permitted to reside in the United States for up to two years, and are eligible to apply for employment authorization through a separate process governed by longstanding regulations not at issue in this case. *Id.*

### a. Application Process.

The CHNV Program involves a multi-step application and vetting process. It begins with an application to DHS by a qualifying "supporter" within the United States who seeks to sponsor (financially and otherwise) a qualifying "beneficiary." ROA.11519-11520. Qualifying beneficiaries must be nationals of the four countries who are residing outside of the United States at the time they apply, possess unexpired passports, can arrange their own commercial travel to the United States, and comply with additional requirements, including pursuant to vaccination and other public health guidelines. ROA.11520 ¶ 17(d); ROA.13977-13978. Unaccompanied children do not qualify for the program. ROA.11520 ¶ 17(d).

The CHNV Program also specifies ineligibility criteria: most important for present purposes, "[i]ndividuals are generally ineligible for consideration for parole under these processes if they have entered the United States unlawfully or irregularly crossed the Mexican or Panamanian border after January 9, 2023." ROA.11522 ¶ 29. Additionally, individuals are ineligible if they do not pass national security and public

safety vetting or are otherwise deemed not to merit a favorable exercise of the Executive's discretionary parole authority; if they have been ordered removed from the United States within the prior five years or are inadmissible based on a prior removal order; or if they are Cuban or Haitian and have been interdicted at sea after April 27, 2023. ROA.13978.

A qualifying supporter based within the United States must initiate the process by applying to sponsor a qualifying proposed beneficiary. ROA.11519 ¶ 17(a). The supporter must complete Form I-134A, Declaration of Financial Support, and provide the requested personal information of both the supporter and the proposed beneficiary, including evidence of income and assets that would support the beneficiary in the United States. *Id.*; *see also* ROA.13975-13981; ROA.13960-13973.

Once a supporter completes and submits the Form I-134A, U.S. Citizenship and Immigration Services ("USCIS") performs an initial background check of the supporter to ensure they meet all requirements, including proof of sufficient financial support for the proposed beneficiary. ROA.13980-13981. If USCIS confirms the supporter's fitness to sponsor, USCIS contacts the proposed beneficiary, who must confirm biographical information and that they meet the eligibility criteria, including public health requirements. ROA.13981. Thereafter, the proposed beneficiary receives instructions on how to register for Customs and Border Protection ("CBP")'s mobile application, CBP One, through which they are required to submit more biographical information

and a live photo, and submit to background checks and still further vetting. *See* ROA.11521 ¶¶ 25-27.

If the proposed beneficiary meets these requirements and passes the background checks, then CBP "determine[s] the individual's eligibility for the CHNV processes and whether it is appropriate to issue a travel authorization" for the beneficiary to travel to the United States. ROA.11521 ¶ 27 (internal quotations omitted). At this point, the beneficiary must secure their own travel to an airport in the United States. ROA.13982. Once they arrive, "a CBP officer considers the request for parole at the port of entry on an individualized, case-by-case basis." ROA.11521 ¶ 28. "CBP has, when making this determination, denied parole for aliens who traveled with advance travel authorization pursuant to the CHNV processes." *Id.* If approved, the individual receives temporary parole for up to two years. ROA.13981-13982.

The experiences of Intervenor Defendants—all of whom are U.S. citizens who have sponsored individuals through the CHNV Program—illustrate how the process works. Each submitted to this lengthy application process with hopes of reuniting with family, fulfilling their religious obligations, providing relief to loved ones struggling to survive, or living by their values to help strangers in need. *See generally* ROA.14669-14683 (declaration of **Dr. Germán Cadenas**, a Pennsylvania university professor who sponsored his uncle, who is like his "second father," from Venezuela); ROA.14750-14761 (declaration of **Paul Zito**, a lifelong Texan and Christian entrepreneur who

answered a "calling from God" by sponsoring a Cuban family he befriended on mission trips to Cuba); ROA.14700-14716 (declaration of **Valerie Laveus**, a Florida schoolteacher who sponsored her brother and nephew who survived murder and kidnapping attempts in Haiti); ROA.14728-14739 (declaration of **Eric Sype**, a Californian working at a nonprofit who sponsored his longtime friend struggling to provide for his minor children in Nicaragua in the wake of natural disasters and political unrest); ROA.14717-14727 (declaration of **Francis Arauz**, a California port truck driver who sponsored her husband and the father of their son with special needs from Nicaragua); ROA.14740-14749 (declaration of **Dr. Kate Sugarman**, a Maryland family physician who applied to sponsor a Venezuelan mother so that she can provide post-surgery care to her young daughter, who suffers from life-threatening neurological disorders in the United States); ROA.14684-14699 (declaration of **Dr. Nan Langowitz**, a business school professor in Massachusetts who sponsored a family of persecuted political activists forced to flee danger in Venezuela). Intervenor Defendants each completed a Form I-134A application and provided substantial evidence demonstrating their ability to financially support their intended beneficiaries. *See* ROA.14706 ¶ 21 (Ms. Laveus spent a week gathering the required materials, including letters from her employer and bank); ROA.14736 ¶ 3 (Mr. Sype's parents had their house appraised to list as an asset for the application); ROA.14674 ¶ 14 (Dr. Cadenas and his spouse took several days to gather documentation and submit bank and

retirement account information); *see also* ROA.11308-11310 (discussing benefits of program participation by Intervenor Defendants and witnesses).

In all these respects, the CHNV Program is similar to U4U, ROA.13267-13274, through which more than 123,000 Ukrainians received parole in the first year of its operation. ROA.12897. Appellants concede CHNV is modeled after U4U, ROA.333 ¶ 43; utilizes materially indistinguishable application and screening processes, ROA.12892-12896; and plays the same role in managing migration flows of people arriving at the Southwest border. *Compare* ROA.13871-13874 *with* ROA.13855-13862. Indeed, U4U is broader than the CHNV Program; U4U has no monthly numerical cap, whereas the CHNV Program limits total monthly parole grants to 30,000 between the four countries. *Compare* ROA.12788 *with* ROA.13267-13274.

### b. Longstanding Statutory Authority.

The CHNV Program, like U4U, is rooted in a decades-long history and practice of presidential administrations of both parties routinely exercising their parole authority under Section 1182(d)(5) of the INA for purposes indistinguishable from those present here, including to manage migration flows and advance foreign policy goals. *See generally* ROA.15082-15103; ROA.14762-14816; ROA.14832-14848. Indeed, the CHNV Program and U4U were preceded by a long list of similar parole programs, including Operation Allies Welcome Program (2021); Filipino World War II Veterans Parole policy (2016); Haitian Family Reunification Parole program (2014); Cuba Family

Reunification Parole program (2007); the Cuban Medical Professionals Program (2006); and the Special Cuban Migration Program (1994–1998). *See id.*

All these parole programs fundamentally differ from non-parole immigration programs like Deferred Action for Childhood Arrivals ("DACA") and Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). *See* Doc. 170 at 4-5, 7. The authority for DACA and DAPA, which aimed to provide temporary relief to undocumented young people and parents of lawfully present children residing in the United States, derives from DHS's authority to exercise *prosecutorial discretion* in granting deferred action for certain individuals who meet specific criteria. *See Texas v. United States*, 50 F.4th 498, 509 (5th Cir. 2022) ("*DACA*"); *Texas v. United States*, 809 F.3d 134, 146-148 (5th Cir. 2015) *as revised* (Nov. 25, 2015) ("*DAPA*"). The CHNV Program, by contrast, rests on the *parole authority* in 8 U.S.C. § 1182(d)(5), under which Congress delegated to the Executive Branch broad discretion to parole noncitizens into the United States on a case-by-case basis for either "urgent humanitarian reasons or significant public benefit," *id.*

## II.    Procedural History

Total migration from CHNV countries plummeted as soon as the CHNV Program went into effect. ROA.11528; *see also* ROA.13859-13862 (showing drop from 91,369 to 21,120 land border encounters of individuals from CHNV countries between December 2022 and January 2023).

