Case No. 24-40160

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants,*

*v.*

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees,*

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees.*

_____

On Appeal from the United States District Court
for the Southern District of Texas, Victoria Division
(USDC No. 6:23-CV-7)

_____

# SUPPLEMENTAL EXCERPTS OF RECORD OF
# INTERVENOR DEFENDANT APPELLEES

_____

*Monika Y. Langarica, Ahilan Arulanantham, Talia Inlender, Sofía López Franco*
*Center for Immigration Law and Policy, UCLA Law*
*385 Charles E. Young Dr., E., Box 951476*
*Los Angeles, CA 90095*
*(310) 983-3345*

*(Additional Counsel Listed on Signature Block)*

**TABLE OF CONTENTS**

**TAB**                                                                      **ROA**

1    Excerpts from Intervenor Defendants' Response to Texas's      ROA.11262-11268
     Post-Trial Brief………………………….……………....…....    ROA.11308-11310


2    Excerpt from Intervenor Defendants' Reply in Support of
     Motion to Strike Texas's Extra-Record Post-Trial
     Evidence………………………………………...…………...    ROA.11470-11473


3    Excerpt from Trial Transcript, Volume 2 of 2………...........…    ROA.12485-12486


4    Excerpt from Federal Defendants' Trial Exhibit HH,
     Declaration of Blas Nunez Neto……………………………    ROA.13403-13404


5    Excerpt from Intervenor Defendants' Trial Exhibit 53, CBP
     Encounters: Southwest Border, CHNV, FY 2023…………....    ROA.13860


6    Excerpts from Intervenor Defendants' Trial Exhibit 68,
     USCIS, Processes for Cubans, Haitians, Nicaraguans, and      ROA.13977-13978
     Venezuelans…………………………………………………    ROA.13980-13982


7    Excerpt from Intervenor Defendants' Trial Exhibit 141,
     Expert Declaration of Yael Schacher ………………….....    ROA.15086-15101

TAB 1

would contravene "equity and fairness" where the "evidence should have been produced no later than the hearing, not as part of the post-hearing briefing." *JJ Plank Co., LLC v. Bowman*, No. CV 18-0798, 2018 WL 4291751, at *4 (W.D. La. Sept. 7, 2018) (granting motion to strike reference to information available on publicly available websites offered for the first time in briefing after a preliminary injunction motion hearing). Indeed, "accepting disputed evidence not tested in the crucible of trial is a sharp departure from standard practice." *Rivera v. Marriott Int'l, Inc.*, 456 F. Supp. 3d 330, 337 (D.P.R. 2020) (internal citation omitted).

The single case Texas cites in inviting the Court to so depart is inapposite. In *Funk v. Stryker Corp.*, the Fifth Circuit held that *at the motion to dismiss stage*, the district court's taking judicial notice of publicly available documents was appropriate and did not convert the motion to dismiss into a motion for summary judgment. *See* 631 F.3d 777, 783 (2011). That case has no bearing here, where the trial record has closed, the parties litigated the evidence in the record at trial, and the parties are now in post-trial briefing to conclude arguments based on the evidence in the record.

     3.    <u>Even if This Court Accepts Texas's Extra-Record Data, Texas Has Failed to Prove Standing.</u>

         a.    *The New Data Illustrates the Unprecedented Effects of the CHNV Pathways, Including an Ongoing Net Reduction in Migration.*

Even if this Court permits Texas to unilaterally reopen the record after the close of trial, which it should not, the Court still must reject Texas's mischaracterizations of the post-trial data.

First, Texas boldly misleads this Court by saying that August 2023 numbers "rebounded to their pre-CHNV levels," Texas's Post-Trial Brief at 8, where Texas's own extra-record graph contradicts its claim. Total migration of individuals from CHNV countries remains significantly lower—by over 20,000 individuals per month—than it was before implementation of the CHNV Pathways in January 2023. *Id.* Yet again, this fact alone defeats Texas's standing; where the CHNV Pathways have reduced total migration from the pre-CHNV Pathways levels, Texas has suffered no harm, regardless of any recent changes in migration trends.

Second, seasonal variation in migration is no answer for the dramatic impact that the CHNV Pathways had on encounters of individuals from Cuba, Haiti, and Nicaragua ("CHN") following implementation of the CHNV Pathways. "The reduction [in the number of CHN nationals encountered between ports of entry] occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop[.]" Nuñez-Neto Decl., Fed. Defs' Trial Ex. HH at ¶ 26. As Economist Amici identified, *total* encounters of individuals from CHN countries dropped from over 80,000 in December 2022 to about 20,000 in January 2023. ECF No. 222 at 11. One year earlier, encounters for the same population had fallen "only slightly" from December 2021 to January 2022, and they *rose* 38 percent from December 2020 to January 2021. *Id.* at 11 n.9; *see also* Technical App., ECF No. 222-1 ¶ 7. The "hot Texas sun," Texas's Post-Trial Brief at 12, is simply no explanation for the truly unprecedented drop in total migration of people from CHNV countries in the winter months of December 2022 and January 2023, as demonstrated by Texas's own extra-

record graph. *See id.* at 8. Nor is the "hot Texas sun" an answer for why total non-CHNV apprehensions rose sharply between June and July 2023 but CHNV apprehensions continued to trend in the opposite direction during the same period. *Compare* graph, *id.* at 8, *with* graph, *id.* at 12.

Indeed, Texas's oversimplification ignores the reality that the impact of the CHNV Pathways can be best observed by looking to the data about migration from Venezuela immediately following implementation of the Pathways for Venezuela in October and November 2022, compared to January and February 2023 for Cuba, Haiti, and Nicaragua. The evidence already in the record proves that the Pathways resulted in a precipitous drop in migration directly following implementation of the Pathways for the respective countries—precisely the moment when the impact of the Pathways themselves, as opposed to the myriad other factors influencing migration patterns, can best be evaluated. *See supra* Section I(A)(2).

Texas urges this Court to derive standing by looking to absolute numbers from August 2023 *only*—and in a vacuum devoid of context. But the intervening *ten* months since the implementation of the Pathways for Venezuela have seen numerous additional external factors that may be affecting Venezuelan migration, and Texas has introduced no evidence to disaggregate the impact of the CHNV Pathways from that of other factors on Venezuelan migration.[3] Indeed, Texas's argument that it is "implausible" that the CHNV Pathways were "the cause of reduced migrant flows," following implementation of the CHNV Pathways, Texas's Post-Trial Brief at 12, cuts

---

[3] *See infra* note 5.

24-40160.11264

both ways, and is fatal for Texas. Texas spills considerable ink detailing what it considers external factors that could have led to changes in migration patterns *immediately* following implementation of the CHNV Pathways. *Id.* at 12–15. But by that same admission, it is even less plausible that Texas can prove that the CHNV Pathways have caused any alleged post-trial increased migration to Texas or anywhere in the United States a whopping *ten months* following their implementation. Because Texas bears the burden of proof, *Lujan*, 504 U.S. at 560, this alone defeats standing.

Finally, Texas's extra-record graphs, Texas's Post-Trial Brief at 8–12, oversimplify recent trends, and in particular, context specific to Venezuela, including, as discussed, its earlier implementation date and recent growing unrest in that country. In reality, when data for Venezuela is disaggregated, the CHN data still prove that the CHNV Pathways have maintained a consistent, drastic reduction in the number of people making the perilous trek to the southern border. Data concerning Border Patrol apprehensions for individuals from CHN countries reflect a consistent reduction from 79,370 in December 2022 to 11,072 in January 2023, 880 in February 2023, and 1,436 in August 2023. *Nationwide Encounters*, U.S. CBP, https://www.cbp.gov/newsroom/stats/nationwide-encounters (FY: select "2022" and "2023;" Region: select "Southwest Land Border;" Citizenship: select "Cuba," "Haiti," and "Nicaragua;" Component: select "U.S. Border Patrol.").[4] The fiscal year 2023 data

---

[4] As discussed in this brief, and in Intervenor Defendants' simultaneously filed Motion to Strike, Intervenor Defendants vehemently oppose Texas's attempt to inject

is a drastic departure from higher numbers and variations reflected in the graph for fiscal year 2022, further disproving Texas's argument about ordinary seasonal migration and *proving* what Defendants have pressed throughout this case: setting aside the growing unrest in Venezuela,[5] the CHNV Pathways have drastically

---

extra-record evidence at this stage of litigation, including by requesting judicial notice of post-trial data. However, to the extent the Court is inclined to take judicial notice of the data Texas has now offered, Intervenor Defendants request the Court do the same for the post-trial data cited here and other publicly available sources offered in notes 5 and 6.

