**No. 24-40160**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants*,

v.

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services, U.S. Customs & Border Protection; Troy Miller, Senior Official Performing Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees*,

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, VICTORIA DIVISION

## BRIEF FOR *AMICUS CURIAE*
## HAITIAN-AMERICANS UNITED, INC.
## IN SUPPORT OF DEFENDANTS-APPELLEES

(Counsel Listed on Next Page)

Michael A. Kippins
Oren M. Sellstrom
Ivan Espinoza-Madrigal
**Lawyers for Civil Rights**
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(781) 591-0123
mkippins@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
iespinoza@lawyersforcivilrights.org

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

### Case No. 24-40160

### *State of Texas, et al. v. U.S. Department of Homeland Security, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

Haitian-Americans United, Inc.

*/s/ Ivan Espinoza-Madrigal*
Attorney of Record for Haitian-Americans United, Inc. as *Amicus Curiae*

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS......................................................iii

TABLE OF CONTENTS .........................................................................iv

TABLE OF AUTHORITIES......................................................................vi

INTEREST OF AMICUS CURIAE ........................................................1

RELEVANT BACKGROUND.................................................................2

   I.  PAROLE PROGRAM FOR HAITIAN NATIONALS .................................2

   II. DISTRICT COURT PROCEEDINGS ..........................................3

ARGUMENT ...........................................................................5

   I.  THE APPELLANTS LACKED STANDING AND THE DISTRICT COURT
      DID NOT ABUSE ITS DISCRETION IN DENYING INJUNCTIVE
      RELIEF WHERE IT DETERMINED THAT TEXAS FAILED TO PROVE
      IT SUSTAINED AN INJURY IN FACT ......................................5

   II. IF THE COURT CONCLUDES THAT THE APPELLANTS HAD
      STANDING, IT SHOULD AFFIRM THE DISMISSAL AND DENIAL OF
      INJUNCTIVE RELIEF BECAUSE THE APPELLANTS CANNOT MEET
      THE REQUIREMENTS FOR A PERMANENT INJUNCTION ................8

     A. The Appellants Did Not Satisfy Their Burden To Prove That There Was A
        Substantial Threat Of Irreparable Injury To Them If The Permanent
        Injunction Was Not Granted ....................................................9

       1. The Appellants Did Not Prove Irreparable Harm Because Their
           Costs Actually Declined As A Result Of The Parole Program .....10

       2. Even Assuming There Were Some Additional Costs To Texas, The
           Appellants Still Did Not Prove Irreparable Harm Because The
           Appellants Failed To Consider Countervailing Benefits ..............10

     B. The Appellants Did Not Prove That Any Threatened Injury Outweighs
        The Threatened Harm To The Appellees Or That The Injunctive Relief
        Requested Would Not Disserve The Public ...........................14

CONCLUSION .................................................................................................15

CERTIFICATE OF SERVICE ...................................................................17

CERTIFICATE OF AMICUS CURIAE RELATING TO FUNDING ...................17

CERTIFICATE OF COMPLIANCE .......................................................17

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Amoco Production Co. v. Village of Gambell, AK,*
   480 U.S. 531 (1987) ............................................................................9

*Bollore S.A. v. Import Warehouse, Inc.,*
   448 F.3d 317 (5th Cir. 2006) ......................................................5, 6

*City of Dallas v. Delta Air Lines, Inc.,*
   847 F.3d 279 (5th Cir. 2017) ...............................................................9

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006) ............................................................................9

*E.V. v. Robinson,*
   906 F.3d 1082 (9th Cir. 2018) ...........................................................8

*Food and Drug Admin. v. Alliance for Hippocratic Med.,*
   602 U.S. 367 (2024) ............................................................................5

*General Land Office v. Biden,*
   71 F.4th 264 (5th Cir. 2023) ...............................................................6

*Humana Inc. v. Jacobson,*
   804 F.2d 1390 (5th Cir. 1986) ...........................................................9

*Jones v. National Conference of Bar Examiners,*
   801 F. Supp. 2d 270 (D. Vt. 2011) .......................................... 10, 11

*Louisiana v. Nat'l Oceanic & Atmospheric Admin.,*
   70 F.4th 872 (5th Cir. 2023) ...............................................................6

