No. 24-40160

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF IDAHO; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WYOMING; STATE OF OKLAHOMA,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR M. JADDOU, DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TAE D. JOHNSON, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

*Defendants-Appellees,*

VALERIE LAVEUS; FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; GERMAN CADENAS,

*Appellees.*

---

*On Appeal from the United States District Court
for the Southern District of Texas, Victoria Division*

---

**BRIEF OF FORMER EXECUTIVE BRANCH OFFICIALS AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation.  In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: August 2, 2024                               */s/ Brianne J. Gorod*
                                                     Brianne J. Gorod

                                                     *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ................. i

CORPORATE DISCLOSURE STATEMENT .................................................. ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ...................................................................... iv

INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ........................................................................................... 6

    I.    Federal Law Gives Immigration Officials Broad Authority to
        Utilize Parole .............................................................................. 6

    II.   For Decades, the Executive Branch Has Used Parole Programs to
        Respond to Pressing Diplomatic and Migration-Related
        Developments ............................................................................. 11

    III.  The CHNV Program Is a Valid Exercise of the Executive's Parole
        Power ........................................................................................ 23

CONCLUSION ....................................................................................... 27

APPENDIX ............................................................................................ 1A

CERTIFICATE OF SERVICE ................................................................... 5A

CERTIFICATE OF COMPLIANCE ........................................................... 6A

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Albertson's, Inc. v. Kirkingburg,*
   527 U.S. 555 (1999)............................................................... 11

*Arizona v. United States,*
   567 U.S. 387 (2012)............................................................ 1, 2, 5

*Biden v. Texas,*
   597 U.S. 785 (2022)............................................ 2, 3-5, 7, 8, 26, 27

*Chy Lung v. Freeman,*
   92 U.S. 275 (1875)................................................................. 6

*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952)............................................................ 3, 6

*Jama v. Immigr. & Customs Enf't,*
   543 U.S. 335 (2005)................................................................ 7

*Kiobel v. Royal Dutch Petroleum Co.,*
   569 U.S. 108 (2013)................................................................ 3

*Lichter v. United States,*
   334 U.S. 742 (1948)................................................................ 6

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
   486 U.S. 825 (1988)............................................................... 21

*Mathews v. Diaz,*
   426 U.S. 67 (1976)................................................................. 2

*Opati v. Republic of Sudan,*
   590 U. S. 418 (2020)............................................................... 7

*S.A. v. Trump,*
   363 F. Supp. 3d 1048 (N.D. Cal. 2018)............................................ 22

*Trump v. Hawaii,*
   585 U.S. 667 (2018)........................................................... 6, 7, 10

*United States ex rel. Knauff v. Shaughnessy,*
   338 U.S. 537 (1950)............................................................. 6, 26

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

<u>Constitutional Provisions, Statutes, and Legislative Materials</u>

Additional Ukraine Supplemental Appropriations Act, Pub. L. No. 117-128, 136 Stat. 1211 (2022) ........................................................................ 20

An Act to Amend the Immigration and Nationality Act, and for other purposes, Pub. L. No. 89-236, 79 Stat. 911 (1965) ................................ 13

*An Examination of the Administration's Central American Minors Refugee/Parole Program: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Immigr. and the Nat'l Interest*, 114th Cong. (2015) .............................................................................................. 17, 18, 23, 25

Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. No. 117-43, 135 Stat. 344 (2021) ...................................... 20

Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1990, Pub. L. No. 101-167, 103 Stat. 1195 (1989) ................................................................................................. 20

Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2001, Pub. L. No. 106-429, 114 Stat. 1900 (2000) ................................................................................................. 20

H.R. 1915, 104th Cong. (1995) ...................................................................... 10

H.R. 2202, 104th Cong. (1995) ............................................................... 8, 9, 10

H.R. Rep. No. 104-469 (1996) .................................................................. 9, 10, 21

H.R. Rep. No. 104-828 (1996) ...................................................................... 11

Help Haitian Adoptees Immediately to Integrate Act of 2010, Pub. L. No. 111-293, 124 Stat. 3175 (2010) ......................................................... 20

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 ....................................... 8, 15, 20

*Immigration in the National Interest Act of 1995: Hearing before Subcomm. Immigr. & Claims of H. Jud. Comm.,* 104th Cong., 2d Sess. (1995) ........................................................................................... 4, 9

**TABLE OF AUTHORITIES – cont'd**

                                                                    **Page(s)**

*Midyear Consultation on Refugee Programs: Hearing Before S. Subcomm. Immigr. & Refugee Affairs*, 100th Cong., 1st Sess. (1987)... 22

National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019) .................................................... 21

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ........................... 14

S. Rep. No. 104-249 (1996) ......................................................... 8

*Soviet Refugees: Hearing before H. Subcomm. Immigr. Refugees, and Int'l L.*, 101st Cong., 1st Sess. (1989)...................................... 14

8 U.S.C. § 1182(d)(5)(A) ......................................... 2, 3, 4, 7, 8, 10

8 U.S.C. § 1182(d)(5)(B) ........................................................... 14

*United States Refugee Programs: Hearing before S. Comm. Jud.*, 96th Cong., 2d Sess. (1980) .................................................... 13

<u>Other Authorities</u>

David J. Bier, *126 Parole Orders over 7 Decades*, Cato Institute (July 17, 2023), cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders .................................... 12, 18, 19, 22

Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole* (Oct. 15, 2020)...................................................................... 12, 13, 14

Cambridge English Dictionary, dictionary.cambridge.org/us/dictionary/english/case-by-case (last visited July 10, 2024) ............................................................ 10

*Central American Minors (CAM) Parole Program*, USCIS (Sept. 14, 2021), uscis.gov/CAM ...................................................... 16, 18

Communique Between the United States of America and Cuba, 94-909, *signed at* New York (Sept. 9, 1994), *entered into force* Sept. 9, 1994, state.gov/wp-content/uploads/2022/07/94-909-Cuba-Migration-and-Refugees.pdf........................................................................ 15

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Bo Cooper, Gen. Counsel, INS, *Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001), americanprogress.org/wp-content/uploads/sites/2/2023/04/INS-GenCou-ParoleLegOp-1996-amends18.pdf .......................................... 18, 19, 24

*Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007) ........................................................................... 16, 18

*Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75,581 (Dec. 18, 2014) .............................................. 16

*Implementation of a Parole Process for Cubans*, 88 Fed. Reg. 1,266 (Jan. 9, 2023)...................................................................... 25

*Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1,255 (Jan. 9, 2023).................................................................. 3, 24, 25

*Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63,507 (Oct. 19, 2022) .............................................................. 25

Jeh Charles Johnson, Sec'y of Homeland Sec., *Families of U.S. Armed Forces Members and Enlistees* (Nov. 20, 2014), dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf ....................................................................................... 19

Charlotte Moore, Cong. Rsch. Serv., *Review of U.S. Refugee Resettlement Programs and Policies* 9 (Comm. Print 1980)................. 12, 13

Oxford English Dictionary, doi.org/10.1093/OED/1037895988 (last visited July 10, 2024)................................................................ 10

U.S. General Accounting Office, *U.S. Response to the 1994 Cuban Migration Crisis* (1995) ............................................................. 22

*Welcoming Ukrainian Nationals to the United States*, U.S. Department of State, state.gov/welcoming-ukrainian-nationals-to-the-united-states/ ........................................................................................ 22

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are former officials of the Department of State, Department of Homeland Security, Immigration and Naturalization Service, and other federal departments and agencies who served in both Republican and Democratic administrations. *Amici* may differ in their views of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela as a matter of policy, but they all agree that programs like these are lawful and are critical to the executive branch's ability to enforce the nation's immigration laws and manage its foreign policy. Accordingly, *amici* have an interest in this case.

A full listing of *amici* appears in the Appendix.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

As the Supreme Court has recognized, "[f]ederal governance of immigration . . . is extensive and complex," and has the potential to affect "trade, investment, tourism, and diplomatic relations for the entire Nation." *Arizona v. United States*, 567 U.S. 387, 395 (2012). As *amici* know from their decades of service in the Department of State (DOS), the Department of Homeland Security (DHS), the Immigration and Naturalization Service (INS), and other government

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

departments and agencies, the executive branch relies on many different tools to effectuate the nation's immigration policies, including its authority to temporarily "parole" noncitizens into the country. *See* 8 U.S.C. § 1182(d)(5)(A) (giving the Secretary of Homeland Security the "discretion" to parole noncitizens into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit").

Throughout history, the parole power has afforded Democratic and Republican administrations alike much-needed flexibility to respond quickly to "changing world conditions" in ways that advance the nation's foreign policy interests. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Often, parole has been the only way to address unexpected surges in migration, remedy humanitarian emergencies, or otherwise "ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy," *Biden v. Texas*, 597 U.S. 785, 806 (2022) (quoting *Arizona*, 567 U.S. at 397); *see id.* at 816 (Kavanaugh, J., concurring) (noting that parole decisions implicate "the President's Article II judgment with respect to American foreign policy and foreign relations").

The DHS parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela that are at issue in this case (collectively, the "CHNV Parole Program") are only the latest illustration of the importance of parole to the executive's ability to manage the "delicate field[s]" of immigration and international relations. *Id.* at

2

805 (quoting *Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108, 115-16 (2013)).

Announced in January 2023 amidst a "surge" of migration of nationals from the

covered countries, the CHNV Parole Program enables "supporter[s]" within the

United States to apply to DHS for permission to sponsor a particular qualifying

national from one of those countries.  ROA.11512-14.  Once they have a supporter,

CHNV nationals can apply to DHS for advance authorization to travel to the

United States and request a discretionary grant of parole.  ROA.11514.  As DHS

has explained, the Program seeks to "enhance the security of our Southwest

Border" and support the executive branch's "multi-pronged, regional strategy to

address the challenges posed by irregular migration."  *See, e.g.*, *Implementation of

a Parole Process for Nicaraguans*, 88 Fed. Reg. 1,255, 1,255 (Jan. 9, 2023).

Despite the Supreme Court's repeated exhortation that courts should not

"improperly second-guess" the executive's parole decisions, *Biden*, 597 U.S. at

816 (Kavanaugh, J., concurring); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589

(1952) (immigration decisions are "largely immune from judicial inquiry or

interference"), Texas now claims that the CHNV Parole Program exceeds DHS's

authority under 8 U.S.C. § 1182(d)(5), *see* Appellants' Br. 3.  This argument is

wrong.

Like many immigration provisions, § 1182(d)(5) "afford[s] substantial

discretion to the Executive" and allows different executives to "exercise that

discretion differently." *Biden*, 597 U.S. at 815 (Kavanaugh, J., concurring). Indeed, when Congress last passed a significant amendment to § 1182(d)(5), it intentionally empowered the DHS Secretary to define the terms "urgent humanitarian reasons" and "significant public benefit" in response to the executive branch's contention that it needed this discretion to "respond flexibly to . . . immigration matters of foreign policy consequence." *Immigration in the National Interest Act of 1995: Hearing before Subcomm. Immigr. & Claims of H. Jud. Comm.,* 104th Cong., 2d Sess. 51 (1995); *see infra* Part I.B.

Notwithstanding the discretion the statute confers on the executive, Texas argues that the Program cannot be "squared" with § 1182(d)(5)(A)'s "case-by-case" requirement. *See* Appellants' Br. 1. Specifically, Texas argues that § 1182(d)(5) cannot be used to "admit entire categories of aliens" in high numbers and at a high rate. *Id.* at 3 (citation omitted). To be sure, that provision provides that the DHS Secretary's decision to grant parole for "urgent humanitarian reasons or significant public benefit" must be made on a "case-by-case basis." 8 U.S.C. § 1182(d)(5)(A). But it does not prevent the Secretary from determining that paroling individuals who meet certain criteria will address urgent humanitarian needs or advance a significant public benefit, so long as parole applicants who meet those criteria are then considered individually.

