# 24-40160

# United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiffs-Appellants,*

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants-Appellees,*

VALERIE LAVEUS,

*Appellees.*

*(Caption continues inside front cover.)*

On Appeal from the U.S. District Court
for the Southern District of Texas

**BRIEF FOR THE STATES OF NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, AND VERMONT, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
KARTIK NARAM
  *Assistant Solicitor General*
    *of Counsel*
*(Additional counsel listed on signature pages.)*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Amici Curiae
28 Liberty Street
New York, New York 10005
(212) 416-6347

Dated: August 2, 2024

*(Caption continues from front cover.)*

STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS;  STATE OF FLORIDA; STATE OF IDAHO; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WYOMING; STATE OF OKLAHOMA

*Plaintiffs-Appellants,*

v.

ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR M. JADDOU, Director of U.S. Citizenship and Immigration Services; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, Senior Official Performing the Duties of the Commissioner, U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TAE D. JOHNSON, Acting Director, U.S. Immigration and Customs Enforcement

*Defendants-Appellees,*

FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; GERMAN CADENAS,

*Appellees.*

## CERTIFICATE OF INTERESTED PERSONS
### Supplemental Statement Pursuant to Local Rule 29.2

*State of Texas v. DHS,*
No. 24-40160

Under the fourth sentence of Fifth Circuit Rule 28.2.1, all the signatories listed below are governmental entities and need not furnish a certificate of interested persons.

 */s/ Kartik Naram*
Kartik Naram
*Counsel of Record for Amici States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania, and Vermont, and the District of Columbia*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION AND INTERESTS OF AMICI CURIAE ..................... 1

BACKGROUND ......................................................................................... 5

    A.   DHS Implements the Parole Pathways Program for
         Cubans, Haitians, Nicaraguans, and Venezuelans .................5

    B.   The Parole Pathways Reduce the Number of Cubans,
         Haitians, Nicaraguans, and Venezuelans Illegally
         Entering the United States ..................................................... 11

    C.   The District Court Dismisses Plaintiffs' Claims for Lack
         of Standing ............................................................................. 12

ARGUMENT

PRESERVING THE PAROLE PATHWAYS PROGRAM BENEFITS THE
PUBLIC AND SERVES URGENT HUMANITARIAN CONCERNS..................... 14

    A.   Immigrants Are Key Contributors to the Economies of
         Amici States. ......................................................................... 15

    B.   Plaintiffs' Assessment of the Costs Associated with the
         Parole Pathways Is Fundamentally Flawed. ......................... 20

    C.   Ending the Parole Pathways Would Separate Families
         and Subject Parolees to Danger. ........................................... 23

CONCLUSION ........................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Moore v. City of East Cleveland*,
   431 U.S. 494 (1977) ................................................................. 25

**Federal Statutes**

8 U.S.C. § 1182 ...................................................... 1, 5, 14

**Administrative Sources** (*by date*)

Implementation of a Parole Process for Venezuelans,
   87 Fed. Reg. 63,507 (Oct. 19, 2022) ...........................7-8, 28

Implementation of a Parole Process for Cubans,
   88 Fed. Reg. 1266 (Jan. 9, 2023) .........................7-8, 12, 28

Implementation of a Parole Process for Haitians,
   88 Fed. Reg. 1243 (Jan. 9, 2023) ...................................8, 27

Implementation of a Parole Process for Nicaraguans,
   88 Fed. Reg. 1255 (Jan. 9, 2023) ...................................8, 27

Implementation of Changes to the Parole Process for
   Venezuelans,
   88 Fed. Reg. 1279 (Jan. 9, 2023) ........................................8

**Miscellaneous Authorities**

Abha Bhattarai, *Worker Shortages Are Fueling America's
   Biggest Labor Crises*, Wash. Post (Sept. 16, 2022),
   https://www.washingtonpost.com/business/2022/09/16/worke
   r-shortage-strikes-economy/ ............................................. 19

Allison Abrams, *Damage of Separating Families*, Psych. Today
   (June 22, 2018),
   https://www.psychologytoday.com/us/blog/nurturing-self-
   compassion/201806/damage-separating-families ..........................24-25

**Miscellaneous Authorities**                                **Page(s)**

Am. Immigr. Council, *Immigrants in California*,
https://map.americanimmigrationcouncil.org/locations/califor
nia/ ............................................................................................ 16-17

Am. Immigr. Council, *Immigrants in District of Columbia*,
https://map.americanimmigrationcouncil.org/locations/distric
t-of-columbia/ ............................................................................ 17

Am. Immigr. Council, *Immigrants in New York*,
https://map.americanimmigrationcouncil.org/locations/new-
york/ ......................................................................................... 16-17

Am. Immigr. Council, *Immigrants in the United States*,
https://map.americanimmigrationcouncil.org/locations/nation
al/ ............................................................................................... 16

Am. Immigr. Council, *Immigrants in Washington*,
https://map.americanimmigrationcouncil.org/locations/washi
ngton/ ....................................................................................... 16-17

Anatoly Kurmanaev & Ethan Singer, *Election Results
Presented by Venezuela's Opposition Suggest Maduro Lost
Decisively*, N.Y. Times (July 31, 2024),
https://www.nytimes.com/2024/07/31/world/americas/venezu
ela-maduro-election-results.html ......................................... 29

Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole*
(Oct. 15, 2020),
https://crsreports.congress.gov/product/pdf/R/R46570 ..................... 5-6

Andorra Bruno, Cong. Rsch. Serv., R47654, *Immigration
Options for Immigration Parolees* (Aug. 17, 2023),
https://crsreports.congress.gov/product/pdf/R/R47654 ................. 10-11

**Miscellaneous Authorities**                                    **Page(s)**

Bureau of Consular Affs., U.S. Dep't of State, *Nicaragua Travel Advisory* (Jan. 11, 2024), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Nicaragua.html ........................................................................ 28

Bureau of Consular Affs., U.S. Dep't of State, *Venezuela Travel Advisory* (May 13, 2024), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Venezuela.html ......................................................................... 28

Bureau of Consular Affs., U.S. Dep't of State, *Haiti Travel Advisory* (July 27, 2023), https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Haiti.html ................................................................................ 27

Bureau of Lab. Stat., U.S. Dep't of Lab., Econ. News Release, *Labor Force Characteristics of Foreign-Born Workers Summary* (May 21, 2024), https://www.bls.gov/news.release/forbrn.nr0.htm ............................. 15

Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief 1 (July 2019), https://www.ncfr.org/sites/default/files/2019-07/Immigrant_Families_Policy_Brief_July_23_2019.pdf ................... 24

Dan Kosten, Nat'l Immigr. F., *Immigrants as Economic Contributors: They Are the New American Workforce* (June 5, 2018), https://immigrationforum.org/article/immigrants-as-economic-contributors-they-are-the-new-american-workforce/ ......... 17

Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*, Manhattan Inst. (May 25, 2023), https://manhattan.institute/article/bidens-immigration-parole-programs-are-working ............................................................... 22

**Miscellaneous Authorities**                                    **Page(s)**

Darrell M. West, *The Costs and Benefits of Immigration*, 126
   Pol. Sci. Q. 427 (2011), https://www.jstor.org/stable/23056953 ......... 15

David J. Bier, *126 Parole Orders over 7 Decades: A Historical
   Review of Immigration Parole Orders*, Cato Inst. (July 17,
   2023), https://www.cato.org/blog/126-parole-orders-over-7-
   decades-historical-review-immigration-parole-orders ...................... 5-6

FWD.us, *Industries with Critical Labor Shortages Added 1.1
   Million Workers Through Immigration Parole* (Jan. 3, 2024),
   https://www.fwd.us/news/immigration-labor-shortages/ .................. 18

Hirokazu Yoshikawa, *Immigrants Raising Citizens:
   Undocumented Parents and Their Young Children* (2011) ............... 25

Howard Schneider, *Fed's Barkin: Labor Shortages May Persist*,
   Reuters (Feb. 17, 2023),
   https://www.reuters.com/markets/us/feds-barkin-labor-
   shortages-may-persist-2023-02-17/ ...................................... 19

James Queally, *Fearing Deportation, Many Domestic Violence
   Victims Are Steering Clear of Police and Courts*, L.A. Times
   (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-
   undocumented-crime-reporting-20171009-story.html ........................ 23

Lydia DePillis, *Immigration Rebound Eases Shortage of
   Workers, Up to a Point*, N.Y. Times (Feb. 6, 2023),
   https://www.nytimes.com/2023/02/06/business/economy/immi
   gration-labor.html ................................................. 18

New Am. Econ., *New Study Shows the Economic Power of
   Immigrants in Los Angeles* (Feb. 8, 2017),
   https://www.newamericaneconomy.org/wp-
   content/uploads/2017/03/LA.pdf ....................................... 16

**Miscellaneous Authorities**                                   **Page(s)**

New York City Mayor's Office of Immigr. Affs., *State of Our Immigrant City* (2021),
https://www.nyc.gov/assets/immigrants/downloads/pdf/MOIA-Annual-Report-for-2020.pdf .............................................. 16

Nik Theodore, Great Cities Inst., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (2013),
https://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF ................................ 23

Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Sec. 577 (2017),
https://journals.sagepub.com/doi/pdf/10.1177/233150241700500302 ...................................................... 19

Safia Samee Ali, *Farmers Push for Immigration Reform to Counter Labor Shortages and Rising Food Prices*, NBC News (Sept. 5, 2022), https://www.nbcnews.com/news/us-news/farmers-pushing-immigration-reform-counter-labor-shortages-escalating-rcna45741 .............................. 19

Stephanie Ferguson, U.S. Chamber of Com., *Understanding America's Labor Shortage* (July 24, 2024),
https://www.uschamber.com/workforce/understanding-americas-labor-shortage ...................................... 19

Stuart Anderson, *GOP State Lawsuit Could Stop Sound Way to Reduce Illegal Immigration*, Forbes (Mar. 21, 2023),
https://www.forbes.com/sites/stuartanderson/2023/03/21/gop-state-lawsuit-could-end-effective-immigration-parole-programs/?sh=32d8e58b5c19 .............................. 22

**Miscellaneous Authorities**                                    **Page(s)**

Tom K. Wong, Ctr. for Am. Progress, *The Effects of Sanctuary Policies on Crime and the Economy* (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ .................................. 23

Tom K. Wong et al., Ctr. for Am. Progress, *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship* (Feb. 3, 2022), https://www.americanprogress.org/article/2021-survey-of-daca-recipients-underscores-the-importance-of-a-pathway-to-citizenship/ ...................................................................... 19

