No. 24-40160

# In the United States Court of Appeals for the Fifth Circuit

———————

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants*,

*v.*

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees,*

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees.*

On Appeal from the United States District Court for the Southern District of Texas, Victoria Division

————————————————————

## BRIEF OF *AMICUS CURIAE* LEGAL INFORMATION NETWORK FOR UKRAINE IN SUPPORT OF INTERVENOR DEFENDANT-APPELLEES

*(Counsel Listed on Inside Cover)*

_____

Amelia T.R. Starr, *Attorney in Charge*

Nishan Bhaumik, *of counsel*
Maya Kapelnikova, *of counsel*
Jaclyn M. Willner, *of counsel*
Zach Zaremba, *of counsel*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4516
amelia.starr@davispolk.com

*Counsel for* Amicus Curiae
LEGAL INFORMATION
NETWORK FOR UKRAINE

No. 24-40160

## Certificate of Interested Persons

State of Texas; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Iowa; State of Kansas; Commonwealth of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of Tennessee; State of Utah; State of West Virginia; State of Wyoming; State of Oklahoma,

*Plaintiffs-Appellants*,

*v.*

United States Department of Homeland Security; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; U.S. Citizenship and Immigration Services; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; U.S. Customs & Border Protection; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; United States Immigration and Customs Enforcement; Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement,

*Defendants-Appellees,*

Valerie Laveus; Francis Arauz; Paul Zito; Eric Sype; Kate Sugarman; Nan Langowitz; German Cadenas,

*Appellees.*

Under FED. R. APP. P. 29(4)(A) and 26.1, amicus curiae is not a corporation and a disclosure statement is not required.

Pursuant to 5TH CIR. R. 28.2.1, the undersigned counsel of record certifies that no persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Dated: August 2, 2024

 /s/ *Amelia T.R. Starr*

Amelia T.R. Starr, *Attorney in Charge*

Nishan Bhaumik, *of counsel*
Maya Kapelnikova, *of counsel*
Jaclyn M. Willner, *of counsel*
Zach Zaremba, *of counsel*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4516
amelia.starr@davispolk.com

*Counsel for* Amicus Curiae
LEGAL INFORMATION
NETWORK FOR UKRAINE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE ........................................... 1

SUMMARY OF ARGUMENT ................................................................ 2

I.    ARGUMENT ................................................................................ 5

    A.    Uniting for Ukraine has been championed across the political
spectrum as one of the most successful immigration programs
in recent history. ........................................................................ 5

    B.    The U4U Program and its rigorous individual vetting of
applicants serve as a model for effective and mutually
beneficial lawful pathway programs for refugees. ............................... 6

    C.    THE SUCCESS AND BIPARTISAN POPULARITY OF THE
U4U PROGRAM LED TO THE CREATION OF THE
NEARLY IDENTICAL CHNV PROGRAM ....................................... 9

    D.    FEDERAL REPORTS AND PUBLIC DATA HIGHLIGHT
THE SUCCESSES OF U4U AND CHNV AND UNDERMINE
STATE CLAIMS OF HARM RELATED TO BORDER
CROSSINGS, SECURITY, OR FINANCIAL BURDEN ................. 11

        1.    U4U and CHNV Cut Southern Border Arrivals and Illegal
Crossings by 89.0 - 99.9%, nearly eliminating any related
burden to the States. ................................................................ 12

        2.    U4U and CHNV employ similar security and vetting
procedures through a Rigorous Case-by-Case Adjudication,
Nearly Eliminating the Burden on Individual States. ............... 16

        3.    State claims of financial harm are undermined by U4U and
CHNV's financial self-sufficiency model and by beneficiaries'
net boost to struggling state economies. ................................... 17

        4.    U4U and CHNV's Private and Federal Funding Results in a
Significant Net Boost to Struggling State Economies .............. 18

i

II.    UNITING FOR UKRAINE EXAMPLES ......................................................21

    A.    Yelizaveta Marushchak – Successful family reunification and protection from war crimes committed in Ukraine ............................22

    B.    Valentyna Veretska – International Professional Athlete and new American Business Owner ..........................................................24

    C.    Yuliia Aksaniuk – Successful family reunification, gainfully employed and independent, who is now most proud to be "an honest taxpayer." ..................................................................................27

    D.    Polina Herman – Filmmaker in Los Angeles, enrolled in a professional program for producers at UCLA, sharing the experiences of Ukrainians during the war...........................................30

CONCLUSION ....................................................................................................32

# TABLE OF AUTHORITIES

PAGE(S)

## STATUTES & RULES

8 U.S.C. § 1182(d)(5)(A) ...................................................................7

Fed. R. App. P. 29(a)(4)(E) ...............................................................2

## OTHER AUTHORITIES

Arloc Sherman et al., *Immigrants Contribute Greatly to U.S. Economy Despite Administration's Public Charge Rule,* CTR. BUDGET & POL'Y PRIORITIES, Aug. 15, 2019,
  https://www.cbpp.org/research/poverty-and-inequality/immigrants-contribute-greatly-to-us-economy-despite-administrations .............................. 19

Circumvention of Lawful Pathways, 88 Fed. Reg. 31314 (May 16, 2023) (codified at 8 CFR 208, 1003, 1208) ..................................................... 12

Alexandra Ciullo, "Humanitarian Parole: A Tale of Two Crises,"
  37 Geo. Immigr. L.J. 493 (Spring 2023) ............................................. 9

Daniel Di Martino, *Biden's Immigration Parole Programs are Working*, MANHATTAN INST. (May 25, 2023),
  https://manhattan.institute/article/bidens-immigration-parole-programs-are-working ............................................................................. 14, 15, 17

David J. Bier, *Parole Sponsorship Is a Revolution in Immigration Policy*, CATO INST. (Sept. 18, 2023),
  https://www.cato.org/briefing-paper/parole-sponsorship-revolution-immigration-policy ......................................................... 13, 15, 16, 17

Gil Guerra, *Uniting for Ukraine has Been a Resounding Success. Here's what we've Learned*, NISKANEN CTR. (Feb. 7, 2023),
  https://www.niskanencenter.org/uniting-for-ukraine-has-been-a-resounding-success-heres-what-weve-learned/ ........................................ 6, 14, 15

