No. 24-40160

# In the United States Court of Appeals
# for the Fifth Circuit

STATE OF TEXAS, ET AL.,
*Plaintiff - Appellant*,

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY
*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS VICTORIA DIVISION
NO. 6:23-CV-00007

**BRIEF FOR *AMICI CURIAE* DRS. STAN VEUGER, TARA WATSON, DOUGLAS HOLTZ-EAKIN, & LEAH BOUSTAN IN SUPPORT OF DEFENDANTS-APPELLEES AND SUPPORTING AFFIRMANCE**

Deborah Malamud
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
dmalamud@cov.com

Brandon R. Gould
Carolyn F. Corwin
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
ccorwin@cov.com
bgould@cov.com

*Attorneys for* Amici Curiae *Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, & Leah Boustan*

August 2, 2024

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2 and Rule 28.2.1, *amici curiae* make the following supplemental statement of interested parties to fully disclose all those with an interest in this brief.

Amici Curiae
Dr. Stan Veuger
Dr. Tara Watson
Dr. Douglas Holtz-Eakin
Dr. Leah Boustan

Counsel for Amici Curiae
Brandon R. Gould
Carolyn F. Corwin
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
bgould@cov.com
ccorwin@cov.com

Deborah Malamud
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
dmalamud@cov.com

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ............................................................... v

SUMMARY OF ARGUMENT ............................................................... 1

BACKGROUND ................................................................................... 4

ARGUMENT ......................................................................................... 8

I.   The District Court Correctly Recognized that Migration Plummeted After the CHNV Program Launched, Lowering Texas's Fiscal Costs. ......... 8

II.  Texas's New Criticisms of the District Court's Factual Conclusions All Fail. ............................................................................................ 14

     A.   The District Court Relied on All the Relevant Data, Not Some "Small Sample Size." ......................................................... 16

     B.   The Decline in CHNV Migration Differed Vastly from Trends in Non-CHNV Migration. .................................................. 18

     C.   Texas Cites No Evidence that "Other Factors" Caused the Drop in Migration Immediately After the CHNV Program Launched. ...... 22

     D.   Texas's Arguments About Migration Increases Many Months After the CHNV Program Began Are Irrelevant and Misleading. ......................................................................... 25

CONCLUSION ..................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City, N.C.*,
 470 U.S. 564 (1985) ................................................................. 16, 23

*Ctr. for Biological Diversity v. EPA*,
 937 F.3d 533 (5th Cir. 2019) ........................................................ 18, 22

*E.T. v. Paxton*,
 41 F.4th 709 (5th Cir. 2022) ............................................................. 12

**Regulatory Publications**

87 Fed. Reg. 25040 ............................................................................. 5, 25

88 Fed. Reg. 1255 ................................................................................... 14

88 Fed. Reg. 1266 .......................................................................... 10, 11, 24

88 Fed. Reg. 1279 ..................................................................................... 5

88 Fed. Reg. 31314 .................................................................................. 24

**Other Authorities**

Fed. Judicial Ctr. & Nat'l Acad. Scis., REFERENCE MANUAL ON
 SCIENTIFIC EVIDENCE (3d ed. 2011) ................................................... 13

Jonathan Gruber, PUBLIC FINANCE AND PUBLIC POLICY (5th ed. 2015) ............. 26, 28

Michael Clemens & Kate Gough, *Can Regular Migration Channels
 Reduce Irregular Migration?* Ctr. for Global Development, 5
 (2018) ............................................................................................... 13

*Secretary Mayorkas Announces Extension and Redesignation of
 Venezuela for Temporary Protected Status*, DHS (Sept. 20, 2023), ................... 28

# INTEREST OF AMICI CURIAE[1]

Drs. Stan Veuger (American Enterprise Institute, Harvard University visiting lecturer), Tara Watson (Brookings Institution, Williams College professor of economics), Douglas Holtz-Eakin (American Action Forum, former Chief Economist of the President's Council of Economic Advisers (2001-2002), former Congressional Budget Office Director (2003-2005)), and Leah Boustan (National Bureau of Economic Research, Princeton University professor of economics) are Ph.D economists who have researched and written extensively on the economics of fiscal and immigration policy. They previously filed an *amicus* brief in the District Court, which is attached as Exhibit A for the Court's convenience. That brief and the Motion for Leave that accompanies this brief provide further information on their professional backgrounds and relevant expertise in these matters, which they believe will assist this Court in assessing the parties' arguments on appeal.

---

[1] No party's counsel authored this brief in whole or in part, nor did any party, counsel for any party, or any person other than amici curiae or their counsel contribute funding for the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The District Court correctly determined that Texas and other appellant states (hereinafter, "Texas") lacked standing to challenge the government's immigration parole program for Cubans, Haitians, Nicaraguans, and Venezuelans (the "CHNV Program" or "Program").  That decision rested on the dramatic decline in migration levels from those four countries that occurred immediately after the CHNV Program launched.  This sudden drop in migration meant that Texas spent much less money on newly arrived migrants from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") after the Program began than before it launched.  In light of those lower expenditures, the District Court held that Texas had not suffered an injury-in-fact and therefore lacked standing to challenge the CHNV Program.

The Department of Homeland Security ("DHS") launched the CHNV Program to combat an increase in unauthorized CHNV migration on the Southwest border.  The Program allows CHNV nationals who are sponsored by U.S. residents to apply from abroad and, if approved, to travel at their own expense to a U.S. port of entry to seek up to two years of immigration parole.  DHS intended the Program to provide a safe and orderly process for prospective CHNV migrants to seek lawful parole rather than attempting a dangerous, expensive, and unauthorized entry at the Southwest border.  DHS expected that many prospective CHNV migrants would choose to apply through the Program and await travel authorization, which would

1

decrease unauthorized entries, relieve burdens on U.S. immigration enforcers, and strengthen border security.  Up until trial, Texas disputed DHS's expectations. Texas argued the Program would *increase*, not decrease, CHNV migration, which Texas argued would cost it more money providing social services to those additional migrants.

In an *amicus* brief filed ten days before the bench trial, Drs. Stan Veuger, Tara Watson, Douglas Holtz-Eakin, and Leah Boustan (the "Economists" or "*amici*") presented an analysis of DHS data showing that overall levels of migration by CHNV nationals (lawful plus unauthorized) had dropped precipitously immediately after the CHNV Program launched in January 2023 as well as after a predecessor parole program for Venezuelans began in October 2022.  ROA9914-16 (attached as Exhibit A).  For Cubans, Haitians, and Nicaraguans, *amici* presented data showing that migration levels dropped approximately **75** percent between December 2022 and January 2023, when the CHNV Program began.  *Id.*  For Venezuelans, *amici* showed a similar migration decline of approximately **60** percent between September and November 2022, immediately after DHS created the similar, Venezuelan-specific parole program.  *Id.*  These two drops in migration, *amici* explained, were consistent with migrants' rational economic incentives, the government's experience in creating several prior legal migration pathways, and DHS's expectations when it launched the CHNV Program.  ROA9915-16.

2

At trial, Texas did not dispute that migration levels for CHNV nationals had dropped dramatically after the Program launched, or that, as a result of that drop, Texas spent less money on new CHNV entrants.  ROA11532.  Abandoning its prior arguments, Texas pivoted to a new theory, arguing that *any* amount Texas spent on *any* CHNV parolee gave it standing because, tautologically, no parolees entered Texas under the CHNV Program before the CHNV Program existed.

In a 31-page decision, District Court Judge Drew Tipton ("Judge Tipton") rejected Texas's novel "baseline-of-zero theory" of CHNV migration.  Judge Tipton also determined that the CHNV Program had caused the dramatic and unprecedented declines in CHNV migration that occurred immediately after the Program launched in January 2023.  ROA11536.  Texas appeals both aspects of Judge Tipton's decision, arguing that those two determinations were "clearly erroneous."  Texas Br. at 28 (ECF 133).

As *amici* explain in this brief, Judge Tipton's detailed analysis of the programmatic causes and fiscal effects of the dramatic drop in CHNV migration comport with well-recognized principles of economic theory, econometric data analysis, and basic common sense.  *Infra* § I.  The same is true for Judge Tipton's rejection of Texas's novel "baseline-of-zero theory" because it "attempts to skirt the fact that Texas is not financially harmed by the Program."  *Id.*; ROA11536, 11540.

On appeal, Texas raises a handful of new critiques and data analyses to argue that Judge Tipton "clearly erred" in finding that the CHNV Program reduced CHNV migration in January 2023. However, as *amici* explain, Texas's new arguments mischaracterize the District Court's factual conclusions, and Texas's new data analyses actually confirm those conclusions were reasonable as a matter of economic analysis. For these reasons, *amici* believe this Court should affirm the District Court's dismissal of Texas's case for lack of standing.

## BACKGROUND

On January 5, 2023, DHS launched the CHNV Program to reduce unauthorized migration and increase border security. The Program allows approved U.S. residents to sponsor CHNV nationals who apply from abroad for authorization to travel to a U.S. port of entry and seek up to years of parole in the country. CHNV nationals and their sponsors undergo a multi-stage application process that includes rigorous financial, criminal, and national security screening before approved CHNV applicants may enter the U.S. The program is capped at 30,000 approvals per month.

Approximately two weeks after the CHNV Program launched, Texas sued to enjoin the Program. Texas alleged the Program would "potentially" allow "hundreds of thousands of additional aliens to enter" the U.S. ROA67 ¶5. Those potential "additional" migrants, Texas asserted, would cause it to spend more money on

incarcerating or providing healthcare, education, and drivers' licenses to new CHNV entrants. ROA75-77.

However, by the time Texas filed its original Complaint on January 24, 2023, new entries of CHNV nationals had plummeted, falling over 80 percent from the levels DHS experienced just two weeks before the Program launched. ROA11528. And by February 14 when Texas filed its Amended Complaint, over 60,000 fewer CHNV nationals had entered the U.S. in January 2023 compared to the all-time peak of CHNV arrivals in December 2022. ROA9914-16.

This significant drop in CHNV migration built upon DHS's successful implementation of two similar parole programs for Venezuelan and Ukrainian nationals. On October 12, 2022, DHS responded to a spike in unauthorized Venezuelan migration by allowing up to 24,000 sponsored Venezuelans per month to apply from abroad authorization to seek parole into the U.S. 88 Fed. Reg. 1279. Within a month, Venezuelan migration "substantially decreased" and remained well below its September 2022 peak for months. ROA11528; 9915-16. Similarly, on April 25, 2022, DHS implemented the "Uniting for Ukraine" program ("U4U"), which allowed sponsored Ukrainians to flee the Russian invasion and apply for parole into the U.S. See 87 Fed. Reg. 25040. Like the CHNV Program, U4U staunched the flow of tens of thousands of unauthorized Ukrainian migrants across

the Southwest border and continued to reduce overall Ukrainian migration levels for months. ROA9910-11, 9915-16.

