No. 24-40160

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF IDAHO; STATE OF IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OHIO; STATE OF SOUTH CAROLINA; STATE OF TENNESSEE; STATE OF UTAH; STATE OF WEST VIRGINIA; STATE OF WYOMING; STATE OF OKLAHOMA,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; UR M. JADDOU, DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. CUSTOMS & BORDER PROTECTION; TROY MILLER, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; TAE D. JOHNSON, ACTING DIRECTOR, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

*Defendants-Appellees,*

VALERIE LAVEUS; FRANCIS ARAUZ; PAUL ZITO; ERIC SYPE; KATE SUGARMAN; NAN LANGOWITZ; GERMAN CADENAS,

*Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas, Victoria Division

## REPLY BRIEF FOR APPELLANTS
*(Counsel Listed on Inside Cover)*

—————

GENE P. HAMILTON
America First Legal Foundation
Virginia Bar No. 80434
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

CORY A. SCANLON
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for the State of Texas

[Additional counsel listed in signature block]

# Table of Contents

Page

Table of Authorities ................................................................ ii

Introduction ........................................................................ 1

Argument ............................................................................ 2

    I.   Texas Has Standing. .................................................. 2

        A.   The district court improperly turned the injury element of standing into an "accounting exercise." ........................................... 2

        B.   The district court got the accounting wrong, regardless. .................. 13

        C.   The States are entitled to special solicitude. ...................... 18

        D.   The States have met the remaining standing requirements. ............. 20

    II.  Because Texas Has Standing, This Case Must Be Remanded. ................. 22

Conclusion .......................................................................... 24

Certificate of Service ............................................................. 30

Certificate of Compliance .......................................................... 30

# Table of Authorities

Page(s)

**Cases:**

*Bernal v. Bexar County*,
   757 F.App'x 316 (5th Cir. 2018) ....................................................... 12

*California v. Texas*,
   593 U.S. 659 (2021) ............................................................. 8, 11, 21

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
   98 F.4th 220 (5th Cir. 2024) .............................................................. 14

*Charter Commc'ns, Inc. v. Prewitt Mgmt., Inc.*,
   No. 23-50419, 2024 WL 2044025 (5th Cir. May 8, 2024) ............................... 23

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ....................................................................... 7

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...................................................................... 6

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
   1 F.4th 371 (5th Cir. 2021) ............................................................... 6

*Data Mktg. P'ship, LP v. Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ............................................................. 1

*Deanda v. Becerra*,
   96 F.4th 750 (5th Cir. 2024) ............................................................ 20

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ....................................................... 10, 11, 20, 21

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ........................................................................ 3

*FDA v. All. for Hippocratic Med. (Alliance)*,
   602 U.S. 367 (2024) ................................................................. 11, 12

*FEC v. Cruz*,
   596 U.S. 289 (2022) ..................................................................... 10

*In re Gee*,
   941 F.3d 153 (5th Cir. 2019) ............................................................ 15

*General Land Office v. Biden (GLO)*,
   71 F.4th 264 (5th Cir. 2023) ..................................................... 15, 17, 19

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...................................................................... 9

*Hewlett-Packard Co. v. Quanta Storage, Inc.*,
  961 F.3d 731 (5th Cir. 2020) .............................................................. 13

*Huss v. Gayden*,
  571 F.3d 442 (5th Cir. 2009) .............................................................. 13

*In re Joint E. & S. Dist. Asbestos Litig.*,
  52 F.3d 1124 (2d Cir. 1995) ............................................................... 14

*Larson v. Valente*,
  456 U.S. 228 (1982) ........................................................................... 22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ....................................................................... 8, 12

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ....................................................................... 8, 19

*Medellin v. Texas*,
  552 U.S. 491 (2008) ........................................................................... 18

*Mercado v. Lynch*,
  823 F.3d 276 (5th Cir. 2016) ................................................................ 9

*OCA-Greater Hous. v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ................................................................ 2

*In re RMM Records & Video Corp.*,
  372 B.R. 603 (Bankr. S.D.N.Y. 2007) ................................................ 17

*Rutila v. DOT*,
  12 F.4th 509 (5th Cir. 2021) .............................................................. 22

*Sissom v. Univ. of Tex. High Sch.*,
  927 F.3d 343 (5th Cir. 2019) ................................................................ 7

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................. 6

*Tex. Med. Ass'n v. HHS*,
  No. 23-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) ............................ 1, 9

*Texas v. Biden (MPP)*,
  20 F.4th 928 (5th Cir. 2021) .................................. 1, 4, 5, 9, 10, 16, 19, 22, 23

*Texas v. DHS*,
  2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) .......................................... 5

*Texas v. Rettig*,
  987 F.3d 518 (5th Cir. 2021) .............................................................. 22

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2007) .............................................................. 12

iii

*Texas v. United States,*
    691 F. Supp. 3d 763 (S.D. Tex. 2023) ............................................................. 10
*Texas v. United States (DACA),*
    50 F.4th 498 (5th Cir. 2022) .............................................. 2, 11, 16, 17, 19, 21, 22
*Texas v. United States (DAPA),*
    809 F.3d 134 (5th Cir. 2015)...................................... 3, 9, 11, 13, 16, 17, 18, 19, 21
*United States v. Abbott,*
    No. 23-50632, 2024 WL 3580743 (5th Cir. July 30, 2024).............................. 17
*United States v. Onenese,*
    542 F.App'x 427 (5th Cir. 2013) ...................................................................... 17
*United States v. Oyervides,*
    No. 21-50844, 2022 WL 780424 (5th Cir. Mar. 14, 2022) .............................. 12
*United States v. Texas (Priorities),*
    599 U.S. 670 (2023) ...................................................... 3, 5, 9, 11, 19, 20
*Zadvydas v. Davis,*
    533 U.S. 678 (2001)........................................................................................ 12