Despite this reality, on January 24, 2023, Texas and nineteen other states filed suit to challenge the program, claiming injury from increased migration as a result of the CHNV Program. ROA.65-103. On February 14, 2023, the states filed a First Amended Complaint ("FAC"), adding one state plaintiff, ROA.326-361, and moved for a preliminary injunction, 365-393.[1] Even though migration from CHNV countries continued to drop, in the FAC Texas again alleged it was harmed by the CHNV Program because "as the number of illegal aliens in Texas increases, the number of illegal aliens receiving [] services likewise increases."[2] ROA.337 at ¶ 64.

Shortly after Texas filed suit, Intervenor Defendants—a group of seven U.S. citizens seeking to sponsor through the CHNV Program their close relatives, longtime friends, and individuals with whom they share deep religious and humanitarian

---

[1] Of the twenty-one States that are parties to this suit, only Texas has proffered evidence and otherwise participated in the litigation, as every other putative plaintiff affirmatively disclaimed the intent to try to prove their standing, including after a remand following appeal. *See, e.g.*, ROA.7986 (joint stipulation stating that, of Plaintiff States, only Texas would seek to establish injury for Article III standing). Thus, as they did below, Intervenor Defendants refer to Plaintiffs-Appellants as "Texas."

[2] Intervenor Defendants directly quote this language from the pleadings in order to precisely state its allegations, even though this language is both pejorative and inaccurate because federal law authorizes individuals granted parole to be in the United States during the designated parole period. *See* 8 U.S.C. § 1182(d)(5).

13

connections—moved to intervene. ROA.7781-7803. On April 19, 2023, Judge Tipton granted their motion. ROA.7966-7975.[3]

After the close of discovery and following the Supreme Court's decision in *Priorities*, 599 U.S. 670 (holding Texas lacked standing to challenge DHS's prosecutorial discretion policy), Intervenor Defendants filed a motion to dismiss for lack of standing. ROA.9604-9630. Judge Tipton consolidated the motion to dismiss, the preliminary injunction motion, and the merits, and held a bench trial on August 24-25, 2023. ROA.11946.

The data available from the time that the case was filed through the beginning of trial reflected a reduction in total CHNV migration compared to before the program started. ROA.13836. At trial, Texas conceded as much:

> THE COURT:  Is it Texas's position that -- does Texas agree with the statement that at this point as opposed to before the Program, there are fewer aliens coming into the country now as opposed to before the Program from those four countries?

> MR. WALTERS (Texas):  That's what the data looks like up through June.

> THE COURT:  Okay.

ROA.12486.

---

[3] Texas moved to amend its Complaint a second time on May 12, 2023, seeking to challenge and enjoin a completely different parole policy relevant to border processing. ROA.7994-8000. That unrelated policy was already enjoined by a separate lawsuit in Florida, in which Florida was *also* a party. *See, e.g.*, ROA.11746-11748. Judge Tipton denied Texas's request. ROA.8257-8261. Texas never filed a separate challenge against that program in federal court.

THE COURT: So the only evidence in the record, I should say, then, is that the numbers are decreasing –

MR. WALTERS (Texas): Right.

ROA.12603. The record "officially closed" at trial. ROA.12095.

In its post-trial brief, Texas cited post-trial migration flow data. *See* ROA.11068-11173. Intervenor Defendants moved to strike the post-trial data, arguing the evidentiary record had closed at trial and that Texas's characterization of the post-trial data was misleading. ROA.11320-11329; ROA.11259-11268. Judge Tipton denied Intervenor Defendants' Motion to Strike and took judicial notice of all post-trial data submitted to the court, which included data through October 2023. ROA.11517.

On March 8, 2024, Judge Tipton issued a thirty-one-page Memorandum Opinion and Order, ROA.11511-11541, and a Final Judgment dismissing the complaint for lack of standing, ROA.11542-11543. The court concluded that "Plaintiffs have not proven that Texas has suffered an injury and therefore do not have standing to maintain this suit." ROA.11541. Judge Tipton's ruling was based on extensive Findings of Fact. Among others, he found that:

> 76.    Despite the high approval rate of Program applications, the record reflects that the Program has resulted in a decrease of CHNV nationals entering the United States. . . .

> 79.    Thus, as of May 2023, the total number of CHNV nationals entering the United States had declined from an average of 2,356 per day prior to the Program starting to 1,326 per day in the months after—a 44 percent reduction.

15

80.     The decline in CHNV nationals entering the United States after the rollout of the Program was occurring at the time that Plaintiffs filed their Amended Complaint on February 14, 2023. . . .

87.     In conclusion, the Parties agree, and the record reflects, that the number of CHNV nationals entering the United States has dramatically declined from the date the Program commenced through the last date for which data was received by the Court.

ROA.11528-11529 (internal citations omitted). Additionally, regarding the feature of

the program that involves an agreement with Mexico, he found:

30.     Prior to the Program, when a CHNV national was detained for illegally entering the United States, DHS faced significant challenges in returning the [noncitizen] back to their home country. . . .

33.     To ameliorate these issues, the Program was conditioned on an agreement with Mexico. Specifically, because the Program would require CHNV nationals to enter the United States via an interior port of entry— as opposed to traveling through Mexico to reach the Southwest border— the Government of Mexico agreed to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect.

34.     The Government of Mexico has indicated that its willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States.

ROA.11522-11523 (internal citations omitted).

Texas noticed its appeal on March 11, 2024. ROA.11544-11549. More than three

weeks later, Texas moved for reconsideration pursuant to Federal Rule of Civil

Procedure ("FRCP") 59(e), ROA.11559-11580, which Intervenor Defendants and

Federal Defendants opposed, ROA.11584-11594; ROA.11596-11612. On May 28, Judge Tipton denied the reconsideration motion in an eight-page Memorandum Opinion and Order, finding that Texas "s[ought] to do precisely what Rule 59(e) forbids: re-litigate the same legal theories and present the same arguments" rejected by the court. ROA.11627-11634. Texas subsequently filed an amended Notice of Appeal. ROA.11635-11640.

## SUMMARY OF ARGUMENT

Judge Tipton committed no clear error in finding that the CHNV Program reduces costs to Texas, nor in the corresponding conclusion that Texas failed to establish injury for purposes of Article III standing. This Court should affirm for three reasons.

**I.** Judge Tipton did not err in concluding that Texas failed to meet its burden to establish standing. To satisfy Article III, pled injury "must be an injury in fact," *Stringer v. Whitley,* 942 F.3d 715, 720 (5th Cir. 2019), and alleged future injury must be "imminent," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). In February 2023, Texas claimed injury from the CHNV Program, arguing that as migration to its state increases, so too do costs to the state from providing social services. ROA.337 at ¶ 64. But Judge Tipton concluded that the CHNV Program decreases migration based on record evidence showing that, since the start of the program, total migration from CHNV countries has decreased substantially, as Texas conceded at trial. ROA.11529 ¶ 87. Thus,

17

he committed no clear error in finding that the CHNV Program "has actually lowered [the Plaintiffs'] out-of-pocket costs." ROA.11540-11541. And because Texas bore the burden of proof, Judge Tipton certainly did not err in concluding Texas "failed to prove that it suffered an injury-in-fact for purposes of Article III standing." *Id.*

Texas complains that Judge Tipton erred by looking at too short a time period to assess its standing claims, and by not considering data from September 2023. But Judge Tipton correctly considered all the data in the record, including post-trial data through October 2023 (which necessarily includes September), to assess whether Texas had standing when it filed this case. ROA.11529 ¶ 87; ROA.11633-11634. Texas also attempts to attribute the reduction in CHNV migration to unrelated factors, but the record contradicts these assertions, and, in any event, if true they would fatally undermine Texas's standing altogether: if outside factors explain the reduction in migration at the start of the CHNV Program, then they could also account for any purported rise in migration eight months later. Because Texas bears the burden, its own argument defeats standing.

Under this Court's precedent, Judge Tipton did not err in analyzing Texas's alleged injury by comparing costs to the state *after* implementation of the CHNV Program to its costs *before*, which is how Judge Tipton determined that the program reduces Texas's costs. As Judge Tipton noted, "when deciding whether a state has been injured for Article III standing purpose, the Fifth Circuit reviews whether the numbers

18

of aliens, and the associated amount expended because of them, increased relative to the same numbers prior to the implementation of the challenged program." ROA.11540. Texas relies on this Court's standing rulings in *DAPA, DACA, MPP I,* and *GLO,* but this case differs from all of them because here there is no "comparative rise" in the number of noncitizens in Texas entitled to state-funded services as a result of the CHNV Program, ROA.11536, and thus no corresponding increase in costs to Texas. ROA.11540; ROA.11529 ¶ 87.