[5] As of July 17, 2023, the U.S. Department of State has issued a "Level 4" travel warning: "Do not travel to Venezuela due to crime, civil unrest, kidnapping, and the arbitrary enforcement of local laws. Reconsider travel due to wrongful detentions, terrorism, and poor health infrastructure." *Venezuela Travel Advisory*, U.S. Department of State (July 17, 2023), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html. For Venezuelans, the "health care situation is dire. . . . electricity and gasoline shortages . . . continue because of the country's deteriorating infrastructure. Caracas, the capital, has suffered almost daily electricity cuts in the last year, while lines for subsidized gasoline last up to six hours." Julie Turkewitz & Isayen Herrera, *Why Are So Many Venezuelans Going to the United States*, N.Y. Times (Sep. 24, 2023), https://www.nytimes.com/2023/09/24/world/americas/why-are-so-many-venezuelans-going-to-the-united-states.html.

24-40160.11266

reduced and *maintained* a reduction in irregular migration of individuals from the impacted countries.[6] *Id.*



These nuances further underscore why Texas should not be permitted to inject this data into the record after trial and confirm why the opportunity to thoroughly

---

[6] Filtering for apprehensions made exclusively by CBP component agency U.S. Border Patrol, rather than grouping with those made by the Office of Field Operations, is critical to discern the number of individuals migrating irregularly between ports of entry. The Office of Field Operations has "broad law enforcement authorities" at official "ports of entry," whereas U.S. Border Patrol is "responsible for securing U.S. borders between ports of entry." *Stats and Summaries*, U.S. CBP, https://www.cbp.gov/newsroom/stats#:~:text=OFO%20is%20the%20law%20enforce ment,including%20facilitating%20lawful%20international%20travel (last modified Sep. 8, 2023).

24-40160.11267

analyze and interrogate data "in the crucible of trial" is critical. *Rivera*, 456 F. Supp. 3d at 337.

In short, even *if* this Court is persuaded to consider Texas's extra-record post-trial data, Texas has still failed to prove standing.

> b. *Regardless of Net Migration, Texas Has Still Not Proven Harm from the CHNV Pathways.*

As discussed, Texas has utterly failed to meet its burden to *prove* its standing claims, instead urging this Court to turn a blind eye to the record in this case and impute its standing based upon other cases with entirely different records. Critically, Texas has failed to demonstrate that *even if* the CHNV Pathways caused increased net migration to the state, costs to Texas would increase as a result. Indeed, Texas cannot do so. The trial record shows Texas has failed to prove net costs associated with its alleged harms from the provision of social services to CHNV parolees.[7]

Texas's arguments concerning driver's licenses illustrate this point. First, Texas argues that regardless of a net decrease in migration, it is injured because

---

[7] *See, e.g.*, Expert Declaration of Cyierra Roldan ("Roldan Expert Decl."), Int. Defs' Trial Ex. 140 at ¶ 25 ("Texas's statement about being overburdened, does not factor in the fees paid by people who apply for the licenses. Texas charges $33 per person for a new Class A, B, or C driver's license . . . ."); Joint Expert Declaration of Patricia Gándara and Gary Orfield ("Gándara and Orfield Joint Expert Decl."), Int. Defs' Trial Ex. 136 at ¶¶ 17–19 (noting the ways in which Texas ignores federal compensation received for education funds and other offsetting benefits); Expert Declaration of Leighton Ku ("Ku Expert Decl."), Int. Defs' Trial Ex. 138 at ¶¶ 12–14 (pointing out the accounting errors in Texas's healthcare cost calculations); Expert Declaration of Charis Kubrin ("Kubrin Expert Decl."), Int. Defs' Trial Ex. 139 at ¶ 19 (noting the findings supporting a negative relationship between immigration and crime); Expert Declaration of Jennifer Hunt ("Hunt Expert Decl."), Int. Defs' Trial Ex. 137 at ¶ 7 ("[I]t is the consensus of the NAS panel of experts that the inflow of foreign-born workers . . . is integral to the nation's economic growth.").

caused by the CHNV Pathways. Moreover, to the extent that this Court finds Texas has shown injury at all, it has failed to prove anything more than *de minimis* harm, much less any harm that outweighs the likely and substantial harm an injunction would inflict on Intervenor Defendants, the Federal Defendants, and the public interest. Given the trial record developed in this case, the nationwide injunction that Texas seeks would impermissibly stray beyond "vindicat[ing] the individual rights of the people appearing before [the court]" to "vindicat[ing] . . . generalized partisan preferences." *Missouri*, 2023 WL 6425697, at *29 (quoting *Gill*, 138 S. Ct. at 1933–34; *see also Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *16 (S.D. Tex. Sept. 26, 2023) ("[W]hen a court . . . order[s] the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." (quoting *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring))).

Texas cannot avoid the fact that it has failed "to prove that whatever injunction [it] request[s] is broad enough to protect against [its] proven injuries and no broader." *Feds for Med. Freedom*, 63 F.4th at 389. Neither the record nor the case law supports a nationwide injunction here.

### B. Texas Has Entirely Failed to Address Harms to Intervenor Defendants and to the Public Interest.

Texas likewise fails to address the substantial record documenting the harms that an injunction would inflict on Federal Defendants, Intervenor Defendants, and the public interest. Texas's only mention of the balance of equities is its self-serving

assertion that the Defendants "face essentially no harm from maintaining the status quo ante," Texas's Post-Trial Brief at 84, while citing *no evidence*, but only *DAPA*—a case with an entirely different factual record and entirely different legal issues—for the proposition that the CHNV Pathways would inflict financial losses on Texas that outweigh any harms an injunction might cause. 809 F.3d at 187. This does not satisfy Texas's "burden of persuasion" to show that injunctive relief—indeed, any relief—is warranted. *Holland Am. Ins. Co.*, 777 F.2d at 997.

In its post-trial briefing and proposed findings of fact and conclusions of law, Texas fails even to acknowledge or address record evidence of the immeasurable benefits of the CHNV Pathways that an injunction would eliminate, including the humanitarian protections that a safe pathway to the United States affords;[30] the free exercise of deeply held religious beliefs;[31] the reunification of families;[32] safety from harm;[33] and economic growth, including where it serves mutual interests.[34]

---

[30] Declaration of Heather Scanlon ("Scanlon Decl."), Int. Defs' Trial Ex. 133 at ¶ 18 (expressing relief that her sponsored parole beneficiaries "no longer need to brave the dangers of the overland trek to the southern border or expose themselves to the risk that they will be trafficked or assaulted").

[31] Supplemental Declaration of Dr. Nan Langowitz, Int. Defs' Trial Ex. 120 ¶ 14 ("Welcoming others in need is an integral expression of our faith . . . It has really brought our synagogue together.")

[32] Arauz Decl., Int. Defs' Trial Ex. 123 ¶ 13 ("I am now sponsoring my husband. . . because I need my husband and my son urgently needs his father").

[33] Supplemental Declaration of Anne Valerie Daniel-Laveus ("Supp. Laveus Decl."), Int. Defs' Trial Ex. 122 ¶ 25 ("I just want my brother and nephew to be safe and with the rest of our family and to have access to the same opportunities I had.").