*Nken v. Holder,*
   556 U.S. 418 (2009) ..........................................................................14

*Optimus Steel, LLC v. U.S. Army Corps of Engineers,*
   492 F. Supp. 3d 701 (E.D. Tex. 2020)................................. 9, 14, 15

*Robinson v. Lavalais*,
  331 F. App'x 282 (5th Cir. 2009) ....................................................8

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) ..........................................................5

*Sierra Club v. United States Army Corps of Engineers*,
  990 F. Supp. 2d 9 (D.D.C. 2013)..................................................14

*State v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ...........................................................6

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ...........................................................6

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ...........................................................6

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ...........................................................6

*Texas v. Yellen*,
  105 F.4th 755 (5th Cir. 2024) .........................................................8

*United States v. Texas*,
  599 U.S. 670 (2023)........................................................................5

*Valley v. Rapides Parish School Bd.*,
  118 F.3d 1047 (5th Cir. 1997) ......................................................14

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008)..........................................................................14

## Statutes

8 U.S.C. § 1182(d)(5)(A) ........................................................................1

**<u>Other Authorities</u>**

Implementation of a Parole Process for Cubans,
88 Fed. Reg. 1266 (Jan. 9, 2023)..........................................................1

Implementation of a Parole Process for Haitians,
88 Fed. Reg. 1243 (Jan. 9, 2023)........................................................ 1, 2, 3

Implementation of a Parole Process for Nicaraguans,
88 Fed. Reg. 1255 (Jan. 9, 2023)..........................................................1

Implementation of a Parole Process for Venezuelans,
87 Fed. Reg. 63507 (Oct. 19, 2022) ......................................................1

Implementation of Changes to the Parole Process for Venezuelans,
88 Fed. Reg. 1279 (Jan. 9, 2023)..........................................................1

## INTEREST OF AMICUS CURIAE[1]

Haitian-Americans United, Inc. ("HAU") is a Massachusetts nonprofit organization that focuses on community empowerment for Haitians and Haitian-Americans. Over 80,000 Haitians live in Massachusetts – the second largest Haitian population by state.[2] HAU works directly with individuals and families protected under the U.S. Department of Homeland Security's ("DHS") Parole Program.[3]

The Parole Program permits Haitian nationals to temporarily enter the U.S. in a lawful, safe, humane, and orderly way to escape life-or-death conditions in Haiti.[4] HAU helps these individuals and families to facilitate family reunification, housing, employment, and other community-related issues. HAU thus has first-hand knowledge of the positive impact such humanitarian programs have on the economy and communities. As such, HAU has a significant interest in the continuation of the Parole Program, which, if ended, would have catastrophic effects.

---

[1] All parties have consented in writing to the filing of HAU's *amicus curiae* brief.

[2] *See* "A Prosperous Boston for All," https://www.bostonplans.org/getattachment/c1a82525-5c19-45d5-8601-ccd51c99e154; "Haitian Population by State 2023," World Population Review, https://worldpopulationreview.com/state-rankings/haitian-population-by-state.

[3] The "Parole Program," as used in this Brief, refers to the Executive Branch's implementation of parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans, pursuant to 8 U.S.C. § 1182(d). *See* 88 Fed. Reg. 1243 (Jan. 9, 2023); 88 Fed. Reg. 1255 (Jan. 9, 2023); 88 Fed. Reg. 1266 (Jan. 9, 2023); 87 Fed. Reg. 63507 (Oct. 19, 2022); and 88 Fed. Reg. 1279 (Jan. 9, 2023).

[4] *See* U.S. Citizenship and Immigration Services, Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, https://www.uscis.gov/CHNV (announcing processes through which CHNV nationals "may request to come to the United States in a safe and orderly way").

## RELEVANT BACKGROUND

## I.    PAROLE PROGRAM FOR HAITIAN NATIONALS[5]

The recent deplorable and dangerous conditions in Haiti have led tens of thousands of Haitians to flee to the United States. *See* 88 Fed. Reg. 1243 (Jan. 9, 2023). These conditions include the assassination of Haitian President Jovenel Moïse in July 2021, the resulting rise in gang violence to fill the power vacuum, and the lack of availability of basic human needs, such as food, clean water, and medicine. *See id.* ("Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five times more than in 2019.").