Significantly, Texas's "novel" reading of the parole statute conflicts with

4

almost a century of executive practice. *Cf. Biden*, 597 U.S. at 805 (emphasizing that "every Presidential administration" had adopted an interpretation of the provision in question that differed from the one being advanced). The executive branch has for decades employed programs in which certain categories of noncitizens are presumptively eligible for parole, subject to case-by-case review. Indeed, officials have long relied on such programs to advance the same objectives that underlie the CHNV Parole Program. And in the course of developing such initiatives, immigration officials have twice explicitly rejected the reading of the statute that Texas now proposes. *See infra* at 19-20. If Texas were correct, all of these programs would have violated federal law. That is simply not the case.

Finally, Texas's argument would impose a "significant burden upon the Executive's ability to conduct diplomatic relations" and manage the security of the nation's borders. *Biden*, 597 U.S. at 806. Parole decisions "involve policy choices that bear on this Nation's international relations." *Arizona*, 567 U.S. at 396. Limiting the executive's parole authority, as Texas urges, would undermine a variety of the government's foreign policy goals, including its negotiations with the government of Mexico, which has agreed to accept CHNV nationals only because of the existence of the Program, *see infra* at 25-26. These stark consequences underscore why courts have long declined to "substitute [their] own

assessment for the Executive's" in matters of immigration policy. *Trump v. Hawaii*, 585 U.S. 667, 708 (2018).

Whatever *amici* believe about the CHNV Parole Program as a matter of policy, they all recognize that the program is legal. And they know that a decision to the contrary would seriously impair the executive branch's ability to manage the nation's immigration policy in a manner that is sensitive to its security and foreign policy needs.

## ARGUMENT

### I.     Federal Law Gives Immigration Officials Broad Authority to Utilize Parole.

**A.** As *amici* well know, immigration decisions are "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades*, 342 U.S. at 588-89; *see Chy Lung v. Freeman*, 92 U.S. 275, 279 (1875) (noting that immigration policy decisions have the potential to "bring disgrace upon the whole country, the enmity of a powerful nation, or the loss of an equally powerful friend").

Because of this, the executive branch has long enjoyed significant "flexibility" in the enforcement of immigration law, thereby permitting "the adaptation of the congressional policy to infinitely variable conditions." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (quoting *Lichter v.*

*United States*, 334 U.S. 742, 785 (1948)); *Biden*, 597 U.S. at 816 (Kavanaugh, J., concurring) (noting that "the immigration statutes afford substantial discretion to the Executive").  Among other things, the DHS Secretary is authorized to temporarily parole certain noncitizens into the United States, so long as parole decisions are made "on a case-by-case basis" and parole is granted either for "urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).

The INA's text repeatedly emphasizes the Secretary's broad discretion to make decisions regarding parole.  By "entrust[ing]" the Secretary with the power to decide whether, when, and on what conditions to grant parole, the statute "exudes deference" to the executive.  *Hawaii*, 585 U.S. at 684.  And by providing that the Secretary "*may*" parole noncitizens into the United States "in his *discretion*," 8 U.S.C. § 1182(d)(5)(A) (emphasis added), the statute "does not just suggest discretion, it 'clearly connotes' it."  *Biden*, 597 U.S. at 802 (quoting *Opati v. Republic of Sudan*, 590 U. S. 418, 428 (2020)); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion.").

Furthermore, the statute places no cap on the number of noncitizens who may be paroled pursuant to its terms.  Nor does it define the phrases "urgent humanitarian reasons" or "significant public benefit."  These elements of the

statute's text underscore the significant discretion it confers on immigration officials to determine as a matter of policy what constitutes an "urgent humanitarian reason[]" or "significant public benefit" and to decide "on a case-by-case basis" whether those criteria apply to any particular individual's case. 8 U.S.C. § 1182(d)(5)(A).

**B.** The history of the parole statute confirms that it affords the executive "substantial discretion" in determining how to use its parole authority. *Biden*, 597 U.S. at 816 (Kavanaugh J., concurring). Congress passed the current parole statute as part of its 1996 overhaul of the INA. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, § 602(a), 110 Stat. 3009-546. When it did so, it sought to deter any "abuse" of the parole authority while at the same time preserving the executive's flexibility to determine when parole was appropriate. *See* S. Rep. No. 104-249, at 2 (1996).

When Congress was debating IIRIRA's parole provisions, it considered a version of the statute that would have explicitly limited the definitions of "humanitarian parole" and "public interest parole" to certain narrow and pre-defined categories. *See* H.R. 2202, 104th Cong. § 524 (1995) (limiting "humanitarian parole" to situations involving medical emergencies, organ transplants, or the imminent death of a close family member in the United States, and limiting "public interest parole" to situations in which "the alien has assisted

the United States Government in a matter[] such as a criminal investigation, espionage, or other similar law enforcement activity"). In describing this proposal, the House Judiciary Committee explained that it wanted to impose significant limitations on the executive's parole authority and to end the use of parole to "admit entire categories of aliens" in relation to agreements with other countries. *See* H.R. Rep. No. 104-469, at 140 (1996). Texas repeatedly cites these statements to explain why § 1182(d)(5) does not authorize the CHNV Program. *See* Appellants' Br. 3-4, 7.

But Texas neglects to mention that the House Judiciary Committee's proposal—the one that allegedly prohibited the admission of "entire categories of aliens" via parole, *see* H.R. Rep. No. 104-469, at 140 (1996) (describing H.R. 2202, 104th Cong. (1995))—did not become law. Instead, Congress rejected this proposal after the executive branch expressed its "deep concern" that it would "limit the Administration's ability to respond flexibly to immigration emergencies, compelling humanitarian concerns or immigration matters of foreign policy consequence." *See Immigration in the National Interest Act of 1995: Hearing before Subcomm. Immigr. & Claims of H. Jud. Comm.,* 104th Cong., 2d Sess. 51 (1995) (written testimony of Diane Dillard, Acting Ass't Sec'y, Bureau of Consular Affairs, U.S. Department of State); H.R. Rep. No. 104-469, at 538 (1996) (dissenting legislators objecting that the changes to parole "unwisely tie[] the

Administration's hand").[2]  By doing so, Congress left the executive branch with "ample power," *Hawaii*, 585 U.S. at 684, to determine when the "urgent humanitarian reasons" or "significant public benefit" standards were met, 8 U.S.C. § 1182(d)(5)(A), and merely required that there be an individual determination with respect to whether any specific applicant merited parole.