U.S. Citizenship & Immigr. Servs., *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Oct. 11, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans ......................................... 9, 22

U.S. Citizenship & Immigr. Servs., *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 16, 2024), https://www.uscis.gov/CHNV ................................... 8-10, 21

U.S. Citizenship & Immigr. Servs., *Uniting for Ukraine* (last updated July 17, 2024), https://www.uscis.gov/ukraine ..................... 7

U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007), https://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/87xx/doc8711/12-6-immigration.pdf .............................................. 21

U.S. Dep't of Homeland Sec., *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and ...................................................................... 8

## Miscellaneous Authorities                    Page(s)

U.S. Dep't of Homeland Sec., *Operations Allies Welcome* (Aug. 29, 2021), https://www.dhs.gov/sites/default/files/publications/21_0903_oaw-fact-sheet_508.pdf .......................................................... 6

U.S. Select Comm'n on Immigr. & Refugee Pol'y, *U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission of Immigration and Refugee Policy* 112 (Mar. 1, 1981), https://babel.hathitrust.org/cgi/pt?id=txu.059173024374848&view=1up&seq=9 .............................................................. 26

Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear: Immigration Policy's Effects on Young Children* (Mar. 2018), https://www.clasp.org/sites/default/files/publications/2018/03/2018_ourchildrensfears.pdf ................................................. 25

Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 26, 2019), https://www.reuters.com/article/us-usa-immigration-ban/us-denied-tens-of-thousands-more-visas-in-2018-due-to-travel-ban-data-idUSKCN1QF2KF/ ............................................. 25

Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417 (2017), https://cmsny.org/publications/jmhs-case-for-family-unity/ ....................................................................... 24

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

In 2023, defendant-appellee U.S. Department of Homeland Security (DHS) announced a program that made available certain parole processes (or "parole pathways") for Cubans, Haitians, Nicaraguans, and Venezuelans, in exchange for Mexico's agreement to accept immigrants from those countries who attempt to cross the U.S. border illegally. In implementing these parole pathways, DHS exercises its statutory authority to grant immigration parole to noncitizens "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Under the program, the government may grant advance authorization to up to 30,000 noncitizens from those countries each month to travel to a port of entry and seek a two-year period of parole in the United States. Several States sued to challenge the parole pathways.

The U.S. District Court for the Southern District of Texas (Tipton, J.) dismissed plaintiffs' suit after a bench trial. The district court found that plaintiffs lacked standing under Article III of the U.S. Constitution because the parole pathways, together with the related agreement with Mexico, had the net effect of reducing immigration from the eligible countries and, as a result, did not cause plaintiffs any cognizable injury.

Amici States of New York, California, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Oregon, Pennsylvania, and Vermont, and the District of Columbia submit this brief in support of affirmance. The district court determined that the parole pathways reduce the cost burdens on States. The court reasoned that they reduce the total amount of immigration from the eligible countries, by pairing incentives for legal entry with new deterrents to illegal entry. And the district court determined that because of this reduction, the plaintiff States had failed to establish that their purported per-person cost of immigration from the eligible countries had gone *up* rather than *down*.

Amici States have a strong interest in the program's continued success. Many thousands of immigrants from Cuba, Haiti, Nicaragua, and Venezuela live in Amici States. Immigrants from these countries and other countries are essential to the fabric of our communities and are vital members of the workforce who contribute to the tax base. Plaintiffs' arguments both disregard the far-reaching benefits of the parole pathways program (Br. for Appellants (Br.) at 1-2) and, at the same time, fail to

grapple with the harms and costs to States that would result from terminating it.

We write to address these incorrect arguments and underscore three points about the parole pathways. *First*, ending the parole pathways would deprive Amici States of the substantial economic and social contributions that parolees have brought and will continue to bring to state and local economies and communities throughout the Nation. Immigrants pay substantial sums in state and local taxes and wield significant spending power. And parolees in particular hold key jobs in state and local workforces, including in industries facing labor shortages.

*Second*, plaintiffs incorrectly frame the supposed costs to States of the parole pathways. While plaintiffs point to purported costs associated with incarcerating or providing health insurance to foreign nationals (Br. at 8-9), they ignore how the parole pathways serve to reduce such costs over time. Parolees under this program must have supporters in the United States and they must be eligible for work authorization and employer-sponsored healthcare. And because parolees are stringently vetted before entry, the program enhances rather than undermines public safety. Plaintiff

States thus failed to establish that the pathways increased their purported expenditures.

*Third*, ending the parole pathways would separate families and endanger parolees. In many cases, current or potential parolees are family members and friends of individuals already living in Amici States' communities. Shutting down the parole pathways—which would terminate current parolees' status and foreclose future applications—would result in family separations, prevent the reunification of families, and place current parolees at immediate risk of removal from the United States to countries with exceptionally dangerous living conditions. Those negative effects would reverberate in communities within our respective jurisdictions and across the Nation.