Johanna Burke, *Are Refugees Bad or Good for the Economy?*, ICMC (July 14, 2020),

https://www.icmc.net/2020/07/14/refugees-good-or-bad-for-
economy/ ................................................................................................ 20, 21

Off. Refugee Resettlement, *Benefits for Ukrainian Humanitarian Parolees:
Fact Sheet* (May 2022),
    https://www.acf.hhs.gov/orr/fact-sheet/benefits-ukrainian-humanitarian-
    parolees ........................................................................................... 18

Off. Refugee Resettlement, Policy Letter 16-01: Documentation Requirements
for the Refugee Resettlement Program (Nov. 29, 2022),
    https://www.acf.hhs.gov/orr/policy-guidance/documentation-requirements-
    refugee-resettlement-program ........................................................... 18

Press Release, Alejandro N. Mayorkas, Sec'y DHS, Statement from Secretary
Mayorkas on the Anniversary of Russia's Unprovoked Invasion of Ukraine (Feb.
24, 2023),
    https://www.dhs.gov/news/2023/02/24/statement-secretary-mayorkas-
    anniversary-russias-unprovoked-invasion-ukraine ............................. 5

Robin Dunn Marcos, *Dear Colleague Letter 23-13: Parole Processes for Cubans,
Haitians, Nicaraguans, and Venezuelans*, Admin. Child. & Fams. (Jan. 6, 2023),
    https://www.acf.hhs.gov/sites/default/files/documents/orr/DCL-23-13-New-
    USCIS-Parole-Process-CHNV.pdf ................................................... 12

Rosa Flores, The US asylum backlog is nearing 1.6 million, the highest number on
record, CNN (Dec. 26, 2022),
    https://www.cnn.com/2022/12/26/us/asylum-backlog-highest-record/
    index.html ......................................................................................... 4

Russell Coates, *Uniting for Ukraine: How Ukrainian Refugees are Filling
America's Labor Void*, LEARN LIBERTY (Aug. 11, 2023),
    https://www.learnliberty.org/blog/how-ukrainian-refugees-are-filling-
    americas-labor-void/ ..................................................................... 19-20

Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040 (Apr. 27, 2022) .......... 7, 8

U.S. Citizen & Immig. Servs. ("USCIS"), *Asylum*,
    https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum
    (last updated July 22, 2024) ............................................................. 13

U.S. Citizen & Immig. Servs. ("USCIS"), *Frequently Asked Questions About the
Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Oct. 11, 2023),

iv

https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans ........................... 11

U.S. Citizen & Immig. Servs. ("USCIS"), *Frequently Asked Questions About Uniting for Ukraine*,
https://www.uscis.gov/humanitarian/uniting-for-ukraine/frequently-asked-questions-about-uniting-for-ukraine (last updated Dec. 5, 2023) ................... 8, 9

U.S. Citizen & Immig. Servs. ("USCIS"), *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*,
https://www.uscis.gov/CHNV (last updated July 16, 2024) ...................... 10, 12

U.S. Citizen & Immig. Servs. ("USCIS"), *Uniting for Ukraine*,
https://www.uscis.gov/ukraine (last updated July 17, 2024) ............... 5, 8, 9, 12

U.S. Customs and Border Protection, Uniting for Ukraine, Publishing No. 1719-0422 (April 21, 2022),
https://www.cbp.gov/sites/default/files/assets/documents/2022-Apr/Uniting%20for%20Ukraine%2020220421.pdf .......................................... 3

U.S. Dep't of Homeland Sec. ("DHS"), *Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows That Lawful Pathways Work*, Homeland Sec. (July 25, 2023),
https://www.dhs.gov/news/2023/07/25/fact-sheet-data-first-six-months-parole-processes-cubans-haitians-nicaraguans-and .................................... 13, 15

U.S. Dep't of Homeland Sec. ("DHS"), *Uniting for Ukraine*,
www.dhs.gov/ukraine (last updated July 8, 2024) ........................ 2-3, 5, 7, 8, 12

YMCA of Greater N.Y., *Uniting for Ukraine*,
https://www.uscis.gov/humanitarian/uniting-for-ukraine/frequently-asked-questions-about-https://ymcanyc.org/uniting-ukraine
(last visited July 31, 2024) ............................................................... 12

## STATEMENT OF INTEREST OF AMICUS CURIAE

Legal Information Network for Ukraine (LINU) is a legal resources organization born out of an urgent need to provide timely and accurate US immigration information to all those fleeing their homes as a result of the war in Ukraine, and to those unable to return to their homes because of ongoing military action or fear of persecution. Their immediate objective is to offer legal information to those displaced by the war in Ukraine who are seeking entry to the United States. Their mission is to create clarity and transparency into the current legal processes, outline options and, when possible and needed, connect those seeking support with legal providers and resources. Much of LINU's services involve assisting Ukrainians understand their options under Uniting for Ukraine ("U4U"), temporary protected status for Ukrainians, asylum, humanitarian parole, family-based immigration, employment-based immigration, and Lautenberg Program options. LINU also provides support for those seeking to sponsor Ukrainians and those who need assistance navigating the various benefits that might be available to them, such as refugee benefits, or benefits designated for Ukrainian Humanitarian Parole.

As one of the few dedicated Ukrainian legal resource providers, LINU is uniquely positioned by having a legal team staffed with senior immigration law experts and volunteers with decades of combined experience in immigration law and policy, who are also leaders in local and national advocacy efforts and are active in

the American Immigration Lawyers Association.  Their services have a wide reach assisting **thousands** of Ukrainians across the United States seeking safety and sanctuary. As of August 2, 2024, LINU has hosted 55 informational sessions or webinars that attracted nearly 3,000 registrants from individuals, to non-profits, and community leaders, and supported approximately 600 people with their request for legal information and support.   It is through this large network of Ukrainians who have fled the war and have benefited from parole programs such as United for Ukraine and other humanitarian programs such as Temporary Protected Status and asylum, that they are able to draw information and experiences to authoritatively highlight the deep impact and resounding success of the parole program known as United for Ukraine.

## DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 29(a)(4)(E): (i) a party's counsel did not author the brief in whole or in part; (ii) a party or a party's counsel did not contribute money that was intended to fund preparing or submitting the brief; and (iii) no person contributed money that was intended to fund preparing or submitting the brief.

## SUMMARY OF ARGUMENT

On April 21, 2022, President Biden announced *Uniting for Ukraine* ("U4U"), a new streamlined process to provide Ukrainian citizens who have fled Russia's unprovoked war of aggression opportunities to come to the United States. U.S. Dep't

of Homeland Sec. ("DHS"), *Uniting for Ukraine*, www.dhs.gov/ukraine (last updated July 8, 2024) (hereinafter "DHS, *U4U*"). Uniting for Ukraine builds on the robust history of humanitarian assistance provided by the U.S. government while also ensuring that those entering the United States meet stringent eligibility criteria to be considered for parole.  As The Department of Homeland Security describes, all applicants must have an eligible US-based financial guarantor submit to a vetting process by the US Government that protects against exploitation and abuse as well as verifies the financial ability to support the applicant. *See* DHS, *U4U*.  Only after financial support is vetted, applicants may then proceed through multiple additional rigorous vetting requirements: Applicants must present valid identity documents, must complete vaccinations and public heath requirements, and must pass rigorous biographic screening, vetting, and security checks. *Id*.; *see also* U.S. Customs and Border Protection, Uniting for Ukraine, Publishing No. 1719-0422 (April 21, 2022).[1]

The Uniting for Ukraine program has been widely celebrated by progressives and conservatives as an exemplary model that provides efficient, reasonable, secure, and expedient processing of refugees fleeing persecution.  In comparison to the backlog of nearly 1.6 million asylum applications languishing for years in US immigration courts and at US Citizenship and Immigration Services, the Uniting for

---

[1] U.S. Customs and Border Protection, Uniting for Ukraine, Publishing No. 1719-0422 (April 21, 2022), available at https://www.cbp.gov/sites/default/files/assets/documents/2022-Apr/Uniting%20for%20Ukraine%2020220421.pdf.

Ukraine program presents an astonishingly common-sense approach that meets U.S. obligations to supports refugees, but also ensures the safety of participants and communities, dramatically reduces financial costs to the taxpayer, and minimizes the burden on social services. *See* Rosa Flores, The US asylum backlog is nearing 1.6 million, the highest number on record, CNN (Dec. 26, 2022), https://www.cnn.com/2022/12/26/us/asylum-backlog-highest-record/index.html.

Built on the remarkable success and bipartisan support of the Uniting for Ukraine program, the Government announced a similar program to support the humanitarian crisis occurring in Cuba, Haiti, Nicaragua, and Venezuela.  As Texas has agreed, the parole options for citizens from Cuba, Haiti, Nicaragua, and Venezuela, are nearly indistinguishable from the lauded Uniting for Ukraine program.  ECF 20 ¶ 43.  In fact, as discussed below, the Uniting for Ukraine program has fewer limitations, whereas the parole programs currently being challenged have more restrictions and monthly limits on approvals.

In summary, the below analysis and client stories that follow show the inconsistency of championing the Uniting for Ukraine program as a successful immigration and refugee model, while challenging the materially indistinguishable parole programs available to citizens fleeing Cuba, Haiti, Nicaragua, and Venezuela. Plaintiff's challenge, therefore, must similarly fail.

# I.  ARGUMENT

### A. Uniting for Ukraine has been championed across the political spectrum as one of the most successful immigration programs in recent history.

"On April 21, 2022, the United States announced a key step toward fulfilling President Biden's commitment to welcome Ukrainians fleeing Russia's invasion." U.S. Citizen & Immig. Servs. ("USCIS"), Uniting for Ukraine, https://www.uscis.gov/ukraine (last updated July 17, 2024) (hereinafter "USCIS, *U4U*").  Uniting for Ukraine, or "U4U," provided an immediate, and expedited option for Ukrainian citizens living outside of the United States to come to the United States and escape the harmful effects of Russia's invasion of Ukraine.  *Id*. Under U4U, the participating individuals may temporarily stay for a two-year period. *Id*.  U4U created a "new streamlined process" for Ukrainian citizens to escape Russia's "unprovoked" war in Ukraine.  DHS, *U4U*.

The program has been universally celebrated as a success.  In the first ten months of the program, over 115,000 Ukrainians were admitted to the United States under the U4U program.  Press Release, Alejandro N. Mayorkas, Sec'y DHS, Statement from Secretary Mayorkas on the Anniversary of Russia's Unprovoked Invasion of Ukraine (Feb. 24, 2023), https://www.dhs.gov/news/2023/02/24/statement-secretary-mayorkas-anniversary-russias-unprovoked-invasion-ukraine.  Sponsors of the program have been

widespread: "[t]he 10 states with the most sponsors per capita include Democratic strongholds in the Pacific northwest (Washington and Oregon), solidly red states on either end of the country (Alaska and Florida), and battleground states in the Mid-Atlantic and Midwest (Pennsylvania and Ohio)." Gil Guerra, *Uniting for Ukraine has Been a Resounding Success. Here's what we've Learned*, NISKANEN CTR. (Feb. 7, 2023), https://www.niskanencenter.org/uniting-for-ukraine-has-been-a-resounding-success-heres-what-weve-learned/ (hereinafter "Guerra, *U4U has Been a Resounding Success*"). Ultimately, U4U supporters do not reside in any one specific area of the country or hold any single political affiliation.

U4U has also dramatically decreased southern border crossings by Ukrainians. After Russia's invasion, Ukrainian encounter numbers [at the southern border] peaked at 20,118 in April 2022. Following the implementation of U4U, encounters in May 2022, just one month later, dropped significantly to 375—or in essence, "***a staggering 98% drop in the span of a month***." *Id*.

The government's rapid response and U4U's immediate success gained widespread and bipartisan support. Over the coming months, the government would continue to prove the effectiveness of the program and its permanent positive impact.