Despite these dramatic declines, Texas argued up until the eve of trial that the CHNV Program would increase migration. For example, when Texas sought a preliminary injunction in February 2023, it argued that the "number of illegal aliens who are present in the State" would "increase[] due to grants of parole" under the Program. ROA376. Likewise, when Texas responded to the government's interrogatories on May 19, 2023, it stated that "all" of its "asserted injuries … arise from costs imposed by the increased presence of aliens in Texas." ROA14465. Finally, on June 27, 2023, Texas reiterated that an injunction against the CHNV Program would "reduce … the number of illegal aliens[ ]present" in Texas and save it "millions of dollars per year." ROA9550, 9552.

On August 14, 2023—ten days before the start of trial—the Economist *amici* filed their brief showing that, consistent with economic theory, past parole programs, and DHS's expectations, migration of CHNV nationals to the U.S. had "declined significantly since the Program began." ROA9907 (attached as Exhibit A). The Economists explained this "huge drop in CHNV migration since December 2022 must mean the States spent *less* money on newly arrived CHNV nationals than they did before the Program went into effect." ROA9917, 9922.

At trial ten days later, Texas jettisoned its theory that "additional" CHNV migration gave it standing to challenge the Program. Instead, Texas agreed with Judge Tipton that "there are fewer aliens coming into the country now as opposed to before the Program from those four countries." ROA12485-86. Texas did not introduce any trial evidence disputing *amici's* and Defendants' argument that the CHNV Program caused this precipitous decline in CHNV migration.

Instead, Texas urged the District Court to disregard the fact that reduced CHNV migration would also reduce Texas's spending on new CHNV migrants. Rather, Texas argued it was "[l]osing money compared to the baseline of zero parolees" because "there are more people coming in through the parole program that we would not have had if the parole program didn't exist." ROA12603, 12611-13.

On March 8, 2023, the District Court dismissed Texas's case for lack of standing. As his "most important finding," Judge Tipton determined "the number of CHNV nationals entering the United States has dramatically declined from the date the Program commenced through the last date for which data was received by the Court." ROA11529. That decline meant the CHNV Program had "actually lowered [Texas's] out-of-pocket costs" in providing social services to new CHNV migrants. ROA11541. Judge Tipton likewise rejected Texas's new "baseline-of-zero theory" because it "attempts to skirt the fact that Texas is not financially harmed by the Program" and flouted how "injury-in-fact … has long been understood in the

immigration context." ROA11536.  Instead, he concluded that standing must be assessed "relative to the status quo, and relative to [Texas's] position absent the challenged policy." *Id.*

In this Court, Texas argues that Judge Tipton's "clearly erred" in attributing the "dramatic decline" in CHNV migration to the CHNV Program and in rejecting Texas's "baseline-of-zero theory" concerning the fiscal effects of the Program.

## ARGUMENT

### I.    The District Court Correctly Recognized that Migration Plummeted After the CHNV Program Launched, Lowering Texas's Fiscal Costs.

As Judge Tipton recognized, Texas "do[es] not dispute either … (1) that there are fewer aliens coming into the country from th[e] four [CHNV] countries, or (2) that as a result, Texas is spending less money" on newly arrived CHNV migrants. ROA11532.  Nor could it.

As *amici* explained below, undisputed DHS data show that CHNV migration fell dramatically immediately after implementation of the CHNV Program.  Before the Program, border enforcers struggled to contain "a surge in migration of CHNV nationals" at the Southwest border, which included 85,000 Cuban, Haitian, and Nicaraguans who arrived in December 2022 alone.  ROA9905-09; 11513.  But immediately after the Program launched, those numbers dropped approximately 75 percent with fewer than 21,000 migrants from those countries arriving in January 2023.  ROA9908-09.  In the months that followed, migration remained well below

December 2022 levels through the August 2023 bench trial.  Figure 1 below is reproduced from the Economists' brief below and depicts the dramatic decline in January 2023.

**Figure 1**



This January 2023 drop in Cuban, Haitian, and Nicaraguan migration was not a one-time fluke.  Roughly three months earlier, on October 12, 2022, DHS had launched a similar parole program for Venezuelan nationals.  (DHS subsequently folded this Venezuela-specific program into the CHNV Program.)  After that program began, DHS encounters with Venezuelans dropped 60 percent, from a

September 2022 peak of approximately 34,000 to fewer than 14,000 in November. ROA9909-10.

As *amici* explained below, CHNV migrants' economic incentives explain these two dramatic drops. CHNV nationals, like anyone else, weigh costs and benefits before making important decisions, like whether, when, and how to migrate. DHS's creation of new, safe, lawful, and orderly migration pathways for CHNV nationals changed that balance of costs and benefits for Venezuelans in October 2022 and for Cubans, Haitians, and Nicaraguans in January 2023. As *amici* explained, once these new parole pathways became available, prospective CHNV migrants could avoid a dangerous, expensive, and uncertain journey to the Southwest border by remaining at home, applying through the Program and awaiting travel authorization. ROA9910, 9916.

As *amici* explained, DHS policymakers anticipated this dynamic when implementing the CHNV Program. DHS created the Program to provide "a significant incentive" for CHNV nationals apply for travel authorization and "wait where they are" pending approval to seek parole. 88 Fed. Reg. 1266, 1268. Those changed incentives, DHS expected, would produce "a meaningful change in migratory flows." *Id.* That prediction was not idle speculation; it was based upon DHS's demonstrated success in launching the Venezuelan parole program months earlier. That predecessor program "fundamentally changed the calculus for

Venezuelan migrants." *Id.* Many Venezuelans traveling to the Southwest border "turned around and headed back" while "[s]till others who were intending to migrate north … stay[ed] where they [were] to apply for th[e] parole process." *Id.*

Faced with this undisputed evidence, Judge Tipton concluded that CHNV migration had "dramatically declined" since the Program began. ROA11529. "[A]s a result" of this "dramatic[] decline[]," Judge Tipton further determined that "Texas is spending less money" on social services for new CHNV migrants. *Id.*; ROA11532, 11540. Moreover, "the fact that [Texas's] out-of-pocket costs have declined during the relevant period" meant that Texas had not suffered an injury-in-fact and lacked standing to challenge the CHNV Program. ROA11534, 11536.

Although Texas did not dispute these facts below (ROA11532), it now argues that Judge Tipton's factfinding was "clearly erroneous." Texas cites no record evidence to support that contention. This is because Texas failed to offer any evidence rebutting either the January 2023 decline in CHNV migration or the parallel reduction in Texas's fiscal expenditures on new CHNV migrants.

Instead, Texas now argues that the District Court should have adopted the "baseline-of-zero theory" of CHNV migration that Texas debuted on "the eve of trial," days after Economist *amici* filed their brief. ROA11532. That theory asked the District Court to ignore the "dramatic[] decline[]" in CHNV migration that occurred immediately after the CHNV Program launched, and instead to focus

11

exclusively on the limited number of migrants who received parole under the Program.  ROA11529, 11535.  Judge Tipton rejected Texas's "baseline-of-zero theory" as "artful pleading" in an attempt to "end-run around the strictures of Article III."  ROA11535-36 (citing *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022).

Putting aside Article III questions, Judge Tipton's rejection of Texas's fallback "baseline-of-zero theory" was correct as a matter of economics, as well as common sense.  As Judge Tipton correctly recognized, Texas's last-minute "re-characterization" of its standing arguments "attempt[ed] to skirt the fact that Texas is not financially harmed by the Program."  ROA11535.  To assess how the Program affected Texas, the District Court appropriately asked whether Texas's fiscal expenditures increased or decreased "relative to the status quo" by "looking to the costs that would have been incurred absent the challenged" CHNV Program.  ROA11535-36.  And because CHNV migration "dramatically decreased" under the Program, Judge Tipton reasonably inferred that the Program had "actually lowered [Texas's] out-of-pocket costs," benefiting, not harming, Texas.  ROA11512, 11541.

Judge Tipton's analysis of how the Program reduced Texas's expenditures is consistent with how an economist would evaluate the economic effects of any major event or policy change.  As explained by the National Academy of Sciences, "an analysis of the economic impact of that event [i]n most cases … considers the difference between the plaintiff's economic position if the … event had not occurred

and the plaintiff's actual economic position." Fed. Judicial Ctr. & Nat'l Acad. Scis., REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 432 (3d ed. 2011). Texas's fallback contention that "any CHNV parolee increases its costs above what it would have spent but-for the CHNV Program … raises a misleading baseline," as *amici* explained below. ROA9917 n.11. Judge Tipton's rejection of Texas's misleading "baseline-of-zero theory" and adoption of December 2022 as the pre-Program "baseline" against which to measure the Program's immediate effects was an economically and methodologically reasonable decision, and certainly not "clearly erroneous" as Texas argues on appeal.

Judge Tipton's rejection of Texas's "baseline-of-zero theory" also makes common sense. As a practical matter, *amici* noted below that the District Court could not choose "'between regular migration and no migration' at all." *Id.* Relying upon historical examples from economic scholarship, *amici* explained that Texas's "baseline-of-zero theory" presented an "illusory tradeoff" that was "'made impossible by overwhelming demographic, economic, geographic, and historic realities' that drive CHNV migration, both legal and unauthorized," over time. *Id.* (quoting Michael Clemens & Kate Gough, *Can Regular Migration Channels Reduce Irregular Migration?* Ctr. for Global Development, 5 (2018)). Consistent with that economic analysis—and with common sense—Judge Tipton apparently agreed with *amici* that "enjoining the Program will only return Texas to its pre-2023 status quo

of higher CHNV migration flows across a less-secure border at greater fiscal costs."

ROA9917 n.11.  That factual determination was sound, not clearly erroneous.[2]

## II.  Texas's New Criticisms of the District Court's Factual Conclusions All Fail.

At trial, Texas "d[id] not dispute either … (1) that there are fewer aliens coming into the country from th[e] four [CHNV] countries, or (2) that as a result, Texas is spending less money" on newly arrived CHNV migrants.  ROA11532.  Nor did Texas introduce any trial evidence rebutting the reasonable inference that the CHNV Program caused the sudden drop in migration in January 2023.