**Constitutional Provisions and Statutes:**

U.S. Const. art. III ....................................................... 5, 9, 14, 16, 18, 19, 22
8 C.F.R. §274a.12(c)(14)...............................................................................10-11
8 U.S.C. §1182(d)(5)(A) ............................................................................ 1-2, 10
8 U.S.C. §1225 ................................................................................................ 12
8 U.S.C. §1226 ................................................................................................ 12
8 U.S.C. §1325 ................................................................................................ 12

**Other Authorities:**

13A C. Wright & A. Miller, Fed. Practice & Procedure §3531.4 (3d
    ed. 2014) ........................................................................................................ 13
Elliot Spagat, *US Homeland Security Halts Immigration Permits From 4
    Countries Amid Concern About Sponsorship Fraud*, Associated Press
    (Aug. 2, 2024, 5:05 PM CDT), https://perma.cc/H27K-EE5A......................... 1
John Gramlich & Alissa Scheller, *What's Happening at the U.S.-
    Mexico border in 7 charts*, Pew Research Center (Nov. 9, 2021),
    https://tinyurl.com/PewImmigPattern ........................................................... 18
U.S. Citizenship & Immigr. Servs., *Process for Cubans, Haitians,
    Nicaraguans, and Venezuelans* (Aug. 9, 2024),
    https://perma.cc/9EES-K5XZ............................................................................ 1

# Introduction

Appellees admit that DHS implemented a wide-ranging parole program under which tens of thousands of nationals from Cuba, Haiti, Nicaragua, and Venezuela are released into the Plaintiff States every month. They also acknowledge that Program beneficiaries may live and work in the States. And the district court found that Texas has demonstrated that it "will inevitably expend … resources on CHNV nationals who enter the United States under the Parole Program." ROA.11524.

That alone is sufficient to establish standing under cases like *Texas v. Biden (MPP)*, 20 F.4th 928, 1001 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022), which contrary to Appellees' suggestion, *e.g.*, DHS.BR.33; Int.Br.46, remains good law, *see, e.g.*, *Tex. Med. Ass'n v. HHS*, No. 23-40217, 2024 WL 3633795, at *5 (5th Cir. Aug. 2, 2024) (citing *Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846 (5th Cir. 2022)). The district court clearly erred by conflating temporary fluctuations in migration rates with the concrete costs Texas must bear in providing services to beneficiaries of this unlawful program—one so plagued with fraud DHS has now frozen it.[1] This Court should reverse the district court's error, and the States respectfully reiterate their request that it do so promptly.

---

[1] *See, e.g.*, U.S. Citizenship & Immigr. Servs., *Process for Cubans, Haitians, Nicaraguans, and Venezuelans* (Aug. 9, 2024), https://perma.cc/9EES-K5XZ; Elliot Spagat, *US Homeland Security Halts Immigration Permits From 4 Countries Amid Concern About Sponsorship Fraud*, Associated Press (Aug. 2, 2024, 5:05 PM CDT), https://perma.cc/H27K-EE5A ("3,218 sponsors [apparently] were responsible for 100,000 filings and … 24 of the top 1,000 Social Security numbers used by sponsors corresponded to dead people."). Granting parole "on a case-by-case basis," 8

<div align="center">

**ARGUMENT**

</div>

## I.  Texas Has Standing.

A premise of Appellees' briefs is that DHS's decision to allow tens of thousands of individuals requiring social services into the United States will impose no costs on States. Texas, however, has presented evidence directly to the contrary. ROA.12820-12827; ROA.12835-12841. And the district court *agreed* that "Texas will inevitably expend some health care resources on CHNV nationals who enter the United States under the Parole Program." ROA.11524. This means Texas has suffered an injury. Appellees have no real answers for that commonsensical point.

### A.  The district court improperly turned the injury element of standing into an "accounting exercise."

**1.** The district court should have stopped with its conclusion that Texas will "inevitably" expend money providing social services to Program beneficiaries. After all, "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Texas v. United States (DACA)*, 50 F.4th 498, 518 (5th Cir. 2022). That is, to be justiciable, the injury must be concrete and non-speculative, but it "need not measure more than an identifiable trifle." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017). Yet here, the district court looked beyond the fact that CHNV nationals paroled into Texas cause the State to incur pocketbook injury to conclude that the CHNV Program "actually lowered [Texas's] out-of-pocket costs" because the rate of increase slowed for a while. ROA.11540-11541.

---

U.S.C. §1182(d)(5)(A), and for documented "urgent humanitarian reasons or significant public benefit," *id.*, would go a long way towards preventing fraud.

This was legal error because it involved an "accounting exercise"—*viz.*, offsetting the entry (and costs) of some paroled individuals against the supposed non-entry (and lack of costs) of aliens who supposedly did not unlawfully enter Texas—that this Court has held impermissible in assessing standing. *See Texas v. United States (DAPA)*, 809 F.3d 134, 156 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016); *see also, e.g.*, *United States v. Texas (Priorities)*, 599 U.S. 670, 683 (2023) (citing *DAPA*, 809 F.3d at 154, with favor); *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 26 (2020) (citing *DAPA*, 809 F.3d at 155, with favor).

Texas's evidence showed both actual and imminent harms; the States were not required to, but did, establish both. *Infra* 6-7; States.Br.30-33. Although there was a temporary dip in entries by CHNV nationals shortly after the Program was implemented as almost always happens that time of the year, Texas's evidence showed that these numbers would, and did, rise. *See, e.g.*, ROA.11414. As DHS's brief seems to acknowledge (at 6 and 26), even that initial drop can be explained by a natural lag related to some CHNV nationals waiting for their applications to be processed.[2] But entering an interior port of entry only delayed rather than prevented the individuals' arrival in Texas—and thus Texas's injury.

---

[2] Intervenors fault the States (at 25) for citing the record for the assertion that "at the time of trial in summer of 2023, it was plain that the CHNV Program does not reduce illegal border crossings by CHNV nationals." But they only needed to look to the next page for this evidence, States.Br.32, which Intervenors acknowledged (at 26-27) was properly before the Court as a matter of judicial notice.