Texas attempts to attack Judge Tipton's diligent analysis as an "accounting exercise." But, "as the Court explained, it need not consider . . . offsetting benefits, because Texas has not suffered an injury at all." ROA.11631 (cleaned up). Judge Tipton had no need to analyze reimbursements and other potential offsets of the kind at issue in *DAPA* and elsewhere, and he did not. ROA.11541 n.17. Moreover, even if this Court reads Judge Tipton's analysis as involving an offsets analysis, it was permissible under this Court's precedent because the decrease in net migration resulting from the CHNV Program "arise[s] from the same transaction" as the CHNV Program itself, and therefore must be considered in the standing analysis. *DAPA,* 809 F.3d at 155. Texas attempts to rebut this point by segregating integral features of the CHNV Program, suggesting that the agreement with Mexico that permits removal of certain individuals from CHNV countries can be analyzed separately from the program's parole component. But this ignores Judge Tipton's finding that the agreement with Mexico is

19

"contingent" on the parole provision, ROA.13403 at ¶ 6; 11523 ¶ 34, and also invites the Court to substitute its judgment for that of the federal government in matters of foreign relations, which the Supreme Court has held impermissible. *MPP II,* 597 U.S. at 806.

Texas's other attempts to cure the fundamental problem with its injury theory also fail. Its alternative standing theory—that so long as the CHNV Program allows even one person into the state, it injures Texas, even if the program reduces net migration—breaks truly new ground, as this Court has never found that a state can challenge an immigration policy that *decreases* migration.

Texas also argues that the CHNV Program is somehow "non-enforcement" and therefore "abdication" of the government's obligation to enforce the immigration laws. It never explains how these assertions implicate standing. But in any event the CHNV Program implements statutory parole authority and comports with longstanding practice. Indeed, Texas has never explained how the CHNV Program constitutes "abdication" of authority where it is modeled on the nearly identical Ukraine program that remains in effect (and which Texas never challenged).

**II**. Because Texas failed to establish injury, Judge Tipton did not address the standing requirements of traceability or redressability. But they constitute alternate grounds for affirmance. As the Supreme Court recently held in a very similar case, because Texas's alleged injury results from the government's regulation of others, any

20

indirect financial injury it may suffer is far too "attenuated" to be traceable to the challenged program. *Priorities*, 599 U.S. at 680 n.3. Moreover, because the relief Texas seeks—enjoining the CHNV Program—would *increase* migration, its alleged injury is not redressable. Ultimately, Texas cannot escape the jurisdictional implications of its failure to prove that the CHNV Program increases migration.

**III.** Special solicitude cannot save Texas's case. "Regardless of the applicability of the special solicitude, Plaintiffs must still satisfy the basic requirements of standing," *Louisiana ex rel. Landry v. Biden*, 64 F.4th 674, 683–84 (5th Cir. 2023). Because Texas failed to do so, special solicitude is irrelevant. But even if this Court disagrees, Texas is not entitled to special solicitude here because its claim to a "procedural right" has no limiting principles, it has no "quasi-sovereign interests" to protect here, and it has never disputed the long history of parole programs that predate the CHNV Program.

## ARGUMENT

### I.    Standard of Review.

This Court reviews findings of fact for clear error and questions of law *de novo*. *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000). Clear error review "is a highly deferential standard." *Id.* at 613. "When the district court's account of the evidence is plausible in light of the record viewed in its entirety, this court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Env't Tex. Citizen Lobby v. ExxonMobil Corp.*, 824

F.3d 507, 515 (5th Cir. 2016) (cleaned up). "[J]urisdiction is a legal question. But the facts that underlie a jurisdictional determination are still reviewed only for clear error." *DeJoria v. Maghreb Petroleum Expl., S.A.*, 935 F.3d 381, 390 (5th Cir. 2019).

Denials of FRCP 59(e) motions are generally reviewed for abuse of discretion. *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005). However, Texas waived review of its FRCP 59(e) motion by failing to address it in its brief. *See* Doc. 170; *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal.").[4]

## II.     The Court Did Not Err in Concluding Texas Failed to Meet Its Burden to Show Injury Because the CHNV Program Has Caused a Net Reduction in Migration.

After a full bench trial, Judge Tipton found that the CHNV program decreases migration and therefore reduces Texas's purported costs. That finding is overwhelmingly supported by the record; it certainly was not *clearly erroneous*. Nor does Judge Tipton's ruling contain legal error, as all the standing cases on which Texas relies involve policies that increase migration or otherwise increase its costs. Unsurprisingly, Texas cites no cases where a state established standing to challenge a policy that *decreased* its direct costs. For that reason alone, this Court should affirm.

---

[4] Texas acknowledges that the merits question—whether the CHNV Program comports with federal statutory authority—is not before this Court. *See* Doc. 170 at 2; *cf. Cinel*, 15 F.3d at 1345 (noting that appellants waive issues not raised in their opening brief).

### a.  Texas Bore the Burden to Establish Standing and Failed to Do So.

To have standing to sue in federal court, a party must establish that (1) they have suffered injury in fact which is "concrete and particularized" and "actual or imminent;" (2) the injury is fairly traceable to the challenged action; and (3) it is likely to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[L]ike all injuries supporting Article III standing," threatened future injury "must be an injury in fact." *Stringer*, 942 F.3d at 720. This means the alleged future injury must be "imminent," and thus there must exist at least a "substantial risk" that the injury will occur. *Clapper*, 568 U.S. at 409.

As Judge Tipton correctly held, standing is determined "at the time the case commenced." ROA.11530 (citing *Lujan*, 504 U.S. at 560). Plaintiffs "bear[] the burden of establishing standing as of the time [they] brought th[e] lawsuit and [of] maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020). The evidence required to meet this burden grows as the litigation progresses. *DACA*, 50 F.4th at 513. Because this case went to trial, Texas bore the burden of proving standing by a preponderance of the evidence at trial. ROA.11530 (citing *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd and remanded*, 597 U.S. 785 (2022) ("*MPP I*") (cleaned up)).

Texas filed the operative Complaint on February 14, 2024, alleging harm from the CHNV Program because "as the number of illegal aliens in Texas increases, the number of illegal aliens receiving [] services likewise increases." ROA.337 at ¶ 64. Texas

23

alleged the CHNV Program would increase the number of immigrants residing in Texas and thus increase costs associated with driver's licenses, education, law enforcement, and medical care. *Id.* at ¶¶ 65-70. On the eve of trial, Texas additionally complained of costs associated with individuals paroled through the CHNV Program, regardless of increased migration. ROA.10313 ¶ 76; *see also* ROA.12484:1-3.

After considering extensive evidence from all parties, Judge Tipton correctly found that "the number of CHNV nationals entering the United States has dramatically declined from the date the Program commenced through the last date for which data was received by the Court," ROA.11529 ¶ 87, a finding Texas does not dispute on appeal. Thus, Texas "failed to prove that it suffered an injury-in-fact for purposes of Article III standing" because the CHNV Program "has actually lowered [the Plaintiffs'] out-of-pocket costs." ROA.11540-11541.

Judge Tipton did not err, let alone commit clear error, in his factual findings or his inevitable conclusion that Texas cannot prove harm based on increased migration from a program that decreases migration to the state. The record evidence overwhelmingly established the CHNV Program decreased total CHNV migration; this was true at the time of the filing of the operative complaint through the close of trial, ROA.11529 ¶¶ 85-86, and through the completion of pre-judgment briefing, ROA.11471-72.

Texas nonetheless complains that Judge Tipton's standing analysis was incorrectly based on the "limited period" around the time that Texas filed the operative Complaint, Doc. 170 at 28-29, and Texas otherwise grasps at straws to attribute its lack of injury to outside factors, *id.* These arguments are meritless.