[34] *See* Hunt Expert Decl., Int. Defs' Trial Ex. 137 at ¶ 3 ("Data shows that immigrants expand the U.S. economy's productive capacity, stimulate investment, increase aggregate demand, and promote specialization that in the long run boosts

For example, Ms. Scanlon, awaits the opportunity to sponsor a woman and her daughter so that they can avoid making the perilous journey through the Darien Gap to reach safety in the United States. Scanlon Decl., Int. Defs' Trial Ex. 133 at ¶¶ 4–7, 12, 18. And Mr. Zito also remains in limbo while awaiting the opportunity to finally sponsor Abel, whom he sees as "a brother in need." Declaration of Paul Zito ("Zito Decl."), Int. Defs' Trial Ex. 129 at ¶ 14. Mr. Zito sees "the opportunity [to sponsor Abel] for what it is: a calling from God." *Id.* Likewise, Major League Baseball pitcher, Eduardo Rodriguez, remains in limbo. Declaration of Eduardo Jose Rodriguez Hernandez ("Rodriguez Hernandez Decl."), Int. Def' Trial Ex. 132 at ¶¶ 4–5. He has sponsored his parents so that they can finally come see him play in the big leagues in person. *Id.* ¶¶ 2, 4–6, 8, 10–12. And the trial record, which remains unrefuted, clearly establishes that immigration increases economic growth while having no negative impact on native employment. Hunt Expert Decl., Int. Defs' Trial Ex. 137 at ¶ 6.

Texas makes no effort to address, much less refute, any of these significant interests that weigh against injunctive relief. Nor does Texas acknowledge, much less refute, the significant public benefits of the CHNV Pathways, as articulated in the relevant Federal Register Notices, including the urgent humanitarian reasons compelling mass migration from the CHNV countries, enhancing national security,

---

productivity."); Declaration of Eric Sype ("Sype Decl."), Int. Defs' Trial Ex. 125 ¶¶ 9, 11 ("Oldrys. . . is chronically underemployed and barely earns enough to meet his family's basic needs. . . The economic situation has only gotten worse with the pandemic and political instability in Nicaragua. . . The family farm [where Oldrys plans to work in Washington] constantly suffers from labor shortages and is looking for additional workers.").

24-40160.11310

TAB 2

Intervenor Defendants have dutifully followed this Court's procedures to build their trial record, including by seeking reconsideration of this Court's prior exclusion of exhibits. *See* Int. Defs' Mot. to Reconsider or Clarify, ECF No. 225. Allowing Texas to unilaterally introduce post-trial evidence (of the same kind that this Court previously excluded as untimely) by circumventing the established procedures and timelines that ensure due process for all litigants would render the Court's procedures meaningless and be fundamentally unfair. This showing of prejudice is far from "vague, cursory [or] unpersuasive," *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015).

### III.   Texas Mischaracterizes and Cherry-Picks the Post-Trial Data.

As Intervenor Defendants explained in their Post-Trial Response Brief, ECF No. 291 at 23-29, and Motion to Strike, ECF No. 292 at 8-10, Texas's characterization of the Post-Trial Data falls far short of Rule 201's requirement that the facts "be accurately and readily determined." Fed. R. Evid. 201(b)(2). Texas plainly misrepresented the August 2023 Post-Trial Data in its Post-Trial Brief, arguing the numbers "rebounded to their pre-CHNV levels," where the graph unequivocally shows total migration of individuals from CHNV countries has significantly *decreased* since before the implementation of the CHNV Pathways. *See* ECF No. 285 at 22.

Further, Texas attempts to attribute the post-implementation reduction in migration to seasonal weather patterns. *Id.* at 22-26. But this is at odds with the data itself, *see* Int. Defs' Post-Trial Response Brief, ECF 291 at 24-25, and with record evidence and expert analyses, which strongly suggest the impact of the CHNV

24-40160.11470

Pathways is best discerned from the data immediately following their implementation, *see* Decl. of Blas Nuñez-Neto, Fed. Defs' Trial Ex. HH at ¶ 26; Memorandum of Law of Drs. Stan Veuger, Tara Watson, Douglas Holtz Eakin & Leah Boustan as Amici Curiae in Opp. to Pls' P.I., ECF No. 222 at 11.

More recent data impugns Texas's characterization of the Post-Trial Data. Nationwide encounters with nationals of CHNV countries *decreased* to 91,697 in October (the beginning of Fiscal Year 2024)—a 19 percent reduction from September, and, again, a net reduction from pre-CHNV levels.[2]

---

[2] To the extent the Court is inclined to take judicial notice of Texas's Post-Trial Data, Intervenor Defendants request the Court do the same for the post-trial data cited in Intervenor Defendants' post-trial briefing and the October 2023 CBP data cited here.

24-40160.11471



*Nationwide Encounters*, U.S. CBP, https://www.cbp.gov/newsroom/stats/nationwide-encounters (selecting "Cuba," "Haiti," "Nicaragua," and "Venezuela" under "Citizenship," showing October 2023 data as an orange dot). Encounters with Venezuelan nationals—which accounted for over half the October encounters—decreased by 36.4 percent, from 72,325 to 45,950. *Id.* (selecting "Venezuela" under "Citizenship").

Ultimately, Texas seeks to rely on the August and September Post-Trial Data in isolation because it cannot reconcile its theory of harm with the continued net decrease in migration that the trial record shows and the October CPB data confirms.

8

Instead, Texas promotes two self-serving—and contradictory—interpretations of the record evidence and Post-Trial Data. On the one hand, it asks this Court to ignore the *trial record data* concerning encounter rates immediately following the implementation of the CHNV Pathways, contending there is no way to attribute the "reduced migrant flows" to the CHNV Pathways because such flows are "affected by a multitude of variables." Texas's Post-Trial Brief, ECF No. 285 at 26. Yet at the same time, Texas urges the Court to accept as dispositive the *extra-record Post-Trial Data* that postdates the implementation of CHNV by more than *ten months,* and which Texas mischaracterizes. *See* Int. Defs' Post-Trial Response Brief, ECF No. 291 at 25-26.

The context-dependent nature of this data underscores why the opportunity to interrogate data "in the crucible of trial" is critical. *Rivera,* 456 F. Supp. 3d at 337. Texas must prove standing with evidence adduced *at trial. TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("[T]he specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial.") (internal quotation marks omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (holding the party bearing the burden of proving jurisdiction must do so "with the manner and degree of evidence required at the successive stages of the litigation"). Unable to do so, Texas now cherry-picks post-trial, extra-record data in an attempt to save its case. That serves Texas no better, and should not be permitted.

24-40160.11473

TAB 3

1 are not talking about what -- Mexico isn't accepting

2 people.  Like, that is something separate.

3                    So when we say the increased presence of

4 aliens in Texas, these people, the specific people who are

11:47:18 5 coming in are people we have to expend a cost on; whether

6 other people are not coming in is something separate.

7                    THE COURT:  But -- but my understanding was, is

8 that limited to these four countries -- I am not talking

9 about global migration.  My understanding was limited --

11:47:33 10 whether this chart is proven up, somebody is vigorously

11 looking up that information, but if that chart says from

12 these four countries in January monthly migration was this

13 and now it's substantially lower, that's what we're

14 comparing.

11:47:47 15                    MR. WALTERS:  Well --

16                    THE COURT:  Because that is from the four

17 countries.  You are talking about Operation Lone Star and

18 all that stuff.  That is not directed at these four

19 countries.  That is directed globally.

11:47:56 20                    MR. WALTERS:  Right.  But -- but our argument

21 would be there is many factors that go into this, and the

22 program itself increases from zero to 30,000 people a

23 month.

24                    THE COURT:  Well, let me ask you this.  I think

11:48:06 25 this is where we get to it.  Is it Texas's position that --

1  does Texas agree with the statement that at this point as

2  opposed to before the program, there are fewer aliens

3  coming into the country now as opposed to before the

4  program from those four countries?

11:48:26   5              MR. WALTERS:  That's what the data looks like

6  up through June.

7              THE COURT:  Okay.

8              MR. WALTERS:  But obviously our assertion is

9  also like, you know --

11:48:32  10              THE COURT:  No.  I understand you have got a

11  but that doesn't matter, but I wanted to know that

12  particular statement.  Does Texas agree with what I think I

13  heard the DOJ and the intervenors say, which is

14  beforehand -- and I'm just making numbers up -- these four

11:48:46  15  countries had 100,000 coming in a month and now it is

16  something less than 100,000 after the program.  I am not

17  saying a causal link, but do you agree that the raw numbers

18  are lower?