In addition to these violent conditions, on August 14, 2021, a 7.2 magnitude earthquake in Haiti "kill[ed] more than 2,200 people, injur[ed] over 12,000 more, destroy[ed] tens of thousands of homes, and crippl[ed] Haiti's already fragile infrastructure." *Id*. Within a month of the earthquake, more than 650,000 Haitians, including more than 260,000 children, needed humanitarian assistance. *See id.* "The World Bank estimates that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP." *Id.* As a result of

---

[5] The Parole Program applies to Cubans, Haitians, Nicaraguans, and Venezuelans. In this brief, HAU focuses on the Parole Program as it relates specifically to Haitians and Haitian-Americans.

the "political, security, and environmental crises," Haiti's economy collapsed. Even

before the 2021 crisis, Haiti was the "poorest country in the Americas and one of the

poorest in the world." *Id.* Even when Haitians are able to leave the country and seek

refuge in the U.S., they often take routes and use means that pose dangerous risks to

their lives, for example, traveling in "makeshift boats." *Id.*

The Parole Program incentivizes parolees to use less dangerous means of

travel, in order to reunite with their family members who often serve as Parole

Program sponsors.[6] Parolees are eligible for work authorization from U.S.

Citizenship and Immigration Services, and they are limited to two years in the U.S.

## II.    DISTRICT COURT PROCEEDINGS

In February 2023, 21 states filed an Amended Complaint to enjoin the

implementation of the Parole Program, including requests for preliminary and

permanent injunctive relief.[7] After the Appellants moved for a preliminary

injunction, the district court consolidated the motion with a trial on the merits. After

trial, the district court dismissed the case and denied all requested relief, including

---

[6] Participants in the Parole Program must be sponsored by an individual who: (1) is a "U.S. citizen, national, or lawful permanent resident," or holds "a lawful status in the United States," or is "a parolee or recipient of deferred action or Deferred Enforced Departure"; (2) has passed "security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns"; and (3) has demonstrated "sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period." 88 Fed. Reg. 1243 (Jan. 9, 2023).

[7] *See* Amended Complaint, ECF 20, p. 31, *Texas v. U.S. Dep't of Homeland Security*, No. 23-CV-00007 (S.D. Tex. 2023).

injunctive relief, on the ground that the Appellants lacked standing.

For the trial, the parties stipulated that the Appellants would seek to establish Article III injury and irreparable harm based on alleged injuries to the State of Texas only.[8] As such, the district court's findings are based on evidence specific to Texas. One of the key factual findings was "that the [Parole] Program ha[d] resulted in a decrease of CHNV nationals entering the United States." Record on Appeal ("ROA") 11528. Specifically, "as of May 2023, the total number of CHNV nationals entering the United States had declined from an average of 2,356 per day prior to the Program starting to 1,326 per day in the months after—a 44 percent reduction." *Id.* The Appellants did not "dispute either contention: (1) that there [we]re fewer aliens coming into the country from those four countries, or (2) that as a result, Texas [wa]s spending less money." ROA.11532. Ultimately, relying on Fifth Circuit precedent, the district court concluded that because Texas's costs actually decreased following the implementation of the Parole Program, Texas could not establish that it had suffered an injury in fact, and therefore could not establish standing. ROA.11541.

After the district court entered final judgment, the Appellants filed a notice of appeal to the Fifth Circuit. ROA.11544-11549. Before that appeal could be heard, the Appellants filed a motion to reconsider the district court judgment, arguing that

---

[8] *See* Joint Notice of Stipulations, ECF 139, p. 1, *Texas v. U.S. Dep't of Homeland Security*, No. 23-CV-00007 (S.D. Tex. 2023).

the district court erred by: (1) considering offsetting benefits of the Parole Program to Texas; (2) considering facts that post-dated the complaint to analyze standing; and (3) disregarding data presented in the Appellants' post-trial briefing.[9] The district court denied the motion to reconsider because it was effectively an attempt to re-litigate the same legal theories that the district court already decided.[10]

## ARGUMENT

**I.  THE APPELLANTS LACKED STANDING AND THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING INJUNCTIVE RELIEF WHERE IT DETERMINED THAT TEXAS FAILED TO PROVE IT SUSTAINED AN INJURY IN FACT.**

Because federal courts do not "operate as an open forum for citizens to press general complaints about the way in which government goes about its business," *Food and Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 379 (2024), a plaintiff must show "an injury in fact caused by the defendant," *United States v. Texas*, 599 U.S. 670, 676 (2023), which the Appellants have not done.