**C.**  Texas argues that the CHNV Parole Program cannot be "squared with federal law" because parole cannot be used to "admit entire categories of aliens," Appellants' Br. 3 (citing H.R. Rep. No. 104-469, at 140 (1996)), at least at a high number or high rate, *id.* at 24-25.

Texas mistakenly presumes that "case-by-case" parole assessments will necessarily result in a small number of parolees or a reduced rate of parole.  But that is not what "case-by-case" means.  Rather, "case-by-case" means "[o]n the basis of, or according to, each individual case," or "so as to consider each case separately, taking into account its individual circumstances and features." *Case-by-case*, Oxford English Dictionary, doi.org/10.1093/OED/1037895988 (last visited July 10, 2024); *case-by-case*, Cambridge English Dictionary, dictionary.cambridge.org/us/dictionary/english/case-by-case (last visited July 10, 2024) ("decisions that are made separately, each according to the facts of the

---

[2] The Subcommittee hearing hearing addressed H.R. 1915, which contained parole provisions identical to those in H.R. 2202. *Compare* H.R. 1915, 104th Cong. § 524 (1995), *with* H.R. 2202, 104th Cong. § 524 (1995).

particular situation"); *see, e.g.*, *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999) (statutory language "with respect to an individual" requires analysis "on a case-by-case basis"). Nothing in that text precludes the parole of a large number of noncitizens so long as each noncitizen's case is considered individually.

To be sure, the executive cannot use the parole power on an "*en masse*" or blanket basis, Appellants' Br. 4, but that does not prevent immigration officials from designating classes or categories of noncitizens who presumptively meet § 1182(d)(5)'s criteria, subject to individualized review. Indeed, the 104th Congress, which enacted IIRIRA, anticipated the parole of "categories of aliens" into the United States, *see* H.R. Rep. No. 104-828, at 245 (1996) (describing reporting requirements regarding the "number and *categories* of aliens paroled into the United States" (emphasis added)), and subsequent Congresses have repeatedly approved of the executive's use of parole processes applicable to categories of noncitizens subject to individualized review, *see infra* at 20-21. In fact, immigration officials from a variety of administrations created programs of this kind both before and after IIRIRA, as the next Section explains.

## II.    For Decades, the Executive Branch Has Used Parole Programs to Respond to Pressing Diplomatic and Migration-Related Developments.

Texas's argument is not only at odds with the text of the parole statute, but also with decades of executive branch practice. For almost a century, the executive has used parole to facilitate the entry of "certain defined types of noncitizens,"

subject to individualized review.  *See, e.g.,* David J. Bier, *126 Parole Orders over 7 Decades*, Cato Institute (July 17, 2023), cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders.  While the specifics of these parole programs differed over time, they provide two general lessons.  First, parole programs have afforded the executive the crucial ability to provide alternatives to dangerous and potentially unmanageable migration patterns and advance broad geopolitical aims.  Second, both before and after the passage of IIRIRA, Republican and Democratic administrations alike have used the parole authority to designate specific classes of noncitizens for whom parole is presumptively available and to permit them to enter the country in fairly large numbers—the exact practice that Texas now claims violates § 1182(d)(5).

**A.**  The INA as originally enacted did not specifically provide for the admission of refugees fleeing persecution.  For this reason, the executive branch frequently relied on the parole authority to allow large numbers of refugees to enter the country.  Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole* 2 (Oct. 15, 2020).  For example, an Eisenhower administration parole program resulted in the admission of over 30,000 noncitizens from Hungary following the collapse of the anti-Communist revolution.  *See* Charlotte Moore, Cong. Rsch. Serv., *Review of U.S. Refugee Resettlement Programs and Policies* 9 (Comm. Print 1980).

Even after the 1965 amendments to the INA added a "conditional entry" provision for the admission of refugees, *see* An Act to Amend the Immigration and Nationality Act, and for other purposes, Pub. L. No. 89-236, § 3, 79 Stat. 911, 913 (1965), the executive branch used its parole authority to establish programs that facilitated the admission of hundreds of thousands of noncitizens fleeing persecution from Cuba, Vietnam, Indochina, and other areas throughout the 1960s and 1970s—at times at a rate of over 20,000 per month. *See* Moore, *supra*, at 11-14. These programs furthered the government's "broader foreign policy objectives," including by "promot[ing] stability in friendly, democratic countries of first asylum." *See United States Refugee Programs: Hearing before S. Comm. Jud.*, 96th Cong., 2d Sess. 6 (1980) (statement of Att'y Gen. Benjamin Civiletti). They also disrupted more dangerous migration patterns—practices that, in the eyes of the government, would have had "profound" political and humanitarian consequences. *See id.* at 139 (U.S. Coordinator for Refugee Affairs noting that a reduction in admission of refugees and parolees could lead to a "[r]esumption of boat departures on . . . a large scale" from Vietnam).

After the enactment of the Refugee Act of 1980, which provided for a separate refugee admissions process, the executive continued to rely on the "broad, discretionary authority" granted in § 1182(d)(5), Bruno, *supra*, at 1, to establish special parole programs for particular populations in response to unexpected

13

diplomatic and migration challenges, *id.* at 8-13; *see generally* Refugee Act of

1980, Pub. L. No. 96-212, 94 Stat. 102, 108 (codified at 8 U.S.C. § 1182(d)(5)(B)).

For example, in 1988, then-Attorney General Edwin Meese announced a

program in which certain Soviet nationals who were denied refugee status would

be "considered for entry to the United States under [his] parole authority." *Soviet*

*Refugees: Hearing before H. Subcomm. Immigr. Refugees, and Int'l L.*, 101st

Cong., 1st Sess. 128-30 (1989). As officials at the time made clear, the varied

policy initiatives adopted by the administration in response to unexpected changes

in Soviet emigration patterns, including the parole policy, were "intimately linked

with basic bilateral and multilateral foreign policy objectives." *Id.* at 35

(Statement of Jonathan Moore, U.S. Coordinator for Refugee Affairs); *see also id.*

(describing a "surge in emigration from the Soviet Union").