# BACKGROUND

**A.    DHS Implements the Parole Pathways Program for Cubans, Haitians, Nicaraguans, and Venezuelans**

The Immigration and Nationality Act gives the Attorney General discretion to grant immigration parole to noncitizens applying for admission to the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" until the purposes of such parole have been served. 8 U.S.C. § 1182(d)(5)(A). "Parole is one of several authorities that allow foreign nationals to live and work in the United States without being formally admitted to the country and without having a set pathway to a permanent immigration status."[1] In this respect, parole shares characteristics of other immigration programs, such as Temporary Protected Status (TPS) and Deferred Action for Childhood Arrivals (DACA).[2]

The federal government's exercise of its parole authority has "deep historical precedent."[3] Over the years, this authority has been used to

---

[1] Andorra Bruno, Cong. Rsch. Serv., R46570, *Immigration Parole* 1 (Oct. 15, 2020).(For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on August 2, 2024.)

[2] *Id.* at 3.

[3] David J. Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Inst. (July 17, 2023).

provide safe harbor to immigrants in danger and to reunify separated families. Past parole programs have benefitted various groups, including refugees from Southeast Asia, Cuban nationals, minor children ineligible for refugee status, and family of U.S. military servicemembers.[4] For example, between 1998 and 2003 (the most recent six-year period for which DHS published such data), the United States admitted between 235,000 and 300,000 parolees annually.[5]

More recently, the United States has created parole pathways for certain Central American minor children of parents residing in the United States,[6] vulnerable Afghan nationals through Operation Allies Welcome,[7] and Ukrainian citizens and their immediate family members. The United States announced the Uniting for Ukraine parole pathway in 2022, in the wake of the Russian invasion. That pathway makes it possible for eventual parole recipients to stay in the United States for a two-year

---

[4] *Id.*

[5] *Id.* (figure 1).

[6] *Id.*

[7] DHS, *Operations Allies Welcome* 1-2 (Aug. 29, 2021); *see also* Intervenor Defs.' Opp'n to Pl. States' Challenge to Parole Pathways and to Mot. for Permanent Nationwide Inj. at 16-18 (June 20, 2023), S.D. Tex. ECF No. 175 (detailing similar programs).

period, provided that a sponsor "agrees to provide them with financial support for the duration of their stay."[8] The pathway successfully curbed a sudden influx of thousands of Ukrainian immigrants who had started arriving at ports of entry along the southwest border of the United States and shifted such prospective immigrants into a safe and orderly process.[9]

In October 2022, following the success of Uniting for Ukraine, the United States implemented a similar parole pathway for Venezuelans.[10] This pathway drastically "decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along" the southwest border.[11]

In January 2023, the United States announced that the parole pathway for Venezuelans would continue and announced similar parole pathways for Cubans, Haitians, and Nicaraguans modeled on the successful processes

---

[8] U.S. Citizenship & Immigr. Servs. (USCIS), *Uniting for Ukraine* (last updated July 17, 2024).

[9] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507, 63,508 (Oct. 19, 2022).

[10] *Id.* at 63,507.

[11] Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266, 1268 (Jan. 9, 2023).

for Venezuelans and Ukrainians.[12] These parole pathways, which are detailed in the *Federal Register*,[13] allow qualifying nationals of these countries, along with their spouses and qualifying children, to "request to come to the United States in a safe and orderly way" for a period of up to two years.[14]

The parole pathways allow the United States to "grant advance travel authorization to up to 30,000 noncitizens each month to seek parole on a case-by-case basis."[15] To participate, prospective parolees must "have a supporter in the United States who agrees to provide them with financial support for the duration of their parole in the United States," and can "[d]emonstrate sufficient financial resources to receive, maintain, and support" the applicant, including ensuring that the applicant's health

---

[12] DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023).

[13] *See* Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022).

[14] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated July 16, 2024).

[15] *Id.*

and medical needs are met and assisting the applicant with accessing education and securing employment.[16] After U.S. Citizenship and Immigration Services (USCIS) vets the supporter, the applicant must submit biographic information. USCIS may then, in its discretion, grant the applicant "advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis."[17]

In practice, the government's case-by-case determination of eligibility means that some individuals are denied parole after arriving at a port of entry under the program. (*See* ROA.11521, ¶ 28.) When a prospective parolee arrives at a port of entry, USCIS performs additional screening and vetting to determine whether to grant parole.[18] Before parole is granted, the applicant must pass a robust national-security screening and public-safety vetting, demonstrate that their parole "is warranted based on significant public benefit or urgent humanitarian reasons," and satisfy

---

[16] USCIS, *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Oct. 11, 2023) ("Questions Relating to Supporters").

[17] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, supra* ("Process Steps").

[18] *Id.*

other eligibility criteria.[19] Individuals recently removed from the United States, found to have crossed into the United States without authorization after the announcement of the parole pathways, or who are subject to an admissibility bar based on a prior removal order are not eligible to participate.[20]

If an individual is granted parole, the individual is eligible to apply for employment authorization.[21] Parole terminates when the parole period expires, or when the parole recipient leaves the United States without first securing appropriate documentation.[22] "With the exception of Cubans, beneficiaries of [these recent parole processes], like immigration parolees generally, do not have a dedicated pathway to another form of immigration relief or an immigration status once their parole periods expire."[23] Parolees "may be eligible individually for one or more immigration

---

[19] *Id.* ("Eligibility").

[20] *Id.*

[21] *Id.* ("Process Steps").