**B. The U4U Program and its rigorous individual vetting of applicants serve as a model for effective and mutually beneficial lawful pathway programs for refugees.**

The Uniting for Ukraine Parole Program, established through a Federal Register notice in April 2022, allows qualifying Ukrainian citizens and their immediate family members, to obtain advance authorization to travel to the United States and be considered for temporary parole and employment authorization for up to two years. Implementation of the Uniting for Ukraine Parole Process, 87 Fed. Reg. 25040, 25040 (Apr. 27, 2022). The Department of Homeland Security ("DHS") established this parole program in response to the displacement of Ukrainians stemming from Russia's "war of aggression" in Ukraine. *Id.* The parole process is meant to provide a "safe, legal, and orderly pathway to support vulnerable Ukrainians… who have been displaced from their country as a result of Russia's unprovoked invasion." *Id.* In line with its goal of promoting a safe, legal, and orderly pathway, following the establishment of U4U, Ukrainians who attempt to enter the United States at the Southwest border will be denied entry there. DHS, *U4U.*

Decisions on whether to grant parole are made on a case-by-case status, and parole is granted where there are "urgent humanitarian reasons or significant public health" justifications. 87 Fed. Reg. at 25040; *see also* 8 U.S.C. § 1182(d)(5)(A). The individual seeking parole under U4U must have "a supporter in the United States who agrees to provide them with financial support for the duration of their stay in the United States." DHS, *U4U.* Furthermore, U4U requires that supporters, rather than the individuals seeking refuge, initiate the application process. USCIS conducts

background checks on supporters "to protect against exploitation and abuse and to determine the supporters' financial suitability to support beneficiaries." 87 Fed. Reg. at 25042-43. Beneficiaries themselves are vetted against national security and law enforcement databases. *Id.* By tying membership in the program to the consent of a supporter, U4U sought to limit the number of crossings at the United States' southern border. *See* DHS, *U4U.* "From April 25, 2022, Ukrainian nationals who present at U.S. Southwest border land ports of entry without a valid visa or without pre-authorization to travel to the United States through Uniting for Ukraine may be denied entry and referred to apply through this process." *Id*.

Additionally, parolees must pass biometric and biographic vetting, provide evidence of private financial support in the United States, and meet a series of additional criteria including public health and national security concerns. 87 Fed. Reg. at 25040. For example, parolees must have been physically present in Ukraine immediately before Russia's invasion of Ukraine (as of February 11, 2022), and Ukrainians who are already present in the US are not eligible for parole under Uniting for Ukraine. USCIS, *Frequently Asked Questions About Uniting for Ukraine*, https://www.uscis.gov/humanitarian/uniting-for-ukraine/frequently-asked-questions-about-uniting-for-ukraine (last updated Dec. 5, 2023). Children seeking parole without their parent or legal guardian are ineligible for Uniting for Ukraine. *Id.*

Once beneficiaries are approved, they are responsible for arranging and paying for their own travel. *Id.* However, an authorization to travel to the United States does not guarantee parole status—final parole decisions are made by U.S. Customs and Border Protection officers at ports of entry, and Ukrainians who arrive at ports of entry without adequate travel documents, for example, will be refused entry. *See id.*

Paroled individuals are authorized to work in the United States. USCIS, *U4U*. Parolees may also be entitled to certain federal-funded benefits, such as cash assistance, health insurance through Medicaid, and food assistance through SNAP. Furthermore, parolees can be eligible for employment assistance through Refugee Support Services (RSS), also federally funded, which provides supplemental services like English language training.

Uniting for Ukraine has been viewed as an overwhelmingly successful program "that demonstrates USCIS's ability to respond to a massive humanitarian crisis rapidly and innovatively [and] [t]his response also shows the willingness of Americans to support Ukrainian refugees. Alexandra Ciullo, "Humanitarian Parole: A Tale of Two Crises," 37 Geo. Immigr. L.J. 493 (Spring 2023).

### C. THE SUCCESS AND BIPARTISAN POPULARITY OF THE U4U PROGRAM LED TO THE CREATION OF THE NEARLY IDENTICAL CHNV PROGRAM

Following the widely acclaimed success of the U4U program, on January 9, 2023, the Biden Administration announced that it would be implementing a special 2-year humanitarian parole option specifically for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") in response to an alleged surge of migrants from these four nations at the border. The Biden Administration consciously modelled this policy on the successful U4U program.  As explained below, the CHNV program borrows heavily from the U4U program to provide a legal pathway for individuals from a number of countries to seek protection in the United States.

The CHNV program allows up to 30,000 Cuban, Haitian, Nicaraguan, and Venezuelan nationals and their immediate family members to seek parole on a case-by-case basis.[2]  To qualify for the CHNV program applicants must be located outside the United States to apply and be approved. As detailed in defendants' briefs, the program requires a financial supporter in the U.S, rigorous vetting, and similar logistical criteria to U4U.

Like U4U parolees, CHNV beneficiaries are required have a financial supporter who must meet detailed financial evidentiary requirements and submit to

---

[2] USCIS *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV (last updated July 16, 2024) (hereinafter "USCIS, *CHNV Process*").

financial background checks to confirm their ability to financially support the beneficiaries for the duration of their stay in the United States.[3]

Like U4U, beneficiaries must also meet additional criteria, including being outside the U.S. at the time of their application; providing for their own commercial travel to the U.S.; passing required national security and public safety vetting; and complying with vaccination requirements and other public health guidelines.[4]

Successful applications receive parole for up to two years and are eligible for discretionary employment authorization. DHS may terminate parole at any time at its discretion, including if the beneficiary violates any U.S. laws.[5] Like U4U, during the two-year parole period, the beneficiary may be able to pursue other lawful immigration pathways.[6]

### D. FEDERAL REPORTS AND PUBLIC DATA HIGHLIGHT THE SUCCESSES OF U4U AND CHNV AND UNDERMINE STATE CLAIMS OF HARM RELATED TO BORDER CROSSINGS, SECURITY, OR FINANCIAL BURDEN

The U4U and CHNV programs provide a critical pathway to humanitarian relief consistent with government obligations and policies and as an extension of

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] U.S. Citizen & Immig. Servs., *Frequently Asked Questions About the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (October 11, 2023), https://www.uscis.gov/humanitarian/frequently-asked-questions-about-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans.