After trial, however, Texas attempted to reinterpret the data and argued that various "confounding factors" coincidentally caused the unprecedented drop in CNHV migration that followed immediately after the Program launched.  Texas Br. at 29-30.  Texas also argued that post-trial data showing temporary increases in

---

[2] Texas now defends its "baseline-of-zero theory" by arguing that CHNV migrants who cross the border without authorization are "not in the same category" as lawful CHNV parolees.  Texas Br. at 22 (speculating that CHNV parolees "impos[e] greater and different kinds of costs on Texas").  Texas, however, failed to offer any record evidence to support that new argument on appeal.  Indeed, when Judge Tipton asked at trial whether parolees "are more expensive because they come in through the parole program," Texas disavowed that theory.  ROA12603-04 ("No. … I don't think there is necessarily a fundamental difference.").  Regardless, as *amici* explained below, CHNV parolees, if anything, likely cost *less* to Texas than unauthorized entrants.  This is because lawful parolees, unlike unauthorized entrants, undergo rigorous criminal background checks, pay taxes and can obtain health insurance from their work in the formal sector, and have U.S.-resident sponsors who must "demonstrate sufficient financial resources" to support them during their two-year period of parole.  ROA9906, 9918-20; 88 Fed. Reg. 1255, 1263.

CHNV migration in the summer of 2023 gave it standing to challenge the CHNV Program retroactively.  *Id.* at 30-33.

Judge Tipton rejected Texas's post-hoc arguments respecting the undisputed migration data.  In denying Texas's motion for reconsideration, the District Court explained that "all the evidence presented at trial indicated that when suit was filed, the rate of entry was plummeting" and, at the time of its operative Complaint, Texas "offered nothing to suggest that … a rebound in that rate of entry was on the horizon."  ROA11633-34.  That deficient showing was fatal because "standing is determined" based on whether Texas faced an "'actual or imminent'" injury "at the time of the operative complaint."  *Id.*  All of Texas's "post-trial evidence" was therefore "of no moment" to whether it had standing to sue in early 2023.  *Id.*

Now, on appeal, Texas reprises its post-trial arguments, raises several novel data-based arguments it failed to preserve below, and argues that the District Court erred in concluding the CHNV Program caused the "dramatic[] decrease[]" in CHNV migration that occurred in January 2023.  *See* ROA11512, 11529.  Texas now argues the District Court:  (1) considered an "[un]representative" and "extremely small sample size" of migration data; (2) failed to acknowledge a supposedly "similar" decline in non-CHNV migration that occurred in January 2023; (3) did not rule out "other likely causes" of the January 2023 drop in CHNV

migration; and (4) did not adequately account for data published after the trial showing a temporary rise in Venezuelan migration in August and September 2023.

For each of these post-trial data-based challenges, Texas acknowledges it must establish that Judge Tipton's factfinding was "clearly erroneous" under the "appropriately deferential standard" for appellate review. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574-77 (1985) (cited by Texas Br. at 30). But even without deference, Texas's four post-trial arguments confirm—not contradict—Judge Tipton's factual conclusion that the CHNV Program "dramatically decreased" CHNV migration, both when the Program was implemented and in the many months that followed. ROA11512, 11529.

## A.   The District Court Relied on All the Relevant Data, Not Some "Small Sample Size."

Texas's first criticism that Judge Tipton "erred by considering a short span of time" is incorrect. As an initial matter, Texas is wrong to assert that Judge Tipton considered an "extremely small sample size" of CHNV data. Texas Br. at 28-29. To the contrary, Judge Tipton considered not a sample but *all the data* the parties and *amici* submitted, and that data covered the *full universe of DHS's encounters* with Cuban, Haitian, Nicaraguan, and Venezuelan nationals, not some narrower "sample" of CHNV encounters.

Texas's argument that the District Court considered only "a short span of time" to reach its factual conclusions is similarly off the mark. Judge Tipton did

conclude that "on February 14, 2023, when Plaintiffs filed suit, fewer CHNV nationals were entering the country compared to before the Program began." ROA11529.   But to the extent Texas argues that this month-plus period was too "short" that is a problem of Texas's own making.   At trial and thereafter, Texas argued that the District Court could not consider any CHNV migration data that post-dated its Complaint to determine standing.[3]   Texas now protests that Judge Tipton "clearly erred" by not considering the same data Texas sought to exclude below.

Regardless of Texas's change of position, the District Court did not limit its analysis of the data to two weeks—or even two months—before and after DHS implemented the CHNV Program.  To the contrary, the District Court also based its factual findings on the Venezuelan parole program, which DHS launched in October 2022 and later incorporated into the CHNV Program:

> Prior to October 12, 2022, when Venezuela's parole process was announced, DHS was encountering an average of 1,100 Venezuelan nationals per day at the Southwest border. Within a week of the Venezuelan process announcement, DHS observed the number of encounters per day begin to drop. By the week ending in January 22, 2023, DHS reported a daily average of just 28 Venezuelan encounters per day.  ROA11528.

Taken together with the later CHNV Program, the decline in migration following the October 2022 Venezuelan program supported the District Court's

---

[3] *See, e.g.*, ROA12487-90, 12594-98, 12605-07, 12610-11; ROA11082-84; ROA11417-18.

17

conclusion that CHNV migration had "dramatically declined" by the time Texas filed its operative Complaint on February 14, 2024.  ROA11528-30.

Finally, although not essential to the District Court's legal conclusions on standing, Judge Tipton also considered the post-trial data Texas submitted, as well as all the other migration data in the trial record.  *See* ROA11515-17 (taking judicial notice of Texas's proffered post-trial data); ROA11529.  As shown in Figure 1 above (*supra* 9), that data showed that the January 2023 decline in migration persisted for months after the CHNV Program launched.  After considering all this data, Judge Tipton reasonably concluded that "the number of CHNV nationals entering the United States has dramatically declined from the date the Program commenced through the *last date for which data was received by the Court*."  ROA11529.

**B.    The Decline in CHNV Migration Differed Vastly from Trends in Non-CHNV Migration.**

Texas also argues that the District Court "clearly erred" by not accounting for a supposedly "similar drop" in migration that occurred across "*all* population groups," not just CHNV nationals, in January 2023.  *See* Texas Br. at 29.  Texas says it raised this concern in post-trial briefing before the District Court, but the record excerpts it cites show that Texas is making this argument for the first time on appeal.  *See id.* (citing ROA11089-93 (discussing a parallel *increase* in CHNV and non-CHNV migration in *August* and *July* 2023, but not an across-the-board *decrease* in January 2023); *see also Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th

Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").

In any event, Texas's new arguments do not undermine Judge Tipton's factual conclusions below; in fact, they confirm those findings. As discussed in Section I and the Economists' district court brief, undisputed data show that migration by CHNV nationals plummeted immediately after DHS created a safe, lawful, and orderly parole pathway for Venezuelans in October 2022 and one for Cuban, Haitian, and Nicaraguan nationals in January 2023. ROA9914-15. The undisputed data also show that migration of non-CHNV nationals—who lacked access to those parole pathways—did *not* experience a similar decline at either time.

Figure 2 below depicts DHS data on nationwide encounters with Venezuelan and non-CHNV nationals, both before and after DHS implemented the Venezuelan parole program in October 2022. As the graph shows, Venezuelan migration dropped 60 percent from September to November 2022, *i.e.*, the first full months before and after the Venezuelan parole program was announced in mid-October. During that same time, encounters with non-CHNV nationals *increased* 4 percent. These data confirm the District Court's conclusion that the new Venezuelan parole pathway explained the "substantial[] decrease[]" in Venezuelan migration in fall 2022.

**Figure 2**



Figure 3 below compares the same, nationwide data for non-CHNV migration against Cuban, Haitian, and Nicaraguan migration before and after DHS launched the CHNV Program in January 2023. As with Venezuelans in the fall of 2022, DHS encounters with Cuban, Haitian, and Nicaraguan nationals fell by approximately 75 percent immediately following the Program's launch in January 2023. In that same month, entries of non-CHNV nationals dipped slightly, falling only 15 percent, but

---

[4] In Figure 2 the thin, black lines above and below the migration data are 95% confidence intervals that account for normal, month-to-month fluctuations in migration levels. Those bars confirm that the drop in Venezuelan migration in fall 2022 was statistically significant beyond normal seasonal or other variation. The same conclusion holds for Cuban, Haitian, and Nicaraguan migration in January 2023, as shown in Figure 3. The conclusions in Figures 2 and 3 also hold true if one compares Venezuelan to non-Venezuelan migration in fall 2022 or CHN to non-CHN migration in January 2023.

soon rebounded above their December 2022 levels, unlike Cuban, Haitian, and Nicaraguan arrivals, which remained lower for months.

**Figure 3**



This difference between the 75 percent decrease in Cuban, Haitian, and Nicaraguan arrivals and the 15 percent decrease in non-CHNV arrivals in January 2023 is statistically significant at a 95 percent confidence level.  Put in non-economist terms, these data disprove Texas's new argument that there was a "similar drop in migration flows during this period across _all_ population groups."  Texas Br. at 29 (emphasis partially added).

### C.    Texas Cites No Evidence that "Other Factors" Caused the Drop in Migration Immediately After the CHNV Program Launched.

Texas also recites a laundry list of "possible confounding factors" that it speculates might have caused the dramatic decline in CHNV migration in January 2023.[5] Each of these alternative explanations suffers from the same problem:  Texas failed to introduce any evidence in the District Court to meet its burden in advancing these new theories.   That alone defeats Texas's speculation on appeal.   *See Biological Diversity*, 937 F.3d at 542.

In any event, the District Court could reasonably infer that the newly launched CHNV Program precipitated the dramatic decline in CHNV migration based solely upon the undisputed migration data from January 2023.   The Economist *amici* explained below that the dramatic drop in Cuban, Haitian, and Nicaraguan migration was historically unprecedented, "more than *doubling* the previous record decline" in the "history of DHS's data."   ROA9915.   Analyzing data across multiple years, the Economists also explained that "[s]easonal variation cannot explain the large drop in January 2023."   *Id.* n.9 (explaining that "CHN encounters fell only slightly" in January 2022, one year before the Program's implementation, and entries actually "*rose* 38 percent from December 2020 to January 2021," two years beforehand); *see*

---

[5] Texas Br. at 29-30 (speculating that "misinformation campaigns by smugglers," "stiffened consequences for irregular migration," "actions by other nations, including Colombia, Costa Rica, Ecuador, Canada, and Guatemala," and "seasonal patterns" of migration might have reduced CHNV entries in January 2023).

*also supra* Figures 2-3 (showing that CHNV migration departed from any "seasonal patterns" in non-CHNV migration). From these undisputed data, the District Court could reasonably infer that the CHNV Program caused the dramatic drop in CHNV migration from December 2022 to January 2023, even if Texas's unsupported speculation about "other likely causes" is taken at face-value. *See* Texas Br. at 29-30; *Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

But, as discussed above (*supra* § II.A), the District Court's factfinding was not limited to that two-month period. The District Court also considered a parallel decline in Venezuelan migration that occurred immediately after the October 2022 launch of the Venezuela-specific predecessor parole program. Texas's brief on appeal offers neither arguments nor evidence for how various hypothetical "confounding factors" supposedly caused Venezuelan migration to suddenly drop in October 2022 in the same manner that Cuban, Haitian, and Nicaraguan migration later fell when the CHNV Program began in January 2023.