Intervenors—but, notably, not DHS—complain (at 49-50) that Texas allegedly only offered "unsubstantiated suppositions" regarding CHNV nationals causing injury. But they have no answer for the fact that 13,900 parolees communicated their intent to settle in Texas, 2,664 of whom were minors who must be provided education. ROA.11523. Far from unsubstantiated, these facts are established by DHS's own interrogatory responses. ROA.13080-13081.

DHS acknowledges (at 17) that standing exists if "the challenged action 'increased the number of parolees in the state.'" *MPP*, 20 F.4th at 966. But that is the case here. *MPP* concludes that standing is established when a challenged action results in *parole* of groups of migrants who would otherwise be subject to deportation—it did not require Texas to show increasing rates of *migration. See id.* at 968 ("[T]he fact remains that, according to both the record and the Government's own brief, MPP's termination drastically increases the proportion of incoming aliens who are *paroled* rather than returned to Mexico. And it is precisely that increase in *paroles* that causes the States' harms.") (emphases added).

Indeed, there is an even more direct connection between the CHNV Program—which on its face paroles CHNV nationals for two years—and Texas's finances, than there was in *MPP*. Despite this Court's on-point holding regarding parole of foreign nationals, however, Intervenors conflate (at 34) Texas's agreement that overall migration rates (which were never below zero) apparently decreased for a short time with a concession that Texas's *costs* decreased—a concession Texas has never made, and which one would struggle in vain to find given a record showing only entries into the United States and Texas, but no removals whatsoever.

The effects of the district court's error, moreover, are significant. This Court has squarely held that DHS cannot "parole aliens en masse." *MPP*, 20 F.4th at 997. Yet the district court's analysis offers DHS a roadmap to do just that—especially because the federal government keeps the count of border crossings and can decide how and even whether to report crossings. *See, e.g.*, *Texas v. DHS*, 2023 WL 8285223, at **4-5 (W.D. Tex. Nov. 29, 2023) (documenting widespread failure to process). Because illegal border-crossing rates are almost always lower at certain times of the year, DHS need only wait to announce any new "en masse" parole program until then. Blessing such a roadmap promotes neither good logic nor good law.

**2.**   Appellees raise what appear to be eight arguments in the contrary.[3] Many are nothing like the district court's analysis, and none has merit.

*First*, DHS tries (at 13) to buttress the district court's conclusion by asserting that an accounting exercise was unnecessary to determine that Texas's costs supposedly decreased for providing social services to Program beneficiaries unlawfully in Texas because "the numbers [of CHNV nationals] had decreased." That is non-responsive; no matter how many times and ways Appellees repeat the district court's error, offsetting concrete dollars-and-cents costs associated with *particular* parolees who indisputably entered Texas against any alleging 'savings' associated

---

[3] DHS also attempts in passing to apply *Priorities* (at 36) to the language of the relevant statutes. Because such issues go to the merits, they are outside the scope of this appeal, which is only about Article III standing. The States reserve the right to respond to any merits arguments at the appropriate time.

with *other people* who supposedly did not enter Texas can only be an accounting exercise. To say, as DHS does (at 24) that there were no "offsets at all" ignores that, by definition, whenever concrete costs associated with one person are disregarded because of alleged savings associated with someone else, that's an offset. DHS's argument also paints an incomplete picture of the record. As the district court explained, the number of entries of CHNV nationals into Texas was as high as 13,990 during the relevant months. ROA.11523. The number of those present was never shown to have *decreased*. To the contrary, DHS concedes (at 26) that the district court did not consider any evidence of removals or departures more generally.

Nor is Texas's straightforward pocketbook injury speculative. *Contra* DHS.Br.19, 42. The Court in *Clapper v. Amnesty International USA* rejected that self-imposed costs based on an unfounded fear of future harm can create a cognizable injury. 568 U.S. 398, 416-17 (2013).[4] But nothing in *Clapper* requires setting non-speculative, here-and-now costs of a government program against the supposed benefits of that program. Moreover, as *Crawford v. Hinds County Board of Supervisors* explains, even if the party's existing harms are "insufficient to confer standing" by themselves, they can "still [serve as] 'evidence bearing on whether there is a real and immediate *threat* of [future] injury,'" thus justifying standing. 1 F.4th 371, 376

---

[4] *Summers v. Earth Island Institute*, 555 U.S. 488 (2009) is, if anything, more off point. True, it noted that federal courts don't resolve "abstract" questions. *Id.* at 494. But the only supposedly "abstract" question identified by the district court related to *causation*, ROA.11538, 11541, which it never reached, States.Br.37. And far from being "abstract," Texas's causation analysis is fully supported by precedent from both this Court and the Supreme Court. *Id.*

(5th Cir. 2021) (emphasis added) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)) (emphasis added). Here, it makes no sense to force the States to file a new lawsuit (as the district court suggests, ROA.11541) to re-allege injury that is *already in their complaint*,  especially because they relied on the same standing evidence and theories this Court has recognized to reasonably predict that paroling more people into Texas will injure Texas.

Contrary to DHS's suggestion (at 40), the States have not waived application of this principle. Texas alleged in its complaint that it faced a substantial risk of prospective injuries if the Program continues, ROA.326-361, which was later born out by post-complaint evidence, *see, e.g.*, States.Br.30-33. The States did not disagree that the district court was required to examine standing at the time of the operative complaint. ROA.11082. But whether Texas has shown a likelihood of injury must be assessed at *each* stage of the proceeding. *See Lyons*, 461 U.S. at 102. Texas's position (at ROA.11083-11084) that it had (and has) standing both at the time of complaint *and* at the time of trial hardly waives its prospective-injury claim. Rather, it only underscores that Texas has standing twice over.

DHS also asks (at 43, also at 23-24) the Court to ignore clear evidence that entry of CHNV nationals has increased because it was entered after the record closed. But, as Intervenors acknowledge (at 26-27), the district court took judicial notice of *all* data filed in post-trial briefing. ROA.11515-11517. As neither DHS nor Intervenors assert *that* ruling was an abuse of discretion, they are bound by it. *See, e.g.*, *Sissom v. Univ. of Tex. High Sch.*, 927 F.3d 343, 349 (5th Cir. 2019) (per curiam).