### *Judge Tipton Did Not Clearly Err in Considering All Data in the Record.*

First, as a matter of fact, Judge Tipton committed no clear error in considering the entirety of the data in the record, which included the period "from the date the Program commenced" through October 2023. ROA.11529 ¶ 87 (finding a decrease in CHNV migration from the start of the program "through the last date for which data was received by the Court."); ROA.11471-72 (submitting data through October 2023). Indeed, Texas's assertion that "at the time of trial in summer of 2023, it was plain that the CHNV Program does not reduce illegal border crossings by CHNV nationals," Doc. 170 at 31, is baseless: Texas offers no citation to the record because nothing in the record supports it, as Texas admitted at trial. As Judge Tipton correctly found, "*Plaintiffs agree* that since the implementation of the Program, CHNV nationals have been entering the United States at a lower rate than before." ROA.11529 ¶ 85 (citing trial transcript at ROA.12485:24-12486:7) (emphasis added).[5]

---

[5] To the extent Texas desired to rely on evidence across a different span of time, it could have brought suit at a different time, sought to extend discovery or trial, or not opposed the request to extend the trial date. ROA.9562.

Despite these clear findings, Texas complains that Judge Tipton "set aside" data from one month, September 2023—eight months after implementation of the CHNV Program and seven months after the operative Complaint, which, according to Texas, shows the state's feared harm "came to be." Doc. 170 at 32. But Judge Tipton *did* consider the September 2023 data; he just refused to give it the (illogically) dispositive weight that Texas wants in assessing Texas's standing. ROA.11529 ¶ 87; ROA.11633-11634. This was not clear error.

In support of its argument, Texas cites a graph purporting to show DHS's encounter data from the relevant time period. Doc. 170 at 32. But that graph only includes data through September 2023, whereas in fact Judge Tipton considered data through the *following month*—October 2023 (the start of FY 24). In that month, encounters were below pre-CHNV Program levels. The graph below, of which Judge Tipton took judicial notice, ROA.11515-11517, includes October 2023—the last month for which data was available at the time post-trial briefing concluded (represented by the orange dot at the top left).



ROA.11472.

As this graph illustrates, September 2023 was an outlier; total CHNV encounters remained below pre-CHNV Program levels during every other month from January through October 2023. *Id.* It was not clear error for Judge Tipton to consider *all* the data, including data from October 2023, and conclude that any temporary rise that occurred in September—eight months after the program's implementation—was insufficient to show that the CHNV Program increases migration. *See* ROA.11264-11268. Indeed, any temporary rises that occurred eight months after implementation

27

must be considered in the context of other intervening factors—only further illustrating just how difficult it is for Texas to prove standing. *See* ROA.11264-11268; ROA.11470-11473.

On appeal, Texas requests that this Court do exactly what Judge Tipton rightly refused. Texas urges this Court to *ignore* trial record evidence showing a sharp net decrease in migration just after program implementation in January 2023, continued net decrease in migration during and after the filing of the operative Complaint in February 2023, and continued decrease through trial in August 2023. Texas then asks this Court to *consider in isolation* data from September 2023, and then once again *ignore* data from October 2023 showing another net reduction in total CHNV migration compared to before the CHNV Program. It was not clear error for Judge Tipton to reject that illogical approach. *Cf. MPP I*, 20 F.4th 928 at 967 ("[T]he task of evaluating competing statistics is precisely the kind of task a district court is best situated to undertake.").

*Judge Tipton Correctly Concluded Standing Cannot Be Established Retroactively.*

Judge Tipton correctly concluded that standing is assessed when the operative Complaint is filed, during which time total CHNV migration was plummeting. ROA.11535 n.14; ROA.11528 ¶¶ 78-80; ROA.11632-11634. As discussed, Texas asks this Court to ignore Judge Tipton's findings of fact on this point, and retroactively impute imminent harm based *only* on data from September 2023.

None of the cases Texas cites show that it can establish standing retroactively. Doc. 170 at 31. In *Crawford v. Hinds County Bd. of Supervisors*, 1 F.4th 371 (5th Cir. 2021), which concerned the alleged inaccessibility of jury service to a disabled individual, the Court considered *past* instances of the threatened injury as well as the likelihood of the injury *repeating* in light of population size and other factors, in determining that the threatened future injury was sufficiently imminent to establish standing. *Id.* at 376. The majority declined to consider occurrences of alleged injury after the filing of the operative complaint. *See id.*; *see also id.* at 377. Here, Texas has not shown any injury, including from before the operative Complaint—let alone injury that is likely to repeat. Similarly, in *Dep't of Com. v. New York*, 588 U.S. 752 (2019), which concerned the legality of a plan to add a citizenship question in the 2020 census, the feared harm—a depressed census response rate—could not have possibly come to pass before the administration of the Census itself. *Id.* at 766-67. The Supreme Court affirmed the district court's conclusion that evidence at trial "established a sufficient likelihood" of the future harm coming to fruition because "these findings of facts were not so suspect as to be clearly erroneous." *Id.* at 767. Here, Judge Tipton did not need to predict whether Texas' alleged harms would come to pass; the program was already running, and it already had evidence sufficient to show the program's actual effects.

*Outside Factors Do Not Explain Texas's Lack of Injury from the CHNV Program.*

Unable to dispute evidence of reduced CHNV migration, Texas asks this Court to look beyond Judge Tipton's factual findings by attributing the impact of the CHNV Program to seasonal migration and other factors. Doc. 170 at 29-30. But Texas can point to no evidence in the record to justify second-guessing Judge Tipton's assessment.

Indeed, a wealth of other evidence supports the conclusion that seasonal variation simply does not explain the drop in CHNV migration. As economist amici explained in their brief in the district court, "[t]he reduction [in the number of CHN nationals encountered between ports of entry] occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop[.]" ROA.13412 ¶ 26. In fact, *total* encounters of individuals from Cuba, Haiti, and Nicaragua dropped dramatically in the month just after the programs for those countries began: CHN encounters dropped from over 80,000 in December 2022 (before implementation) to about 20,000 in January 2023 (first month of implementation). ROA.9915. One year earlier, encounters for the same population during the exact same season had fallen "only slightly" from December 2021 to January 2022. One year before that, encounters with the same population during the same period *rose* 38 percent from December 2020 to January 2021. *Id.* n.9. Nor do weather changes explain why apprehensions of individuals from other countries rose sharply between June and July 2023 while CHNV apprehensions continued to drop during the same period, as demonstrated by Texas's

own graphs. *Compare* graph, ROA.11089, *with* graph, ROA.11093. Judge Tipton did not commit clear error in refusing to accept Texas's convoluted attempts to explain away this evidence.

Texas also argues that there is "no reason to deduce that any decrease in border crossings . . . was caused by the Program, rather than other factors," Doc. 170 at 29, but that argument fatally undermines Texas's own theory of standing. Texas posits numerous external factors that could have led to changes in migration patterns *immediately* following implementation of the CHNV Program. Doc. 170 at 29-30. But the same factors could just as well explain a one-month increase in CHNV migration that occurred *eight months* later, on which Texas's argument relies. Because Texas bears the burden of proof, *Lujan*, 504 U.S. at 560, its own arguments show Texas has failed to establish standing.[6]

*Judge Tipton Rightly Considered the United States-Mexico Agreement Part of the CHNV Program.*

Texas also renews its attempt to make the net reduction in migration go away by segregating the part of the CHNV Program that involves an agreement with Mexico, Doc. 170 at 20, but Judge Tipton did not clearly err in finding that the CHNV Program

---

[6] Notably, after arguing at length that Judge Tipton was *prohibited* from considering relevant factors to ascertain Texas's actual costs from the CHNV Program, *see* Doc. 170 at 17-22, Texas incongruently argues that Judge Tipton erred in *not considering* outside factors that may have influenced reduced migration, *id.* at 29. Texas's contradictory arguments illustrate its failure to identify a shred of clear error in the findings.

explicitly incorporates an agreement with the Government of Mexico. As he found, that agreement facilitates the removal to Mexico of individuals from CHNV countries if they enter the United States without authorization, in exchange for the availability of the parole pathways. ROA.11522 ¶ 33 ("[B]ecause the Program would require CHNV nationals to enter the United States via an interior port of entry – as opposed to traveling through Mexico to reach the Southwest border – the Government of Mexico agreed to accept returns or removals of CHNV nationals encountered at the Southwest border while the program was in effect."); ROA.11523 ¶ 34 ("[The Government of Mexico's] willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes[.]"). Absent that agreement, many of those individuals would not be removable from the United States. ROA.11519 ¶ 10 ("This increase [in CHNV encounters at the border] has been especially challenging because it is difficult for DHS to remove CHNV nationals to their home countries."); *see also* ROA.13412 ¶ 25; ROA.14017. In other words, the CHNV Program has facilitated a foreign relations agreement that permits DHS to remove to Mexico individuals from CHNV countries who otherwise are difficult to remove in exchange for DHS creating the parole pathways.