19              MR. WALTERS:  That is what the data looks like

11:48:58  20  to me.

21              THE COURT:  Okay.

22              MR. WALTERS:  But they are not the same people.

23  Like Mr. Oldrys -- the testimony was that he would not be

24  here in the country --

11:49:05  25              THE COURT:  I understand.  But -- so when I

TAB 4

worked.  Encounters of CHNV nationals have, as detailed below, decreased significantly since

DHS implemented the process for Venezuelans in October 2022 and processes for Cubans,

Haitians, and Venezuelans in January 2023 (collectively, "CHNV processes").  This decrease

in encounters has occurred despite the fact that the underlying conditions driving migration

from these four countries have not changed.  As detailed more fully below, conditional

releases[5] of CHNV nationals into the United States have also declined significantly as a result

of these processes.

      6.     The CHNV processes are dependent on the Government of Mexico's

willingness to accept the return at the SWB of CHNV nationals who do not avail themselves

of these lawful, safe, and orderly pathways and processes to come directly to the United

States.  At the processes' inception, these returns took place under the Centers for Disease

Control and Prevention's ("CDC") Title 42 public health Order, which DHS was required to

implement at the land border on behalf of the CDC.  In recognition of the significant reduction

in irregular migration as a result of the CHNV processes, and to ensure that they continued

after Title 42 ended, on May 2, 2023, the Government of Mexico announced[6] it would

continue to accept returns or removals of CHNV nationals encountered at the SWB under

---

orderly, and lawful manner.  But similarly, incentives without consequences are insufficient to deter irregular
migration—they must go hand-in-hand.  This is why DHS has implemented, for example, the CHNV processes.
[5] For the purpose of this declaration, a "conditional release" refers to the fact that noncitizens released from DHS
custody are subject to strict conditions, with limited exceptions.  Individuals who are released from DHS custody
and issued a Notice to Appear are required to appear before an immigration judge for their removal
proceedings.  Individuals who were encountered between ports of entry and released via parole are required to
request a charging document by mail or to report to an U.S. Immigration and Customs Enforcement facility in order
to be issued a charging document, as appropriate, with limited exceptions.  The discussion of conditional release
numbers in this document refers to noncitizens who were encountered after crossing unlawfully between ports of
entry, or without authorization at a port of entry.
[6] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023),
https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-
joint-humanitarian-plan-on-migration/; U.S. Dep't of Homeland Sec., *DHS and DOJ Finalize Rule to Incentivize
Use of Lawful Immigration Pathways* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/dhs-and-doj-finalize-
rule-incentivize-use-lawful-immigration-pathways.

Defendant's Exhibit HH
6:23-cv-00007

24-40160.13403

Title 8 authorities. This is the first time in the bilateral history of the United States and Mexico
that the Government of Mexico is allowing the United States to systematically return or
remove non-Mexican nationals at the border.

7.     The Government of Mexico has made clear that its willingness to continue to
accept returns of CHNV nationals to Mexico is contingent on the continued availability of
lawful processes for nationals from those countries to come directly to the United States. In
other words, if DHS cannot provide lawful processes for some CHNV nationals to come
directly to the United States, Mexico will almost certainly stop accepting returns or removals
of CHNV nationals at the SWB. DHS expects, in turn, that without both the incentives *and*
disincentives associated with the CHNV processes that have led individuals from those
countries to wait for lawful, safe and orderly pathways and processes to come to the United
States, there will be another increase in migration at the SWB—the precise outcome that
Plaintiffs allegedly seek to avoid.

**Increase in Migration Driven by CHNV Nationals**

8.     Surges in migration and encounters at the SWB have occurred during the last
three Administrations under Presidents of both parties. In the early 2010s, after three decades of
bipartisan investments in border security and strategy, encounters along the SWB reached
modern lows, averaging fewer than 400,000 per year from 2011 to 2017. This followed decades
during which annual encounters routinely numbered in the millions.[7] Even during this period of
relatively low encounters at the border, however, DHS experienced surges of unaccompanied
children in 2014 and families in 2016 that significantly strained its operations given the unique
vulnerabilities of those demographics. Between 2017 and 2019, encounters along the SWB more

---

[7] From 1980 – 2006, the USBP averaged 1.14 million encounters per year along the SW Border, exceeding one
million encounters in 19 out of those 27 years.

Defendant's Exhibit HH
6:23-cv-00007

24-40160.13404

TAB 5



U.S. Customs and Border Protection (CBP) Encounters
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

24-40160.13860

TAB 6

| Term | Definition |
|---|---|
| Supporter | An individual who holds lawful status in the United States or is a parolee or beneficiary of deferred action or Deferred Enforced Departure (DED) who has passed security and background vetting and demonstrated sufficient financial resources to receive, maintain, and support the individual(s) whom they commit to supporting for the duration of their stay in the United States.<br><br>Examples of individuals who meet the supporter requirement include:<br><br>• U.S. citizens and nationals;<br>• Lawful permanent residents, lawful temporary residents, and conditional permanent residents;<br>• Nonimmigrants in lawful status (who maintain their nonimmigrant status and have not violated any of the terms or conditions of their nonimmigrant status);<br>• Asylees, refugees, and parolees;<br>• Individuals granted Temporary Protected Status (TPS); and<br><br>Beneficiaries of deferred action (including deferred action for childhood arrivals) or DED. |
| Beneficiary | A national of Cuba, Haiti, Nicaragua, or Venezuela (or their immediate family member of any nationality) who is outside the United States and who may be considered for parole under these processes.<br><br>Immediate family members of any nationality in these processes include:<br><br>• A spouse or common-law partner; and<br>• Unmarried child(ren) under the age of 21. NOTE: If a child is under 18, they must be traveling with a parent or legal guardian in order to use this process. |

**Who May be Considered for Advance Travel Authorization**

In order to be eligible to request and ultimately be considered for an advance authorization to travel to the United States to seek parole under these processes, beneficiaries must:

• Be outside the United States;
• Be a national of Cuba, Haiti, Nicaragua, or Venezuela; or be an immediate family member (spouse, common-law partner, and/or unmarried child under the age of 21) who is traveling with an eligible Cuban, Haitian, Nicaraguan, or Venezuelan;
• Have a U.S.-based supporter who filed a Form I-134A on their behalf that USCIS has vetted and confirmed;

24-40160.13977

- Possess an unexpired passport valid for international travel;

- Provide for their own commercial travel to an air U.S. POE and final U.S. destination;

- Undergo and pass required national security and public safety vetting;

- Comply with all additional requirements, including vaccination requirements and other public health guidelines; and

- Demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, and that a favorable exercise of discretion is otherwise merited.

An individual is ineligible to be considered for parole under these processes if that person is a dual national or permanent resident of, or holds refugee status in, another country, unless DHS operates a similar parole process for the country's nationals. This requirement does not apply to immediate family members (spouse, common-law partner, or unmarried child under the age of 21) of an eligible national of Cuba, Haiti, Nicaragua, or Venezuela with whom they are traveling.

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under these processes if that person:

- Fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

- Has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;

- Has crossed irregularly into the United States, between the POEs, after the date the process was announced (for Venezuelans, after Oct. 19, 2022; for Cubans, Haitians, and Nicaraguans, after Jan. 9, 2023), except individuals permitted a single instance of voluntary departure pursuant to INA § 240B, 8 U.S.C. § 1229c or withdrawal of their application for admission pursuant to INA § 235(a)(4), 8 U.S.C. § 1225(a)(4) will remain eligible;

- Has irregularly crossed the Mexican or Panamanian border after the date the process was announced (for Venezuelans, after Oct. 19, 2022; for Cubans, Haitians, and Nicaraguans, after Jan. 9, 2023);

- Is Cuban or Haitian and has been interdicted at sea after April 27, 2023; or

- Is under 18 and not traveling through this process accompanied by a parent or legal guardian.