After trial, the district court dismissed the case and denied all requested relief, including the Appellants' request to permanently enjoin the implementation of the Parole Program. ROA.11541. The denial of permanent injunctive relief is reviewed for abuse of discretion. *See Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016). "A court abuses its discretion when it acts in an unreasonable or arbitrary manner . . .

---

[9] *See* ECF 310, *Texas v. U.S. Dep't of Homeland Security*, No. 23-CV-00007 (S.D. Tex. 2023).

[10] *See* ECF 315, p. 5, *Texas v. U.S. Dep't of Homeland Security*, No. 23-CV-00007 (S.D. Tex. 2023).

without reference to any guiding rules and principles." *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 321 (5th Cir. 2006) (quotations omitted).

Here, the district court accurately concluded, and the Appellants did not dispute, that, at the time that the Appellants filed their Complaint, there was a significant decline in CHNV nationals entering the U.S., which resulted in lower costs to Texas. ROA.11528. Specifically, the district court concluded:

> The Fifth Circuit has consistently looked to the impact that the challenged agency action had on the State's fiscal interests in *DAPA*, *DACA*, *MPP I*, *MPP II*, *GLO*, and *LDWF*.[11] And in doing so, the Fifth Circuit has invariably considered whether expenditures increased as compared to pre-agency action expenditures. In this case, those expenditures declined subsequent to the implementation of the CHNV Parole Program, and the Court has before it a case in which Plaintiffs claim that they have been injured by a program that has actually lowered their out-of-pocket costs. As a result, the Court finds that Texas has failed to prove that it suffered an injury-in-fact for purposes of Article III standing.

ROA.11540-11541 (footnote added).

In the motion to reconsider – and on appeal – the Appellants argued that the district court improperly turned the injury in fact element into an "accounting exercise," impermissibly considering whether any alleged injury to Texas was

---

[11] The district court's case name abbreviations stand for the following: *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ("*DAPA*"); *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) ("*DACA*"); *State v. Biden*, 10 F.4th 538 (5th Cir. 2021) ("*MPP I*"); *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) ("*MPP II*"); *General Land Office v. Biden*, 71 F.4th 264 (5th Cir. 2023) ("*GLO*"); and *Louisiana v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023) ("*LDWF*").

outweighed by offsetting benefits.[12] *See* Brief for Appellants, ECF 133, pp. 14-17, *Texas v. U.S. Dep't of Homeland Security*, No. 40160 (5th Cir. 2024). However, the district court did no such thing. As noted in the original opinion, and then reiterated in the memorandum denying the motion for reconsideration, the district court had no need to consider offsetting benefits because it determined that Texas suffered no injury at all; no injury that could even be offset by benefits. ROA.11541 n. 17; ROA.11631.

As the district court explained, "Texas could have proved its alleged injury – dollar damages – in one of two ways: proving by a preponderance either (1) that terminating the Program would reduce migration flow from the four countries, or (2) that migration flow increased after implementation of the Program." ROA.11631. The Appellants failed to prove injury in either way, having conceded that migration decreased following the implementation of the Parole Program.

In support of their motion to reconsider, the Appellants argued that "even if overall immigration flows decreased for such a discrete period of time, they would have decreased *even more* if the unlawful CHNV Program were enjoined." ECF 310, p. 7, *Texas v. U.S. Dep't of Homeland Security*, No. 23-CV-00007 (S.D. Tex. 2023)

---

[12] The Appellants also argue that: (1) even if the analysis were an accounting exercise, the district court erred as a matter of law in disregarding evidence and miscalculating Texas's future costs; (2) the States are entitled to special treatment as plaintiffs for purposes of standing; and (3) Texas met the remaining standing requirements – traceability and redressability. For these remaining arguments, HAU relies on the arguments in the Defendants-Appellees' Brief. *See* ECF 177, pp. 28-50, *Texas v. U.S. Dep't of Homeland Security*, No. 40160 (5th Cir. 2024).