Similarly, immigration officials have often relied on the parole authority to

facilitate entry for Cuban nationals in response to unforeseen migration patterns

and geopolitical imperatives. After a "wave of Cuban nationals [took] to the sea"

in 1994, the Clinton Administration negotiated a bilateral migration agreement

with Cuba. ROA.14838. Because of the flexibility afforded by § 1182(d)(5), the

administration was able to commit to "ensur[ing] that total legal migration to the

United States from Cuba will be a minimum of 20,000 Cubans each year," in

exchange for the Cuban government's promise to discourage irregular and unsafe

departures. *See* Communique Between the United States of America and Cuba, 94-909, *signed at* New York (Sept. 9, 1994), *entered into force* Sept. 9, 1994, state.gov/wp-content/uploads/2022/07/94-909-Cuba-Migration-and-Refugees.pdf. Officials at the time well knew that future administrations would need to "rely heavily" on programs authorized by § 1182(d)(5) to meet this commitment if other legal admissions routes, such as family-based immigrant visas, did not provide sufficient Cuban migration in a given year. ROA.14838-14839. The parole authority, in other words, was "critical to reaching the agreement with Cuba through which [the executive] successfully abated the unsafe and disorderly flow of Cuban migrants." ROA.14771-14772 (describing the "Special Cuban Migration Program," as well as other uses of parole, to reach the 20,000 commitment).

Even after the passage of IIRIRA, when Congress made explicit the requirement that parole decisions be made on a "case-by-case basis," *see* Pub. L. No. 104-208, § 602(a), 110 Stat. 3009-689 (1996), executive officials continued to employ categorical parole programs when circumstances warranted it. In 2007, when Coast Guard apprehensions of Cuban migrants once again peaked, DHS Secretary Michael Chertoff established the Cuban Family Reunification Parole (CFRP) program, under which certain beneficiaries of approved family-based visa petitions from Cuba could be paroled into the United States. Like many parole programs for Cuban nationals, the CFRP program served the critical foreign policy

objective of enabling the United States to meet commitments that it had made to the Cuban government in the U.S.-Cuban Migration Agreement a decade earlier. *Cuban Family Reunification Parole Program*, 72 Fed. Reg. 65,588 (Nov. 21, 2007) ("[T]his Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords."). Further, this program helped to reduce unlawful and unsafe migration, deterring "irregular and inherently dangerous attempts to arrive in the United States." *See id*.; *see also Implementation of Haitian Family Reunification Parole Program*, 79 Fed. Reg. 75,581, 75,582 (Dec. 18, 2014) (explaining that the program would advance "a significant public benefit by promoting safe, legal, and orderly migration to the United States" and "support[] U.S. goals for Haiti's long-term reconstruction and development," which is "a priority for the United States").

Similarly, in 2014, the Obama administration established the Central American Minors (CAM) Refugee and Parole Program. *See Central American Minors (CAM) Parole Program*, USCIS (Sept. 14, 2021), uscis.gov/CAM. Seeking to provide a "safe, legal, and orderly alternative to the dangerous journey across the Southwest border to reach the United States," the CAM program allowed minor children from El Salvador, Guatemala, and Honduras to apply for refugee or parole status from their home country. *An Examination of the*

*Administration's Central American Minors Refugee/Parole Program: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Immigr. and the Nat'l Interest*, 114th Cong. 1-5 (2015) (written testimony of Joseph Langlois, Assoc. Dir., Refugee, Asylum and Int'l Operations, USCIS) [hereinafter *CAM Hearing*]. Minors who did not qualify for refugee status could receive parole based on papers filed by a parent or legal guardian already lawfully present in the United States, if an immigration official found "that the individual [was] at risk of harm in his or her country and that the applicant merit[ed] a favorable exercise of discretion." *Id.*

Like other categorical parole programs, the CAM program enabled the orderly processing and entry of noncitizens fleeing persecution who would otherwise face "serious risk" or attempt a dangerous journey. *Id.* at 6 (written testimony of Hon. Doris Meissner). It also stemmed from the executive's engagement with stakeholders abroad, including the governments of all three participating countries, reflecting the geopolitical importance of providing an "effective alternative" to dangerous and irregular migration networks. *Id.* at 1-3 (written testimony of Simon Henshaw, Principal Deputy Ass't Sec'y, Bureau of Population, Refugees, and Migration, U.S. Department of State). Indeed, the program was announced publicly by then-Vice President Joe Biden at the Inter-American Development Bank as one part of a broader U.S. commitment to address

the root causes of migration.  *Id*. at 4 (written testimony of Joseph Langlois, Assoc. Dir., Refugee, Asylum and Int'l Operations, USCIS).

**B.**  All of these parole policies combined class-based considerations with some kind of individualized—or case-by-case—review.  ROA.15088-15089; Bier, *supra* (noting that "the case-by-case basis requirement was in effect for decades, including for large-scale programmatic uses of parole").  In each one, even if someone's nationality or other categorization "created a presumption" that they met the statutory requirements, "[c]ase-by-case determinations always meant an individual determination."  *Id.*

Once again, this was true both before and after Congress explicitly required in IIRIRA that parole be granted on a "case-by-case basis," *see supra* 14-17; *see, e.g.*, *Cuban Family Reunification Parole Program,* 72 Fed. Reg. 65,588 (Nov. 21, 2007) (CFRP program decisions made on a "case-by-case" basis); *CAM Program*, *supra*, at 4-5 (written testimony of Joseph Langlois, Assoc. Dir., Refugee, Asylum and Int'l Operations, USCIS) (describing case-by-case consideration of parole eligibility in the CAM program); Bo Cooper, Gen. Counsel, INS, *Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status*, at 6 (June 15, 2001), americanprogress.org/wp-content/uploads/sites/2/2023/04/INS-GenCou-ParoleLegOp-1996-amends18.pdf (noting that "the officer consider[ed] the merits of the case for an offer of parole" for "every refugee applicant" under

18

the Lautenberg parole program); ROA.14789-14793 (describing the admission of Cuban nationals on "a case-by-case basis" in 1995 parole program); ROA.14802-14816 (same); *cf.* Bier, *supra* ("Few at the time thought [IIRIRA's] changes [to the parole statute] were substantive, and the categorical parole regulations then in effect were reenacted verbatim.").