[22] *Id.*

[23] Andorra Bruno, Cong. Rsch. Serv., R47654, *Immigration Options for Immigration Parolees* 5-6 (Aug. 17, 2023).

mechanisms that offer a way to remain lawfully in the United States on a temporary or permanent basis."[24]

## B.   The Parole Pathways Reduce the Number of Cubans, Haitians, Nicaraguans, and Venezuelans Illegally Entering the United States

The parole pathways challenged here have drastically reduced the number of Cubans, Haitians, Nicaraguans, and Venezuelans illegally entering the United States. (ROA.11528, ¶ 76.) As the district court found, that result stems, in key part, from the U.S. government's agreement with Mexico. The district court explained that previously, when immigrants from Cuba, Haiti, Nicaragua, or Venezuela were detained for illegally entering the United States, DHS faced significant challenges returning them to their home countries. (ROA.11522, ¶¶ 30-31.) As a result, the court found, many immigrants from those countries who were detained ended up being conditionally released into the United States. (ROA.11522, ¶ 32.) Now, while the parole pathways are in place, Mexico has agreed to accept Cubans, Haitians, Nicaraguans, and Venezuelans who seek to enter the United States illegally. (ROA.11522, ¶ 33.) And as

---

[24] *Id.* at 6.

DHS explains (Br. for Defendants-Appellees at 1-2, 6), the threat of removal to Mexico thus creates immediate new consequences for illegal entry. In parallel, the parole pathways create new incentives for immigrants from Cuba, Haiti, Nicaragua, and Venezuela to wait and use a safe, orderly, and lawful process to enter the United States. 88 Fed. Reg. at 1268.

Prior to the pathway's implementation, DHS encountered over 1,100 Venezuelan nationals daily on the border between ports of entry. Within a week of the pathway's announcement, that number began to drop. And by the week ending on January 22, 2023, DHS reported a daily average of just 28 Venezuelan encounters per day. (ROA.11528, ¶ 81.) Encounters with Cuban, Haitian, and Nicaraguan nationals have also dropped significantly after the pathways' implementation. (ROA.11528, ¶ 82.)

## C.   The District Court Dismisses Plaintiffs' Claims for Lack of Standing

Soon after DHS implemented these parole pathways, plaintiffs filed suit to challenge the lawfulness of the program. After a bench trial, the district court issued an order dismissing the case, finding that plaintiffs lacked standing to maintain the suit. (ROA.11512.) At plaintiffs' request, the standing analysis focused on Texas. The district court explained that

Texas's standing to sue turned on whether it could demonstrate increased state expenditures resulting from the challenged program. (ROA.11534-41.) On that score, the district court found based on the trial evidence and plaintiffs' own admissions that the numbers of immigrants from Cuba, Haiti, Nicaragua, and Venezuela entering the United States had dramatically decreased by approximately forty-four percent since the parole pathways' implementation. (ROA.11512; *see* ROA.11528-29, 11540.) And the court found that these decreases meant that "Texas has actually spent less money as a result of the Program." (ROA.11532; *see* ROA.11540.) Accordingly, the district court concluded, Texas had not spent more funds because of the pathways and thus did not experience any concrete injury-in-fact. (ROA.11541.) This appeal followed.

# ARGUMENT

## PRESERVING THE PAROLE PATHWAYS PROGRAM BENEFITS THE PUBLIC AND SERVES URGENT HUMANITARIAN CONCERNS

For the reasons set forth in the appellees' submissions, DHS acted well within its broad discretion in implementing the parole pathways challenged here. We write to highlight that the parole pathways serve DHS's statutory mandate to grant parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* 8 U.S.C. § 1182(d)(5)(A). Contrary to plaintiffs' one-sided and inaccurate account, Amici States' experience and ample data confirm that parolees, like other immigrants, deliver significant public benefit. Key features of the parole pathways, moreover, reduce both the total amount of immigration from the eligible countries and the per-person cost of immigration from the eligible countries, while enhancing public safety. And terminating the parole pathways would impose severe harms to members of Amici States' communities. Below, we illustrate why.

**A.    Immigrants Are Key Contributors to the Economies of Amici States.**

In the experience of Amici States, the benefits of immigration are profound. Not only do immigrants benefit from the opportunities associated with living in the United States, but the States and the Nation as a whole benefit from immigrants' contributions to our economies and communities. Immigrants enrich the Nation's economic, social, and cultural life; offer pathbreaking contributions in science, technology, and other fields; and ultimately make our diverse communities more desirable places to live.[25] Plaintiffs' blanket assertion that parole pathways can "[b]y no means" benefit the States (Br. at 2) lacks foundation.

Immigrants contribute to national, state, and local economies in many ways, including by paying taxes, starting businesses, contributing to state and local labor forces, and consuming goods and services. Approximately 18% of the American civilian workforce is foreign born.[26] Nationally, immigrants pay over $579 billion in taxes, and immigrant-owned companies

---

[25] Darrell M. West, *The Costs and Benefits of Immigration*, 126 Pol. Sci. Q. 427, 437-41 (2011).

[26] Bureau of Lab. Stat., U.S. Dep't of Lab., Econ. News Release, *Labor Force Characteristics of Foreign-Born Workers Summary* (May 21, 2024).

employ millions of workers.[27] Immigrants' economic contributions to Amici States are staggering. In New York alone, immigrant-led households paid approximately $27.1 billion in state and local taxes and wielded $153.2 billion in spending power in 2022.[28] And in 2019, immigrants contributed $244 billion to New York City's gross domestic product (GDP), or about 23% of the city's total GDP.[29] Immigrant-led households in California paid $50.9 billion in state and local taxes in 2022 and exercised $382.7 billion in spending power.[30] In 2014, immigrants in Los Angeles contributed $232.9 billion to the county's GDP, almost 36% of the total.[31] In Washington, immigrant-led households paid $5.5 billion in state and local taxes in 2022 and wielded $52.4 billion in spending power.[32] And in

---

[27] Am. Immigr. Council, *Immigrants in the United States* (n.d.).