U.S. government findings on urgent humanitarian crises. Government and public reports of both U4U and CHNV programs show that both programs provide vital humanitarian relief to their beneficiaries, while addressing national and state concerns to evaluate applications on a case-by-case basis, ensure financial self-sufficiency, and incorporate significant safeguards that protect the United States from a national security, public safety, public health, and taxpayer perspective.[7] Indeed, not only do federal agencies and public data undermine states' claims of harm, they instead highlight the remarkable efficacy and permanent positive effect of both U4U and CHNV programs.[8]

### 1. U4U and CHNV Cut Southern Border Arrivals and Illegal Crossings by 89.0 - 99.9%, nearly eliminating any related burden to the States.

Both U4U and CHNV programs are far more efficient and streamlined than other counterparts, placing a significantly lower burden on the federal government and nearly eliminating any related burden to state governments. Other USCIS programs, such as asylum, require the individual to be physically present in the

---

[7] *Compare* DHS, *U4U*, *with* USCIS, *CHNV Process*; *see* YMCA of Greater N.Y., *Uniting for Ukraine*, https://ymcanyc.org/uniting-ukraine (last visited July 31, 2024).

[8] *See, e.g.*, Robin Dunn Marcos, *Dear Colleague Letter 23-13: Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, Admin. Child. & Fams. (Jan. 6, 2023), https://www.acf.hhs.gov/sites/default/files/documents/orr/DCL-23-13-New-USCIS-Parole-Process-CHNV.pdf (describing CHNV as a "supporter-based parole process . . . similar to the USCIS Uniting for Ukraine program"); Circumvention of Lawful Pathways, 88 Fed. Reg. 31314 (May 16, 2023) (codified at 8 CFR 208, 1003, 1208).

United     States     to     file     an     application.          USCIS,     *Asylum*, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum     (last     updated July 22, 2024).   Programs that require a physical presence in the country lead to greater border crossings, which hampers the United States' ability to sufficiently process every applicant.   Additionally, physical border crossings subject individuals to the "dangers of crossing the Darien, the dangers of extreme heat, and in some instances, "the consequences of trying to cross into the United States illegally."[9]

Both U4U and CHNV exemplify the fact that lawful pathway programs are a safe and staggeringly effective mechanism to remove the danger to individuals and eliminate the burden at the border. In fact, the U4U process led to an astounding 99.9% decline in Ukrainians arriving at the southwest border from April 2022 to June 2023, and the CHNV process reduced illegal border crossings from nationals of those countries by 90% as of July 2023, down from their peaks in 2021 and 2022. David J. Bier, *Parole Sponsorship Is a Revolution in Immigration Policy*, CATO INST. (Sept. 18, 2023), https://www.cato.org/briefing-paper/parole-sponsorship-revolution-immigration-policy (hereinafter "Bier, *Parole Sponsorship Is a Revolution*"). Because both of these programs have largely diminished the number

---

[9] *Fact Sheet: Data from First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows That Lawful Pathways Work*, Homeland Sec. (July 25, 2023), https://www.dhs.gov/news/2023/07/25/fact-sheet-data-first-six-months-parole-processes-cubans-haitians-nicaraguans-and (hereinafter "DHS, *First Six Months*").

of crossings at the southern border, U4U and CHNV give the United States the ability to scale back its tax dollars spent on border patrol.

Furthermore, the availability of the programs themselves provide a staggering improvement to public safety by reducing irregular border crossings. After Russia's invasion, Ukrainian encounter numbers at the southern border peaked at 20,118 in April 2022. Daniel Di Martino, *Biden's Immigration Parole Programs are Working*, Manhattan Inst. (May 25, 2023), https://manhattan.institute/article/bidens-immigration-parole-programs-are-working (hereinafter "Di Martino, *Biden's Immigration Parole Programs are Working*"). As Figure 1 below indicates, following the implementation of U4U in April 2022, encounters in May 2022 dropped significantly to 375—or in essence, "***a staggering 98% drop in the span of a month***." Guerra, *U4U has Been a Resounding Success*.



Fig. 1. Di Martino, *Biden's Immigration Parole Programs are Working*, at Fig. 10.

Additionally, the number of Ukrainians crossing the southern border between April 2022 and June 2023 plummeted by 99.9 percent.  Bier, *Parole Sponsorship Is a Revolution*; Guerra, *U4U has Been a Resounding Success*.

Indeed, CHNV, just like U4U, drastically reduced crossings of the U.S. southern border.  For example, the CHNV program contributed to an 89 percent drop in a seven-day average of unlawful encounters at the Southwest Border with individuals from the four relevant countries between mid-December 2022 and the end of June 2023.[10]  Relatedly, Figure 2, below, show that arrests stemming from illegal crossings have also decreased significantly, dropping from approximately 80,000 arrests of individuals from the relevant countries per month to typically

---

[10] DHS, *First Six Months*.

around just 10,000 to 20,000 arrests per month. Bier, *Parole Sponsorship Is a Revolution*, at Fig. 5.



Fig. 2. Bier, *Parole Sponsorship Is a Revolution*, at Fig. 5.

Judge Tipton's ruling in this case not only emphasized that the states bringing this suit failed to demonstrate they suffered any financial harm, but it also acknowledged that data shows the CHNV parole program has actually reduced the number of migrants entering the United States. All in all, U4U and CHNV are efficient and effective federal solutions proven to reduce the strain on the federal immigration system as well as nearly eliminate the burden on individual states.

**2. U4U and CHNV employ similar security and vetting procedures through a Rigorous Case-by-Case Adjudication, Nearly Eliminating the Burden on Individual States.**

U4U and CHNV both reduce the United States' need to militarize the border. As discussed above, both programs have significantly reduced the number of border crossings,[11] again, a fact Judge Tipton's opinion acknowledged, which in turn helps reduce the burden on border officers and restore order at the border. Ultimately, both programs reflect that taking security measures prior to any individual actually making the journey to the United States are more effective at reducing the United States' overall burden to ensure its borders are safe.