Indeed, as the Economist *amici* explained below, multiple historical examples foretold the drop in migration following DHS's creation of a new lawful migration pathway for CHNV migrants. In addition to the Venezuelan precedent, *amici* explained that a similar, sudden decline in migration occurred with the "Uniting for Ukraine" program ("U4U"), which cut unauthorized border crossings by Ukrainians

23

from over 20,000 to under 400 just one month after its implementation in April 2022 and continued to reduce total Ukrainian migration for more than a year thereafter. ROA9910-11, 9915-16; 88 Fed. Reg. 1266, 1267 (explaining that the CHNV Program was modeled after U4U). Likewise, the Economists' brief highlighted similar declines in migration following the creation of parole programs or other lawful migration pathways for Balkan migrants in Germany in 2015 and Cuban migrants arriving in the U.S. by boat during the "Balsero Crisis" of 1990. ROA9911, 9916. These historical examples likewise confirm the reasonableness of the District Court's conclusion that the CHNV Program—not Texas's hypothetical "confounding factors"—caused the drop in CHNV migration in January 2023.

Finally, Texas speculates that "stiffened consequences for irregular migration" alone might explain the dramatic drop in CHNV migration that occurred in January 2023. Texas Br. at 20, 29; *see also* ROA12599 (Texas speculating at trial, without evidence, that the January 2023 decline resulted from "the stick" and not "the carrot" in DHS's policymaking). This theory fails for several reasons:

- *First*, Texas has not offered any record evidence to support its alternative causal theory.

- *Second*, the new legal consequences for failing to use a lawful pathway came into effect on a different schedule from the CHNV Program, and therefore cannot explain the contemporaneous drop in CHNV migration. *See, e.g.*, 88 Fed. Reg. 31314 (implementing a presumptive asylum bar for CNHV migrants on May 16, 2023).

- *Third*, historical evidence from U4U refutes Texas's "sticks not carrots" theory of causation.  In U4U, the government allowed an *unlimited* number of Ukrainians fleeing the Russian invasion to seek parole and did not impose *any* new consequences on Ukrainians who instead crossed the border without authorization.  *See* 87 Fed. Reg. 25040.  Despite this "carrots only" approach, Ukrainian migration (legal plus unauthorized) dropped immediately after U4U launched and remained below pre-U4U levels for more than another year.  ROA9910-11, 9915-16.

For all these reasons, Texas's speculation about "possible confounding factors" does not establish that the District Court "clearly erred" in concluding that the CHNV Program precipitated the dramatic, sudden, and unprecedented drop in CHNV migration that occurred in January 2023.

### D.     Texas's Arguments About Migration Increases Many Months After the CHNV Program Began Are Irrelevant and Misleading.

Lastly, Texas argues that the District Court clearly erred in concluding the CHNV Program reduced migration because "total nationwide encounters with CHNV nationals were increasing at the time of trial."  Texas Br. at 30-33.   Texas does not dispute that at the time of trial CHNV encounters remained below December 2022 pre-Program levels.  That alone renders irrelevant Texas's argument that "both the rate and absolute numbers of entrants by CHNV nationals increased" to some degree and at some point "between the time the Program was instituted and the time of trial."  *Id.* at 31.  The District Court also determined that Texas's post-trial evidence was irrelevant to the central legal question of standing, *i.e.*, whether

Texas's "alleged future injury" was "imminent" and "fairly likely" at "the time of the operative complaint." ROA11633.

Putting aside that legal question, the District Court made an economically reasonable decision to (a) focus on the pre-Complaint data that showed that migration "dramatically declined" immediately after the CHNV Program launched, and (b) discount Texas's post-trial data showing a rise in migration many months later, as indicative of the effects of the CHNV Program. ROA11529, 11633-34. As a matter of economic analysis, "time series correlations" are "more useful when there are sharp breaks in trends over a narrow period of time." Jonathan Gruber, PUBLIC FINANCE AND PUBLIC POLICY 76-77 (5th ed. 2015). That is because over "narrow period[s]" before-and-after "sharp breaks" in the data, economists can better isolate the effects of major events, like the CHNV Program, from confounding factors like macroeconomic forces, social and political changes, or other unanticipated causes of observed outcomes. By contrast, "time series correlations are not very useful" when applied to "long-moving trends in the data" because intervening factors make underlying causes harder to identify and isolate. *See id.*

The District Court reasonably adopted the economically sound *first* approach by evaluating the effect of the CHNV Program based on the "sharp break" in CHNV migration during the "narrow period" immediately before and after the Program launched. *Id.* By contrast, Texas on appeal argues that the District Court "clearly

26

erred" by not adopting the unreliable *second* approach, *i.e.*, looking at "long-moving trends" in the post-trial data to assess the effects of the CHNV Program many months after it had launched. The flaw in Texas's proposed methodology is apparent even to non-economists: As the District Court observed, "Essentially, Plaintiffs ask the Court to both (1) ignore post-Complaint, pre-trial data, yet (2) consider post-trial data" when assessing the effect of the CHNV Program. ROA11633-35 & n.3. As Judge Tipton recognized, that proposal made no sense.

Finally, the undisputed data again confirm that Judge Tipton correctly decided (not "clearly erred") to rely on *amici*'s and Defendants' pre-Complaint data over Texas's proposed post-trial data. For its post-trial argument to make economic sense, Texas had to show that the increase in CHNV migration during the summer of 2023 is (a) attributable to the CHNV Program; (b) not explained by other factors; and (c) fully reversed the dramatic drop in CHNV migration that occurred months earlier in January 2023. *But see supra* 25 (noting that CHNV migration remained below December 2022 levels at all times before trial).

The post-trial data do not support Texas's causal theory; instead, they show why Texas's theory is unreliable. True, CHNV migration rose in the summer of 2023 through the August 2023 bench trial. DHS data show that most of that increase came from Venezuelans, whose entries increased 41 percent from June to August 2023 after experiencing similar rises and falls in the prior few months. Unlike

27

Cuban, Haitian, and Nicaraguan migration, which rose a modest 12 percent during this period, the rise in Venezuelan migration occurred nine-plus months after DHS launched the Venezuela-specific parole program in October 2022. For that reason alone, the rise in CHNV migration during the summer of 2023 would be more difficult to attribute to the government's creation of new parole pathways for CHNV migrants as a matter of economics. *See* Gruber, PUBLIC FINANCE AND PUBLIC POLICY 76-77 (explaining that "time series correlations are not very useful when there are long-moving trends in the data").[6]

But even accepting Texas's unreliable methodology, the data do not support Texas's theory that increases in Venezuelan migration during the summer of 2023 reveal the "true effect" of the CHNV Program. Just one page before presenting its post-trial data theory, Texas argued that the District Court should have "account[ed] for a similar drop in migrant flows … across all population groups—not just CHNV populations" immediately after the Program launched in January 2023. Texas Br. at 29. Although Texas's argument was factually wrong as applied to the January 2023

---

[6] Texas also notes that CHNV migration temporarily increased in September 2023, after the trial ended. Texas Br. at 32. Texas offers no evidence linking this September increase to the CHNV Program, as opposed to other factors. Instead, the anticipated expiration and later extension of Temporary Protected Status for Venezuelans more likely explains the September 2023 increase, over 93 percent of which came from Venezuelans. *See Secretary Mayorkas Announces Extension and Redesignation of Venezuela for Temporary Protected Status*, DHS (Sept. 20, 2023), *available at* https://www.dhs.gov/news/2023/09/20/secretary-mayorkas-announces-extension-and-redesignation-venezuela-temporary.

*drop* in migration (*supra* § II.B & Figures 2-3), a comparison between CHNV and non-CHNV entries in Texas's post-trial data actually refutes Texas's arguments about the *rise* in CHNV migration that occurred during the summer of 2023. As noted above, between June and August 2023, Venezuelan entries rose 41 percent and the migration of Cuban, Haitian, and Nicaraguan nationals increased more modestly by 15 percent. During that same period, however, migration of non-CHNV nationals increased by 51 percent, exceeding the rise in either Venezuelan or Cuban, Haitian, and Nicaraguan migration. It would be misleading to attribute the summer 2023 rise in CHNV migration to the CHNV Program while ignoring that migration increased at an even-higher rate for non-CHNV migrants who could not apply for parole under the CHNV Program. Once again, Texas's new data-based arguments refute, not support, its theory of standing.

## CONCLUSION

For the reasons stated above, *amici* believe this Court should affirm the District Court's dismissal of Texas's case for lack of standing.

Respectfully submitted,

Brandon R. Gould
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC  20001-4956
(202) 662-6000

*Attorney for Amici*

Dated: August 2, 2024

# CERTIFICATE OF SERVICE

I, Brandon Gould, hereby certify that on August 2, 2024, I caused copies of

this Amicus Brief to be served by the Court's Electronic Case Filing System upon:

Aaron L. Nielson
Solicitor General of Texas
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Lead Attorney for Plaintiffs-Appellants[7]*

Elissa P. Fudim                        Erez Reuveni
Brian Christopher Ward                 U.S. Department of Justice
U.S. Department of Justice             450 5th Street, N.W.
P.O. Box 868                           Liberty Square Building
Ben Franklin Station                   Washington, DC 20001
Washington, DC 20044

*Attorneys for Defendants-Appellees*

Monika Y. Langarica                    Laura Flores-Perilla
Ahilan T. Arulanantham                 Brandon Galli-Graves
Talia Inlender                         Vanessa Rivas-Bernardy
Sofia Lopez Franco                     Esther Sung
Center for Immigration Law and         Justice Action Center
Policy                                 P.O. Box 27280
UCLA School of Law                     Los Angeles, CA 90027
385 Charles E. Young Drive
P.O. Box 951476
Los Angeles, CA 90095

---

[7] Additional attorneys of record for Plaintiffs-Appellants also served via ECF.

Javier Hidalgo
Raices
P.O. Box 786100
San Antonio, TX 78278

*Attorneys for Intervenors-Appellees*

_/s/ Brandon R. Gould_____
Brandon R. Gould

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I, Brandon Gould, hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point, Times New Roman font.

Dated: August 2, 2024

*/s/ Brandon R. Gould*
Brandon R. Gould

# EXHIBIT A

United States Courts
Southern District of Texas
FILED

*August 14, 2023*

Nathan Ochsner, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

---

STATE OF TEXAS, et al.,

        Plaintiffs,

v.

        Civil Action No. 6:23-cv-00007

U.S. DEPARTMENT OF HOMELAND
SECURITY, et al.,

        Defendants.