Instead, DHS claims (at 43) that the States cannot rely on "'Nationwide' data" to prove its harm—as if Texas isn't part of the nation—because the parties stipulated that only Texas would demonstrate standing. But Texas never stipulated that it could not use nationwide data to make that showing. ROA.7986. Any speculation, moreover, that a nationwide increase in entry to the tune of hundreds of thousands of people does not result in increased entry into Texas blinks reality. Nor is DHS's theory the basis for the district court's decision. ROA.11515-11517. And Intervenors' attempt (at 26-27) to dismiss September 2023 as "an outlier" and to show a small temporary dip in entry rates in early FY2024—again, which is par for the course when fall and winter comes—fails under the district court's own analysis because even these numbers were still higher than at almost any other point in which the Program has been in effect. *See* ROA.11472. And suffice to say, the number is *much* higher than during the years before the Program began.

*Second*, DHS cites *Lujan v. Defenders of Wildlife* (at 12) for the proposition that "more is needed" when defendants argue that plaintiff's complaint involves the regulation of a third party. 504 U.S. 555, 561 (1992) (plurality op.). But the very next sentence in *Lujan* makes clear that the Court was discussing "causation and redressability"—not *injury*. *Id.* That is significant not just because the district court here tied its analysis to injury alone, ROA.11541, but because States are entitled to "special solicitude" in establishing standing's other elements. *Massachusetts v. EPA*, 549 U.S. 497 (2007); *infra* Part I.C. The *Lujan* plaintiffs were not. And because *California v. Texas*, 593 U.S. 659 (2021), merely restates that principle, *id.* at 675 (citing, *inter alia*, *Lujan*, 504 U.S. at 562), DHS's allusion to it (at 46) adds nothing.

*Third*, DHS (at 45) and Intervenors (at 52-53) double down on their position that this Court's cases upholding standing in circumstances like those here are no longer good law after *Priorities*. Tellingly, none of these arguments were the basis for the district court's decision. In all events, *Priorities* did not address *MPP*'s standing analysis at all, and thus could not have "unequivocal[ly]" rejected it—the relevant standard. *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016) (per curiam). In fact, *Priorities* cites *DAPA* with approval for how a court should analyze standing for suits challenging a federal program that combines nonenforcement with the "provision of legal benefits or legal status." 599 U.S. at 683 (citing, *inter alia*, *DAPA*, 809 F.3d at 154). And *MPP* followed *DAPA*, 20 F.4th at 949. Because *Priorities* does not displace *DAPA* and its progeny, those cases remain binding. *See, e.g.*, *Tex. Med.*, 2024 WL 3633795, at *5. Accordingly, not only are DHS's lengthy arguments (at 30-37) about supposed third-party effects, historical analogies, "complicated balancing," and the like wrong for reasons this Court has explained in prior cases, but they are also irrelevant because of the "rule of orderliness." *Mercado*, 823 F.3d at 279.

*Fourth*, DHS claims (at 35) that Texas failed to offer evidence that this is an "extreme case of non-enforcement" that *Priorities* recognized "could exceed the bounds of enforcement discretion and support Article III standing." 599 U.S. at 683 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). Once more, this argument has nothing to do with the district court's analysis. Regardless, DHS's failure to grant parole only on a finding of "urgent humanitarian reasons or significant public benefit" and "prescribe[d] only on a case-by-case basis," is plainly abdication.

8 U.S.C. §1182(d)(5)(A). Congress decided that parole should be limited in duration and purpose, and not provided en masse. Indeed, "DHS" *itself* "has traditionally construed its authority to grant advance parole for 'urgent humanitarian' reasons to be limited to urgent medical, family, and related needs, and its authority to grant advance parole for 'significant public benefit' to be limited to those individuals aiding law enforcement—such as a witness." *Texas v. United States*, 691 F.Supp.3d 763, 785 (S.D. Tex. 2023), *appeal docketed*, No. 23-40653 (5th Cir. Nov. 9, 2023).

Here, the district court found that nearly every applicant was granted parole under the Program, ROA.11523—which this Court has described as "the opposite of *case-by-case* decisionmaking." *MPP*, 20 F.4th at 942. DHS thus cannot avoid a finding of abdication with boilerplate recitations in the Federal Register, especially given that DHS has now frozen the Program because of widescale fraud. *Supra* n.1. And Intervenors' reference (at 10) to evidence of how or why parolees participate in the Program, or why their sponsors participate, says nothing about *DHS's* required decision-making process. *Cf. FEC v. Cruz*, 596 U.S. 289, 301 (2022) (an agency "literally has no power to act … unless and until Congress" confers power to do so). Furthermore, given widespread fraud, there is no need to guess what motivates CHNV participants. Judges are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Similarly, although Intervenors concede (at 7) that the Program provides a benefit, DHS (at 34) insists that work authorization is available under 8 C.F.R.

§274a.12(c)(14), not the Program. Yet (c)(14) pertains to "an alien who has been granted *deferred action*." *Id.* (emphasis added). It is the Program that fills the relevant gap by granting beneficiaries deferred action status and making the conferral automatic for work authorization. ROA.11519. Because CHNV parole is a "benefit" that is conferred on Program beneficiaries, *DAPA* controls.

*Fifth*, again departing from the district court's analysis, DHS (at 28-35) and Intervenors (at 48) argue that Texas's allegations of harm are only "indirect," and therefore not cognizable under *Priorities*. But the United States raised that argument in *Priorities*, and the Supreme Court declined to rule on that ground. *See* Pet.Br. 11-18, *United States v. Texas*, 599 U.S. 670 (Sept. 12, 2023) (No. 22-58), 2022 WL 4278395. It thus remains circuit law that a State suffers a cognizable injury based on increase emergency-Medicaid and public-school expenditures. *DACA*, 50 F.4th at 517-19; *DAPA*, 809 F.3d at 152-53. Regardless, New York had standing under circumstances much more attenuated than those here. *See Dep't of Com.*, 588 U.S. at 767-68; *accord California*, 593 U.S. at 675 (reaffirming *Dep't of Commerce*). *Contra* DHS.Br.46 (suggesting that *California* departed from it).