Moreover, as the record reflects, the program disincentivizes unauthorized entry with harsh ineligibility criteria, *supra* pp. 7-8, including requirements that, as Judge Tipton found, result in individuals being denied parole. ROA.11521-11522 ¶¶ 28-29.

Additionally, the program incentivizes individuals to pursue the parole pathway it creates by offering pre-authorization for air travel to an interior port of entry, allowing applicants to avoid the perilous journey to the Southwest border. ROA.11519 ¶ 14. Together, these program features have reduced the total number of individuals from CHNV countries approaching the Southern border, and, due to the agreement with Mexico, it has reduced how many of those who do come to the Southwest border are conditionally released into the United States after unauthorized entry. ROA.13413-13414 ¶¶ 29-31.

Ultimately, Texas seeks to cure its standing defects by asking this Court to contort caselaw and second-guess Judge Tipton's rigorous assessment of evidence that unequivocally shows a net decrease in CHNV migration since the commencement of the CHNV Program. Texas cannot justify this extraordinary departure from the norm of leaving such assessments to the district court. *MPP I*, 20 F.4th 928 at 967.

### b. The Court Did Not Err in Considering Reduced Net Migration.

Texas also asserts that Judge Tipton committed legal error by considering evidence of the program's overall impact on the source of injury that Texas claimed—the presence of CHNV nationals within its borders—deriding that analysis as an impermissible "accounting exercise.". Doc. 170 at 14. This argument is likewise meritless. Judge Tipton committed no error in concluding that Texas failed to meet its burden to show injury from the CHNV Program because, "when deciding whether a

33

state has been injured for Article III standing purpose, the Fifth Circuit reviews whether

the numbers of aliens, and the associated amount expended because of them, increased

relative to the same numbers prior to the implementation of the challenged program."

ROA.11540. Indeed, the cases Texas cites concern challenged programs or conduct that

increased the number of noncitizens eligible for certain state-funded services, and thus

were found to increase costs to the state. *See, e.g.*, *MPP I*, 20 F.4th 928 at 941. As Judge

Tipton correctly concluded, this case differs from *DAPA*, 809 F.3d 134*, DACA*, 50

F.4th 498, *MPP I*, 20 F.4th 928, and *Texas Gen. Land Office v. Biden*, 71 F.4th 264 (5th

Cir. 2023) ("*GLO*"), because here there is no "comparative rise" in the number of

noncitizens as a result of the CHNV Program, ROA.11536, and thus no corresponding

increase in costs to Texas. ROA.11540; ROA.11529 ¶ 87. Unsurprisingly, Texas has

cited to no case where a state established standing to challenge a program that *decreased

its direct costs*.

*Judge Tipton Correctly Compared Alleged Costs to Texas Before and After the CHNV Program.*

Judge Tipton employed a baseline measure required by this Court's cases by

comparing migration levels before and after the challenged program. Texas asserts this

is wrong, citing *MPP I* for support. Doc. 170 at 18. But there, this Court found no clear

error in the district court's conclusion that the termination of the Migrant Protection

Protocols, a policy pursuant to which individuals seeking asylum near the Southwest

border were returned to Mexico for the pendency of their proceedings, "ha[d] increased

34

the number of [noncitizens] released on parole into the United States, including [to the plaintiff states]." *MPP I*, 20 F.4th at 966. As Judge Tipton noted, ROA.11538, this Court labeled that "the district court's most important finding." *Id.* Texas's attempt to distinguish *MPP I* is fruitless; nothing in Judge Tipton's Opinion suggests he even considered, let alone "focused on each and every economic aspect of immigration." Doc. 170 at 26; *see* ROA.11511-11541. He simply assessed whether immigration itself had increased or not. Similarly, in *GLO*, this Court's finding of injury in fact was based on a determination that the challenged conduct—halting construction of the border wall—"increased [unauthorized] immigration" compared to before. 71 F.4th 273. This Court affirmed based on the alleged costs to Texas from unauthorized migration "relative" to what they would be if the challenged conduct came to pass. *Id.* at 272.[7]

The other cases Texas cites also found standing because the challenged programs increased the number of people on whom plaintiff states would expend resources as compared to before the program. In *DAPA*, plaintiff states challenged the creation of

---

[7] Texas claims the *GLO* court "treated the question of whether there was a 'net increase' [of migration] as one of redressability—not injury," Doc. 170 at 27 (emphasis added); *see also id.* at 37 (asserting "whether illegal immigration will decrease [was] a question of *traceability*, not injury") (emphasis added), but that distinction does not help Texas here, as it has to show traceability as well. *See infra* Argument Section III(a). In any event, Judge Tipton was right to draw the analogy, as he was extremely familiar with this Court's *GLO* opinion: the same day he issued the opinion on appeal here, he granted Texas's request for a preliminary injunction in *GLO*. No. 7:21-CV-00272, 2024 WL 1023047 (S.D. Tex. Mar. 8, 2024).

a prosecutorial discretion program, alleging injury based on costs Texas would incur from issuing driver's licenses to beneficiaries. 809 F.3d 134. The district court found the program would benefit an estimated 500,000 noncitizens in Texas who would be newly eligible for driver's licenses under state law. *Id.* at 155. This Court affirmed because it was undisputed that the challenged program would *increase* the number of noncitizens eligible for driver's licenses, which the district court found would result in "a financial loss" for Texas. *Id.* Similarly, in *DACA*, no party disputed that Texas had already incurred costs from the challenged prosecutorial discretion program. 50 F.4th at 517.

In other words, in every case where plaintiff states have established standing to challenge a federal immigration policy, they showed increased migration to the states or an increase in the number of noncitizens eligible for state services, and therefore increased costs. By contrast, here, Judge Tipton conducted a rigorous analysis of the record evidence, compared overall migration levels before and after the challenged action, and correctly found that "since the implementation of the Program, CHNV nationals have been entering the United States at a lower rate than before." ROA.11529 ¶ 85. Thus, Judge Tipton did not clearly err in concluding the CHNV Program "has actually lowered [Texas's] out-of-pocket costs." ROA.11541. As he noted, this "conclusion is grounded in the way that the term 'harm' has long been understood in the immigration context: relative to the status quo, and relative to Plaintiff's position

36

absent the challenged policy." ROA.11536. In short, the district court committed no

error in concluding that "Texas is not financially harmed by the program." *Id.*

Texas attempts to avoid this basic problem by claiming that Judge Tipton

analyzed the decrease in migration from CHNV as an "offset," and that this constituted

an impermissible "accounting." Doc. 170 at 14-16. That mischaracterizes both the

ruling and this Court's caselaw. Judge Tipton made explicit that he did *not* have to assess

offsets to Texas's alleged injury because Texas never established injury in the first place.

"[A]s the Court explained, it need not consider Defendants' other argument, including

with respect to offsetting benefits, because Texas has not suffered an injury at all."

ROA.11631 (cleaned up). Indeed, Judge Tipton did not consider record evidence of

reimbursements and other revenues that offset Texas's purported costs because Texas

failed to establish injury. ROA.11541 n.17.

Texas's "accounting" argument also mischaracterizes this Court's law. In its

recent state standing decision in *Louisiana Dep't of Wildlife and Fisheries v. Nat'l Oceanic &*

*Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023) ("*LDWF*"), this Court affirmed the

district court's conclusion that Louisiana failed to establish standing because the

allegations that the challenged rule "could substantially burden and interfere with

LDWF Enforcement's ability to effectively perform its various other enforcement

duties," along with other unsupported allegations, were too speculative to prove that

the challenged rule would "increase LDWF enforcement costs." *Id.* at 881. This Court

required Louisiana to show that the challenged program would require it to spend more money, and the state's failure to establish increased costs arising from the challenged rule defeated standing. Texas's only response—that *LDWF* says "nothing about this Court's 'no accounting' rule," Doc. 170 at 27—is exactly the point: the district court need not engage in "accounting" when the plaintiff fails to establish injury in the first instance.