**Important Note about Venezuelan Passports**

The beneficiary must have a valid, unexpired passport. Certified extensions of passport validity serve to meet this requirement. If a beneficiary's passport validity has been extended, the expiration date of the extension should be reflected as the passport expiration date. CBP will not authorize travel if the beneficiary's passport or extension is expired.

Consistent with the National Assembly decree of May 21, 2019, certain expired Venezuelan passports remain valid. A Venezuelan passport:

- Issued before June 7, 2019 (even if expired before this date), without a passport extension ("prórroga"), is considered valid and unexpired for five years beyond the expiration date printed in the passport.

24-40160.13978

U.S.-based supporters will initiate an online request on behalf of a named beneficiary, by submitting a Form I-134A to USCIS for each beneficiary, including minor children. Supporters can be individuals filing independently, filing with other individuals, or filing on behalf of organizations, businesses, or other entities. There is no fee required to file Form I-134A. The supporter will be vetted by the U.S. government to protect against exploitation and abuse and to ensure that they are able to financially support the beneficiary they are agreeing to support.

To serve as a supporter, an individual or individual representing an entity must:

- Be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States such as Temporary Protected Status or asylum; or be a parolee or recipient of deferred action or Deferred Enforced Departure;
- Pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and
- Demonstrate sufficient financial resources to receive, maintain, and support the individual(s) they are agreeing to support for the duration of their parole period.

Supporters who file Form I-134A on behalf of a beneficiary under these processes must be willing and able to receive, maintain, and support the beneficiary listed in Form I-134A for the duration of their parole. Examples of the types of support for beneficiaries that supporters should keep in mind when considering their ability to meet this commitment include:

- Receiving the beneficiary upon arrival in the United States and transporting them to initial housing;
- Ensuring that the beneficiary has safe and appropriate housing for the duration of their parole and initial basic necessities;
- As appropriate, helping the beneficiary complete necessary paperwork such as for employment authorization, for a Social Security card, and for services for which they may be eligible;
- Ensuring that the beneficiary's health care and medical needs are met for the duration of the parole; and
- As appropriate, assisting the beneficiary with accessing education, learning English, securing employment, and enrolling children in school.

Supporters must include the name of the beneficiary on Form I-134A. Supporters may not file a Form I-134A on behalf of an unnamed beneficiary. A supporter may agree to support more than one beneficiary, such as for different members of a family group, but must file a separate Form I-134A for each beneficiary.

**Supporters must file a separate Form I-134A for each beneficiary, even minor children.** Multiple supporters may join together to support a beneficiary. In this case, a supporter should file a Form I-134A and in the filing include supplementary evidence demonstrating the identity of, and resources to be provided by, the additional supporters and attach a statement explaining the intent to share responsibility to support the beneficiary. These supporters' ability to support a beneficiary will be assessed collectively.

Organizations, businesses, and other entities can play a critical role in providing support for beneficiaries arriving through this process. Although an individual is required to file and sign the

24-40160.13980

Form I-134A, they can do so in association with or on behalf of an organization, business, or other entity that will provide some or all of the necessary support to the beneficiary. Individual supporters filing with or on behalf of an organization, business, or other entity should submit evidence of the entity's commitment to support the beneficiary when they file the Form I-134A. This can be demonstrated through a letter of commitment or other documentation from an officer or other credible representative of the organization, business, or other entity describing the monetary or other types of support (such as housing, basic necessities, transportation, etc.) the entity will be providing to the specific beneficiary. Individuals who are filing in association with an organization, business, or other entity do not need to submit their personal financial information, if the level of support demonstrated by the entity is sufficient to support the beneficiary.

Organizations outside of the government may be able to help potential supporters and beneficiaries to prepare for this process. Two organizations that specialize in providing the public with information about providing welcome to newcomers and resources to support participation in these processes are listed below.

- Welcome.us⏍ provides information on welcoming and supporting newcomer populations.
- Community Sponsorship Hub⏍ has established the Sponsor Circle Program⏍, which can provide resources and ongoing guidance to supporters.

This information is provided for informational purposes only. DHS does not endorse these entities. Using these entities in lieu of any other entity does not give any parolee preferential treatment in the adjudication of their application.

## Process Steps ∧

Beneficiaries cannot directly apply for these processes. A supporter in the United States must first complete and file Form I-134A with USCIS on behalf of a beneficiary and include information about them and contact details, such as an email address. If we deem the Form I-134A sufficient, in our discretion, we will send the beneficiary information about the next step in the process to be considered for authorization to travel to the United States and parole consideration at an airport of entry.

Once beneficiaries receive their travel authorization, they should arrange to fly directly to their final destination in the United States. Upon arrival at the interior port of entry, individuals will be inspected by CBP and required to submit additional information, to include fingerprints, for further biometric vetting, and then be considered for a discretionary grant of parole. Those who attempt to enter the U.S. at land ports of entry will not be considered for parole through this process and will generally be denied entry.

The key steps in the processes include:

### *Step 1: Financial Support*

- A U.S.-based supporter will submit a Form I-134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I-134A identifies and collects information on both the supporter and the

24-40160.13981

beneficiary. The supporter must submit a separate Form I-134A for each beneficiary they are seeking to support, including immediate family members and minor children.

- USCIS will then vet the supporter to ensure that they are able to financially support the individual they are agreeing to support and to protect against exploitation and abuse. USCIS, in our discretion, must vet and confirm supporters before they move forward in the process.

### Step 2: Submit Biographic Information

- If USCIS confirms a supporter, the listed beneficiary will receive an email from USCIS with instructions on how to create a USCIS online account and other next steps. The beneficiary must confirm their biographic information in myUSCIS and attest to meeting the eligibility requirements.

- As part of confirming eligibility in their online account, individuals who seek authorization to travel to the United States must confirm that they meet public health requirements, including certain vaccination requirements.

### Step 3: Submit Request in CBP One Mobile Application

- After confirming biographic information in their online account and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS on how to access the CBP One mobile application (PDF, 771.55 KB). The beneficiary must enter their biographic information into CBP One and provide a photo.

### Step 4: Advance Travel Authorization to the United States

- After completing Step 3, the beneficiary will receive a notice in their online account confirming whether CBP will, in its discretion, provide them with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis.

- If approved, this authorization is valid for 90 days. Beneficiaries are responsible for securing their own travel via air to the United States. Approval of advance authorization to travel does not guarantee entry or parole into the United States at a U.S. port of entry. Parole is a discretionary determination made by CBP at the port of entry, based on a finding that parole is warranted due to urgent humanitarian reasons or significant public benefit.

### Step 5: Seeking Parole at the Port of Entry

- When a beneficiary arrives a port of entry, CBP will inspect them and consider them for a grant of discretionary parole on a case-by-case basis.

- As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with the CBP inspection process. Individuals who are determined to pose a national security or public safety threat, or otherwise not warrant parole as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to U.S. Immigration and Customs Enforcement (ICE).

### Step 6: Parole

- Individuals granted parole under these processes generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations.

24-40160.13982

TAB 7

to amend the parole provision to limit the use of parole to narrow, highly prescriptive circumstances that likely would significantly constrain its programmatic use.

9.     Most recently, Congress amended the parole statute in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 to state that parole may be granted "only on a case-by-case basis." Long before 1996, however, the Executive made case by case determinations for parole even in the context of parole programs. The executive specified classes of people to apply for parole and then assessed each applicant individually. The addition of the "case-by-case" language thus did not materially change the way Executives have used parole programmatically. Since 1996, just as before, Congress has several times extended benefits to large numbers of parolees who have (or will) come to the United States through parole programs.

10.    Although the specific humanitarian and/or public benefit justification has varied, programmatic uses of parole have frequently been heavily influenced by U.S. foreign policy and humanitarian objectives. Especially since 1980, these have prominently included (though have not been limited to) deterring dangerous irregular migration, promoting the reception and protection of migrants by other countries, and family unification.