(emphasis in original). However, the Appellants failed to prove that fact at trial, and provided no evidence to support the motion to reconsider. ROA.11631 n. 2. The district court acted well within its discretion to deny the requested injunctive relief after trial, and again upon reconsideration, where Texas could not show that it suffered an injury. The Appellants offer nothing more on appeal to properly challenge the district court's factual finding on this issue, and, accordingly, the Court should affirm the dismissal and denial of injunctive relief.

## II.    IF THE COURT CONCLUDES THAT THE APPELLANTS HAD STANDING, IT SHOULD AFFIRM THE DISMISSAL AND DENIAL OF INJUNCTIVE RELIEF BECAUSE THE APPELLANTS CANNOT MEET THE REQUIREMENTS FOR A PERMANENT INJUNCTION.

The Appellants sought a permanent injunction below. Even assuming, solely for purposes of argument, that the Appellants could establish standing, the Court should affirm the judgment because the Appellants did not prove the four required elements for a permanent injunction. *See Texas v. Yellen*, 105 F.4th 755, 763 (5th Cir. 2024) (court "may affirm for any reason supported by the record, even if not relied on by the district court"); *Robinson v. Lavalais*, 331 F. App'x 282, 284 (5th Cir. 2009) (affirming denial of injunctive relief on other grounds where plaintiff's "allegations in the district court presented no legal basis for the grant of injunctive relief."); *E.V. v. Robinson*, 906 F.3d 1082, 1086 (9th Cir. 2018) (affirming case dismissal and denial of injunctive relief on other grounds).

To obtain a permanent injunction, the moving party must demonstrate:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The standard for a permanent injunction is "essentially the same" as for a preliminary injunction, except that the plaintiff must show "actual success" on the merits rather than a mere likelihood of success. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n. 12 (1987). Failure to establish even one of the elements is fatal. *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Here, the Appellants failed to show "actual success" on the merits because they do not have standing, which alone is sufficient to affirm dismissal. In addition, the Appellants cannot prove prongs two, three, or four of the test, which HAU addresses in turn.

## A. The Appellants Did Not Satisfy Their Burden To Prove That There Was A Substantial Threat Of Irreparable Injury To Them If The Permanent Injunction Was Not Granted.

The Appellants must show that irreparable harm would result if the injunction were not granted. *Dallas*, 847 F.3d at 285. To qualify as "irreparable harm," "there must be 'a significant threat of injury from the impending action,' the injury must be 'imminent,' and 'money damages cannot fully repair the harm.'" *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 724 (E.D. Tex. 2020) (quoting *Humana Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)).

1. <u>The Appellants Did Not Prove Irreparable Harm Because Their Costs Actually Declined As A Result Of The Parole Program.</u>

Similar to the reason why the Appellants do not have standing, *see supra* at 5-8, they did not demonstrate a significant threat of injury where the facts show that Texas's costs actually decreased following implementation of the Parole Program. As stated above, the number of CHNV nationals entering the country decreased by 44 percent, which led to lower costs for Texas – facts that the Appellants do not dispute. Therefore, not only is there no *significant* threat of imminent injury, there is no injury to Texas at all. As such, even if the Appellants were found to have standing (which they do not), they would still not be entitled to injunctive relief.

2. <u>Even Assuming There Were Some Additional Costs To Texas, The Appellants Still Did Not Prove Irreparable Harm Because The Appellants Failed To Consider Countervailing Benefits.</u>

The Appellants' cost analysis fails for another reason as well: it does not account for the substantial benefits to the Appellants from the Parole Program. Even assuming that courts were prohibited from considering offsetting benefits for standing purposes, which they are not,[13] courts are permitted to consider such offsetting benefits when analyzing irreparable harm in the context of a request for injunctive relief. *See Jones v. Nat'l Conference of Bar Examiners*, 801 F. Supp. 2d 270, 286-87 (D. Vt. 2011) (courts consider "countervailing benefits" to the moving

---

[13] *See Texas v. United States*, 809 F.3d at 155 (When analyzing standing, courts may consider "offsetting benefits that are of the same type and arise from the same transaction as the costs.").

party when evaluating irreparable harm). Here, the benefits to the Appellants far outweigh the harm that they allege. Specifically, the Parole Program is saving numerous lives, reducing "unchecked migration,"[14] *and* is a boon to the economy.