Following IIRIRA, immigration officials have twice expressly concluded that the statute's "case-by-case" requirement permits the use of parole programs such as these. In 2001, INS General Counsel Bo Cooper analyzed whether INS could continue former Attorney General Meese's parole program for Soviet nationals denied refugee status. After reviewing the history surrounding IIRIRA's parole provision, Cooper concluded that "[d]esignating, whether by regulation or policy, a class whose members would generally be considered appropriate candidates for parole" did not violate IIRIRA's restrictions on the use of parole, including the statute's requirement that parole decisions be made on a "case-by-case basis." Cooper, *supra*, at 6. DHS Secretary Jeh Johnson reiterated this conclusion in 2014, explaining that § 1182(d)(5) has "long been interpreted to allow for designation of specific classes of aliens for whom parole should be favorably considered, so long as the parole of each alien within the class is considered on a discretionary, case-by-case basis." Jeh Charles Johnson, Sec'y of Homeland Sec., *Families of U.S. Armed Forces Members and Enlistees*, at 1 (Nov.

20, 2014), dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place
.pdf.

Furthermore, Congress has repeatedly referred to class-based parole
programs in legislation, indicating its awareness and acceptance of DHS's
longstanding reading of the parole statute.  Indeed, Congress has permitted the
participants in many such programs to adjust to permanent resident status, *see, e.g.*,
Foreign Operations, Export Financing, and Related Programs Appropriations Act,
1990, Pub. L. No. 101-167, § 599E, 103 Stat. 1195, 1263 (1989) (parolees from
Soviet Union, Vietnam, Laos, and Cambodia); Foreign Operations, Export
Financing, and Related Programs Appropriations Act, 2001, Pub. L. No. 106-429,
§ 586(b)(1), 114 Stat. 1900, 1900A-57 (2000) (Indochinese parolees and
participants in the "Orderly Departure Program"); Help Haitian Adoptees
Immediately to Integrate Act of 2010, Pub. L. No. 111-293, § 1, 124 Stat. 3175,
3175 (2010) (referring by name to the "humanitarian parole policy for certain
Haitian orphans"), including in IIRIRA itself, *see* Pub. L. No. 104-208, § 646, 110
Stat. 3009-709 (1996) ("certain Polish and Hungarian parolees").  Even more
significantly, it has also granted benefits to participants in ongoing parole
programs, *see, e.g.*, Extending Government Funding and Delivering Emergency
Assistance Act, Pub. L. No. 117-43, § 2502, 135 Stat. 344, 377 (2021) (participants
in the parole program for individuals from Afghanistan); Additional Ukraine

Supplemental Appropriations Act, Pub. L. No. 117-128, § 401(a), 136 Stat. 1211, 1218 (2022) (participants in the Uniting for Ukraine parole process), and has expressed the "sense of Congress" that certain categories of individuals are deserving of parole, *see* National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 1758, 133 Stat. 1198, 1860 (2019). These statutes demonstrate that Congress has long been "sufficiently aware" of the prospect of class-based parole programs and not only has declined to prohibit such programs but has instead explicitly "acknowledged and accepted" them. *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837-38 (1988) (citation and quotation marks omitted).

This history illustrates the significant flaws with Texas's contention that the CHNV Program cannot be "squared" with § 1182(d)(5)'s "case-by-case" requirement. Appellants' Br. 1. If Texas were right that parole cannot be used to "admit entire categories of aliens," *id.* at 3 (citing H.R. Rep. No. 104-469, at 140 (1996)), multiple administrations, both Republican and Democratic, would have violated the parole statute. And once again, Congress *rejected* a proposal that would have explicitly limited the definitions of "humanitarian parole" and "public interest parole" to certain narrow categories, instead leaving it to the executive branch to define these terms itself, *see supra* I.B.

The decades-long history of categorical parole programs also undermines

Texas's suggestion that the CHNV Program violates § 1182(d)(5) because of its size and approval rate.  Under many of these programs, the government granted parole at a relatively high rate—owing, perhaps, to the fact that the eligibility criteria were clearly publicized to ensure that only eligible applicants applied.  *See generally* U.S. General Accounting Office, *U.S. Response to the 1994 Cuban Migration Crisis* 8 (1995) (noting the government's estimate "that only a small number" of applicants from Guantanamo Bay camps will be ineligible for parole); *Midyear Consultation on Refugee Programs: Hearing Before S. Subcomm. Immigr. & Refugee Affairs*, 100th Cong., 1st Sess. 84 (1987) (describing a 95% approval rate for a humanitarian parole program for Cambodian refugees); *S.A. v. Trump*, 363 F. Supp. 3d 1048, 1054 (N.D. Cal. 2018) (citing a 99% approval rate for interviewees for parole under the CAM program).

And many of the parole programs described above also permitted the entry of large numbers of noncitizens.  *See, e.g.*, Bier, *supra* (describing, for example, the parole of 226,000 Cubans at U.S. land borders from 2004-2016).  Indeed, as of December 2023, over 170,000 Ukrainian citizens had received parole through DHS's Uniting for Ukraine program—a continuing effort that Texas has not challenged.  *See Welcoming Ukrainian Nationals to the United States*, U.S. Department of State, state.gov/welcoming-ukrainian-nationals-to-the-united-states/ (last visited July 26, 2024); ROA.14551.  Of course, because so many class-based

parole programs aim to reduce the "severe operational and public pressure" caused by "unmanageably large [and] life-threatening" migration patterns, programs that provide for in-country processing of parole applicants are still seen to yield "limited numbers" of overall entries when compared to the alternative, despite their application to large numbers of parolees. *CAM Hearing*, *supra*, at 5-6 (written testimony of Hon. Doris Meissner). As the court below recognized, that has been exactly the case with the CHNV Program. *See* ROA.11528 ("Despite the high approval rate of Program applications, the record reflects that the Program has resulted in a decrease of CHNV nationals entering the United States.").

## III. The CHNV Program Is a Valid Exercise of the Executive's Parole Power.

The CHNV Program enables certain nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to DHS for advance authorization to travel to the United States and to seek a discretionary grant of parole for two years. Applicants must apply with support from a U.S. citizen or resident sponsor who promises to provide financial assistance for the duration of the two-year period. ROA.11519-11520. If U.S. Citizenship and Immigration Services (USCIS) approves the sponsor and confirms the parole applicant's biographical information and other eligibility criteria, Customs and Border Protection (CBP) may issue advance travel authorization after further "vetting." ROA.11521. Once the individual receives authorization and travels to an interior port of entry, a CBP officer again considers

the applicant for parole on an individual basis.  ROA.11521.