[28] Am. Immigr. Council, *Immigrants in New York* (n.d.).

[29] N.Y.C. Mayor's Office of Immigr. Affs., *State of Our Immigrant City* 32 (2021).

[30] Am. Immigr. Council, *Immigrants in California*.

[31] New Am. Econ., *New Study Shows the Economic Power of Immigrants in Los Angeles* (Feb. 8, 2017).

[32] Am. Immigr. Council, *Immigrants in Washington* (n.d.).

the District of Columbia, immigrant-led households paid $682.7 million in state and local taxes in 2022 and wielded $4.9 billion in spending power.[33]

Immigrants often fill important jobs that may otherwise be difficult to fill, especially in burgeoning sectors such as at-home healthcare.[34] For example, in New York, immigrants made up 27.4% of the labor force in 2022 and held 55.7% of healthcare aide jobs and 69.8% of housekeeping jobs.[35] In California, immigrants made up 32% of the labor force in 2022, and held 46.8% of healthcare aide jobs, 84.1% of sewing machine operator jobs, and 61.2% of agricultural jobs.[36] Immigrants account for similarly substantial portions of the labor forces of other States and localities.[37]

The parole pathways at issue here make an important contribution to these benefits to national, state, and local economies. The parole pathways allow individuals who are ultimately granted parole to seek employment authorization, and the pathways further require supporters to assist the

---

[33] Am. Immigr. Council, *Immigrants in District of Columbia* (n.d.).

[34] Dan Kosten, Nat'l Immigr. F., *Immigrants as Economic Contributors: They Are the New American Workforce* (June 5, 2018).

[35] Am. Immigr. Council, *Immigrants in New York, supra*.

[36] Am. Immigr. Council, *Immigrants in California, supra*.

[37] *See, e.g.*, Am. Immigr. Council, *Immigrants in Washington, supra*; Am. Immigr. Council, *Immigrants in District of Columbia, supra*.

parolees that they sponsor in locating employment. As a result, people who enter the country through immigration parole—together with other immigrants who have work authorization—have helped to ease worker shortages in critical industries.[38] According to one estimate, 1.1 million individuals who entered the U.S. with immigration parole from 2021 to 2023 are likely working in industries with labor shortages, such as construction, food services, retail, professional and business services, manufacturing, transportation, warehousing, utilities, and healthcare.[39] And by the end of 2023, recipients of immigration parole helped to reduce job openings in these industries by as much as a third.[40]

Parole recipients' contributions to national, state, and local economies join the already significant contributions of immigrants who obtained temporary legal status through other programs. For example, in a 2021 survey of DACA recipients, nine out of ten individuals reported that they

---

[38] Lydia DePillis, *Immigration Rebound Eases Shortage of Workers, Up to a Point*, N.Y. Times (Feb. 6, 2023).

[39] FWD.us, *Industries with Critical Labor Shortages Added 1.1 Million Workers Through Immigration Parole* (Jan. 3, 2024).

[40] *Id.*

were employed or in school.[41] Similarly, more than eight in ten TPS recipients from El Salvador, Honduras, and Haiti participate in the labor force.[42]

Ending the parole pathways at issue here, as plaintiffs seek to do, would be counterproductive. It would harm Amici States and undermine the broader public interest. Decreasing the number of immigrants who enter the country legally through these pathways would prevent the entry of individuals who contribute positively to our workforces and grow our economies, especially in businesses around the country facing persistent labor shortages.[43]

---

[41] Tom K. Wong et al., Ctr. for Am. Progress, *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship* (Feb. 3, 2022).

[42] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Sec. 577, 577 (2017).

[43] *See, e.g.*, Stephanie Ferguson, U.S. Chamber of Com., *Understanding America's Labor Shortage* (July 24, 2024) (listing low immigration rate as factor contributing to labor shortage); Howard Schneider, *Fed's Barkin: Labor Shortages May Persist*, Reuters (Feb. 17, 2023) (same); Abha Bhattarai, *Worker Shortages Are Fueling America's Biggest Labor Crises*, Wash. Post (Sept. 16, 2022) (same); *see also* Safia Samee Ali, *Farmers Push for Immigration Reform to Counter Labor Shortages and Rising Food Prices*, NBC News (Sept. 5, 2022).

**B.    Plaintiffs' Assessment of the Costs Associated with the Parole Pathways Is Fundamentally Flawed.**

In addition to failing to acknowledge the benefits from the parole pathways discussed above, plaintiffs also rely on an incomplete picture of the parole pathways' supposed costs. This argument ignores key features of the policies that address plaintiffs' purported concerns. First, as the district court found, the pathways reduced the total number of immigrants from the eligible countries who are entering illegally. As the district court noted, without the continued availability of the parole pathways, Mexico would no longer agree to accept immigrants from Cuba, Haiti, Nicaragua, and Venezuela who attempt to enter the United States illegally. (ROA.11523, ¶ 34.) And without that deterrent, the district court reasoned, it would again be more difficult for DHS to address illegal immigration from these countries. (ROA.11522-23, ¶¶ 30-34.)