Further, both U4U and CHNV utilize unique, discretionary decisions made on a case-by-case basis about a potential beneficiary's eligibility and whether that beneficiary should be granted parole. This selective process helps ensure that individuals who have been previously vetted enter the United States. Accordingly, the United States has an interest to timely adjudicate applications and know who is entering the country, rather than have people enter the country without any vetting, and languish for years in the backlog.

>    **3. State claims of financial harm are undermined by U4U and CHNV's financial self-sufficiency model and by beneficiaries' net boost to struggling state economies.**

---

[11] *See* Di Martino, *Biden's Immigration Parole Programs are Working* (noting that the CHNV program has helped result in a 95% reduction of border encounters for Venezuelans, Cubans, Haitians, and Nicaraguans, as well as a greater than 95% reduction for Ukrainians); Bier, *Parole Sponsorship Is a Revolution*.

Both programs require the same type of information about sponsors and beneficiaries, using the same application form, and make the same demands of sponsors to demonstrate and take responsibility for financially supporting their beneficiaries if necessary, to eliminate any substantial burden on the state. Sponsors are required to provide detailed financial information and pay for the beneficiary's necessary expenses.

Additionally, while Cuban and Haitian CHNV beneficiaries—like Ukrainian U4U beneficiaries—are eligible to receive benefits and services from the Office of Refugee Resettlement ("ORR"), those programs are federally funded and do not rely on state budgets.[12]

Both the requirement of a mandatory private financial sponsor and the availability of federal ORR programs for certain beneficiaries, eliminates any substantial financial burden to the state.

### 4. U4U and CHNV's Private and Federal Funding Results in a Significant Net Boost to Struggling State Economies

By design, the U4U program, as well as the CHNV program, encourages economic self-sufficiency in the individuals that are authorized to enter the United

---

[12] Off. Refugee Resettlement, Policy Letter 16-01: Documentation Requirements for the Refugee Resettlement Program (Nov. 29, 2022), https://www.acf.hhs.gov/orr/policy-guidance/documentation-requirements-refugee-resettlement-program; Off. Refugee Resettlement, *Benefits for Ukrainian Humanitarian Parolees: Fact Sheet* (May 2022), https://www.acf.hhs.gov/orr/fact-sheet/benefits-ukrainian-humanitarian-parolees.

States.  Both programs require mandatory private financial sponsorship, which helps to ensure that recipients are encouraged to begin working as soon as possible, thereby reducing recipients' need for economic assistance and ensuring rapid economic integration into their community.

Further, the program also bolsters state economies as beneficiaries receive assistance from the federal Office of Refugees and Resettlement, which is then spent by the beneficiary in state economies.  In addition, despite the perceived cost of hosting migrants, including for example paying for education, hospitals, and other public services, the statistics do not show a drain on states' resources.  On the contrary, foreign-born residents have a higher labor force participation rate than native born individuals.[13]  Indeed, many U.S. industries rely upon foreign-born labor to ensure their continued competitiveness.  Recognizing the substantial positive impact these fee-based programs could have on the economy, employers have even sponsored recipients, finding that the parolees were able to fill vital labor voids in industries like North Dakota's oil industry.  *See* Russell Coates, *Uniting for Ukraine: How Ukrainian Refugees are Filling America's Labor Void*, LEARN LIBERTY (AUG.

---

[13] *See* Arloc Sherman et al., *Immigrants Contribute Greatly to U.S. Economy Despite Administration's Public Charge Rule,* CTR. BUDGET & POL'Y PRIORITIES, Aug. 15, 2019, https://www.cbpp.org/research/poverty-and-inequality/immigrants-contribute-greatly-to-us-economy-despite-administrations.

11, 2023), https://www.learnliberty.org/blog/how-ukrainian-refugees-are-filling-americas-labor-void/.

Additionally, providing humanitarian support to these individuals fleeing danger and strife helps provide workers to support an aging population. Johanna Burke, *Are Refugees Bad or Good for the Economy?*, ICMC (July 14, 2020), https://www.icmc.net/2020/07/14/refugees-good-or-bad-for-economy/. The United States, like most high-income countries, has a large percentage of the population that is out of the workforce, whereas, in comparison, the percentage of refugees who are out of the workforce is much lower. *See id.* (identifying that in 2015, "only 49.7% of the native-born population was of working age as compared to 77.1% of the refugee population"). Thus, individuals who enter the United States under both U4U and CHNV programs "fill the jobs vacated by older Americans and sustain the economy." *Id.*

Further, refugees typically pay on average "$21,000 more in taxes than they cost the government." *Id.* Even in the case where migrants do receive public benefits, the overwhelming majority are employed after receiving these benefits and are employed at higher rates to native born recipients of similar entitlement

programs.[14]  As such, bringing more migrants through programs such as U4U and CHNV is often a net driving force for economic growth.

Both the U4U and CHNV programs provide significant public benefit by encouraging economic self-sufficiency from migrants through stringent private financial sponsorship requirements.  Notably, Judge Tipton's opinion states, "In this case, . . . expenditures declined subsequent to the implementation of the CHNV Parole Program, and the Court has before it a case in which Plaintiffs claim that they have been injured by a program that has actually lowered their out-of-pocket costs." Migrants are a net benefit to the U.S. economy as a whole and states' economies more specifically as the data shows that even migrants that receive financial benefits ultimately contribute economically at a higher-than-average rate.  Overall, both programs are net financial benefits to the communities in which the migrants find themselves.

## II. UNITING FOR UKRAINE EXAMPLES

Uniting for Ukraine parolees exemplify the value, success, and benefit of parole programs.  The following four stories demonstrate the humanitarian need to sustain these programs, as well as the immense contribution to society that parolees provide.

---

[14] *Id.*

### A. Yelizaveta Marushchak – Successful family reunification and protection from war crimes committed in Ukraine

Yelizaveta Marushchak exemplifies the unique benefits of the U4U program, as Yelizaveta and her family were able to reunite with her U.S. citizen sister in New Jersey and provide protection for an entire family of five.   Yelizaveta and her immediate family, have sponsored a total of 13 relatives through the U4U program. Impressively, they continue to uphold their financial obligations to each person, while her husband directly contributes to the public sector through his work at a senior care center.   Yelizaveta and her family receiving protection in the United States directly serves the public interest and contributes to the American economy.