---

**MEMORANDUM OF LAW OF DRS. STAN VEUGER, TARA WATSON, DOUGLAS
HOLTZ-EAKIN, & LEAH BOUSTAN AS *AMICI CURIAE* IN OPPOSITION TO
PLAINTIFFS' REQUEST FOR INJUNCTIVE & OTHER EQUITABLE RELIEF**

COVINGTON & BURLING LLP

Brandon R. Gould*
Carolyn F. Corwin
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
ccorwin@cov.com
bgould@cov.com

Gawon Go
Abigail Kertzman
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
ggo@cov.com
akertzman@cov.com

*Counsel for* Amici Curiae
*Drs. Stan Veuger, Tara Watson
Douglas Holtz-Eakin, & Leah Boustan*

*Attorney-in-charge, admitted *pro hac vice*

## TABLE OF CONTENTS

**INTERESTS OF THE AMICI** ................................................................. ii

**TABLE OF AUTHORITIES** .................................................................. iv

**INTRODUCTION**............................................................................. 1

**BACKGROUND** ............................................................................. 1

**ARGUMENT** ................................................................................. 3

**I.      The CHNV Program Benefits the States by Reducing Unauthorized
         Southwest Border Crossings.** ................................................ 4

**II.     The States Cannot Assume the Program Increases CHNV Immigration
         Levels and Any Associated Costs.** ......................................... 9

**III.    The States' Claims Regarding Individual Cost Categories Are Unsupported.** ......... 13

**CONCLUSION** ............................................................................. 18

24-40160.9899

## INTERESTS OF THE AMICI

Dr. Stan Veuger is a senior fellow in economic policy studies at the American Enterprise Institute and was a Campbell Visiting Fellow at the Hoover Institution in May 2022.  He earned a Ph.D. and an A.M. degree in economics from Harvard University.  He also holds degrees from Erasmus University Rotterdam, Universitat Pompeu Fabra, University of London, and Utrecht University.  Dr. Veuger's research on economics and immigration policy has been published in leading academic and professional journals, including the Journal of Monetary Economics, the Quarterly Journal of Economics, and the Review of Economics and Statistics.

Dr. Tara Watson is professor of economics at Williams College and the Director of the Brookings Institution's Center for Economic Security and Opportunity, where she is a David F. Rubenstein Fellow in Economic Studies.  She is a research associate of the National Bureau of Economic Research and a co-editor of the Journal of Human Resources.  In 2015-2016, Dr. Watson served as deputy assistant secretary for microeconomic analysis in the U.S. Treasury Department's Office of Economic Policy.  Dr. Watson earned her Ph.D. in economics from Harvard University. Her research focuses on economic analysis of the social safety net, health, and immigration policies.

Dr. Douglas Holtz-Eakin is the President of the American Action Forum.  He previously served as a professor of economics at Princeton University, Columbia University, and Syracuse University.  From 2001-2002, he was the Chief Economist of the President's Council of Economic Advisors, and from 2003-2005 he served as the director of the Congressional Budget Office. During 2007 and 2008, he was the Director of Domestic and Economic Policy for the John McCain presidential campaign, and he later served as a Commissioner on the Financial Crisis Inquiry Commission.  Dr. Holtz-Eakin earned his Ph. D. in economics from Princeton.  He has extensive expertise in economic and fiscal policy analysis, including on matters of U.S. immigration policy.

Dr. Leah Boustan is a Professor of Economics at Princeton University, where she also serves as the Director of Princeton's Industrial Relations Section. Dr. Boustan is co-director of the Development of the American Economy Program at the National Bureau of Economic Research, and she serves as co-editor at the American Economic Journal: Applied Economics. Her research lies at the intersection between economic history and labor economics, and she has authored several books and scholarly articles on migration trends in the U.S. Dr. Boustan earned her Ph.D. in economics from Harvard University.

Drs. Veuger, Watson, Holtz-Eakin, and Boustan have researched and written extensively on the subjects of fiscal policy and immigration. Their expertise in these matters and their familiarity with relevant data will assist the Court in evaluating the fiscal and other economic impacts of the parole program at issue in this case.

24-40160.9901

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ...........................................................................18

*Holland Am. Ins. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) ...........................................................................18

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923).........................................................................................17

**Administrative Sources**

87 Fed. Reg. 25040, *Implementation of the Uniting for Ukraine Parole Process*
    (Apr. 27, 2022)................................................................................................7

87 Fed. Reg. 63507, *Implementation of a Parole Process for Venezuelans*
    (Oct. 19, 2022) ................................................................................... *passim*

87 Fed. Reg. 74429, *Federal Financial Participation in State Assistance
    Expenditures; Federal Matching Shares for Medicaid, the Children's Health
    Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for
    October 1, 2023 Through September 30, 2024*
    (Dec. 5, 2022) ................................................................................................16

88 Fed. Reg. 1243, *Implementation of a Parole Process for Haitians*
    (Jan. 9, 2023)..............................................................................................3, 5

88 Fed. Reg. 1255, *Implementation of a Parole Process for Nicaraguans*
    (Jan. 9, 2023)..................................................................................... *passim*

88 Fed. Reg. 1266, *Implementation of a Parole Process for Cubans*
    (Jan. 9, 2023)..................................................................................... *passim*

88 Fed. Reg. 31314, *Circumvention of Lawful Pathways*
    (May 16, 2023)................................................................................................3

**Other Materials**

Gregory Abbot, *Ltr. to Hon. David Saucedo*,
    (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/Colonel_Steven_
    McCraw_Major_General_Thomas_Suelzer.pdf...............................................8, 15

Gregory Abbott, *Ltr. to the Nation's Governors*
    (May 16, 2023), https://gov.texas.gov/uploads/files/press/Governors_Letter_
    Border_Support_1.pd........................................................................................7

24-40160.9902

David Bier, *77% of Drug Traffickers Are U.S. Citizens, Not Illegal Immigrants*,
CATO INST., https://www.cato.org/blog/77-drug-traffickers-are-us-citizens-
not-illegal-immigrants (July 3, 2019) ........................................................................9

Jessica Bither and Astrid Ziebarth, *Creating Legal Pathways to Reduce Irregular
Migration? What We Can Learn from Germany's "Western Balkan
Regulation"*,
MIGRATION STRATEGY GROUP (2018) https://www.bosch-
stiftung.de/sites/default/files/publications/pdf/2019-
01/Creating%20Legal%20Pathways%20to%20Reduce%20Irregular%20Migr
ation.pdf ..................................................................................................................6, 12

Francine Blau and Christopher Mackie, *The Economic and Fiscal Consequences
of Immigration*,
NAT'L ACADS. OF SCIS., ENGINEERING, AND MEDICINE (2017) ...............................17

Steven Camarota and Karen Ziegler, *Immigrants Coming to America at Older
Ages,*
CENTER FOR IMMIGRATION STUDIES (2021),
https://cis.org/sites/default/files/2021-03/camarota-aging-21_0.pdf .......................16

Michael Clemens and Kate Gough, *Can Regular Migration Channels Reduce
Irregular Migration?*,
Ctr. for Global Development (2018),
https://www.cgdev.org/sites/default/files/can-regular-migration-channels-
reduce-irregular-migration.pdf ..............................................................................6, 13

*DHS Announces New Border Enforcement Measures and Additional Safe and
Orderly Processes*,
DHS (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-
prepare-end-title-42-announces-new-border-enforcement-measures-and ..................3

Adam Isaacson, *10 Things to Know About the End of Title 42*,
WASHINGTON OFFICE ON LATIN AMERICA (May 9, 2023),
https://www.wola.org/analysis/end-title-42/ ..............................................................3

*Undocumented Immigrants' State & Local Tax Contributions*, INST. ON TAXATION
& ECON. POLICY (2017),
https://itep.sfo2.digitaloceanspaces.com/immigration2017.pdf ..............................14

Michael Light, et al., *Comparing crime rates between undocumented immigrants,
legal immigrants, and native-born US citizens in Texas*,
117 PNAS 32,340 (2020),
https://www.pnas.org/doi/10.1073/pnas.2014704117 .............................................15

*The Integration of Immigrants into American Society*,
NAT'L ACAD. OF SCIENCES (2015) .............................................................................15

24-40160.9903

Pia Orrenius, *Enforcement and Illegal Migration: Enforcement Deters*
  *Immigration but with Unintended Consequences*,
  81 IZA WORLD OF LABOR 1 (2014),
  https://wol.iza.org/uploads/articles/81/pdfs/enforcement-and-illegal-
  migration.pdf.......................................................................................................6

Jose Rodriguez-Sanchez, *Undocumented Immigrants in Texas:  A Cost-Benefit*
  *Assessment*,
  CTR. FOR U.S. & MEXICO (2020), https://www.immigrationresearch.org/
  system/files/usmx-pub-undocumentedresidents-050620.pd....................................14

Joel Rose, *Who is sneaking fentanyl across the southern border? Hint: it's not the*
  *migrants*,
  NAT'L PUB. RADIO (Aug. 9, 2023), https://www.npr.org/2023/08/09/1191638
  114/fentanyl-smuggling-migrants-mexico-border-drugs...........................................9

*Biennial Revenue Estimate*,
  TEXAS COMPTROLLER OF PUBLIC ACCOUNTS (2021),
  https://comptroller.texas.gov/transparency/reports/biennial-revenue-estimate/
  2022-23/ .........................................................................................................14

*Nation Continues to Age as It Becomes More Diverse*
  U.S. CENSUS BUREAU (2022), https://www.census.gov/newsroom/press-
  releases/2022/population-estimates-characteristics.html........................................16

*Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*,
  U.S. CITIZENSHIP AND IMMIGRATION SERVS., https://www.uscis.gov/CHNV ..........................2

Ruth Wasem, *Cuban Migration to the United States:  Policy and Trends*,
  CONG. RSCH. SERV. (2009), https://sgp.fas.org/crs/row/R40566.pdf .......................................7

*Fact Sheet: Biden-Harris Administration Announces New Border Enforcement*
  *Actions*,
  THE WHITE HOUSE (Jan. 5, 2023), https://www.whitehouse.gov/briefing-
  room/statements-releases/2023/01/05/fact-sheet-biden-harris-administration-
  announces-new-border-enforcement-actions/...........................................................3

24-40160.9904

## INTRODUCTION

In early 2023, the Department of Homeland Security ("DHS") launched the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans" (the "CHNV Program" or "Program") in conjunction with various interrelated enforcement policies in an effort to reduce unauthorized immigration and increase security at the Southwest land border.  The Program and those policies combine tougher consequences for unauthorized immigration with a safe, legal, and orderly process for CHNV nationals to apply for parole and lawfully enter the U.S.  In the months following policy implementation, unauthorized entries at the Southwest border have dropped precipitously, relieving strain on border enforcement resources and strengthening border security.

A coalition of states led by Texas (the "States") allege that the Program will increase immigration from CHNV countries, thereby increasing the States' costs of providing social services.  In fact, the opposite is true:  As with unauthorized border entries, the overall level of immigration by CHNV nationals (legal plus unauthorized) has plummeted since the Program began.  Therefore, even if the States' speculative (and inflated) cost estimates are taken at face value, the Program has significantly reduced their expenditures, benefiting – not harming – the States.