*Sixth*, DHS's (at 29-30) and Intervenors' (at 38) reliance on *FDA v. Alliance for Hippocratic Medicine (Alliance)*, 602 U.S. 367, 374 (2024), is even more misplaced. There, private plaintiffs lacked standing to challenge FDA's approval of mifepristone, which plaintiffs did not prescribe, based on their desire that *other* providers would not prescribe it either. *Id.* at 374. Relevant here, *Alliance* reaffirmed that standing is established if Texas shows "a predictable chain of events leading from

the government action to the asserted injury." *Id.* at 385. Texas has done just that. *See* States.Br.8-9; ROA.12835-12840.

*Seventh,* Intervenors suggest (at 38) that the States' standing arguments have no limits. But the States simply ask the Court's to follow precedent. Regardless, it is not the States' position that is limitless. DHS, for example, says the States lack standing because of the Program's (supposed) benefits, but concedes (at 26) that the district court made no finding regarding removals or departures *at all*, let alone with respect to parolees who are different in kind from other aliens.[5] Accordingly, considering any hypothetical and speculative benefits that *might* offset Texas's documented here-and-now injury was improper. *See, e.g.*, *Texas v. United States*, 497 F.3d 491, 496-98 (5th Cir. 2007) (following *Lujan*, 504 U.S. at 560-61).

*Eighth*, Intervenors assert (at 22) that the States waived some arguments by not challenging the district court's denial of the Rule 59(e) motion. Not so, "[a] party need not use the magic words 'I object' to preserve an issue," either in the district court, *United States v. Oyervides*, No. 21-50844, 2022 WL 780424, at *1 (5th Cir. Mar. 14, 2022) (per curiam), or here, *Bernal v. Bexar County*, 757 F.App'x 316, 319 (5th Cir. 2018) (per curiam). The States' opening brief raises the Rule 59(e) motion on at least three occasions (at 11, 17, 33). And the States extensively argue why the

---

[5] Indeed, CHNV nationals who are not part the Program are different in kind from those who are in critical ways, including (among others) being subject to expedited removal and detention at the federal government's expense, *see, e.g.*, 8 U.S.C. §§1225-26, and even incarceration for violating a federal criminal law, *see id.* at §1325—also at the federal government's expense. Needless to say, *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001), does not bar application of these statutes.

district court erred as a matter of law, including by treating standing as an accounting exercise. Because "a trial court's failure to properly analyze the law or apply it to the facts is also an abuse of discretion," *Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 743 (5th Cir. 2020), nothing more was needed.

## B.    The district court got the accounting wrong, regardless.

Even if the district court *were* permitted to engage in an accounting of the Program's (certain) costs and (alleged) benefits, it still erred. The only instances in which costs and benefits could be offset even in theory is when the supposed benefit is of the "same type" and part of the "same transaction" as the injury:

> Even if the government is correct, that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs. "Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant …."

*DAPA*, 809 F.3d at 155-56 (quoting 13A C. Wright & A. Miller, Fed. Practice & Procedure §3531.4 (3d ed. 2014)).

As the States have explained (at 25-27), the district court misapplied this rule by requiring Texas to show that the *rate* of entries would always be constant or increasing. "Any scientist or statistician," however, "must acknowledge … that correlation is not causation." *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009). Thus, the district court could not rely on a drop in the number of entries (which, to reiterate, was never dropped below zero) to show that Texas was not harmed while, simultaneously, ignoring other possible causes for that drop. That is particularly true as DHS's own witness confirmed multiple potential causes of changed rates.

ROA.13411. Thus, even on its own erroneous terms, the district court was required to explain why such evidence is irrelevant. Surely no one disputes that a valid causation analysis requires "narrow[ing] down the universe of possible confounding factors." *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1130 (2d Cir. 1995). None of Appellees' arguments rebut this error.

*First*, DHS (at 44) and Intervenors (at 31) accuse the States of asking the Court to address confounding factors only when doing so favors standing. The States, however, have explained (at 19, 25-27) that the district court should *not* have engaged in what would have to be a multivariate analysis to determine Article III injury *at all*. The district court's injury assessment should have stopped once it concluded that Texas would "inevitably" suffer higher expenses as parolees enter the State under the Program. ROA.11524-26. The States raise potential confounding factors only to show that Texas has standing even under the district court's flawed approach, especially because alternative explanations plainly exist and DHS's own data show the numbers later rebounded. ROA.11414; States.Br.30-33.

Intervenors counter (at 30) that the reduction in entries by CHNV nationals occurred "even as encounters of other noncitizens began to rebound from their typical seasonal drop." But that conclusory statement relies on a single paragraph of a single page of the record entirely devoid of specifics. ROA.13412 ¶26. To the extent (if at all) the district court relied upon it to reject the States' evidence, that was clear error. *See, e.g.*, *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 237-38 (5th Cir. 2024). Regardless, this argument is legally flawed in multiple respects. Not only does it conflate CHNV nationals generally with CHNV parolees, it ignores that

as 2023 progressed, entry of CHNV nationals surged to greater heights than at any point during the Program's operation, just as the States said would happen.

*Second*, DHS relies (at 18) on *In re Gee*, 941 F.3d 153, 163 (5th Cir. 2019), for the proposition that standing is lacking when "challenged regulations require Plaintiffs to do what they've already been doing." But the federal government certainly was not paroling hundreds of thousands of CHNV nationals en masse and providing them a form of legal status and work authorization before the Program began. Nor, before the Program started, was Texas required to assume ongoing financial responsibility for those new residents because—lacking legal status—they were subject to immediate removal and/or incarceration. That's no longer so. The idea that States lack standing to challenge an unlawful new federal government program that purports to provide residency and work authorization to tens of thousands of parolees each month who receive benefits from the States turns sovereignty on its head.