Recent Supreme Court authority also counsels against accepting Texas's extraordinarily broad theories premised on the false assertion that "standing is not the bar to jurisdiction the district court made it out to be." Doc. 170 at 14. Last year, in *Priorities*, the Court rejected an overbroad standing theory Texas had advanced to challenge a policy directed at third parties. 599 U.S. 670. *See also infra* Section III(a). Then, just weeks ago, the Supreme Court unanimously held that plaintiff doctors and medical associations that challenged FDA actions concerning abortion medication lacked standing because they were "unregulated parties" challenging the federal government's regulation "*of others,*" who could not prove direct harm caused by the challenged action. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 386, 392-93 (2024). As the Court cautioned, failure to enforce prescribed limits on standing could result in "an unprecedented and limitless approach" to federal lawsuits. *Id.* at 391. And two weeks later, in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), the Court rejected another broad standing theory that eroded Article III limitations in a case brought by states to

challenge the federal government's actions directing social media companies to vet information, noting "[t]his Court has 'never accepted such a boundless theory of standing.'" *Id.* at 1996 (internal citations omitted).

Texas's novel view that it can challenge any program that causes even a single person to enter the state, even if that program drastically reduces its costs, is yet another such "limitless" approach. Judge Tipton's meticulous analysis rejecting that theory is entirely consistent with recent Supreme Court precedent.

*The Net Reduction in Migration Is Part of the Same Transaction as the CHNV Program.*

Nonetheless, to the extent this Court considers the analysis below to involve an offsets exercise, Judge Tipton did not err. This Court's precedent allows such an analysis because the decrease in net migration resulting from the CHNV Program "arise[s] from the same transaction" as the CHNV Program itself, and therefore must be considered in the standing analysis. *DAPA*, 809 F.3d at 155.

In *DAPA*, the federal defendants challenged the plaintiff states' standing by pointing to "offsetting" benefits of the costs to the state. *Id.* This Court refused to factor "offsets" to driver's license costs into the standing analysis because the downstream "benefits to the state," such as vehicle registration fees, were not "sufficiently connected" to the costs of issuing driver's licenses. *Id.* at 156. In doing so, *DAPA* distinguished *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002), where the offsetting costs in question "involved a much tighter nexus" and, therefore, had to be

considered. *DAPA*, 809 F.3d at 156. *Henderson* concerned a challenge to a Louisiana statute authorizing the issuance of pro-life automobile license plates. 287 F.3d at 376-77. The Fifth Circuit held that the individual plaintiffs, who complained of the use of their tax money to distribute the license plates, lacked standing in part because the fees that consumers pay in exchange for the license plates "offset the administrative cost" of producing them; thus, there was no basis to conclude the license plates cost the state more on net. *Id.* at 379.

Here, as discussed *supra* pp. 31-33, the factors contributing to a net decrease in migration from CHNV countries are a part of the "same transaction" as the CHNV Program itself. *DAPA*, 809 F.3d at 155. The CHNV Program itself incorporates an agreement with the Government of Mexico as well as other criteria that incentivize use of the program and disincentivize unlawful migration, all of which have resulted in decreased overall migration of individuals from CHNV countries. Because these factors are part of the same transaction as the CHNV Program itself, they are a *direct* "offset" to the purported costs that arise from migration via the CHNV Program. Under this Court's decisions in *DAPA* and *Henderson*, Texas's alleged injury is "insufficient to confer standing." *Henderson*, 287 F.3d at 381.

Texas makes several attempts to refute the tight connection between the different features of the CHNV Program, but each fails.

First, Texas insists this Court must disregard the decrease in migration from CHNV countries because it disagrees with some aspects of DHS's negotiations with Mexico, which it claims is separately responsible for the decrease. *See* Doc. 170 at 20 (first questioning the existence of the agreement and then complaining "no State was consulted—let alone regarding what *quid* DHS should offer in return for Mexico's implicit *quo*"). As discussed, there is no clear error in Judge Tipton's findings that the CHNV Program "was conditioned on an agreement with Mexico," whereby "the Government of Mexico agreed to accept returns or removals of CHNV nationals encountered at the Southwest border while the Program was in effect." ROA.11522 ¶ 28; *see supra* pp. 31-33.

Rather than identify clear error in Judge Tipton's analysis, Texas asks this Court to impermissibly substitute its judgment for that of the federal government in matters of foreign relations. But the Supreme Court has rejected Texas's attempts to limit the federal government's authority to manage such agreements. When the Supreme Court reversed this Court in *MPP II*, it recognized, "[t]he Executive therefore cannot unilaterally return these migrants to Mexico," 597 U.S. at 806, but instead must negotiate with Mexico to do so. Thus, where "Article II of the Constitution authorizes the Executive to 'engage in direct diplomacy with foreign heads of state and their ministers,'" courts cannot interfere with that authority. *Id.* at 805 (quoting *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015)). Indeed, courts must "avoid the danger of unwarranted

41

judicial interference in the conduct of foreign policy" and "decline to run interference in the delicate field of international relations without the affirmative intention of the Congress clearly expressed." *Id.* at 805 (cleaned up); *see also Priorities*, 599 U.S. at 679 (noting the foreign policy considerations that caution in favor of the Executive Branch retaining discretion). Because this case implicates "the Executive's ability to conduct diplomatic relations with Mexico," this Court should decline to substitute its judgment for that of the federal government's. *MPP II*, 597 U.S. at 806; ROA.13401-13424; ROA.13425-13428.

Second, Texas argues that it would prefer a different policy to deter unauthorized migration, insisting "[i]ndividuals unlawfully present in the United States should be incarcerated." Doc. 170 at 22. But Texas's policy preferences cannot confer standing, and the Supreme Court has repeatedly rejected Texas's attempts to micromanage Federal Defendants' immigration enforcement policies, whether on standing or the merits. *See Priorities*, 599 U.S. at 678-80 (finding plaintiff states failed to establish standing in part because, notwithstanding the detention provisions at 8 U.S.C. §§ 1226(c) and 1231(a)(2), lawsuits challenging the federal government's insufficient number of arrests or prosecutions infringe on the Executive's Article II authority); *MPP II,* 597 U.S. at 802-05 (rejecting argument that the detention provision at 8 U.S.C. §

1225(b)(2)(A) requires the federal government to return individuals not detained to Mexico under an otherwise discretionary authority).[8]

Finally, Texas attempts to falsely distinguish individuals based on their manner of entry into the United States, arguing individuals who seek to enter via the Southwest border are of a different "category" than those who enter through the CHNV Program. Doc. 170 at 22. But this fundamentally misunderstands the CHNV Program, which offers a lawful pathway to the same individuals who would otherwise seek to enter the United States via the Southwest border. This is no doubt why it has produced a substantial reduction in border migration since it began. ROA.11528-11529 ¶¶ 76-87.

Texas grossly mischaracterizes Intervenor Defendant Eric Sype's testimony to try to square its unfounded comparison, asserting that the individual Mr. Sype sponsored "would not have entered Texas" if not for the CHNV Program. Doc. 170 at 23. But Mr. Sype's actual testimony does nothing for Texas. True, Mr. Sype testified that his close friend Oldrys had never been to the United States before the CHNV Program. ROA.12071. Beyond that, Mr. Sype simply testified that Oldrys "was looking for . . . more opportunities to provide for his family . . . in whatever way he could," but

---

[8] To the extent Texas differentiates between CHNV Program entrants and those who enter through the Southwest border in an effort to distinguish costs imposed by each so-called "category," this argument is not properly before this Court because Texas "forfeited" it by not raising it below. *See, e.g., E.T. v. Paxton*, 41 F.4th 709, 716-17 (5th Cir 2022).

that he did not have knowledge of other plans that Oldrys may or may not have had to come to the United States. ROA.12070-71. Mr. Sype's testimony confirms simply that Oldrys utilized the CHNV Program; it does not disprove what the overwhelming data shows—that the program decreases migration from CHNV countries to the Southwest border. It most certainly was not clear error for Judge Tipton to decline to draw any conclusion to the contrary from the testimony.