11.    The Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) Parole Processes—as well as the ongoing Uniting for Ukraine Parole Process, on which they were modelled, and through which the Biden Administration has paroled more than 120,000 Ukrainians—are well within this historical tradition of the programmatic use of parole.

### Congress and the Executive on Parole

12.    Section 212(d)(5) of the 1952 Immigration and Nationality Act (INA), codified at 8 U.S.C. § 1182(d)(5), established that "the Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent

24-40160.15086

reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." Congress did not define the terms "emergent" or "public interest" reasons and did not modify the wording of the parole provision for 28 years. Congress did, however, extend benefits to noncitizens who came in through multiple different parole programs, such as the ability to become lawful permanent residents (e.g., "green card" holders) who would eventually be eligible to naturalize.

13.    For example, in late 1956 and early 1957, President Dwight D. Eisenhower directed his Attorney General to parole about 32,000 Hungarian nationals who had fled Soviet repression of the Hungarian Revolution. Each parolee was personally screened before entry to the United States. In 1958, Congress enacted legislation (Public Law 85-559) enabling Hungarian parolees to become lawful permanent residents.

14.    Parole of Cubans into the United States began in 1961, with almost 100,000 Cubans paroled into the United States in just a three-year period, from 1961 to 1963.

15.    In 1965, members of Congress expressed awareness of (and some concern about) large parole programs, but in amending the INA that year, Congress made no changes to the parole statute. Overall, between 1965 and 1975, about 310,000 Cubans—coming directly from Cuba or from third countries—were paroled into the United States after individual screening.

16.    In 1966, Congress enacted the Cuban Adjustment Act (CAA), which granted past and future Cuban parolees the ability to adjust status to lawful permanent residence.

17.    In the midst of a complicated Vietnamese displacement crisis further discussed below, Congress added a restriction to the parole authority in the Refugee Act of 1980 (Public Law § 203(f)): "The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest

with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee."

18.     Beginning in 1988, the Attorney General authorized the parole of people from Vietnam, Laos or Cambodia and the Soviet Union who had been *denied* refugee status. Congress, in 1989, passed a law (Public Law 101-167 § 599E) providing that such parolees could adjust their status to lawful permanent resident after one year. The same law specified that certain categories of people from the Soviet Union, Vietnam, Laos and Cambodia could be granted refugee status on a lower evidentiary burden. The latter is referred to as the "Lautenberg amendment."

19.     Some in Congress became concerned that parole was being used to allow large groups of noncitizens who may not have had a path to permanent legal status to remain in the United States for long periods. Congress addressed this concern in IIRIRA in a provision that limits immigration because of the presence of long-term parolees. Section 603 of the IIRIRA requires that nearly all long-term parolees who have yet to become legal permanent residents be counted against annual numerical caps on family-sponsored immigration, thereby diminishing the available number of family-based visas from a particular country by the same number of its nationals who are long-term parolees in the United States.

20.     IIRIRA also mandated annual reporting to Congress on the Executive's use of parole and replaced the "emergent reasons or for reasons deemed strictly in the public interest" language that had been in the parole criteria since 1952 with "urgent humanitarian reasons or significant public benefit." As before, Congress left those terms undefined and therefore up to interpretation by the executive.

21.     In contrast, an alternative proposal that the House Judiciary Committee considered would have defined those terms with great particularity. *See* H. Rep. 104-469 (1996) at

77-78. That proposal defined the "urgent humanitarian reasons" basis for parole to refer only to certain medical emergencies (i.e., the parolee donating an organ or visiting a dying relative) and defined the "strictly in the public interest" basis as applying only where the parolee assisted the U.S. Government in a law enforcement activity or was to be criminally prosecuted. It also would have explicitly prohibited using parole for noncitizens "who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply." To explain the proposed extensive amendments to the parole statute, the report criticized the programmatic use of parole, including the Clinton Administration's September 1994 migration agreement with Cuba discussed more below. This House Judiciary Committee report's parole amendment proposal *did not become law*; the provisions defining and restricting when parole could be used were removed from the legislation even before the bill was considered by the full House.

22.    IIRIRA also amended the parole statute to specify that parole must be granted "only on a case-by-case basis." As described above, it had long been understood by the Executive that, even when used programmatically, the statutory parole authority required assessing individual applicants for parole.

23.    There were times before the passage of IIRIRA when this individualized assessment was explicitly referred to as "case by case." For example, a September 30, 1994, INS Focus pamphlet from the Office of the Commissioner of the Immigration and Naturalization Service (INS) explained that "the INS authorizes parole, under delegated authority from the Attorney General, on a case-by-case basis." A September 1995 GAO report on the parole of Cubans in 1994 (available at www.gao.gov/assets/nsiad-95-211.pdf) likewise referred to it as a "case-by-case" process.

24.     In the nearly 30 years since the parole authority was amended to include the "case-by-case" language, the Executive and Congress have continued to indicate that the statute permits programmatic uses of the parole.

25.     In June 2001, for example, INS General Counsel Bo Cooper issued a legal opinion on the continued INS authority to parole individuals from the former Soviet Union who are denied refugee status (I understand that this opinion is in the administrative records for the CHNV litigation). Cooper concluded:

> "Designating, whether by regulation or policy, a class whose members generally would be considered appropriate candidates for parole does not conflict with the 'case-by-case' decision requirement, since the adjudicator must individually determine whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case. . . . So long as individual consideration is given to parole decisions, the Service's determination—that it is generally in the public interest to parole denied refugee applicants from Moscow who belong to groups specified in the Lautenberg amendment-—does not violate the case-by-case requirement."

26.     After the passage of IIRIRA, the Executive has continued to use parole programmatically, where individual members of a group or class defined by agency policy to be considered on a case-by-case basis. Such programs include, for example, the Central American Minors Program whereby at-risk children from El Salvador, Honduras, and Guatemala are individually considered for parole if denied refugee status.

27.     Also since the passage of IIRIRA, Congress has taken a number of legislative actions that seem to endorse the programmatic use of parole by the Executive.

28.     For example, in section 1758 of the 2020 National Defense Authorization Act (Public Law 116-92), Congress essentially mandated as a legislative matter a parole program that had been created years earlier by the Executive. Like the Executive-created program, the legislation defined a class (certain family members of those in the military) and then ordered case-by-case consideration of requests for parole of individual members of that class.

29.     In 2021 (Public Law 117-43) and 2022 (Public Law 117-128), Congress extended benefits to Afghans and Ukrainians, respectively, who had already been paroled in through one of the programs created by the Biden Administration, and to certain Afghans and Ukrainians who might be paroled into the United States sometime in the future.

**The Use of Parole as a Tool of Foreign Policy**

30.     Regardless of the particular statutory language, administrations have been heavily influenced by matters of foreign policy and diplomatic relations when deciding whether and how to use parole on a programmatic basis.

31.     The Eisenhower administration used parole for tens of thousands of Hungarians, for example, in order to support opponents of communism non-militarily, shore up Cold War alliances (especially with Austria and Yugoslavia, where most Hungarians initially fled), and reassert America's moral leadership by promoting solutions to refugee and migration crises.

32.     In the wake of the passage of the Refugee Act of 1980 and IIRIRA in 1996, parole programs for Vietnamese and Cubans helped achieve important foreign policy objectives, as discussed below. Most prominent among them were promoting orderly (and safe) migration and encouraging other countries to receive migrants as well.

**The Use of Parole from Vietnam**

33.     In the wake of the war in Vietnam, the United States made extensive use of its parole authority for twenty five years. Parole was used to effectively control and collaboratively manage irregular migration, to ensure countries of first asylum in Southeast Asia (not signatories to the UN Refugee Convention and Protocol) would shelter refugees, and to ensure Vietnamese of concern to the United States (including Amerasian children and those released from re-education camps) could enter the United States with their relatives.

24-40160.15091

34.     Congress was well informed of the extensive use of parole authority to achieve these goals and, not only in 1989 (as mentioned above) but several additional times, including in the Indochinese Parole Adjustment Act of 2000, provided for the adjustment to permanent status of Vietnamese paroled into the United States through the late 1990s. As discussed below, the Executive's programmatic use of parole was crucial to achieving long-term foreign policy objectives.