In addition to supporting themselves financially through work authorization and sponsorship, participants in the Parole Program provide a substantial benefit to the economy.[15] For example, in 2017 in Boston alone, where HAU focuses its efforts, the Haitian community: "earned $511 million in income"; had a consumer demand that "supported an additional 1,674 jobs"; "contributed $256 million to Boston's gross city product"; "contributed $26 million in state income taxes"; and "contributed $8.4 million in state sales taxes."[16]

Immigrants contribute to the U.S. economy in a direct, financial way, and the

---

[14] *See, e.g.*, "The Biden Administration's Use of Immigration Parole Authority is Both Lawful and Smart," Center for American Progress, Tom Jawetz (May 10, 2023), https://www.americanprogress.org/article/the-biden-administrations-use-of-immigration-parole-authority-is-both-lawful-and-smart/ (data shows sharp declines in U.S. Border Patrol encounters with Venezuelan, Haitian, Cuban, and Nicaraguan nationals as a result of the Parole Program).

[15] *See* George W. Bush Institute, The Catalyst, "Benefits of Immigration Outweigh the Costs," Issue 02 (Spring 2016), https://www.bushcenter.org/catalyst/north-american-century/benefits-of-immigration-outweigh-costs#:~:text=Immigration%20fuels%20the%20economy.,so%20do%20those%20of%20natives (noting that "[i]mmigration has net benefits").

[16] *See* "A Prosperous Boston for All," Haitians, Mayor Martin J. Walsh, Boston Planning & Development Agency, https://www.bostonplans.org/getattachment/c1a82525-5c19-45d5-8601-ccd51c99e154 (last visited August 1, 2024).

absence of their spending power would devastate the economy.[17] For example, "[i]mmigrants added $2 trillion to the U.S. GDP in 2016 and $458.7 billion to state, local, and federal taxes in 2018," which were used to "fund our schools, hospitals, emergency response services, highways, and other essential services."[18] In 2018, immigrants had $1.2 trillion in spending power, which they used to stimulate local business activity.[19] "Proposed cuts to our legal immigration system would have devastating effects on our economy, decreasing GDP by 2% over twenty years, shrinking growth by 12.5%, and cutting 4.6 million jobs."[20]

Immigrants also make substantial contributions to the workforce, and often take "low-skilled jobs that natives are either not available [for] or unwilling to take."[21] As of June 30, 2023, there were nearly 10 million job openings in the United States.[22] Nearly half of this gap can be attributed to two years of lost immigration

---

[17] *See* FWD.us, "Immigration Facts: The Positive Economic Impact of Immigration, Immigrants and Immigration Mythbusters: Addressing Common Misconceptions," (July 21, 2020), https://www.fwd.us/news/immigration-facts-the-positive-economic-impact-of-immigration/.

[18] *See* "Immigration Facts," *supra* note 17.

[19] *See* "Immigration Facts," *supra* note 17.

[20] *See* "Immigration Facts," *supra* note 17.

[21] *See* Center on Budget and Policy Priorities: "Immigrants Contribute Greatly to U.S. Economy, Despite Administration's 'Public Charge' Rule Rationale," (Aug. 15, 2019), https://www.cbpp.org/research/immigrants-contribute-greatly-to-us-economy-despite-administrations-public-charge-rule.

[22] *See* U.S. Bureau of Labor Statistics, "Job Openings and Labor Turnover Summary," (Aug. 1, 2023), https://www.bls.gov/news.release/jolts.nr0.htm.

during the COVID-19 pandemic.[23] And while immigrants comprise a small percentage of all U.S. workers, they reflect a large share of workers in important occupations and industries, such as health care, farming, forestry, maintenance work, and hotel work.[24] In fact, nearly 450,000 parolees currently work in industries with critical labor shortages, including health care.[25]

The circumstances of the COVID-19 pandemic demonstrate the significant contribution that immigrants have made to the health care industry while risking their own health and well-being. Immigrants represent disproportionately high shares of workers in many essential occupations, including in health care—a fact underscored during the pandemic as foreign-born individuals played a significant role in frontline pandemic-response sectors. In 2018, more than 2.6 million immigrants, including 314,000 refugees, were employed as health-care workers, with 1.5 million of them working as doctors, registered nurses, and pharmacists.[26]

---

[23] *See* Abha Bhattarai & Lauren Kaori Gurley, "Trump, Covid Slowed Down Immigration. Now Employers Can't Find Workers," Washington Post (Dec. 15, 2022), https://www.washingtonpost.com/business/2022/12/15/immigration-reform-congress-worker-shortage/.