Like the programs employed by previous administrations, *see supra* Part II, the CHNV Program designates a class "whose members generally would be considered appropriate candidates for parole," subject to an adjudicator's individual "determin[ation of] whether a person is a member of the class and whether there are any reasons not to exercise the parole authority in the particular case."  Cooper, *supra*, at 6.  Indeed, as the court below recognized, potential parolees are individually adjudicated at multiple points in the application process, including when seeking advance travel authorization and when being considered for parole at a port of entry.  ROA.11521 (noting that officials have "denied parole for aliens who traveled with advance travel authorization pursuant to the CHNV processes").

The CHNV Program is integrally related to the "foreign policy goals of the U.S. Government" and helps the executive honor political commitments made in multilateral agreements with regional partners.  *See, e.g.*, *Implementation of a Parole Process for Nicaraguans*, 88 Fed. Reg. 1,255, 1,262-63 (Jan. 9, 2023) (noting that the new process "helps achieve" the goals of the Los Angeles Declaration on Migration and Protection, which was endorsed in June 2022 by 21 countries and involves "[k]ey allies" in the region).  For example, the Program played a key role in consultations with Mexico concerning irregular migration, *see*

*id.* at 1,264 (noting that the process is "directly responsive to requests" from the government of Mexico); *Implementation of a Parole Process for Venezuelans*, 87 Fed. Reg. 63,507, 63,514 (Oct. 19, 2022) (describing "ongoing, sensitive diplomatic engagements" with the Mexican government), and is intended to aid ongoing bilateral negotiations with Cuba, *Implementation of Parole Process for Cubans*, 88 Fed. Reg. 1,266, 1,274 (Jan. 9, 2023).

The CHNV Program also stems from DHS's desire to reduce irregular and unsafe migration pathways, providing what the Department hopes will be a "significant incentive for migrants to wait where they are" rather than attempt a dangerous journey. *See, e.g.*, *Implementation of a Parole Process for Nicaraguans,* 88 Fed. Reg. 1,255, 1,257 (Jan. 9, 2023); *id.* at 1,256-57 (noting that the number of Venezuelans attempting to pass through the Darién Gap, "an inhospitable jungle that spans between Panama and Colombia," had reduced from over 40,000 to 668 during a pilot version of a parole process for Venezuelan nationals). Like many of their predecessors, the officials who implemented the CHNV Program hoped to "provide an alternative to dangerous outflows" using the flexibility of § 1182(d)(5). *CAM Hearing*, *supra*, at 6 (written testimony of Hon. Doris Meissner).

And like many parole programs of the past, the CHNV Program has reduced overall admissions in the course of redirecting dangerous migration patterns. As

the court below recognized, DHS's ability to return CHNV nationals was significantly limited prior to the development of the Program, and it was only due to the Program and surrounding negotiations with the government of Mexico that DHS was able to facilitate the return of any CHNV nationals to that country. *See* ROA.11522-23 ("The Government of Mexico has indicated that its willingness to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States."). For this reason, "[d]espite the high approval rate of Program applications, the . . . Program has resulted in a decrease of CHNV nationals entering the United States." ROA.15228. It was this "dramatic[] decline[]" in the number of CHNV nationals, of course, that led the court below to conclude that Texas lacks standing to sue. ROA.15229.

\* \* \*

For decades, § 1182(d)(5) has enabled the executive branch to adapt "congressional policy to infinitely variable conditions," *Knauff*, 338 U.S. at 543, by creating programs that have advanced the government's diplomatic goals and helped to reduce irregular migration. Texas's arguments are at odds with long-standing historical practice, and for good reason: they would frustrate the executive's ability to respond quickly to emergencies involving border security, humanitarian catastrophes, and sensitive "foreign-policy judgment[s]," *Biden*, 597

U.S. at 816 (Kavanaugh, J., concurring).

## CONCLUSION

For the foregoing reasons, if this Court reaches the merits, it should

conclude that the CHNV Program is lawful.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amici Curiae*

Dated: August 2, 2024

# APPENDIX

## LIST OF *AMICI*

**T. Alexander Aleinikoff**
University Professor & Director of the Zolberg Institute on Migration and Mobility, The New School
*Executive Associate Commissioner for Programs, INS, 1995-1996; General Counsel, INS, 1994-1995*

**Daniel Brown**
Partner, Fragomen, Del Rey, Bernsen & Loewy, LLP
*Counselor to the Assistant Secretary and Acting Director of Policy, ICE, DHS, 2005-2006; Deputy Associate General Counsel for Immigration, DHS, 2003-2006; Special Counsel, INS, 2001-2003*

**Stevan E. Bunnell**
*General Counsel, DHS, 2013-2017*

**Scott Busby**
*Deputy Assistant Secretary of State for the Bureau of Democracy, Human Rights, and Labor, U.S. Department of State, 2013-2023*

**Bo Cooper**
*General Counsel, INS, 1999-2003*

**John Creamer**
*Chargé d'Affaires, U.S. Embassy Mexico City, 2018-2019, 2021; Deputy Chief of Mission, U.S. Embassy Mexico City, 2019-2021; Deputy Assistant Secretary of State for the Bureau of Western Hemisphere Affairs, U.S. Department of State, 2016-2018*

**Jeffrey Davidow**
*U.S. Ambassador to Mexico, 1998-2002; U.S. Ambassador to Venezuela, 1993-1996; U.S. Ambassador to Zambia, 1988-1989; Assistant Secretary of State for the Bureau of Western Hemisphere Affairs, U.S. Department of State, 1996-1998*

**Arthur Eugene Dewey**
*Deputy High Commissioner for Refugees, United Nations, 1986-1990; Assistant Secretary of State for the Bureau of Population, Refugees and Migration, U.S. Department of State, 2002-2005*