Second, even if the total *number* of immigrants from the eligible countries remained constant, the parole pathways would still enhance public health and safety. For example, plaintiffs' discussion of healthcare costs (Br. at 8) ignores the increased costs that would ultimately result from ending the program. Parole pathways applicants must have supporters who commit to ensuring that parolees' "health care and medical needs are met

for the duration of the parole."[44] And those granted parole through the pathways are eligible for work authorization and employer-sponsored healthcare. For individuals already paroled into the United States, losing their parole status would take away their access to work authorization, leaving them without a way to receive health insurance for themselves and their families.

Plaintiffs insist that parolees increase Texas's expenditures on its Emergency Medicaid and its Children's Health Insurance Program coverage (*id.*), but that argument again misses what the parole pathways accomplish more broadly. Ultimately, ending the parole pathways would increase Amici States' costs to provide care to uninsured residents—including emergency health services and funding for public health programs that serve underinsured patients.[45]

Plaintiffs' arguments regarding incarceration costs (Br. at 8-9) are similarly misplaced. Though they recite Texas's purported cost to incarcerate foreign nationals (*id.*), plaintiffs do not address how the parole pathways

---

[44] *USCIS, Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, supra* ("Who Can Be a Supporter").

[45] *Cf.* U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007).

affect those costs over time. The parole pathways require applicants to "[p]ass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns."[46] This screening includes the collection of biographic and biometric information, including finger-printing upon arrival.[47] DHS's ability to screen parole recipients helps to mitigate the risk of crime.

Because the parole pathways have significantly reduced illegal border crossings into the United States, DHS can better ensure that individuals entering the country do not pose national-security or public-safety concerns. Indeed, commentators across the ideological spectrum have observed that the parole pathways "have been extraordinarily effective in reducing illegal entry,"[48] as the district court's findings confirm. (ROA.11528-29.) Moreover, if the pathways were terminated, any current parolees who remain would be less likely to report crime due to fear of removal, or of having a

---

[46] USCIS, *Frequently Asked Questions, supra* ("Questions Relating to Supporters").

[47] *Id.* ("Biometric Screening").

[48] *See* Stuart Anderson, *GOP State Lawsuit Could Stop Sound Way to Reduce Illegal Immigration*, Forbes (Mar. 21, 2023); Daniel Di Martino, *Biden's Immigration Parole Programs Are Working*, Manhattan Inst. (May 25, 2023).

family or community member removed.[49] And when law enforcement is unable to obtain evidence of crimes and maintain witness cooperation at trial, public safety suffers.[50]

## C.   Ending the Parole Pathways Would Separate Families and Subject Parolees to Danger.

Finally, Amici States have a strong interest in fostering the reunification of community members with family in danger abroad and preventing the many harms that would result from separating families that have been reunited through the parole pathways. All parole recipients must have supporters in the United States who have agreed to provide them with financial support for the duration of their parole period. And in many cases, these supporters are family members and close friends. Thus, ending the parole pathways would separate families and prevent reunification. It would also upend the lives of children granted parole as the immediate family

---

[49] *See, e.g.*, Nik Theodore, Great Cities Inst., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 14 (2013); James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017).

[50] *See, e.g.*, Tom K. Wong, Ctr. for Am. Progress, *The Effects of Sanctuary Policies on Crime and the Economy* (Jan. 26, 2017) (sanctuary counties have lower crime rates than comparable nonsanctuary counties).

members of parolees. And it would place current and prospective parolees in danger.

Prolonged or permanent family separations have a devastating impact on the welfare of our communities. Multiple studies illustrate that family reunification benefits the economic, social, and psychological well-being of the affected individuals,[51] while family separation results in myriad harms. Separating family members from each other can result in negative health outcomes, including mental- and behavioral-health issues, such as severe stress and symptoms of post-traumatic stress disorder.[52] Separation can be particularly traumatizing to children, resulting in a greater risk of cognitive impairment and developing mental-health disorders such as depression, anxiety, and attention-deficit/hyperactivity disorder.[53] Trauma can also have negative physical effects on children, such as loss of appetite, stomachaches, and headaches, which can become chronic if left

---

[51] Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417, 423 (2017).

[52] *See* Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief 1, 2-3 (July 2019).

[53] Allison Abrams, *Damage of Separating Families*, Psych. Today (June 22, 2018).

untreated.[54] A child's concern about a parents' immigration status can also impair socioemotional and cognitive development.[55] Similarly, spousal separation can cause fear, anxiety, and depression.[56]

The harms to individual residents and their families will, in turn, have a negative effect on Amici States. Intact families provide crucial social support, which strengthens not only the family unit but also the neighborhood, community, and civic society at large. *See, e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 503-04 (1977) ("It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."). The Select Commission on Immigration and Refugee Policy, a congressionally appointed commission tasked with studying immigration policy, expounded upon the necessity of family reunification in 1981:

---

[54] *Id.*; *see also* Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear: Immigration Policy's Effects on Young Children* 2-4 (Mar. 2018).

[55] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120-36 (2011).

[56] *See, e.g.,* Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data,* Reuters (Feb. 26, 2019) (stating that the separation of a U.S. citizen from his noncitizen wife caused them both to "break down psychologically").