Yelizaveta lived with her husband, 3-year-old daughter, and newborn son when Russia invaded Ukraine.   She feared for her life.   While Yelizaveta was worried for her own safety, she was most worried about the safety of Alexey, her 15-year-old stepson.   Alexey lived in the town of Bucha, a name that has now become synonymous with the horrific war crimes that Russia has committed in Ukraine during its invasion.   For two long weeks, Yelizaveta and her husband were unable to get in contact with Alexey and feared that he had been captured by Russian soldiers.   Fortunately, once Bucha was liberated from Russia, Alexey was able to reunite with Yelizaveta and his father, traumatized but otherwise unharmed.

At this point, Yelizaveta and her husband made the painful decision to take their newborn son and young daughter to leave Ukraine to seek safety with

Yelizaveta's sister in the United States. Even before the U4U program was announced, they knew they needed a way out. While waiting for the United States to create a program that would allow them to enter the country legally, they considered traveling to the United States through the Mexican border, despite apprehensions about whether her newborn would be safe. Even though the family has faced difficulties in their new home, they are extremely grateful to be safe. Indeed, there is no possibility for them to return to Ukraine in the foreseeable future, as Ukraine remains an active warzone with regular Russian air strikes on civilian populations even far from the frontlines to this day. In addition, Yelizaveta is deeply emotionally scarred from the time spent fearing for her life at the beginning of the war. In particular, Yelizaveta heard horrific stories from friends that were trapped in Mariupol of many young women and girls being brought to the hospital following being gang-raped by Russian soldiers.

In December 2022—after living through Bucha's occupation, and then living in Kyiv, where they taped over windows to prevent them from shattering if bombs were dropped—Alexey's parents decided he should apply for U4U; his 16th birthday was approaching and they feared he would get drafted. By October 2023, he was here. After fleeing violence and Russian occupation, Alexey was relieved that the process of seeking safety in the United States through U4U was straightforward. He was provided with safe passage out of Ukraine knowing that he would have family

and guaranteed resources from the moment he arrives in the US. Yelizaveta explained that, with three kids, she is now like any other American, usually cooking and cleaning, but without the fear of her kids' safety in a war zone.

### B. Valentyna Veretska – International Professional Athlete and new American Business Owner

Valentyna Veretska is a professional athlete who has won international championships, including in the United States. Valentyna, her husband, Pavlo, and their 13-year-old daughter, came to the United States through the U4U program in November 2022.

Valentyna had first learned about the U4U program in late 2022 from a *Voice of America* interviewer she met after running a marathon in Israel. By October, an athlete friend of Valentyna's in the United States offered to sponsor her for the U4U program. The offer was appealing to Valentyna and her husband, both of whom knew the United States as country of opportunity, after twice losing their home in Ukraine—during the Russian invasion in 2014, and again now. Within a matter of days, Valentyna received a positive response from USCIS.

Valentyna and her family felt safe and excited coming to the United States through the U4U process. When they arrived in New York, an officer took the three of them, along with roughly ten other Ukrainians, into a room to review their

documents.  Valentyna found the immigration officers to be friendly and the process of having their documents checked to be surprisingly efficient.

After receiving parole, Valentyna and her family stayed with a friend from New York for a short period of time before finding an apartment of their own to rent. The woman who interviewed Valentyna for *Voice of America* reached out to Valentyna and invited her to come and visit Princeton for a half-marathon.  While Valentyna ran the half-marathon, the woman who had invited them spread the news of Valentyna's story, and by the time the race had ended and Valentyna had received her award and set a record, people had joined together to collect housing essentials to help Valentyna get started in America.  While she is currently taking a break from competing while awaiting a surgery, she is hoping to compete again in January in a Miami race.

After arriving to the United States, Pavlo applied his experience building the family's house in Ukraine to work in construction.  Their daughter is excited to start an American high school and join its running team.

In addition to running and continuing to place in competitions, Valentyna began a personal training and massage business after arriving to the United States. As of January, she also began working as an assistant coach for track and field at the high school her daughter will soon attend.  Additionally, Valentyna runs a summer day sport program for elementary school-aged children to engage in various sports,

swimming, games, and gymnastics. Valentyna's daughter even helps alongside her at the program.

In May this year, Valentyna and her family obtained Permanent Resident status. As she continues to set records in competitions, Valentyna hopes that with her new status, she can qualify and run for America in the next Olympics. Immediately after receiving her Green Card, Valentyna enrolled in and began taking classes at the Swedish Institute to pursue an Associates degree for massage therapy. With her new immigration status, Valentyna is also considering being a U4U sponsor for her daughter's friend who is still in Ukraine, constantly worried about her safety and future as the war continues.

Valentyna's story of coming into the country contrasts starkly with those she's heard of Ukrainians who entered the country without using the U4U program. Through her work providing massage therapy, Valentyna has heard stories of Ukrainians who entered through the Mexico border, each of whom faced severe physical abuse, extortion, or other traumatic experiences in Mexican prisons during their journeys before being able to enter the United States.

Now, because of the U4U program, Valentyna is finally able to advance her career as a professional athlete, enrich her community through training other athletes, and pursue her goals of helping shape future athletes. Valentyna has said that U4U changed her life, and America now feels like it's really her country. Though it took

Valentyna and her husband some time to get settled, Valentyna's daughter was "maximum excited" to move and go to school.  Now that she is more settled, Valentyna tries to keep an eye out for new immigrants so that she can offer the same kindness and support that she received from neighbors after she arrived. Valentyna's husband is able to help literally build up their neighborhood, and their daughter is an active part of her school and wider community.  Finally, in the United States, Valentyna and her family are able to find a place in their communities without fearing that they will once again lose their home and the life they have established to war with Russia.

### C. Yuliia Aksaniuk – Successful family reunification, gainfully employed and independent, who is now most proud to be "an honest taxpayer."