## BACKGROUND

In recent years, tens of thousands of noncitizens from nations other than Mexico have attempted to cross the Southwest border without authorization each month, with CHNV nationals representing up to half of that total.  Most of these unauthorized migrants could not be swiftly removed because many fled political or other forms of persecution and thus had credible asylum claims, and others came from countries with oppressive regimes that will not accept their return. 87 Fed. Reg. 63507, 63508–09.

24-40160.9905

The States allege these large border flows, driven predominantly by CHNV entries, placed enormous strain on border state communities and law enforcement resources.  Am. Compl. ¶¶71–72 (ECF 20).  They also claim these flows imposed costs beyond the border, as overwhelmed border enforcers struggled to prevent border-related crimes from spreading into the interior of the country.  *Id.* ¶¶77, 94, 99, 118-19, 134.

In January 2023, DHS simultaneously announced the CHNV Program and several interrelated enforcement policies with the goal of decreasing unauthorized entries by CHNV nationals at the Southwest border.  *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, U.S. CITIZENSHIP AND IMMIGRATION SERVS., https://www.uscis.gov/CHNV.  Those policies seek to deter border crossings by toughening consequences for unauthorized entries while providing a safe, legal, and orderly alternative for approved CHNV nationals to enter the interior of the country on parole.  *See, e.g.*, 87 Fed. Reg. 63507, 63511.

The Program imposes stringent requirements on parole applicants.  Applicants must be sponsored by a U.S. resident who can "demonstrate sufficient financial resources to receive, maintain, and support" them after their arrival.  *See, e.g.*, 88 Fed. Reg. 1255, 1263.  Applicants must submit to a rigorous criminal and national security background check while outside the U.S.  *Id.* at 1263–1264.  If preliminarily approved, a maximum of 30,000 applicants per month may then fly – at their own expense – to U.S. airports where they undergo further biometric and security screening.  *Id.* at 1264.  Approved parolees may enter and remain in the U.S. for up to two years and apply for work authorization and long-term immigration status such as asylum during that period.  *Id.*

The Program and related enforcement policies penalize CHNV nationals who fail to seek lawful parole and instead attempt to cross the border without prior authorization.  Before the

2

24-40160.9906

Program, DHS effectively could not remove many CHNV border crossers because neither Mexico nor many migrants' home countries would accept their return.  88 Fed. Reg. 1266, 1275; 88 Fed. Reg. 1255, 1259; 88 Fed. Reg. 1243, 1253; ECF 154, at 5 n.2.  In a diplomatic breakthrough, Mexico has now agreed to accept up to 30,000 CHNV removals per month contingent on the U.S. implementing the Program.  88 Fed. Reg. 1266, 1275; *Fact Sheet: Biden-Harris Administration Announces New Border Enforcement Actions*, THE WHITE HOUSE (Jan. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/01/05/fact-sheet-biden-harris-administration-announces-new-border-enforcement-actions/.  As a result, expulsions to Mexico have increased exponentially.[1]  When the Program launched, DHS also announced that migrants who eschewed the new parole pathway would be presumptively ineligible for asylum and, if removed, subject to a five-year ban and potential criminal prosecution on any attempted reentry.  *DHS Announces New Border Enforcement Measures and Additional Safe and Orderly Processes*, DHS (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and; 88 Fed. Reg. 31314.

As explained below, DHS data show that encounters with CHNV nationals at the Southwest border and total CHNV entries nationwide (both legal and unauthorized) have declined significantly since the Program began.  App'x ¶1.[2]

## ARGUMENT

The States contend they will incur additional costs from the CHNV Program.  That position

---

[1]  Isaacson, *10 Things to Know About the End of Title 42*, WOLA (May 9, 2023), https://www.wola.org/analysis/end-title-42/ (showing that expulsions of CHNV nationals increased from near-zero to over 10,000 in the months after the Program and its Venezuela-specific predecessor began); Nuñez-Neto Decl. ¶¶12-15, 29-31 (ECF 176-1).

[2] Sources and methodologies for calculating statistics presented in this brief appear in a technical appendix.

3

24-40160.9907

(a) ignores the benefits they enjoy from fewer unauthorized entries and greater border security; (b) assumes the Program will increase overall CHNV migration when the data show the opposite; and (c) relies on inflated, speculative, and incomplete analyses of the fiscal impacts of CHNV migration.  Their arguments should be rejected.

I.     **The CHNV Program Benefits the States by Reducing Unauthorized Southwest Border Crossings.**

The CHNV Program and the interrelated enforcement policies collectively aim to deter unauthorized crossings by CHNV migrants at the Southwest border through two mutually reinforcing strategies:  (1) providing a safe, lawful, and orderly process for CHNV migrants to apply for parole from abroad into the interior of the U.S., and (2) imposing strict consequences on migrants who instead cross the border without authorization.  88 Fed. Reg. 1266, 1268.  Combined, these policies radically changed the costs and benefits CHNV nationals must consider in deciding whether, when, and how to migrate, resulting in thousands of migrants applying and waiting for lawful parole rather than attempting to enter without authorization.

These changes in migrants' decisions affect costs incurred by governments, both at the border and in the U.S. interior.  Lower levels of unauthorized entries reduce border-related costs for all levels of government, and all states reap significant benefits from a more secure, stable border.  The States disregard these benefits.  Their allegations are therefore incomplete and misleading as a matter of economics.

Before the CHNV Program, most CHNV migrants had no opportunity to enter the U.S. through a legal channel.  Instead, many attempted unauthorized border crossings knowing they likely could not be removed to Mexico or their home countries.  Now, most prospective CHNV migrants face a stark choice:  apply for lawful parole; or travel to the border, often a long, costly, and perilous journey, and risk apprehension, detention, removal to Mexico, and long-term

4

exclusion from the U.S. if they attempt an unauthorized entry. DHS expected that, consistent with rational human decision-making, this combination of tougher consequences with a new legal pathway would deter migrants from unauthorized border crossing in favor of applying for lawful parole. 88 Fed. Reg. 1243, 1245.

DHS's expectation was borne out following the Program's implementation on January 6, 2023. In December 2022, DHS experienced a record-high 83,176 Southwest border encounters with Cuban, Nicaraguan, and Haitian nationals.[3] In January, the number of these nationals' unauthorized border crossings cratered, falling 84.3 percent to levels DHS had not seen since 2021. At the same time, the share of those nationals entering lawfully through airports around the country soared from miniscule levels to eventually surpass the share entering without authorization at the border. The graph below shows these dramatic shifts. App'x ¶2.



Location of Entry of Cubans, Haitians, and Nicaraguans

---

[3] These numbers (and those in Section II) exclude Venezuelans because, as of October 2022, Venezuelans were eligible for parole under a predecessor parole program.

24-40160.9909

These results confirm that the Program has "fundamentally changed the calculus" for CHNV migrants.  88 Fed. Reg. 1255, 1257.  This is hardly surprising as a matter of economics. Migrants (like anyone else) weigh costs against benefits when making important decisions.  On one hand, a migrant choosing to cross the border without authorization now faces a long and dangerous journey, typically relying on expensive smugglers, and risks detention, removal, and long-term exclusion upon arrival.  Those who evaded apprehension at the border would then live in the shadows, working in informal jobs to avoid immigration enforcement.  On the other hand, the Program creates a legal, safe, and orderly way to enter the U.S., avoiding a dangerous, expensive, and uncertain border crossing.  Once paroled, migrants can apply for work authorization and access superior legal employment opportunities.  In short, the costs of unauthorized entry have risen, while the CHNV Program offers the benefit of a new legal entry alternative.  As a matter of economic theory – and common sense – many CHNV migrants will decide to forgo unauthorized border crossing to apply and await a grant of lawful parole.[4]

Results from three previous parole programs confirm that the Program's success in deterring unauthorized border entries was predictable and is not a short-term anomaly.  In late

---

[4] Academic scholarship supports this conclusion.  Clemens and Gough, *Can Regular Migration Channels Reduce Irregular Migration?*, Ctr. for Global Development, at 2-4 (2018) ("*Regular Migration Channels*"), https://www.cgdev.org/sites/default/files/can-regular-migration-channels-reduce-irregular-migration.pdf (presenting evidence involving Mexican immigrants across seven decades that "lawful channels … coupled with enhanced immigration enforcement" can "effectively alter the incentives and ultimately suppress irregular flows"); Orrenius, *Enforcement and Illegal Migration: Enforcement Deters Immigration but with Unintended Consequences*, 81 IZA WORLD OF LABOR 1, 9 (2014), https://wol.iza.org/uploads/articles/81/pdfs/enforcement-and-illegal-migration.pdf ("[E]fforts to create legal pathways for migration with improvements in enforcement methods can ease pressure at the border and in the interior."); Bither and Ziebarth, *Creating Legal Pathways to Reduce Irregular Migration?  What We Can Learn from Germany's "Western Balkan Regulation"*, MIGRATION STRATEGY GROUP, at 6 (2018) ("*German Legal Pathways*"), https://www.bosch-stiftung.de/sites/default/files/publications/pdf/2019-01/Creating %20Legal%20Pathways%20to%20Reduce%20Irregular%20Migration.pdf (finding that unauthorized border flows of asylum seekers fell 90 percent after Germany created new employment-based legal pathways).

24-40160.9910

April 2022, DHS created the "Uniting for Ukraine" program after Southwest border encounters with Ukrainians spiked to 20,118 that month.  87 Fed. Reg. 25040.  One month later, unauthorized border encounters with Ukrainians nearly vanished, falling to 375 and remaining lower thereafter. App'x ¶3.  In late October 2022, DHS launched the "Parole Process for Venezuelans" after months of rising Venezuelan border crossings.  87 Fed. Reg. 63507.  The following month, Venezuelan border encounters plummeted 76 percent, from a high of 33,804 in September to 8,023 by November 2022.  App'x ¶4.  Finally, nearly three decades ago, the Government combined new lawful pathways (including parole) with tougher enforcement against unauthorized migrants to halt the Cuban "Balsero Crisis," causing Coast Guard apprehensions of unauthorized Cuban migrants to plummet from nearly 40,000 in 1994 to a few hundred annually in 1995-1997.  Wasem, *Cuban Migration to the United States:  Policy and Trends*, CONG. RSCH. SERV. 1-3, 9-10 (2009), https://sgp.fas.org/crs/row/R40566.pdf.