*Third*, *General Land Office v. Biden (GLO)*, 71 F.4th 264 (5th Cir. 2023), affirmatively supports the States and certainly does not help DHS. Notably, injury was not contested in *GLO*—only traceability and redressability. *Id.* at 272-74; *contra* DHS.Br.20-21. Moreover, Texas's points in *GLO* regarding the "relative amount of illegal immigration" were unique to the facts and procedural posture of that case: *GLO* addressed a motion to dismiss regarding whether a border wall would cause fewer migrants to enter the State compared to proposed alternatives. 71 F.4th at 272-74. *GLO* thus does not undermine this Court's holdings that standing is not an accounting exercise, much less does it excuse a *flawed* accounting exercise.

15

The hypothetical DHS poses (at 21) proves Texas's point. The premise that Texas's costs of serving the CHNV population somehow *decrease* when one more CHNV national is released into Texas is upside down. In fact, it is "obvious[] that if the total number of in-State aliens [via parole] increases, the States will spend more on healthcare." *MPP*, 20 F.4th at 969; *accord DAPA*, 809 F.3d at 161.  And if costs go up, even for one person, *of course* Texas has standing—even if DHS may fulfill its statutory duty by removing other migrants who cross illegally. *See DACA*, 50 F.4th at 518. Regardless, DHS's hypothetical confirms that Appellees want not just an accounting exercise, but also a simplistic, one-sided exercise. Intervenors give away the game (at 35) when they assert that a judge can "simply assess[] whether immigration itself had increased or not" without engaging in an extraordinarily complex multivariate analysis beyond anything Article III requires.

*Fourth*, if there is going to be an accounting exercise, a non-public, non-treaty gentleman's agreement between DHS and Mexico is not the same as a transaction between DHS and a parolee, or between DHS and Texas for that matter. To start, DHS persists in leaving it unclear what that supposed agreement *was*. One of DHS's record citations (at 5) appears to be government literature discussing human trafficking in Saudi Arabia. ROA.5433. At most, DHS can rely on a link to a White House statement from May 2, 2023, which makes a cryptic reference to the "consequences for irregular migration" and Mexico's "accepting back migrants on humanitarian grounds." ROA.13416 ¶36 n.21; The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), https://tinyurl.com/47t3vfrs. No details are provided, let alone assurances that all CHNV

nationals are covered or that Mexico would accept a material number of them. Instead, DHS repeatedly (and almost exclusively) cites conclusory *ipse dixit* from the very rule being challenged. The record has nothing from which the district court could have found that return of such nationals was part of the same "transaction" causing the States' injury, much less to defeat the States' showing of injury. *See, e.g.*, *United States v. Onenese*, 542 F.App'x 427, 429 (5th Cir. 2013) (finding clear error where district court relied on evidence that does not exist).

Although DHS concedes (at 26), moreover, that the district court did not consider any evidence showing CHNV nationals are being removed from Texas, it insists that Mexico is accepting return of CHNV nationals at the border based on statements of DHS officials about Mexico's intentions. But the pages it cites make no reference to a treaty, only DHS's speculation about what Mexico will do. ROA.13403-13404. Even if the Court could consider such speculation as an offset, what DHS argues (at 26) does not help its argument because the mere "ability" to remove CHNV nationals is not evidence of an offset negating Texas's harm in the absence of evidence that Mexico has *acted* on this supposed agreement. *Cf. In re RMM Records & Video Corp.*, 372 B.R. 603, 614-15 (Bankr. S.D.N.Y. 2007).

Furthermore, Intervenors assert (at 20, 41) that the States' lawsuit interferes with the Executive's foreign-affairs operations. But that again was not the basis for the district court's decision. Regardless, this merits argument does not suggest that some amorphous diplomatic understanding is part of the same "transaction" as—and thus may be considered to offset—Texas's concrete injury. Intervenors are wrong on the merits anyway, as confirmed by *DACA*, *DAPA*, *GLO*, and *United*

*States v. Abbott*, No. 23-50632, 2024 WL 3580743 (5th Cir. July 30, 2024) (en banc), to say nothing of *Medellin v. Texas*, 552 U.S. 491 (2008).

Finally, DHS faults the States (at 37-39) for not offering enough evidence to prove the role of confounding variables here. This argument rests on the faulty premise that injury is an accounting exercise; the States had no burden to satisfy a requirement that doesn't exist. It also ignores that the district court did not rule on this basis; thus, even if DHS were correct, at best the result would be vacatur and remand. But DHS's argument is not correct. The parties informed the district court of "seasonal [migration] patterns," ROA.11090, which are confirmed by the data charts, as well as variances caused by smugglers and other confounding variables from DHS's own witness, ROA.13411. Nor are such facts remotely secret. *See, e.g.*, John Gramlich & Alissa Scheller, *What's Happening at the U.S.-Mexico border in 7 charts*, Pew Research Center (Nov. 9, 2021) (explaining that "since 2013" the "annual peak" of "border encounters" has shifted after March), https://tinyurl.com/PewImmigPattern.

## C.   The States are entitled to special solicitude.

There would be Article III standing in this case even if it were brought by a private litigant. "It is," however, "of considerable relevance that the party seeking review here is a sovereign State and not a private individual because States are not normal litigants for the purposes of invoking federal jurisdiction." *DAPA*, 809 F.3d at 151 (cleaned up). As the States have explained (at 36-37), the district court denied special solicitude only by wrongly conflating the injury requirement with the

requirements of traceability and redressability. ROA.11531 n.13. This too was re-versible error.

Rather than meaningfully address this error, DHS rehashes (at 45) its reliance on *Priorities*, glossing over the Supreme Court's favorable citation to this Court's *DAPA* decision. Such reliance fails for the reasons already discussed. For their part, Intervenors claim (at 52) that the district court correctly did not analyze special solicitude because Texas suffered no cognizable injury. But that argument once again repeats the district court's fundamental misunderstanding of this Court's "no accounting exercise" rule. In fact, the Court has addressed special solicitude in numerous immigration cases, finding that Texas *has* standing in circumstances remarkably like this one. *See GLO*, 71 F.4th at 274-75; *DACA*, 50 F.4th at 514-17; *MPP*, 20 F.4th at 969-71; *DAPA*, 809 F.3d at 151-55.