Judge Tipton followed this Court's rulings in considering net migration of individuals from CHNV countries before and after the challenged program and did not err in concluding that Texas failed to establish injury where the record reflects a total decrease in CHNV migration.

### c. Texas's Non-Enforcement and Abdication Arguments Are Meritless.

Texas also asserts it has standing because the CHNV Program somehow involves non-enforcement of immigration law that amounts to abdication. Doc. 170 at 24. This argument is utterly meritless. The program at issue *in this case* is premised on longstanding statutory parole authority, not prosecutorial discretion. And even if these arguments somehow had merit, they would not change the fact that Texas failed to establish injury and therefore lacks standing.

First, it is not clear what Texas's arguments concerning abdication have to do with standing. Neither *Priorities* nor *Heckler v. Chaney*, 470 U.S. 821 (1985), held that a

state could show *standing* on an "abdication" theory. *Priorities*, 599 U.S. at 681 (citing *Heckler*, 470 U.S. at 833 n.4). *Heckler* was not about standing at all, but rather the reviewability of a decision not to enforce based on discretion. Similarly, while *Priorities* hypothesized that an "extreme case of non-enforcement" whereby "the Executive has entirely ceased enforcing the relevant statutes" "*might* change" its standing analysis, it did not suggest that such a showing would absolve states of the need to show injury, causation and redressability. *Priorities*, 599 U.S. at 682-83. Here, Texas does not challenge any non-enforcement decision—it challenges the substantive lawfulness of what the Executive has done, not its refusal to act.

Second, even if these are standing arguments, they fail on their own terms. Texas seeks to analogize CHNV to DAPA, which it claims was a "non-enforcement policy" that also conferred benefits, Doc. 170 at 24. But the CHNV Program is not a non-enforcement policy at all. Unlike DAPA, the CHNV Program does not purport to involve an exercise of prosecutorial discretion or other deferred action authority; it involves the exercise of longstanding authority conferred by federal statute. *See* 8 U.S.C. § 1182(d)(5) (explicitly authorizing the parole of otherwise inadmissible noncitizens under certain conditions). The CHNV Program is also distinct in that it serves as a tool for the Executive to manage foreign relations and migration flows, not just enforcement resources. *See supra* pp. 31-33; 41-42.

Finally, to the extent Texas argues the CHNV Program is an abdication of Federal Defendants' duties under the *parole* statute, Texas has never disputed record evidence showing that the CHNV Program operates on a model the agency has used for decades—including since the most recent amendments to the statute—without congressional disapproval. ROA.9386-9405. Texas acknowledges the CHNV Program was "modeled off recent programs" created for Ukraine, ROA.333 ¶ 43, but never explains how this Court could find a widely utilized model to constitute "extreme" abdication.[9] That its theory would invalidate various other programs Texas never challenged shows the CHNV Program does not come close to "extreme" non-enforcement.

Texas's reliance on *MPP I*'s alleged condemnation of "en masse" parole is equally unavailing. *See, e.g.,* Doc. 170 at 24-25 (citing *MPP I*, 20 F.4th at 942). As an initial matter, the scale of the parole program at issue is irrelevant to the *standing* inquiry, where Texas has otherwise failed to prove actual injury. In any event, Texas relies on portions of this Court's opinion that are tethered to its statutory interpretation, which the Supreme Court reversed and, as this Court has acknowledged, are not good law. *Compare, Data*

---

[9] At most, Texas suggests that what the Executive has "abdicated" is the "limiting provisions of the parole statute," Doc. 170 at 24 (cleaned up), but that is just a restatement of Texas's disagreement with the Executive's understanding of the parole authority. If that were enough to show an abdication, every plaintiff could recast virtually any statutory interpretation issue into one of alleged abdication.

*Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022) ("Our rule on orderliness requires us to follow the panel opinion [in *MPP I*] except for the portions of it on statutory interpretation and final agency action."), *with MPP II*, 597 U.S. at 807 ("[T]he availability of the parole option additionally makes clear that the Court of Appeals erred in holding that the INA required the Government to continue implementing MPP.").

Thus, Texas's non-enforcement and abdication arguments cannot remedy its fatal standing defects.

******

Texas has utterly failed to meet its burden to prove any injury from the CHNV Program, thus it has failed to prove standing. This Court should affirm.

## III.    Texas Failed to Prove Traceability or Redressability.

Because Texas failed to prove injury, the district court had no need to determine whether it satisfied the traceability or redressability requirements of Article III standing. The reason for this is obvious—an alleged injury cannot be "likely caused by the defendant" or "likely be redressed by judicial relief" if there is no injury to begin with. *See, e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). However, even if this Court disagrees with Judge Tipton's injury analysis, it still can "affirm on any ground supported by the record." *Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014). The

record here reveals distinct traceability and redressability defects. Should the Court reach those issues, it should conclude that Texas has failed to carry its burden.

### a. Texas Failed to Prove Traceability.

First, Texas's alleged harm is not traceable to the CHNV Program. "When a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, *much more* is needed to establish standing" than in a case where the plaintiff is herself regulated by the action. *Priorities*, 599 U.S.. at 678 & n.2 (emphasis added) (cleaned up). When states complain only of "indirect effects on state revenues or state spending . . . standing can become more attenuated." *Id.* at 680 n.3; *accord FDA.*, 602 U.S. at 383 ("The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."). Here, Texas complains exclusively of "indirect effects on state revenues or state spending" arising from a policy that implements the Executive's statutory authority to exercise discretion over whom to parole, how to manage the border, and how to conduct foreign affairs. Like the policy at issue in *Priorities*, the CHNV Program does not exercise coercive authority over Texas. *See* 599 U.S. at 678. Thus, as in *Priorities* and *FDA*, Texas's burden to show causation is heightened, and the alleged indirect injuries are too "attenuated" to establish standing. ROA.10836-10837.

48

Notwithstanding these recent cases, Texas claims that any "connection need not be direct." Doc. 170 at 37. Texas cites *Dep't of Com.*, 588 U.S. at 768 for this proposition, arguing that "New York could establish standing based on its claim that a likelihood of aliens refusing to respond to census takers might result in diminished federal funding from Congress." Doc. 170 at 38. But *Dep't of Com.* also made clear that "Respondents' theory of standing . . . does not rest on mere speculation about the decisions of third parties; it relies instead on the *predictable effect* of Government action on the decisions of third parties." 588 U.S. at 768 (emphasis added). Here, there is ample record evidence as well as *Texas's own admissions* at trial demonstrating that CHNV does not "predictabl[y]" increase migration; in fact, encounters have decreased following implementation of the challenged program. *See supra* pp. 14-15. Thus, unlike in *Dep't of Com.* where "respondents . . . met their burden of showing that third parties will likely react in predictable ways to the citizenship question," 588 U.S. at 768, here there was no "predictable effect" that encounters would once again rise, let alone rise to a higher level than prior to the program's implementation. Instead, Judge Tipton found the opposite: that the program reduced migration and corresponding costs to Texas. *See supra* pp. 15-16.

Even setting aside the proven net decrease, Texas's purported injury is still too speculative where it never offered any evidence that it sustained harm from even a single CHNV Program beneficiary. Instead, Texas offered unsubstantiated suppositions: that

some number of beneficiaries *may* settle in Texas and that, notwithstanding work authorization and sworn sponsorship, they *may* solicit state benefits at a scale that *may* strain the state's finances. This conjecture is far too speculative and attenuated to establish Article III standing. *Priorities*, 599 U.S. at 680 n.3; *see also Clapper*, 568 U.S. at 410 ("[A] theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending.").

Texas's notion of standing would create absurd results. As in *FDA*:

> [T]here would be no principled way to cabin such a sweeping doctrinal change . . . . That path would seemingly not end until virtually every citizen [or state] had standing to challenge virtually every government action that they do not like—an approach to standing that this Court has consistently rejected as flatly inconsistent with Article III.