35.     As Congress in 1979 debated the legislation that ultimately became the Refugee Act of 1980, the number of people leaving Vietnam to seek refuge in other countries in the region (i.e., overland to Thailand, by boat to Malaysia) increased dramatically. The Office of the United Nations High Commissioner for Refugees (UNHCR) and Vietnamese officials signed a memorandum of understanding to try to better control migration called the Orderly Departure Program (ODP). At a conference in Geneva in the summer of 1979, the Vietnamese government agreed to stop boats from embarking while the United States (and other nations such as Canada, France, and Australia) agreed to receive individuals directly from Vietnam through ODP. By 1985, more Vietnamese were leaving via the ODP process than were arriving by boat in countries of first asylum in the region thus indicating that the program was successfully working to bring order to Vietnamese migration.

36.     But, in 1986, the Vietnamese government suspended the ODP program, accusing the United States of not following through on its responsibility to process applicants, stating an applicant backlog had developed of thousands of people wishing to unite with family in the United States.

37.     At this time, the United States—to fulfill a law passed by Congress— wanted to process Amerasians in Vietnam for resettlement in the United States. The Vietnamese

government insisted that Amerasians were not refugees but American children, yet most Amerasians in Vietnam were not claimed by American fathers and also had mothers and siblings in Vietnam who needed to be processed with them lest families be separated.

38.   To ensure the continuing cooperation of the Vietnamese government with the ODP (and especially the issuing of exit permits) and release and emigration to the United States of those imprisoned in reeducation camps as a result of their close association with the United States (a population of unanimous concern to the Senate as indicated in Resolution 205 of May 1, 1987) it was crucial to use the parole authority.

39.   Between 1990 and 1995, over 45,000 Vietnamese—mostly family members of Vietnamese ineligible for immigrant visas, former United States government employees and former reeducation prisoners denied refugee status, and accompanying relatives of Amerasians and former prisoners—were paroled into the United States as part of the Orderly Departure Program. In the decade and a half after the passage of the 1980 Refugee Act, the continued use of parole *alongside* refugee resettlement to unite Vietnamese families and allow for the migration of Amerasians and prisoners with their relatives was crucial to the normalization of U.S.-Vietnam relations, especially the United States' decisions to permit international financial institutions to lend to Vietnam in July 1993, lift the embargo in February 1994, and establish formal diplomatic relations in July 1995.

40.   In 1995, first countries of asylum insisted on closing camps of screened-out refugees (i.e., individuals who had been determined *not* to meet the refugee definition) and on pushing back all future Vietnamese boat arrivals. In response, the United States and Vietnam negotiated an agreement called Resettlement Opportunity for Vietnamese Returnees (ROVR). The

24-40160.15093

program accepted the requirement that all screened-out migrants return to Vietnam but offered returnees one more chance to apply for resettlement to the United States from Vietnam.

41. The use of parole continued alongside resettlement in the ROVR program; over an eight-month period ending in April 1998, nearly 20 percent of the Vietnamese who came to the United States through ROVR were paroled. The existence of the program prevented forced repatriation in the region and upheld a commitment to resettle families together. Ending the program at the end of the millennium honorably brought to a close a 20-year U.S. engagement on the Vietnamese refugee crisis and paved the way to the U.S. awarding Vietnam most favored nation status in late 2021.

**Parole Programs for Cuban Nationals**

42. The use of parole to advance important U.S. foreign policy interests, both before and after the 1996 changes to the parole authority, can also be seen in the longstanding and robust use of parole for certain Cuban nationals.

43. Parole programs for Cubans put in place during the Clinton and George W. Bush administrations were designed to regularize migration, promote family unification, and put pressure on Cuba to promote political and economic reform and transition to democracy.

44. In late 1984, the United States and Cuba negotiated an agreement whereby Cuba would accept the return of a certain number of Cubans excluded from the United States and would allow for the emigration of 3,000 political prisoners and their families, while the United States would issue 20,000 visas for Cubans to immigrate to the United States annually.

45. In 1985, after the United States launched Radio Marti, a U.S. sponsored broadcaster that transmits to Cuba, Castro suspended implementation of the agreement. Though the agreement was restarted in 1987, the United States interests section in Havana issued only

24-40160.15094

11,222 visas between 1988 and 1994. In 1993 and 1994, when the United States issued fewer than 1,000 visas annually, the number of Cubans arriving in the United States by raft more than doubled (to over 4000 annually from less than 2000 in 1991, during the first half of which Representative Lawrence J. Smith said Florida found approximately 860 corpses along its coasts).

46.     In the spring and summer of 1994 there was a huge uptick in irregular sea migration from Cuba; there were more than 3,000 Cubans interdicted by the Coast Guard on some days in August. The Clinton administration was determined not to allow a repeat of the Mariel boatlift of 1980, when more than 125,000 Cubans traveled by sea to the United States over a period of months, so it adopted a policy of interdicting Cubans heading to Miami and bringing them to the U.S. Naval Base in Guantanamo Bay. Although the U.S. Government wanted to return many of these individuals to Cuba in order to deter irregular journeys by sea, it also was concerned about the safety of such people upon being returned.

47.     In September 1994, the United States and Cuba came to an agreement. The Cuban government agreed to take steps to discourage Cuban nationals from departing by boat in exchange for the Clinton administration allowing 20,000 Cubans to enter the United States annually, not counting the immediate relatives of U.S. citizens.

48.     To get to the annual 20,000 migrants and to include among them people likely to migrate irregularly via rafts, the Attorney General created several programmatic parole programs for Cuban nationals in Cuba, most notably the Special Cuban Migration Program through which those between the ages of 18 and 55 who met specified criteria could register for a parole lottery. Those selected in the lottery were then interviewed about their qualifications and to ensure they met medical, criminal and public charge requirements. This was done in the public

interest of stemming irregular migration and promoting "safe, legal, and orderly" migration from Cuba.

49.     In early 1995, the two countries reached another agreement, memorialized in a joint statement, that specifically addressed how Cubans paroled from Guantanamo would be counted toward the 20,000 figure. As the United States decided to no longer transport interdicted Cuban migrants to Guantanamo but to instead generally repatriate them to Cuba, the agreement also included certain assurances that no actions would be taken against repatriated individuals. Between May 1995 and the end of June 1997, the U.S. Coast Guard interdicted only 771 Cuban migrants attempting to migrate to the United States, the lowest Cuban interdiction rates since the late 1980s.

50.     Due to the success of the programmatic parole programs from Cuba, Castro was unable to use the threat of irregular migration to push for change in other U.S. policies towards Cuba, such as the embargo.

51.     Congress seems to have appreciated this approach of using parole to advance foreign policy: in section 606 of IIRIRA, Congress reaffirmed (rather than repealed, as was considered and rejected by Congress) the Cuban Adjustment Act of 1966, mandating that it stay in place until the President determines that a democratically elected government in Cuba is in power. As mentioned above, the Cuban Adjustment Act permits Cubans paroled into the United States the ability to become lawful permanent residents after one year.

52.     Between January 2004 and June 2009, the Department of State cancelled talks with Cuba because it was not abiding by the agreements by refusing to discuss the issuance of exit permits, to allow registration for the Special Cuban Migration Program, to permit U.S.

diplomats to travel to monitor returned migrants, and to accept the return of Cuban nationals the United States wished to deport.

      53.    It was in this context that the United States once more turned to the statutory parole authority to advance a significant public benefit in the eyes of the Executive and to support U.S. foreign policy objectives with respect to Cuba.

      54.    The George W. Bush administration created two parole programs for Cubans. The Cuban Family Reunification Parole Program (CFRP) was designed to "expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration." The program allowed Cuban nationals in Cuba who were the beneficiaries of approved relative visa petitions for which visas were not yet available to be considered for parole on a case-by-case basis.