[24] *See* Center on Budget and Policy Priorities: "Immigrants Contribute Greatly to U.S. Economy, Despite Administration's 'Public Charge' Rule Rationale," (Aug. 15, 2019), https://www.cbpp.org/research/immigrants-contribute-greatly-to-us-economy-despite-administrations-public-charge-rule.

[25] *See* Philip Connor, "Immigration Parole Has Added 450,000 Workers to Industries with Critical Labor Shortages," FWD.us (Apr. 20, 2023), https://www.fwd.us/news/immigration-labor-shortages/.

[26] Jeane Batalova, "Immigrant Health-Care Workers in the United States," (May 14, 2020), https://www.migrationpolicy.org/article/immigrant-health-care-workers-united-states-2018.

With these benefits factored into the irreparable harm equation, the Appellants did not show that there is a significant threat of injury. Thus, the Court should affirm the dismissal and denial of injunctive relief.

### B. The Appellants Did Not Prove That Any Threatened Injury Outweighs The Threatened Harm To The Appellees Or That The Injunctive Relief Requested Would Not Disserve The Public.

The Appellants must show that "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and that "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997). When the government is the non-moving party, these two factors "merge." *See Nken v. Holder*, 556 U.S. 418, 435 (2009). While a movant may allege harms from the absence of an injunction, "harm can also flow from enjoining an activity." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As here, "the public may benefit most from permitting an activity to continue." *Optimus*, 492 F. Supp. 3d at 726.

Enjoining the Parole Program would significantly harm not only the Defendants but the public at large. The Parole Program is a direct response to humanitarian crises in the covered countries. Individuals and families are fleeing these countries in desperation, to escape horrific social, political, and economic

conditions, including natural disasters, widespread illness, gang violence, and food shortages resulting in pervasive hunger. Entry into the United States is a life-saving measure for many. Through its work with recent Haitian immigrants, HAU has seen first-hand the devastation that its members experience in their home countries, and then the positive effects that those individuals confer on the U.S. economy and local communities once they arrive through an orderly immigration process.

The Appellants failed to address any of these ways in which the Parole Program positively serves the public interest – facilitating the reunion of families, strengthening communities, and saving lives.[27] Eliminating the Parole Program would also eliminate these benefits to the public interest. Moreover, if the Parole Program were enjoined, HAU and the country as a whole would be deprived of the significant economic benefits that have and will result from the Parole Program. *See Optimus*, 492 F. Supp. 3d at 727 (program serves the public interest when it will positively impact the job market and will benefit the economy).

The Court should affirm the judgment because even if the Appellants were found to have standing, they did not demonstrate entitlement to injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

---

[27] *See* "Immigration Facts," *supra* note 17 ("Family-based immigration promotes family unity and integration, all core principles of American values.").

Respectfully submitted on behalf of
*amicus curiae*,

HAITIAN-AMERICANS UNITED,
INC.,

By its attorneys,

*/s/ Michael A. Kippins*
Michael A. Kippins
Oren M. Sellstrom
Ivan Espinoza-Madrigal
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(781) 591-0123
mkippins@lawyersforcivilrights.org
osellstrom@lawyersforcivilrights.org
iespinoza@lawyersforcivilrights.org

Dated: August 2, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on August 2, 2024, I electronically filed a true and accurate copy of the foregoing *amicus* brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Ivan Espinoza-Madrigal*

## CERTIFICATE OF AMICUS CURIAE RELATING TO FUNDING

Pursuant to Fed. R. App. P. 28.2.1, I hereby certify that: (1) no party's counsel authored the brief in whole or in part; (2) no party or a party's counsel contributed money that was intended to fund the preparation or submission of this memorandum; and (3) no person – other than the *amicus curiae*, its members, or its counsel – contributed money that was intended to fund the preparation or submission of this memorandum.

*/s/ Ivan Espinoza-Madrigal*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,872 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

*/s/ Ivan Espinoza-Madrigal*