**John Feeley**
*U.S. Ambassador to Panama, 2015-2018; Principal Deputy Assistant Secretary of State for the Bureau of Western Hemisphere Affairs, 2012-2015; Deputy Chief of Mission and Chargé d'Affaires, U.S. Embassy Mexico City, 2009-2012*

**Lawrence J. Gumbiner**
*Chargé d'Affaires, U.S. Embassy Tegucigalpa, 2019; Chargé d'Affaires, U.S. Embassy Havana, 2017-2018; Deputy Chief of Mission, U.S. Embassy Lima 2014-17; Deputy Assistant Secretary of State, U.S. Department of State, 2010-2012*

**John Hamilton**
*U.S. Ambassador to Guatemala, 2003-2005; U.S. Ambassador to Peru 1999-2002; Deputy Assistant Secretary for the Bureau of Western Hemisphere Affairs, U.S. Department of State, 1998-1999*

**Morton Halperin**
*Director, Policy Planning Staff, U.S. Department of State, 1998-2001; Special Assistant to the President and Senior Director for Democracy, National Security Council, 1994-1996; Senior Staff, National Security Council, 1969; Consultant, Department of Defense, 1993; Deputy Assistant Secretary of Defense (International Security Affairs), Policy Planning and Arms Control, 1967-1969*

**Roberta S. Jacobson**
*U.S. Ambassador to Mexico, 2016-2018; Assistant Secretary of State for the Bureau of Western Hemisphere Affairs, U.S. Department of State, 2012-2016, Deputy Chief of Mission, U.S. Embassy, Lima, 2000-2002; State Department:1986-2018*

**R. Gil Kerlikowske**
*Commissioner, U.S. Customs and Border Protection, DHS, 2014-2017*

**Stephen H. Legomsky**
John S. Lehmann University Professor Emeritus, Washington University School of Law
*Senior Counselor to the Secretary of Homeland Security, DHS, 2015; Chief Counsel, USCIS, DHS, 2011-2013; Advisor to the Commissioner of INS and Chair of the Commissioner's Policy Advisory Group, 1990-1993*

**David A. Martin**
  Warner-Booker Distinguished Professor of International Law Emeritus,
  University of Virginia School of Law
    *Homeland Security Advisory Council, DHS, 2015-2018; Principal Deputy
    General Counsel, DHS, 2009-2010; General Counsel, INS, 1995-1998*

**Brian P. McKeon**
    *Deputy Secretary for Management and Resources, U.S. Department of State,
    2021-2022; Principal Deputy Under Secretary of Defense for Policy, U.S.
    Department of Defense, 2014-2017; Executive Secretary & Chief of Staff,
    National Security Council, 2012-2014; Deputy National Security Adviser to
    the Vice President, 2009-2012*

**Lynden Melmed**
  Partner, Berry Appleman & Leiden LLP
    *Chief Counsel, USCIS, DHS, 2007-2009*

**James D. Nealon**
    *Assistant Secretary of Homeland Security for International Engagement,
    DHS, 2017-2018; U.S. Ambassador to Honduras, 2014-2017; Civilian Deputy
    to the Commander, United States Southern Command, 2013-2014; Deputy
    Chief of Mission, U.S. Embassy Ottawa, 2010-2013; Deputy Chief of Mission,
    U.S. Embassy Lima, 2007-2010; Deputy Chief of Mission and Chargé
    d'Affaires, U.S. Embassy Montevideo, 2005-2007*

**Anne C. Richard**
    *Assistant Secretary of State for the Bureau of Population, Refugees and
    Migration, U.S. Department of State, 2012-2017*

**Leon Rodriguez**
  Partner, Seyfarth Shaw LLP
    *Director, USCIS, DHS, 2014-2017; Deputy Assistant Attorney General,
    USDOJ, Civil Rights Division, 2010-2011; First Assistant United States
    Attorney, Western District of Pennsylvania, 1999-2001*

**Daniel A. Restrepo**
    *Special Assistant to the President and Senior Director for the Bureau of Western
    Hemisphere Affairs at the National Security Council, 2009-2012*

**Peter F. Romero**
  Lecturer and Co-Host/Producer, "American Diplomat" podcast
    *Assistant Secretary of State for the Bureau of Western Hemisphere Affairs,*
    *U.S. Department of State, 1996-2001; U.S. Ambassador to Ecuador, 1993-*
    *1996*

**Eric Schwartz**
  Chair and Professor of Public Affairs, Hubert H. Humphrey School of Public
  Affairs, University of Minnesota
    *Assistant Secretary of State for the Bureau of Population, Refugees, and*
    *Migration, U.S. Department of State, 2009-2011; Special Assistant to the*
    *President for National Security Affairs and Senior Director, National Security*
    *Council, 1996-2001; Director, National Security Council, 1993-1996*

**Lori Scialabba**
    *Acting Director, USCIS, DHS, 2017; Deputy Director, USCIS, DHS, 2011-*
    *2017; Associate Director, Refugee, Asylum and International Operations,*
    *USCIS, DHS, 2006-2011; Chairman, Board of Immigration Appeals, 2002-*
    *2006; Deputy General Counsel, INS, 1994-1998*

**Thomas A. Shannon Jr.**
    *Under Secretary of State for Political Affairs, U.S. Department of State, 2016-*
    *2018; Counselor of the Department, U.S. Department of State, 2013-2016;*
    *U.S. Ambassador to Brazil, 2010-2013; Assistant Secretary of State for the*
    *Bureau of Western Hemisphere Affairs, U.S. Department of State, 2006-2010*

**Margaret D. Stock**
  Managing Attorney, Cascadia Cross Border Law Group
    *Lt. Col. (ret'd), U.S. Army, Military Police Corps; Associate Professor,*
    *United States Military Academy, West Point, NY, 2001-2010*

**Kevin Whitaker**
    *U.S. Ambassador to Colombia 2014-2019; Deputy Assistant Secretary of State*
    *for the Bureau of Western Hemisphere Affairs, U.S. Department of State,*
    *2011-2014*

† Current institutional affiliations are listed for identification purposes only.

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2024, I electronically filed the

foregoing document using the Court's CM/ECF system, causing a notice of filing

to be served upon all counsel of record.

Dated: August 2, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,807 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: August 2, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

6A