> The reunification of families serves the national interest not only through the humaneness of the policy itself, but also through the promotion of the public order and well-being of the nation. Psychologically and socially, the reunion of family members with their close relatives promotes the health and welfare of the United States.[57]

By contrast, denying families the ability to reunite contradicts the foundations of our immigration system and will irreparably harm our families, neighborhoods, and communities. Removing a family's wage-earners from the labor force—either through removal to a foreign country or termination of parole status—also leads to economic hardship for families in Amici States' communities.

Moreover, ending the parole pathways would also expose many current parole recipients to grave personal danger by forcing them to return to the dangerous conditions from which they fled. It would similarly endanger tens of thousands of individuals who would otherwise be entitled to seek relief. For example, "Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence,

---

[57] U.S. Select Comm'n on Immigr. & Refugee Pol'y, *U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission of Immigration and Refugee Policy* 112 (Mar. 1, 1981).

and political assassinations that have devastated the country." 88 Fed. Reg. at 1246. Collectively, these crises have led to the collapse of Haiti's economy and the proliferation of gangs that carry out hundreds of killings, assaults, and kidnappings, and have left "Haitians struggling to find basic products including food, water, and medicines." *Id.* at 1246-47. Haiti is currently subject to a level 4 "do not travel" advisory (the highest level) "due to kidnapping, crime, civil unrest, and poor health care infrastructure."[58] Last year, the State Department ordered family members of U.S. government employees and nonemergency U.S. government employees to leave the country "as soon as possible" in light of the situation there.[59]

Likewise, Nicaraguan nationals flee "political, economic, and humanitarian crises," including the government's "regime of terror and . . . suppression of all freedoms." 88 Fed. Reg. at 1258 (quotation marks omitted). "Nicaragua is one of the poorest countries in Latin America," with almost 30% of families living in poverty, *id.*, and is currently subject to a

---

[58] Bureau of Consular Affs., U.S. Dep't of State, *Haiti Travel Advisory* (July 27, 2023).

[59] *Id.*

level 3 travel advisory due to arbitrary law enforcement, wrongful detention, crime, and limited healthcare.[60]

Cuban nationals also face multiple challenges, including Cuba's "worst economic crisis in decades," marked by "[m]ass shortages of dairy and other basic goods," and "[d]eepening poverty." 88 Fed. Reg. at 1269-70. The Cuban government has resorted to "repressive tactics to manage public discontent," including restricting "freedoms of expression, association, peaceful assembly, and other human rights." *Id.* at 1270.

And in Venezuela, the combination of "[a] complex political, humanitarian, and economic crisis; the widespread presence of non-state armed groups; crumbling infrastructure; and the repressive tactics of Nicolás Maduro have caused nearly 7 million Venezuelans to flee their country." 87 Fed. Reg. at 63,509. Venezuela is currently subject to a level 4 "do not travel" advisory due to civil unrest, crime, kidnapping, arbitrary law enforcement, wrongful detention, terrorism, and limited healthcare.[61] Fallout from recent elections in the country have only heightened the volatility,

---

[60] Bureau of Consular Affs., U.S. Dep't of State, *Nicaragua Travel Advisory* (Jan. 11, 2024).

[61] Bureau of Consular Affs., U.S. Dep't of State, *Venezuela Travel Advisory* (May 13, 2024).

triggering violent demonstrations, prompting "several Latin American countries to suspend or downgrade diplomatic relations with Venezuela, [and] plunging the polarized country into a new period of flux."[62]

For individuals who have already been granted parole, ending the parole pathways would mean returning to these dangerous, violent, and repressive conditions. And preventing prospective parole recipients from accessing relief means narrowing any chance of escape. Amici States and the public at large have strong interests in avoiding such harms, as well as the many other harms that would result from family separation.

---

[62] Anatoly Kurmanaev & Ethan Singer, *Election Results Presented by Venezuela's Opposition Suggest Maduro Lost Decisively*, N.Y. Times (July 31, 2024).

# CONCLUSION

The district court's judgment should be affirmed.

Dated:  New York, New York
        August 2, 2024

                                    Respectfully submitted,

                                    LETITIA JAMES
                                      *Attorney General*
                                      *State of New York*
                                    BARBARA D. UNDERWOOD
                                      *Solicitor General*
                                    JUDITH N. VALE
                                      *Deputy Solicitor General*

                            By:   */s/ Kartik Naram* [63]
                                    KARTIK NARAM
                                    Assistant Solicitor General

                                    Office of the Attorney General
                                    28 Liberty Street
                                    New York, NY 10005
                                    (212) 416-6347


                    *(Counsel listing continues on next page.)*

---

[63] Counsel for the State of New York certifies that the other parties listed in the signature blocks consent to this filing.

ROB BONTA
  *Attorney General*
  *State of California*
1300 I St.
Sacramento, CA 95814

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Ave.
Hartford, CT 06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French St.
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle St.
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Pl., 20th Fl.
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
  King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson St.
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market St.
Trenton, NJ 08625

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

MICHELLE A. HENRY
  *Attorney General*
  *Commonwealth of*
    *Pennsylvania*
Strawberry Sq., 16th Fl.
Harrisburg, PA 17120

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th St., N.W., Ste. 8100
Washington, D.C. 20001

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,266 words and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)-(7) and the corresponding local rules.

*/s/ Ava Mortier*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, the foregoing brief for amici curiae was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: New York, New York
     August 2, 2024

                                   */s/ Kartik Naram*