Yuliia Aksaniuk and her family were a typical, middle class Ukrainian family. Yuliia and her husband, Oleksandr, both had successful careers, and their three children were thriving.  The family lived in Odesa, a city in southern Ukraine on the Black Sea.  On April 8, 2022, after the fighting continued to get closer, and Odesa was at risk of ending up under siege, Yuliia and her family fled their home—and their lives—in Ukraine.

Not only did Yuliia and the rest of her family leave behind her oldest son, their home, and their lives—she and her husband left behind their successful careers. Yuliia is a public relations and marketing specialist and used to run her own advertising agency.  She is also a popular author, who recently received a cultural

diplomacy award from Ukraine for her work in promoting Jewish and Ukrainian culture in her books.

Yuliia's husband, Oleksandr, has had a tremendous career as an engineer. He has three degrees—two bachelor's and one master's—and has over thirty years of experience. Prior to fleeing Ukraine, Oleksandr, managed a company in Kyiv that dealt with electrical equipment for shopping centers, train stations, and residential buildings.

Upon arrival in the United States, the family hit the ground running. They used the last of their available savings to expedite the processing of their SSN cards and work authorization so Yuliia and Oleksandr could work as soon as possible. Yuliia, who speaks English well, began work as a kitchen assistant at an adult day care center, where she formed strong bonds with her clients and provided emotional support. After a few weeks on the job, Yuliia, applying her creative background, started a newspaper for the individuals at the day care center, where they could publish their own stories and talk about their lives. A few months ago, Yuliia, looking to work in an industry more similar to her past experience, moved on to work at a small event agency that specializes in event decoration. However, she still keeps up her connection with the adult day care center, and on her off day, goes back to make sure that the newspaper is still functioning.

Additionally, Oleksandr has had an effect in the community as well. He received a job offer at his first interview and performs highly skilled electrical work for a construction company, which specializes in commercial buildings. Yuliia's children have both acclimated well to the United States. Yuliia's daughter, graduated high school at the age of 17 and enrolled in community college. After one semester, Oleksandra has done very well and is one of the top students in her class, and now receives a scholarship for her tuition. Yuliia's younger son, Savva, has also performed well academically, and recently broke a three-year old record for the highest score at his school.

Yuliia is also very proud that her family has been able to contribute to the United States, and has done so without additional aid. Not only does her family now live in their own three-bedroom apartment, but her family has never used any government benefits or food stamps, and Oleksandr says "[l]et's leave them for those who need them more. We will not rely on those who kindly accepted us and will be able to support ourselves."

Ultimately, not only have Yuliia and her family successfully escaped the Russian war in Ukraine, but they have also already contributed to the community in New York. The children are involved at school, and both Yuliia and Oleksandr are working hard in their jobs to support their community. Indeed, Yuliia and Oleksandr proudly filed their first United States' tax return in April 2023, and now, Yuliia can

say what she terms as the "legendary" American phrase: "I am proud to be an honest taxpayer."

### D. Polina Herman – Filmmaker in Los Angeles, enrolled in a professional program for producers at UCLA, sharing the experiences of Ukrainians during the war.

Polina Herman lived in Kyiv with her thirteen-year-old son when the war started. Shortly after the first week of the war, once the shock wore off and reality set in, Polina realized she had to flee for her and her son's safety. Although she had a successful film production business in Ukraine, she had to leave her life behind and quickly decide where to relocate.

With the help of Julia Zagachin, the founder of Jobs Not War, Polina was able to find a sponsor. On May 19, 2022, she and her son arrived, in one of the first groups of Ukrainians to benefit from the Uniting for Ukraine program. By October 2022, Polina was renting her own apartment in Los Angeles. Since arriving to the United States, Polina has also been taking English classes and has enrolled in a professional program for producers at UCLA. Simultaneously, she works in film production, both in the United States and with her team in Ukraine via Zoom.

Polina has also applied for a talent visa which she hopes will allow her to stay in the United States and further build her career by allowing her to travel to film festivals and events in Europe. Through her films, Polina aspires to create bridges

between Americans and Ukrainians. She believes that it is important, for both groups, to highlight in her films the experiences of Ukrainians during the war.

Within her local community, Polina started the Dovzhenko League, which brings together a group of Ukrainian filmmakers in Los Angeles. The group focuses on providing support to Ukrainians trying to integrate into the American film industry. Polina also looks forward to continuing to contribute to her new community in Los Angeles through the unique perspective she provides in her films. She is thriving in the film community and she dreams of winning an Oscar. Her son, who recently completed middle school and is an avid basketball player, dreams of going pro. Polina is grateful for the safety and opportunities U4U has provided her— she believes it is an excellent and indispensable program for Ukrainians.

## CONCLUSION

For the reasons stated above, the Court should rule in favor of the defendant-appellees and intervenor defendant-appellees.

Dated: August 2, 2024

Respectfully submitted,

  /s/ *Amelia T.R. Starr*

Amelia T.R. Starr, *Attorney in Charge*

Nishan Bhaumik, *of counsel*
Maya Kapelnikova, *of counsel*
Jaclyn M. Willner, *of counsel*
Zach Zaremba, *of counsel*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4516
amelia.starr@davispolk.com

*Counsel for* Amicus Curiae
LEGAL INFORMATION
NETWORK FOR UKRAINE

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of FED. R. APP. P. 29(a)(5) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f):

☑ this document contains 6,478 words, as provided by the word count accompanying Microsoft Word, Version 2308, Microsoft 365, or

☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Microsoft Word, Version 2308, Microsoft 365, in size 14 Times New Roman, or

☐ this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

Dated: August 2, 2024

Respectfully submitted,

/s/ *Amelia T.R. Starr*

Amelia T.R. Starr, *Attorney in Charge*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4516
amelia.starr@davispolk.com

*Counsel for* Amicus Curiae
LEGAL INFORMATION
NETWORK FOR UKRAINE

## PROOF OF SERVICE

I hereby certify that on August 2, 2024, a true and accurate copy of the foregoing document was filed electronically via CM/ECF and served on all counsel of record.

Respectfully submitted,

*/s/ Amelia T.R. Starr*

Amelia T.R. Starr, *Attorney in Charge*

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4516
amelia.starr@davispolk.com

*Counsel for* Amicus Curiae
LEGAL INFORMATION
NETWORK FOR UKRAINE