The drastic reductions in unauthorized border crossings following initiation of parole programs benefit all states and levels of government.  Benefits at the Southwest border are particularly pronounced.  When border enforcers are overwhelmed, border-related threats are exacerbated.  In May 2023, DHS admitted that it "lacks the resources" to apprehend, detain, and deport all unauthorized Southwest border crossers who lack viable claims for relief, while still pursuing its many other border-related missions.  *See Florida v. United States*, No. 3:21-cv-01066 (N.D. Fla.), ECF 163 at 3, 7-10; Nuñez-Neto Decl. ¶¶4, 28.  Texas Governor Greg Abbott has similarly claimed that "drug cartels and other … criminal enterprises profit off [border] chaos," for example, by "smuggling people and dangerous drugs like fentanyl into" the U.S.  Abbott, *Ltr. to the Nation's Governors*, at 1 (May 16, 2023), https://gov.texas.gov/uploads/files/press/ Governors_Letter_Border_Support_1.pdf.    Accordingly,  Governor  Abbot  asserts  Texas  has

24-40160.9911

diverted its own law enforcement resources to the border and spent billions to fill federal enforcement gaps.  Abbot, *Ltr. to Hon. David Saucedo*, at 2 (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/Colonel_Steven_McCraw_Major_General_Thomas_Suelzer.pdf  ("*Gov. Abbott-Saucedo Letter*").

The CHNV Program alleviates these pressures on border states by significantly reducing unauthorized entries at the Southwest border.  In December 2022, CHNV migrants accounted for over a third of all DHS border encounters, but by February 2023 that number had dropped by roughly 77,000, to less than 10 percent of that greatly reduced total.  App'x ¶5.  This sudden decline immediately saved huge amounts of federal and state resources that would otherwise have been used to manage tens of thousands of CHNV migrants.  For example, 77,000 fewer border encounters potentially saved DHS over $310 million in monthly immigrant detention costs alone.  *Id.* ¶¶5-6.  As DHS anticipated, fewer border crossers "free[s] up resources" and "allow[s] for the removal of more noncitizens … faster," further reducing costs to all governments that incur border-related expenses.  88 Fed. Reg. 1266, 1272.  With fewer crossings, federal and state law enforcers can also refocus attention on other border priorities, such as intercepting illegal drugs, preventing human trafficking, disrupting smuggling networks, and interdicting national security threats.[5]

A more secure Southwest border, in turn, benefits all states.  That is, in part, because threats at the border may spread to the U.S. interior.  For example, Missouri alleges it suffers from a "fentanyl crisis" that causes countless "drug-related" crimes, "devastating the lives and health of Missouri's citizens," which Missouri claims is driven by "[d]rug smugglers unlawfully entering

---

[5] 88 Fed. Reg. 1266, 1273-74 (explaining the Program "will allow USCG to better balance its other important missions, including its counter-drug smuggling operations" and "undermine the profits and operations of the dangerous T[ransnational] C[riminal] O[rganizations]" and "human-smuggling networks").

the United States through the southern border."[6]  Am. Compl. ¶119.  Similarly, Iowa alleges it sits

at "a hot spot for [human] trafficking activity" and "bears the additional costs of combating

trafficking associated with illegal immigration."  *Id.* ¶94.  Accepting these allegations arguendo,

by reducing CHNV Southwest border crossings, the Program reduces these alleged costs.

Although the States recognize that a more secure border benefits them (*id.* ¶141(e)), their

challenge to the Program entirely disregards the benefits of reduced CHNV border crossings.

Their claim that the Program will "impose[] millions of dollars of costs upon the States" (PI Mot.

10 (ECF 22)) is thus both incomplete and misleading.  Absent consideration of *both* the costs and

benefits, the Court should reject the States' cost arguments.

## II.  The States Cannot Assume the Program Increases CHNV Immigration Levels and Any Associated Costs.

Beyond disregarding the benefits of reduced border crossings, there is a more fundamental

flaw in the States' allegations:  They assume that the Program will increase overall CHNV

immigration.  Increased immigration, the States argue, will increase their total costs of providing

public services.  But they offer no evidence for their bedrock assumption of increased immigration,

and the actual data contradict it.

The States' complaint asserts that the Program will "*potentially*" allow "hundreds of

thousands of *additional* aliens to enter" the U.S.  Am. Compl. ¶5 (emphases added).  Their briefs

and supporting declarations likewise assume that parole grants will increase "the number of illegal

---

[6] In fact, the "vast majority" of drug smugglers on the Southwest border are U.S. citizens.  Bier, *77% of Drug Traffickers Are U.S. Citizens, Not Illegal Immigrants*, CATO INST., https://www.cato.org/blog/77-drug-traffickers-are-us-citizens-not-illegal-immigrants  (July  3, 2019).  Specifically, most fentanyl is trafficked by U.S. citizens through legal ports of entry, not via migrants surreptitiously crossing between those ports.  Rose, *Who is sneaking fentanyl across the southern border? Hint: it's not the migrants*, NPR (Aug. 9, 2023), https://www.npr.org/2023/08/09/1191638114/fentanyl-smuggling-migrants-mexico-border-drugs.

aliens in the State[s]," raising their costs of providing various social services.  PI Mot. 12; *cf.* PI

Reply 4 (ECF 179) ("it is *possible*" that an injunction will "reduce the number of … illegal aliens

[] present in the Plaintiff States") (emphasis added).[7]  But the States admit their costs will increase

only "***to the extent that***" the Program causes *total* CHNV immigration to rise.  *See, e.g.*, Terry

Decl. ¶7 (ECF 141-3); Lopez Decl. ¶7 (ECF 22-4) (emphasis added).  Conversely, applying the

States' reasoning, "***If*** [fewer] illegal aliens enter the State[s]," their costs will fall.  *Cf.* Am. Compl.

¶77 (Alaska), ¶101 (Kansas), ¶112 (Mississippi), ¶¶133-39 (Wyoming) (emphasis added).

Although it is critical to their cost claims, the States offer no evidence that the Program will

actually increase total CHNV immigration.

In fact, the available data show that, like Southwest border encounters, total CHNV

immigration plummeted following implementation of the Program and its Venezuela-specific

predecessor.  When the Program was announced, immigration encounters with Cuban, Haitian,

and Nicaraguan nationals had escalated for seven straight months, reaching an all-time peak of

84,961 migrants in December 2022.  In January 2023, the month the Program went into effect, the

number of migrants from those countries (both legal and unauthorized) encountered by DHS fell

by over 64,000 to less than a quarter of December's total.[8]  Indeed, January 2023 marked the

---

[7] *See also* Am. Compl. ¶64 (Texas), ¶76 (Alabama), ¶77 (Alaska), ¶78 (Arkansas), ¶¶87, 89 (Idaho), ¶93 (Iowa), ¶¶98-101 (Kansas), ¶¶102-05 (Kentucky), ¶108 (Louisiana), ¶¶111-12 (Mississippi), ¶¶115-16, 119-20 (Missouri), ¶130 (South Carolina), ¶131 (Tennessee), ¶134 (Utah), ¶¶137-39 (Wyoming).

Of course, authorized parolees enter the country legally and therefore are not "illegal aliens."

[8] If anything, these numbers *understate* the reduction in the number of CHNV nationals who ultimately reside in the U.S. because DHS can (and does) now remove unauthorized CHNV border crossers to Mexico.  *Supra* 2-3.  Before the Program and its Venezuela-specific predecessor, DHS conditionally released into the U.S. approximately 90 percent of apprehended CHNV border crossers, but releases dropped by 90 percent after implementation of the parole programs.  Nuñez-Neto Decl. ¶¶15, 29-31.

24-40160.9914

largest monthly drop in Cuban, Haitian, and Nicaraguan migration in the history of DHS's data –

more than *doubling* the previous record decline.[9]  The chart below shows this precipitous drop.

App'x ¶7.



Likewise, after DHS launched the "Parole Process for Venezuelans" (now part of the

CHNV Program) in late October 2022, total Venezuelan migration (both unauthorized and legal)

fell by over 20,000 migrants per month from its September peak to November 2022.  *Id.* ¶8.  These

steep drops in CHNV migration are no surprise.  After DHS initiated the "Uniting for Ukraine"

program in late April 2022 following Russia's February invasion, total Ukrainian immigration (not

---

[9] Seasonal variation cannot explain the large drop in January 2023.  From December 2021 to
January 2022, CHN encounters fell only slightly, and they *rose* 38 percent from December 2020
to January 2021.  App'x ¶7.

24-40160.9915

just Ukrainian immigration at the Southwest border) fell by nearly two thirds from a peak of 21,154 in April to 7,246 in May 2022. *Id.* ¶9. Similarly, in late 2015, Germany responded to growing numbers of arriving Balkan asylum seekers by creating a legal employment-based immigration pathway. In the following two years, total annual migration of Balkan nationals dropped by nearly two thirds. *German Legal Pathways*, at 6, 19-20.

These steep declines are consistent with economic incentives. As explained in Section I, standard economic theory teaches that potential migrants will weigh costs and benefits when deciding how, when, and whether to travel to the U.S. Even with the monthly cap of 30,000 parolees, a level lower than monthly CHNV entry attempts over the prior year, many migrants are likely to conclude that applying for parole and waiting for its approval is still a better option than risking a costly, dangerous, and uncertain attempt to cross the border without authorization.

DHS anticipated this dynamic. It explained that the Program will give CHNV nationals "a significant incentive" to apply for parole and "wait where they are" pending approval. 88 Fed. Reg. 1266, 1268. This, DHS predicted, will result in "a meaningful change in migratory flows." *Id.* That is exactly what had happened with the earlier Venezuelan parole program. That program, DHS explained, "fundamentally changed the calculus for Venezuelan migrants." *Id.* Thousands who had already started the long journey to the U.S. "turned around and headed back" while "[s]till others who were intending to migrate north … stay[ed] where they [were] to apply for th[e] parole process." *Id.* When many CHNV nationals stay in their home countries and wait their turn for legal permission, total migration flows will decrease, especially if improving source country conditions induce some not to immigrate at all.

24-40160.9916

Both economic theory and available data thus counter the States' assumption that the Program will increase total CHNV immigration.  And if the Program does not cause more immigration, the States' cost claims collapse.  By their own argument, the huge drop in CHNV migration since December 2022 must mean the States spent *less* money on newly arrived CHNV nationals than they did before the Program went into effect.  *Supra* 9-10 & n.7.  For example, if each "additional" migrant really costs Texas roughly $12,000 in education and driver's license expenses (Terry Decl. ¶¶3-4; Gipson Decl. ¶¶7-9 (ECF 22-3)), then in December 2022, the State incurred up to $428.8 million in those expenses from new CHNV migrants.  App'x ¶10.  But, again accepting Texas's figures for the sake of argument, the drop in new CHNV entrants following implementation of the Program *saved* Texas up to roughly $1 ***billion*** from January through March 2023 compared to its December costs. *Id.* ¶11.[10]   Texas thus reaps fiscal benefits – not harms – from the Program.[11]

### III.    The States' Claims Regarding Individual Cost Categories Are Unsupported.

Even if the States could assume the Program would result in increased CHNV immigration levels (the data show it has not), their cost allegations are incomplete, unsupported, and often inconsistent with economic scholarship.  At this stage, their only cost evidence is four declarations speculating that Texas will spend more on law enforcement, healthcare, education, and other social

---

[10] Texas does not estimate the costs per migrant for healthcare and law enforcement services, but by its argument, Texas would save on those expenses too.