DHS's attempt (at 47) to distinguish *Massachusetts* as involving a loss of territory is foreclosed by the rule of orderliness. *See DAPA*, 809 F.3d at 151-55. DHS is also wrong (at 49-50) that the States did not show harm to a quasi-sovereign interest based on the Program's "pressure on them to change State laws." That argument cannot be reconciled with *DACA*. 50 F.4th at 515. After all, as in *DACA*, Texas faces the *same* pressure to change how it provides social benefits.

*Priorities* is not to the contrary. The Court did not apply *Massachusetts* because it was considering "only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to … mak[e] more arrests." 599 U.S. at 684-85. But the States aren't asking courts to direct DHS to make more arrests. Instead, they argue that DHS should not unlawfully allow

hundreds of thousands of people to live and work in the United States, especially because some would not come but for the Program. ROA.12071-12072. The injury here thus is not even similar to *Priorities*—let alone "*identical*" to it. *Contra* DHS.Br.50.

The States have also been deprived of their procedural right to challenge the CHNV Program because it was never subject to notice and comment. ROA.11521. The States do not wish to comment for commenting's sake; the APA process would allow the States to identify real-world errors in the Program that are concretely harming them—a cognizable, real-world interest by any measure. *Cf. Deanda v. Becerra*, 96 F.4th 750, 757 (5th Cir. 2024) ("Merely describing these 'bare procedural right' cases shows why they do not apply here."). And the States also seek to vindicate the injury to their quasi-sovereign interests. ROA.12600. These harms, which Texas established at trial, entitle the States to special solicitude.

### D. The States have met the remaining standing requirements.

Finally, Texas has also shown traceability and redressability.

**1.** As to traceability, there is a much clearer line between the CHNV Program and Texas's harms than what the Supreme Court accepted in *Department of Commerce*. There, the alleged injury was possible lost funding should a citizenship question on the census depress the number of responses. *See* 588 U.S. at 768. As the Court explained, there is a critical distinction between a "theory of standing" that "rest[s] on mere speculation about the decisions of third parties" and one that "relies … on the predictable effect of Government action[s] on … third parties." *Id.*

One such predictable effect—indeed, one of the most predictable of all—is that people will act in their economic self-interest. *See California*, 593 U.S. at 678.

The direct connection between Texas's social-service expenditures and the Program is well-established in the record. Because anyone could have predicted that allowing CHNV nationals to be paroled (thereby gaining functionally indefinite lawful presence and work authorization) would result in many CHNV nationals availing themselves of those benefits (thereby imposing costs on Texas). Under *Department of Commerce*, these harms are traceable to DHS's unlawful actions.

Rather than confront the Supreme Court's analysis head-on, DHS largely ignores it, citing *Department of Commerce* only in passing (at 46, 48). Intervenors point (at 46) to instances where other large groups of foreign nationals were paroled. Leaving aside that these instances largely predate the Illegal Immigration Reform and Immigrant Responsibility Act of 1996—which was passed in part to *combat* abuse of the parole power—this Court has repeatedly rejected this argument because "historical practice does not, by itself, create power." *DACA*, 50 F.4th at 527 (cleaned up) (quoting *DAPA*, 809 F.3d at 179).

**2.**   Eliminating the Program would also redress Texas's harms by preventing additional future costs incurred by the automatic two years of lawful presence enjoyed by CHNV parolees. DHS (at 17) acknowledges that "if [the challenged program] were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social services and education costs." For good reason: That is precisely what *DACA* found when recognizing that Texas's harm would be redressed by rescinding the executive branch's decision to

establish the DREAM Act by executive fiat. *See* 50 F.4th at 520. Likewise, vacating this unlawful (and fraud-ridden) Program would prevent future entry.

True, vacatur would not redress *all* of Texas's injury. But a plaintiff need not show its injury will be "completely redressed by a favorable decision of this Court" to satisfy Article III—only "that a favorable decision will relieve a *discrete* injury." *Larson v. Valente*, 456 U.S. 228, 243 & n.15 (1982) (emphasis added); *see also Texas v. Rettig*, 987 F.3d 518, 528-29 (5th Cir. 2021). Here, vacating the Program will remedy a discrete injury by requiring true case-by-case parole evaluations. Because Texas would thereby avoid the costs imposed by en masse parole of CHNV nationals, redressability is satisfied. *See MPP*, 20 F.4th at 942.

DHS (at 51) and Intervenors (at 21, 51) insist that termination of the CHNV Program would instead cause a surge in illegal immigration. Intervenors go so far as to state (at 51) that the district court entered a factual finding to this effect. It did not. ROA.11517-11529. To the contrary, the district court never purported to reach redressability, confining its analysis entirely to injury. ROA.11530-11541. Because Texas established injury as a matter of law, the district court's judgment cannot stand. Accordingly, at a minimum, the Court should vacate that judgment.

## II.  Because Texas Has Standing, This Case Must Be Remanded.

The district court did not resolve their remaining jurisdictional defenses and this Court typically will "not to seek out alternative grounds" to affirm. *Rutila v. DOT*, 12 F.4th 509, 511 (5th Cir. 2021) (quotation omitted).

The Court should apply that principle here. Although DHS preserves its arguments, it acknowledges (at 51) the only issue addressed by the district court is

standing. Intervenors have not briefed other issues at all. Such issues are thus "best answered by the district court in the first instance." *Charter Commc'ns, Inc. v. Prewitt Mgmt., Inc.*, No. 23-50419, 2024 WL 2044025, at *2 n.3 (5th Cir. May 8, 2024) (per curiam). Regardless, Appellees' arguments fail under *MPP* and other binding precedent.