602 U.S. at 392 (alteration added). As a vital element of standing, traceability cannot be "approached at a high level of generality," *Murthy*, 144 S. Ct. at 1987, and courts must ensure not to "gloss over complexities in the evidence." *Id.* at 1988. Texas would have this Court do exactly that. Under *Priorities* and *FDA*, Texas has failed to show traceable injury. This constitutes an independent basis on which to affirm.

**b. Any Purported Injury Would Not Be Redressable.**

Texas also suffers from a separate redressability problem. Texas's argument for injury is based on the proposition that "even one person paroled into Texas" under the CHNV Program "causes Texas to sustain an injury for standing purposes." Doc. 170 at 17. This theory of injury is wrong for the reasons described *supra* Argument Section

II, but it also gives rise to a distinct deficiency on redressability. The relief Texas seeks is an injunction ending the CHNV Program. Yet, per Judge Tipton's factual findings, enjoining the CHNV Program would *increase* migration flow from CHNV countries, which would result in greater, not lesser, "financial injury" to Texas. Indeed, the record shows Texas's alleged costs would increase if the CHNV Pathways are blocked. *E.g.*, ROA.13417-13418 ¶¶ 39-40, 48-61. Even if it were somehow true that Judge Tipton should have ignored the fact that the CHNV Program decreases migration for purposes of the *injury* analysis, that fact remains critical for *redressability*; the relief Texas seeks will not redress the harm it asserts.

Texas's fallback argument fares no better. It claims that "overall immigration flows . . . would have decreased even more if the unlawful CHNV Program were enjoined," ROA.11631 n.2, but not an iota of record evidence supports such speculation, and Judge Tipton's conclusion to the contrary most certainly was not clear error, *id.* ("Plaintiff[s] failed to prove that fact at trial and would have the Court assume as much. At no point, including on reconsideration, have Plaintiffs identified evidence to support this assertion.").

Accordingly, because Texas's alleged injury "is not the kind redressable by a federal court," Texas lacks Article III standing for distinct reasons. *Priorities*, 599 U.S. at 678; *see also Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61).

To the extent this Court reaches the issues, Texas has failed to demonstrate traceability and redressability. This Court can affirm the decision below on this independent ground as well.

## IV.    Special Solicitude Cannot Cure Texas's Standing Defects.

The district court correctly rejected Texas's claims to special solicitude, because "[r]egardless of the applicability of the special solicitude, Plaintiffs must still satisfy the basic requirements of standing." *Louisiana*, 64 F.4th at 684; *see also LDWF*, 70 F.4th at 882 ("[Special solicitude] . . . does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and particularized."). If relevant at all, special solicitude *may* impact the analysis regarding "redressability and immediacy," *DACA*, 50 F.4th at 514 (quoting *Massachusetts v. EPA*, 549 U.S. 497 at 517-18 (2007)); *see also DAPA*, 809 F.3d at 152-53 (highlighting the *injury* to the state's fisc and "quasi-sovereign interests" as a justification and prerequisite to invoke special solicitude, and finding that the plaintiff states were asserting "institutional *injury* to their lawmaking authority" (emphasis added). Thus, Judge Tipton correctly distinguished Texas's claims to injury in fact from its claims to special solicitude. ROA.11531. Because Judge Tipton correctly found that Texas failed to establish injury, ROA.11541; *supra* pp. 15-16, Argument Section (I)(a), special solicitude is irrelevant, and Texas's reliance on the *DACA* and *DAPA* cases, Doc. 170 at 16, is misplaced. This is even more true now

because the doctrine may be obsolete. *Priorities*, 599 U.S. at 687 (Gorsuch, J., concurring).

In any event, Texas cannot satisfy the factors this Court considers for special solicitude: a "procedural right to challenge the action in question" and an impact on the state's "quasi-sovereign interests," *DACA*, 50 F.4th at 514. Inasmuch as it argues that its inability to file comments regarding the CHNV Program constituted a violation of a "procedural right" that is "plainly injury," Doc. 170 at 34, states would always have standing to bring challenges to agency actions based on hollow allegations alone. This cannot be. Texas is also incorrect that the CHNV Program implicates "quasi-sovereign interests." Doc. 170 at 35. As an initial matter, Texas's argument that it has a quasi-sovereign interest in the "'economic well-being' of [its] 'citizens,'" who it claims are "obviously injured by the influx of tens of thousands of competing workers," *id.* at 36, as well as its claim that the Program causes it to suffer "significant monetary injury" by requiring it to "pay millions to provide services to CHNV nationals," *id.*, are premised on its disproven theory that the CHNV Program leads to a net increase in migration to the state. *See* ROA.11540; *supra* pp. 14-15, Argument Section (II)(a). Additionally, Texas's argument that the program implicates its quasi-sovereign interests because preemption prohibits it from changing "classifications" of parole recipients, Doc. 170 at 36, also has no limiting principles. By Texas's logic, states would *always* have standing

to challenge any federal immigration policy, regardless of whether it has proven injury. Again, this cannot be.

Texas further complains that its sovereignty is implicated by DHS's implementation of the CHNV Program, which it contends amounts to a failure to enforce federal law. Doc. 170 at 22. To the contrary, the Program is based on the longstanding parole authority granted by Congress, and DHS enforces federal law under the parole statute when it considers applicants for parole through the Program. *See supra* pp. 7-9, 45-46. Moreover, Texas is not entitled to special solicitude because the CHNV Program has no "direct effect on [its] law or policy." *Louisiana*, 64 F.4th at 683 (finding Louisiana's challenge to a federal policy that applied "only to federal executive departments and agencies" and provided "no substantial pressure for [states] to change *their* laws" "lack[ed] the hallmarks of a state's 'special solicitude'").[10]

Special solicitude did not save Texas's standing in *Priorities*, in which the majority declined to entertain the theory at all. *See* 599 U.S. 670; *see also id.* at 689 ("[I]t's hard not to think . . . that lower courts should just leave that idea [of special solicitude] on the shelf in future [years].") (Gorsuch, J., concurring). Nor did it cure state plaintiffs'

---

[10] Moreover, Texas's interests are in "the well-being of its *populace*," which "include interests in the health and well-being—both physical and economic—of its *residents*." *DACA*, 50 F.4th at 514 (emphasis added). Texas cannot assert a "quasi-sovereign interest" in discriminating against one group of residents—certain noncitizens lawfully residing in the state through parole—to the alleged benefit of another group of residents.

standing defects in *Murthy*. 144 S. Ct. 1972. Similarly here, Texas cannot avail itself of

special solicitude where the district court correctly found Texas has suffered no injury

at all.

The district court did not err in rejecting Texas's claims to special

solicitude.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Dated: July 26, 2024               Respectfully submitted,

*s/ Monika Y. Langarica*
Monika Y. Langarica
Ahilan Arulanantham
Talia Inlender
Sofía López Franco
Center for Immigration Law and Policy
UCLA Law
385 Charles E. Young Dr. E., Box 951476
Los Angeles, CA 90095
(310)983-3345

Esther H. Sung
Karen C. Tumlin
Laura Flores-Perilla
Brandon Galli-Graves
Vanessa Rivas-Bernardy
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323)316-0944

Javier Hidalgo
RAICES
P.O. Box 786100
San Antonio, TX 78278
(210)610-6143

*Counsel for Intervenor Defendant Appellees*

**CERTIFICATE OF SERVICE**

I, Monika Y. Langarica, hereby certify that on July 26, 2024, I caused the foregoing Brief of Intervenor Defendant Appellees to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit via the CM/ECF system, which will send a notice of this filing to counsel for Plaintiff Appellants and Federal Defendant Appellees.

*s/ Monika Y Langarica*
Monika Y. Langarica
Center for Immigration Law and Policy
UCLA Law
385 Charles E. Young Dr., E., Box 951476
Los Angeles, CA 90095
(310) 983-3345

*Counsel for Intervenor Defendant Appellees*

-

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify the following:

1.  The foregoing brief complies with the type-volume limitations of Rule 32(a)(7)(B). The brief contains 12,893 words according to the Microsoft Word counting function, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  The foregoing brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14 Point Garamond type style.

*s/ Monika Y. Langarica*
Monika Y. Langarica
Center for Immigration Law and Policy
UCLA Law
385 Charles E. Young Dr., E., Box 951476
Los Angeles, CA 90095
(310) 983-3345

*Counsel for Intervenor Defendant Appellees*