      55.    The Bush administration also created the Cuban Medical Professionals Parole (CMPP) Program, which allowed Cuban doctors and other medical professionals working in third countries such as Venezuela or Namibia to request that they and their dependents be paroled into the United States. The Cuban Medical Professionals Parole Program served U.S. foreign policy interests by undermining Cuba's efforts to cultivate foreign influence through its medical aid program. More than 9,000 Cuban medical professionals and their family members were paroled into the United States under the program before its termination in 2017.

      56.    The Obama's administration's decision to terminate that parole program in early 2017 illustrates how the changing landscape on foreign policy shifted the U.S. government's analysis of whether the parole of Cuban medical professionals advanced a significant public benefit to the United States. By that point, the United States had worked with Cuban doctors to

respond to humanitarian needs in Haiti in the wake of that country's 2010 earthquake and as part of other public health efforts.

57.     The U.S. Government was also rethinking its policy toward Cubans who traveled by land to the U.S.-Mexico border (under the so-called "wet foot/dry foot" policy, whereby Cubans caught attempting to enter the United States by sea would be returned to Cuba or to a third country, but if apprehended on land would get a chance to remain in the United States). This was partially in response to complaints by several countries in South and Central America through which Cubans traveled to the border that the policy encouraged irregular and unsafe migration, increased smuggling and trafficking among Cubans en route, as well as insecurity and humanitarian needs among those stranded in transit.

58.     As a step toward normalizing relations with Cuba and toward a more regional and multilateral approach to managing migration and forced displacement, the Obama Administration decided in January 2017 to terminate both the Cuban Medical Professionals Parole Program and its longstanding wet foot/dry foot policy.

59.     Parole programs established by the Obama administration in 2014—the Central American Minors (CAM) Program and the Haitian Family Reunification Parole Program (HFRP)—were designed to unite families and address humanitarian and protection needs in origin countries while stopping dangerous migration in the hands of smugglers by land (through several transit countries) and sea. In response to a rise in child arrivals at the U.S. border and as part of a multifaceted effort to stop children from taking "irregular" and "dangerous" journeys through Mexico, the Obama administration announced the creation of the Central American Minors program in its late 2014 Report to Congress on 2015 refugee admissions.

60.   The CAM Program continues today; it allows certain parents and legal guardians with authorized presence in the United States to request that their unmarried children in El Salvador, Guatemala, and Honduras under the age of 21, as well as some of the child's relatives, receive a refugee resettlement interview. When those interviewed are not deemed to be a refugee but nonetheless determined to be at risk of harm in their country, USCIS decides whether each person merits a grant of parole. As with the parole of Vietnamese nationals through the Orderly Departure Program, commitments of support from a U.S.-based supporter are required to be considered for parole through CAM.

61.   The Haitian Family Reunification Parole (HFRP) Program, like its Cuban predecessor, is for certain beneficiaries of approved family-based immigrant visa petitions. The Federal Register Notice on the program explains that "[b]y expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States." The Notice additionally recognized that using parole for HFRP Program beneficiaries would facilitate the ability of beneficiaries to more quickly work lawfully in the United States and earn money that could be sent back to Haiti in the form of remittances to help fund the "rebuilding and development of a safe and economically strong Haiti," a multi-year project and "a priority for the United States." Approximately 8,300 applications for parole have been approved through the HFRP program.

### CHNV Processes Resemble Previous Uses of Parole

62.   In the wake of Russia's invasion of Ukraine, over twenty thousand Ukrainians traveled to Mexico in order to come to the United States via the land border. The Biden administration started the Uniting for Ukraine parole program to provide an alternative, more orderly pathway for displaced Ukrainians to come to the United States directly through airports.

Just as with Hungarians and Vietnamese, parole is being used for Ukrainians alongside refugee resettlement and to complement the reception of displaced people in other countries. Similar to several other parole programs discussed above—most notably the Orderly Departure Program and the CAM Parole Program—Ukrainian nationals seeking parole through the program must be supported by one or more individuals or entities in the United States who have demonstrated to USCIS that they have sufficient income or immediate access to sufficient financial resources to support the parole beneficiaries for the duration of the parole (typically two years). Unlike the CHNV parole programs, the Ukrainian parole program does not have any monthly numerical caps.

63.     The justifications provided in the Federal Register Notices for the CHNV Parole Processes are similar in many respects to the humanitarian, foreign policy, and migration control goals of past parole programs.

64.     The CHNV processes are designed to provide a safe pathway for migrants from four countries experiencing humanitarian and human rights crises—and from which in-country consular processing, and to which removals, are a challenge, if not impossible—to enter the United States through an airport, as an alternative to them coming to the U.S.-Mexico border. Just like the parole programs for Vietnamese and Cubans discussed above, the CHNV programs are designed to deter dangerous irregular migration frequently facilitated by smugglers. Each potential parolee is assessed on a case-by-case basis, as the Executive has long understood the parole statute to require, as discussed above. Each must have a financial supporter in the United States, as was the case with the Orderly Departure Program and the Uniting for Ukraine, and each must pass background checks, as was the case with individuals paroled through all the past programs discussed in this declaration.

65.     Consistent with the historical use of the parole statute discussed above, CHNV is also part of a broader foreign policy strategy—articulated at the 2022 Summit of the Americas and through collaborative engagement on the L.A. Declaration on Migration and Protection—to address the unprecedented challenge of displacement in the Western Hemisphere. Like the handling of Vietnamese discussed above, this effort involves the United States taking the lead in working with key allied countries and international organizations towards resolution of a regional displacement crisis. Just as with the Uniting for Ukraine program, the Biden administration is planning also to resettle Cubans, Haitians, Nicaraguans and Venezuelans as refugees and the CHNV processes complement the reception of, for example, Nicaraguans in Costa Rica and Venezuelans in Colombia. Since the start of the CHNV processes, the United States has continued to work with Colombia and Costa Rica to curb irregular migration of CHNV nationals.

66.     Like in several prominent past parole programs, such as those related to parolees from Vietnam and Cuba discussed above, the number of people considered for parole is linked to relations and negotiations with foreign governments, including origin and transit or regional countries. Regarding the current program, the number of people from Cuba, Haiti, Nicaragua, and Venezuela that may be paroled into the United States (30,000 per month) is tied directly to the number of people of the same four nationalities that Mexico has agreed to accept for removal.

67.     Through the parole of Cubans in the CHNV program, the United States is also reviving migration talks with Cuba to accept return of its nationals—in April of this year, deportations to Cuba were restarted for the first time in two years—similar to how parole programs have been used by past administrations as a tool to achieve foreign policy objectives in a bilateral context.

Dated: July 26, 2024                    Respectfully submitted,


                                        *s/ Monika Y. Langarica*
                                        Monika Y. Langarica
                                        Ahilan Arulanantham
                                        Talia Inlender
                                        Sofia Lopez Franco
                                        Center for Immigration Law and Policy
                                        UCLA Law
                                        385 Charles E. Young Dr., E., Box 951476
                                        Los Angeles, CA 90095
                                        (310) 983-3345

                                        Esther H. Sung
                                        Karen C. Tumlin
                                        Laura Flores-Perilla
                                        Brandon Galli-Graves
                                        Vanessa Rivas-Bernardy
                                        Justice Action Center
                                        P.O. Box 27280
                                        Los Angeles, CA 90027
                                        (323)316-0944

                                        Javier Hidalgo
                                        RAICES
                                        P.O. Box 786100
                                        San Antonio, TX 78278
                                        (210)610-6143


                                        *Counsel for Intervenor Defendant Appellees*

**CERTIFICATE OF SERVICE**

I, Monika Y. Langarica, hereby certify that on July 26, 2024, I caused the foregoing Supplemental Excerpts of Record of Intervenor Defendant Appellees to be electronically filed with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit via the CM/ECF system, which will send a notice of this filing to counsel for Plaintiff Appellants and Federal Defendant Appellees.

*s/ Monika Y. Langarica*
Monika Y. Langarica
Center for Immigration Law and Policy
UCLA Law
385 Charles E. Young Dr., E., Box 951476
Los Angeles, CA 90095
(310) 983-3345

*Counsel for Intervenor Defendant Appellees*