[11] To the extent that Texas contends that *any* CHNV parolee increases its costs above what it would have spent but-for the CHNV Program, this argument raises a misleading baseline.  The Court's decision of whether to enjoin the CHNV Program is not a choice "between regular migration and no migration" at all.  *Cf. Regular Migration Channels*, at 5.  That illusory tradeoff is "made impossible by overwhelming demographic, economic, geographic, and historic realities" that drive CHNV migration, both legal and unauthorized.  *Id.*  Therefore, enjoining the Program will only return Texas to its pre-2023 status quo of higher CHNV migration flows across a less-secure border at greater fiscal costs.

24-40160.9917

services if the number of CHNV migrants living in Texas rises. These bare assertions overstate Texas's costs and disregard the fiscal benefits Texas receives from the Program.

Section I above highlights the many benefits the States enjoy from fewer unauthorized CHNV border crossings. Section II explains that the drop in the total number of CHNV migrants entering the U.S. after the Program began would reduce any costs of providing social services to new entrants.

The States' narrow focus on the *costs* of providing services to new CHNV residents also disregards the *revenues* they receive (both tax revenues and federal transfer payments) attributable to those same migrants. Those revenues finance the States' social services and typically *exceed* the expenditures attributable to immigrants. Rodriguez-Sanchez, *Undocumented Immigrants in Texas: A Cost-Benefit Assessment*, CTR. FOR U.S. & MEXICO, at 28 (2020), https://www.immigrationresearch.org/system/files/usmx-pub-undocumentedresidents-050620.pdf ("[F]or every dollar spent on public services for undocumented immigrants, they provide $1.21 in fiscal revenue for the state of Texas."). Moreover, State tax revenues per CHNV migrant are likely to rise due to the Program: CHNV parolees may obtain employment authorization from DHS, allowing them to work in the formal economy, earn higher wages, make more purchases (generating sales tax revenue), and pay State income-related taxes, unlike many unauthorized migrants who labor (sometimes untaxed) in informal jobs. *Undocumented Immigrants' State & Local Tax Contributions*, INST. ON TAXATION & ECON. POLICY, at 3 (2017), https://itep.sfo2.digitaloceanspaces.com/immigration2017.pdf (estimating Texas's tax revenues would increase $156 million if its unauthorized residents shifted from informal to formal employment). And the States admit they receive federal transfer payments that, in part, offset their law enforcement, education, public safety, and healthcare costs. Waltz Decl. ¶¶3-5 (ECF 22-6)

14

(correctional expenditures); Bricker Decl. ¶6 (ECF 22-5) (Emergency Medicaid); *see also Biennial Revenue Estimate*, TEXAS COMPTROLLER OF PUBLIC ACCOUNTS, at 28 (2021), https://comptroller.texas.gov/transparency/reports/biennial-revenue-estimate/2022-23/ (estimating that Texas will receive $46.3 billion in payments from the federal government for, *inter alia*, criminal justice, public safety and highways, education, and healthcare in 2023).

The States ignore these benefits and instead recite a litany of costs that the Program allegedly might impose. Apart from incorrectly assuming the Program will increase migration, these costs are factually unsupported:

**Law Enforcement.** Texas asserts that it "spends tens of millions of dollars" annually in law enforcement and correctional costs that "will increase as the number of illegal aliens in the State increases." PI Mot. at 12-13. But, as discussed above, Texas could avoid or reallocate these expenditures given the 80,106 fewer total CHNV entrants (both legal and unauthorized) arriving in Texas during the first full month CHNV nationals could apply for parole. *Supra* §§I-II; App'x ¶12. Texas disregards these savings and speculates the Program will lead it to incarcerate more CHNV nationals. PI Mot. 12-13. To the extent Texas decides to arrest or detain new, unauthorized CHNV border crossers, *see, e.g.*, *Gov. Abbott-Saucedo Letter*, fewer border crossings free up federal immigration enforcement capacity and would reduce any alleged burden that Texas chose to shoulder. *Cf.* 88 Fed. Reg. 1266, 1272-73. As for lawful CHNV parolees who may reside in Texas, studies show that immigrants, on average, commit far fewer crimes than U.S. citizens,[12]

---

[12] Light, et al., *Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas*, 117 PNAS 32,340 (2020), https://www.pnas.org/doi/10.1073/pnas.2014704117 (native Texans are over twice as likely to be arrested for violent, drug, and property crimes than undocumented immigrants); *The Integration of Immigrants into American Society,* NAT'L ACAD. OF SCIENCES, at 33 (2015) (concluding that "immigration [is] inversely related to crime").

even though both migrants' and citizens' taxes help finance Texas's criminal justice system.  By requiring rigorous background checks and biometric screening, the Program likely further lowers the incidence of crime among CHNV parolees.  87 Fed. Reg. 63507.

**Healthcare.**  Texas alleges that as the number of migrants in Texas rises it will incur additional costs to fund or reimburse healthcare services for low-income residents.  Am. Compl. ¶64; PI Mot. 12.  Texas, however, ignores that the Program requires all parolees to be sponsored by a U.S. resident with "sufficient financial resources" to support the applicant "for the duration of their parole period."  88 Fed. Reg. 1255, 1263.  Moreover, parolees who obtain formal work authorization may gain employer-provided health insurance, further limiting their reliance on public healthcare.  87 Fed. Reg. 63507.  CHNV migrants also pay their share of the state, local, and federal taxes that finance public healthcare programs, even though on average they are younger, healthier, and require less care than U.S. citizens.[13]  And around 60 percent of Texas's health-care costs for low-income residents is covered by federal Medicaid and CHIP reimbursement.  87 Fed. Reg. 74429, 74431.

**Driver's Licenses.**  Texas claims that many migrants "released or paroled into Texas will obtain Texas driver's licenses," allegedly costing the State roughly $200 for each additional migrant who seeks a license.  PI Mot. 11.  These costs are speculative and inflated, in part because Texas conflates the fixed and variable costs of issuing licenses.  At most, the Program theoretically could have led Texas to process 833 license applications from CHNV parolees arriving in January 2023, presumably not all in the same part of the State.  App'x ¶¶13-14.  Although this is roughly

---

[13] *Compare* Camarota and Ziegler, *Immigrants Coming to America at Older Ages,* CENTER FOR IMMIGRATION STUDIES 2 (2021), https://cis.org/sites/default/files/2021-03/camarota-aging-21_0.pdf (average age of newly arrived migrants is 30.6 years) *with Nation Continues to Age as It Becomes More Diverse*, U.S. CENSUS BUREAU (2022), https://www.census.gov/newsroom/press-releases/2022/population-estimates-characteristics.html (national median age is 38.8).

24-40160.9920

0.01 percent of the nearly 7.5 million licenses issued statewide in 2018 (*id.*), Texas claims it "*may*" have to "open additional driver license offices" and hire "[a]dditional [e]mployees" to meet this demand.  Gipson Decl. ¶¶6, 9 (emphasis added).  But those speculative facility and hiring costs, which account for over 98 percent of the $200 estimate (PI Mot. 11; App'x ¶¶13-14), are unlikely to rise with such small increases in the number of license applicants.  In any event, Texas's license application fees ($33/license) and gasoline taxes paid by CHNV residents far exceed the remaining alleged $3.60 in variable costs per license.  *Id.*

**Education.**  Texas conflates the fixed costs of building new schools and hiring new teachers with the relatively low variable costs of educating, at most, a few hundred additional children each month scattered amongst the over 5.4 million students enrolled across thousands of Texas public schools.  *Id.* ¶15.  Texas even admits it "cannot quantify the number of illegal aliens or children of illegal aliens in its schools" (PI Mot. 11), thus conceding its cost allegations are speculative.  And it ignores that migrants' taxes and federal transfers help finance Texas schools, not to mention the benefits to Texas of a more educated CHNV population.

**Wages.**  Without citing evidence, Texas suggests that employed CHNV parolees will lower Texans' wages.  PI Mot. 13-14.  The weight of economic scholarship, however, concludes that the "impact of immigration on the wages of natives overall is very small."  Blau and Mackie, *The Economic and Fiscal Consequences of Immigration*, NAT'L ACADS. OF SCIS., ENGINEERING, & MEDICINE, at 267 (2017) (surveying "decades" of economic research).  Regardless, the effect (if any) of the Program on wages is irrelevant because Texas's citizens – not the State itself – bear any such costs.  *Massachusetts v. Mellon*, 262 U.S. 447, 479, 485-86 (1923) (states lack *parens patriae* standing to challenge federal policies).

17

## <u>CONCLUSION</u>

The available data, economic scholarship, and even its own allegations undermine any claim that Texas (or the other States) will incur increased costs from the CHNV Program. This economic logic has legal consequences. Without any concrete evidence establishing harm, the States' alleged injuries are "purely speculative" and therefore cannot establish either Article III standing or irreparable harm for an injunction. *Crane v. Johnson*, <u>783 F.3d 244, 252</u> (5th Ci<u>r. 2015)</u>; *Holland Am. Ins. v. Succession of Roy*, <u>777 F.2d 992, 997</u> (5th Ci<u>r. 1985</u>). The Court should apply the economic perspectives *Amici* provide here when analyzing the States' standing and irreparable injury claims.

18

Dated: August 11, 2023                          Respectfully submitted,


**COVINGTON & BURLING LLP**

By: /s/ Brandon R. Gould

Brandon R. Gould*                               Gawon Go
Carolyn F. Corwin                               Abigail Kertzman
850 Tenth Street, N.W.                          The New York Times Building
Washington, D.C. 20001                          620 Eighth Avenue
Telephone: (202) 662-6000                       New York, New York 10018
bgould@cov.com                                  Telephone: (212) 841-1000
ccorwin@cov.com                                 ggo@cov.com
                                                akertzman@cov.com


*Counsel for* Amici Curiae
*Drs. Stan Veuger, Tara Watson*
*Douglas Holtz-Eakin, & Leah Boustan*

*\*Attorney-in-charge, admitted* pro hac vice


*Certificate of Word Count:*
This memorandum contains 4,997 words, as
calculated by Microsoft Word.

24-40160.9923

**CERTIFICATE OF SERVICE**

I certify that a Copy of the foregoing instrument was served via ECF pursuant to the Federal

Rules of Civil Procedure on the 11th day of August, 2023, upon all counsel of record in this matter.


By: */s/ Brandon R. Gould*
Brandon R. Gould