## Conclusion

The judgment of the district court should be reversed, and the case should be remanded for further proceedings.

Respectfully submitted.

<div style="display:flex">
<div>

Gene P. Hamilton
America First Legal Foundation
Virginia Bar No. 80434
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

</div>
<div>

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

Cory A. Scanlon
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for the State of Texas*

</div>
</div>

/s/ Edmund G. LaCour Jr.

Steve Marshall

Alabama Attorney General

Edmund G. LaCour Jr.

Solicitor General

Office of the Attorney General

State of Alabama

501 Washington Avenue

P.O. Box 300152

Montgomery, Alabama 36130-0152

Tel: (334) 242-7300

Edmund.LaCour@AlabamaAG.gov


*Counsel for the State of Alabama*


/s/ Nicholas J. Bronni

Tim Griffin

Arkansas Attorney General

Nicholas J. Bronni

Arkansas Solicitor General

Office of the Arkansas Attorney
General

323 Center Street, Suite 200

Little Rock, Arkansas 72201

Nicholas.Bronni@arkansasag.gov


*Counsel for the State of Arkansas*


/s/ Christopher A. Robison

Treg Taylor

Attorney General of Alaska

Cori M. Mills

Deputy Attorney General

Christopher A. Robison

Alaska Bar No. 2111126

Texas Bar No. 24035720

Assistant Attorney General

Alaska Department of Law

1031 W. 4th Avenue, Suite 200

Anchorage, Alaska 99501-1994

chris.robison@alaska.gov


*Counsel for the State of Alaska*


/s/ Henry C. Whitaker

Ashley Moody

Attorney General of Florida

Henry C. Whitaker

Solicitor General

Office of the Attorney General

The Capitol, Pl-01

Tallahassee, Florida 32399-1050

Tel: (850) 414-3300

james.percival@myfloridalegal.com


*Counsel for the State of Florida*

/s/ Joshua N. Turner

Raúl R. Labrador

Attorney General of Idaho

Joshua N. Turner, ISB No. 12193

Alan M. Hurst, ISB No. 12425

Office of the Attorney General

700 W. Jefferson Street, Ste. 210

P.O. Box 83720

Boise, Idaho 83720-0010

Tel: (208) 334-2400

josh.turner@ag.idaho.gov

alan.hurst@ag.idaho.gov

*Counsel for the State of Idaho*

/s/ Anthony J. Powell

Kris Kobach

Attorney General of Kansas

Anthony J. Powell

Solicitor General

Office of Kansas Attorney General

120 SW 10th Avenue, 2nd Floor

Topeka, Kansas 66612-1597

Tel: (785) 368-8197

Anthony.Powell@ag.ks.gov

*Counsel for the State of Kansas*

/s/ Eric H. Wessan

Brenna Bird

Attorney General of Iowa

Eric H. Wessan

Solicitor General

1305 E. Walnut Street

Des Moines, Iowa 50319

Tel: (515) 823-9117

Fax: (515) 281-4209

eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

/s/ Matthew F. Kuhn

Russell Coleman

Attorney General of Kentucky

Matthew F. Kuhn

Solicitor General

Kentucky Office of the Attorney General

700 Capital Avenue, Suite 118

Frankfort, Kentucky

Tel: (502) 696-5478

Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

/s/ J. Benjamin Aguiñaga

Elizabeth B. Murrill
Attorney General of Louisiana
Benjamin Aguiñaga
Solicitor General
Kelsey L. Smith
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70802
Tel: (225) 326-6766
aguinagab@ag.louisiana.gov
smithkel@ag.louisiana.gov

*Counsel for the State of Louisiana*

/s/ Justin L. Matheny

Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Office of the Mississippi Attorney
General
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for the State of Mississippi*

/s/ Joshua M. Divine

Andrew Bailey
Attorney General of Missouri
Joshua M. Divine, Mo. Bar #69875
Solicitor General
Maria Lanahan, Mo. Bar #65956
Deputy Solicitor General
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, Missouri 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

/s/ Christian B. Corrigan

Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Peter M. Torstensen, Jr.
Assistant Solicitor General
Office of the Attorney General
215 N Sanders
Helena, Montana 59601
Tel: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for the State of Montana*

/s/ Eric J. Hamilton

Michael T. Hilgers
Attorney General of Nebraska
Eric J. Hamilton
Solicitor General
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for the State of Nebraska*

/s/ Zach West

Gentner F. Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Zach West
Director of Special Litigation
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Counsel for the State of Oklahoma*

/s/ T. Elliot Gaiser

Dave Yost
Ohio Attorney General
T. Elliot Gaiser
Solicitor General
Mathura Jaya Sridharan
Ohio Deputy Solicitor General
Ohio Attorney General
30 E. Broad St., 17th Floor
Columbus, OH 43215
Tel: (614) 466-8980
mathura.sridharan@OhioAGO.gov

*Counsel for the State of Ohio*

/s/ Thomas T. Hydrick

Alan Wilson
Attorney General of South Carolina
Thomas T. Hydrick
Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

/s/ Whitney Hermandorfer

Jonathan Skrmetti
Tennessee Attorney General
and Reporter
Whitney Hermandorfer
Director of Strategic Litigation
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 741-7403
Whitney.Hermandorfer@ag.tn.gov

*Counsel for the State of Tennessee*


/s/ Stanford E. Purser

Sean D. Reyes
Utah Attorney General
Stanford E. Purser
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Tel: (801) 538-9600
spurser@agutah.gov

*Counsel for the State of Utah*


/s/ Michael R. Williams

Patrick Morrisey
Attorney General of West Virginia
Michael R. Williams
Solicitor General
Office of the West Virginia
Attorney General
State Capitol, Bldg 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
Tel: (681) 313-4550
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*


/s/ Ryan Schelhaas

Bridget Hill
Wyoming Attorney General
Ryan Schelhaas
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for the State of Wyoming*

## Certificate of Service

On August 9, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
Aaron L. Nielson

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,324 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
Aaron L. Nielson